Shayna Balch Santiago, SBN 024852
Lori A. Guner, SBN 031646
Jacob R. Valdez, SBN 035634
FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
Telephone: (602) 281-3400
Fax: (602) 281-3401
ssantiago@fisherphillips.com
lguner@fisherphillips.com
jvaldez@fisherphillips.com
Attorneys for Defendants

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher J. Houck, on behalf of himself and all those similarly situated,<br><br>  Plaintiff,<br><br>v.<br><br>Maricopa County,<br><br>  Defendant. | No. 2:23-cv-00068-DGC<br><br>**DEFENDANT'S RESPONSE AND OPPOSITION TO PLAINTIFF CHRISTOPHER J. HOUCK'S MOTION FOR CONDITIONAL CERTIFICATION UNDER THE FAIR LABOR STANDARDS ACT**<br><br>**(Oral Argument Requested)** |

FP 47686180.1

Defendant Maricopa County (the "County" and/or "Defendant"), by and through undersigned counsel, hereby submits its Response and Opposition to Plaintiff Christopher J. Houck's Motion for Conditional Certification Under the Fair Labor Standards Act ("FLSA"). The County requests the Court deny conditional certification because Plaintiff has not established that he is similarly situated to current and potential opt-in plaintiffs in this collective action. As a result, the County asks that the Court deny his request for conditional certification and issuance of a notice of lawsuit. This Response is more fully supported by the following Memorandum of Points and Authorities, all pleadings and papers on file in this action, and such matters as may be presented at oral argument.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

### I.   INTRODUCTION AND RELEVANT FACTUAL BACKGROUND

#### A.   Overview of the Maricopa County Sheriff's Office.

The Maricopa County Sheriff's Office ("MCSO") oversees law enforcement activities for Maricopa County, primarily serving unincorporated areas of the County as well as contracted services in cities and towns. **Exh. A, ¶1** (Declaration of Chief Barry Roska). For purposes of law enforcement, the county is divided into five geographical areas referred to as "Districts" as well as a "Lake Patrol." **Exh. A, ¶6**.

The MCSO is also divided into three bureaus: Enforcement, Custody and Compliance. **Exh. A, ¶7.** The Enforcement Bureau (the only Bureau relevant to this case) is further broken down into divisions such as Patrol Bureau-East (Patrol Districts I, VII, and Lake Patrol), Patrol Bureau-West (Patrol Districts II, III, and IV), Patrol Resources Bureau (Intelligence Information Division, Enforcement Support, Community Outreach, SWAT, Aviation, Extraditions, and Judicial Enforcement Division), Investigations Bureau (Special Investigations Division, Major Crimes Division, General Crimes Division and the Crime Lab). **Exh. A, ¶7**. Each division within the Patrol Bureau is overseen by a Deputy Chief. **Exh. A, ¶8**. Each district has a Commander (typically a Captain), Deputy Commander (a lieutenant assigned to the Patrol District to act on his

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

behalf when he is unavailable), additional lieutenants, uniformed sergeants (mid-level supervisors), patrol deputies and administrative staff. **Exh. A, ¶8**. Patrol Bureaus East and West employ the various Sheriff's deputies that can be seen patrolling Maricopa County's streets on a daily basis, along with their supervisors. Patrol deputies and sergeants are paid on an hourly basis and not considered exempt under the FLSA. **Exh. A, ¶9.** However, lieutenants are classified as exempt under the FLSA and are paid on a salary basis in excess of $684/week.[1] **Exh. A, ¶9.**

Plaintiff Christopher Houck has been a lieutenant since 2022 and has requested conditional class certification under the FLSA for the following group within the MCSO:

> All current and former lieutenants employed by Maricopa County in the Patrol Division from January 11, 2020 through the date FLSA Notice is distributed ("Patrol Lieutenants")

[Doc. 27, PMCC p. 1]. Based on the above language, it is unclear precisely which lieutenants Plaintiff seeks to include in the collective action. There is no "Patrol Division." Rather, there is an "Enforcement Bureau" with numerous distinct divisions thereunder – divisions which can vary widely from one another. Presumably Plaintiff only seeks class certification as to lieutenants within Patrol Bureaus East and West.[2]

**B.     The County Appropriately Classifies Lieutenants as Exempt.**

All sworn personnel in the MCSO fall under the umbrella of law enforcement personnel. However, each distinct position within the MCSO has a job description which sets forth the essential tasks of the position. Lieutenants within the Patrol Bureau-East and Patrol Bureau-West divisions are subject to the "Law Enforcement Lieutenant" job description. **Exh. A, ¶13 (Exh. 3).** The applicability of this job description to Lieutenants within the Patrol Bureau-East and West divisions is not in dispute.[3] The job

---

[1] Maricopa County's payroll system requires employees' pay to be entered as an hourly rate, even for employees who are salaried. **Exh. A, ¶¶9-10.**

[2] To the extent Plaintiff seeks class certification of a wider class of lieutenants in other Patrol Bureau divisions, those positions are vastly different and Plaintiff has not alleged facts setting forth alleged "substantial similarity".

