Shayna Balch Santiago, SBN 024852
Lori A. Guner, SBN 031646
David G. Myers, SBN 038484
FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
Telephone: (602) 281-3400
Fax: (602) 281-3401
ssantiago@fisherphillips.com
lguner@fisherphillips.com
dmyers@fisherphillips.com
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Christopher J. Houck, on behalf of himself and all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Maricopa County,<br><br>Defendant. | No. 2:23-cv-00068-DGC<br><br>**DEFENDANT'S MOTION TO DECERTIFY PLAINTIFFS' COLLECTIVE ACTION**<br><br>**(Oral Argument Requested)** |

Defendant Maricopa County (the "County" and/or "Defendant"), by and through undersigned counsel, moves for decertification of the collective action conditionally certified by the Court on October 25, 2023. (Doc. 38). This Motion is supported by the County's Separate Statement of Facts in Support of its Motion for Summary Judgement and Motion to Decertify ("SOF"), all pleadings and papers on file, and the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     INTRODUCTION**

Plaintiff Christopher Houck filed this lawsuit on January 11, 2023, on behalf of himself and all those similarly situated. (Doc. 1). Plaintiff claims that he and the other Plaintiffs were misclassified as exempt under the Fair Labor Standards Act ("FLSA") and were not paid for

overtime hours worked. Specifically, Plaintiff alleges that his primary duty as a Patrol Lieutenant is "law enforcement" which is non-exempt in nature. (Doc. 1, ¶ 20). Plaintiff moved for conditional certification on April 11, 2023. (Doc. 27).

On October 25, 2023, the Court granted Plaintiff's Motion for Conditional Certification and certified a collective composed of "all current and former lieutenants from Patrol Divisions East and West who worked for Defendant at any time from January 11, 2020, to the present." (Doc. 38, at 11:18-22). In doing so, the Court rejected Defendant's argument that Plaintiffs had failed to establish that they are materially alike, noting that "[a]ny disparities in the factual employment situations of any plaintiffs who choose to opt in should be considered during the court's second tier analysis[.]" (Doc. 38, at 9:3-13 (citations omitted)). The Court ultimately found that "Plaintiffs sufficiently allege that they are alike with regard to a material aspect of this litigation – namely, that they all have the primary duty of law enforcement." (Doc. 38, at 7:21-22).

Now, after almost two years of discovery, the evidence establishes that Plaintiffs cannot meet their strict burden of proving they are "similarly situated" under the decertification analysis set forth in *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018). The discovery record and multiplicity of first responder and exemption elements that must be considered confirms that collective treatment is not feasible.

The disposition of Plaintiffs' FLSA claims ultimately depends on whether they are exempt from overtime under one or more of the FLSA's exemptions. Because this case turns on the applicability of the one or more exemptions, collective treatment is only appropriate if Plaintiff Houck and Opt-In Plaintiffs are similar in ways that are material to the issue of whether any exemptions apply. Whereas Plaintiffs argue that they are misclassified because their primary duty is performing non-exempt first responder duties, Defendant maintains that Plaintiffs are properly classified because their primary duty is performing exempt duties that qualify them for the FLSA's executive, administrative, or highly compensated employee exemptions. The dispute over Plaintiffs' primary duties is therefore decisive in this case, and the decertification analysis turns on whether Plaintiffs are similarly situated with respect to

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

their primary duties, and whether their primary duties disqualify them from the FLSA's overtime requirement.

Even assuming Plaintiffs' evidence to be true for purposes of the decertification analysis, Plaintiffs' testimony regarding their day-to-day job duties and responsibilities varied considerably from person to person. Because Plaintiffs' job duties and responsibilities varied significantly, Plaintiffs are not similarly situated for purposes of evaluating their exempt status. Resolution of Plaintiffs' claims would require individual analysis of each Plaintiff's job duties at summary judgment or separate mini trials for each Plaintiff, thereby circumventing the purpose of a collective action. Accordingly, decertification this collective is appropriate.

## II.    ARGUMENT

### A.    Plaintiffs' Stringent Burden of Showing They Are "Similarly Situated"

The FLSA provides that a plaintiff may sue on behalf of himself and other "similarly situated" employees. 29 U.S.C. § 216(b). The Ninth Circuit follows a two-step approach in deciding whether to grant collective action status. *Campbell*, 903 F.3d at 1109. "First, at or around the pleading stage, plaintiffs will typically move for preliminary certification." *Id.* At step one, the court will grant preliminary certification if "the collective as defined in the complaint satisfies the 'similarly situated' requirement of section 216(b)." *Id.* "Assuming the collective has survived its earlier scrutiny, the second stage will come at or after the close of relevant discovery." *Id.* At the second step, "[t]he employer can move for 'decertification' of the collective action for failure to satisfy the 'similarly situated' requirement in light of the evidence produced to that point," and "[t]he district court will then take a more exacting look at the plaintiffs' allegations and the record." *Id.*

*Campbell* clarified that "similarly situated" means "that party plaintiffs must be alike with regard to some *material* aspect of their litigation." *Id.* at 1114 (emphasis in original). Specifically, the court explained that "a collective can only be maintained [] to the extent party plaintiffs are alike in ways that matter to the disposition of their FLSA claims." *Id.* Therefore, "[i]f the party plaintiffs' factual or legal similarities *are* material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Id.* (emphasis in

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

original). The court elaborated that "what matters is not just *any* similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiffs' claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1115 (emphasis in original).

However, the court did not dispel that "'procedural considerations' can never justify decertification." *Id.* at 1115-16. "A 'collective' action in which, as a practical matter, no material dispute truly could be heard on a collective basis would hardly be consistent with the FLSA's remedial purpose." *Id. See also Campanelli v. Image First Healthcare Laundry Specialists, Inc.*, No. 15-CV-04456-PJH, 2018 WL 6727825, at *6 (N.D. Cal. Dec. 21, 2018) (at the decertification stage, the court may consider "the practical consideration of manageability or efficiency that permeated prior district court FLSA certification jurisprudence" to the extent those considerations show that the collective mechanism is "truly infeasible") (quoting *Campbell*, 903 F.3d at 1117).

As to the standard for evaluating a motion for decertification, *Campbell* concluded that when "decertification overlaps with the merits of the underlying FLSA claims, the summary judgment standard is the appropriate one." *Campbell*, 903 F.3d at 1119. The standard is "whether sufficient evidence exists to preclude a judgment as a matter of law because, viewing the competent evidence in the light most favorable to the nonmoving party, the trier of fact could properly find for the nonmoving party." *Id.* at 1118. Even at the decertification stage, the plaintiff bears the burden to show that collective treatment is appropriate, which is "a heavier burden" than at the notice stage. *Id.* at 1117-18 (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008)).

Viewing the evidence in the light most favorable to Plaintiffs here, collective treatment is infeasible, and the collective should be decertified.[1]

**B.** **Decertification of the FLSA Collective Is Warranted Because Plaintiffs Cannot Meet Their Burden to Show That They Are "Similarly Situated"**

---

[1] For purposes of this motion only, the County assumes Plaintiffs' testimony and other evidence to be true.

In this case, Plaintiffs allege that they are non-exempt under 29 C.F.R. § 541.3(b) ("First Responder Regulation") because their "primary and most important duty as a Patrol Lieutenant constitute law enforcement first responder duties." (Doc. 1, ¶ 21). As set forth in Defendant's Motion for Summary Judgement lodged under seal at Doc. 153, Plaintiffs do not fall under the First Responder Regulation because their primary duty qualifies them for the FLSA's executive, administrative, and/or highly compensated employee exemptions.

