Shayna Balch Santiago, SBN 024852
Lori A. Guner, SBN 031646
David G. Myers, SBN 038484
FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
Telephone: (602) 281-3400
Fax: (602) 281-3401
ssantiago@fisherphillips.com
lguner@fisherphillips.com
dmyers@fisherphillips.com
Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher J. Houck, on behalf of himself and all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Maricopa County,<br><br>Defendant. | No. 2:23-cv-00068-DGC<br><br>**DEFENDANT'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Defendant Maricopa County ("Defendant" or "Maricopa") hereby moves for summary judgment pursuant to Fed. R. Civ. P. 56. This Motion is supported by Defendant's Separate Statement of Facts in Support of its Motion for Summary Judgment ("SOF") and Memorandum of Points and Authorities, all pleadings and papers on file in this action, and such matters as may be introduced at the hearing on this Motion. Also contemporaneously filed with this Motion is Defendant's Motion to Decertify Plaintiff's Collective Action at Doc. 152.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiff Christopher Houck ("Houck") and the Opt-In Plaintiffs' sole claim for "Failure to Pay Overtime Wages" brought pursuant to the Fair Labor Standards Act

FISHER & PHILLIPS LLP<br>3200 N. Central Avenue, Suite 1550<br>Phoenix, Arizona 85012-2487<br>(602) 281-3400

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

("FLSA") must be dismissed because Houck and the other Plaintiffs are properly classified as exempt from overtime pursuant to the executive, administrative, and/or highly compensated employee exemptions of the FLSA.

At its core, the Plaintiffs have alleged that they believe they are misclassified as exempt under the FLSA despite their undisputed and significant managerial duties because they subjectively believe that "law enforcement" or "first responder duties" are their "most important" responsibility. This argument is nothing more than a red herring. As the below demonstrates, the undisputed facts show that Houck and the remaining opt ins performed significant managerial tasks and rarely performed first responder duties. It is well established that the determination of exempt status is based on actual duties, not based on subjective beliefs. Since Plaintiffs have offered no admissible facts in support of their contention that they primarily performed non-exempt duties, Defendant is entitled to summary judgment in its favor.

## II.    LEGAL STANDARD

Summary judgment "must" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Loserth v. Accelerated Retention Inst. LLC*, No. CV-18-03587-PHX-SRB, 2020 WL 13268122, at *3 (D. Ariz. Feb. 7, 2020) (internal citations omitted). To defeat Defendants' motion, Plaintiff "may not rest upon the mere allegations or denials of [their] pleading, but … must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). A "genuine" dispute about facts exists if the evidence is "such that a reasonable jury could return a verdict for the non-moving party." *Id.* Defendant's motion should be granted if the evidence presented by Plaintiffs "is merely colorable or is not significantly probative." *Id.* at 249 (internal citations omitted).[1]

---

[1] Defendant has moved to decertify this collective action (Doc. 152) contemporaneously with this Motion. If the Court grants Defendant's Motion to Decertify, then the collective action is dissolved and large portions of the instant Motion for Summary Judgment will be

2

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

## III.    LEGAL ARGUMENT

### A.    Houck and the Remaining Plaintiffs Are Properly Classified as Exempt From Overtime.

Houck and the remaining Plaintiffs have alleged that they "worked for the County in excess of forty hours per week, but the County failed to pay them for those excess hours at the statutorily required rate of one and one-half times their regular rate of pay as required by the FLSA." Compl. ¶48. This claim fails because Houck and the Plaintiffs were correctly classified as exempt from overtime under the FLSA under the executive, administrative or highly compensated employee exemptions. 29 U.S.C. § 231(a)(1); 29 C.F.R. § 541.100, *et seq.* (Executive Employees); 29 C.F.R. § 541.200 *et seq.* (Administrative Employees); 29 C.F.R. § 541.601. [2]

In order to take advantage of such an exemption, the employer need not identify the specific exemption an employee falls under at the time of hiring. *Copas v. E. Bay Mun. Util. Dist.*, 61 F. Supp. 2d 1017, 1019 (N.D. Cal. 1999) ("The FLSA does not articulate the parameters of the three exemptions; the application of the exemptions is set forth in the regulations and interpretations promulgated by the Secretary of Labor, pursuant to 29 U.S.C. § 213."). There is no requirement under 29 U.S.C. § 213 that an employee identify the specific exemption an employee falls under in advance. Instead, the question of whether an employee is exempt lies with the functions or duties of the employee. *Campbell v. PricewaterhouseCoopers, LLP*, 253 F.R.D. 586, 597 (E.D. Cal. 2008); *Texas v. United States Dep't of Lab.*, 756 F. Supp. 3d 361, 384 (E.D. Tex. 2024).

---

moot, with the Court only needing to render a decision as to summary judgment on Houck's claims.    *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1110 (9th Cir. 2018). However, if the Court is disinclined to grant Defendants' Motion to Decertify, then Defendant maintains it is entitled to summary judgment as to each of the opt-in plaintiffs in this case.

[2] It is well-established that an employee's qualification for different "primary duties" under the white-collar exemptions does not disqualify them from exempt status. For example, it is permissible for an employee to have a primary duty of management (executive) and also have a primary duty of management of general business operations (administrative operations) and qualify under both exemptions. 29 C.F.R. § 541.708.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

There is no dispute that the County treated its lieutenants as exempt from overtime under the FLSA. Houck concedes this fact in his Complaint at Doc. 1, ¶27 and in his Motion for Conditional Certification. Doc. 27, p.4:7-8 ("the County classifies Houck and the Patrol Lieutenants as exempt managers and pays them a 'salary.'"). Houck and the others further acknowledged their exempt status under the FLSA as part of their employment with Maricopa County. [SOF ¶¶ 18, 28, 38, 47, 59, 72, 82, 102, 115, 127, 138, 148, 156, 164, 172, 181, 189]. Instead, this case is premised on Houck's assertion that he and similarly situated lieutenants in the East and West Patrol Bureaus were primarily performing duties that were "first responder" and "nonexempt in nature" and, thus, they were misclassified as exempt from overtime. Doc. 27, p. 1:21-23. However, as set forth in greater detail below, Houck and the remaining Plaintiffs fall squarely within the FLSA's exemptions from overtime. Their primary duties were managerial in nature and not "first responder."

## 1. The Lieutenants Qualify As Exempt Under The FLSA's Executive Exemption.

To prove the lieutenants qualify under the executive exemption, Defendant must establish: (1) the lieutenants were compensated on a salary basis at not less than $684 per week; (2) their primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) the lieutenants customarily and regularly direct the work of two or more other employees; and (4) the lieutenants have the authority to hire or fire other employees or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100(a).

### a) All of the Lieutenants Earned A Salary Basis of $684 Per Week.

The salary basis level for each of the white-collar exemptions is set by 29 C.F.R. § 541.600 and has remained unchanged at $684 per week since January 1, 2020. *See* DOL Final Rule at 2019-20353 (84 FR 51230-01). This case was filed on January 11, 2023. Doc. 1.

Accordingly, even assuming a three-year-lookback period (which Defendant disputes), the $684/week salary basis amount applies to the entirety of this case. With regards to this amount, there is no dispute that Houck and the opt-ins earned a salary basis of at least $684 per week for the relevant time period. This is supported by The Plaintiffs' paystubs and W2s. [3] [SOF ¶¶ 26, 36, 45, 55, 70, 80, 89, 100, 113, 120, 121, 134, 146, 154, 162, 170, 179, 188, 196]. Additionally, each and every opt-in that Defendant was permitted to depose conceded under oath that they were paid a salary of at least $648/week.[4] [SOF ¶¶ 24, 34, 43, 53, 68, 78, 87, 98, 111, 120, 127, 138, 148, 156, 164, 172, 181, 189].

