# EXHIBIT 1

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Christopher J. Houck, on behalf )
of himself and all those        )
similarly situated,             )
                                )
      Plaintiff,                 )   NO.
                                )   2:23-cv-00068-DGC
vs.                             )
                                )
Maricopa County,                )
                                )
      Defendant.                 )
                                )


VIDEOTAPED DEPOSITION OF CHRISTOPHER JOHN HOUCK

Phoenix, Arizona
March 18, 2025
9:34 a.m.


Glennie Reporting Services, LLC
1555 East Orangewood Avenue      Prepared by:
Phoenix, Arizona 85020
                                 Jill Marnell, RPR
602.266.6535                     Arizona Certified
www.glennie-reporting.com        Reporter No. 50021

5

1          VIDEOTAPED DEPOSITION OF CHRISTOPHER JOHN HOUCK

2     was taken on March 18, 2025, commencing at 9:34 a.m., at

3     Fisher & Phillips, 3200 North Central Avenue, Suite 1550,

4     Phoenix , Arizona, before Jill Marnell, a Certified

5     Reporter in the State of Arizona.

6                          ---oOo---

7     APPEARANCES

8     For the Defendant:

9              SHAYNA H. BALCH SANTIAGO
               LORI A. GUNER
10             JACOB R. VALDEZ
               Fisher & Phillips
11             3200 North Central Avenue
               Suite 1550
12             Phoenix, Arizona 85012
               ssantiago@fisherphillips.com
13             lguner@fisherphillips.com
               jvaldez@fisherphillips.com

14

15    For the Plaintiff:

16             TY D. FRANKEL
               Frankel Syverson
17             2375 East Camelback Road
               Suite 600
18             Phoenix, Arizona 85016
               ty@frankelsyverson.com

19

20    Also present:  Samantha Elliott, videographer
21                   Megan Morley (via Zoom)

22

23

24

25

Christopher John Houck, Videotaped - 03/18/2025

20

1   remains law enforcement, being available to respond to
2   calls, being -- having to show up in uniform, be on the
3   radio, be logged in to the CAD system to be dispatched to
4   calls.  I'm not a -- in a management-type role.  I'm still
5   in a first responder role.
6       Q.   I want to walk you through some of these.  All
7   right.  So you said that you have to be logged in to the
8   CAD system; you are in a first responder role.  What were
9   the others?
10      A.   That my primary duty remains law enforcement.
11  That's what -- that's what I'm there for.
12      Q.   I think you also said something about your
13  vehicle?
14      A.   I don't think I mentioned vehicle.
15      Q.   Oh, I thought you said you had to be in a -- in a
16  vehicle.  Okay.
17               So let's walk through some of these.  So
18  what is the CAD system?
19      A.   The CAD system is -- stands for computer-aided
20  dispatch.  And it is a software program on our laptops.
21  That is where the dispatchers keep track of the calls for
22  service and they dispatch the deputies to take those calls
23  for service from that system.
24      Q.   And does that correlate at all with the radio?
25      A.   The -- the radio is what the dispatchers use to

21

1    get the information to put into the CAD system.

2        Q.   So do the CAD system and radio kind of go hand in

3    hand?

4        A.   They're two separate things.  The dispatchers

5    have to manually put what they're hearing on the radio

6    into the CAD system.  It doesn't like auto-type, if that's

7    what you're asking.

8        Q.   No, but the radio -- Strike that.

9             Any information that is relayed on the radio

10   gets entered into the CAD system; correct?

11       A.   For the most part.  I'm sure they don't give

12   word-for-word entries from what they're hearing on the

13   radio.

14       Q.   So since you brought that up, when do you have to

15   first log in to the CAD system?

16       A.   When you -- when I start my duty shift for that

17   day.

18       Q.   And where is that?

19       A.   Beginning of my duty shift starts in my driveway.

20       Q.   And why is that?  Is that because you are allowed

21   to take your work vehicle home?

22       A.   Everybody lieutenant and above has take-home

23   vehicles and you're permitted to start your shift from

24   your -- start and end your shift in your driveway.

25       Q.   And is that a practice that you engage in?

22

1      A.    Yes.

2      Q.    There are some references to this CAD system in

3   both your complaint and your -- your declaration.  I'd

4   like to draw your attention to Page 2 of your declaration.

5   And you reference it in Paragraphs 11 and 16, so let's

6   talk about Paragraph 11 first.  [As read]:  I spend every

7   day working monitoring the police radio for patrol

8   activity so that I can respond to first responder law

9   enforcement calls as required by the County.

10                That's a reference to the radio.

11                How -- how do you monitor the radio?

12      A.    There's a radio in the -- in my take-home car

13   that I use as I'm driving.  And then there's a radio on my

14   shoulder that I use when I'm walking around or if I have

15   to go to the bathroom, I'll take this one with me.  And

16   there's also a radio on my desk at my office.

17      Q.    What are the hours that you have your radio on?

18      A.    It's when I'm on shift, on duty.

19      Q.    And just so that we can have a clean record

20   throughout today's deposition, what do you define to be

21   shift or on duty?

22      A.    It's my scheduled hours, my scheduled days that I

23   work.

24      Q.    Okay.  And what are those scheduled days, hours

25   right now?

Christopher John Houck, Videotaped - 03/18/2025

24

1      Q.   Okay.  So from April 4, 2022, through your

2   transfer out of patrol bureau January 20, 2025, have you

3   worked hours outside of your scheduled shift?

4      A.   Yes.

5      Q.   Describe those hours that you've worked outside

6   of your scheduled shift for me.

7      A.   Well, there were many times where towards the end

8   of my scheduled shift a high-priority call would occur.

9   And it's not something that I can just walk away from, I

10  have to respond to it.  And I would get basically stuck

11  there until the conclusion of the call.  That could be

12  several hours after my scheduled shift was supposed to

13  end.

14          In addition to those times during my days

15  off and time off I would often check my voicemails,

16  respond to phone calls, check emails, respond to emails to

17  do business work for the office.

18      Q.   Any other categories of time that were outside of

19  your scheduled hours?

20      A.   There's also mandatory training classes that they

21  would make us attend.  And depending on the training class

22  sometimes I could not do it on a day that I would

23  regularly be scheduled to work so I would have to do it on

24  a day off because I couldn't -- I couldn't leave the

25  patrol district unmanned.

Christopher John Houck, Videotaped - 03/18/2025

25

1      Q.   Any other categories of time that would be
2   outside your scheduled hours?
3      A.   Those are the only ones I can think of.
4      Q.   Okay.  Would it be fair to characterize your
5   description of staying past your assigned shift as
6   holdover time?
7      A.   I don't really know what holdover time means.
8      Q.   Let's use a different word, then.  So you
9   described for me three categories of time that could fall
10  outside of your scheduled hours.  One is mandatory
11  training that could occur any -- any day of the week or at
12  any time; correct?
13     A.   Correct.
14     Q.   Okay.  How often would -- How often does
15  mandatory training outside of your scheduled hours occur?
16     A.   Just a couple times a year, maybe three, four
17  times a year.
18     Q.   About how long?  Is it full day?  Half day?  A
19  few hours?
20     A.   They are usually full days.
21     Q.   Okay.  You also mentioned checking, responding to
22  phone calls or emails?
23     A.   Yes.
24     Q.   When does that typically take place?
25     A.   That takes place all the time.

26

1    Q.    When?  Before your shift?  During your shift?

2    After your shift?

3    A.    All.  All times.

4    Q.    How much time per day?

5    A.    It varies.  It's not a specific amount of time

6    each day.

7    Q.    Can you give me an approximate?

8    A.    There's some days where I don't get any calls and

9    then there's some days where I'm on the phone for an hour.

10    Q.    But is -- is this time -- I understand it's

11    outside of your scheduled hours.  Do the calls typically

12    come in before your scheduled hours?  Do they typically

13    come in after your scheduled hours?

14    A.    Like I said, I've had them at all times.  I've

15    had -- If I'm not supposed to start to 7:00, I've gotten

16    calls at 2 o'clock in the morning saying, hey, we're

17    shorthanded.  I need you to come in right now.  I know

18    you're not scheduled for another five hours.  I've had to

19    go in.

20    Q.    Understood.

21          Those calls that -- the calls, the emails

22    that you receive outside of your scheduled hours, are they

23    typically calls to report to duty?

24    A.    No.

25    Q.    What categories would you describe them as?

1      A.    They are typically calls from people that are
2   currently on duty and they have questions about things
3   they need guidance on.
4      Q.    From your sergeants?
5      A.    Sergeants and deputies have called me as well.
6   Captains call me.  Chiefs call me.  A lot of people call
7   me.
8      Q.    What types of questions?
9      A.    Just scheduling questions for the next upcoming
10  week or questions about the -- how to handle a certain
11  type of call or how to process a certain type of
12  administrative task.
13     Q.    But I think you testified those don't occur every
14  single day but they do vary in -- in frequency --
15     A.    That's correct.
16     Q.    -- and duration.
17           And a third category I believe you testified
18  was you're already on shift and you have to stay past your
19  shift.  Is that correct?
20     A.    That's correct.
21     Q.    And how often would that occur?
22     A.    Again, it varied.  There were some weeks where it
23  didn't occur at all and then there were some weeks where
24  it was back-to-back having to do that.
25     Q.    Okay.  Can you walk me through what a typical day

53

1            Walk me through your understanding of how

2    the system auto-populates.

3        A.    Your captain assigns you a schedule.  And you --

4    you have Workday mirror your schedule so it automatically

5    puts in -- It doesn't like have your start and end times

6    but it has hours.  So like at District 1 I worked

7    Wednesday, Thursday, Friday, Saturday.  So Workday would

8    automatically populate ten hours Wednesday, ten hours

9    Thursday, ten hours Friday, ten hours Saturday.

10        Q.    So Workday auto-populates the total shift hours

11    but not the shift times; is that correct?

12        A.    Correct.

13        Q.    Do you have an understanding as to how those

14    schedules are uploaded into Workday, or prior to that ADP?

15            MR. FRANKEL:  Foundation.

16            THE WITNESS:  I think the HR people put them

17    in there.  I'm not -- I'm not sure exactly how they end up

18    in there.

19            I know I had a conversation with an HR

20    person once because my schedule was wrong in there.  It

21    kept auto-populating the wrong days, and she said that

22    my -- my supervisor had to do something in the software to

23    update it.  And eventually it got fixed but I'm not sure

24    how it got fixed.

25        Q.    BY MS. BALCH SANTIAGO:  What was incorrect with

54

1    what was auto-populating with your schedule in the payroll

2    system?

