# EXHIBIT 5



# MARICOPA COUNTY JOB DESCRIPTION

## Law Enforcement Lieutenant

| | |
|---|---|
| **MARKET RANGE TITLE:** | Law Enforcement Lieutenant |
| **DEPARTMENT:** | Maricopa County Sheriff's Office (MCSO) |
| **DIVISION:** | Multiple |
| **FLSA STATUS:** Exempt | **CLASSIFIED/UNCLASSIFIED:** Law Enforcement |
| **POSITION NUMBER:** Multiple | **JOB CODE:** SEF016 |

### POSITION OVERVIEW

The Law Enforcement Lieutenant administers, plans, organizes and directs the operations of a district or other assigned operational area within the Maricopa County Sheriff's Office (MCSO). The Lieutenant is responsible for work of considerable difficulty, supervising Deputy Sheriffs and Sergeants to ensure the public safety of the citizens of Maricopa County and the State of Arizona in accordance with all applicable local, state, and federal laws, regulations and MCSO policies.

### ESSENTIAL JOB TASKS
*(This is not an all-inclusive list of all job duties that may be required; employees will be required to perform other related duties as assigned. List in order of importance)*

#### *Administration*
Reviews and responds to MCSO emails, phone messages, administrative broadcasts, shift summaries, and other reports of significant events in order to be aware of work activities and issues from the previous shift and to maintain updated information; attends and provides input into roll call to provide information regarding shift activities; documents activities on electronic and handwritten reports/forms; writes narrative documents to summarize and/or formally document information; reviews reports/forms completed by subordinates to ensure accuracy, comprehensiveness, clarity and compliance with Departmental and legal guidelines; performs inspections of subordinates' equipment to ensure operational readiness; ensures the shift obtains all necessary equipment and/or required parts; reviews Squad Productivity Report to provide feedback on performance and set goals for improved productivity; ensures the end of shift summary is completed at the end of each shift to identify crime trends and disseminate information to others; manages shift activities; attends meetings; utilizes technology to access information and records, and document in reports as required by policy.

#### *Incident Management*
Manages and monitors all MCSO and public safety personnel during emergency incidents to ensure their safety and accountability; manages and reports to emergency incident scenes that require an increase of command presence (e.g., newsworthy incidents, unusual incidents and major emergency incident scenes); requests appropriate resources and implements the Incident Command System to control resources on incident scenes; participates in post-incident critiques to improve future operations.

#### *Career & Professional Development*
Performs duties commensurate with the level of training, knowledge and experience required of position; maintains current training and undergoes additional training as dictated by policy,

12-19-19



EXHIBIT NO. 14
Houck
3/18/25
Jill Marnell CR #50021

HOUCK000175

assignment, environment and personal development both internal and external to the Sheriff's Office; ensures the completion of MCSO mandated in-service training for all subordinates; informally trains subordinates on operational skills to ensure future development.

### Supervision
Performs duties and responsibilities associated with monitoring subordinates' job performance to ensure compliance with MCSO policies; prioritizes, directs, plans and schedules daily activities of subordinates; oversees and ensures accurate and timely completion of required logs, forms and reports associated with day-today operations; oversees the condition, maintenance and operational readiness of MCSO equipment and facilities; documents and monitors job performance of subordinates; facilitates the resolution of conflicts between subordinates and recommends intervention services, crisis intervention, stress management or other MCSO resources.

### Community Policing
Represents the Sheriff's Office in the best possible light to the public, subordinates and coworkers; maintains the public trust and confidence; identifies short- and long-term solutions to community problems and concerns; provides routine assistance to civilians and groups seeking help or information; answers questions regarding public events; explains citizen complaint procedures and ensures any complaints are handled effectively.

### Management
Monitors daily staffing to ensure operational readiness and minimum staffing; monitors subordinates leave and overtime; develops and monitors objectives and goals in adherence with the Sheriff's Office; conducts investigations regarding situations in which procedures may not have been properly followed (e.g., vehicle accidents, citizen complaints, personnel injuries) and determines the best course of action.

## POSITION QUALIFICATIONS

### Minimum education and/or experience:
High school diploma or GED; minimum of four (4) consecutive years of service with the Maricopa County Sheriff's Office; and must currently be serving in the classification of Law Enforcement Sergeant.

### Specialized training, certifications, and/or other special requirements:
Certified by the State of Arizona Peace Officer Standards and Training Board (AZ POST) as a Peace Officer; a valid Arizona driver's license and successful completion of training provided on-the-job in the following topics: FEMA NIMS – IS100 AND 700, OSHA, payroll and PREA.

Successful completion of a Criminal Justice Report Writing Course from an accredited college or sponsored by AZ POST or equivalent Criminal Justice Report Writing training.

### Knowledge, skills, and abilities:

**Work ethic and integrity:** Ability and willingness to work hard and conscientiously regardless of assignment and be committed to MCSO's mission; to represent information truthfully and be trustworthy in performance of duties; to act without regard to personal preference or bias; to take actions and make decisions through the thoughtful consideration of discretion; to act consistently with professional standards and within MCSO's policies, procedures and values.

**Command presence:** Ability to carry oneself with authority and confidence; to take and remain in command of emergency and non-emergency situations; to lead and direct others in situations that require authority; to take necessary actions when in command.

12-19-19

HOUCK000176

**Supervise:** Ability to apply knowledge of principles as they relate to setting performance expectations; to document job performance (e.g., supervisory notes, Performance Assessment Form); to apply methods and techniques for providing employee feedback (e.g., constructive feedback), coaching, counseling and commending; to take corrective actions, and mentor employees within the scope of MCSO policy and procedure; to apply conflict resolution techniques for difficult situations; to apply methods for career development; to apply delegation techniques; to apply techniques for directing others that may not be under the incumbents direct supervision.

**Leadership:** Ability to maintain good morale, motivation and commitment from others; to set a positive tone; to have the psychological and emotional maturity, self-confidence and willingness to assume responsibility for efforts and actions and to take responsibility for the consequences of those actions; to represent the Sheriff's Office in the best possible light; to identify organizational and environmental issues that could have an effect on the ability to lead; to recognize Personal and Professional accountability and its effects on leadership, both positive and negative.

**Function under stress:** Ability to maintain composure in difficult or stressful situations such as those that require emergency action; to make security-related decisions promptly; to use sound judgment in stressful situations by either taking or refraining from action (e.g., showing restraint); to remain calm during emergencies.

**Decisiveness**: Ability to choose the most appropriate course of action; to anticipate consequences to actions; to recognize implications of actions; to choose among several conflicting priorities; to quickly make sense of information that initially appears to be without meaning or organization; to combine separate pieces of information to form conclusions; to use judgment in a situation in which there is incomplete information or no established rules to arrive at a desired conclusion.

**Teamwork:** Ability to work as a member of a team; to create and develop a team (e.g., assigning team roles and responsibilities, developing team goals); to lead a team; to identify potential team building problems and how to prevent them (e.g. Groupthink, scapegoating); to work harmoniously with coworkers, to participate when appropriate, and to work with others to achieve desired solutions; to assist coworkers in both emergency and non-emergency situations; to understand and use individual strengths and weaknesses in a team environment to facilitate success; to instill the belief that leaders are invested in the success of their co-workers in addition to achieving the desired goals.

**Analytical:** Ability to apply deductive and inductive reasoning to information and facts about situations to reach logical conclusions from the reasoning process; to recognize problems, understand their implications and devise solutions; to determine the relevance of each item of information; to discern how similarities and differences of data can vastly alter actions or decisions and either increase or decrease the relevance of each.

***Preferred education and/or experience:***
Successful completion of 32 credit hours (or equivalent) from an accredited college or university in a related field such as Criminal Justice, Public Administration, Business, Leadership/Management, or Legal Studies.

***Preferred training, certifications and/or other special requirements:***
N/A

***Working conditions:***
Working conditions may vary depending on assignment. Incumbents may be subjected to harsh

12-19-19

HOUCK000177

elements such as extreme heat or cold, wet or dry, altitude, rough terrain, rural, suburban and urban environments. Incumbents may face dangerous, hostile and at times life threatening conditions, fatigue, physical or emotional stress related to the performance of the duties of a law enforcement officer.

Job requires the ability to work any shift and assignment operating 24 hours per day, 7 days per week.

Job requires the ability to: perform sprints, jumping and vaulting tasks; perform lifting, carrying, pushing and pulling; move quickly around objects and obstacles in pursuit situations; and pursue, extract and use force in both short intense effort and sustained effort situations. Actual situations may require efforts beyond the following:

- Perform lifting and carrying that may include lifting heavy and awkward objects weighing 50 lbs. or more; carrying heavy and awkward equipment and objects 0 to 60 ft.; and carrying equipment weighing 20 to 50 lbs. up and down stairs and over rough and uneven terrain for long distances.

- Perform dragging movements that may include extracting victims weighing up to 175 lbs. and dragging victims, objects or suspects weighing up to 175 lbs., 20 to 30 ft.

- Perform pushing and pulling that may include pushing heavy objects or people weighing up to 200 lbs., 10 to 25 ft.; pulling heavy objects or people weighing up to 150 lbs., 10 to 25 ft.; and pulling self over 6 ft. obstacle.

- Perform range of motion activities that may include bending to reach for objects; bending and twisting in use of force situations; crouching during movement of 10 to 15 ft.; and climbing ladders and fire escapes. Use force that may include self-defense situations for 45 to 60 seconds; control holds in self-defense situations for 30 to 60 seconds; strikes using hands, elbows, feet, and knees; use of intermediate impact weapons; and forced entry by pushing and pulling. The ability to use and exercise deadly force by approved means (firearm).

- Perform foot pursuits that may include running sprints of 100 feet or more; running for sustained periods, usually 300 feet but up to 5 minutes; running up and down stairs, usually 2 flights but may be up to 4 flights; run over uneven terrain; and dodge around obstacles.

