# EXHIBIT 16

# EXHIBIT 17



# FAIR LABOR STANDARDS ACT (FLSA) EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| September 14, 2011 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| | |
|---|---|
| **Employee ID:** 811044680  **Position #:** 00012600 | **Name (Last, First):** Rosenberger,Donald J |
| **Market Range Title:** Law Enforcement Lieutenant | **Working Title:** Law Enforcement Lieutenant |
| **FLSA Status:** Exempt | Non-Exempt = Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week. |
| | Exempt = Not eligible for overtime pay. |

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy (B7006) is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked and Overtime Policy (B7006) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7006.pdf

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy (B7006).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____     _____
Employee Signature                                                      Date

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy (B7011) is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy (B7011) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7011.pdf

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy (B7011).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____#959_____     ___10/27/11___
Employee Signature                                                      Date

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy (B7006) or the Hours Worked for Exempt Employees Policy (B7011) , whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

_Stephen P. Whitney_____     _Capt. SPW____-611__   _11/2/11__
Supervisor Name (print)                   Supervisor Signature                        Date

**NOTE:** The original signed acknowledgement form is maintained by the department while a copy of the form must be sent to Employee Records.

Revised: 8/4/11

CONFIDENTIAL                                                        MCC 003497

# EXHIBIT 18

# FILED

# UNDER

# SEAL

# EXHIBIT 19

1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Christopher J. Houck, on behalf of himself and all those similarly situated, | ) ) ) ) | |
| Plaintiff, | ) | No. 2:23-cv-00068-DGC |
| vs. | ) ) ) | |
| Maricopa County, | ) ) | |
| Defendant. | ) ) ) | |

VIDEOTAPED DEPOSITION OF JONATHAN HALVERSON

Phoenix, Arizona
April 8, 2025
9:33 a.m.

CERTIFIED COPY

Reported by:                    CARRIE REPORTING, LLC
CARRIE A. CARIATI              Certified Reporters
Certified Professional Reporter 17505 North 79th Avenue
Certified Realtime Reporter    Suite 301-C
Arizona CR No. 50355           Glendale, Arizona 85308
carrie@carriereporting.com     (480)429-7573

3

1                VIDEOTAPED DEPOSITION OF JONATHAN HALVERSON

2    was taken on April 8, 2025, commencing at 9:33 a.m.

3    at the law offices of Fisher & Phillips, LLP, 3200 North

4    Central Avenue, Suite 1550, Phoenix, Arizona, before

5    CARRIE A. CARIATI, RPR, CRR, a Certified Reporter in the

6    State of Arizona.

7

8    COUNSEL APPEARING:

9    For the Plaintiff:

10          Frankel Syverson, PLLC
            By:  PATRICIA N. SYVERSON
11          9655 Granite Ridge Drive
            Suite 200
12          San Diego, California    92123
            patti@frankelsyverson.com
13
     For the Defendant:
14
            Fisher & Phillips, LLP
15          By:  SHAYNA BALCH SANTIAGO
            3200 North Central Avenue
16          Suite 1550
            Phoenix, Arizona   85012
17          ssantiago@fisherphillips.com

18

19

20   Also present:  Samantha Elliott, videographer
                    Megan Morley
21

22

23

24

25

11

1    A.    Yes.

2    Q.    Any other documents that you reviewed with your

3    counsel yesterday?

4    A.    Not that I recall.

5    Q.    Have you discussed today's deposition with

6    anyone other than your counsel?

7    A.    I notified my -- my supervisor that I was going

8    to be gone for a deposition today.

9    Q.    Anyone else?

10   A.    No.

11   Q.    Have you discussed the facts of this case with

12   anyone other than your counsel?

13   A.    Lieutenants from time to time will ask what the

14   status is.  Since most of us work in the same divisions,

15   we just ask what the status is or anything else, and

16   that's about it.

17   Q.    Who have you discussed status of this case with?

18   A.    Lieutenants Brice, Whelan, and Houck.

19   Q.    Do you have any notes, logs, or diaries that you

20   have maintained relating to the facts in this case?

21   A.    No.

22   Q.    What's your current position with Maricopa

23   County?

24   A.    I am a captain with the Maricopa County

25   Sheriff's Office.

12

1      Q.    When were you promoted to captain?

2      A.    March 3rd, 2025.

3      Q.    Congratulations.

4      A.    Thank you.

5      Q.    And do you oversee a district as a captain?

6      A.    No.  I have a division.

7      Q.    What division do you oversee?

8      A.    Enforcement support division.

9      Q.    And is the enforcement support division within

10  patrol bureaus east or west?

11     A.    It is not.

12     Q.    With regards to patrol bureaus -- strike that.

13            Do you have an understanding of the scope

14  of this particular lawsuit, who is eligible to participate

15  in this lawsuit?

16     A.    Yes.

17     Q.    And do you have an understanding that that

18  includes certain lieutenants that worked in patrol bureaus

19  east or west for a certain period of time?

20     A.    Yes.

21     Q.    What districts would be included within patrol

22  bureaus east or west?

23     A.    Patrol bureau west would include District 2 and

24  District 3.  Patrol bureau east would include District 1,

25  District 4, District 7, and it would also include what is

13

1   technically District 5, but called lake patrol, and then I

2   am not exactly sure what the time scope was, but District

3   6, which was Queen Creek.

4           District 6 was subsequently removed from

5   MCSO jurisdiction and became Queen Creek PD.  I'm not sure

6   or don't remember whether that was during the scope of

7   this lawsuit.

8       Q.   Do you also have an understanding there are

9   certain, for lack of a better way to describe it,

10  administrative divisions within MCSO?

11      A.   I don't know -- administrative divisions?

12      Q.   Let me rephrase it.  So, for example -- there

13  are other areas, for example, SWAT, that would not be

14  within patrol bureaus east or west; is that correct?

15      A.   They are not assigned to those bureaus, that is

16  correct.

17      Q.   How about BIO, is that within patrol bureau east

18  or west?

19      A.   It is not.

20      Q.   What other departments, divisions, districts

21  exist within Maricopa County Sheriff's Office that are not

22  within patrol bureaus east or west?

23      A.   Well, that's a rather large question.  Do you

24  mean for sworn or for civilian or detention or a

25  combination or --

14

1    Q.    Fair point.  Let me rephrase that.

2              For sworn personnel --

3    A.    Sure.

4    Q.    -- on the enforcement side, not the custody

5    side, I am trying to have an understanding of -- let me

6    rephrase it.  I will come back to that in a minute.

7              Prior to your current position as captain,

8    what was your prior role?

9    A.    I was a lieutenant assigned to the traffic stop

10   analysis unit, which is within the court implementation

11   division.

12   Q.    And how long were you in that role for?

13   A.    Approximately one year.

14   Q.    So approximately March of 2024 through March of

15   2025?

16   A.    It would have been January 2024 was the start

17   date until promotion.

18   Q.    And court implementation division is not within

19   patrol bureau east or west?

20   A.    It is not.

21   Q.    And what role were you in prior to serving as

22   lieutenant in court implementation?

23   A.    I was assigned to Patrol District 7 as a

24   lieutenant within the patrol bureau east.

25   Q.    How long were you in that position for?

16

1    Kratzer's supervisor, correct?

2         A.    Yes.

3         Q.    And prior to January of 2022, what role were you

4    in?

5         A.    I was a lieutenant assigned to the bureau of

6    internal oversight.  I was assigned to the audits and

7    inspections unit for approximately one year.

8         Q.    And the Bureau of Internal Oversight is also

9    referred to as BIO, correct?

10        A.    BIO, yes.

11        Q.    And that is not within patrol unit east or west,

12   correct?

13        A.    No.

14        Q.    Who was your supervisor in BIO?

15        A.    Captain James McFarland.

16        Q.    And that was for approximately one year,

17   correct?

18        A.    Yes.  I believe, as I remember, it was January

19   of 2021 to January of 2022.

20        Q.    And prior to your placement in BIO, you were

21   previously in District 7, correct?

22        A.    As a lieutenant, yes.

23        Q.    And what were the dates of that placement with

24   District 7 as lieutenant?

25        A.    It's easier to go backwards.  January 2021 to

17

1    March or April of 2019.

2        Q.    And did you also report to Captain Kratzer?

3        A.    I did.

4        Q.    And have you at any point other than when you

5    reported directly to a chief reported to any captain other

6    than Captain Kratzer while you worked in District 7 from

7    2019 through your promotion to captain this year?

8        A.    Yes.  Yes.  Every time the captain would be on

9    vacation, I would report to the bureau chief, and that

10   bureau chief changed several times during those years.

11       Q.    Other -- I am asking specifically about

12   captains.  Let's put chiefs aside.  Were there any other

13   captains that you reported to while you were at District 7

14   as a lieutenant?

15       A.    No, just Captain Kratzer.

16       Q.    Now, let's talk about chiefs since 2019.

17              What chiefs have you reported to since

18   2019?

19       A.    Chief Cory Morrison, Chief David Letourneau, and

20   Chief McFarland, and -- well, there was a period of time

21   in 2023 when I was sent, while still a District 7

22   lieutenant, temporary duty to run the liaison -- our

23   liaison side of a massive staffing study.  And I was sent

24   to enforcement support to run that project for a few

25   months while still assigned to District 7.

33

1      Q.   In the past you have served as acting commander

2  over patrol, though; is that correct?

3      A.   Yes.

4      Q.   When you served as acting commander over patrol,

5  did you ever do these twice monthly reviews of -- of

6  lieutenants in patrol?

7      A.   No, because that is a supplemental duty, not

8  sole.  So I would do a lieutenant's role plus the

9  additional portion of a commander.

10      Q.   Let me rephrase my question because it might not

11  have come through clearly.

12           When you were serving in a dual role of

13  lieutenant but also assuming the duties as acting

14  commander if the captain was out on FMLA, vacation, or

15  leave of absence, did you ever prepare one of these

16  supervisor notes on a twice monthly basis for any

17  lieutenants in patrol?

18      A.   I might have.  There was a very brief time when

19  we had a second lieutenant for a couple of weeks at two

20  periods in time.  I don't remember if I had to do BlueTeam

21  notes for them or not, or if they went to their new unit,

22  and that unit did those BlueTeam notes.

23      Q.   Understood.

24      A.   District 7 only has one lieutenant.  They do

25  have several more now.  That has come since I was

47

1  going to work it from home, I would have myself -- no, it

2  would still show in CAD.  I believe -- I believe it would

3  not show as a CAD history on my unit, but it would show up

4  in the call for service as Adam 706 monitoring.

5            That's why CAD is not designed to be an

6  all-inclusive showing of what one does for work product.

7  You would have to look at the actual calls for service and

8  look for the call signs, because you can run a scene and

9  your call sign will show, but you are not on CAD.  Unit

10  histories are not what the office does to show that.

11      Q.   But if you are on scene somewhere, physically on

12  scene --

13      A.   If you are physically on scene, it should show

14  in CAD.

15      Q.   That's what I am trying to understand and

16  distinguish here.  So from the time that you get into --

17  you drive an unmarked vehicle, correct?

18      A.   Yes.

19      Q.   And you also drove an unmarked vehicle as a

20  lieutenant, correct?

21      A.   They were -- yes.

22      Q.   So from the moment that you got into your

23  unmarked vehicle at home as a lieutenant to when you drove

24  to work and when you came back to your driveway, you would

25  be logged in to the CAD system, correct?

48

1    A.   Yes, unless I were going to go do something that

2  was not work-related like on the way home, then I would

3  log out because I was no longer working.

4    Q.   Understood.

5         So now I want to focus on the time that

6  would not be captured in CAD.

7    A.   Okay.

8    Q.   And my understanding from your testimony is that

9  would include things like phone calls, text messages,

10  e-mails, or running a scene from home in the evening

11  hours.

12         Is that a correct synopsis?

13    A.   Yes.

14    Q.   Okay.  Approximately --

15    A.   To an extent.

16    Q.   Oh, please clarify.

17    A.   If it was -- I want to be clear.  If it was like

18  a super small thing, just like I am going to answer your

19  question, I didn't worry about that whatsoever.  You mean

20  like in my timesheet?

21    Q.   I am not even asking about timesheets.  I am

22  just asking in general, your time that is -- other than

23  being logged in to CAD --

24    A.   It would be what you described.

25    Q.   It would be -- let me make sure I have a clear

60

1          Do you see that?

2      A.    I do.

3      Q.    What do those categories refer to?

4      A.    The Regular Pay is your -- what you get paid

5  for.  The Regular No Pay is the extra -- what would amount

6  to overtime that you are not paid for, and that's during

7  that time period.

8      Q.    So is the column, "Reg Pay" essentially your

9  salary that you are paid as a lieutenant?

10     A.    I believe so.

11     Q.    And then, the "Reg No Pay" are additional

12  recorded hours, correct?

13     A.    Yes.

14     Q.    Do you have an understanding as to how time is

15  input into whether it is ADP or Workday?

16     A.    Yes.  For the lieutenant -- for lieutenant or

17  for a different rank?

18     Q.    For lieutenant.

19     A.    For lieutenant, it is input by the number of

20  hours.  It is not put in by a start and stop time.  I

21  don't remember on ADP, but on Workday, they can prefill in

22  the number of hours for you, for example, five, eight-hour

23  shifts or four, 10-hour shifts, but then you go back and

24  adjust it as necessary to what it actually was.

25     Q.    What were your hours when you worked for

61

1    District 7 as lieutenant from 2019 through your promotion

2    to captain?

3         A.    Traditionally, it was 7:00 a.m. to 5:00 p.m.,

4    Monday through Thursday.

5         Q.    So were those scheduled hours of 7:00 a.m. to

6    5:00 p.m., Monday through Thursday input into ADP or

7    Workday, and then if you worked additional hours or less

8    hours, you would either add or subtract?

9         A.    Yes.  I just don't remember if they input it for

10   me or if mine were blank, and then you would just go in

11   and add the number of hours for the day.

12        Q.    Understood.

13        A.    But I would take my number of hours -- if I

14   worked 12 hours that day, I would make sure that for me

15   for that day it said 12 or 12.5, whatever it happened to

16   be.

17        Q.    And did you have a practice of routinely

18   reviewing through your pay stubs?

19        A.    No, because it was usually around the same

20   amount.  We don't get pay stubs.  It just shows up as a

21   direct deposit into your checking account.

22        Q.    You have reviewed your pay stubs in the course

23   of this litigation, though, correct?

24        A.    Yes, I provided them.

25        Q.    Any reason to doubt the accuracy of those pay

64

1          A.   January of 2024, which is when I went to that

2    Traffic Stop Analysis Unit for court implementation

3    division.

4          Q.   Okay.

5          A.   I promoted out of that unit.

6          Q.   Understood.

7               So I want to focus on the first time period

8    of January 2020 to January of 2021 as lieutenant in

9    District 7.

10               Did you ever serve as acting commander

11    during that time period if Kratzer was out of the office

12    or on leave?

13          A.   Yes.  Every time he was off for vacation or

14    something.  If the captain is not there, then -- I mean,

15    if he is on vacation where he is gone, then I would be the

16    acting commander.

17          Q.   And what duties would you assume if Captain

18    Kratzer was out of the office, on leave, or on vacation?

19          A.   Everything that I did normally, plus his.  His

20    duties were mainly -- I ran -- I ran everything I had

21    normally, plus his duties were more oriented towards the

22    town of Fountain Hills as a contract town.

23               So it was the diplomatic side -- the town

24    councils, the meeting with the mayors, the -- in that time

25    period, it was really just the town councils and the

65

1    meeting with the mayor.

2        Q.    Approximately -- strike that.

3              When you would serve as acting commander

4    for Captain Kratzer when he was out of the office, was it

5    typically a couple of days at a time or would it typically

6    be a week or two at a time?

7        A.    In that time period, I think it was really just

8    like a week or so if he was on vacation.

9        Q.    And approximately how many times do you believe

10   you served as acting commander for Kratzer over the course

11   of the year?

12       A.    Over those initial years?

13       Q.    Over January of 2020 to January of 2021.

14       A.    I don't -- I don't know.  Maybe -- maybe four

15   times as a week, and then the other times whenever he was

16   just taking a day or two off.  I don't know.  I don't

17   remember his vacation schedule.

18       Q.    Since you have reviewed the BlueTeam supervisor

19   notes prior to today's deposition, do you have a

20   familiarity as to whether or not Captain Kratzer would

21   notate in BlueTeam supervisor notes when you serve as

22   acting commander?

23       A.    I reviewed them years ago.  As I remember, I

24   thought he did.

25       Q.    So if the BlueTeam supervisor notes show that

66

1    from January 2020 to January 2021, that there was

2    approximately 18 weeks that you served as acting

3    commander, does that sound correct to you?

4        A.   I don't know.  I know there was a time that he

5    was gone for several months, but I thought that was later

6    on in a different year.