[3] Plaintiff Houck concedes the applicability of the Law Enforcement Lieutenant job

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

description sets forth the primary job duties of the Law Enforcement Lieutenant position which include administration, incident management, career and professional development, supervision, community policing, and management. Absent from the lieutenant job description is the expectation that lieutenants conduct criminal investigations, respond to calls for service, or engage in patrol duties.

Separate job descriptions exist for sergeants and deputies (officers). The sergeant and deputy roles are heavily focused on patrol duties, criminal investigations, and responding to calls for service. The job description for Deputy Sheriff states that the primary duties of the position are criminal investigations, response to calls for service, patrol duties, training, and administration. **Exh. A, ¶11 (Exh. 1)**. The job description for Law Enforcement Sergeant states that the primary duties of the position are training, supervision, administration, patrol duties, and criminal investigations. **Exh. A, (Exh. 2)**. A chart comparing the essential job tasks of the lieutenant, sergeant and deputy positions attached hereto as **Exh. B**.

C.  **MCSO Policies and Procedures.**

The MCSO has numerous policies and procedures in place ranging from "General Policies and Procedures" that govern day-to-day operations to more specific "Enforcement Policies and Procedures" on discrete topics. The MCSO Command Responsibility policy was put into place to "ensure supervisors, at all levels, provide proper direction, coordination and control of subordinates." **Exh. A, ¶18 (Exh. 5)** (GB-2, p. 1). The policy defines a "Commander" as "[a]n employee with the rank of lieutenant or above" and defines a "First-Line Supervisor" as "[a]n employee with the rank of sergeant." **Exh. A, (Exh. 5)** (GB-2, p. 4). The policy specifically states that in order "to ensure accountability, a supervisor shall" perform tasks including, but not limited to, the following:

- Actively direct and supervise employees of a lower rank to ensure they perform assigned duties efficiently;

---

description to lieutenants in his Motion for Conditional Certification. Doc. 27.

3

FP 47686180.1

- Monitor situations in which subordinates are involved and ensure that proper actions are taken;
- Assume command of any situation coming to their attention that requires their involvement;
- Respond to emergencies as necessary and assume command until they are relieved by another supervisor assuming such command;
- Ensure that subordinates promptly and accurately complete all required reports on proper forms;
- Investigate reports of unlawful, improper, or immoral conduct of subordinates;
- Maintain a written record of the performance of each of their subordinate employees; and
- Document all tardies and early departures of employees.[4]

As the above supervisory job duties demonstrate, lieutenants are not required or expected to routinely engage in deputy level tasks (except in emergency or exigent circumstances) such as rescuing crime victims, detecting crimes, conducting criminal investigations, apprehending suspects, or interviewing/interrogating individuals. Instead, lieutenants are required to supervise their direct reports who carry out these basic law enforcement duties. Accordingly, to the extent Plaintiff is alleging lieutenants perform deputy level tasks "alongside the officers" on their teams, such an argument focuses on the degree and extent that individual lieutenants intentionally deviate from express expectations set forth in written job descriptions, policies and procedures.

**D.  Patrol Bureaus East and West and the MCSO CAD System.**

As set forth above, the Patrol Bureaus East and West are broken down into distinct districts. When "Calls for Service" (calls from members of the general public through 911 or directly with the MCSO) come in through the MCSO, they are dispatched to the various districts based on beat assignment. **Exh. A, ¶23.** Each incoming call is tracked through the MCSO Computer Assisted Dispatch ("CAD")

---

[4] The Command Responsibility policy further states that First-line supervisors (sergeants) are required to, among other things, respond to the scene of certain arrests such as assault or injury to a member of the public by a MCSO employee, use of force, felony pursuits, and critical incidents (i.e. use of force, death, discharge of a firearm by a MCSO employee). **Exh. A, (Exh. 5)** (GB-2).