Ultimately, the disposition of Plaintiffs' FLSA claims depends on whether they are exempt from overtime pay under one of these exemptions. Because this case turns on the applicability of one or more of these exemptions, collective treatment is only appropriate under § 216(b) if Plaintiff Houck and Opt-In Plaintiffs are similar in ways that are material to the issue of whether any of these exemptions apply. *Campbell*, 903 F.3d at 1117. The decertification analysis, thus, turns on whether Plaintiffs are similarly situated with respect to their ***primary duties***, and whether their primary duties disqualify them from the FLSA's protections. These are the factual and legal issues "material to the resolution of the party plaintiffs' claims." *Id.* at 1115. *See also Maestas v. Day & Zimmerman, LLC*, 664 F.3d 882, 827 (10th Cir. 2012) ("In FLSA cases, a court must first determine the employee's primary duty, and then determine whether that primary duty disqualifies the employee from FLSA's protections.") (citation omitted).

For the reasons identified below, Plaintiffs have failed to produce sufficient evidence that this case should continue as a collective action because they fail to provide any evidence to demonstrate that Plaintiff Houck and Opt-In Plaintiffs share legal or factual similarities material to the dispositions of their claims. *Campbell*, 903 F.3d at 1117.

### 1. *Plaintiffs Cannot Rely on Generalized Evidence to Show They are "Similarly Situated"*

In their motion for conditional certification, Plaintiffs specifically identify the County's uniform job description for all Patrol Lieutenants, uniform compensation and overtime policies applicable to all Patrol Lieutenants, and uniform policy of classifying all Patrol Lieutenants as exempt to show that they are "similarly situated" with respect to whether any

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FLSA exemption applies. (Doc. 27, § 3.A.2.). However, Plaintiffs' reliance on such generalized evidence to show that they are similarly situated is misplaced.

First, the Patrol Lieutenants cannot have it both ways and argue, on the one hand, that a uniform job description shows that they are similarly situated while also arguing that their actual day-to-day job duties, not the job description, govern. For example, in *Green v. Harbor Freight Tools USA, Inc.*, the court held:

> Plaintiffs offer testimony from individual Store Managers that the written job description does not accurately reflect their actual day-to-day duties. Thus, Plaintiffs may not rely on the job description itself as generalized evidence of the scope and similarity of their daily activities. Instead, the Court must conduct a fact-intensive inquiry into the daily activities of each individual plaintiff in order to adequately identify the actual scope of Plaintiffs' job duties to determine the extent and consequences of any disparities among them.

888 F. Supp. 2d 1088, 1099 (D. Kan. 2012). *See also Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 579 (E.D. La. 2008) (holding that "plaintiffs maintain that it is their day-to-day responsibilities, not their job descriptions, that render them misclassified. Therefore, the Court must look beyond the nominal job description of [plaintiffs'] job responsibilities to determine whether plaintiffs are similarly situated with respect to their actual job duties."); *Smith v. Heartland Auto. Servs, Inc.*, 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005) (not considering a job description that the employees largely disavowed). Here, as in *Green*, some Plaintiffs alleged the Patrol Lieutenant job description was incomplete, while others agreed that it accurately describes their duties and responsibilities as a Patrol Lieutenant, which confirms the need for individualized inquiry.[2] (SOF, ¶ 14).

[2] Plaintiff Houck agrees that the job description "accurately summarize[s] the essential job tasks of a law enforcement lieutenant." (SOF, ¶ 14). Plaintiff Halverson testified that "[a] lieutenant does all of these functions, but this list is not all-inclusive," that the "job description does not include the requirement of actually taking the calls for service and being the first responder on scene," and that "some of the items mentioned simply don't exist." (SOF, ¶ 14). Plaintiff Freeman agreed that the job description does not list any job tasks that lieutenants do not do but testified that lieutenants "may be required to perform other related duties as assigned." (SOF, ¶ 14). Plaintiff Jackson testified that the job description "is not all inclusive" because "every position doesn't always do it all" and "it won't include every lieutenant in every position because each district is different." (SOF, ¶ 14). Plaintiff Keller testified that the job description "doesn't show anything about the first part of us being deputies and what we do as a deputy" and "just show[s] you what your management role is;" testified "I don't pull productivity reports or any of that, and I don't do anything with

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57041449.1

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

Second, and for similar reasons, Plaintiffs may not rely on the County's uniform policy of classifying Patrol Lieutenants as exempt. *See In re Wells Fargo Home Mortg. Litig.*, 571 F.3d 953, 959 (9th Cir. 2009) ("The fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties."); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1131 (N.D. Cal. 2011) ("The Ninth Circuit [has] made clear . . . that an analysis of what job duties each employee actually performed is more probative than an employer's classification policy when considering whether plaintiffs are similarly situated.") (citation omitted); *Esparsen v. Ridley's Fam. Markets, Inc.*, No. 18-cv-01556-RM-GPG, 2022 WL 1092136, at *3 (D. Colo. Apr. 12, 2022) ("General allegations of an overarching policy [of misclassification] are insufficient to establish similar employment settings, however, and the Court is not persuaded that the assistant managers experiences were similar enough to say that they shared factual nexus regarding their status.").

### 2. Discovery Confirms that Plaintiffs are not "Similarly Situated" For Purposes of Determining Whether Their Primary Duty is Exempt or Non-Exempt Work

As the preceding section makes clear, Plaintiffs may not rely on generalized evidence to show that they are similarly situated with respect to whether they are exempt or non-exempt employees under the FLSA. This is because in FLSA misclassification cases like this, "courts have rejected similar arguments and made clear that the decertification analysis must turn on whether the class members were actually performing similar duties." *Guanzon v. Vixxo Corp.*, No. CV-17-01157-PHX-DWL, 2019 WL 1586873, at *6 (D. Ariz. Apr. 12, 2019).

The opposite is true here. The Plaintiffs' testimony confirms that each Plaintiff was not actually performing similar duties. "As such, the disposition of each Plaintiffs' FLSA claims will depend on evidence that is not common to the collective, i.e., Plaintiffs' testimony and other evidence regarding their individual circumstances and how they completed their day-to-day tasks[,] . . . [and] [t]hat inquiry will also require credibility assessments of Plaintiff's

budgeting;" and further testified "I don't disagree with [the essential job tasks]. I just think they're vague." (SOF, ¶ 14).

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

1   testimony." *Julian v. MetLife, Inc.*, No. 17-cv-957 (AJN), 2021 WL 3887763, at *3 (S.D.N.Y.

2   Aug. 31, 2021) (granting decertification under the *Campbell* standard because the plaintiffs'

3   testimony and other evidence demonstrated "varied experiences" involving exempt and non-

4   exempt work). *See also Myers v. HertzCorp.*, 624 F.3d 537, 548 (2d Cir. 2010) ("[W]hether

5   plaintiffs were *entitled* to overtime under the FLSA . . . is a complex, disputed issue, and its

6   resolution turns on exemption, which in turn will require the district court to decide a number

7   of subsidiary questions involving whether plaintiffs fall within the Labor Department's criteria

8   for" the exemptions at issue.) (emphasis in original). Similarly here, resolution of Plaintiffs'

9   claims would require multiple mini trials for each Plaintiff on the exemption issue alone,

10  notwithstanding the separate issue of whether each Plaintiff worked more than 40 hours in

11  any one workweek.