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

---

[3] It is anticipated that Houck may try to argue that the salary basis test has not been established because the lieutenants' paystubs reflect an "hourly" amount and because they were required to "account" for 80 hours during a two-week-payroll period. These arguments fail as a matter of law. [argument that limitations of payroll system]. Moreover, Defendant is a public agency and the FLSA specifically provides that "[a] n employee of a public agency who otherwise meets the salary basis requirements of § 541.602 shall not be disqualified from exemption under §§ 541.100, 541.200, 541.300 or 541.400 on the basis that such employee is paid according to a pay system established … by a policy or practice established pursuant to principles of public accountability, under which the employee accrues personal leave and sick leave and which requires the public agency employee's pay to be reduced or such employee to be placed on leave without pay for absences for personal reasons or because of illness or injury of less than one work-day…" 29 C.F.R. §541.710. Here, Defendant has disclosed that it is a public agency with a public accountability policy in place. That public accountability policy provides, in pertinent part, "Maricopa County is a public Employer who provides paid leave and has a compensation system based on principals of public accountability." [SOF ¶ 237]

[4] Defendant was permitted to depose Houck plus 50% of the opt-ins. Houck, Acosta, Brice, Freeman, Jackson, Keller, Neville, Rankin, Rosenberger, Thomas and Vance were deposed and Defendant was later granted leave of court to also depose Trowbridge. Each of these opt-ins has conceded under oath that they received a salary basis of at least $684/week since their promotion to lieutenant. Defendant was not permitted to depose Cruz, Goad, McCann, Sanchez, Rank, Kremer, Jakowinicz, or Whelan-Gonzalez. However, paystubs show that each of these additional lieutenants also earned a salary basis of at least $684/week. To the extent Houck or the other Plaintiffs dispute they earned $684/week during any pay periods, Defendant reserves the right to include Plaintiff paystubs with its reply. Defendant has not provided copies of all paystubs with this filing out of consideration for the Court and Parties due to the voluminous nature of the paystubs (well over **_1,000_** pages of records).

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

**b)    Primary Duty Is Management of the Enterprise, or A Customarily Recognized Department or Subdivision Thereof.**

**(1)    Primary Duty is Management**

**(a)    There is No Dispute That the Lieutenants Perform Daily Management Responsibilities.**

The CFRs provide the following guidance as to what constitutes "management" within the context of the FLSA's executive exemption:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures. 29 C.F.R. § 541.102.

Here, there is no dispute that Houck and the opt-ins regularly and customarily performed precisely these types of duties. To begin, MCSO maintains a job description for law enforcement lieutenants. [SOF ¶ 15]. This job description was prepared in or around December of 2019 following a comprehensive Job Analysis that was performed by an outside consultant, Fields Consulting Group, Inc. ("Fields") in 2016/2017. [SOF ¶¶ 9-14]. Fields was hired by Maricopa County to analyze the job duties actually performed by deputies, sergeants, lieutenants, and captains within the Patrol Bureau of MCSO. [SOF ¶ 9]. Fields prepared a report in 2017. [SOF ¶ 9]. The purpose of the Job Analysis Report was to assist Maricopa County with preparation of updated and accurate job descriptions for each rank, based on job duties *actually performed*. [SOF ¶ 9]. As stated in the report, Fields sent surveys to numerous individuals, performed interviews, and analyzed the responses before preparation of their findings contained in the report. [SOF ¶ 10] It is important to note that Fields received and analyzed responses to the "Task Survey" (asking questions about frequency of tasks performed) from *over 90% of the lieutenants in patrol bureau* (37 out of 41

6

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

lieutenants). [SOF ¶ 10]. Notably, as part of the surveys, Fields specifically asked lieutenant about the "frequency" and "importance" of the various tasks performed. Lieutenants selected their own rankings in response to the surveys. [SOF ¶ 10]. Upon receipt of the survey results, Fields merged the frequency and importance ratings for an overall "Importance" score. Fields reported the findings to Maricopa County by way of "Task Cluster" tables, demonstrating that "Incident Management" and "Supervision" were some of the most important and commonly performed tasks. [SOF ¶ 11]. On the other hand, "Patrol Duties" and "Criminal Investigations" were rarely performed.  [SOF ¶ 11]

After Fields completed its analysis, Fields provided draft job descriptions to Maricopa County that "represent the core position at each rank." [SOF ¶ 12].[5] Maricopa County adopted the job descriptions prepared by Fields, without making any material changes to the "Essential Job Tasks" for the lieutenant position.[6] [SOF ¶ 13]. The applicability of this job description to the lieutenants in this case is not in dispute. Each of the deposed plaintiffs conceded the applicability and accuracy of the job description. [SOF ¶ 14]. They further conceded that they actually perform all of the duties listed in the job description. [SOF ¶ 14].

Moreover, at deposition, Houck and the opt-ins conceded that they regularly and customarily performed a wide variety of managerial duties. At deposition, Houck testified that he had the authority to deny a sergeant's request to flex his time, had authority to approve or deny requests for days off and/or overtime, put procedures in place regarding

---

[5]  The draft job description Fields prepared for lieutenants specifically included "Supervision," "Career & Professional Development," "Incident Management," and "Community Policing, and Administration." HOUCK000152-153. Specifically excluded from the draft job description were task clusters for "Patrol Duties" and "Criminal Investigations" due to Fields' assessment that the importance of these duties to the lieutenant role was low. [SOF ¶ 12].

[6] Separate job descriptions exist for sergeants and deputies (officers). The sergeant and deputy roles are heavily focused on patrol duties, criminal investigations, and responding to calls for service. The job description for Deputy Sheriff states that the primary duties of the position are criminal investigations, response to calls for service, patrol duties, training, and administration. [SOF ¶ 15]. The job description for Law Enforcement Sergeant states that the primary duties of the position are training, supervision, administration, patrol duties, and criminal investigations. [SOF ¶ 15].

call outs, placed a sergeant on an action plan, had authority to file complaints about employees with internal affairs, performed evaluations of his assigned (and previously assigned) sergeants, conducted informalized training, and handled internal affairs investigations. [SOF ¶216-222]

The remaining opt-ins similarly testified that they had performed a wide variety of managerial tasks. For example, it is undisputed that they have performed the following managerial duties:[7] when a patrol district's Captain/Commander is unavailable, filling the role as the patrol district's "acting commander" or "acting captain (who becomes the highest-ranking individual in the patrol district) for periods ranging from an occasional weekend to several consecutive months at a time; being involved with and making recommendations as to hiring and promotion decisions; serving on deputy-to-sergeant and sergeant-to-lieutenant promotion boards; having the authority to report misconduct, file complaints, initiate and serve as the principal, and assume responsibility over internal affairs investigations, including making recommendations of sustained findings, issuing action plans to subordinates, and issuing verbal and formal coaching; supervising two or more employees; supervising, monitoring, and directing the work of their subordinates; taking command of significant incidents until they are resolved (which includes setting up a command post, calling in and coordinating resources, assigning duties to people on scene, ensuring notifications are given to the chain of command, and ensuring sergeants are properly doing their duties); performing annual performance evaluations for each of their Sergeants; preparing performance notes for each of their Sergeants on a bi-weekly basis; having responsibility for several other key managerial and administrative tasks to maintain developmental functions and operational readiness, such as budgeting, conducting formal training to Sergeants and Deputies, serving as firearms instructors for the MCSO firearms training unit, teaching substantive courses at the police academy, and managing and

_____

[7] While the types of managerial tasks may have varied from Lieutenant to Lieutenant, the volume and significant nature (extent and frequency) of management responsibilities was common to all Lieutenants in this case.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

overseeing Field Training Officer programs; and being tasked with special projects where they make important recommendations, including scheduling projects to address staffing issues, designing and buildouts of facilities, procuring new equipment and devices like fingerprint scanners for office-wide implementation, and revising district operations manuals. DSOF ¶¶ 216 – 223.