3        A.    Instead of putting ten hours Wednesday, ten hours

4    Thursday, it was doing like ten hours Monday, ten hours

5    Tuesday, ten hours Wednesday, ten hours Thursday.  So it

6    just had the wrong days I was working.

7        Q.    Wrong days but total number of shifts was

8    correct?

9        A.    Right.

10       Q.    And the total number of hours per shift was

11   correct?

12       A.    Yes.  It automatically auto-populates the

13   40 hours a week.  There's no way to do less or more than

14   that.

15       Q.    And is it correct that you have the ability to

16   view what hours are auto-populated into the payroll

17   system?

18       A.    Yes.  At the end of the two-week period we have

19   to review the entries in the system and then submit it to

20   our supervisor for approval.

21       Q.    Walk me through what that process looks like.

22       A.    It's just you log in to the Workday website and

23   then you click on your time sheet and it will show the

24   hours for the previous two weeks.  And then it will have

25   a -- either a review or approve button on the bottom right

Christopher John Houck, Videotaped - 03/18/2025

55

1    that you click to send it to your supervisor if it was
2    correct.
3        Q.    Have you ever needed to correct your time sheet
4    during this process?
5        A.    Yes.
6        Q.    When have you needed to correct your time sheet?
7        A.    A lot of times if I take -- if I take vacation I
8    have to change the hours to vacation hours instead of
9    regular pay hours.  Or if I take a sick day I have to
10   change it to sick -- sick time hours.  Or if I have worked
11   outside of my regular scheduled hours I can add in the
12   additional hours that I worked.  Or if I swap days I can
13   swap the hours around.
14       Q.    And have you had to go through this process of
15   reviewing the numbers in the payroll system each pay
16   period since your promotion to lieutenant in April --
17   April 4, 2022?
18       A.    Yes.
19       Q.    Do you have a practice of reviewing your pay
20   stubs?
21       A.    No, I usually never look at them.
22       Q.    Do you agree that your pay stubs reflect the --
23   the pay that you actually received from Maricopa County?
24               MR. FRANKEL:  Form.
25               THE WITNESS:  Yes, I get the same amount

Christopher John Houck, Videotaped - 03/18/2025

60

1      A.    Yes.

2      Q.    Were the responses in Exhibit 9 to your

3  deposition correct at the time you submitted them?

4      A.    Yes.

5      Q.    Are they still correct to this day?

6      A.    Yes.

7      Q.    Let's walk through your response to Interrogatory

8  Number 1.  It's on Page 3 to Exhibit 9.  Let me know when

9  you're there.

10      A.    I'm there.

11      Q.    In this interrogatory request [as read]:  For any

12  periods of time that you contend that you were employed as

13  a law enforcement lieutenant in patrol bureaus east or

14  west between January 11, 2020, and the present, please

15  identify the following.

16            Do you see that?

17      A.    Yes.

18      Q.    And in your response you identified District 1

19  and District 7; correct?

20      A.    Correct.

21      Q.    We now also need to add a new assignment;

22  correct?

23      A.    Yes, but the new assignment is not in patrol

24  bureau east or west.  The court security, it's a different

25  bureau.

1      Q.   Thank you for that clarification.

2                So then let's go ahead and modify the

3    response to this interrogatory to have the correct dates

4    when you worked in patrol bureau east or west from

5    January 11, 2020 and the present.  I -- I realize that at

6    the time you submitted this these were the correct dates,

7    but --

8      A.   Would it be better to word it now, just a

9    suggestion, till January 19th of 2025, because that's when

10   I left the --

11     Q.   January 19, 2025?

12     A.   Yeah, because the 20th is -- I think that is a

13   Monday.  That's when I started at court security.

14     Q.   So I want to go through and make sure I have a

15   clean record here.

16                So you worked in District 7 in patrol

17   bureaus east or west from April 4, 2022, through April 18,

18   2022; correct?

19     A.   Yes.

20                MR. FRANKEL:  Hold on.  I think he started

21   in District 1, just to clarify.

22                THE WITNESS:  No, it was -- it was 7 for two

23   weeks.

24                MR. FRANKEL:  Oh, I'm sorry.

25     Q.   BY MS. BALCH SANTIAGO:  You then worked in

 1    District 1 from April 18, 2022, through January 19, 2025;
 2    correct?
 3         A.   Yes.
 4         Q.   And for the first seven months as a patrol
 5    lieutenant in District 1 you worked the night shift;
 6    correct?
 7         A.   Correct.
 8         Q.   And that was Wednesday through Saturday from
 9    5:00 p.m. to 3:00 a.m.; correct?
10         A.   Yes.
11         Q.   Did you remain in the day shift Wednesday through
12    Saturday 7:00 a.m. to 5:00 p.m. for the entire time period
13    that remained through January 19, 2025, after that initial
14    seven-month period?
15         A.   Yes.
16         Q.   There's a reference here in this discovery
17    response that you served as acting commander for one week.
18              Do you see that?
19         A.   Yes.
20         Q.   What is an acting commander?
21         A.   It's just basically taking over as the captain
22    when the captain's not available.
23         Q.   When did you serve as acting commander?
24         A.   It's like I mentioned before, when I first got
25    promoted to lieutenant, the first week I got sent to

Christopher John Houck, Videotaped - 03/18/2025

63

1    District 7 and I had John Halverson, who's the other

2    lieutenant up there, kind of show me like what to do as a

3    lieutenant.  And then the second week I was basically

4    told, you know, you're on your own because I'm on vacation

5    as well, and there was no other lieutenant or captain in 7

6    for that second week.

7        Q.   Other than that second week of your employment as

8    a lieutenant while you were at District 7, have you ever

9    served as acting commander at any other times?

10       A.   No.

11       Q.   What is a watch commander?

12       A.   That's the title that they give to a lieutenant

13   that works the night shift.

14       Q.   When you are serving as the watch commander are

15   you the highest ranking individual at that time?

16       A.   Usually, yes.

17       Q.   What are the responsibilities of a watch

18   commander?

19       A.   They're really not much different than a regular

20   day shift commander.  Yeah, I worked both positions.  I

21   didn't really see a difference in the two.

22       Q.   What's a day shift commander?

23       A.   It's just one of the lieutenants that work during

24   the day shift.

25       Q.   What's the difference between -- Strike that.

Christopher John Houck, Videotaped - 03/18/2025

64

1          Would you agree with me that there are a

2   total of three bureaus within Maricopa County Sheriff's

3   Office?  That would be enforcement, custody, and

4   compliance?

5      A.  I'm not sure.  I think there's -- I think there's

6   more than that.  I'm not sure.

7      Q.  You just don't know one way or the other?

8      A.  I know I've seen a tree in the past and they had

9   it like broken down, but I don't remember how many

10  branches were on the tree.

11          THE COURT REPORTER:  Did you say brackets or

12  branches?

13          THE WITNESS:  Branches.

14     Q.  BY MS. BALCH SANTIAGO:  Do you have an

15  understanding as to whether or not the enforcement bureau

16  is broken down into divisions including patrol bureau

17  east, patrol bureau west, patrol resources bureau, and

18  investigations bureau?

19     A.  So I know east and west are under enforcement.

20  The other two, I'm not really sure about them.

21     Q.  So let's go through patrol bureau east and patrol

22  bureau west.  Am I correct in understanding that patrol

23  bureau east is comprised of Patrol Districts 1, 7, and

24  lake patrol?

25     A.  Yes, and lake patrol is often referred to as

Christopher John Houck, Videotaped - 03/18/2025

65

1   District 5.

2       Q.   And patrol bureau west is comprised of Patrol

3   Districts 2, 3, and 4; correct?

4       A.   That's correct.

5       Q.   So you've only worked for patrol bureau east as a

6   lieutenant; correct?

7       A.   That's correct.

8       Q.   You have not worked for patrol bureau west?

9       A.   Not as a lieutenant, no.

10           Well, actually I should correct myself and

11  say there have been shifts that I've filled in for in

12  patrol bureau west, but I wasn't technically like assigned

13  there.

14      Q.   Thank you for that clarification.

15           When you've had to fill in for shifts in

16  patrol bureau west what -- what districts have those been

17  in?

18      A.   Districts 2 and 3.

19      Q.   How many shifts have you filled in for in

20  Districts 2 and 3 since April 4 of 2022 to the present?

21      A.   A handful.  I would say no more than two or

22  three.

23      Q.   No more than two or three total or two or three

24  each?

25      A.   Total.

1      Q.    Were those ten-hour shifts or 12-hour shifts?

2      A.    Ten-hour shifts.

3            Usually the -- Whenever a lieutenant takes

4      vacation they have to have another lieutenant cover their

5      shift.  Which is very hard to do because they're not going

6      to get any overtime to cover their shift.  So that's why I

7      have done so few.

8      Q.    Are you familiar with the phrase patrol resources

9      bureau?

10     A.    I've heard it before.  I'm not sure who all is in

11     it.  I think it might be like the SWAT division.  I'm not

12     sure.

13     Q.    Well, there are -- so -- So let's talk about the

14     SWAT division briefly.  To your knowledge is the SWAT

15     division within patrol bureaus east or west?

16     A.    No.

17     Q.    It's not -- The SWAT division is not within

18     patrol bureau east or west; is that correct?

19            MR. FRANKEL:  Foundation.

20            THE WITNESS:  Not as far as I know.

21     Q.    BY MS. BALCH SANTIAGO:  How about the bureau of

22     internal oversight; is that within patrol bureau east or

23     west?

24     A.    No.  It's just the districts you mentioned

25     earlier.  That's it.

Christopher John Houck, Videotaped - 03/18/2025

1      A.   I don't remember.  I want to say maybe three or
2  four just for that two-week period.
3      Q.   How about in District 1; how many sergeants did
4  you have reporting to you?
5      A.   So when I was on night shift I had four.  And
6  then on day shift I had three.
7      Q.   At all times while you've served as a lieutenant
8  between April 4, 2022, through January 19th of 2025 have
9  you continuously supervised at least two sergeants?
10      A.   Yes.
11      Q.   Do you have an understanding as to whether or not
12  there were individuals with the designation watch
13  commander in all of the patrol districts?
14      A.   They are not in all the districts, no.
15      Q.   What is your understanding of how the
16  determination was made to give the designation of watch
17  commander in the district?
18      A.   I know they wanted to have two watch commanders
19  in each bureau, so two for bureau east and two for bureau
20  west.  In bureau west they have one in District 2 and one
21  in District 3.  And in bureau east they have one in
22  District 1 and they have one in District 7.  But over the
23  last three years the person in District 7 has been hit or
24  miss whether they had one assigned or not due to short
25  staffing.

Christopher John Houck, Videotaped - 03/18/2025

70

1     Q.   Are there watch commanders assigned during day

2   shifts or are watch commanders only designations that

3   refer to the night shift?