**_Working environment:_**
_The following environments described are only representative of how the essential job tasks are currently performed or envisioned. As such, in order to accommodate a disability or limitation, the essential job tasks may be performed in ways other than described on these pages._

_Work Environment:_
- Indoors and outdoors; confined areas
- Smoke, dust, fumes, chemicals
- Dim or bright lighting
- High noise level
- May be exposed to contagious diseases

_Physical Environment:_
- Sitting, standing, walking
- Driving a vehicle

12-19-19

HOUCK000178

- Speaking, hearing, reading, seeing including distinguishing colors
- Wearing protective gear
- Precise dexterity

*Social Environment:*
- Interruptions, multiple or complicated tasks, frequently changing or unscheduled tasks, working under deadlines or time pressures
- Accuracy, concentration, and vigilance
- Isolation

## REPORTING STRUCTURE

**Supervision received:** Law Enforcement Captain

**Supervision exercised:** Law Enforcement Sergeant

12-19-19

HOUCK000179

# EXHIBIT 6



# MARICOPA COUNTY JOB DESCRIPTION

## Deputy Sheriff

**MARKET RANGE TITLE:**          Law Enforcement Officer

**DEPARTMENT:**          Maricopa County Sheriff's Office (MCSO)

**DIVISION:**          Multiple

**FLSA STATUS:** Non-Exempt          **CLASSIFIED/UNCLASSIFIED:** Classified

**POSITION NUMBER:** Multiple          **JOB CODE:** REF015, REF030-REF034

### POSITION OVERVIEW

Do you have a desire to protect and serve your community? The Maricopa County Sheriff's Office (MCSO) is seeking passionate individuals to join our team as a Deputy Sheriff Trainee. In this role, high importance is placed on ensuring public safety is provided and maintained by an individual who takes pride in their work and considers the impact of their actions on an individual, team and organizational level.

We are looking for candidates who possess integrity and strong interpersonal skills. Ideal candidates are skilled problem solvers with the ability to use good judgment while diffusing situations, resolving conflict, and serving others and the community.  If this sounds like the right opportunity for you... your adventure with MCSO awaits!

To be part of our team as a Deputy Sheriff, you must:
- Be an effective communicator, even in the most challenging of situations.
- Care about the safety and well-being of others.
- Respect all individuals regardless of background or socio-economic status.
- Embrace the concepts of integrity, accountability and transparency as core values.
- Collaborate with team members, supervisors and managers to forward the mission and vision of MCSO.

Compensation is more than a salary with MCSO.  Your perks at work include:
- Paid training
- A stable environment
- Great benefits
- Flexibility and generous leave
- And, an opportunity to serve your community as part of a diverse and talented workforce.

### ESSENTIAL JOB TASKS
*(This is not an all-inclusive list of all job duties that may be required; employees will be required to perform other related duties as assigned. List in order of importance)*

The Deputy Sheriff in the Maricopa County Sheriff's Office (MCSO) enforces laws and maintains order while protecting life and property. The Deputy Sheriff is responsible for ensuring the public safety of the citizens of Maricopa County and the State of Arizona in accordance with all applicable local, state, and federal laws, regulations and MCSO policies.

12-19-19

### *Criminal investigations*
Conducts traffic and criminal investigations, using accepted methods and techniques to identify, secure, collect and protect evidence and crime scenes; conducts interviews with victims, witnesses, and suspects, gathering information, developing probable cause, making arrests and executing search warrants.

### *Response to calls for service*
Responds quickly to emergency situations via department vehicle using vehicle's emergency equipment when needed (e.g., lights and sirens); determines the quickest and safest approach to an emergency scene; determines the best strategy for restoring or maintaining order and safety; uses defensive tactics and appropriate level of force, to include using assigned weapons (e.g., firearm, Taser, baton), to control a situation; issues warnings and/or citations to ensure public safety and compliance with the law.

### *Patrol duties*
Maintains a safe and secure community by identifying and responding to in-progress criminal activity and unusual or suspicious circumstances, vehicles, packages; makes observations, writes reports, communicates with the public and provides a level of service required in conjunction with all local, state and federal laws, as well as all applicable policies and procedures of the Maricopa County Sheriff's Office; engages the community in positive proactive policing practices to fulfill the departments mission, establishes strong ties and relationships within the community by conducting oneself in a professional, fair and transparent manner at all times.

### *Training*
Attends, implements and provides all required training associated with the duties and functions of a law enforcement officer as specified by Arizona Police Officers Standards Training Board (POST) and the Maricopa County Sheriff's Office.

### *Administration*
Interacts with the public and staff by effectively communicating verbally, and in writing, to direct, ascertain information, document incidents, requirements, needs and conditions within the facility; operates electronic and other equipment (e.g., telephones, portable radios, desktop and mobile computers, cameras); independently gathers information through a variety of methods in order to document information and actions; utilizes technology to access information and records, and documents in reports as required by policy.

## POSITION QUALIFICATIONS

### *Minimum education and/or experience:*
High school diploma or GED; must be a U.S. citizen; and must be at least 21 years of age.

For trainee: High school diploma or GED; must be a U.S. citizen; and must be at least twenty (20) years and six (6) months of age at the time of application, and 21 years of age prior to completion of the Sheriff's academy.

For lateral: Individuals with lapsed Arizona POST certification, and those who have served as a certified peace officer in another state or federal agency, may apply. To be considered, such otherwise qualified individuals must be eligible to gain Arizona POST certification through Waiver Testing or successful completion of a basic academy. The Arizona POST waiver process consists of meeting all minimum qualifications for certification as an Arizona Peace Officer including successful completion of a written exam, driving proficiency, firearms qualification, and the POPAT (Police Officer Physical Agility Test), administered by Arizona

12-19-19

POST, within sixty (60) days of hire. Whether to send an applicant through a basic academy again or allow an applicant to pursue the Waiver Process is at the discretion of the Sheriff.

***Specialized training, certifications, and/or other special requirements:***
Possess, or have the ability to possess, an Arizona Driver's License within six (6) months of hire.

Certified by the State of Arizona Peace Officer Standards and Training Board (AZ POST) as a Peace Officer.

Training on the following provided on-the-job: FEMA NIMS – IS100 AND 700, OSHA, payroll, and PREA.

Trainee applicants must successfully demonstrate physical readiness by completing a series of assessments with the requisite results in order to be considered for employment.

| Assessment: | What is Measured by the Assessment: | Pre-Employment Standard* |
|---|---|---|
| Maximum Push-Ups | Upper Body Muscular Endurance | Twenty (20) |
| 1.5 Mile Run | Aerobic Power | 17 minutes 44 seconds or less |
| One (1) Repetition Bench Press | Upper Body Absolute Strength | 115 pounds or 72% of Body Weight, whichever is less |

*Graduation from the academy requires trainees successfully complete the Arizona Post POPAT (Police Officer Physical Aptitude Test).

***Knowledge, skills, and abilities:***

**Work ethic and integrity:** Ability and willingness to work hard and conscientiously regardless of assignment and be committed to MCSO's mission; to represent information truthfully and be trustworthy in performance of duties; to act without regard to personal preference or bias; to take actions and make decisions through the thoughtful consideration of discretion; to act consistently with professional standards and within MCSO's policies, procedures and values.

**Attention to detail:** Ability to attend to physical needs and human comfort and identify when inconsistencies in protocol exist.

**Reasoning and judgment:** Ability to apply deductive and inductive reasoning to information and facts about situations to reach logical conclusions from the reasoning process; to recognize problems, understand their implications and devise solutions; to determine the relevance of each item of information.

**Problem solve**: Ability to devise multiple solutions or contingencies and to evaluate their strengths and weaknesses; to evaluate and choose between conflicting alternatives based on partial or incomplete information; to solve problems quickly in emergency situations and under stress.

**Leadership:** Ability to maintain good morale, motivation and commitment from others; to set a positive tone; to have the psychological and emotional maturity, self-confidence and willingness to assume responsibility for efforts and actions and to take responsibility for the consequences of those actions; to represent the Sheriff's Office in the best possible light.

12-19-19

**Function under stress**: Ability to maintain composure in difficult or stressful situations such as those that require emergency action; to make security-related decisions promptly; to use sound judgment in stressful situations by either taking or refraining from action (e.g., showing restraint); to remain calm during emergencies.

**Teamwork:**  Ability to work as a member of a team; to create and develop a team (e.g., assigning team roles and responsibilities, developing team goals); to lead a team; to identify potential team building problems and how to prevent them (e.g., Groupthink, scapegoating); to work harmoniously with coworkers; to participate when appropriate; to work with others to achieve desired solutions; to assist coworkers in both emergency and non-emergency situations.

*Preferred education and/or experience:*
Any combination of advanced education (AA, BA, BS or Graduate Degree) or experience (including Military).

*Preferred training, certifications, and/or other special requirements:*
N/A

*Working conditions:*
Working conditions may vary depending on assignment. Incumbents may be subjected to harsh elements such as extreme heat or cold, wet or dry, altitude, rough terrain, rural, suburban and urban environments. Incumbents may face dangerous, hostile and at times life threatening conditions, fatigue, physical or emotional stress related to the performance of the duties of a law enforcement officer.

Job requires the ability to work any location, shift and assignment operating 24 hours per day, 7 days per week.

Job requires the ability to: perform sprints, jumping and vaulting tasks; perform lifting, carrying, pushing and pulling; move quickly around objects and obstacles in pursuit situations; and pursue, extract and use force in both short intense effort and sustained effort situations.  Actual situations may require efforts beyond the following:

- Perform lifting and carrying that may include lifting heavy and awkward objects weighing 50 lbs. or more; carrying heavy and awkward equipment and objects 0 to 60 ft.; and carrying equipment weighing 20 to 50 lbs. up and down stairs and over rough and uneven terrain for long distances.