7        Q.   According to my notes, there was six weeks of

8    FMLA in January of 2020, a week -- two weeks in March of

9    2020, another week in July of 2020, another two weeks of

10   FMLA in July of 2020, another two weeks in August of 2020,

11   a week and a half of bereavement leave and vacation in

12   November of 2020, and one or two weeks in December of

13   2020.

14            MS. SYVERSON:  For the record, are you

15   referring to BlueTeam notes?

16            MS. SANTIAGO:  I am referring to the

17   BlueTeam supervisor notes, yes.

18            THE WITNESS:  I don't remember.  I know he

19   was gone for a couple of months.  I thought it was a

20   different year, but ...

21   BY MS. SANTIAGO:

22       Q.   Do you have any reason to doubt the accuracy of

23   Captain Kratzer's notes input to BlueTeam supervisor notes

24   during that time period?

25       A.   No.

67

1              MS. SYVERSON:  Object.

2     BY MS. SANTIAGO:

3         Q.   Same exercise with respect to February of 2022

4     through June of 2023.  That's the time period that I have

5     the BlueTeam supervisor notes through.  That is a little

6     over a year.

7              It looks like Captain Kratzer was on FMLA

8     leave again for about two months during that time period.

9              Does that sound familiar?

10        A.   Yes.

11        Q.   And that was in February or March -- February

12    and March of 2022, another two weeks in May of 2022,

13    another two weeks in June of 2022, another week in August

14    of 2022, another week in November of 2022, two weeks in

15    February of 2023, one week in March of 2023, and a week in

16    June of 2023, for a total of approximately 19 weeks

17    between February of 2022 through June of 2023.

18             Any reason to doubt that you served as

19    acting commander for 19 weeks between February 2022 and

20    June of 2023?

21             MS. SYVERSON:  Object.

22             THE WITNESS:  No.

23    BY MS. SANTIAGO:

24        Q.   Jonathan, during your employment as a lieutenant

25    in District 7 from January 2020 through your promotion to

68

 1   captain, did you earn at least $684 a week?

 2        A.   Yes.

 3        Q.   Do you know approximately how much you earned in

 4   total compensation in the year 2020?

 5        A.   I don't.

 6        Q.   Was it at least 107 -- $108,000 a year?

 7        A.   I don't know.  It would be whatever my

 8   timesheet -- my pay stub says.

 9        Q.   As a lieutenant in District 7 from 2020 through

10   2024, did you supervise two or more employees?

11        A.   Yes.

12        Q.   Did you set or adjust any employees' schedules?

13        A.   No.  We assigned them to patrol squads -- well,

14   the captain assigned them to a patrol squad.  I didn't

15   adjust their schedules.

16        Q.   Did you approve or deny any questions for time

17   off?

18        A.   I mean, it -- it was the captain and I that

19   would talk about it and find coverage for it, but we don't

20   do like forms where you sign -- actually, no, I took the

21   forms to the captain for approval.

22        Q.   Would you approve or deny a request for

23   overtime?

24        A.   Yes.

25        Q.   And --

69

1      A.   I would authorize the overtime.

2      Q.   And that was for sergeants, correct?

3      A.   And -- and deputies.

4      Q.   Did you have any involvement in the setting of

5  work schedules?

6      A.   I don't understand.  We assign people to squads,

7  but the schedules were already predone.  So I didn't set

8  their schedule.  I assigned people to empty slots -- well,

9  the captain did.  He did shift bid.

10     Q.   Did you take on any projects from executive

11 command as a lieutenant from January of 2020 through 2024?

12     A.   Yes.

13     Q.   Was one of those special projects dealing with

14 scheduling?

15     A.   Yes.

16     Q.   What was that project dealing with scheduling?

17     A.   It was looking at alternate schedules where we

18 could try and fix our -- our staffing problem.

19     Q.   Did you make recommendations regarding alternate

20 schedules?

21     A.   I did.

22     Q.   What were those recommendations regarding

23 alternate schedules?

24     A.   I ran a reverse Earley algorithm looking at

25 calls for service with call volume and dispatch time to

70

1    recalculate our beat structure and look at matching

2    empirical data as what was necessary for manpower

3    allocation as opposed to filling beat numbers based upon

4    just precedent.

5        Q.   And how were those recommendations of yours made

6    to executive command?

7        A.   It was a presentation to patrol bureau west and

8    patrol bureau east as well as the Executive Chief of

9    Compliance.

10       Q.   Did anyone assist you with this project?

11       A.   Yes.

12       Q.   Who assisted you?

13       A.   Jason Speck and Briana Frenzel.

14       Q.   And who are they?

15       A.   Jason Speck was a -- I think he was a sergeant

16   at that time assigned to training division.  They made --

17   well, he made the PowerPoints.  I am not very good at

18   PowerPoints.

19            And Briana Frenzel was a management analyst

20   helping me with the data analysis.  She was assigned to

21   the research unit at BIO.

22       Q.   Who was in charge of this project?  Were you in

23   charge of this project?

24       A.   Yes.

25       Q.   Were your recommendations adopted?

83

1    rescue the person?

2         Q.   How many times did you actually physically

3    rescue fire, crime, or accident victims within that

4    four-year time period?

5         A.   Zero.

6         Q.   How many times did you physically prevent or

7    detect crimes during that 2020 to 2024 time period?

8         A.   I have no idea.  I don't know how to accurately

9    answer that question because I would run the scenes with

10   the sergeants, and we would find and process the scenes

11   and the evidence and make the arrest.

12        Q.   We will come back to that one.

13             How many times would you personally conduct

14   an investigation between January of 2020 and 2024 as a

15   lieutenant within District 7?

16        A.   I was never assigned as a case agent, so I would

17   assist with the sergeant with the squad's investigation.

18        Q.   So you would not personally conduct the

19   investigation; is that correct?

20             MS. SYVERSON:  Object.

21             THE WITNESS:  No.  There were -- I'm sorry.

22             MS. SYVERSON:  Go ahead.

23             THE WITNESS:  No.  I am trying to think how

24   to answer that one.  We -- like would I go and interview

25   somebody?  I can only think of one incident where I made

84

1    the arrest.

2    BY MS. SANTIAGO:

3        Q.   In that four-year time period?

4        A.   Yes.

5        Q.   How many times between January of 2020 and 2024

6    as a lieutenant in District 7 did you personally perform

7    surveillance?

8        A.   None.

9        Q.   How many times as a lieutenant within District 7

10   between January of 2020 and 2024 did you personally

11   pursue, restrain, and apprehend a suspect?

12       A.   One.

13       Q.   How many times as a lieutenant in District 7

14   from January of 2020 and 2024 did you detain or supervise

15   suspected or convicted criminals?

16       A.   Detain or supervise or -- what was the last one?

17       Q.   Detain or supervise.

18       A.   I have no idea.  Can you explain "supervise"?

19       Q.   Let me come back to that one.

20            How many times between January of 2020 and

21   2024 as a lieutenant in District 7 did you personally

22   interview witnesses?

23       A.   Five or six, I believe.

24       Q.   Over the course of roughly four years?

25       A.   Those years, yes.

85

1      Q.   How many times did you personally interrogate or

2  fingerprint a suspect as a lieutenant in District 7 from

3  January 2020 and 2024?

4      A.   Zero.

5      Q.   How many times did you prepare the primary --

6  the investigative report as a lieutenant in District 7

7  from January 2020 and 2024?

8      A.   Two or three.

9      Q.   How many times did you prepare a supplemental

10  investigative report between January 2020 and 2024 as a

11  lieutenant in District 7?

12      A.   I know there were several.  I don't know how

13  many, though.

14      Q.   How many traffic stops did you -- do you believe

15  you conducted as a lieutenant in District 7 from

16  January 2020 and 2024?

17      A.   I don't remember those.  I was hold stop.  I

18  think it was two or three until I was hold stop.

19      Q.   You did a total of two to three over that

20  approximately four-year time period?

21      A.   Yes, until I was told to stop.

22      Q.   As a lieutenant over District 7, did you ever

23  exercise discretion or independent judgment in supervising

24  your sergeants?

25      A.   Yes.

89

1      A.   I'm sorry.  This is disposition codes.

2              MS. SYVERSON:  Do you have a question?

3  Sorry.

4              THE WITNESS:  Sorry, am I missing --

5  BY MS. SANTIAGO:

6      Q.   Yeah, let me rephrase that.

7              So does this document, Exhibit 11 to your

8  deposition, show how many calls you responded to as a

9  primary unit, for example, in 2020?

10     A.   Yes.

11     Q.   And what is that number for 2020 as a primary

12  unit?

13     A.   46.

14     Q.   What is that number for 2021 that you responded

15  to as a primary unit?

16     A.   Six.

17     Q.   What is the number that you responded to as a

18  primary unit in 2022?

19     A.   Ten.

20     Q.   What is the number that you responded to as a

21  primary in 2023?

22     A.   Seven.

23     Q.   How about as an assisting unit that you

24  responded to in 2020?

25     A.   14.

95

1    the office or in the office versus being on scene in the

2    field?

3        A.    The majority of it would -- you would go on

4    scene, but that might only happen a couple of times a

5    week.  But when you go on scene, depending upon if you are

6    in the scene or not, you are not going to be doing it on

7    CAD.  You are going to be doing it under a status, and

8    then you are going to have to look at the call sign in CAD

9    notes.

10       Q.    Got it.  So I understand what you are saying

11   with the status.

12              My question to, though, is:  What

13   percentage of your time as a lieutenant would you spend

14   either in the office or driving to/from the office versus

15   being on scene?

16       A.    On scene would be, I would think, 10 to

17   20 percent.

18       Q.    And how much of your day would you spend --

19   strike that.

20              You have a physical office that you have

21   been assigned by MCSO, correct?

22       A.    Yes.

23       Q.    And you had one office as a lieutenant, correct?

24       A.    Yes.

25       Q.    Do you have a new office as a captain?

96

1      A.   I do, but I am in a whole different -- I am at

2   headquarters.

3      Q.   Understood.

4           As a lieutenant in District 7 when you had

5   an assigned office, where was that office?

6      A.   It was at the District 7 substation, which is a

7   part of town hall for Fountain Hills.

8      Q.   And this would be subject to the protective

9   order, but can you give me your home address?

10      A.   674 North El Dorado Drive in Gilbert.

11      Q.   And how far was your commute from your home

12   residence in Gilbert to this District 7 substation?

13      A.   You would have to Google it.  I think it is like

14   20 -- 20-some miles, about 45 minutes, 30 to 45 minutes.

15      Q.   So if we carved out your roughly 45-minute

16   commute back and forth, roughly an hour and a half per

17   day, how many hours do you think you spent in your

18   District 7 substation office in a given day?

19      A.   I don't know.  About two-thirds of the day.  The

20   rest was spent with the supervisors or meeting with people

21   or going by a scene or whatever.  Usually going by a

22   scene.

23           MS. SANTIAGO:  All right.  Let's take a

24   short break because I don't want to run out of time here.

25   So let's take a quick break.  I want to get a time check,

105

1                    MS. SYVERSON:  I do not have any follow-up.

2                    MS. SANTIAGO:  All right.

3                    MS. SYVERSON:  Okay.

4                    VIDEO TECHNICIAN:  This concludes today's

5          deposition.  Off the record at 1:02.

6                    (Proceedings adjourned at 1:02 p.m.)

7

8                              JONATHAN HALVERSON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

106

1                          CERTIFICATE

2              I HEREBY CERTIFY that the foregoing deposition
     was taken by me pursuant to notice; that I was then and
3     there a Certified Court Reporter for the State of Arizona,
     and by virtue thereof authorized to administer an oath;
4     that the witness before testifying was duly sworn by me to
     testify to the whole truth and nothing but the truth;
5     pursuant to request, notification was provided that the
     deposition is available for review and signature; that the
6     questions propounded by counsel and the answers of the
     witness thereto were taken down by me in shorthand and
7     thereafter transcribed through computer-aided
     transcription under my direction, and that the foregoing
8     typewritten pages contain a full, true, and accurate
     transcript of all proceedings had upon the taking of said
9     deposition, all done to the best of my skill and ability.
              I FURTHER CERTIFY that I am in no way related to
10   nor employed by any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
11            I FURTHER CERTIFY that I have complied with the
     ethical obligations set forth in ACJA Sections
12   (J)(1)(g)(1) and (2).
              DATED at Phoenix, Arizona, this 21st day of
13   April, 2025.

14
                         CARRIE A. CARIATI
15                       Registered Professional Reporter
                         Certified Realtime Reporter
16                       Certified LiveNote Reporter
                         Certificate No. 50355

17

18            I CERTIFY that this Registered Reporting Firm
     has complied with the ethical obligations set forth in
19   ACJA Sections (J)(1)(g)(1) and (2).

20
              DATED at Phoenix, Arizona, this 21st day of
21   April, 2025.

22
                         _____
23                       Registered Reporting Firm R1064
                         CARRIE A. CARIATI, Owner
24

25

# EXHIBIT 20

## FAIR LABOR STANDARDS ACT (FLSA)
## EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 03/26/2018 | 500 | Maricopa County Sheriffs Office |

### I. EMPLOYEE INFORMATION

| | |
|---|---|
| **Employee ID:** 811074642    **Position #:** 70262 | **Name** (Last, First): Halverson, Jonathan |
| **Market Range Title:** Law Enforcement Lieutenant | **Working Title:** Law Enforcement Lieutenant |

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

### II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| | |
|---|---|
| Employee Signature | Date |

### III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| | |
|---|---|
| *Jonathan Halverson* (signature) | 0326 2018 |
| Employee Signature | Date |

### IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

| | | |
|---|---|---|
| *Paul Chagolla* (signature) | *(signature)* #956 | 3/29/2018 |
| Supervisor Name (print) | Supervisor Signature | Date |

**NOTE:** Signed acknowledgment forms are maintained by departments while a copy of the form must be sent to Employee Records.

Revised: 08/07/2017

CONFIDENTIAL

MCC 002083

# EXHIBIT 21

# FILED

# UNDER

# SEAL

# EXHIBIT 22

1              IN THE UNITED STATES DISTRICT COURT

2                      DISTRICT OF ARIZONA

3
    Christopher J. Houck, on          )
4   behalf of himself and all         )
    those similarly situated,         )
5                                      )
         Plaintiff,                    )    No. 2:23-cv-00068-DGC
6                                      )
    vs.                                )
7                                      )
    Maricopa County,                   )
8                                      )
         Defendant.                    )
9                                      )
    _____)
10

11

12

13       VIDEOTAPED DEPOSITION OF TODD CHRISTOPHER BRICE

14

15                      Phoenix, Arizona
                        April 15, 2025
16                       9:08 a.m.

17

18

19

20
    CERTIFIED COPY
21

22
    Reported by:                    CARRIE REPORTING, LLC
23  CARRIE A. CARIATI               Certified Reporters
    Certified Professional Reporter 17505 North 79th Avenue
24  Certified Realtime Reporter     Suite 301-C
    Arizona CR No. 50355            Glendale, Arizona 85308
25  carrie@carriereporting.com      (480)429-7573

1           VIDEOTAPED DEPOSITION OF TODD CHRISTOPHER BRICE

2    was taken on April 15, 2025, commencing at 9:08 a.m. at

3    the law offices of Fisher & Phillips, LLP, 3200 North

4    Central Avenue, Suite 1550, Phoenix, Arizona, before

5    CARRIE A. CARIATI, RPR, CRR, a Certified Reporter in the

6    State of Arizona.

7

8    COUNSEL APPEARING:

9    For the Plaintiff:

10          Frankel Syverson
            By:  PATRICIA N. SYVERSON
11          9655 Granite Ridge Drive
            Suite 200
12          San Diego, California   92123
            patti@frankelsyverson.com
13
     For the Defendant:
14
            Fisher & Phillips, LLP
15          By:  SHAYNA BALCH SANTIAGO
                 LORI GUNER
16          3200 North Central Avenue
            Suite 1550
17          Phoenix, Arizona  85012
            ssantiago@fisherphillips.com
18

19

20
     Also present:  Cedric Tinard, videographer
21                   Megan Morley

22

23

24

25

1        A.    No -- or correct, I am not.

2        Q.    What is your -- are you currently employed by

3    Maricopa County?

4        A.    Yes.

5        Q.    What is your current position with Maricopa

6    County?

7        A.    In like where I am assigned or my title, what do

8    you refer to?

9        Q.    All of the above, but let's -- let's do it piece

10   by piece.

11               Are you currently employed as a lieutenant

12   with Maricopa County?

13       A.    Yes.

14       Q.    And what is your assignment with Maricopa County

15   presently?

16       A.    I am in the court implementation division.

17       Q.    And how long have you been in the court

18   implementation division?