4

FP 47686180.1

system. **Exh. A, ¶23.** If individual deputies personally witness a crime in progress, the deputy radios into dispatch and the activity is likewise tracked through the CAD system ("On View" or "Deputy Initiated Activity"). **Exh. A, ¶23.** Once a Call for Service or On View activity is entered into the CAD system, an "MC" number is generated for the incident. **Exh. A, ¶24.** The dispatcher will update CAD as the incident progresses. **Exh. A, ¶24.** If the incident rises to the level of an "Incident Report" needing to be generated, then an "IR" number is generated. **Exh. A, ¶24.** The CAD system tracks each incident through final disposition. **Exh. A, ¶24.**

Plaintiff is incorrect that lieutenants are required to login to the CAD system in order to be "be dispatched to law enforcement patrol calls." Doc. 27, 4:3-5. To the contrary, lieutenants (and higher ranks) should login to the CAD system when engaging in law enforcement services with the public, for internal tracking purposes since the CAD system is the data management tool used by the MCSO. **Exh. A, ¶25.** Once a lieutenant is logged into the CAD system, he/she is required to report status back to dispatch until they log off. **Exh. A, ¶26.** Status can range from being available, out of service, dispatched, enroute, or even on scene. **Exh. A, ¶26.** Often times, when a lieutenant is "out of service" they are performing supervisory or administrative work at the MCSO Patrol District. **Exh. A, ¶26.** Supervisory and administrative work can be specifically coded into the CAD system. **Exh. A, ¶26.**

### E. Primary Law Enforcement Lieutenant Job Duties

Contrary to Plaintiff's assertions in his Motion for Conditional Certification, the primary duties of a lieutenant are exempt in nature. Lieutenants in the East and West Patrol Bureaus perform primarily supervisory and/or administrative duties including, but not limited to, general administration, incident management, career and professional development, supervision, community policing, and management. Many lieutenants also sit on promotion boards, prepare district department budgets, conduct internal affairs investigations, and are involved in special administrative projects ranging from

5

performing an audit of law enforcement personnel, work on research projects, approve and provide overtime justifications and managing building remodels. **Exh. A, ¶¶13-14 (Exh. 3)**. Plaintiff Houck concedes that he performs at least some of these supervisory duties but downplays the predominance of these duties in his role as a lieutenant. Instead, Houck claims that his "primary job duties are law enforcement duties he typically performs alongside the officers on his team on a daily basis, including rescuing crime victims, preventing or detecting crimes, conducting investigations and inspections for violations of law, performing surveillance, pursuing, restraining, and apprehending suspects, detaining or supervising suspected and convicted criminals, interviewing witnesses, and interrogating suspects." Doc. 27, pp2:25-3:5. Notably these alleged "primary job duties" are nothing more than formulaic assertions that are taken directly from 29 C.F.R. §541.3(b)(1) and lack any specific factual support.

## II.      ARGUMENT

In 2018 the Ninth Circuit addressed the issue of class certification in FLSA collective action matters and approved of a two-step approach that, at the time, had been applied by other circuits. *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109 (9th Cir. 2018).[5] In *Campbell*, the Ninth Circuit held that courts typically have "substantial judicial discretion" in managing a collective action administration – i.e. "the form and timing of notice, the timing of motions, the extent of discovery before decertification is addressed…" *Id*. at 1110. Under the two-step approach, first "at or around the pleading stage, plaintiffs will typically move for preliminary certification." *Id*. at 1109. "Assuming the collective action has survived [this] earlier scrutiny, the second stage will come at or after the close of relevant discovery" when the employer moves for

---

[5] Since 2018, at least two Circuits have shifted from this two step approach and have, instead, required a plaintiff proceeding in an FLSA collective action to meet a higher level of initial scrutiny in order to obtain conditional certification. *See Swales v. KLLM Transp. Sers., LLC*, 985 F.3d 430 (5th Cir. 2021); *Clark et al., v. A&L Home Care & Training Center, LLC et al.,* 2022 WL 1597849 (6th Cir. 2022).

6

"'decertification' of the collective action for failure to satisfy the 'similarly situated' requirement in light of the evidence produced to that point." *Id.*

### A. Plaintiff Must Establish That He Is "Similarly Situated" to All the Other Potential Members of the Class.

The FLSA permits a plaintiff to maintain an action on "behalf of himself ... and other employees similarly situated." 29 U.S.C. § 216(b). Here, Plaintiff has moved for preliminary (or conditional) certification. This preliminary certification "refers to the dissemination of notice to putative collective members, conditioned on a preliminary determination that the collective as defined in the complaint satisfies the 'similarly situated' requirement of section 216(b)." *Campbell*, 903 F.3d at 1109. The FLSA does not define "similarly situated," but the Ninth Circuit has determined that to satisfy this element, "party plaintiffs must be alike with regard to some *material* aspect of their litigation." *Id*. at 1111, 1114. (emphasis in original). Courts have discretion to regulate the notice, if any, sent to "similarly situated" individuals in a collective action. *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 168-70 (1989); *Campbell*, 903 F.3d at 1110.