12      Several courts in this district have decertified FLSA collective actions under the

13  *Campbell* standard where the plaintiffs failed to demonstrate material factual or legal

14  similarities of exempt status within the collective class. *See, e.g., Guanzon*, 2019 WL 1586873,

15  at *7 (granting decertification where plaintiffs "provided divergent testimony" concerning the

16  third element of the administrative exemption, which the court held  "aren't immaterial

17  differences—they go to the heart of the merits issue to be decided at trial, which is whether

18  each [plaintiff] was properly classified as exempt under the administrative exemption because

19  he or she had a 'primary duty that includes the exercise of discretion and independent

20  judgment with respect to matters of significance'"); *Weeks v. Matrix Absence Mgmt. Inc.*, No.

21  CV-20-00884-PHX-SPL, 2022 WL 17104261, at *3 (D. Ariz. Nov. 21, 2022) (granting

22  decertification where employees' "discretion was constrained by varying degrees such that the

23  administrative exemption may apply to some members of the collective class and not others").

24      In this case, any attempt at an effective trial of each Plaintiff's misclassification claim

25  on a collective basis would prove infeasible, if not impossible. Discovery has proven that

26  Plaintiffs are not similarly situated on the determinative issue of whether they are exempt

27  from FLSA's overtime requirement, and resolution of each Plaintiff's misclassification claim

28  will require the factfinder to engage in multiple fact-intensive and highly individualized

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

inquiries for each Plaintiff. Given the number of exemptions involved in this case and the wide variety of actual duties performed, the multiple permutations of the exemptions and duties analysis are considerable.

Moreover, Plaintiffs are not similarly situated in that there is wide variation amongst them with regards to their duty assignments. As set forth below, the Maricopa County Sheriff's Office ("MCSO") is comprised of numerous districts and support divisions. The Court previously ruled that this FLSA collective is limited to only those Patrol Lieutenants in Patrol Bureaus East and West. (Doc. 38, at p.11). However, it is commonplace for Patrol Lieutenants within MCSO to transfer in and out of districts or support divisions, and these duty assignments may or may not be in Patrol Bureaus East or West. As but one example, named Plaintiff Houck was in District 7 from April 4, 2022, to April 18, 2022. (SOF, ¶ 19). He was then transferred to District 1 where he worked through January 19, 2025. (SOF, ¶ 20). As of January 20, 2025, he is in Court Security, a division of the Support Services Bureau, which is not in Patrol Bureaus East or West. (SOF, ¶¶ 1, 21). This type of movement (if not more movement) is typical of the Plaintiffs. Accordingly, the Court will need to conduct individualized assessments for each duty assignment each Patrol Lieutenant had during the relevant time period to assess the duties performed during that time period and potential damages. As set forth below, the duties vary widely from position to position.

Simply put, "a factfinder would be unable to determine that all plaintiffs in the collective are either exempt or non-exempt in one swoop." *Julian*, 2021 WL 3887763, at *3. Plaintiffs have merely provided common questions while providing wildly different answers, making collective treatment of this case "truly infeasible." *Campbell*, 903 F.3d at 1117.

> **3.    *The Collective Must Be Decertified Because Determination of Whether the Patrol Lieutenants' Primary Duties Qualify Them Under the Executive, Administrative, or Highly Compensated Employee Exemptions Requires Individualized Analysis***

The dispute over Plaintiffs' primary duties is decisive in this case. To be exempt under the executive or administrative exemptions to FLSA's overtime protections, an employee's primary duty must be managerial or administrative. *See* 29 C.F.R. § 541.100(a)(2) (executive

employee's primary duty must be "management of the enterprise); § 541.200(a)(2)–(3) (administrative employee's primary duty must be "performance of office or non-manual work directly related to . . . management or general business operations" and "include[] the exercise of discretion and independent judgment with respect to matters of significance"). To be exempt under the highly compensated employee exemption, an employee's primary duty must include "performing office or non-manual work." § 541.601(d).

An employee's "primary duty" is the "principle, main, major or most important duty that the employee performs" after analyzing "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Each Plaintiff must perform exempt work as their primary duty but performing both exempt and non-exempt work does not necessary defeat exempt status. 29 C.F.R. § 541.106(a)–(b). Generally, an employee satisfies the primary duty requirement if he spends more than 50 percent of his time performing exempt work, but "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." § 541.700(b). Factors to consider regarding an employee's primary duty include: (1) "the relative importance of the exempt duties as compared with other types of duties," (2) "the amount of time spent performing exempt work;" (3) "the employee's relative freedom from direct supervision;" and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." § 541.700(a).

However, the FLSA exemptions for executive, administrative, and highly compensated employees do not apply to "first responders." 29 C.F.R. § 541.3(b)(1). Individuals who qualify as "first responders" are employees whose primary duty is related to emergency response or law enforcement. § 541.3(b)(1). Such employees are not exempt executive employees "because their primary duty is not management of the enterprise in which the employee is employed or a customarily recognized department or subdivision thereof as required under § 541.100." § 541.3(b)(2). Such employees are not exempt administrative employees "because their primary duty is not the performance of work directly

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

related to the management or general business operations of the employer or the employer's customers as required under § 541.200." § 541.3(b)(3). Similarly, such employees are not exempt highly compensated employees "because their primary duty by definition is not 'office or non-manual' work." *Benavides v. City of Austin*, No. A-11-CV-438-LA, A-11-CV-471 LY, 2012 WL 12882001, at *15 (W.D. Tex. Sept. 21, 2012) (citing 29 C.F.R. § 541.601(d)). "Whether an employee is categorically non-exempt under the First Responder Regulation or is considered exempt under the executive, administrative, or [highly compensated employee] exemptions depends on that employee's primary duty." *Emmons v. City of Chesapeake*, No. 2:18-cv-402, 2019 WL 8888192, at *3 (E.D. Va. June 18, 2019).

### a. Plaintiffs' Testimony Regarding Whether Their Primary Duty is Performing Exempt Executive Work Varied Considerably

To qualify for the FLSA's executive exemption, an employee must: (1) earn not less than $684 per week; (2) have the primary duty of management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) customarily and regularly direct the work of two or more other employees; and (4) have the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion, or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100. Whether a Patrol Lieutenant's actual work qualifies as exempt under the executive exemption requires analysis of factors for which the testimony is incredibly varied and individualized.

#### 1. *Salary Requirement*

All Plaintiffs earned $684 per week during his or her relevant lookback period. (SOF, ¶¶ 24, 34, 43, 53, 68, 78, 87, 98, 111, 120, 132, 144, 152, 160, 168, 177, 186, 194.

#### 2. *Primary Duty of Management*

In the context of law enforcement, "[h]igh-level police, fire, and emergency officials may still be exempt employees if their primary duty is not first-response work but rather managerial and administrative tasks." *Benavides*, 2013 WL 3197636, at *9 (citing 69 Fed. Reg. 22122, 22130 (Apr. 23, 2004). "Both exemptions require that the employee's 'primary duty'

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

11

be related to 'management' or 'management of the enterprise." *Burke v. Mgmt. and Training Corp.*, No. 3:16-CV-00152-NBB-JMV, 2018 WL 4038115, at *2 (N.D. Miss. Aug. 22, 2018) (citations omitted). The federal regulations set forth a list of emergency response tasks that are decidedly managerial, including:

> Evaluating personnel performance; enforcing and imposing penalties for violations of rules and regulations; making recommendations as to hiring, promotions, discipline, or termination; coordinating and implementing training programs; maintaining company payroll and personnel records; handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation; preparing budgets and controlling expenditures; ensuring operations readiness through supervision and inspection of personnel, equipment, and quarters; deciding how and where to allocate personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at crime, fire or accident scenes, including deciding whether additional personnel or equipment is needed.