Houck and the opt-ins do not deny the extent and frequency of their managerial duties. Instead, Houck appears to contend that he did not primarily perform managerial duties because:

> As a Patrol Lieutenant, my primary job duties are law enforcement duties that I typically perform alongside the officers on my team **on a daily basis**, including rescuing crime victims, preventing or detecting crimes, conducting investigations and inspections for violations of law, performing surveillance, pursuing, restraining, and apprehending suspects, detaining or supervising suspected and convicted criminals, interviewing witnesses, and interrogating suspects.
> Doc. 27-1 (Houck Declaration in Support of his Motion For Conditional Certification, ¶9) (emphasis added)

To begin, the above paragraph from Houck's declaration is taken nearly verbatim from the First Responder Regulation found at 29 § 541.3(b)(1). When questioned at deposition about the paragraph in his declaration claiming to have performed these duties on a "daily basis," Houck clarified that he did not individually rescue crime victims on a daily basis. Instead he acted as part of a "team" in the performance of this duty. [SOF ¶ 226]. ("Q: Is it your contention that you rescue crime victims on a daily basis? A: As part of a team I do. Not specifically me." Houck Depo., pp. 243:7:17. With regards to the remaining examples in his declaration, Houck similarly disavowed performing them on a "daily basis." He testified that in the approximately three years since his promotion to Lieutenant (April 4, 2022 through March 18, 2025) he "guessed" he had rescued crime victims "five times or less"; "detected crimes, very infrequently[8]"; conducted investigations and inspections for violations of law "several times"; performed surveillance "a few times…

---

[8] Houck could not provide an estimate for how many times he personally prevented crimes, and instead contended that his mere "presen[ce] [at] a location could prevent the crime but you wouldn't necessarily know you prevented a crime." [SOF ¶ 226].

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

"[m]aybe 30 times or so"; pursued, restrained, and/or apprehended suspects "around 20 times"; detained or supervised suspected and convicted criminals and/or interviewed witnesses and interrogating suspects "probably about 50 times" in a "supporting" capacity (only "a few primary"). [SOF ¶¶ 226, 227, 228, 229, 230, 231, 22, 233]. Simply put, when placed under oath, Houck clarified that he had only performed the duties identified in paragraph 9 of his declaration at most 150 times over three years. [SOF ¶¶ 226-233]. During the relevant time period, Houck was generally scheduled to work four (4) ten-hour shifts. [SOF ¶¶ 19-20]. Four (4) ten-hour shifts per week multiplied by 52 weeks equals 208 shifts per year or 624 shifts over three years. As a matter of law, Houck cannot possibly contend that the performance of the duties identified in paragraph 9 of his declaration were his "primary" duties if he performed them, at most, less than 25% of the days he worked.[9]

### 2. "Management" is The Principle, Main, Major, or Most Important Duty That Lieutenants Perform.

"An employee's "primary duty" is the "principle, main, major or most important duty that the employee performs" after analyzing "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Each Plaintiff must perform exempt work as their primary duty but performing both exempt and non-exempt work does not necessary defeat exempt status. 29 C.F.R. § 541.106(a)–(b). Generally, an employee satisfies the primary duty requirement if he spends more than 50 percent of his time performing exempt work, but "[e]mployees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion." § 541.700(b). Factors to consider regarding an employee's primary duty include: (1) "the relative importance of the exempt duties as compared with other types of duties," (2) "the amount of time spent

---

[9] For the purposes of summary judgment only, Defendant interprets Houck's deposition testimony in the broadest manner possible. But the 25% figure merely represents the number of days Houck would have performed one of the alleged "first responder duties," and does not represent the actual percentage of time performing the duties. For example, it would not have taken Houck an entire 10-hour shift to apprehend a suspect or interview a witness. Accordingly, time Houck allegedly spent performing "first responder" duties was minimal, at best.

performing exempt work;" (3) "the employee's relative freedom from direct supervision;" and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." § 541.700(a). Here, each of these factors weigh heavily in Defendant's favor.

### a) The Relative Importance Of The Exempt Duties As Compared With Other Types Of Duties

The relative importance of exempt duties performed by the Plaintiffs is not in dispute. Multiple plaintiffs conceded at deposition that their "primary duty" was to perform managerial related duties. Acosta testified that when he worked in District 1, his primary duty was "basically giving guidance and – and ensuring that the deputies were safe and that they were following policies and procedures and – and that they were documenting whatever they needed to document to ensure it was done appropriately." SOF 283. Plaintiff Acosta now works day shifts in District 2, where he serves more of an administrative lieutenant role and characterizes his primary responsibilities as overseeing "internal affairs investigations," working with the "field training program," and "building maintenance and anything that has to do with supplies for . . . the district itself." SOF ¶283

Houck testified his "primary duty as patrol lieutenant remains law enforcement, being *available* to respond to calls," yet he agreed that it is not the primary duty of a Patrol Lieutenant to *actually* "respond to calls for service." SOF ¶284

Keller testified his "primary duty is to uphold the laws, lead by example, while managing [his] sergeant and deputies," and testified that there are "some personnel . . . that are in management positions, all ranks [including lieutenant], that their primary job is just to sit in their office." SOF ¶285

Thomas, his primary responsibility is "incident command" of "significant incidents," where he "set[s] up a command post," "request[s] additional resources," "assign[s] duties to people on scene," "ensure[s] notifications are given to the chain of command," and "[e]nsure[s] the sergeants are properly doing their duties." SOF ¶286.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

Neville testified that his responsibilities as watch commander are "primarily command and control trying to keep everything balanced and make sure that resources are gotten to the patrol deputies on the ground." SOF ¶286. Neville further testified about his responsibilities as follows: "So I'm being held to the standard of you are not an engaged leader, you're not out there with your troops, you're not responding to these emergency calls because you're spending your entire time in the office, that's a bad mark on my reputation. I would be held accountable for that, up to and including discipline. But then when I go out and do it, I'm also told you still have your administrative stuff you have to get taken care of . . . ." SOF ¶286.

**b)      The Amount Of Time Spent Performing Exempt Work.**

The amount of time that the plaintiffs spent performing exempt work is significant. Houck estimates that he spends between four and five hours of every 10-hour shift in his office performing administrative duties and conversing with sergeants. SOF ¶288  He only spends 20 to 25% percent of his time each week responding to calls for service.  SOF ¶288

Acosta estimates that he currently spends approximately 65% of his time performing administrative work, another 15% performing duties related to internal affairs, and five percent 5% for patrol functions. SOF ¶289

Halverson  was asked to estimate how much time he spent each day (over more than a two-year period in District 7) performing the administrative tasks set forth in the Patrol Lieutenant job description, and he testified he could not provide an accurate percentage because all the essential duties set forth in the job description "are intermixed" and "every task [he] did involve[d] administration, supervisory oversight, management, mentoring, professional development." SOF ¶290.

Jackson testified that when he worked in District 2 from November 2022 through January 2024, the tasks he performed while working in his office were "[j]ust regular administrative stuff like checking e-mails, supervisor notes, report reviews, just the

standards," yet he could not quantify what percentage of time he actually spent in his office versus out in the field because "[i]t would be a guess." SOF ¶291

### c) The Employee's Relative Freedom From Direct Supervision.

There is no dispute that the lieutenants enjoyed relative freedom from direct supervision. When a patrol district's captain/commander is unavailable, a patrol lieutenant will fill the role as the districts "acting commander" or "acting captain." [SOF ¶ 216]. Houck, Acosta, Freeman, Halverson, Vance, Keller and Rankin have all served as "Acting Commanders/Captains" overseeing their entire district. [SOF ¶¶ 19, 63, 216]. The lieutenants conceded that when they served in this role, they were the highest-ranking individual in their district. SOF ¶¶ 216, 19, 63]. Moreover, lieutenants who work the night shift are referred to as the "Watch Commander" and are the highest-ranking individual during that shift for Patrol Bureaus East or West and at times for the entire county. [SOF ¶ 216]. Houck, Brice, Jackson, Freeman, Keller, Vance, Neville, and Rankin have all served as "Watch Commanders" overseeing the night operations for either Patrol Bureau East, Patrol Bureau West, or the entire county. [SOF ¶¶ 20, 30, 74, 103, 128, 137, 139, 182, 183]. When they served as night watch commander for Patrol Bureau East or West, they were the highest-ranking scheduled employee. [SOF ¶ 216]. When they were scheduled to serve as the night watch commander for the entire county, they were the highest-ranking scheduled employee within all of MCSO. [SOF ¶ 216]. Given these undisputed facts, it is hard to imagine a situation where an employee enjoys greater relative freedom from direct supervision.