4     A.   The night shift.

5     Q.   Let's walk through the designation of commander

6   in general.

7     A.   Commander is anybody with the rank of lieutenant

8   or above.

9     Q.   If a captain is out of the office on leave or on

10  vacation, does someone need to fill in for that position?

11    A.   Not necessarily.  They -- I guess they could have

12  a lieutenant like be the acting captain for a while.  But

13  if it's going to be a long-term thing, they usually do

14  have another captain fill in the position from another

15  district.

16    Q.   I want to discuss each of the time periods that

17  you were in the different districts.  I understand that

18  you were in District 7 for a period of two weeks.  During

19  which time the captain was out for that entire period;

20  correct?

21    A.   Correct.

22    Q.   And the first week that you were assigned to

23  District 7 Lieutenant Halverson was serving as acting

24  captain; correct?

25    A.   Correct.

Christopher John Houck, Videotaped - 03/18/2025

173

1  deposition.  Do you recognize this document?

2      A.    I do.

3      Q.    What is this document?

4      A.    This is the job description for a law enforcement

5  lieutenant.

6      Q.    And that is the current position that you hold

7  right now; correct?

8      A.    Correct.

9      Q.    And you have held that position since April 4th

10 of 2022; correct?

11     A.    Correct.

12     Q.    Have you read this document prior to today's

13 deposition?

14     A.    I have.

15     Q.    And this document, Exhibit 14 to your deposition,

16 is at Houck 175 through 179; is that correct?

17     A.    Correct.

18     Q.    Since you've reviewed this prior to today's

19 deposition is there anything in this job description that

20 you contend is inaccurate?

21     A.    Nothing stands out, from what I remember.

22     Q.    So does this job description at Exhibit 14 to

23 your deposition accurately summarize the essential job

24 tasks of a law enforcement lieutenant?

25     A.    Yes.

Christopher John Houck, Videotaped - 03/18/2025

174

1      Q.   Let's walk through each of these categories.

2           So the first essential job task of a law

3  enforcement lieutenant is administration.

4           Do you see that?

5      A.   I do.

6      Q.   In your own words how would you describe the

7  administration duties of a law enforcement lieutenant?

8      A.   It's pretty much exactly the same as a sergeant's

9  administrative duties.  Less on the reading reports

10  because the sergeants don't typically write reports, but

11  everything else is pretty much exactly the same.

12           The lieutenants will typically do a -- an

13  additional level of review over and above the sergeant

14  review just to make sure that the sergeant didn't miss

15  anything.  And that's especially important on cases where

16  there's like an arrest or charges being submitted.

17      Q.   Can you walk me through each of the

18  administrative duties that you need to do on a regular

19  basis in your position as -- in the position that you held

20  as law enforcement lieutenant in Districts 1 and 7?

21      A.   So as I mentioned before BlueTeam is one of them.

22  We have to log in to a software program called BlueTeam

23  and we have to document supervisor notes on the sergeants

24  that -- that report to us.  We have to do a minimum of two

25  notes per month.  And we document performance issues, or

1    compliments, as well as traffic stop reviews.  And we have

2    to review their -- they call it an EIS profile.  It's

3    basically an alert system that the sheriff's office put in

4    place to see if there's any problems that could

5    potentially be coming up with the employees.  In addition

6    to that there's the report reviews, which I mentioned.

7    Anything -- anytime there's an arrest or there's charges

8    being submitted, we do like a command review to make sure

9    that the -- everything the sergeant signed off on was

10   correct before it goes down to the County Attorney's

11   Office.  We do EPAs on our sergeants.  Those are just

12   once-a-year performance evaluations.  We have to check the

13   patrol activity logs for the sergeants making sure that

14   the activity logs are correct.  We review any -- any forms

15   and TraCS that are sent to us.  Anything that they do in

16   BlueTeam they send to us to review and then we have to

17   review it and send it to the captain for final approval.

18              I think that about covers it.

19              And then we -- you know, just like

20   sergeants, we take our own reports and supplements

21   sometimes when we have to document something from a law

22   enforcement action.

23   Q.   Let me make sure I understand this correctly.

24              So as far as administrative duties that you

25   engage in as a lieutenant, you have to take two notes per

176

1   month per sergeant that is reflected in BlueTeam notes;

2   correct?

3       A.   Minimum of two, yes.

4       Q.   Minimum of two.

5            You also have to review a minimum of two

6   traffic stops per sergeant per month to the extent the

7   sergeant has at least two traffic stops per month;

8   correct?

9       A.   Well, if they have one we still have to do the

10  one, just -- Most sergeants don't usually have traffic

11  stops.

12      Q.   What's the EIS review?

13      A.   It's called the early identification system.  And

14  it's a system that was put in place as a result of the

15  court order you mentioned earlier where different --

16  different incidents will flag for certain categories.

17           So say for instance a deputy was in a

18  traffic accident.  In BlueTeam you would make an entry

19  saying that they were in a traffic accident.  And then

20  after a certain number of traffic accidents within a

21  certain time frame it would flag as being like a possible

22  problem.  This deputy's had, you know, three accidents in

23  two years.  And then an EIS alert would be sent out to the

24  sergeant and they have to -- or sent out to the lieutenant

25  if it was on a sergeant -- and we would have to basically

1    fill out forms to either, you know, discount or prove

2    the -- the alert and send it through the chain of command.

3        Q.   How often do you have to do this EIS review?

4        A.   We have to do it twice a month.

5        Q.   You also have to do a review of reports where

6    there was an arrest or charges; correct?

7        A.   Yes.  Not always -- it's not always me, it's

8    whoever is available at the time.  If it's not me, it

9    could be the detective sergeant that we have at the

10   district did it.  Or the other lieutenant would have done

11   it.  The -- all of the reports have to get electronically

12   sent to the County Attorney, and so we review them before

13   we do that just to make sure they are all correct.

14       Q.   EPAs were employee performance evaluations;

15   correct?

16       A.   Yes.

17       Q.   And you do those once a year for all your

18   sergeants?

19       A.   Correct.

20       Q.   What are the patrol activity logs that you need

21   to review?

22       A.   So every day when -- when they log in to the CAD

23   system they have to create like a -- like a shift roster.

24   And in that shift roster they have to have who the

25   supervisor was and which deputies were reporting to which

 1   supervisor.

 2                   That's another part of the court order for

 3   (indecipherable) of control.

 4                   THE COURT REPORTER:  For what control?

 5                   THE WITNESS:  Span of control.

 6                   And then inside each sergeant -- So the

 7   sergeants have to do the deputies, but the lieutenants

 8   have to do the sergeants.

 9                   You have to click on -- on their CAD history

10   and it basically shows you what they did during that

11   shift; which calls they responded to, which reports they

12   took.  And you have to approve it, just basically saying

13   that the logs are accurate.

14       Q.   BY MS. BALCH SANTIAGO:  So am I correct in

15   understanding that you need to review for your sergeants

16   and the sergeants need to review for their deputies patrol

17   activity logs?

18       A.   Correct.

19       Q.   Correct?

20                   And those patrol activity logs are created

21   by reviewing the CAD history for the individual; correct?

22       A.   Correct.

23       Q.   And is the CAD history similar in data as to

24   Exhibit 10 to your deposition, the unit history that's in

25   front of you?

1        A.    Yeah, yeah, that would be what -- what it was.

2    But it wouldn't be like -- These are all the days mished

3    together.  It would be one day.

4        Q.    Understood.

5              You indicated that you also have to review

6    forms in TraCS.

7        A.    Yes.

8        Q.    What forms are those that you have to review in

9    TraCS?

10       A.    That would be any types of reports that were

11   filled out, whether they be accident reports or incident

12   reports.

13             And then there's a couple of other forms in

14   TraCS, like tow sheets and victim rights forms and contact

15   forms.  There's -- there's probably about a dozen

16   different forms in TraCS.

17       Q.    Are those forms that you have to review on a

18   daily basis?

19       A.    The sergeants do.  Like I said, very rarely do

20   the sergeants generate forms.  So for -- for me not -- not

21   a daily basis.  But the sergeants have them on a daily

22   basis.

23       Q.    And then you also referenced doing your own

24   reports.  How often do you have to prepare your own report

25   in responding to either a call for service or your own --

1  that list?

2      A.   And then I think I mentioned Blue -- the BlueTeam

3  thing with the notes.  I also have to review the notes

4  that the sergeants did on their deputies.

5      Q.   Okay.  Anything else?

6      A.   That's all I can think of.

7      Q.   About how much of your time as a lieutenant do

8  you estimate you spend doing these administrative duties?

9      A.   Are we talking like in a given week?  In a given

10  month?

11      Q.   Whatever you feel most comfortable with.

12      A.   I would say in a given week probably ten hours of

13  time doing those tasks.

14      Q.   Approximately 25 percent of your time?

15      A.   Correct.

16      Q.   Okay.  Next category is "Incident Management."

17           Do you see that?

18      A.   I do.

19      Q.   Can you describe for me in your own words what

20  you understand your essential job task of incident

21  management is as a law enforcement lieutenant.

22      A.   Yes.  That's kind of a new thing that they just

23  started having us do within the last couple years.  But

24  they want the lieutenants to respond to major scenes and

25  set up what they call a command post.  Where you basically

1 | set up a pop-up tent and you coordinate the resources that
2 | are coming out, like the -- the SWAT team, the hostage
3 | negotiation team, and you basically take charge or command
4 | of the incident until the incident is resolved.
5 |     Q.   And what are the major -- Strike that.
6 |         What was your phrase that you used in
7 | characterizing when you had to do incident management?
8 | Was it for major crimes?
9 |     A.   Like major incidents typically.  It could also be
10 | for minor things where multiple units are -- are
11 | responding.
12 |         It's really just something you have to kind
13 | of play by ear and know what you have to go to and know
14 | what you don't have to go to.
15 |     Q.   So walk me through how that's determined.  Is
16 | that going to vary based on a particular lieutenant?
17 |     A.   It will.  And -- and based on the expectations of
18 | the captain that you work for.
19 |     Q.   Did the -- I understand the captain that you had
20 | in District 7 was on leave during your --
21 |     A.   Correct.  Never met him.
22 |     Q.   -- two weeks there, but you did report to Acting
23 | Captain Halverson for a week.
24 |         Did you -- Were you involved in any major
25 | incidences that you had to do incident management for

Christopher John Houck, Videotaped - 03/18/2025

1    Q.    Can you give me an average of how many sergeants

2    or deputies there are on-site?