- Perform dragging movements that may include extracting victims weighing up to 175 lbs. and dragging victims, objects or suspects weighing up to 175 lbs., 20 to 30 ft.

- Perform pushing and pulling that may include pushing heavy objects or people weighing up to 200 lbs., 10 to 25 ft.; pulling heavy objects or people weighing up to 150 lbs., 10 to 25 ft.; and pulling self over 6 ft. obstacle.

- Perform range of motion activities that may include bending to reach for objects; bending and twisting in use of force situations; crouching during movement of 10 to 15 ft.; and climbing ladders and fire escapes; use force that may include self-defense situations for 45 to 60 seconds; control holds in self-defense situations for 30 to 60 seconds; strikes using hands, elbows, feet, and knees; use of intermediate impact weapons; and forced entry by pushing and pulling; ability to use and exercise deadly force by approved means (firearm).

12-19-19

- Perform foot pursuits that may include running sprints of 100 feet or more; running for sustained periods, usually 300 feet but up to 5 minutes; running up and down stairs, usually 2 flights but may be up to 4 flights; run over uneven terrain; dodge around obstacles.

***Working environment:***

*The following environments described are only representative of how the essential job tasks are currently performed or envisioned. As such, in order to accommodate a disability or limitation, the essential job tasks may be performed in ways other than described on these pages.*

*Work Environment:*
- Indoors and outdoors; confined areas
- Smoke, dust, fumes, chemicals
- Dim or bright lighting
- High noise level
- May be exposed to contagious diseases

*Physical Environment:*
- Sitting, standing, walking for extended periods
- Driving a vehicle
- Speaking, hearing, reading, seeing including distinguishing colors
- Wearing protective gear
- Precise dexterity

*Social Environment:*
- Interruptions, multiple or complicated tasks, frequently changing or unscheduled tasks, working under deadlines or time pressures
- Concentration/vigilance
- Isolation

## REPORTING STRUCTURE

**Supervision received:** Law Enforcement Sergeant

**Supervision exercised:** N/A

12-19-19

MCC 000005

# EXHIBIT 7



**FAIR LABOR STANDARDS ACT (FLSA)
EMPLOYEE ACKNOWLEDGEMENT FORM**

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 04/04/2022 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| Employee ID: 811091790 | Position #: 2933 | Name (Last, First): Houck, Christopher |
|---|---|---|
| Market Range Title: Law Enforcement Lieutenant | | Working Title: Law Enforcement Lieutenant |

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____     _____

Employee Signature            Date

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

*Christopher Houck*            *3-30-22*

Employee Signature            Date

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

*Gertrude T. Jackson*    *[signature]*    *3/30/2022*

Supervisor Name (print)       Supervisor Signature       Date

*For MCSO HR*

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

Revised: 08/07/2017

CONFIDENTIAL - ATTORNEYS' EYES ONLY      MCC 000093

# EXHIBIT 8



# MARICOPA COUNTY JOB DESCRIPTION

## Law Enforcement Sergeant

**MARKET RANGE TITLE:**        Law Enforcement Sergeant

**DEPARTMENT:**        Maricopa County Sheriff's Office (MCSO)

**DIVISION:**        Multiple

**FLSA STATUS:** Exempt        **CLASSIFIED/UNCLASSIFIED:** Law Enforcement

**POSITION NUMBER:** Multiple        **JOB CODE:** SEF015

## POSITION OVERVIEW

The Law Enforcement Sergeant in the Maricopa County Sheriff's Office (MCSO) enforces laws and maintains order while protecting life and property. The Sergeant is responsible for work of considerable difficulty, supervising a unit or shift of Deputy Sheriffs to ensure the public safety of the citizens of Maricopa County and the State of Arizona in accordance with all applicable local, state, and federal laws, regulations and MCSO policies.

## ESSENTIAL JOB TASKS

*(This is not an all-inclusive list of all job duties that may be required; employees will be required to perform other related duties as assigned. List in order of importance)*

### Training

Performs duties commensurate with the level of training, knowledge and experience required of position, maintains current training and undergoes additional training as dictated by policy, assignment, environment and personal development both internal and external to the Sheriff's Office.

### Supervision

Performs duties and responsibilities associated with monitoring subordinates' job performance to ensure compliance with MCSO policies; prioritizes, directs, plans and schedules daily activities of subordinates; oversees and ensures accurate and timely completion of required logs, forms and reports associated with day to day operations; oversees the condition, maintenance and operational readiness of MCSO equipment and facilities; helps facilitate and coordinate all necessary training, information and policy objectives for subordinates as required by Sheriff's Office policies and procedures.

### Administration

Interacts with the public and staff by effectively communicating verbally, and in writing, to direct, ascertain information, document incidents, requirements, needs and conditions within the facility; leads meetings (e.g., roll call) in order to disseminate information and training about previous shift activities, current crime trends, new policies and other department issues; operates electronic and other equipment (e.g., telephones, portable radios, desktop and mobile computers, cameras); independently gathers information through a variety of methods in order to document information and actions; utilizes technology to access information and records, and documents in reports as required by policy.

### Patrol Duties

12-19-19

Maintains a safe and secure community by identifying and responding to in-progress criminal activity and unusual or suspicious circumstances, vehicles, packages; makes observations, writes reports, communicates with the public and provides a level of service required in conjunction with all local, state and federal laws, as well as all applicable policies and procedures of the Maricopa County Sheriff's Office; engages the community in positive proactive policing practices to fulfill the departments mission, establishes strong ties and relationships within the community by conducting oneself in a professional, fair and transparent manner at all times.

***Criminal Investigations***
Facilitates or conducts traffic and criminal investigations, using accepted methods and techniques to identify, secure, collect and protect evidence and crime scenes; conducts interviews with victims, witnesses, and suspects, gathering information, developing probable cause, making arrests and executing search warrants.

## POSITION QUALIFICATIONS

***Minimum education and/or experience:***
High school diploma or GED; minimum of four (4) years of service as a Deputy Sheriff with the Maricopa County Sheriff's Office; must currently be serving in the classification of Deputy / Law Enforcement Officer.

***Specialized training, certifications, and/or other special requirements:***
Certified by the State of Arizona Peace Officer Standards and Training Board (AZ POST) as a Peace Officer; a valid Arizona driver's license and successful completion of training provided on-the-job in the following topics: FEMA NIMS – IS100 AND 700, OSHA, payroll and PREA.

Successful completion of a Criminal Justice Report Writing Course from an accredited college or sponsored by AZ POST or equivalent Criminal Justice Report Writing training.

***Knowledge, skills, and abilities:***

**Function under stress:** Ability to maintain composure in difficult or stressful situations such as those that require emergency action; to make security-related decisions promptly; to use sound judgment in stressful situations by either taking or refraining from action (e.g., showing restraint); to remain calm during emergencies.

**Work ethic and integrity:** Ability and willingness to work hard and conscientiously regardless of assignment and be committed to MCSO's mission; to represent information truthfully and be trustworthy in performance of duties; to act without regard to personal preference or bias; to take actions and make decisions through the thoughtful consideration of discretion; to act consistently with professional standards and within MCSO's policies, procedures and values.

**Reasoning and judgment:** Ability to apply deductive and inductive reasoning to information and facts about situations to reach logical conclusions from the reasoning process; to recognize problems, understand their implications and devise solutions; to determine the relevance of each item of information.

**Teamwork:** Ability to work as a member of a team; to create and develop a team (e.g., assigning team roles and responsibilities, developing team goals); to develop techniques for leading a team; to identify potential team building problems and how to prevent them (e.g., Groupthink, scapegoating); to work harmoniously with coworkers; to participate when appropriate; to work with others to achieve desired solutions; to assist coworkers in both

12-19-19

HOUCK000181

emergency and non-emergency situations; to instill the belief that leaders are invested in the success of their co-workers in addition to achieving the desired goals.

**Supervise:** Ability to apply knowledge of principles as they relate to setting performance expectations;  to document job performance (e.g., supervisory notes, Performance Assessment Form); to apply methods and techniques for providing employee feedback (e.g., constructive feedback), coaching, counseling and commending; to take corrective actions, and mentor employees within the scope of MCSO policy and procedure; to apply conflict resolution techniques for difficult situations; to apply methods for career development; to apply delegation techniques; to apply techniques for directing others that may not be under one's direct supervision.

**Leadership:** Ability to maintain good morale, motivation and commitment from others; to set a positive tone; to have the psychological and emotional maturity, self-confidence and willingness to assume responsibility for efforts and actions and to take responsibility for the consequences of those actions; to demonstrate credibility and integrity (personal and professional) and their effects on the ability to supervise; to recognize personal and professional accountability and their effects on leadership; to represent the Sheriff's Office in the best possible light.

***Preferred education and/or experience:***
Advanced education and combination of experience (Military) or coursework towards an advanced degree.

***Preferred training, certifications and/or other special requirements:***
N/A

***Working conditions:***
Working conditions may vary depending on assignment. Incumbents may be subjected to harsh elements such as extreme heat or cold, wet or dry, altitude, rough terrain, rural, suburban and urban environments. Incumbents may face dangerous, hostile and at times life threatening conditions, fatigue, physical or emotional stress related to the performance of the duties of a law enforcement officer.

Job requires the ability to work any shift and assignment operating 24 hours per day, 7 days per week.

Job requires the ability to: perform sprints, jumping and vaulting tasks; perform lifting, carrying, pushing and pulling; move quickly around objects and obstacles in pursuit situations; and pursue, extract and use force in both short intense effort and sustained effort situations.  Actual situations may require efforts beyond the following:

- Perform lifting and carrying that may include lifting heavy and awkward objects weighing 50 lbs. or more; carrying heavy and awkward equipment and objects 0 to 60 ft.; and carrying equipment weighing 20 to 50 lbs. up and down stairs and over rough and uneven terrain for long distances.