19       A.    About a year and a half, approximately.

20       Q.    When did you transfer into the court

21   implementation division -- can you give me an approximate

22   month and date?

23       A.    Well, it's kind of strange.  I've been in the

24   compliance bureau -- the compliance bureau since two

25   thousand -- 2020, February-ish.  And I was part of the

```
 1   Bureau of Internal Oversight, and I was part of the -- the
 2   audits inspections unit.  And then after a point, I went
 3   to the traffic stop analysis unit.
 4                  And then about a year and a half ago,
 5   approximately, they just took the traffic stop analysis
 6   unit and put it under CID, the court implementation
 7   division.  So -- and then I went from the traffic stop
 8   analysis unit lieutenant to just a CID lieutenant.  So
 9   it's kind of -- I never left the compliance bureau.
10                  So that was all about a year -- I don't --
11   I don't remember exactly when I went from TS -- traffic
12   stop analysis to CID versus when it all moved.  But about
13   a year and a half ago was -- I have been in that same
14   bureau since 2020.
15        Q.   So since February of 2020, you have been in the
16   compliance bureau, correct?
17        A.   Yes.
18        Q.   And the compliance bureau is not part of patrol
19   bureaus east or west; is that correct?
20        A.   Correct.
21        Q.   Do you remember the specific date that you
22   transferred into the compliance bureau?
23        A.   I don't, right off the top of my head, but it
24   was -- I believe it was near the end of February.
25        Q.   Can you walk me through how the transition went
```

1   from -- strike that.

2              Prior to transferring to compliance bureau,

3   what role did you have?

4       A.   So I was a lieutenant in District 3 patrol --

5   District 3 patrol.

6       Q.   And did you have a specific shift that you

7   worked?

8       A.   So I did both nighttime and daytime over that --

9   I was there from -- for approximately three and a half

10  years.  So I did nighttime watch commander, then I went to

11  daytime watch commander, then I went to nighttime watch

12  commander.  So I believe during this period in question I

13  was -- I believe I was a nighttime watch commander.

14      Q.   Did you say you went from nights to days to

15  nights?

16      A.   Um-hum.  Yes, sorry.

17      Q.   And your last period of time that you were

18  working nights as a watch commander in District 3 as a

19  patrol lieutenant, what shift did you work?

20      A.   Sunday through Wednesday nights.  5:00 p.m. to

21  3:00 a.m. was the hours.

22      Q.   What was your new schedule after you transferred

23  to the compliance bureau?

24      A.   Was the question what was my new schedule in the

25  compliance bureau?

1    Q.    Yes.

2    A.    Daytime schedule, office hours, 40 hours, so

3  sometimes through -- Monday through Friday.  On paper, the

4  way the County works is you do -- you know, they set your

5  time, so mine was usually Monday through Thursday from

6  6:00 to 4:00, like it defaults to a certain, like, it's

7  just ten hours per day on the timesheet.

8              So mine was set to Monday through Thursday,

9  but I could work any time between the week to make my

10 40 hours.

11   Q.    So walk me through your understanding of how

12 that works with schedules being uploaded into either ADP

13 or -- or -- or Workday.  I think you just told me the

14 County had you entered as working Monday through Thursday,

15 6:00 to 4:00, but you could work any time to make your

16 40 hours?

17   A.    So -- and I don't remember ADP; it has been a

18 while.  But Workday, like the way Workday works, if you

19 are a salaried employee, they -- it defaults -- like it

20 fills your time sheet for you automatically, and it just

21 puts hours.  So it doesn't actually say 6:00 to 4:00; that

22 was like my approximate time I worked, like, hey, 6:00 to

23 4:00.

24             But it just -- so, for example, Monday, it

25 just has 10 hours, and it has regular pay as the time

1    you're logged off, if you are no longer going to be
2    responding to calls unless you got to log back in because
3    something happened, which would be fairly rare.  But you
4    still can, you know, take phone calls and stuff.
5              It is more like a -- you -- you know, if
6    you are going to be taking calls, you log in to the
7    system.  Does that make sense?
8    Q.   Let's -- let's go about it a little bit
9    differently.
10             Can you walk me through what a typical day
11   looked like for you, understanding, of course, that each
12   day might be a little bit different?  But start me out at
13   the beginning of your day, how that would start.
14   A.   And this is as a nighttime watch commander?
15   Q.   Yes.  Let me -- let me clarify on the record.
16             So when you were a nighttime watch
17   commander, between the time period of January 2020 through
18   your transfer out of District 3, walk me through what a
19   typical day would look like as a night watch commander
20   lieutenant in District 3.
21   A.   So to start, you would start -- basically, I
22   would start driving towards my assignment, and then I
23   would log in to CAD to notify them I was -- you know, the
24   County I was on and available.
25             And then the night, depending on what goes

1   on, you are -- the nighttime watch commander's
2   responsibility is to -- depending on if you are the whole
3   county, if you are the only one on, or you're east or
4   west, is to be responsible for the overall command of that
5   side when it comes to calls for service, critical
6   incidents, answering questions from supervisors, if they
7   are on a call and they need to call you and they have --
8   questions they have about what to do.
9          So one of the main things is doing that --
10  you know, handling critical incidents, handling major
11  calls, answering calls from supervisors, and then tied in
12  with all that, you have your normal supervisor admin
13  responsibilities that are heavily tied in with like court
14  related stuff; supervisor notes; if you were assigned an
15  IA that you had to review or do; you know, any BlueTeam
16  type thing, if you had BlueTeam things in your incident --
17  county attorney turn-downs, use of forces, so BlueTeam
18  processing.
19         And then you just stayed available -- so
20  you would respond where needed to calls, answer phone
21  calls, and that's kind of how you spent the night.  And
22  then when the night was over, you would log out and be at
23  home, but then you still -- the expectations were you were
24  still basically on call until the daytime watch commander
25  came on.

1          So you had to have your phone on in case

2   something occurred after you logged out of CAD, between

3   3:00 and -- it usually went up to like 6:00 or 7:00, at

4   least, that's what I did.

5      Q.   As a lieutenant in District 3 between

6   January 2020 and your transfer out of District 3 in

7   February of 2020, did you have an unmarked vehicle that

8   was issued to you?

9      A.   Yes.

10     Q.   And were you permitted to take that unmarked

11  issued vehicle to and from your personal residence?

12     A.   Yes.

13     Q.   At the time you were in District 3 as a

14  lieutenant, what was your home address?

15     A.   19349 North Tara, T-a-r-a, Lane in Maricopa,

16  85138.

17     Q.   And do you recall the address of the District 3

18  location that you worked out of?

19     A.   It's -- it's Dysart and Bell.  I don't know the

20  address off the top of my head.

21     Q.   How long was your commute from your personal

22  residence in Maricopa to the District 3 location at Dysart

23  and Bell?

24     A.   Depends on the time of day, but as the nighttime

25  watch commander, probably be about -- depending on

1    traffic, an hour to an hour and a half.  But that -- as a

2    nighttime watch commander, you don't go to your home

3    district.  That's not like the assignment.

4              Like I don't start at the district.  I

5    start -- as soon as I log in, I am ready to go.  So I

6    could be the watch commander for whole county because

7    somebody is off, so I got to respond to District 7.  So

8    usually then I would try to stay central so I could go to

9    east or west to respond.

10             If I am just the west side commander,

11   because I -- I was District 3 so I was the west side watch

12   commander, District 2 and 3, and then at some point, I

13   don't know when it changed, they added 4 to that.  But

14   you -- you had to respond -- like that whole -- basically

15   the whole county on the west of central was your

16   responsibility.

17             So basically wherever, District 2, 3, and

18   at some point, I don't remember, during this period, 4 was

19   added to that.

20        Q.   Between January 2020 and your transfer out of

21   District 3 in February of 2020, did you ever drive

22   directly from your personal residence to the District 3

23   building?

24        A.   I don't recall, but probably.

25        Q.   And if you did drive directly from your personal

1  residence to the District 3 building, is it your testimony

2  that it was approximately one to one and a half hours each

3  way, depending on traffic?

4      A.    Yeah.  Well, in the morning, if we are talking

5  coming home, I usually wouldn't be at the district coming

6  home.  But if -- if I was just driving from the district

7  to home during that time period, at 3:00 a.m., it would

8  take, you know, 45, 50 -- probably more 50, 50 minutes to

9  an hour.  Hopefully I am not -- sounds about right.

10     Q.    So if I understand your testimony correctly,

11  that if you drove directly from your personal residence to

12  the District 3 location, or vice versa, from the

13  District 3 location back to your personal residence,

14  depending on traffic, it could be anywhere between

15  50 minutes one way or an hour and a half one way; is that

16  correct?

17     A.    Yeah.  Going to, at 5:00, it will never be 50

18  minutes, but more like an hour to an hour and a half,

19  going there.  Coming home at 3:00 a.m., it would be on the

20  shorter end, 50 minutes to an hourish, I would guess.

21     Q.    So with no traffic, closer to 50 minutes to an

22  hour; with traffic, an hour to an hour and a half?

23     A.    Right.

24     Q.    At the District 3 location you were based out of

25  at Dysart and Bell, did you have an office?

1    *Q.*   So if I understand your testimony correctly,
2    when you were serving as the watch commander for only the
3    west side, it was common for you to head to your office at
4    Dysart and Bell multiple times per week, correct?
5    *A.*   And when you say "head," that -- like during the
6    10-hour period.  I am not referring to like at the
7    beginning of the shift.  Like sometime during that 10-hour
8    period?
9    *Q.*   Correct.
10   *A.*   Yes.
11   *Q.*   During -- at -- at -- at some point during --
12   *A.*   Yes.
13   *Q.*   -- your ten-hour shift, it was common for you to
14   go to your District 3 office at Dysart and Bell if you
15   were only serving as the west side watch commander,
16   correct?
17   *A.*   Yes.
18   *Q.*   How -- do you have any facts or information as
19   to whether or not you served as watch commander for the
20   whole county between January 2020 and your transfer out of
21   District 3 in February of 2020?
22   *A.*   I don't.  That would have -- you would have to
23   look at CAD to see if -- you know, each day, if a watch
24   commander -- how many watch commanders logged on.  I don't
25   know.  That's something the County could provide.

1  those special cases where, you know, situationally, that

2  it is a full moon and Monday is the worst night of the

3  week.  But I would say -- and you can actually pull data

4  to show calls for service, pattern based, like -- like I

5  have seen data in the past where it breaks down the days

6  of the week, times, to get an idea.

7            So I am just basing it off of my own

8  historic perception.  But, yes, I would say it's -- it --

9  and then to answer your question about oversight, there

10 has always got to be oversight no matter what, even --

11 sometimes even when it is not as busy, that might be a

12 special time to pay extra attention to, you know, what you

13 are not hearing.

14           But the pressure might be more on the

15 weekends because even -- you know, instead of three hot

16 tones that night, you get 12 hot tones.

17      Q.   When you were spending time in your personal

18 office at District 3, was it common or uncommon to spend

19 four or more hours in your office during a shift?

20      A.   I would -- I would say -- situation.  Again, it

21 was based on what was assigned.  So if you were

22 assigned -- if the assignments drove that you needed to be

23 there, then yes, the -- so I don't want to say it is

24 common or uncommon.  I would say it is purely driven by

25 what assignments you have.

1          So sometimes you would have none, so
2  when -- you shouldn't be there at all, you should be out
3  on the road the whole time because you have no admin
4  responsibilities driving that side of it.  But there might
5  be times where you have to review two IA cases and you
6  have one assigned to you, and someone just did a use of
7  force, so now you are going to spend much more time in the
8  office.
9          But, again, if you're still listening to
10 radio and something kicks out, then you got to
11 unfortunately drop all of that and then go and take that
12 call.  And then you -- and that was part of the -- the
13 difficulty of patrol, is you have these assignments and
14 you are constantly being pulled away from those
15 assignments and you have to come back -- stop the -- we
16 would complain about this a lot.
17          But it is not like an office where you can
18 focus on one assignment, get it done, nobody is bothering
19 you.  You are -- you are constantly being pulled away from
20 these assignments, have to refresh and go back to it.
21          So if the night dictated you could spend
22 five hours, then that -- that was a -- a great night,
23 right.  So nothing is -- nothing crazy happening, you can
24 get your work -- that annoying admin work done, so ...
25     Q.    During your time in District 3 as a

1  lieutenant -- and I am not limiting this to just January
2  or February of 2020 -- but at any time during your
3  employment as a lieutenant in District 3, did you ever
4  spend an entire shift in your office?
5      A.   As a nighttime watch commander, I would -- I
6  have -- I would find that highly irregular, border on like
7  very rare exception, if that ever happened, and I can't
8  remember.
9            Daytime -- so up to the point that I was
10  the nighttime watch commander, because I asked to go back
11  to nights, I was the only daytime patrol commander.  And
12  so I was doing the work of two patrol commanders.  So
13  there would be times where I would spend all day in the
14  office.
15      Q.   So if I understand that correctly, when you were
16  a day lieutenant in District 3, there were times that you
17  would spend all day in your office, correct?
18      A.   At the office --
19      Q.   At the office?
20      A.   -- you know.
21      Q.   In -- in -- in the --
22      A.   In the office building, yes.  Yes.
23      Q.   In -- in -- in the District 3 building?
24      A.   Yeah.
25      Q.   But as a watch commander, your testimony is that

1  it would be rare for you to spend the whole shift in the

2  District 3 building, but you don't specifically recall one

3  way or another; is that correct?

4       A.   Right.

5       Q.   Okay.

6       A.   Because there is always exceptions if you have

7  that case something that is due and nothing is happening

8  out in patrol, it is a dead night, then you would have the

9  luxury of spending the whole time.

10      Q.   Would it be rare to spend a half a shift or more

11  at the District 3 building as a watch commander night

12  shift District 3?

13      A.   I would say it would be more -- it would be on

14  the -- it would be less likely than not.  Like you --

15  you -- you have to manage your time properly where you are

16  not spending your whole -- like you would pick out times

17  of the day where things would die down, like later in the

18  evening, you know, sometimes like late at night, after

19  11:00, things would die down as far as number of calls for

20  service.

21            So then you could -- you could kind of an

22  idea that after 11:00, I can potentially do more of my

23  admin type stuff.  But then also after 11:00, that's when

24  your homicides and -- you know, your crazy stuff happens

25  too.  So it would kind of depend on like what's occurring

1   and what time you sought it out for yourself.  And then

2   even then if you then start doing it, if you get pulled

3   away, but probably ...

4                   And even what you should be doing is you

5   shouldn't be spending half your time in the -- in the

6   office because the expectation is you are out there --

7   well, at least the expectation I have for myself, I don't

8   know that there is any written expectations -- is you are

9   out there doing that watch commander role, like helping

10  your guys, helping them on their calls, helping the

11  supervisor grow as a supervisor, you know, answering their

12  questions.

13                  So if you spend -- even what we tell the

14  sergeants, if you spend all your time doing admin, you are

15  not doing your job, right.  Admin stuff is important, but

16  you got to -- we are here for policing.  And that's where

17  we get lost a lot of times with the *Melendres* stuff.

18      *Q.*    Well, even when you were in the District 3

19  building, you were still available for phone calls --

20      *A.*    Yeah.

21      *Q.*    -- and to provide assistance, oversight to your

22  sergeants, correct?

23      *A.*    Absolutely.

24      *Q.*    And you were also available via phone to

25  providing mentoring, oversight, guidance to your sergeants

1  it says "Unit initial log for service."  Do you see that?

2      A.    Correct.  Yes.

3      Q.    Do you have an understanding as to what "initial

4  log for service" means?

5      A.    It's probably when you are logged in to CAD,

6  either your radio or punching into CAD.  When you actually

7  entering the system of CAD.

8      Q.    Is it your testimony that you would actually log

9  in to or get entered into CAD during your drive out of

10 Maricopa at the beginning of your shift?

11     A.    From what I recall, yes, that was my typical

12 procedure.

13     Q.    Then I want you to turn to page MCC 8472.  And

14 again, midway through the page, there is an entry of

15 1/13/2020.  And if you follow it at 2:46:53, and if you

16 follow all the way over to the right, it says "Unit log

17 off of service."  Do you see that?

18     A.    Yes.

19     Q.    Do you have an understanding of what "Unit log

20 off of service" means?

21     A.    That means you are leaving CAD, you know,

22 exiting the program.  You know, either on the radio or by

23 voice.

24     Q.    Is it your testimony that you would typically

25 leave or exit CAD on your drive home as you are entering

1    Maricopa?

2         A.    From, yes, what I recall, that was ...

3         Q.    Do you have any reason to dispute the accuracy

4    of the data and entries in this category?

5         A.    Not off the top of my head, no.

6         Q.    During your time at District 3, as a night watch

7    commander, did you ever take a lunch break?