Court-facilitated notice is not mandatory or automatic. *Saleen v. Waste Management, Inc.*, 2009 WL 1664451, *3 (D. Minn. June 15, 2009) (notice should only be judicially authorized and facilitated in "appropriate cases") (citing *Hoffman-La Roche Inc.*, 493 U.S. at 170). This is because conditional certification imposes significant costs and burdens on both the parties and the Court, including "the expense of sending out notice to the putative collective members, the substantial widening of discovery, and the burden on the courts of administrating the [number] of claims brought ..." *Saleen*, 2009 WL 1664451, at *29. While the Court's analysis is less rigorous at the notice stage, unsupported assertions of FLSA violations are not sufficient to meet plaintiffs' burden. *Ellerd v. County of Los Angeles*, 2009 WL 982077, *3 (C.D. Cal. April 9, 2009) (quoting *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 990 (C.D. Cal. 2006)).

7

### 1. **It Is Undisputed That Patrol Lieutenants Have Been Treated as Exempt from Overtime For the Relevant Time Period.**

There is no dispute that the County treated its lieutenants as exempt from overtime under the FLSA. Plaintiff concedes this fact in his Motion for Conditional Certification. Doc. 27, p.4:7-8 ("the County classifies Houck and the Patrol Lieutenants as exempt managers and pays them a 'salary.'"). Instead, this case is premised on Houck's assertion that he and similarly situated lieutenants in the East and West Patrol Bureaus were primarily performing duties that were "nonexempt in nature" and, thus, they were misclassified as exempt from overtime. Doc. 27, p. 1:21-23.

### 2. **It Undisputed That The Law Enforcement Lieutenant Job Description Applies To All Lieutenants in the East and West Patrol Bureaus; The Job Description, on its Face, Shows That The Lieutenants' Primary Duties Are Exempt in Nature.**

There is similarly no dispute that the same Law Enforcement Lieutenant job description applies to lieutenants in the East and West Patrol Bureaus. Doc. 27, Exh. 3. This job description states that the primary duties of a Law Enforcement Lieutenant include administration, incident management, career and professional development, supervision, community policing, and management. **Exh. A, (Exh. 13, pp. 1-2)**. The MCSO Command Responsibility policy further states that lieutenants are expected to actively direct and supervise lower ranks, monitor situations in which subordinates are involved, assume command of any situation that requires their attention, and investigate reports of unlawful, improper, or immoral conduct of subordinates (i.e. internal affairs investigations). **Exh. A, (Exh. 5, pp. 7-8)**.[6]

Notably, while Plaintiff contends in his Motion that his and the opt-in's "primary duties are nonexempt in nature," he does not set forth any specific admissible facts in support of this contention. Plaintiff vaguely asserts that he "spends every day working

---

[6] Nowhere in the Law Enforcement Lieutenant job description or in any other MCSO policy or procedure does it state lieutenants are required to perform line-level deputy duties. On the other hand, these job duties are expressly listed in the job descriptions for Deputy Sheriffs and Law Enforcement Sergeants.

monitoring the police radio for patrol activity, so that he can respond to first responder law enforcement calls." But supervisors need to supervise, and mere observation of subordinates performing their duties does not convert an otherwise exempt duty into a nonexempt one. As set forth in the Command Responsibility policy, supervisors are required to "[m]onitor situations in which subordinates are involved." **Exh**. **A, (Exh. 5, p. 7)**. Plaintiff does not provide any specific facts or evidence that his primary duty as a lieutenant is patrolling the streets, pulling vehicles over, and performing other low ranking law enforcement activities. In fact, as set forth above, the County has offered objective evidence consisting of CAD reports that show Plaintiff and the opt-ins primary duties were supervising, not acting as line-level Sheriff's deputies.

### 3. The Court Should Consider the County's Evidence.

The County's attached evidence rebuts Plaintiff's claims that the County misclassified lieutenants. Indeed, Plaintiff's own performance evaluations and reports generated from the MCSO's CAD system contradict the assertions in his Motion for Conditional Certification. It is within the Court's discretion to consider the County's evidence when determining whether to grant a motion for conditional certification. *See Holt v, Rite Aid Corp.*, 333 F.Supp.2d 1265, 1274 (M.D. Ala. 2004) (in determining whether potential plaintiffs are similarly situated, the court should consider the submissions of both parties, not just the plaintiff).