69 Fed. Reg. at 22130 (Apr. 23, 2004).

Here, Patrol Bureau East and Patrol Bureau West are the only relevant bureaus in this collective. (Doc. 38, at p.11). Patrol Bureau East includes Patrol Districts I, VII, and Lake Patrol (District V), and Patrol Bureau West includes Patrol Districts II, III, and IV. (SOF, ¶ 1). Each district is overseen by a Captain/Commander, and has Lieutenant/Commanders, (which, depending on the district and shift, can serve roles such as "Administrative Lieutenant," "Night Watch Commander," "Weekend Watch Commander," or "Acting Captain"), uniformed sergeants (mid-level supervisors), patrol deputies, detectives, and administrative staff. (SOF, ¶ 2). Plaintiffs testified to significant differences in command responsibilities and job duties, and job duties varied from district to district.

### i. Differences in Serving as Acting Captain and the Highest-Ranking Individual in the District

Plaintiffs testified that when a patrol district's Captain/Commander is unavailable, a Patrol Lieutenant will step in and serve as that patrol district's "acting commander" or "acting captain." (SOF, ¶ 216). However, Plaintiffs' testimony reveals significant differences in their experiences and responsibilities while serving as acting commander/captain.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57041449.1

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

For example, Plaintiff Acosta served as acting commander of District 1 "[m]aybe two or three times" for no more than two weeks each time and of District 2 approximately two to four times for "maybe a week, 10 days" each time. (SOF, ¶ 216). Similarly, Plaintiff Freeman served as acting captain of District 7 one time and of District 3 two or three times for "[t]wo weeks at most." (SOF, ¶ 216). Plaintiff Houck, since his promotion to lieutenant in April 2022, has only served as acting commander one time for one week. (SOF, ¶ 216). Yet Plaintiff Halverson served as acting commander of District 7 for approximately 19 weeks between February 2022 and June 2023, where he took on a more "diplomatic" role that involved "town councils and the meeting with the mayor." (SOF, ¶ 216). Plaintiff Vance served as acting commander of Lake Patrol District from April 2024 until January 2025. (SOF, ¶216). Plaintiff Keller served as acting captain of District 7 for a total of approximately four to five weeks in 2021, four to five weeks in 2022, over six weeks in 2023, five to six weeks in 2024, and at the time of his deposition in April 2025, had been serving as acting captain for four weeks. (SOF, ¶ 216). In his current role as acting captain, Plaintiff Keller's additional duties include "dealing with contract cities," "dealing with the chief," "making sure they're apprised of all the issues in the area," "[w]orking with the squads as far as making sure manpower and resources are there," "[a]nswering questions from the community . . . and for the district to respond to[] the chiefs or to the sheriff." (SOF, ¶ 216).

### ii. Differences in Serving as Watch Commander and the Highest-Ranking Individual in Each Patrol Bureau or the County

Plaintiffs also testified to serving as "watch commander," which is the lieutenant who works the night shift and is the highest-ranking individual during that shift. (SOF, ¶ 216). The watch commander is responsible for "the oversight for all patrol functions and to ensure that everything [i]s done copacetically according to policy." (SOF, ¶ 216). There are typically two watch commanders each night, one who commands the districts in Patrol Bureau East and one who commands the districts in Patrol Bureau West, with each respective watch commander serving as the highest-ranking individual in Patrol Bureau East or West during

that shift. (SOF, ¶ 216). However, there are times when one watch commander oversees both Patrol Bureau East and West and serves as the highest-ranking individual for the entire County during that shift. (SOF, ¶ 216).

Once again, the testimony confirms that Plaintiffs are not similarly situated regarding this supervisory and managerial role. For example, during the relevant time period, Plaintiffs Rosenberger, Halverson, Neville, and Thomas have either never served as watch commander or have predominately worked day shifts (SOF, ¶¶ 49-50, 61, 63, 83, 116, 118, 204, 207, 209-10). In contrast, Plaintiffs Brice, Jackson, and Freeman have predominately worked night shifts serving as watch commander (SOF, ¶¶ 74, 92, 95, 182-83, 202-03, 205). Whereas Plaintiffs Houck, Keller, Vance, Rankin, and Acosta have regularly worked both night and day shifts (SOF, ¶¶ 20, 29-31, 103-05, 107, 128, 139, 141, 200-01, 206, 208, 212).

### iii. Differences in Primary Duties as Day Versus Watch Commander and District to District

Plaintiffs' testimony about the primary duties each performs, and the relative importance of those primary duties, varies wildly and confirms collective assessment of their primary duty is not possible. For example, Plaintiff Jackson testified that the position of watch commander versus day commander differs, as well as the position of lieutenant in one district versus another, and therefore the responsibilities of a particular lieutenant could vary based on a particular lieutenant's assignment. (SOF, ¶ 245). Moreover, the County sets out its reasonable expectations as to Patrol Lieutenants' duties and responsibilities in its job descriptions, but as detailed in footnote 2, *infra*, whether Plaintiffs agree, disagree, or agree and disagree with the applicability of those descriptions to their own actual work as a Patrol Lieutenant is subject to wide variation.

To further illustrate, when Plaintiffs were asked what they viewed as their primary responsibilities, they unsurprisingly gave different answers. For example, Plaintiff Acosta testified that when he worked in District 1, his primary duty was "basically giving guidance and – and ensuring that the deputies were safe and that they were following policies and procedures and – and that they were documenting whatever they needed to document to

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

ensure it was done appropriately." (SOF, ¶ 245). Plaintiff Acosta now works day shifts in District 2, where he serves more of an administrative lieutenant role and characterizes his primary responsibilities as overseeing "internal affairs investigations," working with the "field training program," and "building maintenance and anything that has to do with supplies for . . . the district itself." (SOF, ¶ 245).

According to Plaintiff Houck, his "primary duty as patrol lieutenant remains law enforcement, being *available* to respond to calls," yet he agreed that it is not the primary duty of a Patrol Lieutenant to *actually* "respond to calls for service." (SOF, ¶ 245). According to Plaintiff Keller, his "primary duty is to uphold the laws, lead by example, while managing [his] sergeant and deputies," and testified that there are "some personnel . . . that are in management positions, all ranks [including lieutenant], that their primary job is just to sit in their office." (SOF, ¶ 245). According to Plaintiff Thomas, his primary responsibility is "incident command" of "significant incidents," where he "set[s] up a command post," "request[s] additional resources," "assign[s] duties to people on scene," "ensure[s] notifications are given to the chain of command," and "[e]nsure[s] the sergeants are properly doing their duties." (SOF, ¶245). And according to Plaintiff Neville, his watch commander responsibilities are "primarily command and control trying to keep everything balanced and make sure that resources are gotten to the patrol deputies on the ground." (SOF, ¶ 245). Plaintiff Neville then characterized his responsibilities as follows:

> So I'm being held to the standard of you are not an engaged leader, you're not out there with your troops, you're not responding to these emergency calls because you're spending your entire time in the office, that's a bad mark on my reputation. I would be held accountable for that, up to and including discipline.
>
> But then when I go out and do it, I'm also told you still have your administrative stuff you have to get taken care of. …(SOF, ¶245).