### d) The Relationship Between The Employee's Salary And The Wages Paid To Other Employees For The Kind Of Nonexempt Work Performed By The Employee.

With regards to the last factor, it is undisputed that each lieutenant received substantial increases in pay upon their promotion from sergeant to lieutenant. Upon their promotion to Lieutenant, each of the opt-ins received pay raises of at least 10%.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

**(1)    A   Customarily   Recognized   Department   of Subdivision.**

Finally, Defendant has established that lieutenants "manage" "a customarily recognized department or subdivision" within MCSO. The first sentence of the Law Enforcement Lieutenant job description reads "The Law Enforcement Lieutenant administers, plans, organizes and directs the operations of a district or other assigned operational area within the Maricopa Conty Sheriff's Office (MCSO)." [SOF ¶ 14]. Houck and the other Plaintiffs conceded the accuracy of this job description at deposition. [SOF ¶¶ 14]. Each of the lieutenant in Patrol Bureaus East and West are assigned to a District. [SOF ¶ 1]. Most Districts have two or three lieutenants. [SOF ¶ 2]. Those lieutenants, in turn, oversee and supervise subdivisions within the District consisting of two to four patrol squads. [SOF ¶2][10] Different squads are assigned to work different days and shifts, but each squad consistently reports to the same assigned lieutenant. [SOF ¶ 2]. Courts have routinely held that a lieutenant's management and supervision of squads serves to satisfy this requirement. *Anderson v. City of Cleveland, Tenn.*, 90 F. Supp. 2d 906, 912 (E.D. Tenn. 2000) (finding police lieutenants as exempt employees under the executive exemption in part because they managed recognized subdivisions of the department); *Auer v. Robbins*, 65 F.3d 702, 713 (8th Cir. 1995), *aff'd*, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997) (finding police sergeants to be exempt employees because, in part, they supervised officers assigned to their precinct); *Shockley v. City of Newport News*, 997 F.2d 18, 26 (4th Cir. 1993) (finding police sergeants as exempt through management of a recognized subdivision within the police department).

---

[10] "The phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function. A customarily recognized department or subdivision must have a permanent status and a continuing function. For example, a large employer's human resources department might have subdivisions for labor relations, pensions and other benefits, equal employment opportunity, and personnel management, each of which has a permanent status and function." 29 C.F.R. § 541.103.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

### e)    Customarily and Regularly Direct the Work of Two or More Other Employees

The fact that the lieutenants "regularly direct the work of two or more other employees" is similarly not in dispute. Each of the lieutenants in Patrol Bureaus East and West separately and regularly direct the work of multiple squads. [SOF ¶ 2] Each of the squads consist of a sergeant and up to 8 deputies and non-sworn civilian staff. [SOF ¶2]. At deposition, each of the opt-ins that Defendant was allowed to depose openly conceded that they have always supervised at least two or more individuals at all times since they have been a lieutenant. [SOF ¶¶ 25, 35, 44, 54, 69, 79, 88, 99, 112, 133, 145, 187].

### f)    Authority to Hire Or Fire Other Employees, or Suggestions are Given Particular Weight.

The final requirement for the executive exemption is that the employee has the authority to hire or fire other employees, "or their suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.105. "To determine whether an employee's suggestions and recommendations are given 'particular weight,' factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. "An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher-level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." C.F.R. § 541.105.

Here, there is no dispute that the suggestions and recommendations of Houck and the opt-ins are given "particular weight."[11]    At deposition, Houck and the other plaintiffs

---

[11] In his Compliant, Plaintiff vaguely alleges that he "does not have authority to hire and fire employees" and that his discretion in his administrative or supervisory role is limited by the decisions of his Captain, who ultimately makes decisions regarding management and operations of the Patrol Division." Doc. 1, ¶¶ 25-26. Defendant strongly contests these assertions. However, even assuming the truthfulness of these assertions (for purposes of

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

testified that they were involved in ranking candidates up for promotion, sat on interview panels, participated in discipline and internal affairs investigations, directed and supervised the work of subordinates, made judgment calls regarding incident command, evalauated employees, and made recommendations regarding purchase orders and other special projects.  SOF 217-222

### 3. The Lieutenants Further Qualify As Exempt Under The FLSA's Administrative Exemption.

To prove the lieutenants qualify under the administrative exemption, Defendant must establish: (1) the lieutenants were compensated on a salary basis at not less than $684 per week; (2) their primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer; and (3) their primary duty includes the exercise of discretion and independent judgment with matters of significance. 29 C.F.R. § 541.200(a).

#### a) Salary Basis of $684 Per Week.

As set forth above in section III(A)(1)(a), *supra*, the salary basis test has been satisfied as to all opt-ins.

#### b) Primary Duty Is The Performance of Office or Non-Manual Work Directly Related to Management or General Business Operations.

"To qualify for the administrative exemption, an employee's primary duty must be the performance of work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. 541.[12] Courts have recognized that this primary duty has significant overlap with the managerial requirements under the

---

summary judgment only), they are not sufficient to overcome summary judgment. The Code of Federal Regulations makes clear that a supervisor can qualify under the executive exemption "even if the employee does not have authority to make the ultimate decision" regarding change in status. 29 C.F.R. §541.105.

[12] 29 C.F.R. §541.201(a) further provides that the "phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."

FP 57035296.1

executive exemption.  *See, generally, Copas*, 61 F. Supp. 2d at 1020-1021 (outlining "managerial" duties under both the executive and administrative exemptions).

As set forth above in section III(A)(1)(b)(1), it is undisputed that Houck and the remaining lieutenants' primary duty was related to management.  Houck and the opt-ins' primary duties must have been the performance of office or non-manual work related to management because, by their own testimony, the majority of Lieutenants in this case spent 50% or more of their time either in their MCSO office, driving to and from work, or doing administrative paperwork in their MCSO issued vehicle.

Houck testified it took him between 90 minutes and three hours each day, depending on traffic, to commute round trip from between his home and his office. SOF ¶200. For the remaining seven to 8.5 hours of his shift, Houck testified he spent approximately four to five hours in his office at District 1. SOF ¶200. Houck testified he spent approximately 20 to 25 percent of his time each week out in the field responding to calls for service. SOF ¶200.

Acosta has worked in multiple districts.  While working nights in Districts 1 and 3 it took him approximately 60 to 80 minutes each day to commute round trip between his home and his office. SOF ¶201. For the remainder of his 10-hour shift, he spent 30% of his time in his office and 70% of his time in the field. SOF ¶201. Acosta and estimates he split his time 50/50 in his office and in the field when he worked District 3 day shifts. (SOF ¶201. Acosta testified it currently takes him approximately 30 minutes each day to commute roundtrip from his home to the District 2 office. SOF ¶201. Acosta testified he spends approximately 90% of his time in his office versus out in the field. SOF ¶201.

While working in District 3, Brice testified it took him an hour to an hour and a half to commute to work and about 50 minutes to an hour to commute back home.  SOF ¶202.Brice testified it was "common" for him to head to his office multiple times per week during his ten-hour shift, when he served as a watch commander for the west side. Id. The amount of time Brice spent in his office varied depending on administrative workload. He

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

testified he could spend five hours a night in his office if he had administrative tasks. Id. He also testified there were times he spent an entire day at his office. Id.