3    A.    It depends on the incident.  And then as time

4    goes on more people arrive.  So in the beginning it's

5    usually just like two deputies and maybe a sergeant.  Then

6    after, you know, two hours when the SWAT team gets there

7    we may have three lieutenants, five sergeants, and, you

8    know, 20 deputies.  It just -- it just depends on the

9    situation, who's available, who's coming.

10    Q.    In responding -- In doing this incident

11    management have you ever been the highest ranking

12    individual on-site?

13    A.    Yes.

14    Q.    How many times?

15    A.    I would say probably close to 75, 80 percent of

16    those -- what did I say, ten times total for the three

17    years.  At least at first unless more people came -- came

18    on scene.

19    Q.    How much of your time as a law enforcement

20    lieutenant would you say is comprised of this incident

21    management?

22    A.    I would say less than five percent.

23    Q.    Okay.  Let's talk next about career and

24    professional development.  Can you describe for me in your

25    own words what the essential job tasks of career and

189

1    way.  I don't know of anybody that specifically like

2    required people to put in formal requests to take -- take

3    days off.

4        Q.    Anything else that would be encompassed within

5    supervision duties as a law enforcement lieutenant?

6        A.    No.  Like I said, it's pretty much exactly the

7    same from a sergeant aspect with deputies as it is from a

8    lieutenant aspect with sergeants.

9        Q.    How much of your time as a law enforcement

10   lieutenant would you say you spent supervising your

11   sergeants?

12       A.    Well, there's -- there's active supervising and

13   passive supervising.  I mean, sometimes situations come up

14   where you have to address it right then and there, and

15   other times you are just kind of waiting to see if they

16   need you for something.  So it's kind of hard to say.  I

17   mean, I guess I supervise all day.  But as far as like

18   active supervising, very little per week.  I would say no

19   more than, I don't know, an hour or two a week.

20       Q.    And that would be what you are calling active

21   supervision?

22       A.    Yeah.

23       Q.    How about passive supervision?

24       A.    Yeah, I do that all the time, all -- all day.

25   Like I'm listening to them on the radio, I'm listening to

190

1  the calls they are making, making sure they are doing a

2  good job.

3      Q.   Can you give me some other examples of what you

4  would consider to be passive supervision?

5      A.   I think it's just monitoring the way that they

6  run their squad, the way that they handle the radio, the

7  way that they help their deputies become better deputies.

8  The supervising notes that they write, make sure they are

9  detailed and, you know, they are actually addressing

10  issues that are coming up with the deputies.

11          It's just -- Like I said, most of the

12  sergeants are pretty squared away and they need very

13  little supervision.  But I have on occasion had a couple

14  of them that I had to like really, you know, watch like a

15  hawk because they kept screwing things up.  But the

16  majority of them didn't really need any supervision.

17      Q.   Let's skip next to "Management," since I feel

18  like supervision and management might go somewhat hand in

19  hand.

20          MR. FRANKEL:  Shayna, before we switch to

21  the next can we -- can I use the restroom?

22          If you -- if you want to finish a line of

23  questioning that's fine, but I --

24          MS. BALCH SANTIAGO:  Yeah, can you give me

25  like literally two minutes?

Christopher John Houck, Videotaped - 03/18/2025

191

1    MR. FRANKEL:  That's fine.

2    MS. BALCH SANTIAGO:  All right.

3    Q.   BY MS. BALCH SANTIAGO:  So with like management,

4    how would you describe management in the context of your

5    job duties as a law enforcement lieutenant?

6    A.   It's kind of -- Like you said, it's kind of the

7    same things.  The job description says it's maintaining

8    minimum staffing and readiness.  Like I said, I don't have

9    an issue with that.  There's always somebody willing to

10   work overtime.  And even if there wasn't, the one sergeant

11   could run the squad by themselves.  Yeah, so --

12   Q.   How much of your time as a law enforcement

13   lieutenant would you say is dedicated towards this

14   management category in the job description?

15   A.   I would say five to ten percent.

16   Q.   And the last category "Community Policing," what

17   is your understanding of that?

18   A.   That is going to community events like when they

19   have like Coffee With a Cop or just various events in the

20   community.  That's what that is.

21   Q.   How much of your time as a law enforcement

22   lieutenant would you say you spend doing community

23   policing?

24   A.   When I was night shift never, because they all

25   happen during day shift.  As day shift I would do them

1   occasionally.  I would average maybe one every two or

2   three months, we'd have an event that we would have to go

3   to.

4       Q.   Okay.  Are there any categories not listed on

5   this job description that you would describe as an

6   essential job task as a law enforcement lieutenant?

7       A.   Yes.  I think the main issue is that they have --

8   you know, they have these tasks for deputies, sergeant

9   and -- and -- or was it sergeant, captain, and lieutenant,

10  but there -- there's various different roles that a

11  lieutenant, captain, and sergeant can play in the

12  sheriff's office.  So the job of a patrol lieutenant is a

13  lot different than the job of a, you know, PSB lieutenant

14  or the job of a detective lieutenant or the job of a

15  compliance lieutenant.  It's very different.

16            So that's why I don't think that these are

17  very accurate, because they don't specifically talk about

18  the position that you are in.  They just talk about

19  overall in general.  So like I think this is -- these

20  should be broken down into your specific duty assignment

21  where you work, and they are not.

22            But if this was written for my duty

23  assignment I would expect it to talk about like patrol,

24  going to calls, monitoring the radio, assisting with the

25  apprehension of bad guys, putting together -- helping

1  deputies put together criminal investigations.  But they

2  don't -- This is just a general blanket lieutenant that

3  the whole office uses, if that makes any sense.

4        Q.   So if there was an additional category for what

5  you just described as assisting with apprehension and

6  patrol, what amount of time would you say you spend on a

7  weekly basis focused on just those tasks?

8        A.   And part of that I consider to be like monitoring

9  the radio, being ready.  I think that's 75 percent of my

10  time.  That's what I'm there for.  I'm there to respond to

11  calls.  I'm there to respond to things that need a command

12  presence.

13        Q.   If I were to carve out and put aside the portion

14  of that in monitoring the radio, how much of your weekly

15  time would be spent actually responding to calls?

16        A.   I think it's very similar to the sergeants.  You

17  are probably looking at about 20, 25 percent.

18        Q.   20 to 25 percent that you would respond to either

19  public-initiated calls for service or your own initiated

20  calls for service; correct?

21        A.   Correct.

22              MS. BALCH SANTIAGO:  Okay.  Let's go ahead

23  and take a break.

24              THE VIDEOGRAPHER:  Off the record at 4:25.

25              (Recess.)

1    A.   No.

2    Q.   Just a desk and a chair?

3    A.   A desk and a chair.

4    Q.   Did you utilize your office?

5    A.   I did.

6    Q.   How often would you utilize your office?

7    A.   I'd say probably -- On a regular workday I'd be

8  in there every day.

9    Q.   You had a ten-hour shift; correct?

10    A.   Correct.

11    Q.   And I think we established that approximately

12  45 minutes of your shift each day was the commute back and

13  forth to the District 1 office.  Correct?

14    A.   Close to three hours during day shift in rush

15  hour.

16    Q.   Thank you for that correction.

17         So of the remaining approximately seven to

18  eight hours per day how much time would you spend in your

19  lieutenant office?

20    A.   Probably four or five.

21    Q.   And what would you be doing in your lieutenant

22  office?

23    A.   I'd be doing the admin stuff that I previously

24  mentioned.

25         I also was working on a couple of like side

Christopher John Houck, Videotaped - 03/18/2025

199

1   projects regarding like outdated forms that were never

2   finished by deputies that had retired or left the office.

3   And some forms the sergeants had not yet signed off on

4   that were several months, even years old.  So I would work

5   on special projects like that.  And then I would also like

6   routinely have conversations with the sergeants that were

7   at the district.

8       Q.   When you say that you would routinely have

9   conversations with sergeants, how often?

10      A.   Every day.

11      Q.   Would you -- what -- What would you be discussing

12  with sergeants?

13      A.   A mix of like work-related stuff and

14  nonwork-related stuff.  Performance issues with deputies

15  on their squad.  And then as far as not work-related

16  stuff, like things they did over the weekend

17  (indecipherable).  Stuff like that.

18              THE COURT REPORTER:  Stuff they did over the

19  weekend, what?

20              THE WITNESS:  Movies they saw.

21      Q.   BY MS. BALCH SANTIAGO:  Would you work on

22  employee performance reviews in your office?

23      A.   You mean the EPAs?

24      Q.   Yes.

25      A.   Yeah, the -- once a year when they were due,

Christopher John Houck, Videotaped - 03/18/2025

201

1      A.    Yeah.

2      Q.    -- yeah.

3            So when you were at the District 1

4  building --

5      A.    I called the whole building my office, so --

6      Q.    When you were in the District 1 building you

7  might also have meetings with sergeants, captains, other

8  individuals in other spaces or in their offices; correct?

9      A.    Correct.

10     Q.    So you would spend the majority of your shift

11 either driving to/from the District 1 building or spending

12 time in the District 1 building itself; correct?

13     A.    That's correct.

14     Q.    Since your promotion to lieutenant April 4, 2022,

15 through the present have you always consistently earned at

16 least 684 a week?

17     A.    Yes.

18     Q.    Do you recall approximately how much you earned

19 in total pay in 2022?

20     A.    I know the first three months would have been at

21 sergeant-level pay.  I don't know.  I don't know.  I know

22 the starting lieutenant pay was 97,000 when I first took

23 the job.  And then they raised it up each year since.  I

24 think starting lieutenant pay right now is 118.

25     Q.    What are you currently earning as a lieutenant in

1   And then the chiefs and above pick from the roster who

2   they are going to promote.

3       Q.   Have you disciplined any sergeants reporting to

4   you in District 1 or 7?

5       A.   Like I said, we're forbidden by policy to issue

6   any type of discipline.  It has to all go through the

7   professional standards bureau.

8            So like if I have an employee that was

9   repeatedly coming to work late, my only option is to enter

10  a complaint in BlueTeam and send it to PSB to investigate

11  and -- and discipline.

12      Q.   Have you ever placed a sergeant on an action

13  plan?

14      A.   I did.  That Sergeant Kelleher I mentioned

15  earlier.

16      Q.   What was the action plan that you placed that

17  sergeant on?

18      A.   He was having an issue related to alcohol where

19  he was having a lot of no-call-no-shows to work and the

20  work product he was turning in was very subpar.  So the

21  action plan was -- It wasn't anything different than I was

22  having any of the other sergeants do except that his was

23  like a formalized process.  Like I basically had in

24  writing what I was looking at and then every week he had

25  to like provide me answers to -- I think it was like ten

1    correct?

2        A.    Yeah.    Those are pretty much a copy and paste of

3    the supervisor notes that were put in over the past year.