- Perform dragging movements that may include extracting victims weighing up to 175 lbs. and dragging victims, objects or suspects weighing up to 175 lbs., 20 to 30 ft.

- Perform pushing and pulling that may include pushing heavy objects or people weighing up to 200 lbs., 10 to 25 ft.; pulling heavy objects or people weighing up to 150 lbs., 10 to 25 ft.; and pulling self over 6 ft. obstacle.

12-19-19

- Perform range of motion activities that may include bending to reach for objects; bending and twisting in use of force situations; crouching during movement of 10 to 15 ft.; and climbing ladders and fire escapes; use force that may include self-defense situations for 45 to 60 seconds; control holds in self-defense situations for 30 to 60 seconds; strikes using hands, elbows, feet, and knees; use of intermediate impact weapons; and forced entry by pushing and pulling; ability to use and exercise deadly force by approved means (firearm).

- Perform foot pursuits that may include running sprints of 100 feet or more; running for sustained periods, usually 300 feet but up to 5 minutes; running up and down stairs, usually 2 flights but may be up to 4 flights; run over uneven terrain; and dodge around obstacles.

***Working environment:***
*The following environments described are only representative of how the essential job tasks are currently performed or envisioned. As such, in order to accommodate a disability or limitation, the essential job tasks may be performed in ways other than described on these pages.*

*Work Environment*
- Indoors and outdoors; confined areas
- Smoke, dust, fumes, chemicals
- Dim or bright lighting
- High noise level
- May be exposed to contagious diseases

*Physical Environment:*
- Sitting, standing, walking
- Driving a vehicle
- Speaking, hearing, reading, seeing including distinguishing colors
- Wearing protective gear
- Precise dexterity

*Social Environment:*
- Interruptions, multiple or complicated tasks, frequently changing or unscheduled tasks, working under deadlines or time pressures
- Accuracy, concentration, and vigilance
- Isolation

## REPORTING STRUCTURE

**Supervision received:** Law Enforcement Lieutenant

**Supervision exercised:** Law Enforcement Deputy Sheriff

12-19-19

# EXHIBIT 9

# FILED

# UNDER

# SEAL

# EXHIBIT 10

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on    )
behalf of himself and all   )
those similarly situated,   )
                            )
          Plaintiff,        )
                            )
vs.                         ) Case No.:
                            ) 2:23-cv-00068-DGC
Maricopa County,            )
                            )
          Defendant.        )
                            )


VIDEO-RECORDED DEPOSITION OF DAVID SCOTT KELLER
(and Videoconference via Zoom)


Phoenix, Arizona
April 21, 2025
2:05 p.m.


REPORTED BY:                CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR   Certified Reporters
AZ CR No. 50200             17505 N. 79th Avenue
                            Suite 301-C
PREPARED FOR:               Glendale, AZ 85308
CERTIFIED COPY              (480) 429-7573

2

1        VIDEO-RECORDED DEPOSITION OF DAVID SCOTT KELLER

2    commenced at 2:05 p.m., on April 21, 2025, at Fisher

3    & Phillips, LLP, 3200 North Central Avenue, Suite

4    1550, Phoenix, Arizona, and videoconference via Zoom

5    before Kristy A. Ceton, RPR, CRR, Arizona Certified

6    Court Reporter No. 50200.

7

8                              * * *

9

10   APPEARANCES:

11       For the Plaintiff:

12           FRANKEL SYVERSON, PLLC
             By:  Patricia N. Syverson, Esq.
13           2375 East Camelback Road
             Suite 600
14           Phoenix, Arizona 85016
             patti@frankelsyverson.com
15
         For the Defendants:
16
             FISHER & PHILLIPS, LLP
17           By:  Shayna Balch Santiago, Esq.
             3200 North Central Avenue
18           Suite 1550
             Phoenix, Arizona 85012
19           ssantiago@fisherphilliips.com

20       Also Present:

21           Cedric Tinard, the videographer

22           Megan Morley (via Zoom)

23

24

25

14

1   before, I also was transferred from District 2 to

2   District 7 in January.  That's how I know it was one

3   exact year in District 7.

4           Q.   Okay.

5           A.   They tended to transfer me right before

6   my birthday both times.

7           Q.   All right.  All right.

8                So one year in District 7.  Also as

9   lieutenant, correct?

10          A.   Correct.

11          Q.   And who did you report to while you were

12  in District 7?

13          A.   Captain Larry Kratzer.

14          Q.   Anyone else?

15          A.   No, ma'am.

16          Q.   Before that, you spent six months in

17  District 2?

18          A.   Yeah.  Approximately six months.

19          Q.   And who did you report to there?

20          A.   God.  He got -- he passed away.  So I

21  know Joe Dietrich was the XO.  Since there was three

22  lieutenants, there's always an XO, like me, the

23  assistant commander.  He used to be part of our IA

24  unit.  He came from IA.  Came to us.  I can't

25  remember his name, but he passed away about a year

Deposition of: David Scott Keller                                April 21, 2025

17

1   through your time in the different districts.

2             So at the bottom of page 3, your response

3   to interrogatory No. 1 states that you worked for

4   District 2 --

5        A.   Yes, ma'am.

6        Q.   -- and that was as a lieutenant in

7   District 2, correct?

8        A.   Correct.

9        Q.   And the dates you listed here until

10  approximately April, May of 2021.

11            Do you see that?

12       A.   Yes, ma'am.

13       Q.   Do you recall the date that you were

14  promoted to lieutenant?

15       A.   If I can refer to my thing because I have

16  to -- I have notes on every time I was promoted

17  because it's based on when I can do things.  So...

18       Q.   Was it approximately October of 2020?

19       A.   Let's see.  Hired 11.

20            Promoted as sergeant in 8/14 of '06.

21            Promoted as lieutenant 10/19 of 2020.

22       Q.   Perfect.

23            So you're promoted as -- as -- you were

24  promoted to lieutenant October 19th, 2020, correct?

25       A.   Correct, ma'am.

                                                                    18

1           Q.   So were you a lieutenant in District 2
2      from October 19, 2020, through approximately April or
3      May of 2021?
4           A.   No.  It would be January of 2021 because
5      I -- January of 2021 is when I went to District 7, I
6      believe.
7           Q.   Okay.
8           A.   So I was -- I was there in -- for about
9      six months is all I recall from District 2.  I wasn't
10     there very long.
11          Q.   Okay.
12          A.   Since I was newly promoted to lieutenant
13     and started there.
14          Q.   So your next assignment was -- after
15     District 2 was District 7, correct?
16          A.   Correct.
17          Q.   And you were there for about a year,
18     correct?
19          A.   Correct.  January to January.
20          Q.   January of 2021 through January of 2022,
21     correct?
22          A.   Yes, ma'am.
23          Q.   Okay.  After that, your next assignment
24     was District 3, correct?
25          A.   Correct.

19

1          Q.   And that was from -- was it also January

2     of --

3          A.   2022 to current.

4          Q.   Okay.  When you were in District 2, who

5     was your captain?

6          A.   That's the one I can't remember who his

7     name is.  He passed away.

8          Q.   Was it Shawn --

9          A.   Shawn Braaten.  Yes, ma'am.  Sorry about

10    that.

11         Q.   That's all right.

12              Other than Shawn Braaten, Larry Kratzer,

13    and Brian Stutsman, have you had any other captains

14    since you've been promoted to lieutenant in October

15    of 2020?

16         A.   No, ma'am.

17         Q.   Can you please, in your own words,

18    explain your understanding of the claims that you

19    filed against Maricopa County?

20         A.   The claims against Maricopa County is

21    that I do not get compensated for overtime.  I'm a

22    salary, and there are certain tasks that I have to do

23    that they're the same as a sergeant, as well as

24    exigent circumstances that I have to show up to that

25    I will not get paid for.

Deposition of: David Scott Keller                    April 21, 2025

20

1          Q.   Do you have an understanding that

2    Maricopa County classified you as exempt from

3    overtime?

4          A.   Yes, ma'am.

5          Q.   And you disagree with that

6    classification, correct?

7          A.   Yes, ma'am.

8          Q.   Since your promotion to lieutenant in

9    October of 2020, have you earned at least $684 a

10   week?

11         A.   That would be what my salary is, yes.

12         Q.   Do you recall how much you earned for the

13   year in 2020?

14         A.   I do not, ma'am.

15         Q.   How about 2021?

16         A.   I can tell you this year, ma'am, because

17   I just did my taxes.

18         Q.   For --  Do you mean for 2024?

19         A.   Yes, ma'am.

20         Q.   How much did you earn in 2024?

21         A.   119,000.

22         Q.   Did you earn about the same the year

23   prior?

24         A.   Because we got a -- a higher pay raise, I

25   believe it was just a little under that.

Deposition of: David Scott Keller                                    April 21, 2025

26

1         Q.   -- are autopopulated into Workday; is

2    that correct?

3         A.   Correct, ma'am.

4         Q.   And they're populated where the days of

5    the week and the total number of hours for each day

6    are what are entered into Workday, correct?

7         A.   Correct.

8         Q.   So walk me through.  If in --  And what

9    are your current scheduled hours and days?

10        A.   0730 to 1730, Tuesday through Friday is

11   what it's on the schedule.  But they vary.

12        Q.   So if I understood you correctly, 7:30 to

13   1730, Tuesday, Wednesday, Thursday, Friday, correct?

14        A.   7:30 to 5:30, yeah.

15        Q.   Okay.  So if you worked more hours than

16   you were regularly scheduled --

17        A.   Yes, ma'am.

18        Q.   -- then you would notate that into

19   Workday, correct?

20        A.   Yes, ma'am.

21        Q.   How would you note -- notate that into

22   Workday?

23        A.   I would change the hours, and if there

24   was a special detail I was doing that day, like last

25   week, I had to go to a town hall meeting for Aguila,

Deposition of: David Scott Keller                                April 21, 2025

37

1          A.   Monitor the calls for service.  I monitor

2    my sergeants.  I monitor my deputies.  I respond to

3    calls for service utilizing the CAD system.