8         A.    Well, I -- I have certainly had lunch.  We don't

9    have, really, lunch breaks in policing, like you are --

10   like we go to lunch, but you are -- if you are logged in

11   to CAD, you are available at any moment.  So like we --

12   there has been incidences where we just ordered our food

13   and there is a hot tone, and we are like, "Sorry, we got

14   to go," and we leave.

15               So there's no -- we don't have like -- I

16   don't know if we even have the same requirements for like

17   15-minute breaks and lunch breaks and stuff.  Like there

18   is no -- like no level of our organization practices

19   like -- like official lunch breaks.

20               Does that make sense?

21        Q.    Did you ever have occasion to go to an eating

22   establishment while you were on shift?

23        A.    Yes.

24        Q.    And I want you to describe for me how that would

25   typically go.  For example, would you drive up, park,

1    would take more of a think, because you -- like I can't

2    remember what -- any specifics of what was occurring down

3    there during that time frame.  I am sure I could come up

4    with some additional things, but I would need more time to

5    think of that.

6              But -- like a lot of -- it doesn't -- it --

7    it briefly touches -- and it kind of touches on the

8    actual -- because this is -- this is really talking a lot

9    about admin duties.  It does have some supervision, and it

10   has got the -- the supervision aspect.  But this is high

11   level, like I am sure I could come up with more minutia,

12   more specific things.

13             But it kind of does pretty well as a very

14   overall -- high-level overall encompassing because it

15   talks -- but, you know, briefly talks about the most --

16   the policing aspect -- somewhere in here, I know I read

17   it -- about handling like emergency situations and stuff

18   like that.

19             So I think at a very high level, it covers

20   most of it.  But I -- certainly if you gave me a day, I

21   could come back and give you all kinds of additional

22   points, right?  Does that make sense?

23        Q.   But sitting here today and reviewing through

24   Exhibit 5, pages 175 to 176, under "Essential Job Tasks,"

25   the job tasks listed appear to be an accurate summary of

1    duties for a law enforcement lieutenant as it applied to

2    you in District 3 from January 2020 through your transfer

3    out February 2020?

4                    MS. SYVERSON:  Object.

5                    THE WITNESS:  I think it falls in line

6    with -- when I see these -- because I have -- I have dealt

7    with these in my current assignment for like different

8    civilian positions that we have that we have opened up to,

9    and it does basically the same thing where it gives a very

10   high level of what someone wrote at some point of what

11   this -- a lieutenant would do.

12                    But it is -- it is very general and broad,

13   but it does -- you know, if -- if -- just no -- if a -- a

14   man walked off the street and read this, he would have a

15   decent idea of what lieutenant does.  They wouldn't, by no

16   means, be an expert at it.

17                    Does that make sense?

18   BY MS. SANTIAGO:

19       Q.   Is -- are the essential job tasks set forth in

20   Exhibit 5 to your deposition accurate?

21       A.   Yeah.  That -- except for that ICS thing, but

22   that's -- yeah, none of them are inaccurate.

23       Q.   While you were a lieutenant in District 3, from

24   January 2020 through your transfer out in February 2020,

25   did you learn at least 684 a week?

1        A.    Dollars?

2        Q.    Yes.

3        A.    Yes.

4        Q.    In 2020, do you remember how much you earned for

5    the year?

6        A.    I mean, it was like 50 -- I think it was like

7    50-something an hour or so.  I think it was over 100,000.

8    But I don't remember the exact sum.

9        Q.    Do you know if you earned over 108,000 for the

10   year?

11       A.    I think that might be the -- that had been the

12   starting pay, so yes.  I mean, if you could give me a

13   calculator, I can give you -- can I calculate it?

14       Q.    If -- if you think that you can easily calculate

15   it, yeah.

16       A.    I am pretty sure my pay was -- oh, it is on

17   here.  It was on here, right?  If you got raises -- so, I

18   mean, I don't know.  It looks like it is pretty close, but

19   I don't know if we had a raise midway through that year.

20   Just based off this pay, it would be 105,690, so -- but

21   that might have had some holiday in there.

22              So it would be pretty close, unless we had

23   a pay raise, but I don't remember.  I mean, if I had -- I

24   could tell you on my -- if I could get the final check.

25       Q.    During your employment as a lieutenant in

1   District 3, January 2020 through your transfer out in

2   February of 2020, did you supervise two or more employees?

3       *A.*   Yes.

4       *Q.*   During your time as a lieutenant in District 3,

5   January 2020 through January twenty -- I'm sorry, through

6   February 2020, did you provide any coaching or feedback to

7   employees?

8       *A.*   I can't think of any specific incident, but I am

9   sure -- I am sure I did, yes.

10      *Q.*   Did you -- during your time in District 3 as a

11  lieutenant, January through February 2020, did you approve

12  or deny any request for overtime or days off?

13      *A.*   So the overtime thing -- I don't -- at some

14  point, like overtime -- and -- and my -- the people right

15  now might be better to answer that.  Like there is

16  unlimited overtime because we are so short.  So I don't

17  know we would ever be disapproving any overtime.  So I

18  don't know if we -- if I disapproved any overtime because

19  there was like unlimited overtime.

20              Days off, I -- I certainly could have told

21  someone they couldn't have like:  Hey, you cannot have

22  that day off.

23              I don't remember.  But it usually wasn't --

24  it was outside the norm for me to say you couldn't have a

25  day off --

```
 1        Q.    Did --
 2        A.    -- so I could -- I could tell them they couldn't
 3   have that day off, yes --
 4        Q.    So is it fair to say --
 5        A.    -- from what I understood.
 6        Q.    Is it fair to say that you had the discretion to
 7   approve or deny requests for overtime or days off?
 8        A.    I thought I could, yes.
 9        Q.    During your time in District 3 as a lieutenant,
10   January to February of 2020, were you involved in the
11   hiring or interviewing process with any sworn or unsworn
12   personnel?
13        A.    Not to my recollection, no.
14        Q.    Did you make any recommendations regarding
15   terminations or disciplinary action?
16        A.    No.  We are not permitted to.
17        Q.    Did you --
18        A.    Only --
19        Q.    -- place anyone on an action plan as a
20   lieutenant in District 3, January to February of 2020?
21        A.    I don't remember.  We do have a thing called an
22   action plan in BlueTeam.  And that -- the way that works
23   is you -- you get with the EIU and you set up an action
24   plan, and it is an early intervention thing.  So I don't
25   know what -- what I mean by action plan and what you mean
```

1    by action plan, I don't know if those are the same things.

2              So what is your -- what do you mean by

3    "action plan"?

4        Q.   Well, my understanding is that "action plan" is

5    a term of art is the action plan in -- within BlueTeam.

6    So --

7        A.   So you are -- you are referring to how we refer

8    to action plan?

9        Q.   Yes.

10       A.   I don't remember, but I have.  I have put people

11   on action plans.  I just don't remember during this

12   period.

13       Q.   Have you performed evaluations of assigned staff

14   as a lieutenant in District 3?

15       A.   What do you mean?

16       Q.   Have you ever performed evaluations for your

17   sergeants --

18       A.   Like a --

19       Q.   -- as a lieutenant in District 3?

20       A.   Like a EPA?

21       Q.   Yes.

22       A.   Yes.

23       Q.   How often do you perform evaluations of your

24   sergeants?

25       A.   So the formal is a yearly, the -- it is a yearly

1  performance appraisal.  And then by policy, any supervisor

2  is required to do a monthly performance note on their

3  subordinate.  And that's based on the court order.  Court

4  ordered that.

5      Q.   Are you required to do one monthly performance

6  note or two monthly performance --

7      A.   Two --

8      Q.   -- notes?

9      A.   -- notes; one has to be performance.  So you got

10 to do two EIS reviews, one performance note.  You just

11 have to have a total of two notes, but just one has to

12 reference performance.  And then you need to do a body cam

13 if they did any traffic stops.

14     Q.   And you did, in fact, do those two notes per

15 subordinate during your time as lieutenant in District 3,

16 correct?

17     A.   Yes.

18     Q.   Am I correct in understanding that you were the

19 watch commander, for the entirety of the time period

20 January 2020 through your transfer out of District 3 in

21 February 2020, for District 3?

22     A.   It looks like it.  I couldn't really remember,

23 but this CAD history is -- well, see, it starts at 110,

24 so -- because there was -- it was around that time I

25 flipped.  Because I went from watch commander nighttime to

1  shift?

2      *A.*   So I will speak of what I know.  Like I don't --

3  I don't have a recollection of the time, but yes.  If

4  you're the watch -- the watch commander is the highest

5  ranking that is logged in.  There's people that are on

6  call, like there is a chief on call, but there is

7  nobody -- like the watch commander is the expectation of

8  being the highest level.

9              But you can, and you actually -- I do

10 remember having to have the chief paged -- the on-call

11 chief paged for various incidents.

12     *Q.*   Have you ever served on a promotional board?

13     *A.*   I have, yes.

14     *Q.*   When?

15     *A.*   I don't -- I served on two.  I don't remember --

16 yeah, I think it was when I was in CID.

17     *Q.*   You don't remember when?

18     *A.*   No.  I -- oh, I did serve on one when I was --

19 when I was a daytime commander because I -- I remember --

20 I am pretty sure I was daytime commander, District 3.

21 In -- for Surprise, I was like a guest on their board, in

22 Surprise PD.

23     *Q.*   What type of promotional board was it?  Was it

24 for sergeants to lieutenants?

25     *A.*   Yes.  No, no, it was -- it was officer to

1   sergeant.

2       Q.   For both?

3       A.   No, the one I did for the County was to

4   lieutenant.

5       Q.   Was what?

6       A.   To -- sergeant to lieutenant.

7       Q.   So you have served on at least two promotional

8   boards; one, officer to sergeant, and one, sergeant to

9   lieutenant?

10      A.   Yes.

11      Q.   Have you sat on any awards boards?

12      A.   No.

13      Q.   Have you been involved in the hiring or

14  interviewing or recruitment process for any administrative

15  personnel?

16      A.   In CID, yes.  Not -- not -- not recruiting, but

17  I have been on the board for hiring.

18      Q.   And is that in your current role?

19      A.   Yes.

20      Q.   Were you involved in interviewing or hiring of

21  administrative personnel in District 3?

22      A.   Not that I recall.  I don't remember even any

23  new administrative staff coming in.

24      Q.   Have you conducted training?

25      A.   Yes.

```
1    Q.   What kinds of training have you conducted in
2 District 3 as a --
3    A.   Oh --
4    Q.   -- lieutenant?
5    A.   -- I didn't in District 3.  I have done it in my
6 current role.  Training about -- I would -- like I would
7 be called in, in a training session, and then I would
8 train on the traffic stop analysis that we have been doing
9 for the court order, because I ran that traffic stop
10 analysis unit.
11              So I would give training on a monthly
12 analysis that we instituted to analyze traffic stops.
13 That has been like where I have been -- formally given
14 training.
15    Q.   In your time in District 3, January to
16 February of 2020, did you conduct any Internal Affairs
17 Investigations?
18    A.   I don't -- I -- I have when I was in District 3.
19 But I don't -- I don't know if I had any when I was the
20 watch commander at that last part.  I don't remember.  But
21 I have -- as a -- as a District 3 lieutenant, I did
22 conduct and review.
23    Q.   That was going to be my next question.
24              Have you -- did you review any Internal
25 Affairs Investigations in January or February of 2022
```

1  (sic) in District 3?

2      A.    I don't know if I -- at that time.  But I -- I

3  did.

4      Q.    You could have?

5      A.    Yes.  It just certainly would have been a

6  responsibility --

7      Q.    Okay.

8      A.    -- or it was a responsibility.

9      Q.    Yeah.  During your time in District 3 as watch

10 commander lieutenant, February -- sorry, January 2020 to

11 February 2020, did you perform any surveillance?

12     A.    No.  Well, I like -- no formal surveillance, I

13 would say I would -- if I performed like just sitting out

14 and observing what is occurring, like when I be out and

15 just observing what is occurring, I mean, that is a

16 concept, surveillance.  But, no, like -- like a formal,

17 you know, like a drug unit doing surveillance, no.

18     Q.    As a lieutenant in District 3, January to

19 February of 2020, did you pursue, restrain, or apprehend

20 any suspects?

21     A.    I don't remember.  But I have, yes, during --

22 when I was a District 3 lieutenant.

23     Q.    How often in a year would you pursue, restrain,

24 or apprehend suspects in District 3?

25     A.    Pursue, that would be rare.  We're not -- our --

1  our pursuit policy for vehicles is very -- very
2  restricted.  It's very difficult to even pursue anybody.
3  Foot pursuit, I would just let the fast people chase them.
4  But so pretty -- maybe once I year, I would pursue
5  someone.
6      Q.    How about restraining or apprehending?
7      A.    I would say more helping in the -- the
8  restraining.  So restraining is -- I see that as
9  handcuffing.  I could have -- that would probably be -- if
10 I am on scene and I am helping, that would be more likely.
11 I wouldn't say no more than once every -- once a month.
12 Just depends on the situation we are dealing with.
13          Me personally apprehending, I would say
14 like just depends on the situation.  I -- I remember -- I
15 don't remember if it was during this time period.  But I
16 remember rolling up on a -- a drunk driver, and I pulled
17 him over and pulled him out and started doing all the
18 stuff and then helped restrain him, but -- so
19 circumstances would dictate.
20          But it wouldn't be as regular as a deputy
21 would or even a sergeant.  It would be less.
22     Q.    How about interviewing witnesses in your time in
23 District 3 as a lieutenant, January and February of 2020?
24     A.    And, again, I don't -- can't really remember the
25 time frame specifically.  But we would, on occasion --

1    if -- if the scene was chaotic or -- like I remember a --

2    a fire scene where there's people everywhere, ambulances,

3    we're -- you know, we're short people.

4                    And so, you know, I would throw in and help

5    out, you know, asking -- I see some need and I would fill

6    it, or I remember rolling up on a guy who shot himself,

7    and I was the first one on scene.  I rolled in, restrained

8    him, you know, and then asked him the basic -- you know,

9    where is the gun, et cetera.

10                   So, you know, that first is going to land

11   with the deputy, the line level, right, because that's

12   their role and that is what they are learning to do.  So

13   it would be more on the basis of there is a need like we

14   are short and there is a direct need that needs to occur

15   now or you need to step in because things aren't going

16   right and you need to help out and redirect what is

17   occurring.

18                   So not a -- super often, but, you know --

19   for me, at least, could occur.

20   Q.    In your opinion, what is the primary job duty of

21   a sheriff's deputy?

22   A.    Like a sheriff's patrol deputy?

23   Q.    Yes.

24   A.    To -- I mean, it boils down to enforce the law,

25   but -- so that is reflected in self-initiated and call

1  things during your time, either specifically in January or
2  February of 2020 or just generally as a lieutenant in
3  District 3.
4           Prevent, control, or extinguish fires of
5  any type?
6      A.   More -- like I am not the fireman, but
7  definitely been on a fire scene where we have to manage
8  the people around, but we are not -- we don't have the
9  hoses, but we are managing that scene for the -- with the
10 fireman.  But I've had to do that --
11     Q.   How -- how many times?
12     A.   That I can think of, one specific incident off
13 the top of my head.
14     Q.   In the past several years?
15     A.   When I was watch -- so I was -- I was watch
16 commander -- nighttime watch commander for probably, from
17 the beginning and the end, of a total of like four and a
18 half months.  Maybe more.  I can't remember how -- the end
19 was only like a month and a half, but the beginning -- I
20 think it was like four to six months.  I mean, I'm --
21 around six months, I was a nighttime watch commander.
22     Q.   So approximately one time in six months that you
23 prevented, controlled, or extinguished fire?
24     A.   That I can remember, yes.
25     Q.   How about rescuing fire, crime, or accident

1                    Have you rescued fire, crime, or accident

2    victims during the six months that you were a watch

3    commander in District 3, and if so, how many times?

4        A.    So if we are going to use the literal rescue,

5    like pull from harm?  Not that I recall.

6        Q.    How about preventing or detecting crimes in the

7    six months you were a watch commander in District 3?

8        A.    Yeah.  I mean, that's -- I can't think off the

9    top of my head.  I mean -- because even -- it's difficult

10   to even quantify how you prevent it because just active

11   patrolling, our purpose is to -- by our active patrolling,

12   is to prevent crime.  And so we would actively, even as a

13   watch commander, cruise around and be, you know, doing

14   that, deterring crime.

15                   So I mean, I got a guy with a DUI, a

16   suicide -- so that was not really a crime.  We did get him

17   for discharging.  So two -- I know off the top of my head

18   two in the -- and that would be more recollection of

19   the -- around the nine -- the last part.  I -- the early

20   part was '17.  I definitely can't remember anything that

21   happened then.

22       Q.    Okay.  How about conducting investigations or

23   inspections for violations of the law in the six months

24   that you were a watch commander in District 3?