Here, the County's evidence directly contradicts Plaintiff's assertions that the lieutenants were misclassified as exempt from overtime "when their job duties uniformly require them to perform nonexempt first responder duties as their primary and most important responsibility." Doc. 27, 9:7-9.  In actuality, review of reports generated from the MCSO's CAD patrol activity for Houck and the current opt-in plaintiffs show that from January 2023 through June 2023 they engaged in significant amounts of supervisory and administrative duties in comparison to lower ranking duties such as serving as a primary patrol unit, preparing reports, and traffic stops. *See* **Exh. C.** (Summary of all opt-ins supervisory duties); *see also* **Exh. A, (Exh. 11-25).** In

comparison, a report showing data for deputies who worked more than 200 hours between January 1, 2023 and March 31, 2023 shows:

- **Primary Responding Unit** – All deputies have served as the primary responding unit on a call for service at least 41 times. Over 75% of the Deputies have been the primary responding unit on over 100 calls for service. One deputy was the primary responding unit on 288 calls. In this same time period, Houck was the primary responding unit on 4 calls.

- **On View** – All Deputies have logged on view activities in excess of 32 times. Over 75% of the Deputies have logged over 50 on view activities. One deputy had 330 on view service calls. In this same time period, Houck had 7 on view service calls.

- **Reports Taken** – All Deputies have prepared at least 23 reports. Over 90% of the Deputies have prepared at least 30 reports. One deputy prepared 80 reports. In this same time period, Houck prepared 1 report.

A report was also generated to show the number of reports generated by all sworn members of the East and West Patrol Bureaus as compared to current opted-in lieutenants. This report shows that the opted-in lieutenants, prepared on average, 4.89 incident reports in 2022 as compared to an average of 68.96 incident reports prepared by all other members of East and West Patrol Bureau. **Exh. A, (Exh. 10).** [7]

This information demonstrates that Houck and the current opt-ins do not work "alongside" deputies on a daily basis. Rather, the evidence produced by the County shows that Houck and the current opt-ins performed significant amounts of supervisory and administrative duties and minimal, if any, non-exempt duties. Considering this contradictory evidence presented, it is abundantly clear that the potential opt-in plaintiffs as alleged are not similarly situated in that they primarily performed nonexempt duties.

### 4. Plaintiff Has Not Met the Burden of Demonstrating That the Putative Class Members Are Similarly Situated.

At this stage, Plaintiff bears the burden of establishing "substantial allegations" or demonstrating there is a "reasonable basis" to believe that Plaintiff and potential opt-in

---

[7] Report preparation in a law enforcement context is important. It is the responsibility of the primary responding sworn MCSO member to prepare the incident report.

10

plaintiffs are "similarly situated." *Campbell*, 903 F.3d at 1109. In order to demonstrate they are similarly situated, Plaintiff must show that potential party plaintiffs are alike with regard to a **material** aspect of litigation, such as by demonstrating factual or legal similarities that are material to the resolution of their case. *Id*. at 1114.

A court may deny the request for conditional certification with or without prejudice. *Id*. at 1109. A denial with prejudice is "premised on the party plaintiffs' failure to satisfy the 'similarly situated' requirement of section 126(b), [and] it functions as an unfavorable adjudication of the right to proceed in a collective." *Id.* When conditional certification is denied with prejudice "if opt-in plaintiffs have already joined, they will be dismissed without prejudice to the merits of their individual FLSA claims, and the original plaintiff will be left to litigate alone." *Id*.

### 5. **Plaintiff Has Not Demonstrated He Is Similarly Situated to Other Potential Party Plaintiffs as to a Material Aspect of the Case.**

The purpose of the similarly situated analysis "is not simply to identify shared issues of law or fact *of some kind*, but to identify those shared issues that will collectively advance the prosecution of multiple claims in a joint proceeding." *Campbell*, 903 F.3d at 1115. (emphasis in original). "[W]hat matters is not the raising of common questions – even in droves – but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (internal citations omitted).