### iv. Differences in Amount of Time Spent Performing Primary Duties

Collective assessment of the amount of time spent performing exempt work is equally not possible. First, as illustrated in section II.B.2.a., *supra*, the non-exempt first responder

duties actually performed, and the frequency of performing those duties, is not common to the collective.

Second, each Plaintiff's own testimony as to the amount of time spent performing exempt work demonstrates that Plaintiffs are not similarly situated for purposes of determining their primary duty. In fact, some Plaintiffs' testimony about their own time cannot even be intelligibly assessed, Plaintiff Houck being one of them. He estimates that he spends 25% percent of his time performing administrative duties; less than 5% of his time performing incident management; very little time each week actively supervising his sergeants; passively supervising his sergeants "all the time;" 5 to 10% of his time performing management duties; 75% of his time monitoring the radio, which he describes is a function of his primary duty of patrol; 20 to 25% percent of his time each week actually responding to calls for service; between 45 minutes to three hours of every 10-hour shift commuting to and from the District 1 facility depending on traffic; and between four and five hours of every 10-hour shift in his office performing administrative duties and conversing with sergeants. (SOF, ¶¶ 200, 219, 245). Much more intelligibly, Acosta estimates that he currently spends approximately 65% of his time performing administrative work, another 15% performing duties related to internal affairs, and five percent 5% for patrol functions. (SOF, ¶ 245).

Third, some Plaintiffs acknowledged that because their duties varied and coalesced so much, they could not even attempt to quantify the time spent on certain tasks, which further demonstrates that Plaintiffs are not similarly situated for analysis of this factor. For example, Plaintiff Halverson was asked to estimate how much time he spent each day (over more than a two-year period in District 7) performing the administrative tasks set forth in the Patrol Lieutenant job description, and he testified he could not provide an accurate percentage because all the essential duties set forth in the job description "are intermixed" and "every task [he] did involve[d] administration, supervisory oversight, management, mentoring, professional development." (SOF, ¶ 245). Similarly, Plaintiff Jackson testified that when he worked in District 2 from November 2022 through January 2024, the tasks he performed while working in his office were "[j]ust regular administrative stuff like checking e-mails,

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

16

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

supervisor notes, report reviews, just the standards," yet he could not quantify what percentage of time he actually spent in his office versus out in the field because "[i]t would be a guess." (SOF, ¶ 245).

### v.    Differences in Other Managerial Tasks

With respect to Plaintiffs' involvement in training programs, each Plaintiff's individual experiences also vary widely. Plaintiff Halverson testified generally that he believes he has conducted formal training to his sergeants or deputies. (SOF, ¶ 222). Plaintiff Jackson testified he spends approximately 20 hours per year serving as a firearms instructor for the firearms training unit. (SOF, ¶ 222). Plaintiff Neville testified he teaches several multi-day courses at the police academy each year. (SOF, ¶ 222). Plaintiff Acosta testified that between approximately March 2021 and April 2022, he managed the Field Training Officer ("FTO") program in District 1 for newly hired or newly sworn officers where he spent approximately two hours each shift performing supervisor and administrative tasks for the FTO Program. (SOF, ¶ 222). Similarly, Plaintiff Rosenberger testified he oversaw the FTO program in District 1 and District 6, yet he only spent approximately one hour each week working on the program. (SOF, ¶ 222). Whereas Plaintiffs Houck and Rankin each testified that they have not conducted any formal training as a Patrol Lieutenant.  (SOF, ¶ 243).

Significant variations also exist with respect to budgeting. For example, Plaintiffs Halverson and Vance testified to being involved in budgeting. (SOF, ¶ 222). Whereas Plaintiffs Houck, Jackson, and Keller testified to no such involvement. (SOF, ¶ 242).

Moreover, Plaintiffs' involvement with special projects varied from person to person. Plaintiff Halverson was involved with a special scheduling project that looked at alternate schedules to address staffing issues and made recommendations to the Executive Chief of Compliance. (SOF, ¶ 222). Plaintiff Neville worked on two special projects relating to a new buildout of a gym and a memorial and made recommendations that were accepted; his involvement in the gym project alone lasted approximately seven months. (SOF, ¶ 222). Plaintiff Rankin was involved with a District 3 redesign and build project and made

recommendations regarding facility design and layout as well as revising the District 3 operations manual. (SOF, ¶ 222). Plaintiff Vance authored/reviewed the District 1 operations plan. (SOF, ¶ 222). Plaintiff Keller was tasked with a special project relating to new fingerprint scanners that he delegated to his subordinates and oversaw. (SOF, ¶ 222). To the contrary, Plaintiffs Houck and Jackson have not been involved with any special projects. (SOF, ¶ 244).

### 3. Customarily and Regularly Direct the Work of Two or More Employees

It is undisputed that all Plaintiffs supervise, manage, and direct the work of their subordinate patrol sergeants and deputies. (SOF, ¶¶ 219-21).

### 4. Authority to Hire or Fire or Whose Suggestions and Recommendations as to the Hiring, Firing, Advancement, Promotion, or Any Other Change of Status Are Given Particular Weight

The testimony related to whether and to what extent Plaintiffs were involved in hiring, firing, disciplining, promoting, and other actions impacting employees' status is likewise one of differences in degrees of involvement and responsibility. With respect to hiring and promoting alone, the testimony is incredibly varied.

Some Plaintiffs have been involved in hiring but not promotion decisions. For example, Plaintiff Acosta has participated on a three-person hiring panel where he conducted several interviews of deputy service aides and provided input as to which candidates should proceed through the interview process. (SOF, ¶ 217). Plaintiff Acosta has also conducted interviews of lateral transfer candidates into his division and provided input to his captain about which candidates should be considered. (SOF, ¶ 217). Plaintiff Neville has personally interviewed an administrative assistant who was hired based upon his recommendation. (SOF, ¶ 217). Similarly, Plaintiff Rankin was involved in hiring an administrative assistant who he personally interviewed and recommended for hire. (SOF, ¶ 217). Plaintiff Rankin also testified that he and another lieutenant collectively interviewed approximately 50 to 60 individuals that resulted in the hiring of nine deputy service aides. (SOF, ¶217). Plaintiff Rankin personally interviewed and made recommendations for approximately 30 to 40 of the individuals, some

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

of whom were hired upon his recommendation. (SOF, ¶ 217). However, Plaintiffs Acosta, Rankin, and Neville have not served on promotion boards. (SOF, ¶ 240).

Other Plaintiffs have been involved in promotion but not hiring decisions. For example, Plaintiff Brice has served on one deputy-to-sergeant promotion board and on one sergeant-to-lieutenant promotion board. (SOF, ¶ 217). Similarly, Plaintiff Jackson has served on a four-day oral promotion board for sergeant-to-lieutenant promotions involving 22 applicants. (SOF, ¶217). However, Plaintiffs Brice and Jackson have not been involved with any interviewing or hiring process. (SOF, ¶ 240).

Still other Plaintiffs have been involved in both hiring and promotion decisions. For example, Freeman has sat on an interview panel for deputy service aides and served on a sergeant-to-lieutenant promotion board. (SOF, ¶ 217). Similarly, Rosenberger has served on an interview panel for an administrative assistant, served on a one-day sergeant-to-lieutenant promotion board, and participated in a staged briefing scenario for deputy-to-sergeant promotion candidates. (SOF, ¶ 217). Vance has personally interviewed and made hiring recommendations for two barn technicians and one deputy service aide as well as served on a deputy-to-sergeant promotion board where he scored each candidate. (SOF, ¶ 217).