While working in District 7, Freeman testified it took one hour each way, regardless of night or day shift to commute to work. SOF ¶203. Freeman testified that while in District 7 – for the first 3-4 weeks - he spent 75% of his time in the office and about 25% of his time in the field. Id. While as a watch commander in District 7, his time was closer to 50% in the office and 50% in this field. Id. While working in District 3, Freeman testified it took him between 30 to 45 minutes to commute to work for day shifts. For the remaining 9 to 9.5 hours of his shift, Freeman spent about 75% of his time in the office and 25% of his time in the field. SOF ¶203. After transferring to night shifts in District 3, Feeman testified it takes about one hour to commute to work. (Freeman Depo., pp., 46:06-17). Freeman testified as a nighttime watch commander in District 3, he spends 50% of time in the office and 50% of his time in the field. SOF ¶203.

While working in District 7, Halverson testified it took approximately 30 minutes to 45 minutes each way to commute to work. SOF ¶204. Halverson testified that he spent two-thirds of his workday in the office. The rest of the day was spent meeting with supervisors or going by a scene. Id. Halverson testified being on scene in the field was about 10-20% of his time as a lieutenant. Id.

While in District 2, Jakson testified his commute to work took approximately 15 minutes. SOF ¶205. Jackson was not able to quantity the percentage of time while in District 2 that he spent in the office versus the field, but stated he never spent an entire shift in the office. Id.

While in District 2, Keller testified it took him 35 minutes each way to commute to and from work. SOF ¶206. For the remaining 9.5 hours of his shift, Keller spent 50% of his time in the office and 50% of the time in the field. Id. While in District 3, Keller testified it takes about 15 minutes to commute each way to and from work. Id. Keller testified he spends 50% of his workday in the office and 50% in the field. Id. During a 10-hour shift,

Keller would be in the office 4.5 to 5 hours each day and in the field 4.5 to 5 hours each day. Id.

While in District 2, Neville testified his commute took about 25 minutes to and from work. SOF ¶207. Neville testified he would try to spend the first "couple three hours in the office" to take care of administrative concerns. He estimated he needed about 2-3 hours per day in the office and the remainder of the day in the field. Id.

While in District 3, Rankin testified his commute to and from work took approximately 30 minutes. SOF ¶208 Rankin testified the majority of the remaining 9.5 hours of his shift was spent in the office. Half of the day he would be in his personal office and the other half he would be in the captain's or other sergeants' offices. Id

While in District 1, Thomas testified it takes about 20 minutes each way to commute to and from work. SOF ¶210. Thomas testified he spends about 3 out his 4 workweek days entirely in the office. Id.

While in Lake Patrol as the West Side Lieutenant, Vance would drive about an hour and 45 minutes each way to work. SOF ¶212. Vance spent 25% of his time as the Lake Patrol West Side Lieutenant in the field responding to calls. Id. The remaining 75% would be spent performing administrative tasks. Id.  While in Lake Patrol in an administrative capacity, Vance testified it took about 11 minutes to drive to work. Id. Vance spent about 90-95% of his day in the office. Id.

**c)     Primary duty includes the exercise of discretion and independent judgment with matters of significance**

"To qualify for the administrative exemption, an employee's primary duty must include the exercise of discretion and independent judgment with respect to matters of significance. In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered. The term 'matters of

**FISHER & PHILLIPS LLP**
**3200 N. Central Avenue, Suite 1550**
**Phoenix, Arizona 85012-2487**
**(602) 281-3400**

significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. §541.202(a).[13]

Here, there can be no better example of exercising discretion and independent judgment with "matters of significance" than serving as a Lieutenant within MCSO. To begin, the lieutenant job description clearly identifies "Incident Management" as a core responsibility of the lieutenant position. [SOF ¶ 14]. When asked to describe the essential job task of "incident management" in his own words, Houck testified that lieutenants "respond to major scenes and set up … a command post. Where you basically set up a pop-up tent and you coordinate the resources that coming out, like the --- the SWAT team, the hostage negotiation team, and you basically take charge or command of the incident until the incident is resolved." [SOF ¶¶220, 280]. Houck further testified that he had served as night Watch Commander, overseeing all of Patrol Bureau East overnight. [SOF ¶ 20]. Houck explained that when he served as a night Watch Commander he was required to respond to serve as commander on scene whenever "something of significance" occurred such as a barricade situation or murder. Houck 224:9-225:14. He was expected to take command of the scene, make judgment calls in real time and then provide a briefing up the chain of command "after [he] made the world safe." DSOF 281 As set forth above, many of the remaining opt-ins also served as night Watch Commander or Acting Commander, serving as the highest-ranking scheduled individual during their respective shift, resulting in

---

[13] Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: **whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business**; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business; **whether the employee has authority to commit the employer in matters that have significant financial impact**; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long- or short-term business objectives; **whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances. 29 C.F.R. § 541.202(b)** (emphasis added)**.**

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

them regularly assuming supervisory command over scenes involving matters of significance. [SOF ¶¶ 216, 19, 63, 20, 30, 74, 103, 128, 137, 139, 182, 183].

As set forth in 29 C.F.R. §541.202(a), the above referenced conduct is the epitome of comparing and "evaluation of possible courses of conduct[] and acting or making a decision." Moreover, "the level of importance or consequence of the work performed" is extremely high, especially in situations where potential consequences of decisions can literally be life and death.

### 4. The Opt-Ins Further Qualify As Exempt Under the Highly Compensated Exemption For Multiple Years.

The Highly Compensated Exemption applies if: (1) "the employee receives total annual compensation" of set amounts proscribed under the rules; and (2) "the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative, or professional employee." 29 C.F.R. §541.601(a).

### a) Total Yearly Compensation

Until June 30, 2024, the threshold to qualify under the highly compensated exemption was $107,432.[14] On July 1, 2024, it increased to $132,964. 29 C.F.R. §541.601(a)(1). Beginning on January 1, 2025, it increased to $151,164 per year. 29 C.F.R. §541.601 (a)(2). An employee may fall in and out of the highly compensated exemption year-to-year depending on overall yearly compensation. C.F.R. 541.601(b); *see also McCoy v. N. Slope Borough*, No. 3:13-CV-00064-SLG, 2013 WL 4510780, at *8 (D. Alaska Aug. 26, 2013) (total annual compensation is calculated during a 52-week period). Thus, the analysis must be conducted for each year in question.

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[14] See old version of C.F.R. §541.601 at Federal Register Vol. 69, No. 79 chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/regulations.pdf.



### b) Exempt Duties or Responsibilities

Regulations make clear that "[a] high level of compensation is a strong indicator of an employee's exempt status, thus eliminating the need for a detailed analysis of the employee's job duties. Thus, a highly compensated employee will qualify for exemption if the employee customarily and regularly performs any one or more of the exempt duties or responsibilities of an executive, administrative or professional employee." 29 C.F.R. § 541.601(c). Regulations further clarify that ***"[a]n employee may qualify as a highly compensated executive employee, for example, if the employee customarily and regularly directs the work of two or more other employees, even though the employee does not meet all of the other requirements for the executive exemption under § 541.100."*** 29 C.F.R. § 541.601(c).

Here, there is no dispute that all of the lieutenants "regularly directe[d] the work of two or more other employees" during the relevant time period. [SOF ¶¶ 2, 25, 35, 44, 54, 69, 79, 88, 99, 112, 133, 145, 187]. This, in of itself, is sufficient to meet the duties test under the highly compensated exemption.

---

[15] "Where the annual period covers periods during which multiple total annual compensation levels apply, the amount of total compensation due will be determined on a proportional basis. 29 C.F.R. §541.601(a)(4). Since the salary basis was changed July 1, 2023, the prior standard of $107,432 (adjusted for 6 months) applies to January 1, 2023 through June 30, 2023. $132,964 (adjusted for 6 months) applies to July 1, 2023 through December 31, 2023. The total prorated amount for 2023 (assuming the employee was in the HCE role the entire year) is **$120,198** ($53,716+$66,482).