4        Q.    Do you -- As a lieutenant, do you perform

5    evaluations of all of your assigned sergeants?

6        A.    It's kind of weird the way that the process

7    works.    So the way that it currently works -- but they are

8    changing it -- is whoever the current supervisor is has to

9    do the EPA.    So I guess that would be yes in that case.

10            But the way they are changing it back to,

11   which I prefer, is whoever had the person the longest.

12   Because there was many instances where I would get a -- a

13   sergeant assigned to me and I'd have him for like two

14   weeks and then his EPA was due and I had to write the EPA

15   and I didn't know the guy.

16            So now they are going back to whoever had

17   him the longest.    So I may be writing EPAs for sergeants

18   that don't currently work for me.

19       Q.    Approximately how many employee performance

20   reviews do you write on a yearly basis?

21       A.    Just one per year per sergeant.

22       Q.    How many total is that?

23       A.    So most of the time in District 1 it was -- it

24   would have been two -- No, I had a -- Yeah, I had three

25   per year in District 1.

Christopher John Houck, Videotaped - 03/18/2025

219

 1          There were times, though, that I would write
 2   other EPAs that I wasn't responsible for doing just
 3   because the person that was responsible was overwhelmed or
 4   in some cases the supervisor had left the agency and there
 5   was nobody to write the deputy's EPA.  So rather than make
 6   another sergeant do it I would just do it for them.
 7       Q.   Earlier I asked you about promotion boards.  And
 8   I understand that you have not ever sat on one, but my
 9   question is a little bit different.
10          Do you have the ability to sit on a
11   promotion board if you wanted to?
12       A.   No.  You have to be selected.
13          So I asked -- Because I actually -- I've
14   always wanted to sit on one just so I can see how the
15   process works from the other side of the table.  And the
16   way I understand the process is that the chiefs basically
17   pick people to do the boards.  So like the chief might --
18   might call up like Jason Thomas and say, hey, would you
19   like to sit on a promotion board?  Yes.  But if he doesn't
20   call me, then -- I can't like apply for it.  It's
21   something that's just kind of divvied out based on their
22   whim.
23       Q.   But am I correct in understanding that
24   lieutenants, if they are selected, can sit on promotion
25   boards for -- Is it deputies looking to be promoted to

1    sergeant or sergeant looking to be promoted to deputy?

2                    MR. FRANKEL:  Form.

3                    THE WITNESS:  I believe it might be both.

4                    I believe that Lieutenant Thomas told me he

5    sat on the one where deputies were becoming sergeants.

6    But I think he could also have sat on one for sergeants

7    becoming lieutenants.  But I don't think you can do the

8    rank above that.  I think you have to -- you have to stop

9    at whatever your rank is.  I'm not a hundred percent sure.

10       Q.   BY MS. BALCH SANTIAGO:  Have you ever conducted

11   training?

12       A.   Not formalized training, just informalized

13   training.

14       Q.   What would be informalized training that you have

15   conducted?

16       A.   It would be something where like there was no

17   curriculum.  It wasn't like a classroom-type setting.  It

18   was just a -- me briefing my squad on how to, you know,

19   handle a certain call or how to fill out a certain form or

20   going over how a call went, what we can do better, what we

21   can do worse.

22       Q.   Do you do that type of informal training daily

23   with your sergeants?

24       A.   No.

25                    When I was a patrol sergeant I did it more

1  frequently because most of the deputies are new and they

2  don't really know what's going on.  But most of the

3  sergeants are pretty squared away.  They don't really need

4  much training.

5      Q.   How often do you do informal training with your

6  sergeants?  Or did you at District 1 or District 7?

7      A.   Maybe six, seven times a year.  And it was

8  usually because like there was a problem and the sergeant

9  didn't do it right.  And it was usually a newer sergeant,

10  so I just made sure they knew how to do it.

11      Q.   We already discussed internal affairs

12  investigations, PSB investigations, that you've handled

13  at least one; correct?

14      A.   Yes.

15      Q.   I think you gave me a number.  How many PSB

16  investigations do you think you've handled as a

17  lieutenant?

18      A.   I think I said like two or three is all I've done

19  as a lieutenant.  But I've reviewed more than a dozen that

20  the sergeants have done.

21      Q.   As a lieutenant?

22      A.   Yes.

23      Q.   Have you been the recipient of any deputy or

24  sergeant grievances?

25      A.   No.

Christopher John Houck, Videotaped - 03/18/2025

222

1    Q.   Is one of your responsibilities as a lieutenant
2  to monitor compliance measures that are in place based on
3  the court orders?
4    A.   No.
5    Q.   Have you, as a lieutenant, taken on any projects
6  where you have assessed different tools, equipment or
7  processes that should be amended or revised?
8              MR. FRANKEL:  Form.
9              THE WITNESS:  Not that I can recall.
10   Q.   BY MS. BALCH SANTIAGO:  Have you ever been
11 involved in budgeting?
12   A.   No.
13   Q.   Do you know if any other lieutenants have been
14 involved in the budgeting process?
15   A.   I know there are some lieutenants that write
16 grants like to get special equipment or to fund like the
17 DUI task force.  But as far as budgeting, not that I'm
18 aware of.  I've never heard of a lieutenant doing that.
19   Q.   Do you know of any of your colleague lieutenants
20 who have been involved in special projects?  For example,
21 researching license plate readers and if that's technology
22 that the sheriff's office wants to implement?
23   A.   I'm not aware of it.
24   Q.   Is there a difference between a watch commander
25 and a deputy commander?

Christopher John Houck, Videotaped - 03/18/2025

224

1    have a watch commander on.  So District 2 and 3 would have

2    one watch commander.  And then the other watch commander

3    would cover Districts 7, 5, and -- well, 1, 7, 5, and --

4    Wait a minute.  1, 7, 5 -- yeah, 1, 7, 5.  So that's how

5    they are kind of broken up east and west.

6                There was typically two watch commanders on

7    per night, but there was many nights when there was only

8    one because the other one was off.

9        Q.   BY MS. BALCH SANTIAGO:  Can you walk me through

10   what the chain of command would be on a night where there

11   were either two or one watch commanders?

12               MR. FRANKEL:  Form.

13               THE WITNESS:  If something of significance

14   happened the watch commander would have to respond to the

15   scene.  And then the watch commander would make

16   notifications to the captain of the district.  And then

17   the captain would then in turn notify the chief of the --

18   the bureau chief.  And then the bureau chief -- I don't --

19   I don't know what he would do with the information.

20   That's typically how it went.

21       Q.   BY MS. BALCH SANTIAGO:  What do you mean by

22   something of significance?

23       A.   Well, like if there was a barricade or say

24   somebody got murdered, I would -- I would have to let my

25   captain know because that's what they expect, is for you

225

1  to let them know.  Because they don't want to get like

2  surprise phone calls from their bosses saying, hey, what's

3  this hear I hear about a murder in your district, tell me

4  about it, and they don't have any answers.  So you have to

5  give them like a briefing of what it's about, and then --

6  so when their bosses ask them they have the information.

7      Q.   When would you have to provide that briefing?

8      A.   As soon as I got enough information to pass

9  along.

10          So like if a call kicked out we've got shots

11  fired, I'm not going to call him.  But if I get on scene

12  and after we make the world safe and we figured out

13  somebody died, then I would call him and give him like a

14  briefing as to what happened, what we had.

15      Q.   What -- When you served as watch commander what

16  days of the week did you cover?

17      A.   Wednesday through Saturday, night shift.

18      Q.   And would you be covering multiple districts?

19      A.   Yes.

20      Q.   What districts were you covering as watch

21  commander Wednesday through Saturday nights?

22      A.   I was covering District 1; lake patrol, which is

23  District 5; District 7; and District 4.

24      Q.   If you had to estimate how many personnel were on

25  duty when you served as watch commander Wednesday through

Christopher John Houck, Videotaped - 03/18/2025

228

1   the District 2 sergeant would call me and say -- I

2   remember one in particular, he had a complaint -- He was

3   involved in a traffic accident investigation and the

4   person wanted to file a complaint on him.  And so he

5   wanted to have somebody of a higher rank take the

6   complaint.  So he called me over in District 1, even

7   though he was in District 2, and said, there is this lady

8   that's mad; can you take the complaint?  So I took the

9   complaint.  But I never actually had to go over there.

10       Q.   Earlier you testified that you drive a Maricopa

11  County Sheriff's Office-issued vehicle; correct?

12       A.   Correct.

13       Q.   Is that a marked or an unmarked vehicle?

14       A.   Unmarked vehicle.

15       Q.   Can you describe it for me?

16       A.   I've had different ones since I've been a

17  lieutenant.  The current one I have is a Chevy Tahoe.

18  It's silver.  And it has a spotlight on the driver's side.

19       Q.   What was the vehicle that you were issued before

20  the current silver Chevy Tahoe?

21       A.   I had a blue Ford F-150.

22            And then before that I had a Dodge Ram.  And

23  then before that it was another Ford F-150.

24       Q.   Am I correct in understanding that all four of

25  these vehicles were unmarked vehicles?

Christopher John Houck, Videotaped - 03/18/2025

229

1       A.   Yes.

2       Q.   Do you know why they were unmarked?

3       A.   It's because they don't want the -- the

4  lieutenant to be -- to have to respond to -- like do

5  traffic -- traffic enforcement or -- Like if you are

6  driving down the road they don't want people to know you

7  are a lieutenant so they can flag you down, make you have

8  to handle the call for service.

9            Basically just to make it look like you're

10  not a law enforcement officer to the public.  That's what

11  the purpose of the unmarked cars are.

12      Q.   Have you ever pulled someone over in your

13  unmarked vehicle as a lieutenant?

14      A.   I believe I have, yes.

15      Q.   How many times?

16      A.   Very rarely.  Probably no more than two or three

17  times.

18      Q.   What were the circumstances as to why you pulled

19  someone over in your unmarked vehicle?

20      A.   They would have to be doing something like really

21  egregious.  One -- one of them was he ran a red light

22  right -- right in front of me, and he ended up being DUI.

23      Q.   Can you recall the other ones?

24      A.   I can't recall the other ones.

25      Q.   In that situation that you just described for me,

Christopher John Houck, Videotaped - 03/18/2025

230

1    someone running a red light and being a DUI, that's a

2    significant safety issue; correct?

3        A.    Correct.

4        Q.    Is it your understanding that Maricopa County

5    Sheriff's Office does not want lieutenants making routine

6    traffic stops unless it's a significant safety issue?

7        A.    Yeah.  And that's the verbal orders that my

8    captain has given me.

9                That's why all the captains and chiefs all

10   have unmarked cars as well.