4          Q.   And in your role as a lieutenant in the

5    three various districts that you've worked in since

6    your promotion to lieutenant, have you consistently

7    supervised sergeants?

8          A.   Sergeants and deputies, yes, ma'am.

9          Q.   And the deputies report to both sergeants

10   and yourself?

11         A.   They report directly to the sergeants,

12   but if the sergeant's not on scene, they report to

13   me.

14         Q.   Okay.  And can you give me an average

15   number of how many sergeants you've supervised at any

16   given time?

17         A.   Usually, right now, it's four.  In a

18   given time, I'm supervising four to two.  Right now,

19   being the XO, I supervise them all.

20         Q.   What's "XO" mean?

21         A.   Executive officer.  Second in command

22   from the captain, but I'm also acting captain right

23   now.

24         Q.   Since your promotion to lieutenant in

25   October of 2020, have you consistently supervised at

38

 1    least two individuals?

 2              A.    Yes, ma'am.

 3              Q.    You testified that you were currently

 4    serving as acting captain, correct?

 5              A.    Correct, ma'am.

 6              Q.    Walk me through what that means.

 7              A.    That means I take on all the captain's

 8    duties as well as the lieutenant's duties when a

 9    captain is absent from work.

10              Q.    What are these additional duties that you

11    take on on behalf of the captain while he's out?

12              A.    Right now, it's dealing with contract

13    cities.  It's dealing with the chief.  Making sure

14    they're apprised of all the issues in the area.

15    Working with the squads as far as making sure

16    manpower and resources are there.

17                    Doing pretty much anything that comes to

18    the captain's way.  Answering questions from the

19    community.  Answering questions for the district to

20    respond to, to the chiefs or to the sheriff.

21              Q.    Your current time serving as acting

22    captain, when did that start?

23              A.    About four weeks ago, I believe.  When --

24    yeah.  Beginning of April.  Brian went out for FMLA.

25              Q.    Have you served as acting command --

39

1    acting captain in the past?

2          A.    Yes, ma'am.

3          Q.    How many times have you served as acting

4    captain?

5          A.    Let's see.  District 2, I didn't serve as

6    acting captain down there.

7                District 7, and probably two to three

8    times for Captain Kratzer while he was out on

9    vacations, and/or out due to sickness.

10               Captain Stutsman, probably -- three

11   years, five or six times due to vacations or due to,

12   again, out due to sickness or illness.

13         Q.    Is this current period of four weeks the

14   longest that you've served as acting captain?

15         A.    One of the longer ones, yeah.  It's

16   usually anywhere from three to five weeks is where

17   I'm serving as acting captain.

18         Q.    Have you served as acting captain for

19   less than three weeks?

20         A.    Yes, ma'am.

21         Q.    How many times?

22         A.    That, I would not be able to tell you

23   because if the captain wants to take the weekend off,

24   somebody's got to be in charge.  So Kratzer's done

25   that to me.  Brian's done that to me several times.

40

1    Hey, you got the ball this weekend.  Okay.

2          Q.   Can you give me an estimation out of the

3    total number -- out of 52 weeks in a year --

4          A.   Uh-huh.

5          Q.   -- the total number of weeks that you've

6    served as acting captain, for example, in 2024?

7          A.   In 2024, it's probably -- well, Brian's

8    taken another week off for vacation.  It's probably

9    five weeks, six weeks.

10         Q.   How about 2023?

11         A.   2023, that one was probably a little over

12   six weeks.  He had a -- he had tore his bicep, so...

13         Q.   How about 2022?

14         A.   2022, Kratzer, that was during the good

15   times.  He was out with COVID, so I covered for him

16   then.  That was probably four or five weeks total in

17   that whole 2022 period with him.

18         Q.   2021?

19         A.   2021, I don't recall.  I started in 2020.

20   2021 is when I went to District 7, I believe.  So

21   2021 to 2022, and then got here.  So the 2021 is when

22   I was in 7, I believe.  And so that would have been

23   the four to five weeks for Kratzer.

24              Brian, I've been with him longer.  He's

25   had three surgeries.  Probably a little longer with

Deposition of: David Scott Keller                              April 21, 2025

41

1   Brian than with Kratzer.

2              Kratzer was out because of COVID.  But he

3   didn't really take any time off, other than a

4   vacation that he -- he booked.  And he booked that to

5   where it was only, like, I was covering on the

6   weekend for him while he was gone.

7         Q.   So is it your testimony that in 2021, you

8   think you were acting captain about four to five

9   weeks?

10        A.   Yeah.  Yeah.  It's hard to recall.  I

11  don't keep it down.  It's usually with -- if, like, I

12  was the only lieutenant in District 7.  I was not

13  only working dayshift, I was working nightshift as

14  watch commander.  So when he would call me and say,

15  Hey, can you cover this weekend?  I didn't write it

16  in a little book.  I got you covered, you know.

17             Nothing that you really write down about

18  this.  It's just all off the top of your head about

19  how much it is.  The only reason I know about right

20  now is because Brian's still out.

21        Q.   Are you familiar with Blue Team

22  supervisor notes?

23        A.   Yes, ma'am.

24        Q.   What are those?

25        A.   Blue Team supervisor notes are notes that

42

1    you put in on your employees on a biweekly basis.

2    Two of them have to be the EIS review, which reviews

3    anything that's come up with the employee that might

4    be an alert, something that you want to watch for or

5    even good things.  Okay.

6              Then, one of those notes has to have a

7    supervisor note, which covers the questions and the

8    EPA, employee performance appraisal.  So you would

9    cover questions in that.

10             Or you can do accommodations in it.  You

11   can do coachings in it.  You can do minor awards,

12   major awards in it.  You can do traffic stop

13   evaluations in it.  I have to do one of those, thanks

14   to Ben.  But so it's not normal for us as lieutenants

15   to do traffic stop evaluations.  Normally, the

16   sergeants do those.

17             So it's about all Blue Team covers that I

18   can remember.

19        Q.   Is it normal for lieutenants to do

20   traffic stops?

21        A.   It's not normal, but we are the same as a

22   deputy.  That's why our title is deputy lieutenant.

23   Ben does a lot of them.  I won't do them unless

24   they're reckless driving or DUI.  I don't do --

25   because I'm in an unmarked car.

Deposition of: David Scott Keller                                  April 21, 2025

57

1    the last three and a half years that I've been at

2    District 3, supervising the IA sergeant that does the

3    investigations and I help him with them.

4          Q.   Understood.  Understood.  Okay.  So let's

5    go about this a little bit differently then.

6               How many -- it -- How should I be

7    describing these?  Should I be describing these as

8    administrative --

9          A.   They're administrative investigations.

10         Q.   -- internal investigations?

11              How many administrative --  Strike that.

12              As lieutenant, am I correct in

13   understanding that you would both review internal

14   administrative investigations of others and also

15   conduct your own?

16         A.   I don't conduct my own unless it's

17   assigned to me because of who the personnel is.  I've

18   only conducted one in the last three and a half years

19   because it was another lieutenant.  That's not my

20   subordinate; that's my peer.  So I had to conduct it

21   because of that.

22              Otherwise, the IA sergeant conducts them

23   all.  I review them.  And then the captain reviews

24   them.  And then after we've all concurred that this

25   is what it's going to be, it goes to IA and they make

Deposition of: David Scott Keller                                    April 21, 2025

58

1    the final determination and then send it to Ken

2    Holmes if punishment is necessary.

3         Q.   So since you have been a lieutenant from

4    October 2020 through the present --

5         A.   Yes, ma'am.

6         Q.   -- how many IAs have you reviewed

7    approximately?

8         A.   30 -- 30 last year.  The two years before

9    that, when I had Sergeant Sosa under me, it was a

10   nightmare because of the backlog.  We had, at one

11   point, 90 IAs that we had to take care of that were

12   prior to us even getting to the district.  And most

13   people had quit.  So we -- we are now, as one comes

14   in, it gets done.  And we are no longer backlogged at

15   the district.

16        Q.   So are the 30 IA reviews that were done

17   last year in the category of they were reviewed as

18   they came in?

19        A.   They were reviewed as the sergeant got

20   done with them.  He has 60 days to get done with

21   them.  Okay.  Well, I push him back to 50 because we

22   have 65 days by the time we have to get it to PSB.

23   So I give him 50.  That gives me and the captain 10,

24   and we have a buffer of 5 to make sure that it gets

25   down there on time.  Otherwise, we're in trouble.

59

```
1              Oops.  Sorry.
2         Q.   How many of the IA reviews that you have
3    been involved with have resulted in a sustained
4    finding?
5         A.   Not as many as you would expect.  I can
6    remember five or six offhand just because of the --
7    it was -- they were purely a violation.  But didn't
8    -- there's some of them that we didn't think were
9    violations.  By the time they got down to PSB, they
10   decided they were a violation.  So they can -- we can
11   be overridden.
12        Q.   So let me make sure I understand that
13   correctly.
14             So was it your testimony that you
15   believed they were sustained five to six, or that --
16        A.   No.
17        Q.   -- you believed they weren't and then PSB
18   overrode you?
19        A.   No.  Five or six of them were sustained.
20   And PSB agreed with that.  There were some other ones
21   that we didn't -- we did a not sustained on.  We got
22   deficiency memos on those.  PSB disagreed with that
23   and doled out punishment.  And they turned them to
24   sustained.
25             So they're --  We don't have final
```

60

1  discretion on any of the administrative reviews.

2  We're just recommending.

3       Q.   Okay.  So if my understanding is correct,

4  since you've been a lieutenant, you have been

5  involved in numerous IA reviews of which you've

6  recommended a sustained finding about five to six

7  times, correct?

8       A.   The actual person that's recommending it

9  is the sergeant.  Me and the captain have to agree

10 with his recommendations.  So, yes.