25       A.    So we do that even as part -- where a big part

1    is -- that happens kind of all the time, where the

2    information is presented to us of what they gathered, and

3    then together, we do that, to determine whether a crime

4    has been committed.

5              So that happens all the time.  That's kind

6    of like a big part of what we do, is, you know, the

7    evidence is gathered and we determine is there a crime

8    that has taken place or not.

9    Q.    But do you conduct the investigations or are you

10   referring to investigations that are conducted by your

11   subordinates?

12   A.    So subordinates, so like we are not typically

13   assigned as a case agent.  We are more -- you know, we

14   have -- one, we have detectives that are ultimately

15   assigned if we need an ongoing investigation, and the

16   deputy is usually the first line.

17             You know, the deputy -- if there is a

18   deputy available, the deputy is going to be the first line

19   of taking that primary role.  And we are more of the

20   assisting portion and helping them with that, completing

21   that task.

22   Q.    As a watch commander in District 3 for

23   approximately six months, how many times did you

24   interrogate or fingerprint suspects?

25   A.    We definitely don't really fingerprint -- so no

```
1   one fingerprints because that's even done at booking, I
2   believe, and we don't even have to do that.  The detention
3   officers do that, from what I remember.
4             Interrogate?  I mean, I can think -- I had
5   the DUI guy.  At least once.
6        Q.   In that six-month time period?
7        A.   I would say in -- in the two-month time frame, I
8   can't -- '17, I don't remember at all.
9        Q.   How about preparing investigative reports?  Did
10  you do that as a watch commander for that six-month time
11  period, and if so, how many times?
12       A.   Yeah, I mean, you would write -- it would be --
13  I wouldn't do -- even in the DUI, I wrote a supplement.
14  So be more like I wrote a supplement to the main report.
15  Maybe a handful, couple of times, write a supplement for
16  actions that were taken.
17       Q.   With regards to each of these topics that we
18  have addressed -- I am going to run them real quickly:
19  preventing or controlling or extinguishing fires; rescuing
20  fire, crime, or accident victims; preventing or detecting
21  crimes; conducting investigations; performing
22  surveillance; pursuing, restraining, and apprehending
23  suspects; detaining or supervising suspected criminals;
24  interviewing witnesses; interrogating suspects; preparing
25  investigative reports -- would you agree that those are
```

 1   the beginning to try to get our wives added so we could be

 2   sued to recover damages.  And frankly, that was very

 3   upsetting to me that the County would pursue such a thing,

 4   and it is just a reflection how they have been treating us

 5   monetarily this whole time.  But, yes, I understand that.

 6   That was upsetting.

 7       Q.   Okay.

 8       A.   Yeah.

 9            MS. SANTIAGO:  I am out of time.  So since

10   I am out of time, then that's all that I have.

11            MS. SYVERSON:  I have no questions.

12            VIDEO TECHNICIAN:  This concludes today's

13   deposition.  We are off the record at 12:38 p.m.

14            (Proceedings adjourned at 12:38 p.m.)

15

16            _____

17                 TODD CHRISTOPHER BRICE

18

19

20

21

22

23

24

25

DEPOSITION OF TODD CHRISTOPHER BRICE, 04/15/2025

1                        CERTIFICATE

2            I HEREBY CERTIFY that the foregoing deposition
   was taken by me pursuant to notice; that I was then and
3  there a Certified Court Reporter for the State of Arizona,
   and by virtue thereof authorized to administer an oath;
4  that the witness before testifying was duly sworn by me to
   testify to the whole truth and nothing but the truth;
5  pursuant to request, notification was provided that the
   deposition is available for review and signature; that the
6  questions propounded by counsel and the answers of the
   witness thereto were taken down by me in shorthand and
7  thereafter transcribed through computer-aided
   transcription under my direction, and that the foregoing
8  typewritten pages contain a full, true, and accurate
   transcript of all proceedings had upon the taking of said
9  deposition, all done to the best of my skill and ability.
            I FURTHER CERTIFY that I am in no way related to
10 nor employed by any of the parties hereto, nor am I in any
   way interested in the outcome hereof.
11          I FURTHER CERTIFY that I have complied with the
   ethical obligations set forth in ACJA Sections
12 (J)(1)(g)(1) and (2).
            DATED at Phoenix, Arizona, this 28th day of
13 April, 2025.

14                    _Carrie A. Cariati_
                      _____
15                    CARRIE A. CARIATI
                      Registered Professional Reporter
16                    Certified Realtime Reporter
                      Certified LiveNote Reporter
17                    Certificate No. 50355

18          I CERTIFY that this Registered Reporting Firm
   has complied with the ethical obligations set forth in
19 ACJA Sections (J)(1)(g)(1) and (2).

20
            DATED at Phoenix, Arizona, this 28th day of
21 April, 2025.

22                    _Carrie A. Cariati_
                      _____
23                    Registered Reporting Firm R1064
                      CARRIE A. CARIATI, Owner
24

25

# EXHIBIT 23



# FAIR LABOR STANDARDS ACT (FLSA) EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 11/06/2017 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| | | |
|---|---|---|
| **Employee ID:** 811084469    **Position #:** | | **Name** (Last, First): Brice, Todd |
| **Market Range Title:** Law Enforcement Lieutenant | | **Working Title:** Law Enforcement Lieutenant |

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____    _____
Employee Signature                                                    Date

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____    10/30/17
Employee Signature                                            Date

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

CAPT. G. LUGO 1480          _____ 1480          11/16/17
Supervisor Name (print)                    Supervisor Signature                    Date

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

Revised: 08/07/2017

CONFIDENTIAL

MCC 001764

# EXHIBIT 24

# FILED

# UNDER

# SEAL

# EXHIBIT 25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


CHRISTOPHER J. HOUCK, on            )
behalf of himself and all           )
those similarly situated,           )
                                    )
          Plaintiff,                )
                                    )   No.
                                    )   2:23-cv-00068-DGC
          vs.                       )
                                    )
                                    )
MARICOPA COUNTY,                    )
                                    )
          Defendant.                )
_____     )


VIDEORECORDED DEPOSITION OF RYAN NEVILLE

Phoenix, Arizona
April 11, 2025
9:08 a.m.


Prepared by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS               Certified Reporters
Registered Professional Reporter 17505 N. 79th Avenue
Certified Realtime Reporter      Suite 301-C
Certified Realtime Captioner     Glendale, AZ 85308
AZ CR No. 50574                  (480) 429-7573
NM CCR No. 614


(COPY)

4

```
 1              VIDEORECORDED DEPOSITION OF RYAN NEVILLE
 2    commenced at 9:08 a.m. on April 11, 2025, at the law
 3    offices of FISHER & PHILLIPS LLP, 3200 NORTH CENTRAL
 4    AVENUE, SUITE 1550, PHOENIX, ARIZONA, before MICHAELA
 5    HERMAN DAVIS, a Certified Reporter, in and for the County
 6    of Maricopa, State of Arizona.
 7
 8
 9                          * * *
10                  A P P E A R A N C E S
11    FOR THE PLAINTIFF:
12            FRANKEL SYVERSON, PLLC
              BY: MS. PATRICIA N. SYVERSON
13                9655 GRANITE RIDGE DRIVE
                  SUITE 200
14                SAN DIEGO, CALIFORNIA 92123
                  patti@frankelsyverson.com
15
16    FOR THE DEFENDANT:
17            FISHER & PHILLIPS LLP
              BY:  MS. SHAYNA BALCH SANTIAGO
18                 MR. JACOB R. VALDEZ
                   3200 NORTH CENTRAL AVENUE
19                 SUITE 1550
                   PHOENIX, ARIZONA 85012-2487
20                 ssantiago@fisherphillips.com
21
      ALSO PRESENT:
22
                  SAMANTHA ELLIOTT, VIDEOGRAPHER
23
                  MEGAN MORLEY, via Zoom
24
25
```

DEPOSITION OF RYAN NEVILLE, 04/17/2025

1     A.    March 29th.

2     Q.    March 29th of?

3     A.    2004.

4     Q.    2004.

5     A.    Now, that's when I started the academy.  There's

6  a difference between becoming a Maricopa County employee

7  and being a sworn deputy sheriff.  That happened, I want

8  to say, October -- or excuse me, August 24th of that same

9  year, but I officially became a County employee as of that

10  day.

11     Q.    Got it.

12           And so if I understand this correctly, you

13  started the academy in March of 2024.  After completing

14  the academy, that's when you became a sworn --

15     A.    I don't know who misspoke, but it was March of

16  2004.

17     Q.    I must have misspoke because I'm looking at

18  2004.  Let me restate that then.

19     A.    Please.

20     Q.    So my understanding is that in March of 2004,

21  you started the academy with Maricopa County Sheriff's

22  Office, and that later that year you became a sworn

23  deputy; is that correct?

24     A.    Correct.

25     Q.    And at some point you were promoted to sergeant;

1  correct?

2      *A.*    I was, yes.

3      *Q.*    When was that?

4      *A.*    Would have been -- everything seems to happen in

5  June, so I want to say it was June/July of 2016.

6              Wait.  I'm, like, having to go through my

7  entire career now.  Hold on.  Give me one second.

8      *Q.*    Take your time.

9      *A.*    Yeah.  Yeah.  2016.

10     *Q.*    And then when were you promoted to lieutenant?

11     *A.*    About the same time frame 2021.  So June/July of

12  2021.

13     *Q.*    And when you were promoted to lieutenant with

14  Maricopa County in summer of 2021, what district was that

15  in?

16     *A.*    District II.

17     *Q.*    And have you remained in that position through

18  today's date?

19     *A.*    No.

20     *Q.*    What was your next position after becoming a

21  lieutenant in District II in summer of 2021?

22     *A.*    It's the current position that I'm occupying

23  which is the narcotics division commander of our special

24  investigations division.  And that would have been this

25  month about two years ago because I'm entering my second

13

 1   year in that assignment.

 2        Q.    And so I get that right, that was narcotics

 3   commander?

 4        A.    For the special investigations division.

 5              I could throw a bunch of acronyms at you,

 6   but I'll just leave it with narcotics.  That's probably

 7   the easier way to understand it.

 8        Q.    And my understanding is that special

 9   investigations is not within patrol bureaus east or west;

10   is that correct?

11        A.    You're correct, yes.

12        Q.    So is it -- and that was two years ago, you

13   said; right?

14        A.    Correct.

15        Q.    So that would have been in summer of 2023?

16        A.    Thereabouts, yeah.  Sounds right.

17        Q.    Do you have an understanding of who is eligible

18   to participate in this particular case?

19        A.    Yes.  A tangential understanding.

20        Q.    And there is a date range at issue, and then

21   it's also individuals that were within patrol bureaus east

22   or west within that period of time.

23              So my question to you is -- strike that.

24   Let me rephrase it.

25              The individuals that are eligible to

DEPOSITION OF RYAN NEVILLE, 04/17/2025

1  participate in this case would be lieutenants during a

2  certain amount of time within patrol bureau east or west,

3  so I want to identify what time frame you've been a

4  lieutenant within patrol bureaus east or west.

5          My understanding is that time frame is

6  June/July of 2021 through approximately June/July of 2023;

7  is that correct?

8  A.    That would be correct, yeah.  I think the

9  official transfer from me going from patrol to special

10  investigations was in April, though.  That's why I said

11  this time of year of 2023 is when I went over to SID.

12  Q.    Thank you for that clarification.

13  A.    Uh-huh.

14  Q.    So approximately summer of 2021 at your

15  promotion to lieutenant through approximately April of

16  2023?

17  A.    That would be, yeah, as close to a correct

18  approximation as you can get.

19  Q.    While you were in District II, did you hold

20  different positions or shifts?

21  A.    Yeah.  So for the first half of my tenure there,

22  I was the night shift watch commander.  And then for the

23  latter half of the tenure, I was a day shift patrol

24  commander.

25  Q.    What were the dates that you were the night

16

1    *Q.*    And did you, as night shift commander, ever

2    serve as watch commander for the whole west side?

3    *A.*    Oh, yes.  And if there was followup, I've served

4    as watch commander for the entire county at one time or

5    another.

6    *Q.*    Okay.  Can you describe for me, in your own

7    words, what the responsibilities are for a watch commander

8    of the whole west side?

9    *A.*    It's basically if any situation -- it's hard to

10   say it in, you know, matters that aren't like idioms,

11   right, but I'll just go ahead and come out and say that.

12           If something goes seriously sideways and

13   they need somebody from a command representative --

14   because everything requires kind of certain chain of

15   command approval, so like if you're going to be calling in

16   the SWAT team, you're not, as a deputy, just going to pick

17   up the phone and call the SWAT sergeant and have him roll

18   out there.  So that's -- that's one of the primary

19   responsibilities is coordinating responses to very complex

20   systems and problems that are happening.

21           But then it's also as a force multiplier for

22   general things.  Like, you'll routinely have major

23   incidents and emergencies going on in multiple districts,

24   so District II might have two different what we call hot

25   tones, which are priority 1 calls going, and then

1    District I all of the sudden has hot tone.

2                You only have three sergeants to figure this

3    all out, and if everything starts going to crap at once,

4    you need to be able to have another individual to kind of

5    break off and assist with those matters.  That happened

6    pretty routinely.

7                But primarily command and control trying to

8    keep everything balanced and make sure that resources are

9    gotten to the patrol deputies on the ground.

10       Q.    I'll walk through more of the chain of command

11   here momentarily, but my understanding is the chain of

12   command generally within MCSO --

13       A.    Yeah.

14       Q.    -- and MCSO, Maricopa County Sheriff's Office,

15   right -- is you have deputies which are supervised by

16   sergeants; right?

17       A.    Correct.

18       Q.    Which are supervised by lieutenants; correct?

19       A.    Correct.

20       Q.    Lieutenants are generally supervised by

21   captains; correct?

22       A.    Correct.

23       Q.    Who then report to chiefs; is that correct?

24       A.    Correct.  And then there's layers of chiefs as

25   well.

DEPOSITION OF RYAN NEVILLE, 04/17/2025

1    *Q.*    Yes.  Correct.

2                So with respect to the chain of command at

3    night, my understanding is that the watch commander,

4    especially if you're serving as either the whole county or

5    the west side watch commander, that you were the highest

6    ranking individual on shift at that time; is that correct?

7    *A.*    Correct.

8    *Q.*    And when you were describing the roles and

9    responsibilities that you held as the watch commander in

10   the evening, would it be correct to also characterize a

11   large component of the responsibilities to be coordinating

12   logistics of personnel and to be able to provide approvals

13   for resources?

14   *A.*    To an extent, but there's also a command and

15   control on the ground component that's pretty critical

16   there too.  You can't have a major incident going on that

17   requires those resources and those logistical support

18   structures to come into place without being there and

19   seeing it for yourself and taking command and control of

20   the scene.

21   *Q.*    So walk me through how that would work with

22   command and control of a scene.

23   *A.*    So I'll give you the real life for instance.  So

24   when Ruiz got killed, my captain was out of town on a

25   hunting trip.  The lieutenant that discovered him in his

DEPOSITION OF RYAN NEVILLE; 04/17/2025

1      A.    I couldn't say.  I'm not sure.

2      Q.    And is SWAT within patrol bureaus east or west?

3      A.    Neither.

4      Q.    Have you ever served as acting captain?

5      A.    Yeah.  I'm currently serving as the acting

6   commander while my captain is out of town but never at the

7   patrol level.  That just means phone calls get made to me,

8   and I make phone calls to the chief instead of me making

9   phone calls to the captain and him making them to the

10  chief.  So we're a little bit different of an animal than

11  the patrol divisions, obviously.

12     Q.    So did you ever fill in -- is there a phrase to

13  refer to what position you would hold if your captain was

14  out of the office on leave or vacation and you covered his

15  duties while you were on patrol?

16     A.    No, not really.  Because what you're talking

17  about here is like I'm gone for a week, so don't call me

18  because my business phone will be on the night stand and

19  call Lieutenant Neville and he'll handle calling the chief

20  on things.  We're not going to assign somebody a unique

21  title for that; it's just going to be Lieutenant Neville

22  is covering in my absence.

23     Q.    And did that happen at all while you were a

24  lieutenant within District II?

25     A.    Not that I can recall.  Again, the first bulk of

1    beats we have there, and they take 200-plus primaries,

2    then I'll stip to that.  That's fine.

3        Q.    So you have no reason to doubt the accuracy of

4    statistics pulled from CAD for District II?

5        A.    No.  No.

6              Again, any other than would be the stuff,

7    the intangibles that don't get captured, but I don't think

8    that it's statistically significant enough to move the

9    needle to any major degree.

10       Q.    Understood.

11             When you worked as a lieutenant in

12   District II -- and the time frame we're talking about is,

13   you know, between 2021 and 2023 -- did you earn at least

14   384 -- at least $684 a week?