#### a) **Houck Cannot Establish That He Was Similarly Situated to the Other Lieutenants.**

While not dispositive, courts routinely consider the duties set forth in an employer's job description in assessing the primary job duties element of a misclassification claim. [8] Houck has not asserted that the job duties set forth in the Law

---

[8] The mere existence of a common FLSA exempt designation or a job description is not sufficient to establish the "similarly situated" requirement for conditional certification on its own. *Guillirn v. Marchalls of MA, Inc.,* 2012 WL 2588771 at *1 (2012 S.D. N.Y.); s*ee Khan v. Airport Mgmt. Servs., LLC,* 2011 WL 5597371, at *4 (S.D.N.Y. 2011); *Vasquez v. Vitamin Shoppe Indus. Inc.,* 2011 WL 2693712, at *4 (S.D .N.Y. 2011).

11

FP 47686180.1

Enforcement Lieutenant job description are incorrect or manufactured. Instead, Houck has argued that "his primary and most important duty as a Patrol Lieutenant is law enforcement acting as a first responder" when he "spends every day working monitoring the police radio for patrol activity" and because he is "required to respond to all high-level patrol calls and report as [a] first responder[] in the field." Doc. 27, p. 3:5-12. These purported requirements are neither listed in the job description nor in the policies relied upon by Houck. Houck also recites language taken nearly verbatim from 29 C.R.F. § 541.3(b)(1) when he states in a conclusory fashion that he performs the following duties alongside officers on his team: "rescuing crime victims, preventing or detecting crimes, conducting investigations and inspection for violations of law, performing surveillance, pursuing, restraining and apprehending suspects, detaining or supervising suspected and convicted criminals, interviewing witnesses, and interrogating suspects." Doc. 27, pp. 2:25-3:5. Plaintiff's recitation of the Code of Federal Regulations is precisely the type of conclusory and unsupported allegation that is insufficient, as a matter of law, for Houck to meet his burden of proof for conditional certification. *Ellerd v. County of Los Angeles*, 2009 WL 982077, *3 (C.D. Cal. April 9, 2009) (quoting *Edwards v. City of Long Beach*, 467 F.Supp.2d 986, 990 (C.D. Cal. 2006)).

Finally, Houck claims that his "discretion in his administrative or supervisory role is limited by the decisions of his Captain, who has actual decision making authority regarding management and operations," that his primary duty "is not management," that he "does not have the authority to hire and fire employees and does not provide input regarding their employment or promotion," and that he "does not have the authority to hire and fire employees and does not provide input regarding their employment or promotion." Doc. 27, p. 3:14-22. Plaintiff's assertions are contradicted by his own performance evaluation which clearly states that he "placed a sergeant who reports to him on an action plan," and that Houck "assumed command of District 7" when that Commander/Captain was gone on vacation. **Exh. D**. Moreover, County records show that Houck has conducted internal affairs investigations of at least 6 subordinates since

12

he assumed the role of lieutenant. **Exh. A (Exh. 15)**

### b) There Is No Evidence of a Common Policy or Plan by the County That Violates the FLSA.

In keeping with this requirement that Plaintiff must show a material legal or factual similarity, courts have held that "[c]onditional certification at this first stage requires a plaintiff to make 'substantial allegations that the putative class members [are] subject to a single ***illegal*** policy, plan, or decision.'" *Alonzo v. Akal Security, Inc.*, 2017 WL 5598227, at *2 (D. Ariz. 2017); *see also Campbell*, 903 F.3d at n. 21.

Here, because Plaintiff concedes that lieutenants in the East and West Patrol Bureaus are treated as exempt from overtime and are governed by the same job description, he should be required to establish a common policy or practice of misclassification. Plaintiff has offered no such evidence other than conclusory and unsupported allegations. Moreover, the assessment of misclassification is a highly fact specific analysis that requires an initialized assessment of an employee's actual job duties and comparison of those duties against the applicable exemption test. 29 C.F.R. §541.106(a).

Plaintiff cannot establish a common "policy" requiring lieutenants to perform non-exempt duties. Plaintiff's Motion relies solely on his own declaration and the declarations from three other opt-ins. These declarations are, on their face, insufficient because they present no admissible facts in support of their conclusory reliance on the Code of Federal Regulations and are themselves factually contradictory. "This Court has rejected such a 'bare-bones' evidentiary showing indicating that a plaintiff has 'apparently rest[ed] on the relatively light burden that FLSA [plaintiffs] generally carry during the first stage of the certification process.'" *Alonzo*, 2017 WL 5598227, *3. Further, assertions in declarations "based on 'beliefs' and 'conversations' are conclusory and provide no meaningful details, thus they fall short of the 'substantial' and 'detailed' allegations necessary to satisfy the 'similarly situated' element." *Palacios v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 2011 WL 6794438, *5 (S.D. Fla. April 19, 2011).