With respect to disciplining and related actions, the testimony is also incredibly varied. Plaintiff Acosta testified that he has the authority to report misconduct, initiate internal affairs investigations, and issue action plans to subordinates but has not ever done so. (SOF, ¶ 218). Plaintiff Houck has handled at least one internal affairs investigation and reviewed more than a dozen internal complaints submitted by his subordinates, as well as placed one sergeant on an action plan. (SOF, ¶ 218). Plaintiff Keller has been involved in an internal affairs investigation of another lieutenant and reviewed approximately 30 investigations conducted in 2024 alone, some of which he recommended sustained findings; however, he has never placed a subordinate on an action plan. (SOF, ¶ 218). Plaintiff Neville has acted as an investigator on one internal affairs complaint and reviewed "tons" of complaints; however, he also has never placed someone on an action plan. (SOF, ¶ 218). Plaintiff Vance has

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

conducted approximately four internal affair investigations but does not recall ever placing any sergeants or deputies on an action plan. (SOF, ¶ 218).

Relatedly, Plaintiff Freeman testified he has the authority to issue verbal coaching and has done so twice as well as instructed his sergeants to issue verbal coaching to their deputies. (SOF, ¶218). Plaintiff Neville testified he has provided formal coaching on one occasion. (SOF, ¶ 218). Plaintiff Thomas testified he provides formal coaching once or twice a year. (SOF, ¶ 218). Whereas Plaintiff Jackson testified he has never provided verbal coaching, and Plaintiff Vance testified he has never provided formal coaching (SOF, ¶ 241).

### b. Plaintiffs' Testimony Regarding Whether Their Primary Duty is Performing Exempt Administrative Work Varied Considerably

To qualify for the FLSA's administrative exemption, an employee must: (1) earn not less than $684 per week; (2) have the primary duty of performing office or non-manual work directly related to the management or general business operations of the employer; and (3) have the primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance. 29 C.F.R. § 541.200. Whether a Patrol Lieutenant's actual work qualifies as exempt under the administrative exemption requires analysis of factors for which the testimony is again incredibly varied and individualized.

With respect to the first element, it is undisputed that all Plaintiffs earned $684 per week during his or her relevant lookback period. (SOF, ¶¶ 24, 34, 43, 53, 68, 78, 87, 98, 111, 120, 132, 144, 152, 160, 168, 177, 186, 194.

With respect to the second element, as set forth above, Plaintiffs' testimony confirms significant differences in work related to management. *See* 69 Fed. Reg. at 22130; *Burke*, 2018 WL 4038115, at *2. Further as set forth above, Plaintiffs' testimony confirms significant differences in the amount of time each spent performing office work or non-manual work, including the amount of time spent driving in their unmarked patrol vehicle, and the tasks they performed while on patrol. (SOF, ¶¶ 200-12).

With respect to the third element, the above analysis likewise shows that Plaintiffs' testimony varied considerably regarding the amount of discretion each Plaintiff exercised with

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

20

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

respect to matters of significance. Accordingly, Plaintiffs are not similarly situated for determining whether they qualify for the administrative exemption.

### c. Records and Testimony Related to the Highly Compensated Employee Exemption Vary Considerably

To qualify for the FLSA's highly compensated employee exemption, an employee must: (1) receive total annual compensation based on statutory requirements; (2) customarily and regularly perform any one or more exempt duties or responsibilities of an executive or administrative employee; and (3) have the primary duty of performing office or non-manual work. 29 C.F.R. § 541.708. Whether a Patrol Lieutenant's annual salary and actual work qualifies as exempt under the highly compensated employee exemption requires analysis of factors for which the facts differ, and the testimony is again incredibly varied and individualized.

With respect to the first element, Plaintiffs are not similarly situated on the determination of whether they meet the applicable salary threshold. To begin, the Patrol Lieutenants do not all receive the same salary. (SOF, ¶¶ 26, 36, 45, 54, 70, 80, 89, 100, 113, 119, 134, 146, 154, 162, 170, 179, 188, 196). During that same time period, different salary thresholds have applied for the highly compensated employee exemption. From January 1, 2020, through June 30, 2024, the salary threshold was $107,432; between July 1, 2024, through December 31, 2024, the salary threshold was $132,964; and the current salary threshold of $151,164 went into effect on January 1, 2025. 29 C.F.R. § 541.601(a). Many Plaintiffs satisfied the threshold in some years and not in others. (SOF, ¶¶ 26, 36, 45, 54, 70, 80, 89, 100, 113, 119, 134, 146, 154, 162, 170, 179, 188, 196). Thus, if the factfinder were to determine that Plaintiffs are not categorically exempt under the executive or administrative exemptions, then in order to determine whether Plaintiffs are exempt under the highly compensated employee exemption, the factfinder would need to determine which years each Plaintiff satisfied the salary threshold, and then conduct a highly individualized inquiry into the actual job duties performed and time spent in the office versus in the field in each particular year to determine

21

**FISHER & PHILLIPS LLP**
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

whether the other elements of this exemption are met. The variances in Plaintiffs' testimony illustrated above exemplify why collective treatment is infeasible in this case.

With respect to the second element, for the reasons set forth above, determining whether Plaintiffs customarily and regularly perform a mix of exempt executive or exempt administrative duties will require a highly individualized analysis.

With respect to the third element, testimony varied wildly regarding whether each Plaintiff's primary duty includes office or non-manual work. For example, the amount of time that Plaintiffs testified to spending in their office versus in the field varied considerably based on district and shift assignment, which often changed within each year. (SOF, ¶¶ 200-12, 245). To illustrate, Plaintiff Acosta currently spends approximately 90% of his time in his office working day shifts in District 2, whereas he spent approximately 30% of his time in the office when he worked night shifts in District 3. (SOF, ¶ 201). When he worked in District 1, he spent approximately 30% of his time in the office when working night shifts but approximately 50% of his time in the office when working day shifts. (SOF, ¶ 201). To further illustrate, Plaintiff Freeman spent approximately 75% of his time in his office when working day shifts in District 7 but closer to 50% of his time in the office when working night shifts in District 7. (SOF, ¶ 203). When he later transferred to night shifts in District 3, he spent approximately 50% of his time in the office but now works day shifts and spends closer to 75% of his time in the office. (SOF, ¶ 203).

### 4. The Collective Must Further Be Decertified Because to the Extent Plaintiffs are Claiming Application of the First Responder Regulation, Their First Responder Duties Varied Considerably

The First Responder Regulation provides that the FLSA's executive, administrative, and highly compensated employee exemptions do not apply to:

> police officers . . . and similar employees, regardless of rank or pay level, who perform work such as preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; prevent or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.