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

Moreover, the lieutenants can easily demonstrate that "one or more of the exempt duties or responsibilities of an executive [or] administrative" employee are "customarily and regularly perform[ed]." 29 C.F.R. 541 §601(d). With regards to the executive exemption, there is no dispute that the lieutenants "manage" "a customarily recognized department or subdivision" within MCSO. [SOF ¶¶ 1, 14, 15]. There is similarly no dispute that the lieutenants make suggestions and recommendations as to changes of employment status, and those suggestions are given particular weight. With regards to the administrative exemption, there is no dispute that the lieutenants perform "office or non-manual work directly related to the management or general business operations of the employer." Finally, there is no dispute that the lieutenants exercise discretion and independent judgment with respect to matters of significance. Any one of these duties or responsibilities is sufficient to satisfy the highly compensated employee test.

**5.    It Is Anticipated Houck and The Opt-Ins Will Argue That "The First Responder Regulation Applies"; Houck's Argument Is Misplaced.**

It is anticipated that Houck and the opt-ins will argue that they are "first responders" pursuant to the first responder regulation set forth in the FLSA, 29 C.F.R. § 541.3(b), and that their "primary" and "most important" job duty is "law enforcement," making them ineligible for the 13(a)(1) exemptions. However, this argument is misplaced and the Court should find that the first responder regulation does not apply.

It is well-established that an "employee must be personally engaged in frontline law enforcement to fall under the first responder regulation." *Miller v. Travis Cnty., Texas*, 1:16-CV-1196-RP, 2018 WL 1004860, at *9 (W.D. Tex. Feb. 21, 2018). The first responder regulation sets forth what type of duties are considered frontline law enforcement such that they would fall under the first responder regulation, as follows:

> The section 13(a)(1) exemptions and the regulations in this part also do not apply to police officers, detectives, deputy sheriffs, state troopers, highway patrol officers, investigators, inspectors, correctional officers, parole or probation officers, park rangers, fire fighters, paramedics, emergency medical technicians, ambulance personnel, rescue workers, hazardous materials workers and similar employees, regardless of rank or pay level, who perform

23

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

work such as **preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work.**

29 C.F.R. § 541.3(b) (emphasis added). "[N]on-exempt first responder duties include 'rescuing fire, crime, or accident victims,' 'performing surveillance,' 'preparing investigative reports,' and other like activities that are normally performed by police officers, paramedics, firefighters, and similar personnel. *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 828 (10th Cir. 2012). Furthermore:

> The first responder regulation does not alter the primary duty test. Thus, high-level employees who perform some first responder duties, like police lieutenants or fire chiefs, can nonetheless be exempt executives if their primary duty is managerial and they meet the other elements of the test.

*Id.* (citing *Maestas*, 664 F.3d at 827.

By contrast, the following duties constitute managerial duties for high-level police and fire personnel, as set forth by the Department of Labor:

> Evaluating personnel performance; enforcing and imposing penalties for violations of rules and regulations; making recommendations as to hiring, promotions, discipline, or termination; coordinating and implementing training programs; maintaining company payroll and personnel records; handling community complaints, including determining whether to refer such complaints to internal affairs for further investigation; preparing budgets and controlling expenditures; ensuring operations readiness through supervision and inspection of personnel, equipment, and quarters; deciding how and where to allocate personnel; managing the distribution of equipment; maintaining inventory of property and supplies; and directing operations at crime, fire or accident scenes, including deciding whether additional personnel or equipment is needed.

69 Fed. Reg. at 22130 (Apr. 23, 2004); see also *Maestas*, 664 F.3d at 829 (quoting *Defining and Delimiting the Exemption for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed.Reg. 22,122, 22,130 (April 23, 2004):

> Some duties performed by high-ranking public safety officers are bona fide managerial duties, such as: "evaluating personnel performance," "making recommendations as to hiring, promotion, discipline, or termination," "coordinating and implementing training programs," "maintaining inventory of property and supplies," "maintaining operational readiness through supervision and inspection of personnel, equipment and quarters," "deciding

how and where to allocate personnel," and "directing operations" at emergency scenes, "including deciding whether additional personnel or equipment is needed."

Additionally, the Ninth Circuit has consistently recognized that a plaintiff should not lose exempt status merely because he or she performs some "ordinary work" performed by subordinate employees. *Barner v. City of Novato*, 17 F.3d 1256 (9th Cir. 1994); *Wainscoat v. Reynolds Electrical & Engineering Co., Inc.,* 471 F.2d 1157, 1161 (9th Cir.1973) ("[T]he plaintiff should be classified as an executive although he engaged, to some extent, in ordinary work performed by employees subordinate to him, which work was a part of his supervisory duties)."

Defendant has made clear that the first responder regulation does not alter the primary duty test for overtime exemptions under the FLSA. *See* Wage & Hour Division, Dep't of Labor, Opinion Letter Dated Oct. 4, 2005, 2005 WL 3308611 at *2–3. In its Opinion Letter, the DOL assessed the job duties of police lieutenants who supervised police officers and sergeants, in order to determine whether they were exempt from the FLSA's overtime provisions. The facts contained in the DOL letter are strikingly similar to the present case. The lieutenants assessed under the Opinion Letter assisted and instructed sergeants, performed appraisals of subordinates, supervised and commanded field personnel, and coordinated and directed expenditures, material acquisition, and maintenance, among job duties. *Id.* at *1. The Department of Labor concluded that the aforementioned duties constituted management duties, and that "the § 13(a)(1) exemptions may apply to police lieutenants, police captains, and fire battalion chiefs positions so long as the employees in these positions meet all of the requirements set out in the Regulations." *Id.* at *2.

Here, Houck and each of the deposed opt-ins have all conceded that the Law Enforcement Lieutenant job description correctly summarizes their job duties and that they actually perform the duties listed in the description. By comparison, if the typical lieutenant is scheduled to work four 10-hour shifts in a week, multiplied by 52 weeks in three years, that is a total of 6,240 shifts. While the testimony of the Lieutenants varied, on average, the

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

Lieutenants performed the frontline law enforcement duties minimally as compared to deputies.  DSOF Exh. 1  For example, for Deputies who worked more than 200 hours between January 1, 2023 and March 1, 2023, all Deputies have served as the primary responding unit on a call for service at least 41 times, that over 75% of the Deputies have been the primary responding unit on over 100 calls for service (one Deputy was the primary responding unit on 288 calls), and that in this same time period, Plaintiff Houck was the primary responding unit on only four calls. Id.

Furthermore, different Lieutenants go on scene differing amounts of time. However, the Lieutenants have testified that when they do go on scene, it is for the purpose of providing mentorship and feedback, or to direct operations. [SOF 217-222. "Directing operations" at an emergency scene is a managerial duty." *Maestas*, 664 F.3d at 829. Alternatively, if it is a high-priority call such as a barricade situation or a homicide, it is not to perform the rank and file police duties that would be performed by a Deputy, but instead to assume command as the commander in charge. [DSOF 220]. These types of duties are the epitome of managerial duties, as set forth by the Department of Labor and in relevant case law, cited above.  Furthermore, during their depositions, the plaintiffs conceded that they exercise discretion regarding which calls to respond to, other than "serious" calls. [SOF 271-275]. They also conceded that they have discretion concerning their start and stop times, and that they could flex their hours. [SOF 271-275.  By contrast, a Sheriff's Deputy does not have discretion regarding whether to respond to a call they are dispatched to.