11       Q.    Can you let me know on -- Strike that.

12                Let me go ahead and enter this as an

13   exhibit, two exhibits.

14                THE COURT REPORTER:  16.

15                (Deposition Exhibit 16 was marked for

16         identification.)

17                MS. BALCH SANTIAGO:  And 17.

18                (Deposition Exhibit 17 was marked for

19         identification.)

20       Q.    BY MS. BALCH SANTIAGO:  Chris, you've just been

21   handed what's been marked as Exhibit 16 to your

22   deposition.  Does this report look familiar to you at all?

23       A.    Yes, I've seen these before.

24       Q.    What is this report?

25       A.    16 is a report that I can pull up in our portal

Christopher John Houck, Videotaped - 03/18/2025

234

1    A.    Yeah, I would say that's pretty typical.  About

2  the same as the sergeants that work there.  So not -- Most

3  calls don't require a supervisor because they are like

4  low-level crimes.

5    Q.    Is it typical for you to respond in an assisting

6  unit capacity to about 11 calls per quarter?

7    A.    Sometimes more, sometimes less.  But, yeah, I

8  would say that's a good estimate.

9    Q.    What would the -- What would be a high number for

10 a quarter for assisting unit calls for service?

11   A.    Probably 25.

12   Q.    Do you see in both of those columns there are

13 some numbers that are significantly higher?

14   A.    I do.  I'm guessing those are deputies.

15   Q.    Why are you guessing those are deputies?

16   A.    Because that's their primary job, is to take all

17 the calls that come in from dispatch.

18           Yeah, all the ones that have zeros or less

19 than ten for calls for service I'm going to guess were

20 supervisors, sergeants or lieutenants.

21           THE COURT REPORTER:  I'm so sorry.

22   Q.    BY MS. BALCH SANTIAGO:  So would you agree that

23 it's not a primary duty of sergeants or lieutenants to

24 respond to calls for service?

25   A.    Right.  That's the deputy's job.

1    of what you were doing between 2:18 and 3:00 o'clock on

2    May 8, 2022?

3         A.   I don't remember.

4         Q.   Let's go back to Exhibit 2 to your deposition.

5    This is your declaration.  Let me know when you are there.

6         A.   I am here.

7         Q.   All right.  Please turn to the second page,

8    although it's labeled 1 at the bottom of the page.  I want

9    to direct your attention to Paragraph 9.  In this

10   paragraph there are -- there is reference to duties that

11   you contend you perform on a daily basis.

12                 Do you see that?

13        A.   I do.

14        Q.   Is it your contention that you rescue crime

15   victims on a daily basis?

16        A.   As part of a team I do.  Not specifically me.

17        Q.   When was the last time you specifically rescued a

18   crime victim?

19        A.   I can't recall.

20        Q.   Was it prior to you being a lieutenant?

21        A.   No.  There's times where I've helped victims as a

22   lieutenant.

23        Q.   How many times approximately since April 4 of

24   2022?

25        A.   I would have to guess.  Individually would be

244

1    like five times or less.  Not very often.

2        Q.   How about preventing or detecting crimes; how

3    many times have you personally prevented or detected

4    crimes since your promotion to lieutenant April 4, 2022,

5    through the present?

6        A.   It's kind of hard to say.  Just being present in

7    a location could prevent the crime but you wouldn't

8    necessarily know you prevented a crime.

9                Standing, like I said, at like a Circle K in

10   a uniform, they are about to rob it, they see you, they

11   leave, you just prevented a crime but you don't know you

12   prevented a crime.

13               Detecting crimes, very infrequently.

14   Probably the on-view activity, the on-view calls for

15   service we discussed earlier where I would see something

16   and then call something out.

17       Q.   Would that -- Can you put an estimate on how many

18   times per year you detect crimes as a law enforcement

19   lieutenant?

20       A.   Oh, I'd say probably no more than 15, or less.

21       Q.   On a yearly basis?

22       A.   Correct.

23       Q.   I want to discuss the preventing crimes a little

24   more.  I understand that you have taken the position that

25   simply sitting on a corner in your uniform could

1  indirectly prevent crimes.  But have you directly

2  prevented any crimes since your promotion to lieutenant in

3  April of 2022?

4      A.   Do you have like an example, a specific example?

5      Q.   Well, I think that what you -- you referenced was

6  you could have prevented a crime but never known it.  So

7  my question to you is, have you prevented a crime and

8  known it, as a lieutenant since April 4 of 2022?

9      A.   I'm sure there has been times on a call for

10 service warning like a suspect or a victim, hey, if you

11 hit him you're going to go to jail.  Preventing the crime

12 of assault in that capacity.  But I can't specifically

13 remember an incident where I did that.

14     Q.   You can't specifically remember any incidences

15 where you personally prevented a crime and knew that you

16 prevented a crime since your promotion to lieutenant,

17 April 4 of 2022, to the present?

18     A.   Right.

19     Q.   Next one, conducting investigations and

20 inspections for violations of law.  How many times have

21 you personally done that since your promotion to

22 lieutenant?

23     A.   I've done that several times.  I kind of look at

24 that as reviewing the reports that the deputies write,

25 inspecting them and making sure that they have the correct

1    statute applied to whatever charge they are investigating.

2    I've probably done that over 500 times.

3        Q.    How many times have you personally conducted

4    investigations since your promotion to lieutenant in

5    April -- April 4, 2022?

6        A.    Like a criminal investigation?  Or what type of

7    investigation?

8        Q.    Well, this is your declaration; right?  And it

9    says [as read]:  Conducting investigations and inspections

10   for violations of law.  So my question to you is, how many

11   times have you personally conducted investigations?

12       A.    I've done that over 500 times.

13       Q.    Since your promotion to lieutenant?

14       A.    Uh-huh.  And as a sergeant I did the same thing.

15             I take that as reviewing reports and making

16   sure they are correct.  Is that how you are taking it?  Or

17   how are you taking it?

18       Q.    No.  I'm asking, how many times have you

19   personally conduct -- Let's -- let's parse this out.

20             I understand that you are telling me that

21   you personally reviewed reports authored by sergeants or

22   deputies on roughly 500 occasions.  I understand that.

23             My question to you is, how many

24   investigations have you personally conducted since you

25   were promoted to lieutenant April 4 of 2022 to the

1    present?

2        A.    I think there's just a handful of criminal cases

3    like related to calls for service.   Maybe 20 or less.

4        Q.    Over that entire time period, April 4, 2022, to

5    the present?

6        A.    Yes.

7        Q.    With regards to the reports that you have

8    reviewed, am I correct in understanding those are the

9    reports authored by sergeants or deputies?

10       A.    Correct.

11       Q.    Performing surveillance.   How many times have you

12   personally performed surveillance since your promotion to

13   lieutenant April 4, 2022, to the present?

14       A.    A few times.   I wouldn't say a lot.   Maybe 30

15   times or so.   It was -- it was helpful because I drove the

16   unmarked car.   So there was a lot of times where the

17   deputies would be on a call for service reference somebody

18   they were looking for, and because I had the unmarked car

19   I was able to like go park in front of their house and be

20   inconspicuous and see like what time they got home and I

21   could alert the deputies to come and arrest them.

22       Q.    Next one, pursuing, restraining, and apprehending

23   suspects.   How many times have you personally done that

24   since your promotion to lieutenant April 4, 2022, to the

25   present?

248

1    A.    I'd say around 20 times that I can recall.

2    Q.    Total since your promotion; correct?

3    A.    Correct.

4    Q.    How about detaining or supervising suspected and

5    convicted criminals, interviewing witnesses, and

6    interrogating suspects; how many times have you personally

7    done that since your promotion to lieutenant April 4,

8    2022, to the present?

9    A.    Probably about 50 times.

10   Q.    And was that in a primary capacity or a

11   supporting capacity?

12   A.    Mostly supporting.  There was a few primary.

13   Q.    How many primary?

14   A.    Maybe less than ten.

15              MR. FRANKEL:  Shayna, we're at seven hours.

16   We're -- we're at the limit here.

17              MS. BALCH SANTIAGO:  Okay.  Can I ask just

18   two very quick --

19              MR. FRANKEL:  No.

20              MS. BALCH SANTIAGO:  -- generic questions?

21              MR. FRANKEL:  No.  I think we're done.

22              MS. BALCH SANTIAGO:  Okay.

23              MR. FRANKEL:  We'll read and sign.

24              MS. BALCH SANTIAGO:  All right.

25              THE COURT REPORTER:  Will you need a copy?

Christopher John Houck, Videotaped - 03/18/2025

250

```
 1   STATE OF ARIZONA         )
                              )  ss.
 2   COUNTY OF YAVAPAI        )

 3           BE IT KNOWN that I took the foregoing
     proceedings; that the witness was duly sworn by me; that
 4   said transcript is a full, true, and accurate record of
     the proceedings; that the proceedings were taken down by
 5   me in shorthand and thereafter reduced to print under my
     direction; that I have acted in compliance with
 6   ACJA 7-206.

 7           I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
 8   outcome thereof.

 9           Pursuant to request, notification was provided
     that the deposition is available for review and signature.
10
             Dated this 1st day of April, 2025.
11

12

13                          _____
14                               JILL MARNELL
                            Certified Reporter #50021
15                          Registered Professional Reporter

16           *       *       *       *       *       *

17           I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
     has complied with                          : forth in
18   ACJA 7-206.

19

20

21                          _____
22                          GLENNIE REPORTING SERVICES, LLC
                            Registered Reporting Firm
23                             Arizona RRF No. R1035

24

25
```

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

1                        SIGNATURE OF WITNESS

2

3      I, CHRISTOPHER JOHN HOUCK, the witness in the above
    deposition, do hereby certify that I have read the
4    foregoing deposition, and that the said deposition is a
    true and correct record of my testimony, with such
5    corrections and changes, if necessary, listed below.

6    _____
                        WITNESS

7    PAGE: LINE: SHOULD READ:          REASON FOR CHANGE:

8    _____  _____  _____

9    _____  _____  _____

10   _____  _____  _____

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24

25

# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on          )
behalf of himself and all         )
those similarly situated,         )
                                  )
        Plaintiff,        ) No.
                                  ) 2:23-cv-00068-DGC
vs.                               )
                                  )
Maricopa County,                  )
                                  )
        Defendant.        )
_____ )

DEPOSITION OF DARRIEN ELLISON

Phoenix, Arizona
August 28, 2025
9:04 a.m.