11      Q.   There were also some additional

12 recommendations of the sergeant that you had to

13 review and also sign off on?

14      A.   Yes, ma'am.

15      Q.   That were submitted to -- to PSB with a

16 not sustained finding, but PSB disagreed and issued a

17 deficiency notice, correct?

18      A.   Correct, ma'am.  We had nine of those out

19 of those 90 that me and poor Sosa were not even the

20 initial investigators.

21      Q.   Have you ever had to put someone, in your

22 time as a lieutenant from October 2020 to the

23 present, on an action plan?

24      A.   On what?

25      Q.   An action plan.

61

1       A.   I have not, no, ma'am.

2       Q.   In your time as lieutenant, have you

3  needed to coach someone?

4       A.   No, ma'am.  I don't remember writing a

5  coaching at all.

6       Q.   In your time as a lieutenant, have you

7  needed to give any of your subordinates constructive

8  feedback?

9       A.   Mentoring?

10      Q.   Sure.

11      A.   Is that what you mean?

12      Q.   Sure.

13      A.   Yeah, I give my subordinates mentoring

14  and constructive feedback every day.  Not only mine,

15  but the deputies, as well as the other sergeants

16  under the other staff.  I'm the senior lieutenant, so

17  I'm out in the field with them a lot of the time.

18      Q.   Have you performed performance

19  evaluations of any of your assigned staff?

20      A.   Yes, ma'am.

21      Q.   How many performance evaluations do you

22  conduct in a given year?

23      A.   Four.

24      Q.   Does that correspond to each one of your

25  assigned sergeants?

Deposition of: David Scott Keller                         April 21, 2025

62

1        A.    Yes, ma'am.

2        Q.    And are those annual evaluations that you

3   need to complete?

4        A.    Yes, ma'am.

5        Q.    So is it correct that you have completed

6   approximately four evaluations each year for each of

7   your sergeants since you've been promoted to

8   lieutenant?

9        A.    Plus or minus four, because some of those

10  years, I didn't have four sergeants, but, yes, ma'am.

11       Q.    Have you ever served on a promotional

12  board?

13       A.    No, ma'am.

14       Q.    Have you ever served on an awards board?

15       A.    No, ma'am.

16       Q.    Walking through your time in the

17  different districts -- we'll start with your current

18  district.  Where is it located?

19       A.    It's located at the corner of Dysart and

20  Bell Road in Sun City, Arizona.  13 --

21       Q.    Do you know the address?

22       A.    13063 West Bell Road, I believe, is the

23  address.

24       Q.    And that's District 3, correct?

25       A.    District 3 patrol.

69

1   suspect into custody?

2         A.   Yes, ma'am.  He was loaded for bear.  I'm

3   glad I have level five armor -- level four armor.

4   I'm sorry.

5         Q.   So I want to walk you through each of the

6   districts that you worked in.  You just testified

7   that your time in the building versus time in the

8   field is about 50/50, correct?

9         A.   Yeah.  Depending on the day and what's

10  going on through that day.  Like, that day -- my

11  whole day was out in the field that day.  So that's

12  why I'm doing the 50/50.

13        Q.   But, conversely, there could be some days

14  where you spend the majority of the your day in the

15  office, correct?

16        A.   Correct, ma'am.

17        Q.   Have you ever spent your whole day in the

18  office?

19        A.   Not if I could help it, ma'am.

20        Q.   But have you?

21        A.   I have -- I have done that on occasion.

22  But I tend to go stir crazy, just like sitting in

23  this office right now.  I don't like sitting still.

24        Q.   Understood.

25             So that approximation of 50 percent in

Deposition of: David Scott Keller                    April 21, 2025

70

1    the office versus 50 percent in the field, is that

2    for your time as lieutenant in all District 2, 3, and

3    7?

4           A.   I would say in 7, I was in the field more

5    because there is very little work for a lieutenant to

6    do in 7.  So I was in the field more patrolling

7    around, doing what we call vacation watch.  They --

8    we had the park up there, and it liked to have patrol

9    cars driving through the park all the time.

10              So I would go drive through the park so

11   my deputies could answer calls for service, or I

12   would go drive around the fountain to do patrol

13   watches so that they could go to calls for service.

14   Because if you didn't -- if they didn't see a patrol

15   car out, and that, and -- they started calling in

16   saying that we weren't doing anything.  So...

17          Q.   And just to have a clear record here,

18   District 7 --

19          A.   That's the citizens.

20          Q.   -- District 7 is Fountain Hills, correct?

21          A.   That's correct.  Yeah.

22          Q.   So what percentage of time would you

23   approximate that you were in the field versus in the

24   office while you were lieutenant in District 7?

25          A.   District 7, I -- I would say, I would

Deposition of: David Scott Keller                                       April 21, 2025

 1    probably -- you know, you got driving to and from,

 2    driving into the office, driving around town, getting

 3    into the office, I maybe had two hours of office work

 4    on a daily basis to do in the office.

 5              And that was just catching up on reports

 6    that the detective sergeant had signed off, and they

 7    had to have a lieutenant's signature to be shipped to

 8    the County Attorney's Office.

 9         Q.   And how far was your drive from your home

10    --

11         A.   Hour and a half.

12         Q.   Let me get a clear record.

13         A.   Yeah.

14         Q.   How far was your drive from your home to

15    the District 7 building at that time that you were

16    lieutenant there?

17         A.   Hour and a half.

18         Q.   Each way?

19         A.   Not on the way home.  It was longer.

20         Q.   How long was it on the way home?

21         A.   About two hours.  Traffic going to

22    Fountain Hills from 72nd and Pinnacle Peak sucks.

23         Q.   I can only imagine.  I grew up out there,

24    so I know that traffic well on the 101.

25         A.   Uh-huh.

Deposition of: David Scott Keller                                    April 21, 2025

73

1          A.    Yes, ma'am.

2          Q.    Okay.  So if I have about a three to

3    three-and-a-half-hour drive, including driving to and

4    driving from the District 7 building, and about two

5    hours each day in the office?

6          A.    Yes, ma'am.

7          Q.    How long were your scheduled workdays in

8    District 7?

9          A.    Same as they are now.  0730 to 1730.

10   They put that on everything for every lieutenant.  It

11   just depends the days of the weeks.

12               But when I was at District 7, one week

13   may be day shifts, the next week may be night shift,

14   as watch commander, which starts at 1700 and goes to

15   3:00 in the morning.

16         Q.    Understood.  I'm going to ask you about

17   your time as a watch commander here shortly.

18               But am I correct in understanding, then,

19   in District 7, when you were lieutenant, that you

20   would spend about three to three and a half hours

21   driving to/from the District 7 building, about two

22   hours in your office, and the remaining time is about

23   four and a half to five hours in the field?

24         A.    Yes, ma'am.

25         Q.    Does that sound accurate?

1        A.    Yes, ma'am.

2        Q.    Okay.  Same exercise as to District 2.

3   How long was your drive from your home to District 2?

4        A.    At that time, I was living closer.

5   District 2 was about 35 minutes.

6        Q.    To and from?

7        A.    Yes, ma'am.

8        Q.    When you were working in District 2 as a

9   lieutenant, would you typically drive into the office

10  to start your day?

11       A.    Yes, ma'am.

12       Q.    How much time on average would you say

13  you spent in your office at District 2?

14       A.    District 2, I would get in, I would meet

15  with Captain Dietrich, which at that time was my

16  partner, Lieutenant Dietrich, and we would discuss

17  what had happened the night before.  We would go over

18  our paperwork.  Joe would go do what he needed to do.

19  I had the West Valley for my guys, and that.

20            So I would head out to, like, Tonopah and

21  Buckeye and go out there and see if I could help them

22  with calls for service.  We had an issue in the

23  Hassayampa River with a lot of shooters and ATVers,

24  so we were trying to quell that.

25       Q.    But how much time, on average, do you

Deposition of: David Scott Keller                              April 21, 2025

75

1    think you spent in the District 2 building?

2           A.   I would say it's probably 50/50.  You

3    know, there was not much more in District 2.  I was

4    just learning to be a lieutenant at that time.  So

5    Joe was mentoring me on all the paperwork and stuff

6    because it's different from a sergeant for some of

7    the upper-end paperwork.

8           Q.   So if I do the math on this, it took a

9    little over an hour of drive time?

10          A.   Yes, ma'am.

11          Q.   Each day.

12               10-hour shift, correct?

13          A.   Yes, ma'am.

14          Q.   So if you have a 10-hour shift and it

15   took you an hour total drive time back and forth,

16   does that mean four and a half hours a day in the

17   office, four and a half hours in the field?

18          A.   Yes, ma'am.

19          Q.   And District 3.  Go through the same

20   questions here.

21               Have you resided at your current

22   residence the entire time you've been in District 3

23   as a lieutenant?