15       A.    Give me that one one more time.

16       Q.    Absolutely.  Let me get a clean question.

17             When you worked as a lieutenant in

18   District II, did you earn at least $684 a week?

19       A.    So we're talking about my paycheck?

20       Q.    Paycheck, yes.

21       A.    Yeah.  I would think so, yeah.  I could do the

22   math, but, yeah.

23       Q.    Do you know how much you earned in 2022?

24       A.    No.  Honestly.

25       Q.    Do you know if you earned at least $108,000 for

1  the year?

2      *A.*    Gross?

3      *Q.*    Yes.  Gross.

4      *A.*    Yeah.  That sounds accurate.

5      *Q.*    Did you also earn at least $108,000 gross for

6  the year in 2023?

7      *A.*    I would think so, yeah.  You don't pay too much

8  attention to your timesheet necessarily when it doesn't

9  matter.

10     *Q.*    How about 2021?  Did you learn at least 108,000

11 gross?

12     *A.*    I don't think so because I don't think -- so

13 that would have been the first year that I promoted, and

14 my understanding of what our pay was then was like

15 somewhere in the order of 98K a year, and then it kind of

16 went up a little bit.

17             Even 108 in those intervening two years

18 might be overshooting the mark.  If it is, it's not by

19 much.  But initially my starting pay as a lieutenant was

20 98, so that's what I would put down.

21     *Q.*    Since your promotion to lieutenant -- strike

22 that.

23             When you served as lieutenant in

24 District II, did you supervise two or more employees?

25     *A.*    Yes.

1      *Q.*   I want to make sure I fully understand your
2  claim in this case.
3            And I guess let's kind of start with this:
4  Do you agree that Maricopa County has treated you as an
5  exempt employee under the FLSA?
6            I understand you disagree with the
7  classification.  My question is:  Do you understand that
8  they have classified you as exempt from overtime?
9            MS. SYVERSON:  Object to foundation.
10           You can answer.
11           THE WITNESS:  Okay.  Okay.  Can you repeat
12  it one more time?
13  BY MS. SANTIAGO:
14     *Q.*   Yes.
15           Let me give this prefatory comment.
16           I understand that you might disagree with
17  the exempt status.  My question is:  Did Maricopa County
18  treat you as exempt as a lieutenant in District II?
19           MS. SYVERSON:  Object to foundation.
20           THE WITNESS:  I would say no.  And I would
21  base that on the fact that there were multiple instances
22  where I would normally be off work and was expected to
23  take command and come in and do tasks that -- and delegate
24  tasks during times that I was off work and not getting
25  paid for it.

1  number I put in there because it's -- I'm not going to get

2  paid for it anyway, so I can put a thousand hours worked.

3  But unless I can actually put it in and approve it,

4  it's -- Workday is a little bit more user friendly in that

5  regard.

6      Q.    So since you started utilizing Workday as a

7  lieutenant, have you accurately input the additional hours

8  above 40 each workweek?

9      A.    Yeah.  As often as I can remember.  Sure.  I

10  don't want to say it's still hundred percent accurate

11  because I'm not -- I'm routinely getting -- like I can

12  show you my phone logs that show my guys calling me in the

13  middle of the night, in the evening.  I was on and off the

14  phone with one of my teams last night because they were

15  doing a search warrant execution in Peoria.

16            So there's always those kinds of things that

17  I'm not going to sit here and nickel-and-dime in Workday

18  for a 15-minute phone conversation at 11:30; 25-minute

19  conversation at 12:45.  You know, so I try to do what I

20  can.

21            I estimate, okay, between those

22  conversations, I was basically having work-related

23  business going on in my living room talking to my guys for

24  half hour, 45 minutes to an hour.

25      Q.    So I want to make sure I understand how you're

1    inputting additional hours into Workday.

2            Obviously there's the preloaded schedule

3    that gets entered; correct?

4        *A.*    Yes, ma'am.

5        *Q.*    Then you have the ability to enter additional

6    hours worked into Workday; correct?

7        *A.*    Yes.

8        *Q.*    It sounds to me, but I don't want to put words

9    in your mouth, that at the conclusion of a two-week

10   period, for a two-week pay period, you're reviewing your

11   timesheet, and you're adding the total number of hours

12   that you think you worked in addition to the 80-hour

13   workweek; is that correct?

14       *A.*    I would not be comfortable with the term "I

15   think."  I mean, look, if I'm having a conversation with

16   one of my guys about an ongoing operation that we're

17   working or some sort of work business, that is time that I

18   am working and I am writing down notes in my notepad of,

19   hey, this is how long I worked here.

20           And then at the approval stage which is

21   generally the week before our paychecks issue, I'm

22   required to review and approve my timesheet anyway.  And

23   at that time, I look back, write it all in, approve it,

24   send to my boss.

25       *Q.*    So let's go through just kind of a sample then.

1              What is your -- what was your last schedule
2    as a lieutenant in District II?
3        A.    I honestly don't know.  Whatever -- prior to my
4    transfer --
5        Q.    It would have been the day shift; right?
6        A.    Yeah, yeah.  Yeah.
7        Q.    And what days of the week would it have been, do
8    you remember?
9        A.    I worked Tuesday through Friday day shift.
10       Q.    Okay.  So let's just take kind of
11   approximations.
12              Let's say on Tuesday you work your regular
13   assigned hours.  Wednesday you work your regular assigned
14   hours.  Thursday you work your regular assigned hours.
15   Friday you end up putting in two phone calls, 30 minutes
16   each.
17              Would you then add that additional time in
18   real time on Friday, or would you wait to add those hours
19   to Workday until a week later when you're reviewing your
20   timesheet a week before the payday?
21       A.    Generally the way that I do it is I just write
22   the notes down, and then when it comes time to review and
23   approve is when I put it in and then submit it up.
24       Q.    Got did.
25              So with this example, if the following week,

1      *A.*    Doing shift work is generally when your shift

2    began, so my shift started at 1700.  I would log into CAD

3    at or around the time frame of 1700.

4      *Q.*    And were you provided with an unmarked vehicle

5    as part of your employment?

6      *A.*    Yes.

7      *Q.*    And were you permitted to take that unmarked

8    vehicle home?

9      *A.*    I was, yes.

10     *Q.*    So when you started your shift, were you at home

11   still?

12     *A.*    Yeah.  Unless there was some extenuating

13   circumstance where I had to go somewhere else before going

14   to work, but yeah.

15     *Q.*    So is it correct to assume that you would get

16   into your -- strike that.

17           Would you log into CAD in your unmarked

18   vehicle or somewhere else?

19     *A.*    Generally, yeah, in the unmarked vehicle.  I

20   could also do it over the radio, if necessary.

21     *Q.*    And so, generally speaking, you would get into

22   your unmarked vehicle at your home, log into CAD, and then

23   start your shift; is that correct?

24     *A.*    Generally, yes.

25     *Q.*    And was the reverse also true where you would

1    conclude your shift at home in your unmarked vehicle when
2    you logged out of the CAD system in your driveway?
3        A.    For the most part, yes.
4        Q.    And on this report that is Exhibit 5 to your
5    deposition, I want draw your attention to a couple of
6    entries here.
7                    So let's look on page 13 of 317.  It's
8    MCC 16451.
9        A.    Okay.
10       Q.    And do you see where it says 8/3/2021 20:32:26
11   on the left-hand side?
12       A.    Yes.
13       Q.    And that's a reference to the date and the time
14   of the particular day and entry; correct?
15       A.    Yes.
16       Q.    And then it has your serial number; correct?
17       A.    Yes.
18       Q.    And if you go all the way to the right, it says
19   "unit initial log for service."
20                    Do you see that?
21       A.    Yes.
22       Q.    Is that your initial logging onto the CAD
23   system?
24       A.    Potentially, yeah.
25       Q.    You have no reason to dispute that?

1   How far before, I couldn't begin to tell you.

2                    I know we were basing it off of, like,

3   landmarks in time.  So I remember we were in the new

4   building because we were laughing at how we had just

5   installed the punch kiosks for ADP and that we were almost

6   certainly going to have to pull those down and put in the

7   new ones for Workday.  That's the only thing that sticks

8   out in my head.

9        Q.   And when did you transfer into your new

10  assignment out of District II?

11       A.   April of two years ago.  So right around this

12  time.

13       Q.   April of 2023; correct?

14       A.   Correct.  Yes.

15       Q.   Do you have a practice of reviewing your pay

16  stubs?

17       A.   Yes.

18       Q.   And do you have any -- have you found any

19  discrepancies or errors in your pay stubs?

20       A.   As far as -- what are we referring to?

21       Q.   As far as the data in the pay stubs, have you

22  seen any errors on your pay stubs?

23       A.   I guess it depends on what you would

24  characterize as errors.  If we're talking about pay for,

25  you know, and did I work the 80 hours listed on my pay

1      Q.    What is Exhibit 7 to your deposition?

2      A.    It's another version of the earnings statement.

3   So like if, for argument's sake, 6 was Workday, this would

4   probably be ADP or vice versa.

5      Q.    MCC 914 through 945 is Exhibit 7 to your

6   deposition.  My understanding is these are the earnings

7   statements for ADP.

8      A.    Yes.

9      Q.    Do you have any reason to doubt the accuracy of

10  the data on these earnings statements?

11     A.    For no other but the same ones that I doubted

12  the accuracy on the Workday ones.

13     Q.    I want to walk through some of your time at

14  District II.

15              I understand that you --

16     A.    Are we not looking at 7?

17     Q.    We're done with 7, yes.

18     A.    Okay.

19     Q.    So my understanding is that you started or were

20  promoted to lieutenant in District II around June/July of

21  2021; correct?

22     A.    Yes, ma'am.

23     Q.    Who did you report to?

24     A.    Initially -- excuse me.

25              Initially Captain Joe Dietrich.  And then

1   upon his promotion, Captain Phil Hilliker.

2       Q.   Did you report to any other captains during your

3   time at District II?

4       A.   No, ma'am.

5       Q.   Do you recall approximately what time you

6   started reporting to Captain Phil Hilliker?

7       A.   I don't remember honestly.

8       Q.   Do you recall if it was while you were on night

9   shift or when you transitioned to day?

10       A.   It was after days.

11       Q.   So if you transferred to day shift around April

12   of 2022, then you likely would have started reporting to

13   Captain Hilliker in 2022 or 2023?

14       A.   Yeah.  Yeah.

15       Q.   And are you now -- who are you now reporting to?

16       A.   Currently, Captain Cory Morrison.

17       Q.   Do you agree that different captains have

18   different management styles?

19       A.   Certainly.

20       Q.   Would you agree that different captains have

21   different policies and procedures for handling things such

22   as needing to take a day off, coming in a little bit late,

23   leaving a little bit early, those types of things?

24       A.   I think it's very careful to remember words have

25   meaning when we start throwing around the words "policies

1  court orders and everything else.  So when you have a
2  sergeant that's going to be out, we need to have coverage,
3  and if that means OT happens, then -- you know, we try to
4  minimize it where we can, but we would have to bring
5  somebody in on OT.
6      Q.    Understood.
7            Did you communicate to sergeants any type of
8  practice for if they needed to call out sick?
9      A.    So we would have staff meetings.  We call them
10 staff meetings.  And it would be the sergeants and then
11 certain designated employees that we had, like
12 administrative role, like admin deputies and that.
13           And during that, if the subject came up,
14 that's how we would communicate to them.  But this has
15 been a process since, I don't know, probably the last
16 almost ten years now of if you need time off, you're going
17 to have to find coverage if it puts us below span of
18 control or minimum staffing.
19           Excuse me.  Above span of control, below
20 minimum staffing.
21     Q.    Have you ever coached or counselled any of your
22 sergeants or deputies underneath them?
23     A.    Honestly don't recall any specific events.  But
24 I would find it hard to believe that I never had to have a
25 formal coaching with one of -- not -- maybe not one of my

1    direct subordinates but certainly one of their

2    subordinates.  In fact, I can -- yeah, I can think of at

3    least one occasion that I did.

4        Q.    Describe for me that one occasion where you had

5    to.

6        A.    It was a deputy that got a little bit out in

7    front of his skis and was upset about a Blue Team entry

8    that he had gotten.  Which you're entitled to be upset

9    about something, but it doesn't necessarily make it not

10   true.

11              And he needed to -- he wanted to take it up

12   with his chain of command over and above the sergeant's

13   head, which is his right.  However, he did not want to

14   wait for his lieutenant to come back from vacation and

15   decided to take his beef straight to the captain.

16              So he and I had a sit-down and had a

17   discussion about how important the chain of command is,

18   and that I, quite frankly, didn't care how much of an

19   emergent problem he thought it was, that he needed to wait

20   for his lieutenant to come back because it was not an

21   exigent circumstance enough necessary to rise to the level

22   of the captain getting involved.

23       Q.    Can you think of any other instances where you

24   had to coach, counsel, or provide constructive feedback to

25   any of your sergeants?

1    A.    I mean, if we're taking it all the way to, like,
2  constructive feedback and talking to folks and teaching
3  them a better way to skin the cat, yeah, like daily, every
4  single day.  But a formal getting involved in a
5  documented, hey, you can't do this and don't do it again
6  type scenario, there aren't too many, no.

7    Q.    Have you ever had to place anyone on an action
8  plan?

9    A.    No.  I've participated in assisting one being
10 carried out on an employee that was on an action plan, but
11 I've, thankfully, never had to be directly involved in
12 that.  I've been blessed with good people.

13    Q.    That's good to hear.

14           Have you ever had to do an internal affairs
15 investigation?

16    A.    Oh, yeah.  Quite a few.

17    Q.    How many during your time at District II?

18    A.    As a lieutenant, yeah.

19           What are we categorizing as "doing"?  Being
20 the actual author of an IA, an investigator of the IA, or
21 a command review?

22    Q.    Let's take them one at a time.

23           How many times did you actually author an
24 internal affairs investigation as a lieutenant in
25 District II?

DEPOSITION OF RYAN NEVILLE; 04/11/2025

1      *A.*    Only one springs to mind, but I don't want to

2    hinge my entire wagon to that.  There might have been one

3    or two more.  Not many, but certainly one for sure.

4      *Q.*    Sounds like you can think of one in particular.

5    What is -- can you describe for me what the circumstances

6    were?

7      *A.*    Yeah.  So got a complaint from a lady who said

8    that a deputy was rude and used a great deal of profanity

9    to her during a call for service over the phone who also

10   wanted to complain that the sergeant when he got on the

11   phone did the exact same thing.  So it was basically your

12   general unprofessional conduct complaint.

13            And since it was against both the deputy and

14   her direct supervisor, both of whom I knew very well and

15   both of whom are in church every Sunday and I've never

16   once heard use a cross word, because the sergeant was

17   involved, I had to investigate it because he was my direct

18   report.  So it turned out to be entirely fabricated.

19      *Q.*    Can you think of any others?

20      *A.*    Like I said, direct investigator involvement, I

21   want to say that there was probably more than just one; I

22   just can't think of any specific example.

23            And the reason that one stands out is

24   because how egregious she made her complaint and how at

25   every layer she added more and more to the complaint.  So

DEPOSITION OF RYAN NEVILLE; 04/17/2025

1  it was particularly gratifying to me to sit in a room like

2  this and have the body camera video up on a 75-inch

3  television and then after hearing her third iteration of

4  the complaint to say, well, let's look at the body camera

5  and you can point out to me where they were rude and used

6  all this profane language.  I almost drew the complaint

7  myself on that one, but worth it.  But other than that,

8  no, I cannot think of any specific examples.

9      Q.    Any that you have reviewed?

10     A.    Oh, yeah.  Tons.

11     Q.    Approximately how many?

12     A.    I mean, at least a dozen.  At least a dozen.

13     Q.    During your time as a lieutenant in District II?

14     A.    Sure.

15     Q.    And when you are reviewing these, are you

16  reviewing these internal affairs reports for your

17  sergeants?

18     A.    Yeah.  We get what's called division cases, so

19  it's overflow from PSB.  So they handle the initial

20  investigation; lieutenants and the captain at the division

21  level have to do a command review.

22     Q.    Have you performed performance evaluations for

23  your sergeants in District II as a lieutenant?

24     A.    Yes.

25     Q.    How many?

1    *A.*    Two sergeants every year.  I had two squads.  So
2    say four a year for that time period.

3    *Q.*    Have you ever served on a promotional board?

4    *A.*    I have not.

5    *Q.*    Have you served on an awards board?

6    *A.*    No, I have -- I wish I could.  They won't let me
7    on, though.  I like to recognize employees, and
8    unfortunately they sometimes act like they are paying for
9    these medals out of their own pockets.

10    *Q.*    Have you been involved in any new hire
11    interviews?

12    *A.*    Yes, actually.

13    *Q.*    Describe for me those new hire interviews that
14    you were involved in.