13

FP 47686180.1

Even a brief review of Plaintiff's supporting declarations demonstrates that they clearly fall into this category of conclusory, unsupported claims. The proffered declarations fall significantly "short of the 'substantial' and 'detailed' allegations necessary to satisfy the 'similarly situated' element." *Palacios*, 2011 WL 6794438, at *5.

      **c)**    **Plaintiff Has Not Demonstrated Common <u>Material</u> Facts to Show the Putative Class Is Similarly Situated.**

Plaintiff has not established how his claims are factually similar to those of other potential class members. "What matters is not just *any* similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiff's claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Campbell*, 903 F.3d at 1115 (emphasis in original). "In the absence of such a policy or practice, and in the absence of allegations of any other similarity of law or fact material to the disposition of the Officers' claims, the Officers were not "similarly situated" within the meaning of the FLSA." *Id*. at 1099. Here, the evidence demonstrates that the potential party plaintiffs are **not materially alike**.

Lieutenants in the East and West Patrol Bureaus are assigned to different Captains who are responsible for overseeing patrol districts and delegating supervisory duties to their lieutenants. **Exh. A, ¶46**. As the attached rosters show, each of the six patrol divisions have between two and three lieutenants. One of the lieutenants is typically appointed as "Deputy Commander" who assumes the responsibilities of the Captain when the Captain is unavailable. **Exh. A, (Exhs. 26-31)**. Notably, Houck filled in as Commander/Captain in his Commander's absence as noted in his yearly performance evaluation. **Exh. D.** The Captain also appoints a "Watch Commander" who is responsible for Commander duties over the graveyard shift. **Exh. A, ¶46.** Since these Deputy Commanders and Watch Commanders assume the responsibilities of the Commander/Captain in his absence, they cannot be similarly situated to the other lieutenants not in those positions.

14

FP 47686180.1

Lieutenants also supervise different squads. By way of example, Houck oversees District 1, Squad 2. His assigned days are Wednesday through Saturday (days). There are also two additional Lieutenants in his district: 1) Lt. Jason Thomas (who has opted in); and 2) a Lt. who oversees Squads 3 and 4. **Exh. A, (Exh. 26).** Both of these lieutenants have different shifts. Lieutenants in the various districts typically supervise one or two squads (total of 15 to 25 employees). Some squads include mostly Sheriff's Deputies who perform patrol duties. Other squads also include administrative personnel. **Exh. A (Exhs. 26-31).** This variation of number of squads and patrol deputies further makes the lieutenants not similarly situated.

Lieutenants' regular shift hours can also vary greatly. MCSO lieutenants are typically scheduled to work one of the following schedules (although hours worked can vary based on staffing needs): (a) eight hrs/day x five days a week, (b) 10 hrs/day x four days a week, or (c) 12 hrs/day x three days a week. **Exh. A, ¶22**. By way of illustration, Houck was scheduled to work 10 hours a day four times per week. **Exh. E.**

Plaintiff's Motion relies heavily on the allegedly common nature of the work performed by lieutenants and the alleged fact that all lieutenants were performing nonexempt law enforcement duties. In actuality, not all lieutenants have similar job duties, as set forth by the summary of CAD data above. Indeed, from January 1, 2023 through March 31, 2023, the current opt-in lieutenants:

- logged between 0 and 86 supervisory duties;
- logged between 0 and 155 instances as the primary responding unit;
- prepared between 0 and 2 reports; and
- conducted between 0 and 18 traffic stops. **Exh. C**

Some of the opted in lieutenants don't typically work in the East or West Patrol Bureaus. For example, opt-in Todd Brice is actually assigned to the Bureau of Internal Oversight (BIO) unit within the Compliance Bureau. **Exh. A, ¶33.** Similarly, Rudy Acosta was transferred to the General Crimes Division in the Investigations Bureau. **Exh. A, ¶31.** Finally, Ryan Neville was transferred to Narcotics. **Exh. ¶41.** Moreover,

15

FP 47686180.1

the following lieutenants have completed or are in the process of conducting Internal Affairs investigations (assigned since January 1, 2020): Jackson, Houck, Keller, Rosenberger, Thomas, Vance, Halverson, Bocardo, Neville and Brice. **Exh. A, ¶15.**