29 C.F.R. § 541.3(b). However, the First Responder Regulation does not change the exemption analysis, and the focus still remains on each Plaintiff's primary duty. *See Maestas*, 664 F.3d at 827 ("The first responder regulation does not alter the primary duty test.") (citing Wage & Hour Division, Dep't of Labor, Opinion Letter dated Oct. 14, 2005, 2005 WL 3308611, at *2–3). Nor does the First Responder Regulation supplant the executive and administrative exemptions; instead, it "must be applied 'in conjunction with'" the exemptions. *Watkins v. City of Montgomery*, 919 F. Supp. 2d 1254, 1263 (M.D. Ala. 2013); *see also Barrows v. City of Chattanooga, Tenn.*, 944 F. Supp. 2d 596, 603 (E.D. Tenn. 2013) ("[C]ourts must consider whether the management and supervisor activities performed by the categories of employees listed in § 541.3(b) are undertaken as a part of the employee's primary field law enforcement duties.") (citing *Mullin v. City of New York*, 653 F.3d 104, 116 (2d Cir. 2011).

The number of times each Plaintiff has performed non-exempt first responder duties and the frequency of performing those duties is incredibly varied and individualized. Plaintiffs' testimony reveals that Patrol Lieutenants perform significantly fewer first responder duties and on a much more infrequent basis than patrol deputies. To briefly illustrate, Halverson responded to calls for service as the primary unit 46 times in 2020, six times in 2021, ten times in 2022, and seven times through June 2023, yet he would typically expect a patrol deputy to respond to calls for service as the primary unit more than 100 times per year. (SOF ¶ 258). Similarly, Jackson responded to calls for service as the primary unit ten times during a seven-month period in 2023, yet he would expect that number to be higher for a patrol deputy. (SOF ¶ 258).

Finally as set forth below, whether a Patrol Lieutenant's work qualifies as non-exempt under the First Responder Regulation requires analysis of specific first responder duties.

### a.    Preventing, Controlling, or Extinguishing Fire

Plaintiff Rosenberger attempted to extinguish one tree trunk fire in a five-year period. (SOF, ¶ 224). Plaintiff Brice dealt with one fire during his six-month role serving as Watch

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

Commander. (SOF, ¶ 224). Plaintiff Neville successfully helped with one fire and unsuccessfully helped with a second fire over a two-year period. (SOF, ¶ 224). Plaintiff Vance dealt with a fire one or two times over a four-year period. (SOF, ¶ 224). Plaintiff Acosta dealt with one fire since 2020. (SOF, ¶ 224). Whereas Plaintiffs Keller, Freeman, Jackson, Thomas, and Rankin have not prevented, controlled, or extinguished fires of any type while serving as a Patrol Lieutenant. (SOF, ¶¶ 224).

### b.    Rescuing Fire, Crime, or Accident Victims

Plaintiff Rankin testified to one example where he provided a bandage to an individual but has not otherwise rescued fire, crime, or accident victims. (SOF, ¶ 225). Plaintiff Thomas has not rescued fire, crime, or accident victims but has responded to approximately ten vehicle crashes over a three-year period. (SOF, ¶ 225). Plaintiffs Houck and Freeman have rescued victims five times or less over a three-year period. (SOF, ¶ 225). Plaintiff Rosenberger does not recall rescuing any victims during a one-year period in District 1, oversaw approximately three hiker rescues during a one-year period in District 6, and was personally involved in 15 to 20 rescue operations during a three-and-a-half-year period in Lake Patrol District. (SOF, ¶ 225). Plaintiff Acosta has rescued at least 10 victims since 2020 (SOF, ¶ 225). Plaintiff Neville has been involved in "half a dozen instances where [he] responded to something early enough to actively play a role in preserving somebody's safety" over a two-year period. (SOF, ¶ 225). Plaintiff Vance rescued between 20 and 30 victims over a two-and-a-half-year period. (SOF, ¶ 225). Whereas Plaintiffs Keller, Halverson, Brice, and Jackson have not rescued fire, crime, or accident victims while serving as a Patrol Lieutenant. (SOF, ¶ 225).

### c.    Preventing or Detecting Crimes

Plaintiff Rankin testified to one instance where he apprehended a suspect during a two-year period. (SOF, ¶ 226). Over a three-year period, Plaintiff Freeman testified to less than 50 instances and Plaintiff Thomas testified to approximately 20 instances. (SOF, ¶ 226). Over a four-and-a-half-year period, Plaintiff Keller testified to approximately 100 instances and Plaintiff Acosta testified to approximately 50 to 100 instances. (SOF, ¶ 226). During his six months as Watch Commander, Plaintiff Brice testified to two instances. (SOF, ¶ 226).

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

Plaintiff Rosenberger testified to 10 instances where he personally intervened over a one-year period in District 1, to five instances over a one-year period in District 6, and to approximately 10 additional instances over a three-and-a-half-year period in Lake Patrol District. (SOF, ¶ 226). Plaintiff Neville testified to preventing or detecting crimes "half a dozen times" over a two-year period. (SOF, ¶ 226). Over a one-year period in District 2 and Lake Patrol District, Plaintiff Jackson testified "there is no way to approximate that." (SOF, ¶ 226). Yet Plaintiff Vance testified to preventing or detecting crimes on a weekly basis over a two-and-a-half-year period. (SOF, ¶ 226). Whereas Plaintiff Houck does not recall personally or directly preventing a crime since his promotion to Patrol Lieutenant in April 2022. (SOF, ¶ 226).

### d. Conducting Investigations or Inspections for Violations of Law

Each Plaintiff has conducted investigations or inspections for violations of law as Patrol Lieutenants, but the frequency and number of instances for each Plaintiff varied significantly. Plaintiff Houck testified to "maybe 20 or less" instances over a three-year period; Plaintiff Keller testified to "probably half a dozen to a dozen" instances over a four-and-a-half-year period; Plaintiff Rosenberger testified to approximately 95 instances over a four-and-a-half-year period; Plaintiff Freeman testified to "less than 100" over a three-year period; Plaintiff Vance testified to approximately 50 to 75 instances over a two-and-a-half-year period; and Plaintiff Acosta testified to approximately 50 to 100 instances over a four-and-a-half-year period. (SOF, ¶ 227). Plaintiff Thomas testified to conducting 10 to 12 investigations or inspections over a three-year period, and Plaintiff Rankin testified to assisting as the non-primary lieutenant on approximately 75 investigations over a two-year period. (SOF, ¶ 227). Plaintiffs Neville and Jackson have conducted or been involved with investigations generally but could not provide an approximate number of instances. (SOF, ¶¶ 227). During his six months serving as Watch Commander, Plaintiff Brice testified that his subordinates determine whether a crime was committed, and that he is "not typically assigned as a case agent" and rather serves more of an assisting role." (SOF, ¶ 227). Plaintiff Halverson testified to "one incident where [he] made the arrest." (SOF, ¶ 227).

### e. Performing Surveillance

Plaintiffs Halverson and Jackson have not performed surveillance as Patrol Lieutenants. (SOF, ¶ 228). Plaintiffs Freeman, Neville, Thomas, and Acosta have performed surveillance less than 10 times as Patrol Lieutenants. (SOF, ¶ 228). Plaintiffs Keller and Vance have performed surveillance between approximately 10 to 20 times as Patrol Lieutenants. (SOF, ¶ 228). Plaintiffs Houck and Rosenberger have performed surveillance approximately 30 to 45 times as Patrol Lieutenants. (SOF, ¶ 228). Plaintiff Brice testified has not performed formal surveillance and has assisted by "only sitting out and observing." (SOF, ¶ 228). Plaintiff Rankin has performed surveillance "many times" but "can only specifically remember one time." (SOF, ¶ 228).