At deposition, the Lieutenants conceded that it was the Deputies who were performing the first responder duties on a daily basis. [SOF 223234]. Nevertheless, Plaintiff contends that his (and the opt-in's) "primary duties are nonexempt in nature," he does not set forth any specific admissible facts in support of this contention. Plaintiff vaguely asserts that he "spends every day working monitoring the police radio for patrol activity, so that he can respond to first responder law enforcement calls." But supervisors need to supervise, and mere observation of subordinates performing their duties does not convert an otherwise exempt duty into a nonexempt one. *Baldwin v. Trailer Inns, Inc.,* 266 F.3d 1104,

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

1115 (9th Cir. 2001) (Determining that the primary duty inquiry for purposes of exemption from overtime under the FLSA focuses on the employee's own duties rather than those of their subordinates). As set forth in the Command Responsibility policy, supervisors are required to "[m]onitor situations in which subordinates are involved." Exh. A, (Exh. 5, p. 7). Plaintiff does not provide any specific facts or evidence that his primary duty as a Lieutenant is patrolling the streets, pulling vehicles over, and performing other low ranking law enforcement activities. In fact, as set forth more fully above, the County has offered Houck and the opt-in's own sworn deposition admissions that show they rarely performed low ranking law enforcement duties.  Instead, such duties are routinely and primarily performed by line-level Sheriff's deputies.

### B. Lieutenant Michael Trowbridge Worked Exclusively in SWAT for the Relevant Time Period, Which is Not in Patrol Bureaus East or West; He Must Be Dismissed.

The Order granting conditional certification in this case limits the FLSA collective to only those lieutenants who have worked in Patrol Bureaus East or West from January 11, 2020 to the present. Doc. 38; ¶SOF 3. Trowbridge opted into this case on February 1, 2023, months before the Court's ruling on conditional certification. SOF ¶ 124. It is undisputed that Trowbridge worked as a lieutenant in in SWAT from November 15, 2018 through March 3, 2025, when he was promoted to Captain. DSOF ¶¶121, 123. Trowbridge has taken the unsupported position that he is properly in the collective because SWAT is (or has been) in Patrol Bureau West during the relevant time period. However, Trowbridge has offered no admissible facts or evidence in that support his position.[16] On the other hand,

---

[16] It is anticipated that Trowbridge may offer the following four documents that purportedly support his position: (1) a Maricopa County Sheriff's Office Patrol Resource Bureau SWAT Division Operations Manual ("SWAT Operations Manual") (cover page produced at TROW000004), (2) a "Supervisor Note" that Trowbridge entered for a sergeant (TROW000035-36); (3) a 11/29/21 Memorandum from Trowbridge in "SWAT Division" to Deputy Chief McWilliams in "Investigations Bureau" (TROW000038-40; and (4) A 1/8/20 Memorandum from Trowbridge in "SWAT Division" to Deputy Chief Brandimarte in Patrol Bureau West (TROW000001-2).  SOF ¶¶264.However, these records do not support Trowbridge's position.  As for the SWAT Operations Manual, Trowbridge testified that the manual was produced because it "was just showing that were in the patrol resource bureau" as of the date of the manual."  SOF ¶265.  Trowbridge further testified that he did not have an understanding as to whether Patrol Resource Bureau was its own independent

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

Defendant has produced evidence that SWAT is not, and has not, been a part of Patrol Bureaus East or West during the relevant time period. SOF ¶1, 2, 269-271. The fact that SWAT is not in Patrol Bureaus East or West has been corroborated by other plaintiffs. SOF ¶1, 2, 269-271. Other than Trowbridge, none of the other plaintiffs have contended that SWAT is in Patrol Bureaus East or West.

### C. If the Court is disinclined to grant complete summary judgment to Defendant on exemption status, Houck And The Opt-Ins' Claim to Alleged Unrecorded Overtime Hours Must Be Dismissed.

Houck and some of the remaining plaintiffs appear to contend that they are entitled to worked hours that they failed to record in Defendant's timekeeping system. The Court shouldn't have to reach this issue because the lieutenants are properly classified as exempt under the FLSA. However, if the Court is disinclined to grant summary judgment in defendant's favor on this issue, the Court should dismiss plaintiffs' clam to unrecorded overtime hours as without merit. MCSO command staff instructs all exempt and non-exempt personnel to accurately record all hours worked in its timekeeping systems. Plaintiffs have never claimed that they were instructed not to report hours worked. Quite to the contrary, plaintiffs testified at deposition that they were specifically instructed to record all hours worked and that no one told them not to. Simply put, Defendant gave plaintiffs

---

bureau apart from Patrol Bureaus East or West. SOF ¶265. As for the Supervisor Note, Trowbridge testified he produced it because "TROW 36, the second page" "shows his title is sergeant enforcement command/patrol and enforcement support." SOF ¶266. However, Trowbridge quickly conceded that he didn't have any understanding one wat or the other whether "command/patrol and enforcement" was "separate apart from patrol bureau east or west. SOF ¶266.).   As for the 11/29/21 Memorandum, Trowbridge testified he produced it because it "was showing that in November of '21 … we would have switched from patrol bureau west over to investigations bureau." **SOF¶267.**  But when asked if there was a reference to patrol bureau west on the Memorandum, Trowbridge conceded "[t]here's not.  Investigations bureau is a separate – separata from patrol bureau west." SOF ¶267. Finally, as for the 1/9/20 Memorandum, a memo from one individual to another is not indicative of what department SWAT fell under.  But even putting that aside, it is dated before the relevant time period in this case.  Trowbridge opted in on February 1, 2023. Doc. 16. Thus, even if a 3-year lookback period were to apply, his relevant period would be February 1, 2020 through March 3, 2025. [SOF  ¶¶123-24]. A memo dated January 9, 2020 does not establish whether SWAT was part of patrol bureau west nearly two weeks later. At deposition, Trowbridge testified that he did not have any other facts or records (other than the above referenced documents) to support his position that SWAT was in Patrol Bureaus East or West. **SOF ¶268**

the opportunity to report all hours worked. Accordingly, if plaintiffs worked **additional** hours that they voluntarily chose not to record into the system, Defendant would have no reasonable way of knowing.

### D.    The Court Should Disregard Any Declarations Offered by Cruz, Goad, McCann, Sanchez, Rank, Kremer, Jakowinicz, or Whelan-Gonzalez.

Defendant fully anticipates that Plaintiffs will submit declarations in support of their response to Defendant's Motion for Summary Judgment and/or Motion to Decertify. However, in the event Plaintiffs do so, Defendant will be severely prejudiced because Defendant was prohibited from deposing half of the opt-ins. Specifically, Defendant was not allowed to depose Cruz, Goad, McCann, Sanchez, Rank, Kremer, Jakowinicz, or Whelan-Gonzalez.    To the extent these opt-ins offer declarations for the first time in response to Defendant's Motion for Summary Judgment and/or Motion to Decertify, Defendant will have been deprived of the opportunity to test the veracity of any statements made by these individuals.    Defendant brought this issue to the Court during the July 29, 2025 Conference regarding the briefing schedule. The Court specifically requested briefing from Defendant on this issue.

Courts within the Ninth Circuit have routinely found that when an absent class member intentionally injects themselves into the case through submission of a declaration, those class members may be deposed. Aldapa v. Fowler Packing Co., Inc., No. 115CV00420DADSAB, 2019 WL 2635947, at *8 (E.D. Cal. June 27, 2019) (allowing an additional fifteen depositions for individuals who submitted declarations supporting class certification); Vasquez v. Leprino Foods Co., No. 117CV00796AWIBAM, 2019 WL 4670871, at *4 (E.D. Cal. Sept. 25, 2019) (allowing depositions of seven absent class members who submitted declarations); Moreno v. Autozone, Inc., No. C-05-4432 MJJ EMC, 2007 WL 2288165, at *1 (N.D. Cal. Aug. 3, 2007) (allowing depositions of absent class members when class members "injected" themselves into the action through declarations). A contrary result would result in fundamental unfairness.