REPORTED BY:
Kellie L. Olney, RPR
AZ Certified Reporter No. 50223

PREPARED FOR:
Superior Court
(Original)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

**Houck vs**
**Maricopa Country**                                                    **Darrien Ellison**

4

1          DEPOSITION OF DARRIEN ELLISON was taken on

2   August 28, 2025, commencing at 9:04 a.m., at the offices

3   of Griffin Group International, 3200 East Camelback

4   Road, Suite 177, Phoenix, Arizona, before Kellie L.

5   Olney, RPR, a Certified Reporter for the State of

6   Arizona.

7

8   APPEARANCES:

9       For the Plaintiff:

10          Frankel Syverson, PLLC
            By:  TY D. FRANKEL, ESQ.
11          2375 East Camelback Road, Suite 600
            Phoenix, Arizona  85016
12

13      For the Defendant:

14          Fisher & Phillips, LLP
            By:  SHAYNA BALCH SANTIAGO, ESQ.
15          3200 North Central Avenue, Suite 1550
            Phoenix, Arizona  85012
16

17       Also present:

18          Megan Morley

19

20

21

22

23

24

25



**Griffin Group International**
**888.529.9990 | 602.264.2230**

8

1    Q.   So it was a question related to how promotions

2  might work?

3    **A.   No.  It has nothing to do with promotions.  It**

4  **has to do with a step plan for -- at the time he was a**

5  **deputy sheriff, and so whether -- basically whether the**

6  **County had a step plan so that next year would he move**

7  **to that step, would he move to this step, would he move**

8  **to that step.  Step plans don't have anything to do with**

9  **promotions.**

10    Q.   Okay.  And other than that, have you had any

11  interactions with Lieutenant Houck?

12    **A.   Have I had any interactions with**

13  **Lieutenant Houck?  Not to my knowledge.**

14    Q.   Are you aware that there are other patrol

15  lieutenants who opted into the case?

16    **A.   Am I aware that others?  I believe -- yes.**

17    Q.   And do you know the names of any of the

18  individuals who --

19    **A.   No, I do not.**

20    Q.   -- opted in --

21      Do you know whether you've had any interactions

22  with any of the other opt-in plaintiffs in this case?

23      MS. BALCH SANTIAGO:  Form.  Foundation.

24      **THE WITNESS:  No, I do not.**

25    Q.   BY MR. FRANKEL:  Are patrol lieutenants



9

1   entitled to overtime?

2       **A.    Patrol lieutenants are --**

3              MS. BALCH SANTIAGO:  Form.

4              **THE WITNESS:  Patrol lieutenants are classified**

5   **exempt.  So, no, they are not entitled to overtime.**

6       Q.    BY MR. FRANKEL:  What is your understanding for

7   why they're classified as exempt?

8       **A.    Because of their -- they fit the executive**

9   **exemption and the administrative exemption under the**

10  **Fair Labor Standard Act [verbatim].**

11      Q.    Were you involved in the decision to arrive at

12  that classification?

13      **A.    Yes.**

14      Q.    When was that decision made?

15      **A.    So the change was made in 2007.**

16      Q.    2007?

17      **A.    Mm-hm.**

18      Q.    Is that a yes?

19      **A.    Yes.**

20      Q.    And prior to that were the patrol lieutenants

21  getting overtime?

22      **A.    So yes and no, meaning that there was a time**

23  **that they were exempt, and then there was a time that**

24  **they were changed to be overtime eligible, until they**

25  **were changed back to being exempt in 2007.**

**Houck vs**
**Maricopa Country**

**Darrien Ellison**

10

1     Q.    Do you recall what period that they were

2    overtime eligible?

3     **A.    From probably 1997 to 2007.**

4     Q.    And then in 2007 you mentioned that there was a

5    decision made to switch them over to exempt status?

6     **A.    To move them back to exempt status again, yes.**

7     Q.    And that was based on the executive exemption

8    and administrative exemption?

9     **A.    Yes.**

10    Q.    What were their duties during the period when

11    they were overtime eligible?

12          MS. BALCH SANTIAGO:   Form.   Foundation.

13    **THE WITNESS:  So what happened when we changed**

14    **them from -- so they were exempt.  And their duties were**

15    **the same as they were when they were exempt when they**

16    **were non-exempt and then when they were exempt.**

17    **The reason that they were changed to non-exempt**

18    **wasn't because they qualified under the FLSA to be**

19    **hourly and non-exempt.  It was because there was concern**

20    **with the salary compression between a sergeant and**

21    **lieutenant.**

22    **And so the County, in 1997, decided that they**

23    **would make them hourly so that they could evaluate the**

24    **compression and see what -- basically look at the**

25    **hourly, see the compression with the sergeant, and**



13

1     A.   I believe it was Jessica Wilson.

2     Q.   And what was her title?

3     A.   I believe it was either compensation supervisor

4  or compensation manager.

5     Q.   Was legal counsel involved?

6     A.   No.

7     Q.   Did Mary Lou or Jessica have a law degree?

8     A.   No.

9     Q.   Do you recall what information was evaluated to

10  make the determination that the patrol lieutenants were

11  eligible for the executive or administrative exemption?

12         MS. BALCH SANTIAGO:  Form.  Overbroad as to

13  time, if you could specify that.

14     Q.   BY MR. FRANKEL:  When the decision was being

15  made to reclassify them in 2007, do you recall what

16  information was evaluated to make that decision?

17     A.   Yes.  So we looked at their central functions.

18  We -- we researched and looked at the resources that are

19  on the Department of Labor.  They have some really

20  useful resources, from frequently asked questions, from

21  the actual rules and regulations.

22         There was a 2005 Department of Labor opinion

23  letter that we were aware of that another agency or

24  organization reached out to the Department of Labor and

25  asked some questions about lieutenants, patrol



14

1   lieutenants, and captains and I think fire captains.

2           And as -- also, as I mentioned, had

3   conversations with the -- or with our FLSA expert,

4   Mary Lou.

5       Q.   Was her title "FLSA expert," or is that just

6   your characterization of her --

7       A.   That was just what we called her.  Her title,

8   it was either -- I don't know if it was consultant or

9   comp analyst or -- but we called her our "FLSA expert,"

10  and we had her -- one of her responsibilities at

11  different times was to basically keep us updated on any

12  of the FLSA changes because that was one of her

13  passions.  She really enjoyed the FLSA and knew it well.

14      Q.   Since that decision was made in consultation

15  with Mary Lou in 2007, has there been any reevaluation

16  by the County of whether the patrol lieutenants are

17  properly classified as exempt?

18           MS. BALCH SANTIAGO:  Form.  Overbroad.

19           THE WITNESS:  Yes.

20      Q.   BY MR. FRANKEL:  When?

21      A.   2016, 2017.

22      Q.   And who was involved in that?

23      A.   We had an outside consultant, Fields

24  Consulting, conduct the job analysis on that.  And then

25  I was involved as far as just being there for, you

15

1    know -- anyway, the -- Fields was the one who did the

2    analysis.

3        Q.   Was Fields hired for the purpose of evaluating

4    the exemption classification, or was it more related to

5    figuring out the job duties for the patrol lieutenants?

6            MS. BALCH SANTIAGO:   Form.   Foundation.

7            THE WITNESS:   It would be both.   The -- they

8    were hired to look at and identify the job, the

9    essential functions.

10           We were looking to determine, you know, did we

11   have a good, up-to-date job description, but we also

12   looked at the Fair Labor Standard Act.   Part of that was

13   to review the Fair Labor Standard Act -- was to have

14   information so that we could review the Fair Labor

15   Standard Act and determine whether or not these

16   positions were properly classified, whether it was a

17   lieutenant or whether it was other positions that were

18   being looked at at that time.

19       Q.   BY MR. FRANKEL:   And was legal counsel involved

20   at this point?

21       A.   I do not believe that they would have been

22   involved.

23       Q.   In 2007, when this analysis was being done

24   related to the exemption of the patrol lieutenants, do

25   you know whether it was ever evaluated if the first



26

1  responder exception?

2     A.   The first responder would -- there's duties

3  that a first responder would do that are -- that you

4  would see when somebody is basically the first responder

5  on the scene of -- of either an investigation or an

6  accident or a crime.

7         However, I know that there is a difference

8  between an officer who is on the scene doing those first

9  interviews and taking notes and whatnot versus a

10 lieutenant who is at the scene directing and managing

11 people that are at the scene.

12    Q.  Do you think it's possible that a lieutenant's

13 primary duties could be first responder duties even if

14 they may also have other managerial duties under the

15 exception?

16    A.   No.

17        MS. BALCH SANTIAGO:  Form.  Foundation.

18    Q.  BY MR. FRANKEL:  Did you ever -- was legal

19 counsel involved in helping make that determination?

20    A.   No.

21    Q.  What makes you think that their primary duty

22 would never be first responder simply because they may

23 actually have managerial duties, then?

24        MS. BALCH SANTIAGO:  Form.

25        THE WITNESS:  So the primary duty is their



**Houck vs**
**Maricopa Country**                                    **Darrien Ellison**

27

1  major, most.  In the 2016, 2017 analysis that was

2  conducted by the Fields, it was clear that those first

3  responder duties, that the lieutenants rated those as

4  low if -- if even that they had performed any of those

5  duties.

6          And so to say that it's the -- their main

7  responsibility, based on the 2016, '17, it wasn't their

8  main responsibility.  You could have a lieutenant that

9  is the only one on the scene doing first responder

10  duties, but based on what happened in 2016, '17, the

11  lieutenants indicated that that was -- rarely did they

12  do that and rarely -- so it wasn't -- it wasn't their

13  main and primary job.

14    Q.    BY MR. FRANKEL:  And you're basing that on that

15  2016, 2017 Fields report?

16    A.    Yes.

17    Q.    Has there been any audit like that since that

18  Fields report in 2016 and 2017?

19    A.    No, other than when there was -- if there was a

20  position that was submitted, to have it be -- you know,

21  if a new position -- if a new lieutenant was being

22  requested, then we would have evaluated the essential

23  functions at that time.

24    Q.    Are there --

25    A.    But we did not conduct job analysis like the



65

1    Human Resources level.

2        Q.   What legal information did you rely on in

3    making the determination that the patrol lieutenants

4    were exempt?

5             MS. BALCH SANTIAGO:  Form.

6             THE WITNESS:  Back in 2005, 2006, 2007?

7        Q.   BY MR. FRANKEL:  (No audible response.)

8        A.   Okay.  So in 2005, 2006, 2007, there was the

9    Department of Labor -- the 2005 Department of Labor

10   opinion letter on lieutenants and captains.

11            There is the Department of Labor website.  They

12   have some really amazing frequently asked questions that

13   provide a deeper understanding of the exemptions and who

14   would qualify.

15            They also have other rules and regulations out

16   there that would help in that aspect.