24          A.   No.

25          Q.   What was your prior address?

Deposition of: David Scott Keller                           April 21, 2025

76

1          A.   My prior address was a mile away.  It was
2    just a mile south of that.
3          Q.   At the time, how long was your commute to
4    the District 3 building?
5          A.   Same.  Same time.  I take the same road.
6    Deer Valley.
7          Q.   Isn't your commute currently about 15
8    minutes?
9          A.   Yeah.
10         Q.   So it was 15 minutes at that time, too?
11         A.   Yeah.
12         Q.   So the entire time you've been in
13   District 3, your entire commute has been about 15
14   minutes?
15         A.   Yes, ma'am.
16         Q.   Each way?
17         A.   Yes, ma'am.
18         Q.   How much time on average, on a daily
19   basis, do you spend in the District 3 building versus
20   out in the field?
21         A.   Out in the District 3, right now, because
22   of some of the community outreach that I'm involved
23   in with the Sun City West posse, Sun City posse, all
24   of the community outreach programs that we have for
25   Aguila, Wittmann, all that, I would say, it's still

77

```
1    50/50 because I have a lot more paperwork to do based

2    on those community outreach events.

3              And I -- I put together some slide shows

4    and stuff for crime stats and stuff to talk to the

5    community.

6              I've got another gentleman that works for

7    me.  He's a DSA, that he puts together all the fraud

8    events.  And then we're out in the field doing those

9    events and they -- we meet with HOAs, we meet with,

10   like -- today, I -- before coming here, I got a call

11   from PORA, from Sun City wanting me to deal with a

12   neighbor issue there.

13             So I've already dealt with one with Sun

14   City West with a neighbor that was giving the posse a

15   hard time and had to go out and facilitate a meeting

16   between the neighbor and the posse.  And that's what

17   PORA is asking me to do today.

18        Q.   So your scheduled hours in District 3 are

19   10 hours per day, correct?

20        A.   Correct.

21        Q.   So if you have a 10-hour shift and

22   there's about 30 minutes of drive time back and

23   forth?

24        A.   Uh-huh.  I'm sorry.

25        Q.   Yes?
```

Deposition of: David Scott Keller                                    April 21, 2025

78

1        A.    Yes.

2        Q.    Then you're spending between four and a

3   half and five hours each day in the office and

4   another four and a half to five in the field?

5        A.    Yeah.   That sounds about right.   Some

6   days, it's longer; some days, it's shorter.

7        Q.    But in that in-the-field number, you're

8   also including all this community outreach, correct?

9        A.    Not all the community outreach.   Those

10  are things I do monthly.   So those are things that I

11  have to go out and do monthly.   But because of those

12  incidents, they're alerting us to traffic violators.

13  They're alerting us to the homelessness.   They're

14  alerting us to other areas that they've got concern

15  with.

16             So I go out and try to patrol those areas

17  of concern.   And -- because my guys don't have the

18  time to do it.   I mean, when we get out in the

19  morning, there's probably 25 calls going on the

20  board.   On some mornings, some days of the week, they

21  got lucky, there's five or six.   So...

22        Q.    Walk me through what -- you've already

23  listed some.   But I want a complete list of all of

24  the community outreach that you're involved in.

25        A.    Community outreach for Aguila for the

Deposition of: David Scott Keller                                    April 21, 2025

83

1          A.    All right, ma'am.

2                THE VIDEOGRAPHER:   Okay.   We are off the

3     record at 3:52 p.m.

4                (A break was taken at 3:52 p.m.)

5                THE VIDEOGRAPHER:   We are back on the

6     record at 4:11 p.m.

7          Q.    BY MS. BALCH SANTIAGO:   All right.

8     Taking a short break.   You've had an opportunity to

9     confer with your counsel.   Do you need to change any

10    of your responses to any of my earlier questions?

11         A.    No, ma'am.

12         Q.    Okay.   All right.

13               During your time since your promotion to

14    lieutenant, how many times have you prevented,

15    controlled, or extinguished fires of any type?

16         A.    Fires?

17         Q.    Yes.

18         A.    Not a firefighter, ma'am.

19         Q.    Is that zero?

20         A.    That's zero.

21         Q.    How many times since your promotion to

22    lieutenant in October of 2020 have you rescued fire

23    crime or accident victims?

24         A.    I'm not a fire personnel, so I haven't

25    rescued anybody.   I have been at accident scenes and

Deposition of: David Scott Keller                                April 21, 2025

83

1          A.   All right, ma'am.

2               THE VIDEOGRAPHER:  Okay.  We are off the

3    record at 3:52 p.m.

4               (A break was taken at 3:52 p.m.)

5               THE VIDEOGRAPHER:  We are back on the

6    record at 4:11 p.m.

7          Q.   BY MS. BALCH SANTIAGO:  All right.

8    Taking a short break.  You've had an opportunity to

9    confer with your counsel.  Do you need to change any

10   of your responses to any of my earlier questions?

11         A.   No, ma'am.

12         Q.   Okay.  All right.

13              During your time since your promotion to

14   lieutenant, how many times have you prevented,

15   controlled, or extinguished fires of any type?

16         A.   Fires?

17         Q.   Yes.

18         A.   Not a firefighter, ma'am.

19         Q.   Is that zero?

20         A.   That's zero.

21         Q.   How many times since your promotion to

22   lieutenant in October of 2020 have you rescued fire

23   crime or accident victims?

24         A.   I'm not a fire personnel, so I haven't

25   rescued anybody.  I have been at accident scenes and

Deposition of: David Scott Keller                                    April 21, 2025

86

1              A.   I don't believe that a deputy would be

2    able to perform surveillance in the way that I was

3    performing it because they're in a fully marked

4    police car.  I am not.

5              Q.   You have detectives, right?

6              A.   Ma'am?

7              Q.   There's detectives in the Maricopa County

8    Sheriff's Office, right?

9              A.   I used to be a detective with the

10   Maricopa County Sheriff's Office, yes, ma'am.

11             Q.   Do they drive marked vehicles?

12             A.   No, ma'am.

13             Q.   Would you expect a detective to perform

14   more surveillance than 10 since October of 2020?

15             A.   Yes, ma'am.  If they have the manpower to

16   do so.

17             Q.   Since your promotion to lieutenant in

18   October 2020, have you pursued, restrained, or

19   apprehended suspects?

20             A.   Yes, ma'am.

21             Q.   Approximately how many times?

22             A.   I was in a foot pursuit in Youngtown,

23   caught that guy.  Restrained some people that the

24   deputies were out with on a domestic violence.

25   Probably about 15.

87

1          Q.   Probably 15 since October of 2020?

2          A.   Yeah.  About 15 times.  Used my

3    handcuffs, ran after people.

4          Q.   In your position as a lieutenant, I think

5    you testified earlier that you oversee sergeants and

6    they oversee deputies, correct?

7          A.   Yes, ma'am.

8          Q.   Can you give me an average number of

9    times that a deputy would pursue, restrain, or

10   apprehend suspects on any given year?

11         A.   Well, an average number of times, three

12   times a day.  That's what my guys are doing right now

13   based on their statistics.

14         Q.   So your deputies right now are pursuing,

15   restraining, or apprehending suspects about three

16   times per day each?

17         A.   That's correct.

18         Q.   Have you detained or supervised suspected

19   and convicted criminals since your promotion to

20   lieutenant in October of 2020?

21         A.   Okay.  I didn't hear that one part.  Have

22   I detained or what?

23         Q.   Detained or supervised suspected and

24   convicted criminals since your promotion to

25   lieutenant in October of 2020?

88

1        A.    I've detained them.  I don't know what
2   you mean by supervised criminals.
3        Q.    Well, then how about just with detaining.
4   How many times have you detained a suspected or
5   convicted criminal since your promotion to lieutenant
6   in October of 2020?
7        A.    With assisting my guys, probably about 10
8   or 15 times.
9        Q.    Have you detained a suspected or
10  convicted criminal on your own since your promotion
11  to lieutenant in October of 2020?
12       A.    No, ma'am.  My job is to mentor and
13  train, and I assist them.  So I'm not actively out
14  there doing that.  I am answering calls for service
15  that they can't get to because they are doing that.
16       Q.    Since your promotion to lieutenant in
17  October of 2020, have you interviewed any witnesses?
18       A.    Yes, ma'am.
19       Q.    Approximately how many?
20       A.    Probably about five.
21       Q.    Do you have an idea as to how often your
22  deputies interview witnesses in a given year?
23       A.    Yeah.  Daily.  365 at minimum a year.
24       Q.    Have you interrogated or fingerprinted
25  suspects since your promotion to lieutenant in

91

1    you served as acting captain for all three captains

2    you've worked for?

3            A.    No, ma'am.

4            Q.    Which captains did you --

5            A.    Two.  That would be Kratzer and Stutsman.

6    Joe D served as acting captain for Braaten when he

7    was gone.

8            Q.    Understood.

9            A.    I'm sorry.  Dietrich.

10           Q.    And when you served as acting commander

11   -- sorry -- acting captain for Kratzer, did you

12   possess any degree of discretion in your oversight of

13   subordinates?

14           MS. SYVERSON:  Form.

15           THE WITNESS:  I don't know what you mean

16   by "discretion," first off.  There is no discretion

17   from a captain to lieutenant.  The way we're told how

18   we supervise is by policy.  So it's all the same.

19   Now, how we talk to people, that's different.

20           Q.    BY MS. BALCH SANTIAGO:  Have you ever

21   been asked by a captain or a chief to take on any

22   special projects?

23           A.    What do you mean by "special projects"?

24           Q.    For example, I know that some of your

25   colleagues have done things like assisted with the --

Deposition of: David Scott Keller                                                        April 21, 2025

92

1   with a new building or with purchases of equipment

2   like license plate readers.  Have you ever been

3   tasked with any of those types of projects?

4          A.   I've been asked to have those projects

5   done, and I've assigned them to subordinates to do

6   it, and I've overseen that they -- and made sure that

7   they got it done.

8          Q.   What projects have you been asked to have

9   completed and you oversaw the completion?

10         A.   A fingerprint scanners.  That's the two

11  scanners that we got for the district.  And now all

12  the other districts are trying to get them for

13  equipment for the guys out in the field due to the

14  urban campers.  A lot of them don't have ID, so when

15  they do commit crimes to be able to find out who they

16  are, we can take a mobile fingerprint scanner to

17  them, ID them, so we don't have to book them in the

18  jail.

19         Q.   Okay.  Any other special projects or

20  assignments?

21         A.   Let's see.  Special projects.  Nothing in

22  District 2.  That's for sure.

23              District 7, other than setting up

24  personnel for the annual events and doing scheduling

25  and -- and people, that would be only thing I would

Deposition of: David Scott Keller                                    April 21, 2025

93

1    consider, like, a special project.