15    *A.*    So we were trying to hire a secretary.  I don't
16    want to mischaracterize it; an administrative assistant
17    out in District II.  And it was the first and only time
18    that -- and thankfully the only time -- that I've ever
19    been involved in that process.

20            But it's basically just kind of a here's the
21    job description.  You know, what's your background and
22    that kind of thing.  And then we submit our
23    recommendations up the chain.

24    *Q.*    And what were your recommendations with regards
25    to this administrative assistant that you were

1 | interviewing?

2 |     *A.*    That hopefully they decide to hire her as soon

3 | as possible because we desperately needed her help.  And

4 | she seemed very nice.

5 |     *Q.*    So your recommendation to the higher-ups was to

6 | hire this individual?

7 |     *A.*    Yes.

8 |     *Q.*    And that's the only time that you've been

9 | involved in interviews for a new hire?

10 |     *A.*    Yeah.  But -- yeah.

11 |     *Q.*    Have you been involved in any recommendations

12 | for any kind of disciplinary action for either sworn or

13 | unsworn personnel in District II?

14 |     *A.*    No.  We're not -- we don't have any kind of

15 | policy authority to recommend discipline.

16 |     *Q.*    Is the word "discipline" used with regards to

17 | providing feedback to subordinates?

18 |     *A.*    No, I wouldn't use the word "feedback."

19 | Discipline carries -- again, words have meaning in our

20 | world.  When you talk about discipline, we have the scale

21 | of disciplinary progression.  So if you get a reprimand

22 | for doing a no-no, the next no-no you do might mean days

23 | off.  So we have to be very measured in the way that we

24 | use the word "discipline" because it carries that meaning

25 | where it progresses the worse it gets.

1    A.   Yes.

2    Q.   I'm going to read the next sentence here out

3    loud.

4         "He disciplines and critiques when

5    appropriate and gives praise when rewarded or deserving."

6         Do you see that?

7    A.   Yes, ma'am.

8    Q.   Do you have any reason to dispute that that was

9    an entry that Captain Dietrich put into your Blue Team

10   Supervisor Notes?

11   A.   I have no reason to dispute that Captain

12   Dietrich made that entry.  And this was the direction I

13   figured we were going with this; I would dispute the usage

14   of word "discipline."

15   Q.   Okay.

16   A.   Only in the matter of context and how it was

17   used.

18   Q.   Would you agree that because he used the word

19   "discipline" and "critique" in his supervisor note that

20   reasonable minds could differ as to the interpretation of

21   the word "discipline"?

22   A.   Without the benefit of context, certainly.

23   Q.   Have you ever conducted training for your

24   subordinates?

25   A.   Sure.

1      Q.    How many times?

2      A.    Hard to put a number on that.  I mean, I had the

3  philosophy of briefing is an opportunity for training.  So

4  we would routinely, as you would hope, promote guys out of

5  specialty assignments, and they came with whatever skill

6  set that they gained throughout however many years they

7  were in that assignment.

8            I view it as this is your opportunity to pay

9  that experience forward to your troops and develop them

10  with that experience.  So I would challenge my sergeants

11  to make briefing meaningful.  Don't just sit there and

12  shoot the proverbial; sit down and have meaningful

13  discussions, take opportunities, and if I had experiences

14  that I could impart on them, I would.

15            And then in a more formal setting, I've

16  taught at the academy for years.

17      Q.    Let's talk about that.

18            When you said you taught at the academy,

19  you're talking about the police academy; correct?

20      A.    Yes, ma'am.

21      Q.    What have you done in teaching at the police

22  academy?

23      A.    Are you asking me which classes I've taught?

24      Q.    Yes.

25      A.    I've been one of the primary instructors for

1    intro and substantive criminal law for many years.  I have
2    taught interview and questioning for many years.  Next
3    week, I think I'm teaching death investigations.  And then
4    a few weeks after that, again.  So those are the main
5    ones, I would say, that I've taught since Academy 138, and
6    we're on 168 now.
7        Q.    Have you taught law and legal?
8        A.    So is that law school parlance?  Because we just
9    do Title 13.  That's what I teach.  I don't really go into
10   the constitutional law or anything like that.  That is a
11   different class, certainly, but I don't teach that
12   specific class.
13       Q.    Well, take a look at -- this is Exhibit 8.
14       A.    Still in the same --
15       Q.    Exhibit 8, 17458.
16       A.    Okay.
17       Q.    And mid page where it says Summary.
18       A.    Okay.
19       Q.    That first full paragraph, I want you to look --
20   one, two, three, four -- five lines down, middle of the
21   page says "earlier this week."
22             Do you see that?
23       A.    Yes, ma'am.
24       Q.    "Earlier this week, Lieutenant Neville was
25   called upon to fill in for instructor that could not teach

1    law and legal for the deputy recruit academy."

2              Do you see that?

3    A.    Yes.

4    Q.    Did you, in fact, teach a class titled or

5    loosely titled "Law and Legal" for the deputy recruit

6    academy?

7    A.    No.  I would chalk it up to the author just

8    using words interchangeably.  It was more than likely

9    their intro or substantive criminal law.

10   Q.    Turn next to page 17460.

11   A.    460?

12   Q.    460.  Bottom of the page under where it says

13   Summary, there's another reference here at the bottom

14   where it says Summary.  We're going to go three lines down

15   at the far right --

16   A.    I'm sorry.  Page number one more time.

17   Q.    17460.

18   A.    I'm sorry.  Misheard you there.

19   Q.    You're fine.  Take your time.

20   A.    Okay.

21   Q.    Bottom where it says Summary.

22   A.    Uh-huh.

23   Q.    And we're going to go -- one, two -- three lines

24   down, far right of the page where it says "for the last

25   two weeks."

1              Do you see that?

2        A.    Yes, ma'am.

3        Q.    "For the last two weeks, Lieutenant Neville

4   assisted MCSO training staff with teaching law and legal

5   to the academy classes."

6              Do you see that?

7        A.    Yes.

8        Q.    So that's another reference to you teaching at

9   the academy; correct?

10       A.    Yes, ma'am.

11       Q.    I understand that you're stating that the phrase

12  "law and legal" might be incorrect, but you did, in fact,

13  teach at the academy for at least a couple of weeks during

14  that time frame; correct?

15       A.    Yes, ma'am.

16       Q.    And how many classes approximately do you

17  believe you've taught at the academy?

18       A.    Each class comes up with a patch design for

19  their academy class.  And I've got patches going all the

20  way back to Class 137, and they are currently on

21  Class 168.  So 30, 31 classes.

22       Q.    Approximately how many classes are there a year?

23       A.    We try to shoot for two.

24       Q.    So have you been teaching classes at the academy

25  for roughly 15 years?

1      A.    Sounds reasonable, yes.

2      Q.    And about how many classes do you teach at a

3  given time?

4      A.    So I guess -- can you give me a little bit more

5  clarity on that question?  Because we -- like, I'm only in

6  there for one class; right?  Like obviously I can't be two

7  places at once.

8            Are you asking me, like, in a given academy

9  class, so like let's take Class 168 for instance, how many

10  classes I'm teaching for that academy class?

11      Q.    Yeah.  So, for example, let's just take the

12  example of college.  With college, you might take four

13  classes, 12 credits.  That would be four classes in a

14  semester.

15            With the academy, my assumption is that

16  there are different modules or different types of subjects

17  that are covered at different times, and that there are

18  likely different instructors that cover different topics

19  within the academy.

20            Is my assumption correct?

21      A.    Correct.

22      Q.    So how many different modules or classes or

23  subjects would you teach in a given class out of the 31

24  classes?

25      A.    At my height, three.  If you figure intro to

1  criminal law, substantive criminal law, and interview and
2  questioning.
3      Q.   There we go.
4      A.   And then, currently, I've kind of taken a little
5  bit of a step back because that -- substantive criminal
6  law is a five-day affair.  So I've taken a little bit of a
7  step back and let that go to some of the younger kids to
8  work on that so I can focus on my work a little bit
9  closer.
10     Q.   That's was my next question.
11          About how long were each of these?  So
12  substantive law was a five-day course?
13     A.   It's a long one.
14     Q.   How about the intro?
15     A.   Into is like a half day.  That's just you're
16  going through all the stuff leading up to Chapter 10 in
17  Title 13.
18     Q.   And how about the interviewing course?  How long
19  was that?
20     A.   A day and a half.
21     Q.   Have you taken on any special projects for
22  chiefs?
23     A.   Not for chiefs directly, but I've been delegated
24  tasks by captains, certainly.
25     Q.   What special projects have you been delegated by

DEPOSITION OF RYAN NEVILLE; 04/17/2025

1  captains?

2      A.   So we discussed when this was all happening, we

3  were building a brand new district facility in Avondale.

4  One of the tasks that was delegated to me was building out

5  our gym, our weight room area.  So that was one task that

6  I took on.

7      Q.   Were you also tasked with building out a

8  memorial?

9      A.   Yes.  Yeah, we were.  Still has not gotten done

10 yet, unfortunately.  That turned out to be a little bit

11 more complex.

12     Q.   What specifically were you tasked with with

13 regards to the gym and the memorial?

14     A.   For the gym, it was finding and sourcing the gym

15 equipment necessary to fill the 35-by-30-foot space, and

16 then getting it built and ready to go for the ribbon

17 cutting.

18          And the memorial was a little bit different.

19 We had a huge granite tablet with fallen deputies' names

20 inscribed on it in front of our old building that we

21 needed to extricate from the ground and somehow get to our

22 new building.

23          And then step 2 of that was figuring out how

24 to mount that to a wall.  And it was -- again, not done

25 yet, so it's still -- somebody hopefully has taken up that

1    mantle since my transfer.

2        Q.    With regards to the new build and these two

3    projects -- the memorial and the gym -- were you

4    exercising any discretion or independent judgment with

5    regards to those tasks?

6        A.    So building the gym was my first true experience

7    with understanding the bureaucratic rules because I had

8    all kinds of ideas as far as what to do and what I could

9    do and spent a great deal of time cultivating a source for

10   the equipment who was able to meet all of our needs.

11              Came in at right around $65,000 and said he

12   would mock everything up for us in digital mockups and

13   then come out and build everything for us to spec and then

14   even set up a table with swag bags for all the deputies

15   for the ribbon cutting when we opened the building.

16              Then I found out that you can't do that

17   because they are not an approved County vendor.  You have

18   to go through this person and that person.  And I don't

19   have the authority to go outside of those established

20   protocols.

21       Q.    Are you essentially referring to the RFP process

22   where you have individuals bid to be on an approved list,

23   and you can select from the approved list?

24       A.    Yeah, if that's what it's called.  I mean, I

25   just deal with -- I've learned a lot about approved County

1  vendors and bidding and all the rest of that.  But, yeah.

2      Q.    Did you have an understanding or familiarity

3  with being able to select from a list of approved vendors?

4      A.    Certainly not at the time.

5      Q.    Did you at any point during this process?

6      A.    Well, yeah.  Oh, I learned real quickly when I

7  talked to procurement.

8      Q.    Were you able to select a vendor off of the

9  approved list after talking with procurement?

10     A.    No.  They said "you will be using these people."

11     Q.    Were you allowed to select the equipment?

12     A.    From their catalog, yeah.  I mean, we didn't

13 have a budget to work with.  It was -- what did the CFO

14 call it?  Above base or something like that.  And it was

15 submit your proposal, and then it has to go up the chain.

16 Captain looks at mine, he rubber stamps it; sends it to

17 the chief who stamps it; theoretically executive chief and

18 eventually to CFO and sheriff; right?  So that was the

19 process.

20     Q.    So once you identified a vendor on the approved

21 list, were you able to go through the catalog and put

22 together your recommendations for what equipment should be

23 in the gym?

24     A.    Yes.

25             MS. SYVERSON:  Object.  Sorry.

DEPOSITION OF RYAN NEVILLE; 04/11/2025

1   BY MS. SANTIAGO:

2       *Q.*    Did you, in fact, do that?

3       *A.*    I did, yes.

4       *Q.*    And were those recommendations accepted?

5       *A.*    They were, yeah.  And it was the same process,

6   like when we built our training center gym that Deputy

7   Bria, when he built out that gym, he was delegated that

8   project.  It was the exact same process for him.

9       *Q.*    How long did that process take you?

10      *A.*    Man, it was a nightmare.  Not a huge fan of that

11  County vendor.  And instead of being able to source it

12  from one location and get it $10,000 cheaper, we had to

13  source it from Minneapolis who sourced it from all over

14  the world, so it took forever to get everything in.

15              Like at one point, I had to leave the old

16  building and go to the new building because, quote, a

17  delivery came that was two 70-pound dumbbells in

18  individual boxes.  And I thought to myself:  I ordered

19  these all the way up to 100 and is this what I can come to

20  expect for the next three months?

21      *Q.*    How long overall in matter of months did the

22  project take you to complete?

23      *A.*    I mean, best estimate, probably seven.

24      *Q.*    Seven months approximately?

25      *A.*    Yeah.  It was not fun.

1      Q.    When you worked out of District II, how long was

2  your commute to and from work from your home?

3      A.    It's about 25-ish minutes given traffic

4  conditions.

5      Q.    And when you worked in District II, did you have

6  an office?

7      A.    So the old building, no.  New building, yes.

8  The old building, you have to remember, was put in a

9  service in, like, 1974.  And they didn't obviously have as

10  many people assigned out in that area back then, so

11  offices were at a premium.  I shared an office with the

12  sergeants.  It was the sergeant/watch commander office.

13      Q.    When did the move take place to the new

14  facility?

15      A.    I can't remember precisely what day it was on.

16  But it would be fair to say it was literally right before

17  we lost Captain Dietrich and got Captain Hilliker.

18  Because we were joking with Joe D that he had worked all

19  this time to bring the building to ribbon cutting, and he

20  didn't even get to get his name on the board next to his

21  office.

22      Q.    Do you remember the address of the old facility?

23      A.    Of the old building?

24      Q.    Of the old District II location.

25      A.    Man, I'm going to feel really bad if I don't

 1  know.

 2       Q.    Well, at least the crossroads.

 3       A.    Dysart and Van Buren.  Now 920 East Van Buren.

 4  You're going to make me feel terrible.  I cut my teeth out

 5  there; I can't not remember that.

 6       Q.    And what's the new address?

 7       A.    695 North 105th Avenue.

 8       Q.    Was your commute to your house to the old versus

 9  the new facility about the?

10       A.    Marginally shorter.  Like, we're talking maybe

11  by one or two minutes because -- it's like the difference

12  between Dysart and 107th; it's negligible.

13       Q.    So when you were in the old facility, you said

14  that you shared an office with the sergeants; correct?

15       A.    Yeah.

16       Q.    And walk me through what a typical day would be

17  like in leaving, getting into your vehicle, logging into

18  CAD, driving, whether it's to the office or somewhere on

19  scene.

20       A.    Can we actually take five?  I have to use the

21  bathroom.

22             MS. SANTIAGO:  Absolutely.

23             THE VIDEOGRAPHER:  Off the record at 11:49.

24             (WHEREUPON, a brief recess was taken from

25         11:49 a.m. to 11:55 a.m.)

1    done in that, you know, towards the end of the second week
2    of the month, and then performance notes at the end of the
3    month.

4          So I would plan accordingly so I didn't get
5    deficient in my Blue Teams and get a nastygram from those
6    folks.  If I had an EPA to work on, then I knew I was
7    going to be in the office for a little while that week to
8    get that EPA done.

9          But also, more often than not, there would
10   be something cooking that we would have to respond to or
11   something like that.  So in as much as I want to make it
12   to the district, I'd also go to calls that were active
13   that needed watch commander attention.

14         Because you usually -- as soon as you log
15   in, if something is going on and they need watch commander
16   out there, radio is going to immediately say, hey, do you
17   copy that traffic in District II, District III, wherever
18   it is, look it up on the board and head that way.

19   Q.    How long was your shift?

20   A.    My shift?  Well --

21   Q.    Scheduled for.

22   A.    It's ten hours scheduled for.  But seldom.

23   Q.    So during your ten-hour scheduled shift, carving
24   out about an hour for drive time back and forth, if we
25   take the remaining nine hours, how much would you say was

1  spent physically in your office versus physically on scene
2  somewhere?
3      A.    There's no real clear regularity that you can
4  apply to that.  It all is dictated on what's going on.
5  It's the same way as any patrol deputy or sergeant.  You
6  know, the better comparison would be me to a sergeant.
7  Like, I can't compare myself to a deputy working assigned
8  to a beat.
9            But a patrol sergeant has a lot more overlap
10  in job description.  You might find time where it's just
11  complete famine, and you have all the admin time in the
12  world to get your admin stuff done.  Or you might come in
13  and it's -- everything has completely gone pear-shaped,
14  and the whole district is falling apart and you're out and
15  about the entire shift.
16      Q.    On -- if we were to average it over a week,
17  which I understand to be about four shifts; correct?
18      A.    Yes.
19      Q.    Over about four shifts, how much of the time do
20  you think you would spend in your office versus out in the
21  field?
22      A.    Again, I don't want to -- I can't -- it's not
23  that I don't want to; I can't give you any kind of
24  definitive number of admin time versus patrol time.  I can
25  just say there's an ebb and flow.