The lieutenants' supervisory duties also vary greatly. Lieutenants Halverson and Hunter have both overseen hiring processes for members of the MCSO. **Exhs F & G.** Lieutenants Brice, Neville, and Vance have conducted formal training. **Exhs. I, J, & K.** Lieutenants Brice, Halverson, Houck, Keller, Neville, Rosenberg, and Vance have all served in some capacity as deputy commander, watch commander, or filled in for one of the two commander positions. **Exhs. L, M, G, D, N, J, O, & K.** Lieutenants Brice, Halverson, Hunter, and Houck have participated in the discipline of subordinates. **Exhs. P, G, Q & D.**

Finally, many lieutenants in the East and West Patrol Bureaus drive unmarked police vehicles.[9] Plaintiff has not identified whether he drives a marked or unmarked patrol vehicle, and he has similarly not identified whether his similarly situated counterparts drive marked or unmarked vehicles. MCSO has offered evidence that most lieutenants drive unmarked vehicles and that barring extraordinary circumstances, unmarked vehicles are not allowed to be used to initiate traffic stops. **Exh. A, ¶21.**

These above significant differences demonstrate a lack of material facts in common between Plaintiff and other potential collective class members. Because Plaintiff cannot demonstrate a legal or factual similarity material to the resolution of this matter, his request for conditional certification should be denied. *Campbell*, 903 F.3d at 1115.

---

[9] Deputies and sergeants share patrol vehicles that are conspicuously marked with the MCSO logo and text. **Exh. A, ¶20**. However, detectives and law enforcement lieutenants are typically issued unmarked inconspicuous SUVs, trucks, or sedans for their use. Occasionally lieutenants will request use of a marked patrol vehicle if their individually issued vehicle is being serviced, but this is the exception to the general rule. **Exh. A, ¶20**.

16

FP 47686180.1

### III. IF THE COURT IS INCLINED TO GRANT CONDITIONAL CERTIFICATION, DEFENDANT RESPECTFULLY SUBMITS THAT A REVISED 216(B) NOTICE SHOULD BE SENT BY THE COUNTY OR A THIRD-PARTY ADMINISTRATOR WITH A 45 DAY OPT-IN PERIOD.

Federal courts have held that individuals have a privacy interest in not having names and addresses disclosed without their consent. *See U.S. Dep't of Defense v. Fed. Labor Relations Auth.*, 510 U.S. 487, 501 (1994). This is particularly important here when the potential opt-in class members are Sheriff's Deputies. As a result, the County requests that instead of disclosing contact information to Plaintiff, the County send out the approved Notice via email and mail as directed, or that this responsibility be delegated to a third-party administrator. *See Lewis v. Wells Fargo & Co.*, 669 F.Supp.2d 1124, 1128 (N.D. Cal. Oct. 26, 2009) (requiring notice by third-party claims administrator). Individuals who choose to opt-in to the action will provide their name and contact information on the returned consent form. Only in returning a completed consent form does an individual indicate a willingness to participate in the action, to be represented by Plaintiff's counsel, and, impliedly, to the disclosure of private information. No compelling reason justifies the production of this private information to Plaintiff. In the alternative, the County proposes that it only be ordered to provide Plaintiff with last known addresses and email addresses.

Additionally, Plaintiff asks the Court to approve an opt-in period that extends for 90 days. That time period is excessive given the circumstances of this case, and the County requests a shorter 45-day opt-in period. *See Baden-Winterwood v. Life Time Fitness*, 2006 WL 2225825, *8 (S.D. Ohio, Aug. 2, 2006). An opt-in period of 45 days is sufficient barring extraordinary circumstances. As no such circumstances are present here the Court should limit the opt-in period to forty-five (45) calendar days.

### IV. CONCLUSION

The County requests this Court deny Plaintiff's Motion for Conditional Certification with prejudice and deny Plaintiff's request to send out notice to potential opt-in plaintiffs.

17

FP 47686180.1

RESPECTFULLY SUBMITTED this 17th day of July 2023.

          FISHER & PHILLIPS LLP

          By /s/ Shayna Balch Santiago
              Shayna Balch Santiago
              Lori A. Guner
              Jacob R. Valdez
              3200 N. Central Avenue, Suite 1550
              Phoenix, Arizona 85012-2487
              Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that on July 17, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Ty D. Frankel
Yen Pilch Robaina & Kresin PLC
6017 N. 15th Street
Phoenix, Arizona 85014
tdf@yprklaw.com
Attorneys for Plaintiff

Patricia N. Syverson
Yen Pilch Robaina & Kresin PLC
9655 Granite Ridge Drive, Suite 200
San Diego, California 92123
pns@yprklaw.com
Attorneys for Plaintiff

 s/ Michelle C. Xochicale

FP 47686180.1