### f.    Pursuing, Restraining, and Apprehending Suspects

Each Plaintiff has pursued, restrained, and apprehended suspects as Patrol Lieutenants, but the frequency and number of instances for each Plaintiff again varied considerably. Plaintiff Houck testified to approximately 20 instances; Plaintiff Freeman to less than 50 instances; Plaintiffs Halverson and Rosenberger to one instance; Plaintiff Neville to less than 10 instances; Plaintiff Vance to at least 20 but less than 30 instances; Plaintiff Thomas to three instances; Plaintiff Acosta to approximately 10 to 15 instances, and Plaintiff Jackson an unknown number of instances. (SOF, ¶ 229). Plaintiff Keller testified to approximately 15 instances since October 2020, yet his patrol deputies pursue, restrain, or apprehend suspects an average of "three times a day." (SOF ¶ 259). Plaintiff Rosenberger testified that his patrol deputies during that same time period, the "majority of them could get an arrest every day." (SOF ¶ 259). Plaintiff Brice testified to pursuing an individual approximately one time each year and to handcuffing an individual no more than one time each month, but he does not recall apprehending any suspects but assumes it would be less often than a Patrol Deputy or Patrol Sergeant. (SOF, ¶ 229). Plaintiff Rankin has pursued suspects approximately five times but does not recall if he has handcuffed any suspects. (SOF, ¶ 229).

### g.    Detaining or Supervising Suspected and Convicted Criminals, Including Those on Probation or Parole

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

26

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

Plaintiffs Houck, Freeman, Vance, Thomas, Rankin, and Acosta have detained or supervised suspected and convicted criminals as Patrol Lieutenants, but the frequency and number of instances for each of them varied from "less than five" to upwards of 50 times. (SOF, ¶ 230). Plaintiff Keller has not detained any suspected or convicted criminals on his own. (SOF, ¶ 230). Plaintiff Jackson did not provide an estimate of the number of instances. (SOF, ¶ 230). Plaintiff Rosenberger testified to approximately 15 instances since January 2022, yet "a good amount" of his patrol deputies detain or supervise a suspected or convicted criminal at least once per shift, especially because "if they're making traffic stops, they're detaining somebody." (SOF ¶ 260).

### h.    Interviewing Witnesses

Houck, Rosenberger, Freeman, Halverson, Brice, Neville, Jackson, Vance, and Thomas have interviewed witnesses as Patrol Lieutenants, but the frequency and number of instances for each of them varied from "probably five" to upwards of 50 times. (SOF, ¶ 231). Brice does not interview witnesses "super often." (SOF, ¶ 231). Rankin does not recall interviewing any witnesses, but it is possible he may have. (SOF, ¶ 231. Jackson did not provide an estimate of the number of instances. (SOF, ¶ 231). Acosta conducted approximately 10 to 50 interviews in District 2 between July 2021 and April 2023, but testified that is "[c]ertainly not to the level that a deputy would be expected to do . . . ." (SOF ¶ 261). Similarly, Keller has conducted approximately five interviews since October 2020, while his patrol deputies interview witnesses "daily" and "365 at minimum a year." (SOF ¶ 261).

### i.    Interrogating and Fingerprinting Suspects

As Patrol Lieutenants, Plaintiffs Rosenberger, Halverson, Jackson, Rankin, and Acosta have not interrogated or fingerprinted suspects, whereas Plaintiffs Houck, Freeman, and Vance have, but the frequency and number of instances for each of them varied but was less than 50 times. (SOF, ¶ 232). Plaintiff Keller testified that he does not fingerprint suspects, that his subordinates interrogate suspects, and that he "is there to assist them." (SOF, ¶ 232). Plaintiff Brice does not fingerprint suspects but recalls performing one interrogation. (SOF, ¶ 232). Plaintiff Neville fingerprints suspects and has interrogated approximately less than 30

27

suspects. (SOF, ¶ 232). Plaintiff Thomas does not fingerprint suspects and has interrogated approximately four or five suspects. (SOF, ¶ 232).

### j.    Preparing Investigative Reports

Rankin does not recall authoring a primary investigative report as a Patrol Lieutenant. (SOF, ¶ 233). Keller, Rosenberger, Halverson, Neville, Vance, Thomas, and Acosta have prepared investigative reports as Patrol Lieutenants, but the frequency and number of instances for each of them varied from one to approximately 10 times. (SOF, ¶ 233). Plaintiffs Freeman and Jackson did not provide an estimate of the number of investigative reports they have prepared. (SOF, ¶ 233). Plaintiff Brice has written "a handful" of supplemental reports to the primary report. (SOF, ¶ 233). For Plaintiff Keller, he was asked whether the number of primary investigative reports he has prepared is "lower than sheriff deputy officers that are doing patrol," and his response was, "Oh, significantly, yes." (SOF ¶ 262).

### k.    Conducting Traffic Stops

Plaintiffs were also asked at deposition whether and how frequently they conduct traffic stops of potential offenders, and Plaintiffs' testimony again varied considerably. Plaintiff Halverson has conducted two or three traffic stops over a four-year period, (SOF, ¶ 234). Plaintiff Rankin has not made a traffic stop since at least 2016. (SOF, ¶ 234). Plaintiff Vance has conducted 13 traffic stops over a two-and-a-half-year period. (SOF, ¶ 234). Plaintiff Rosenberger conducted approximately 20 to 25 traffic stops per year for years 2022 and 2023 and has already conducted approximately 40 traffic stops since January 2025. (SOF, ¶ 234). Plaintiff Freeman conducted approximately one traffic stop per week when serving as Watch Commander of District 7, (SOF, ¶ 234), and expects a patrol deputy in District 7 "to make quite a few" on a weekly basis, (SOF ¶ 263). Plaintiff Jackson does not know whether he conducts more or less traffic stops than other Patrol Lieutenants. (SOF, ¶ 234).

Plaintiff Houck testified that Patrol Lieutenants drive unmarked vehicles to reduce the likelihood that Patrol Lieutenants are flagged down by bystanders, and that it is his understanding that Patrol Lieutenants are not to perform routine traffic stops. (SOF, ¶ 234). Acosta confirmed traffic stop activity is not his primary responsibility as a Patrol Lieutenant.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

28

(SOF, ¶ 234). Thomas testified that his primary responsibility is not civil traffic violations but that he has made one or two traffic stops since April 2022. (SOF, ¶ 234). Whereas for Keller, he testified that it is normal to conduct traffic stops but that he does not do so as frequently as other Patrol Lieutenants and chooses to conduct traffic stops only for suspected reckless or drunk drivers. (SOF, ¶ 234).

## III.    CONCLUSION

For the reasons set forth above and in the voluminous discovery record submitted in support of this motion, Defendant respectfully requests that the Court decertify Plaintiffs' collective action under the FLSA and further order any other relief the Court deems just and proper.

DATED this 26th day of September 2025.

FISHER & PHILLIPS LLP


By  s/  David G. Myers
    Shayna Balch Santiago
    Lori A. Guner
    David G. Myers
    3200 N. Central Avenue, Suite 1550
    Phoenix, Arizona 85012-2487
    Attorneys for Defendants

FP 57041449.1

**CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Ty D. Frankel
Frankel Syverson PLLC
2375 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
ty@frankelsyverson.com
Attorneys for Plaintiff

Patricia N. Syverson
Frankel Syverson PLLC
9655 Granite Ridge Drive, Suite 200
San Diego, California 92123
patti@frankelsyverson.com
Attorneys for Plaintiff

  s/  Michelle C. Xochicale

FP 57041449.1