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

Here, Defendant acknowledged this issue long ago and attempted to mitigate the issue by sending at least two letters to Plaintiff's counsel requesting the identities of any opt-ins that were anticipated to offer declarations in this case. SOF ne282. Plaintiffs' Counsel ignored these requests.

Now that discovery has closed and Defendant has fully briefed its motions for summary judgment and decertification, Plaintiffs should not be permitted to offer never before disclosed declarations from witnesses that Defendant has not been permitted to depose. If Plaintiffs were permitted to offer such declarations, it could significantly impact Defendants' briefing and may result in the need to submit amended briefing. Defendant respectfully submits that under the present circumstances, the appropriate sanction is for the Court to disregard any declarations offered by Cruz, Goad, McCann, Sanchez, Rank, Kremer, Jakowinicz, or Whelan-Gonzalez. See Fed.R.Civ.Pro. 56(h).

**E.    Plaintiff Houck and the opt-ins' claims are barred and should be dismissed to the extent they are seeking damages outside the applicable statutes of limitations and/or outside time periods they worked in Patrol Bureaus East or West as a Lieutenant.**

Many opt ins offered damage computations for periods of time that they were not in Patrol Bureaus East or West. To the extent that the Court is disinclined to grant summary judgment to Defendant as to exemption status, plaintiffs should, at a minimum, be limited to claiming damages only during periods of time that they worked in Patrol Bureaus East or West as a Lieutenant from January 11, 2022 to the present. [SOF ¶¶ 17-196] Doc. 38, p. 11. For the Court's convenience, a chart summarizing dates is provided at SOF Exh. 77.

**F.    If the Court is disinclined to grant complete summary judgment in favor of Defendant, it should nevertheless limit the recovery period to two years and rule that liquidated damages are not recoverable.**

**1.    The Relevant Time Period Should Be Limited to The FLSA's 2-Year Presumptive Look Back Period.**

The FLSA requires a plaintiff to commence a civil enforcement action "within two years after the cause of action accrued, except that a cause of action arising out of a 'willful' violation may be commenced within three years. 29 U.S.C. §255(a). To show willfulness, a

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

30

plaintiff must demonstrate that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). "Ordinary violations of the FLSA are subject to the general 2–year statute of limitations." *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 134 (1988).

Here, the opt-ins have offered no evidence of a "willful" violation on the part of Defendant. On the other hand, Defendant has offered evidence that it made the decision to classify lieutenants as exempt in 2007 following a Maricopa County's review of lieutenant job duties and review and reliance on guidance from the Department of Labor (including a 2005 Department of Labor Opinion Letter specifically addressing the exempt status of patrol lieutenants). [SOF ¶ 8]. Approximately ten years later, Maricopa County retained an outside consulting firm to conduct a job analysis of various ranks within the MCSO, including lieutenants. As part of the analysis the consultant provided revised job descriptions to better reflect the actual duties performed by lieutenants. [SOF ¶¶ 9-12]. These job descriptions which were largely adopted by Maricopa County (no material changes to the Essential Job Tasks). [SOF ¶¶ 13-15]. These job duties focus on the extensive managerial duties performed by lieutenants. [SOF ¶ 15]. As part of discovery in this case, the Houck and the other deposed lieutenants conceded the applicability of these job descriptions to their position and that they actually performed all of the tasks listed in the job description – both relating to managerial duties and the exercise of discretion of matters of significance in assuming "Incident Management" as the commander in charge. [SOF ¶ 14]. Finally, there is no dispute that the lieutenants supervised at least 2 ees and have earned $684 a week. [SOF ¶¶ 24, 34, 43, 53, 68, 78, 87, 98, 11, 120, 127, 138, 148, 156, 164, 172, 181, 189, 25, 35, 44, 54, 69, 79, 88, 99, 112, 133, 145, 187]. Given these facts, Plaintiffs cannot establish a "willful" violation of the FLSA occurred.

Given that Plaintiffs have no facts to establish a "willful" violation of the FLSA, the following Plaintiffs who only potentially fall within the FLSA collective based on a three-year-lookback period must be dismissed: McCann, Brice, Kremer and Jakowinicz. [SOF ¶¶

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

31

77, 159, 167, 151].

**6.    Defendant Had Reasonable Grounds and Believed in Good Faith That Its Classification of Patrol Lieutenants Complied With the FLSA; Liquidated Damages Must Be Dismissed.**

Liquidated damages are not automatic under the FLSA. Instead, if an employer shows that it acted in "good faith" and had "reasonable grounds" to believe its actions did not violate the Act, "the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216." 29 U.S.C. § 260. Here, Defendant has shown that it had "good faith" and "reasonable grounds" to believe its actions complied with the FLSA.  As set forth above, Defendant reclassified lieutenants in 2007 following an assessment of job duties actually performed by lieutenants. In so reclassifying the lieutenants, Defendant relied upon guidance from the Department of Labor, including an October 14, 2005 Opinion Letter that specifically dealt with patrol lieutenants.  SOF 8. The duties described by the DOL in the Opinion Letter were nearly identical to the job duties performed by Defendant's patrol lieutenants. SOF 8; SOF Exh. 68  The DOL concluded in its opinion letter "the duties described in your letter are sufficient to qualify the City's Police Lieutenants, Police Captains, and Fire Battalion Chiefs as exempt from the minimum wage and overtime provisions of the FLSA."  SOF 8; SOF Exh  About a decade after the lieutenants were reclassified, in 2017, Defendant hired an outside consultant to assess the job duties performed by lieutenants so that job descriptions could be updated.  SOF 9 As a result of the assessment, it was determined that patrol lieutenant performed primarily managerial duties.  SOF 9-12.  Since the time of the analysis, the job responsibilities of patrol lieutenants have not significantly changed.  Indeed, to the extent there are any changes, it would be the imposition of additional administrative/managerial tasks as a result of the *Melendrez* case (court-ordered reforms including increased supervision and monitoring by management personnel as a result of racial profiling allegations). SOF 16. As a result of the foregoing, at all times, Defendant has

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

acted with "good faith" and had "reasonable grounds" to believe its actions complied with the FLSA such that plaintiffs' demand for punitive damages should be dismissed.

### G. Plaintiffs Hunter and Bocardo, Who Filed Self-Titled "Notice of Withdrawal of Consent" Forms Must Be Dismissed.

Plaintiff Matthew Hunter filed an opt-in notice on 1/18/23 (Doc. 8). Plaintiff Kelly Bocardo filed an opt-in notice on 2/13/23 (Doc. 18). After defendant served discovery on these plaintiffs, they filed self-titled "Notice of Withdrawal of Consent" forms. Hunter filed his on 4/5/24 (Doc. 63) and Bocardo filed hers on 6/6/24 (Doc. 65). Because they have withdrawn their consent to participate in the FLSA collective action, they must be dismissed from the case.

## IV. CONCLUSION

For foregoing reasons, Defendant respectfully requests judgment in its favor, dismissing all of Plaintiff and the opt-ins' claims with prejudice.

DATED this 27th day of September 2025.

FISHER & PHILLIPS LLP


By s/ Shayna Balch Santiago
    Shayna Balch Santiago
    Lori A. Guner
    David G. Myers
    3200 N. Central Avenue, Suite 1550
    Phoenix, Arizona 85012-2487
    Attorneys for Defendant Maricopa County

FISHER & PHILLIPS LLP
3200 N. Central Avenue, Suite 1550
Phoenix, Arizona 85012-2487
(602) 281-3400

FP 57035296.1

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant(s):

Ty D. Frankel
Yen Pilch Robaina & Kresin PLC
6017 N. 15th Street
Phoenix, Arizona 85014
tdf@yprklaw.com
Attorneys for Plaintiff

Patricia N. Syverson
Yen Pilch Robaina & Kresin PLC
9655 Granite Ridge Drive, Suite 200
San Diego, California 92123
pns@yprklaw.com
Attorneys for Plaintiff


 s/ Michelle C. Xochicale

FP 57035296.1