17            MR. FRANKEL:  Off the record.

18            (Discussion off the record.)

19            MR. FRANKEL:  Back on.

20            (Exhibit No. 5 was marked for identification.)

21            THE WITNESS:  Could I go back to a question

22   that was asked previously?

23       Q.   BY MR. FRANKEL:  It's my deposition, so we're

24   going to move on to Exhibit 5, unless there is something

25   in your testimony that you need to change.

Houck vs                                                    Darrien Ellison
Maricopa Country

66

1    A.    So you had asked if the hours worked by exempt

2    employees provided the guidance that I was thinking

3    about regarding departments monitoring the job

4    descriptions.  And after looking at this exhibit, yes,

5    it says here:  Human Resources determines the exempt

6    status for each position/employee, according to the

7    provisions outlined in the FLSA.  Departments are

8    responsible for monitoring the duties of each employee

9    and must notify Human Resources when an employee's

10   duties, responsibilities or compensation changes.  Human

11   Resources will reevaluate the exemption from overtime

12   status for any employee/position after a change, and, as

13   warranted, will revise and maintain such status.

14   Q.    Okay.  Thank you.

15         And am I correct you're referring to section F

16   of Exhibit 4?

17   A.    Yes.

18   Q.    And so am I correct that that is, in fact, the

19   policy you're referring to about how the department is

20   the first line related to investigating exempt status

21   and then they make a determination of when that needs to

22   be passed up to HR?

23         MS. BALCH SANTIAGO:  Form.

24         THE WITNESS:  So that is the policy that talks

25   about how they're responsible for letting us know.



67

1          And actually, it doesn't say that they have to

2   understand the FLSA and make that determination.  It

3   just says that they provide us their -- they notify us

4   when the duties and responsibilities change.

5       Q.   BY MR. FRANKEL:  Right.  So -- sure.  So you're

6   referring to section F of Exhibit 4 then, correct?

7       A.   Yes.

8       Q.   So in relation to that, I'm going to have

9   you -- do you recall the email between Lieutenant Houck

10  and Ms. Farrow that we looked at earlier?

11      A.   That we looked at earlier?

12          MS. BALCH SANTIAGO:  Form.

13      Q.   BY MR. FRANKEL:  Yes.

14      A.   Yes.

15      Q.   And you recall he raised the fact that his

16  captain indicated that he thought the duties had changed

17  for the patrol lieutenants?  Do you recall that?

18          MS. BALCH SANTIAGO:  Form.  Foundation.

19          THE WITNESS:  Yes.

20      Q.   BY MR. FRANKEL:  Do you think that should have

21  been escalated to Human Resources in light of the policy

22  we looked at in Exhibit 4, at section F of that exhibit?

23          MS. BALCH SANTIAGO:  Form.  Foundation.

24  Speculation.

25          THE WITNESS:  No, not knowing what Keely --



Houck vs                                              Darrien Ellison
Maricopa Country

68

1   what Keely was aware of, the information that Keely was

2   provided, what analysis she did, what additional

3   discussions she had, I can't answer whether or not it

4   would have been raised to Human Resources.

5       Q.   BY MR. FRANKEL:  But you agree, though, the

6   policy requires the department to raise duties issues

7   that have changed to Human Resources for purposes of

8   analyzing the exemption to make sure it's accurate,

9   correct?

10          MS. BALCH SANTIAGO:  Form.  Overbroad.

11          **THE WITNESS:  When those duties are significant**

12  **enough that they feel it should be pushed up, yes.**

13      Q.   BY MR. FRANKEL:  So now turning to Exhibit 5,

14  please, this is a Department of Labor opinion that's

15  been disclosed by the County.  Is this the opinion that

16  you relied on in making the determination to classify

17  the patrol lieutenants as exempt?

18      **A.   It would -- it was one of many resources that**

19  **we would have used.**

20      Q.   Okay.  But this is -- is this the only

21  Department of Labor opinion that you recall relying on?

22      **A.   That I -- yes.**

23      Q.   Have you had a chance to review Exhibit 5?

24      **A.   Reviewed it recently in preparation, yes.**

25      Q.   Okay.  So you're prepared to testify about it?



78

1    Q.   Do you recall what research was done

2  specifically looking into the first responder exception

3  when you were making the determination about the

4  exemption?

5    A.   So we would look at the essential functions and

6  determine what was the primary main responsibility of --

7  of the position.

8    Q.   But you don't recall looking up any specific

9  cases that analyzed the first responder exception?

10   A.   Other than this Department of Labor that talks

11 about that, I'm sure that there's potential that we

12 could have looked at other information, but I don't

13 recall any specifically.

14   Q.   Was there anyone at the County other than you

15 and Mary Lou that was involved in the determination to

16 classify the patrol lieutenants as exempt?

17   A.   I believe --

18        MS. BALCH SANTIAGO:  Asked and answered.

19        THE WITNESS:  -- my manager, Jessica Wilson,

20 would have been.

21   Q.   BY MR. FRANKEL:  Anyone else?

22   A.   I can't think of anyone at this time.

23        (Exhibit No. 6 was marked for identification.)

24   Q.   BY MR. FRANKEL:  The court reporter just marked

25 as Exhibit 6 the 2017 Job Analysis Report.  Do you see

Houck vs                                          Darrien Ellison
Maricopa Country

79

1  that?

**2     A.    Yes.**

3     Q.    Is this the job analysis report that you're

4  referring to that was completed by Fields, the audit

5  related to the job duties of the patrol lieutenants?

**6     A.    Yes.**

7     Q.    And can you remind me what your role was with

8  respect to this?

**9     A.    We worked with -- well, basically we decided to**

**10 go with Fields Consulting to go and conduct the**

**11 analysis, and so we helped coordinate and let Fields**

**12 connect with employees in the Sheriff's Office.  And**

**13 then the results were turned over to -- back to the**

**14 County.**

15    Q.    I'm going to ask you to turn to the second page

16 of this exhibit, which is HOUCK000022 at the bottom.  Do

17 you see that?

**18    A.    Mm-hm, yes.**

19    Q.    And you see that it -- in the middle of the

20 page there are bullet points, and above it, it says,

21 "Based on these stated requirements, Fields' job

22 analysis goals were to" -- and it says:  "Conduct

23 interviews with job incumbents and supervisors about

24 tasks and KSAs; administer job analysis surveys to

25 members of each rank in order to collect data regarding

80

1    the tasks, and Knowledge, Skills, Abilities, and Other

2    Characteristics (KSAs); develop comprehensive and

3    accurate Task Lists (work behaviors) for each rank;

4    develop a specific and comprehensive Knowledge, Skill,

5    Ability, and Other Characteristics List for each rank;

6    conduct linkage analyses to determine their

7    relationships between tasks and KSAs."

8         Do you see that?

9    **A.    Yes.**

10   Q.    Does that accurately describe the purpose of

11   this report?

12        MS. BALCH SANTIAGO:  Form.

13   **THE WITNESS:  Yes.**

14   Q.    BY MR. FRANKEL:  Is this the only report that

15   was created by Fields related to the work that it did

16   for the County in 2017 regarding the patrol lieutenants?

17   **A.    I don't know if this includes all of -- so they**

18   **looked at other officers, 911 officers.  I don't know if**

19   **that's included in here.**

20   Q.    But other than that, you think this would be a

21   complete report?

22   **A.    Yes.**

23   Q.    Did you ever use this report in your role in HR

24   after it was completed?

25        MS. BALCH SANTIAGO:  Form.



Houck vs                                                          Darrien Ellison
Maricopa Country

81

1          THE WITNESS:  Yes.

2      Q.   BY MR. FRANKEL:  What types of situations would

3   you go back and look at this report for?

4      A.   So this was used to kind of help develop a -- a

5   description and responsibilities.  We also used this to

6   determine if the FLSA was correct, and so that was what

7   we did after this report was given to us.

8      Q.   Okay.  And when you say you used it to

9   determine if the FLSA was correct, was that because you

10   were looking at the report to understand the duties of

11   the patrol lieutenants?

12     A.   No.

13          MS. BALCH SANTIAGO:  Form.

14          THE WITNESS:  It was because we had an

15   opportunity to have an independent consultant go and

16   analyze and do everything.  And so after that we wanted

17   to take a look at the Fair Labor Standard Act based on

18   the results that she and her group was able to find.

19     Q.   BY MR. FRANKEL:  Okay.

20     A.   So it was a perfect opportunity to reevaluate

21   the lieutenants and the captains and the officers and

22   every -- other positions that had FLSA status.

23     Q.   And when you did that reevaluation, you were

24   looking at the Department of Labor opinion that we just

25   looked at in Exhibit 5; is that correct?



**Houck vs**                                                    **Darrien Ellison**
**Maricopa Country**

120

1          THE COURT REPORTER:  Shayna, are you ordering a

2    copy of the transcript?

3          MS. BALCH SANTIAGO:  Yes, please.

4          (Deposition concluded at 12:18 p.m.)

5

6
                    (Signature not requested.)
7                   DARRIEN ELLISON

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**Houck vs**
**Maricopa Country**                                                   **Darrien Ellison**

121

```
1  STATE OF ARIZONA        )
                           ) ss.
2  County OF MARICOPA      )

3          BE IT KNOWN that the foregoing proceedings
   were taken before me; that the witness before testifying
4  was duly sworn by me to testify to the whole truth; that
   the foregoing pages are a full, true, and accurate
5  record of the proceedings, all done to the best of my
   skill and ability; that the proceedings were taken down
6  by me in shorthand and thereafter reduced to print under
   my direction.

7

           I CERTIFY that I am in no way related to any
8  of the parties hereto, nor am I in any way interested in
   the outcome hereof.

9

10         [ ]  Review and signature was requested.
           [X]  Review and signature was not requested.
11         [ ]  Review and signature not required.

12

           I CERTIFY that I have complied with the
13 ethical obligations set forth in ACJA 7-206(F)(3) and
   ACJA 7-206 J(1)(g)(1) and (2).
14         Dated at Phoenix, Arizona, this 3rd day of
   September, 2025.

15
                       /s/ Kellie L. Olney
16         _____
                       KELLIE L. OLNEY, RPR
17                     Certified Reporter
                       Arizona CR No. 50223
18

19         *       *       *       *       *

20
           I CERTIFY that GRIFFIN GROUP INTERNATIONAL has
21 complied with the ethical obligations set forth in ACJA
   7-206 (J)(1)(g)(1) through (6).
22
                       /s/ Pamela A. Griffin
23         _____
                       GRIFFIN GROUP INTERNATIONAL
24                     Registered Reporting Firm
                       Arizona RRF No. R1005
25
```

# EXHIBIT 4

# FILED

# UNDER

# SEAL