2              District 3 was the fingerprint scanners.

3    Stop Sticks.  We got all new Stop Sticks that -- for

4    all the vehicles now.  So I was asked if I could make

5    sure that happened.  And I tasked my deputy and my

6    sergeant to get that going.  And they wrote the

7    appropriate memos, got them to me to sign, get them

8    to the captain, and we got all new Stop Sticks.

9              As a matter of fact, I got Stop Sticks in

10   my car right now.

11        Q.   Have you been involved in any budgeting?

12        A.   No, ma'am.

13        Q.   Have you been involved in any projects to

14   rewrite any policies or procedures?

15        A.   We all are involved in that.  All

16   supervisors are involved in that.  And it's not

17   really to rewrite them.  They send them out to us to

18   review and for our opinions on policies and

19   procedures.  But normally, they -- they stay as how

20   they were written by policy unit.

21             They'll ask us our opinions, like one of

22   them was on CP29H where they won't define rudeness.

23   So anybody that says a deputy is rude, we are taking

24   a 40-hour investigation on, because they won't define

25   the word rudeness.  And I asked them to do that, and

Deposition of: David Scott Keller                                    April 21, 2025

102

1          A.    That's correct.  Nobody's required me to
2     do that through any of the captains I've been with.
3          Q.    Do you know -- do you have any knowledge
4     one way or the other as to whether other captains
5     have a requirement that individuals be logged into
6     CAD at all times?
7          A.    I'm not aware of any captains requiring
8     that.  Every captain is different.  But even Captain
9     Stutsman doesn't log into CAD all the time.  So
10    sometimes he's in the office, doesn't log into CAD.
11    Other days he does.  Sometimes he can't get logged
12    into CAD and I have to fix his computer for him.
13         (Exhibit 8 was marked for identification.)
14              MS. BALCH SANTIAGO:  Are we on 8?
15              THE COURT REPORTER:  Yes.
16         Q.    BY MS. BALCH SANTIAGO:  You've been
17    handed what's been marked as Exhibit 8 to your
18    deposition.  This is the law enforcement lieutenant
19    job description at Bates range HOUCK175 through 179.
20              Do you recognize this document?
21         A.    Yeah.  It's a job description for law
22    enforcement lieutenant.
23         Q.    Have you reviewed this document prior to
24    today's deposition?
25         A.    Yeah.  When I applied for law enforcement

Deposition of: David Scott Keller                                    April 21, 2025

103

1    lieutenant.

2         Q.   I want you to look through the essential

3    job tasks that are listed.  There's several

4    categories here including administration, incident

5    management, career and professional development,

6    supervision, community policing, and management.

7              And let me know if there is anything on

8    this job description that you contend is not a job

9    duty of a law enforcement lieutenant based on your

10   experience as a lieutenant in Districts 2, 3, and 7

11   since October of 2020?

12        A.   It doesn't show anything about the first

13   part of us being deputies and what we do as a deputy.

14   This is just showing you what your management role

15   is.

16        Q.   I understand that you're contending --

17   well, if I understand you correctly, are you

18   contending that there are job duties that are left

19   off of this job description?

20        A.   That's correct.

21        Q.   Okay.  We'll get to that in a minute.

22             But my question is, is there anything on

23   this job description that you don't do or is

24   incorrect?

25        A.   It --  I don't pull productivity reports

Deposition of: David Scott Keller                                    April 21, 2025

104

1    or any of that, and I don't do anything with

2    budgeting.  That's already pulled for us and it's

3    also pulled for the sergeants.

4         Q.   Okay.  With the exception of your

5    contention that are some things left off of this job

6    description, do you disagree with any of the

7    essential job tasks listed on Exhibit 8, other than

8    not pulling productivity reports and no budgeting?

9         A.   I don't disagree with them.  I just think

10   they're vague.

11        Q.   Okay.  So, again, I'm going to ask you

12   what --  Strike that.

13             What job duties or job tasks do you

14   contend aren't on this job description that should be

15   on here?

16        A.   Uphold all state, local, federal laws,

17   abide by the Constitution of the United States, and

18   perform those duties to serve and protect the

19   community.  The first definition on there is law

20   enforcement lieutenant.  I'm a law enforcement

21   officer.

22             My duties at first and foremost is being

23   a law enforcement officer.  Lieutenant is just a part

24   of the title.  That means I manage other law

25   enforcement officers.

1      Q.   What do you mean by that?  You manage

2  other law enforcement officers?

3      A.   I make sure they're doing their jobs and

4  upholding the laws and the Constitution and abiding

5  by policy.  And if they're not, then I have to

6  intervene one way or another.  I have to mentor them,

7  coach them, I have to guide them.  I have to show

8  them by getting out there and doing it.

9           Show them by doing it is one way I do

10  teach guys.  That's one of the reasons when we went

11  into that house, they didn't believe that -- PSB --

12  that exigent circumstances fit.  Well, I took the

13  brunt of that due to the fact that I led my guys into

14  that house showing them how to do that.

15           They didn't get any punishment.  I got a

16  written reprimand, because even the hearing officer

17  told me, 10 different attorneys, you would get 10

18  different answers for exigent circumstances on that

19  day based on what happened.

20           But, because of what we're under, I got a

21  written reprimand instead of 40 hours off.  Because

22  of my position, anything that I do wrong is

23  automatically 40 hours off without pay.

24      Q.   Would you consider your primary duty as a

25  law enforcement lieutenant to manage your sergeants

Deposition of: David Scott Keller                    April 21, 2025

106

1   and deputies?

2        A.   My primary duty is to uphold the laws,

3   lead by example, while managing my sergeant and

4   deputies.  Now, I can tell you this.  That's how I

5   take it, not everybody else.  Because we do have some

6   personnel that are in management positions, all

7   ranks, that their primary job is just to sit in their

8   office.  So I'm not going to be that guy.

9        Q.   When you said that "all ranks," does that

10  include other lieutenants?

11       A.   It includes sergeants, captains, chiefs,

12  lieutenants.  You always have that one percent in any

13  organization that just want to get a paycheck.

14       Q.   Do you have any understanding --  Strike

15  that.

16            Let me take you back to Exhibit 3 to your

17  deposition.

18       A.   3?

19       Q.   3, yes.

20            Now, it's your testimony that you did not

21  prepare this document, correct?

22       A.   Correct.  I didn't prepare it.

23       Q.   Who prepared this document?

24       A.   I have no clue.  It's a -- it's an Excel

25  spreadsheet that was prepared.

133

1          A.    Off duty.

2          Q.    -- management?

3          A.    Yes, ma'am.

4          Q.    Is there also a call type for PIR?

5          A.    There was, but that was R1 or something

6    like that.  I don't recall what it is.  I haven't

7    worked that in a long time.

8          Q.    What do you mean by R1?

9          A.    R1 is just our -- our radio group that we

10   were in.  We were in R1.  And then we would -- they

11   designated us R1 through R20 something because of how

12   many units were working.

13         Q.    What does PIR refer to?

14         A.    Phoenix International Raceway.

15         Q.    So could there potentially be a reference

16   to PIR as a call type on your unit histories from

17   October 2020 through the present?

18         A.    It would be either 909 or PIR.  But I'm

19   not the one that puts that call type in.  That would

20   have been the dispatch group that was dispatching us

21   because they have an off-duty dispatch group that are

22   our dispatchers that work out at PIR in a command

23   trailer, and they take care of all that so we're not

24   tying up the frequencies for regular patrol units.

25         Q.    So would you agree with me that if there

134

1    are any call types listed in your unit history, 909S,

2    909T, 412, or PIR, that that's not worked hours with

3    Maricopa County and is instead off-duty work?

4         A.   No.  If it's PIR, I'll agree with that.

5    909s, 909 Toms and 909 Sams can also be on-duty work

6    hours.  The only way to be able to tell that it is

7    not is what your unit is designated.

8         Q.   Understood.  Let me clarify that, then.

9              So would you agree with me that any

10   reference to PIR in call type would equate to

11   off-duty work not through Maricopa County?

12        A.   Correct.

13        Q.   How about 412, is that always going to be

14   off-duty work not through Maricopa County?

15        A.   No.

16        Q.   Okay.

17        A.   It can be on duty as well.

18        Q.   So call types 909S, 909T, and 412 can be

19   off-duty work so long as it has the corresponding

20   dispatch group 01, correct?

21        A.   Yes.  Ma'am, you need the dispatch group

22   of 01, and you need to show something other than our

23   regular designated call sign.  So it would be our

24   serial number or, like, with PIR, they gave us, I was

25   R12.  So they gave me R12 sometimes.  Sometimes they

Deposition of: David Scott Keller                                    April 21, 2025

                                                                          135

1    gave me R10, you know.  But it -- all different.

2               MS. BALCH:  Okay.  All right.  That's all

3    that I have.

4               THE WITNESS:  Okay.

5               MS. SYVERSON:  I don't have any

6    questions.  We'll read and sign.

7               THE WITNESS:  I'm not going to rip off

8    your mic, though.

9               THE VIDEOGRAPHER:  This concludes today's

10   deposition.  We're off the record at 5:27 p.m.

11        (The proceedings concluded at 5:27 p.m.)

12

13

14

15

16                    _____

                      DAVID SCOTT KELLER
17

18

19

20

21

22

23

24

25

136

```
 1   STATE OF ARIZONA       )
                            ) ss.
 2   COUNTY OF MARICOPA     )

 3

 4           BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
 5   Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
 6   testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
 7   and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
 8   typewriting under my direction; that the witness
     requested reading and signing said deposition; that
 9   the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
             I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12           I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14
     Kristy A. Ceton                    50200_____
15   Certified Reporter                 CR Number

16
17   _____          5.5.2025
     Certified Reporter Signature       Date

18
             I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).

20
21   Carrie Reporting, LLC              R1064
     Registered Reporting Firm          RRF No.

22
23                                      5.5.2025
     Registered Reporting Firm          Date
24   Signature

25
```