DEPOSITION OF RYAN NEVILLE, 04/17/2025

1          The district has its own heartbeat and life

2   cycle.  And Wednesdays and Thursdays are generally fairly

3   easy and kicked back.  Doesn't mean that the world can't

4   come to a complete end on a Thursday afternoon for some

5   reason, but you get into Friday and Saturday, and that's

6   when everything comes uncorked and falls apart at the

7   seams, and you're out there trying to put it all back

8   together.

9          So it's hard for me to give you a number

10  that has any kind of statistical value to it because

11  it's -- it's like we have the pet peeve of "he was on a

12  routine traffic stop."  There is no such thing.  There is

13  no such thing.  So to say "on an average shift," no such

14  thing of those either.

15  Q.    If we take a two-week pay period of 80 hours --

16  that's what's scheduled -- can you give me an estimation

17  as to how many of those 80 hours might be spent in the

18  office versus out the field?

19  A.    I can only tell you what I do, and that is, I

20  try to spend my first couple three hours in the office

21  knocking down my admin stuff; go through my inbox, get my

22  Blue Teams taken care of, deal with whatever

23  administrative concerns need to be dealt with.  And then I

24  try to get my butt out on the street and go lead my

25  troops.

1          So if you want to nail down an estimate, two

2    to three hours a day of office time; the rest of the time

3    I try to be wearing a uniform for a reason.

4        Q.    So then when you -- to use your words -- are out

5    on the street, what does that typically entail?

6        A.    If it's something that requires the attention of

7    the watch commander, like a major incident where a lot of

8    units are tied up on, that resources need to be

9    coordinated, I respond to that.

10          If I just happen to notice that the guys are

11   getting hammered with calls and there's a bunch of noise

12   complaints or barking dog calls or neighbor disputes that

13   are anodyne, I respond to those and knock those off the

14   board for them so they don't have to worry about it.

15       Q.    Walk me through what your responsibilities are

16   if a watch commander is needed for calls.

17       A.    So, I mean, we talked about it.  It's in the

18   sense of a shooting, deputy-involved or regardless, my

19   policy internally has always been if a gun gets fired in a

20   district that I'm a commander of, I'm going.  I'm going to

21   show up whether we do the shooting or whether somebody

22   else does the shooting.

23          And it's for that reason.  It's because

24   we're need -- potentially detectives are going to be

25   coming out, we're potentially going to be launching an

DEPOSITION OF RYAN NEVILLE; 04/17/2025

1   witness statements so that when SWAT does show up, you can

2   at least provide them with as much information as they can

3   possibly get.  Or when detectives get called out to it

4   having a detective background, I understand that

5   information is power in that circumstance.

6              So I have gone out -- because, again, we're

7   limited on manpower.  I hate to keep hitting that

8   particular nail, but it just is what it is.  So when I've

9   got -- if this is my target area and I four-pointed it and

10  I've got four guys, I ideally don't want to be holding a

11  rifle.

12             I've done it.  You know, I've pointed the

13  rifle at the location plenty of times waiting for SWAT to

14  show up because we were short-handed.  But ideally you

15  don't want to be that guy because you've got to be able to

16  go from point A to point B to Point C to Point D, and you

17  have to be able to take those witness statements.

18             Because ultimately I'm generally going to be

19  the one calling the SWAT team and saying this is what we

20  got, they are pretty sure nobody else is in the house or

21  whatever the situation is.  So, yes.  If we're going to

22  categorize that under investigation, yes.

23  Q.    During your time in District II as a lieutenant,

24  can you give me an approximate number of how many times

25  you've performed surveillance?

1    *A.*    Honestly, I couldn't.  It's not been that many.

2    But, you know, there have been plenty of times where we've

3    had to sit there and wait on a 9-1-1 hang-up that looked

4    like it was going to go south, and we just kind of waited

5    and watched for a little bit until more resources showed

6    up.  I couldn't give you a number, though.

7    *Q.*    Less than ten --

8    *A.*    Probably.

9    *Q.*    -- during time in District II as a lieutenant?

10   *A.*    Probably.

11   *Q.*    How about pursuing, restraining, or apprehending

12   suspects during your time as a lieutenant in District II?

13   *A.*    Not often, but I got a real funny story after

14   this.

15   *Q.*    Can you give me -- is it less than ten?

16   *A.*    Oh, yeah.  Yeah, probably.  But again, its --

17   you know, you're doing a lot of moving around and

18   responding to a lot of different stuff.  By the time I get

19   there, if I'm dealing with something up in District III --

20   I keep pointing and I don't even know if that's north

21   honestly.

22            If I'm coming from the northwest district

23   and then something jumps off that I have to respond to in

24   District II, I've got a 45-minute drive time.  So by that

25   time, all the apprehensions hopefully are done.

DEPOSITION OF RYAN NEVILLE, 04/17/2025

1    *Q.*    How about interviewing witnesses in your time in

2    District II as a lieutenant?

3    *A.*    That just comes down to being short-handed,

4    using the resources that you have available.  So, yes,

5    I've done interviews.  Certainly not to the level that a

6    deputy would be expected to do, but I would put in on par

7    with a sergeant.

8    *Q.*    Do you think ten or less as a lieutenant in

9    District II?

10    *A.*    I'd say probably more than ten.  I'd say

11    definitely more than ten.  I mean, if we're going to talk

12    about gathering information, intel, for a barricade, that

13    puts it over ten in and of itself.  And I've responded and

14    even taken primary on DVs.  So, yeah, I would definitely

15    say more than ten.

16    *Q.*    Can you give me a best ballpark estimate?

17    *A.*    Best, probably anywhere from ten to 50.

18    Let's -- I know that's a broad range, but ...

19    *Q.*    How about interrogating and fingerprinting

20    suspects?

21    *A.*    Not fingerprinting.  I've never really

22    fingerprinted people even as a detective.  We have people

23    for that.

24    *Q.*    How about interrogating?

25    *A.*    Yes.

1    Q.    How many approximately during your time as

2    lieutenant in District II?

3    A.    Okay.  Because, again, we go back to words have

4    meaning.  Interrogating is when I'm questioning somebody

5    directly about a crime that I think that they have

6    committed.  So I would say it's probably less than your

7    garden variety interviewing of witnesses and so on and so

8    forth, but I'd put it at more than ten, probably less than

9    30.

10    Q.    How many investigative reports did you prepare,

11    let's take as a primary first, as a lieutenant in

12    District II?

13    A.    I mean, if I can look at --

14    Q.    Absolutely.

15    A.    -- number one, by year as a primary, I took 37

16    in '21, 44 in '22, and 3 in '23.  That's calls for

17    service.  And of those, took two reports as a primary; one

18    in '22, and then another two in '23.

19    Q.    And how about as a secondary?

20    A.    Oh, I mean --

21    Q.    Or supplemental.  Sorry.

22    A.    Supplemental, looks like one in '22 and one in

23    '23 again.  I don't see an entry, so I'm assuming that

24    would be a zero in '21.

25    Q.    So I don't have it in front of me, but if my

1   notes here are correct, is that less than ten

2   investigative reports while --

3       *A.*   On average --

4       *Q.*   -- while you were in District II as a

5   lieutenant?

6       *A.*   Yeah.  I mean, I'm fine with that.  Yeah.

7   Certainly.

8               But I would think if you compare those same

9   notes with my patrol sergeant numbers, probably going to

10  be close to the same.

11      *Q.*   But lower than sheriff deputy officers that are

12  doing patrol?

13      *A.*   Oh, significantly, yes.

14      *Q.*   How about, do you prevent, control, or

15  distinguish fires?

16      *A.*   I have, yes.

17      *Q.*   How many?

18      *A.*   Not too many, thankfully, because fires -- you

19  can't really wrestle a fire in handcuffs, so I'm a little

20  worried about fire sometimes.

21      *Q.*   How many as a lieutenant in District II?

22      *A.*   As a lieutenant, I think I successfully helped

23  with one, and then unsuccessfully helped with a second,

24  so ...

25      *Q.*   So two total in District II as a lieutenant?

1       *A.*     Yeah.

2       *Q.*     How about rescuing fire, crime, or accident

3    victims?

4       *A.*     One more time with that, please.

5       *Q.*     Rescuing fire, crime, or accident victims.

6       *A.*     Thankfully never in my career have I had to

7    charge into a burning building to rescue anybody.  Not to

8    say I wouldn't be prepared to do it, I just -- that scares

9    the crap out of me.

10              But, yeah, I mean there have been, probably

11   minimum, half a dozen instances where I responded to

12   something early enough and emergent enough to actively

13   play a role in preserving somebody's safety.

14      *Q.*     And is that with regards to either fire, crime,

15   or accident victims?

16      *A.*     Yes.

17      *Q.*     And that's been half dozen while you were at

18   District II as a lieutenant?

19      *A.*     Yes.

20      *Q.*     How many times would you say that you personally

21   prevented or detected crimes during your time at

22   District II as a lieutenant?

23      *A.*     Same.  Half a dozen times.  Like I said, I like

24   to be out there on the road, so ...

25      *Q.*     And how many investigations or inspections for

DEPOSITION OF RYAN NEVILLE, 04/11/2025

1  violations of law would you say that you conducted in

2  District II as a lieutenant?

3      A.    The only thing I can really go off of there is

4  when you start looking at the Dispositions by Year column,

5  when you see the numbers of supervisor duties, 61, 62, 10,

6  that's me on a call assisting with that call and just

7  dispo-ing it as a 4 Sam Paul.

8              I know time is limited, but we have dispo

9  codes for everybody; right?  If I'm taking the primary in

10  it on a criminal matter, it's dispo'd as a number 6.  If

11  I'm writing a supplement, it's dispo'd as -- in a criminal

12  matter, it is a 6 Sam.  If I'm responding as a -- just a

13  backup unit, it's a 4.  Like, if I don't take any paper or

14  anything like that, but I provided material support to the

15  call for service, it's a 4.  But since I am a supervisor,

16  since I am a commander, it's a Sam Paul.

17              So every time you see those 63, 62, whatever

18  it is, that's me on a call backing up an officer, taking a

19  conversation with a witness or victim, what have you.

20  Doing an interview, you know, setting up a perimeter,

21  whatever the case might be.  Filling out a tow sheet.

22      Q.    Okay.  I know that you contend that lieutenants

23  are misclassified or entitled to overtime.  What's your

24  opinion on captains?

25      A.    I think they are misclassified too.

1    *Q.*    How about chiefs?

2    *A.*    Nah.  Like I said, I've worked for some very

3    extraordinary captains, and Joe Dietrich is one of those

4    kind of guys.  He wants to be out with his troops.  He's a

5    very engaged leader.

6                  And none of us have the ability to dictate

7    policy, hire and fire, make decisions in a vacuum or any

8    of the other executive or administrative -- the

9    administrative stuff, you know, somebody is going to have

10   to explain all of the police work that I did during my

11   supposed administrative tenure in District II.  So -- and

12   it's the same with Joe D, so ...

13                  (Deposition Exhibit Nos. 9, 10, and 11 were

14          marked for identification by the reporter.)

15   BY MS. SANTIAGO:

16   *Q.*    All right.  You've been handed Exhibits 9, 10,

17   and 11 to your deposition.  I'll run through these pretty

18   quickly.

19                  Do you recognize the documents that have

20   been introduced as Exhibit 9 to your deposition at

21   Houck 175 through 179?

22   *A.*    Yes.

23   *Q.*    What is that document?

24   *A.*    It is the job description for a law enforcement

25   lieutenant according to Maricopa County.

 1      Q.    Have you reviewed that document prior to today's

 2   deposition?

 3      A.    Yeah.  A long time prior.

 4      Q.    Do you have any reason to doubt the authenticity

 5   of the document at Exhibit 9 to your deposition?

 6      A.    You're asking me if I have any reason to believe

 7   that this isn't an accurate description as to what

 8   Maricopa County believes to be a job description of a

 9   lieutenant?

10      Q.    Yes.

11      A.    No, I have no reason to believe otherwise.

12      Q.    Next question is:  Do you disagree with any of

13   the essential job tasks that are set forth in this job

14   description?

15      A.    I'm really kind of unable to effectively answer

16   that without having the ability to review it because, like

17   I said, when I did review this, it was several years ago.

18      Q.    Go ahead and review it.

19      A.    Okay.

20            MS. SYVERSON:  Can I have Exhibit 11?

21            MS. SANTIAGO:  Oh, yeah.

22            THE WITNESS:  The only position I would take

23   is that this might be the County's position as to what the

24   job requirements or job description are of a lieutenant,

25   but there is significantly more that is asked of

1  lieutenants on a daily basis that is over and above what

2  is reflected here.

3  BY MS. SANTIAGO:

4      *Q.*    Understood.

5              And I want to take those one at a time.

6              So my first question is:  Is there anything

7  on this job description, Exhibit 9 to your deposition,

8  that you contend you don't do?

9      *A.*    No.

10     *Q.*    Next question:  It sounds like you're contending

11 that there are job duties that are not on the job

12 description that you do; is that correct?

13     *A.*    Yes.

14     *Q.*    Outline for me what those additional job duties

15 are that you feel are not reflected on the job

16 description.

17     *A.*    Well, as I said, every leader that I've worked

18 for since promoting to lieutenant has basically the same

19 leadership philosophy.  And that is, is that you are

20 expected to be out there amongst the troops working with

21 the troops.  Granted, you're a lieutenant, and in many

22 cases your job role is different, obviously, than a --

23 certainly than a deputy and even a sergeant.

24             But there is overlap where the sergeants'

25 roles are concerned where we are responsible to respond to

1    these -- like, you look at a lot of the command and

2    supervision stuff, and it doesn't really -- it talks about

3    operational readiness and maintenance like I'm changing

4    cars on tires and doing weapons inspections.  But in

5    reality, when we are supervising, we are actively

6    supervising.  The two sergeants over the course of a

7    5250-square-mile district can only be in two different

8    places.

9                   So when we are talking about a district that

10   is bigger than the rest of the entire county, there's

11   going to be some issues there where holes need to be

12   plugged, and I end up going to those calls on a regular

13   basis.

14       Q.    With regards to supervision, since you've

15   brought that up, when you supervise your troops, are you

16   always on scene with them, or are you sometimes

17   supervising from your office or from home via telephone or

18   text?

19       A.    No.  Same as a sergeant in those cases.  Yeah,

20   there's certainly instances where we're talking over the

21   phone or talking over the phone from an office from home

22   or even en route to another call that I'm actively

23   responding to.

24       Q.    What percentage of the scenes that you are

25   supervising would you say you physically go to versus you

1          THE VIDEOGRAPHER:  This concludes today's

2    deposition off the record at 12:36.

3

4          (WHEREUPON, this deposition concluded at

5    12:36 p.m.)

6

7

8                          _____

9                          RYAN NEVILLE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF ARIZONA    )
                         )  ss.
2   COUNTY OF MARICOPA  )

3

4          BE IT KNOWN that the foregoing proceedings were
    taken by me, MICHAELA HERMAN DAVIS, a Certified Reporter,
5   in and for the County of Maricopa, State of Arizona; that
    the witness before testifying was duly sworn to testify to
6   the whole truth; that the questions propounded to the
    witness and the answers of the witness thereto were taken
7   down by me in shorthand and thereafter reduced to
    typewriting under my direction; that the foregoing pages
8   are a true and correct transcript of all proceedings had,
    all done to the best of my skill and ability.

9

10         I CERTIFY that I am in no way related to any of
    the parties hereto, nor am I in any way interested in the
    outcome hereof.

11

12              [X] Review and signature was requested.
                [ ] Review and signature was not requested.
13              [ ] Review and signature was waived.

14         I FURTHER CERTIFY that I have complied with the
    ethical obligations set forth in ACJA 7-206(F)(3) and
15  ACJA 7-206(J)(1)(g)(1) and (2). Dated at Phoenix, Arizona,
    this 28th day of April, 2025.

16

17                          

18  _____
                  Michaela H. Davis, RPR, CRR, CRC
19                     Arizona CR No. 50574
                       New Mexico CCR No. 614

20

21         I CERTIFY that Carrie Reporting, LLC, has
    complied with the ethical obligations set forth in
22  ACJA 7-206.  Dated at Phoenix, Arizona, this 30th day of
    April, 2025.

23

24  _____
                     Carrie Reporting, LLC
25                   Arizona RRF No. R1064