# EXHIBIT 26

# FAIR LABOR STANDARDS ACT (FLSA)
# EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 07/26/2021 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

**Employee ID:** ▮▮▮▮▮     **Position #:** 69605     | **Name** (Last, First): Neville, Ryan

**Market Range Title:** Law Enforcement Lieutenant     | **Working Title:** Law Enforcement Lieutenant

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____     _____
Employee Signature                        Date

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____     _____7/13/21_____
Employee Signature                        Date

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

Gertrude T. Jackson    _Gertrude Jackson_    _7/13/2021_
Supervisor Name (print)    Supervisor Signature    Date
for MCSO HR

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

CONFIDENTIAL

MCC 003018

# EXHIBIT 27

# FILED

# UNDER

# SEAL

# EXHIBIT 28

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF ARIZONA

3
   Christopher J. Houck, on        )
4  behalf of himself and all       )
   those similarly situated,       )
5                                  )
        Plaintiff,                 )  No. 2:23-cv-00068-DGC
6                                  )
   vs.                             )
7                                  )
   Maricopa County,                )
8                                  )
        Defendant.                 )
9  _____)

10

11

12

13      VIDEOTAPED DEPOSITION OF ALDEN JAMAAL JACKSON

14

15            Phoenix, Arizona
              April 15, 2025
16             1:35 p.m.

17

18

19

20
   CERTIFIED COPY
21

22

23 Reported by:                    CARRIE REPORTING, LLC
   CARRIE A. CARIATI               Certified Reporters
24 Certified Professional Reporter 17505 North 79th Avenue
   Certified Realtime Reporter     Suite 301-C
25 Arizona CR No. 50355            Glendale, Arizona 85308
   carrie@carriereporting.com      (480)429-7573

*DEPOSITION OF ALDEN JAMAAL JACKSON, 04/15/2025*

```
 1              VIDEOTAPED DEPOSITION OF ALDEN JAMAAL JACKSON

 2   was taken on April 15, 2025, commencing at 1:35 p.m. at

 3   the law offices of Fisher & Phillips, LLP, 3200 North

 4   Central Avenue, Suite 1550, Phoenix, Arizona, before

 5   CARRIE A. CARIATI, RPR, CRR, a Certified Reporter in the

 6   State of Arizona.

 7

 8   COUNSEL APPEARING:

 9   For the Plaintiff:

10        Frankel Syverson, PLLC
          By:  PATRICIA N. SYVERSON
11        9655 Granite Ridge Drive
          Suite 200
12        San Diego, California   92123
          patti@frankelsyverson.com
13
     For the Defendant:
14
          Fisher & Phillips, LLP
15        By:  SHAYNA BALCH SANTIAGO
               JACOB R. VALDEZ
16        3200 North Central Avenue
          Suite 1550
17        Phoenix, Arizona  85012
          ssantiago@fisherphillips.com
18

19

20
     Also present:  Cedric Tinard, videographer
21                  Megan Morley (via videoconference)

22

23

24

25
```

1  in District 2.

2      *Q.*   And how long were you in that position for?

3      *A.*   For a little over a year.

4      *Q.*   Do you recall the dates that you worked in

5  District 2 as a lieutenant?

6      *A.*   It would have been from November of 2022 until I

7  believe January of 2024, or something like that.

8      *Q.*   And November of 2022 was when you were promoted

9  from sergeant to lieutenant; is that correct?

10      *A.*   Yes, ma'am.

11      *Q.*   And does -- and you were promoted on

12  November 28, 2022.  Does that sound correct?

13      *A.*   No, ma'am.

14      *Q.*   What was the date that you were promoted?

15      *A.*   I was promoted on November 17th.

16      *Q.*   November 17th, okay.  And that was your

17  promotion from sergeant to lieutenant, correct?

18      *A.*   Yes, ma'am.

19      *Q.*   So following your promotion from sergeant to

20  lieutenant, you were a lieutenant in District 2 until

21  approximately January of 2024, correct?

22      *A.*   Correct.

23      *Q.*   Who was your supervisor during that type period?

24      *A.*   Phil Hilliker.

25      *Q.*   And he was your captain, correct?

1      A.    Yes, ma'am.

2      Q.    Did you have any other captains that you

3  reported to during that time period in District 2?

4      A.    No, ma'am.

5      Q.    When you then transferred to major crimes for

6  approximately five months, can you give me the approximate

7  date range for that?

8      A.    It would have been January to May-ish.

9      Q.    Of 2024, correct?

10     A.    Yes, ma'am.

11     Q.    And who did you report to in major crimes?

12     A.    Captain Frederick Aldorasi.

13     Q.    You then moved to the investigations bureau,

14  correct?

15     A.    Major crimes is part of the investigations

16  bureau.

17     Q.    You then moved to general crimes, correct?

18     A.    Correct.

19     Q.    And what dates were you in general crimes,

20  approximately?

21     A.    From May until December.

22     Q.    Of 2024, correct?

23     A.    Yes, ma'am.

24     Q.    Who did you report to in general crimes during

25  that time period?

1    A.    Initially it was still Captain Aldorasi, and

2    then it was John Bailey, who is also a captain, and then

3    Phil Hilliker.

4    Q.    And you have already testified that both major

5    crimes and general crimes are both in the investigations

6    bureau, correct?

7    A.    Yes.

8    Q.    And major crimes, general crimes, in the

9    investigation bureau are not within patrol bureaus east or

10   west, correct?

11   A.    Correct.

12   Q.    Following your time in general crimes, you then

13   moved to Lake Patrol for approximately two months,

14   correct?

15   A.    Correct.

16   Q.    What was the approximate date range for that

17   time in Lake Patrol?

18   A.    I don't remember the exact dates.  It would have

19   been -- yeah, I don't remember the exact dates, but --

20   Q.    Late 2024, early 2025?

21   A.    Yeah, I was definitely there during -- during

22   the holiday season.  So during Christmas and New Years, I

23   was in Lake Patrol already.

24   Q.    And who did you report to in Lake Patrol?

25   A.    Captain Dave Lee.

1    Q.    And in around -- around March 3, 2025, is when
2    you moved to become the homicide unit commander, correct?
3    A.    Correct.
4    Q.    Okay.  So during today's deposition I am going
5    to be asking you questions about your time in District 2,
6    also your time in Lake Patrol.
7    A.    Okay.
8              (Deposition Exhibit No. 4 was marked for
9    identification by the reporter.)
10   BY MS. SANTIAGO:
11   Q.    All right.  A.J., you have been handed what has
12   been marked as Exhibit 4 to your deposition.  This is a
13   calendar for 2022.  Prior to this last line of
14   questioning, I was asking you about Exhibits 3 and 1 to
15   your deposition, specifically how we could arrive at the
16   number 35.25 for December of 2022.
17             Now that you have the calendar in front of
18   you, can you walk me through how I can arrive at 35.25
19   under "'Reg No Pay' on Stub" on Exhibit 1?
20   A.    Yes, ma'am.  So you would have to look at the
21   Wednesday, Thursday, Friday, Saturday days, and anything
22   over 10 hours for each day is how you would have to -- you
23   would have to add those numbers to arrive at that.
24   Q.    Can you help me do the math on that and walk me
25   through how we actually arrive at that number?

1          Any minor stuff that needs to be done --

2     that needed to be done before, quote, unquote, close of

3     business, because as a watch commander we started later in

4     the day, so for the people that worked day shift we had to

5     catch them just as we were starting and they were ending.

6          And from there, we respond to calls as

7     needed, traffic enforcement, made sure all my personal

8     admin stuff was done, you know, supervisor notes, BlueTeam

9     stuff, anything like that, and then the day would just

10    evolve as it did depending on radio traffic and that kind

11    of thing.

12    Q.    As a lieutenant in District 2, were you issued

13    an unmarked vehicle that you could take home?

14    A.    I was.

15    Q.    And what were the crossroads of the building in

16    District 2 that you worked out of?

17    A.    I guess the major cross streets would be 107th

18    Avenue and Van Buren.

19    Q.    And I understand that you testified that you

20    lived in District 2.  Approximately how long was your

21    commute if you were to drive directly from your personal

22    residence to the District 2 building that you worked out

23    of?

24    A.    Approximately, I don't know, 15 minutes maybe,

25    if that.

1    Q.    Would you typically -- strike that.

2              So you would be dressed, ready, in your

3    uniform, you would get into your unmarked vehicle at your

4    home, get into your vehicle, log into CAD, and then start

5    driving?

6    A.    Correct.

7    Q.    And was the reverse true that when you were

8    finishing your shift that you would stay logged into CAD

9    until you arrived back home, at which point you would log

10   out of the CAD system?

11   A.    Yes, ma'am.

12   Q.    When you would start your day, would you

13   typically drive to the District 2 building to start your

14   day?

15   A.    If needed.  There was times where I didn't have

16   to go there and I would go to calls, or there was times,

17   you know, a hot tone would come out or I wouldn't make it

18   to the district before I had to respond to something else.

19   So once my day was started then I was working, so I didn't

20   always have to respond to the district.

21   Q.    So let me back up here a little bit.

22              District 2, did you have a personal office

23   in District 2?

24   A.    I did.

25   Q.    Did you share that office with anyone or was it

1    your own personal office?

2        A.    It was mine.

3        Q.    Now, am I correct in understanding that would

4    you start your day at your home, log into CAD, start

5    listening to the radio, and you would either head to the

6    District 2 building or perhaps drive elsewhere depending

7    on what the needs were in listening to the radio and in

8    looking at CAD; is that correct?

9        A.    Correct.

10       Q.    How often in a week, in a month, would you drive

11   directly to the District 2 building versus divert

12   somewhere else at the beginning of your shift?

13       A.    I don't know that I could accurately quantify

14   that off the top of my head.

15       Q.    Can you give me a ballpark?  Was it 50/50?  Was

16   it something else?

17       A.    Yes, I don't -- I couldn't give you an accurate

18   quantification.  It just depended on the day.

19       Q.    Was it common for you to head directly to the

20   District 2 building to start your day?

21       A.    I guess you would say it is common.  I like to

22   be at the briefing for a patrol briefing.

23       Q.    What percentage of your time do you think you

24   were at the District 2 building versus being out in the

25   field?

1    *A.*    That's another one I couldn't -- I couldn't

2    accurately quantify that.

3    *Q.*    You cannot quantify it one way or another?

4    *A.*    It would be a guess, and I don't want to give

5    you a guess.

6    *Q.*    Let me give you an example.  Do you have a --

7    actually, strike that.

8                     During your time as a lieutenant in

9    District 2, did you ever spend more than four hours during

10   a given shift in the District 2 building?

11   *A.*    Yes.

12   *Q.*    Did you ever spend an entire shift in the

13   District 2 building while you were a lieutenant in

14   District 2?

15   *A.*    No.

16   *Q.*    Did you ever spend no time in the District 2

17   building during one of your shifts as lieutenant in

18   District 2?

19   *A.*    I would have to say yes at some point.  There

20   would have had to have been a time when I wasn't there at

21   all.

22   *Q.*    Can you give me an approximation of how many

23   times that may have occurred --

24   *A.*    No, ma'am.

25   *Q.*    -- while you were in District 2 as a lieutenant?

1    A.    No, ma'am.

2    Q.    When you were working out of your office in

3    District 2, what types of tasks would you do there?

4    A.    Just regular administrative stuff like checking

5    e-mails, supervisor notes, report reviews, just the

6    standards.

7    Q.    Would you meet with any of your sergeants in the

8    District 2 building?

9    A.    I would.

10    Q.    How often?

11    A.    At a minimum, weekly, but a lot of that came

12    with their briefing points.

13    Q.    Did you ever meet with your captain in the

14    District 2 building?

15    A.    Yes, ma'am.

16    Q.    How often would you do that?

17    A.    So at least once a month during staff meeting

18    but then intermittently like there was things that we had

19    to go over, but there was no time or -- like set amount of

20    time for us to do that.

21    Q.    Did you ever meet -- in District 2, did you have

22    other lieutenants you worked with?

23    A.    I was the only watch commander at night, but

24    there were other lieutenants on day shift.

25    Q.    And did you have any kind of overlap for any

1  portion of a shift with your day lieutenants?

2     A.   Not normally.

3     Q.   Do you need to grab that?  Do you need to take

4  that or no?  No?

5     A.   I had my ringer off, but it still rings in my

6  hearing aids.

7     Q.   You are an important man so if I -- if we need

8  to take a quick break if you need to respond to something

9  from one of your sergeants, just let me know.

10            All right.  What location did you -- strike

11  that.

12            Did you have a personal office when you

13  worked in Lake Patrol as a lieutenant?

14     A.   Yes.

15     Q.   Where was that personal office located?

16     A.   At Lake Patrol headquarters.

17     Q.   Where was Lake Patrol headquarters?

18     A.   It is at Bush Highway and Usery Pass.  So I

19  believe it is 7307 North Bush Highway -- I'm sorry, North

20  Usury Pass (sic).

21     Q.   And approximately how long was your commute from

22  your personal residence to the Lake Patrol headquarters?

23     A.   About an hour.

24     Q.   And for the approximately two months you were at

25  Lake Patrol as a lieutenant, what would a typical day look

1  like?

2      A.    Same thing, uniformed, get in my truck, log onto

3  CAD, see what is going on, see if there was anything

4  priority I need to deal with, and then I would either go

5  to Lake Patrol headquarters or to Lake Pleasant or

6  Bartlett, because I had guys working all over the Valley

7  at different duty posts.  So where I went that day would

8  depend on the needs of my guys.

9      Q.    Can you give me an approximation as to how much

10  time you spent at the Lake Patrol headquarters versus out

11  in the field?

12      A.    Probably 50/50.

13      Q.    When you were working Lake Patrol, did you serve

14  as the watch commander?

15      A.    I guess technically, yes.

16      Q.    What shift -- what shift days and hours did you

17  work Lake Patrol?

18      A.    So the shift days were Wednesday, Thursday,

19  Friday, Saturday, and my hours, I didn't really have a set

20  schedule, but I would normally work from 10 in the morning

21  to 8 at night.  That would be a rough guesstimate.

22      Q.    Are those a little bit later hours than some of

23  your lieutenant counterparts?

24      A.    As far as day shift lieutenants go, yes.

25      Q.    When you worked at District 2, do you recall

1    happened more than once, though.

2        Q.   More than ten times?

3        A.   I don't know.

4        Q.   When you served as watch commander over a

5    portion of the county, were you serving as watch commander

6    over the east or west side?

7        A.   It would have been over the West Valley.

8        Q.   And that was both in your time as district -- a

9    lieutenant in District 2 and as a lieutenant in Lake

10   Patrol?

11       A.   No, ma'am.

12       Q.   So you served as a watch commander for the West

13   Valley while you were in District 2 then, correct?

14       A.   Correct.

15       Q.   When you served as watch commander for Lake

16   Patrol, was that over the east side then?

17       A.   Both.

18       Q.   While you worked as a lieutenant in District 2

19   approximately November 2022 through approximately January

20   of 2024, did you earn at least 684 per week?

21       A.   684 of what?

22       Q.   $684 per week.

23       A.   Yes, ma'am.

24       Q.   Do you recall how much you earned on an annual

25   basis in 2022?

1      A.    No, ma'am.

2      Q.    When you served as a lieutenant in Lake Patrol,

3   late 2024 to earlier this year, did you earn at least $684

4   per week?

5      A.    Yes, ma'am.

6      Q.    When you served as a lieutenant in District 2

7   November 2022 through January of 2024, did you supervise

8   two or more employees?

9      A.    Yes.

10      Q.    When you served as a lieutenant in Lake Patrol

11   from late 2024 to earlier this year, did you also

12   supervise two or more employees?

13      A.    Yes.

14      Q.    Let's go through your time at District 2.  I

15   will ask you some questions, and then I will circle back

16   and also ask you for Lake Patrol.

17            When you were a lieutenant in District 2,

18   did you approve or deny any requests for overtime or days

19   off?

20      A.    Yes.

21      Q.    Did you have any involvement in setting

22   schedules?

23      A.    No.

24      Q.    Did you have any involvement in making

25   recommendations regarding schedules?

1      Q.    And if you were reviewing Internal Affairs
2  reports, would they be reports that you are reviewing
3  authored by your sergeants?
4      A.    Yes.
5      Q.    Have you ever served as a firearm instructor?
6      A.    Yes.
7      Q.    When have you served as a firearm instructor?
8      A.    I am currently a firearms instructor.
9      Q.    How long have you been a firearms instructor
10  for?
11      A.    Maybe 13 years.  I don't remember the exact date
12  I went through.
13      Q.    And do you serve as a firearms instructor for
14  Maricopa County?
15      A.    Yes, ma'am.
16      Q.    Have you consistently served as a firearms
17  instructor for 13 years with Maricopa County?
18      A.    Since I went through the firearms instructor
19  school, so whenever that date was, I believe, of 2012.  I
20  would have to look at my training records.
21      Q.    Have you consistently served as a firearm
22  instructor during your time as a lieutenant in District 2
23  and a lieutenant in Lake Patrol?
24      A.    Yes.
25      Q.    Now what do you do as a firearm instructor with

1    Maricopa County?

2        *A.*    So the overarching thing is you are there to

3    support the firearms training unit because they only have

4    so many people and we have thousands of qualified shooters

5    that have to be recertified and retested every year.

6                So obviously we serve at the pleasure of

7    them as far as going out and helping them with students

8    and helping them get classes through, but we also serve

9    within our own divisions and units as far as putting on

10   trainings and, you know, helping, that type of thing.

11               Whenever my units go out to the range, I

12   will go out, so that's one less firearms unit instructor

13   that they need because I am actually there, and that's

14   kind of gist of it I guess.

15       *Q.*    And how many hours would you say you spend in a

16   month, in a year, in relation to being a firearms

17   instructor?

18       *A.*    Actually instructing maybe 20 hours a year.

19       *Q.*    In addition to that, you indicated you would

20   also go to the range with a group, correct?

21       *A.*    Right, that's where -- but I am also a student

22   at the range.

23       *Q.*    Okay.  How many hours do you estimate you spent

24   at the range over the course of a year?

25       *A.*    I don't know.  I try to get out once every other

1  month or so.  That's kind of the standard.

2       Q.   Have you -- does the abbreviation "EPA" mean

3  anything to you?

4       A.   Yes.

5       Q.   What does EPA mean?

6       A.   Employee Performance Appraisal.

7       Q.   Have you performed any of your employee

8  performance appraisals for your subordinates either in

9  District 2 or Lake Patrol as a lieutenant?

10      A.   Yes, in District 2.

11      Q.   Have you also done employee performance reviews

12 in Lake Patrol or was your time there too short to have

13 done that?

14      A.   I didn't have that came due while I was there.

15      Q.   So in District 2 as a lieutenant, how many

16 employee performance appraisals did you complete?

17      A.   I think I did four.

18      Q.   In addition to employee performance appraisals,

19 did you also complete BlueTeam supervisor notes for your

20 subordinates?

21      A.   Yes.

22      Q.   Was that two per month per subordinate?

23      A.   Yes.

24      Q.   You completed BlueTeam supervisor notes on

25 behalf of or for your sergeants, correct?

1      A.    Usually I would try to do it if I had a day

2    shift training event and if -- especially if it was on a

3    day off, then I would try to flex those hours like on the

4    Wednesday when we had coverage.  Other than that, it was

5    not usually possible to flex.

6      Q.    So I want to make sure I understand it

7    correctly.  Are you telling me that if you had day

8    training on a day that you were not normally scheduled to

9    work --

10     A.    Right.

11     Q.    -- that you would try to flex that with a

12   Wednesday because you knew that you would have coverage

13   from your other lieutenant on that day?

14     A.    Not from my other lieutenant, from the other

15   watch commanders.

16     Q.    The other watch commanders, thank you.

17           And that was in District 2 then, correct?

18     A.    Yes, ma'am.

19     Q.    Were you able to flex your time at all in Lake

20   Patrol with overlap with your other lieutenants?

21     A.    I never tried to.

22     Q.    Would you have the ability to?

23     A.    I would have to say yes at some point, but I was

24   there during the off season so it wasn't a requirement.

25     Q.    Have you ever sat on a promotion board?

1          A.    Yes, ma'am.

2          Q.    When did you sit on a promotion board?

3          A.    I sat on the last promotion board for the

4    lieutenant assessment.

5          Q.    Do you remember the date that was on that or

6    approximately the month?

7          A.    I don't.  They just -- I believe the list is

8    still live, but I don't remember the exact month.

9          Q.    Was it earlier this year?

10         A.    No.  It would have been earlier last year.  It

11   would have been 2024 for sure.

12         Q.    First part of 2024, last part of 2024?

13         A.    It would have had to be earlier in the year.

14         Q.    First half of 2024, approximately?

15         A.    Yeah, it had to be.

16         Q.    And which promotion board was that, sergeants to

17   lieutenants or some other classification?

18         A.    It was sergeant to lieutenant.

19         Q.    And what was your involvement in the promotion

20   board?

21         A.    I was a part of the review panel for the

22   critical incident.

23         Q.    Did you review both written and oral

24   applications?

25         A.    No, ma'am, just the oral board portion.

1      Q.    Just the oral board.

2            How many days did you serve on the

3  promotion board?

4      A.    I believe it was four days.

5      Q.    Do you recall how many sergeants you reviewed

6  oral boards for over those four days?

7      A.    22, I think.

8      Q.    I believe you testified earlier that a decision

9  has not been reached on these sergeants yet?

10      A.    How do you mean?

11      Q.    Has a decision whether or not to promote these

12  sergeants to lieutenants, these 22, has a decision been

13  reached?

14      A.    For some of them, yes.

15      Q.    Did you make any recommendations or prepare any

16  scorings regarding these oral boards?

17      A.    Just scorings only.

18      Q.    As to all of the 22 sergeants?

19      A.    Yes, of the ones that came through on our

20  portion.

21      Q.    Have you sat on any other promotion boards?

22      A.    No.

23      Q.    Do you remember what division or department you

24  were working in while you sat on this promotion board?

25      A.    I believe I was in major crimes.  It was -- it

1  would have been right during that major crimes to general

2  crimes like during that time transition I believe.

3      Q.    Have you sat on any awards boards -- awards

4  boards?

5      A.    Not that I know of.

6      Q.    Have you been involved in the hiring,

7  interviewing, or recruitment process for any individuals

8  during your time at District 2 as a lieutenant or Lake

9  Patrol either in a sworn or unsworn capacity?

10     A.    No.

11     Q.    Have you ever needed to provide constructive

12  feedback or coaching to any of your subordinate sergeants?

13     A.    Yes.

14     Q.    Was that during your time at District 2 in

15  November 2022 through January 2024?

16     A.    Yes.

17     Q.    How often would you have to provide constructive

18  feedback or coaching to your subordinate sergeants?

19     A.    Constructive feedback, daily.

20     Q.    How about coaching?

21     A.    No.

22     Q.    Did you have to put any of your sergeants on an

23  action plan?

24     A.    No.

25     Q.    Have you ever had to discipline anyone?

1    A.    No.

2    Q.    Have you ever been involved in the disciplinary

3   process or an action plan being provided to an individual

4   during your time at District 2 as a lieutenant?

5    A.    I guess I would have to ask you to clarify your

6   question because those are two very different things.

7    Q.    Let's take them one at a time then.  The term

8   "action plan," what does that mean to you?

9    A.    So an action plan is just that.  It's an action

10  plan that is built out through the early intervention

11  system to help an employee reach their maximum potential

12  in areas that they are falling short.

13   Q.    So in other words, it is addressing areas of

14  deficiency with an employee, correct?

15   A.    Correct.

16   Q.    Have you administered action plans to anyone

17  during your time as a lieutenant in District 2

18  November 2022 to January 2024?

19   A.    Yes.

20   Q.    Who did you issue an action plan to during that

21  time frame?

22   A.    I guess I shouldn't say I issued it.  I was a

23  part of the issuance, but it was with Deputy Corlusky

24  Juarez.

25   Q.    Deputy who?

1    *A.*    Juarez.

2    *Q.*    Do you know how to spell that?

3    *A.*    J-U-A-R-E-Z.

4    *Q.*    Have you been involved in the issuance of any

5    other action plans at District 2 as a lieutenant

6    November 2022 through January 2024?

7    *A.*    No, ma'am.

8    *Q.*    Do you know what the resolution of an action

9    plan was with Deputy Juarez?

10   *A.*    No, ma'am.

11   *Q.*    How about your time at Lake Patrol?  I know it

12   was shorter, but were you involved with issuance of any

13   action plans to individuals in Lake Patrol as a lieutenant

14   there late 2024 to early 2025?

15   *A.*    No, ma'am.

16   *Q.*    In your time either as a lieutenant in District

17   2, November 2022 through January 2024, or as a lieutenant

18   in Lake Patrol, late 2024 through early 2025, have you

19   been assigned any special projects by the executive team,

20   chiefs, or your captain?

21   *A.*    No.

22   *Q.*    Have you either at District 2 as a lieutenant or

23   in Lake Patrol as a lieutenant been involved in the

24   budgetary process?

25   *A.*    No.

1    Q.   Did I read that correctly?

2    A.   Yes, ma'am.

3    Q.   And this is -- do you recognize this document?

4    A.   I do.

5    Q.   What is this document?

6    A.   This is the Maricopa County Job Description for

7  a law enforcement lieutenant.

8    Q.   Have you seen this document prior to today's

9  deposition?

10   A.   Yes, ma'am.

11   Q.   Does this appear to be a true and accurate copy

12 of the law enforcement lieutenant job description in

13 Maricopa County?

14   A.   Yes, ma'am.

15   Q.   Since you have reviewed this document prior to

16 today's deposition, can you let me know if there are any

17 essential job tasks listed on page HOUCK 175 or 176 that

18 you haven't done as a law enforcement lieutenant either in

19 patrol District 2 or in Lake Patrol?

20   A.   I have would say the first line of the position

21 overview is inaccurate.

22   Q.   In what way?

23   A.   It says, "The Law Enforcement Lieutenant

24 administers, plans, organizes and directs the operations

25 of a district," and that's not true.  That would be the

1  captain's job.  The law enforcement lieutenant supports

2  the captain in that -- in that mission.

3      Q.   Okay.  So with the modification of the first

4  sentence of the position overview, if we were to modify

5  that by saying "The law enforcement lieutenant supports

6  the captain in administering, planning, organizing, and

7  directing the operations of the district," would you agree

8  with that sentence?

9      A.   Yes.

10     Q.   With that modification, is there anything else

11 in this law enforcement lieutenant job description that

12 you disagree with?

13     A.   Nothing I would disagree with directly, but it

14 is not all -- all inclusive.

15     Q.   With the -- so what should be added to the law

16 enforcement lieutenant job description that you believe is

17 not on here?

18     A.   Well, when I say it is not all inclusive, I

19 mean, every position doesn't always do it all.  That's

20 what I mean by it is not all inclusive.  So it won't

21 include every lieutenant in every position because each

22 district is different.

23     Q.   Got it.  So is it your position that the

24 responsibility of a particular lieutenant could vary based

25 on the assignment?

1      A.    It could.

2      Q.    So, for example, was your position as lieutenant

3  in Lake Patrol different from your position as a

4  lieutenant in District 2?

5      A.    Yes, ma'am.

6      Q.    Would you agree that the position of a

7  lieutenant watch commander is also different from a day

8  shift lieutenant?

9      A.    Yes, ma'am.

10     Q.    Can you explain for me, based on your own

11 personal experiences, in what ways your position as a

12 lieutenant in Lake Patrol differed from your position as a

13 lieutenant in District 2?

14     A.    The main thing would be the hours, also it would

15 be in Lake Patrol even though it's under -- a patrol

16 bureau is still a specialized assignment so it requires

17 specialized training, specialized certifications, the

18 sergeants and deputies there are more senior than what you

19 would get in a district, and you are also patrolling

20 different types of areas.

21           So you are not patrolling residential areas

22 in Lake Patrol, you are patrolling the unincorporated

23 areas of the Tonto National Forest essentially or the

24 county parks, so it -- it's a huge difference from just

25 the regular patrol district.

1      *A.*    A lot of it is based on personality for one, but
2    I also worked in the patrol bureau and the investigations
3    bureau and they are run differently as well.

4      *Q.*    I am going to go through a list of items and I
5    am going to ask you about your experiences in doing these
6    things in your time as a lieutenant either in District 2
7    or in Lake Patrol.

8                    In your time in District 2 or Lake Patrol
9    as a lieutenant, have you prevented, controlled, or
10    extinguished fires of any type?

11      *A.*    Actual fires?

12      *Q.*    Actual fires.

13      *A.*    No.

14      *Q.*    In your time as lieutenant in District 2 or in
15    your time at -- in Lake Patrol as a lieutenant, have you
16    rescued fire, crime, or accident victims?

17      *A.*    No.

18      *Q.*    In your time as lieutenant either in District 2
19    or in Lake Patrol, have you prevented or detected crimes?

20      *A.*    Yes.

21      *Q.*    Approximately how many times while in District
22    2, which was approximately November 2022 through
23    January 2024?

24      *A.*    There is no way to approximate that.

25      *Q.*    Can you approximate it for me during your time

1  in Lake Patrol for roughly two months?

2       *A.*   No, there is no way to approximate that either.

3       *Q.*   Have you conducted investigations or inspections

4  for violations of the law as your time as a lieutenant in

5  District 2 or a lieutenant in Lake Patrol?

6       *A.*   Yes.

7       *Q.*   How many times in District 2?

8       *A.*   I couldn't give you an estimate.  I would have

9  to go through CAD.

10      *Q.*   Can you give me an approximation?

11      *A.*   No, because it would be -- it would be a guess.

12  It wouldn't be an approximation, and I don't want to give

13  you a guess.

14      *Q.*   Can you let me know if it is more than ten, less

15  than ten in your time in District 2 as a lieutenant?

16      *A.*   Like I said, it would be a guess.  I don't know.

17      *Q.*   How about in Lake Patrol?

18      *A.*   I don't know.

19      *Q.*   Don't know one way or the other?

20      *A.*   Yeah.  Like I said, it would be a guess.

21      *Q.*   Have you performed your surveillance in your

22  role as lieutenant in District 2 or in Lake Patrol?

23      *A.*   No.

24      *Q.*   Have you pursued, restrained, or apprehended

25  suspects as a lieutenant in District 2?

1      *A.*    Yes.

2      *Q.*    Approximately how many times?

3      *A.*    I don't know.

4      *Q.*    Can you tell me more than ten, less than ten?

5      *A.*    Once again, it would be a wild guess and I don't

6   want to do that.  We would have to go through CAD and look

7   at it.

8      *Q.*    How about in Lake Patrol, have you pursued,

9   restrained, or apprehended suspects in Lake Patrol in

10  those two months?

11     *A.*    Yes.

12     *Q.*    Can you give me any type of an estimate in Lake

13  Patrol?

14     *A.*    No.

15     *Q.*    Have you detained or supervised suspected and

16  convicted criminals during your time as a lieutenant in

17  District 2?

18     *A.*    What do you mean "suspected and convicted

19  criminals"?  What does that mean?

20     *Q.*    Have you detained or supervised individuals that

21  were either suspected or convicted criminals in your time

22  in District 2 as lieutenant?

23     *A.*    Yes.

24     *Q.*    How many times approximately?

25     *A.*    I don't know.

1        Q.    Can you tell me more or less than ten?

2        A.    I am not going to guess.

3        Q.    How about in Lake Patrol?

4        A.    Yes, but once again, it would be a guess.

5        Q.    Have you interviewed witnesses in your role as a

6   lieutenant in District 2?

7        A.    Yes.

8        Q.    Can you give me an approximation?

9        A.    No, ma'am.

10       Q.    How about your time in Lake Patrol, did you

11  interview witnesses as lieutenant in Lake Patrol?

12       A.    Yes.

13       Q.    Can you give me an approximation?

14       A.    No, ma'am.

15       Q.    Have you interrogated and fingerprinted suspects

16  in your role as lieutenant in District 2?

17       A.    No.

18       Q.    Have you interrogated and fingerprinted suspects

19  in your role as lieutenant in Lake Patrol?

20       A.    No.

21       Q.    Have you prepared investigative reports in your

22  role as a lieutenant in District 2?

23       A.    What is an "investigative report"?

24       Q.    Do you have an understanding of what an

25  investigative report is?

1      A.    I want to make sure we are on the same page.
2  Right now I don't, no, ma'am.
3      Q.    Well, it is a phrase that is used -- well, let
4  me strike that.
5              My understanding is that with the Maricopa
6  County Sheriff's Office that there is terminology to refer
7  to reports including primary and supplemental reports,
8  correct?
9      A.    Correct.
10     Q.    Have you authored primary reports with the
11 sheriff's office in your time at -- as a lieutenant in
12 District 2?
13     A.    Yes.
14     Q.    How many?
15     A.    I don't know that number off the top of my head.
16     Q.    Have you prepared any supplemental reports in
17 your time at District 2 with the sheriff's office?
18     A.    Yes.
19     Q.    Do you have an approximation of how many
20 supplemental reports you prepared?
21     A.    No.
22              (Deposition Exhibits No. 7 and 8 were
23 marked for identification by the reporter.)
24 BY MS. SANTIAGO:
25     Q.    A.J., you have been handed what has been marked

1    Q.   How about Deputy Initiated Activities, On View,
2    should the -- should the number for a deputy be more than
3    25 for an approximately seven-month time period?
4    A.   So that's not a number that I can give an
5    approximation on because that depends on the activity of
6    the deputy and where they are assigned.
7    Q.   The next chart down says "Dispositions By Year."
8         Do you see that?
9    A.   Yes, ma'am.
10   Q.   And I am looking at 2023, again, this is for an
11   approximately seven-month time period, and there is a
12   phrase "Primary Unit."
13        Do you see that?
14   A.   Yes, ma'am.
15   Q.   Is that a reference to you responding as the
16   primary unit to a call?
17   A.   Yes, ma'am.
18   Q.   Am I reading this correctly that you responded
19   as the primary unit to a call on ten occasions between
20   January 2023 and June 29th of 2023?
21   A.   Yes, ma'am.
22   Q.   Would you expect that number to be higher for a
23   deputy?
24   A.   I would.
25   Q.   Would you expect that number to be higher for a

1  to fill in the missed time.

2      Q.   Did you ever flex your hours where you didn't do

3  a modification to the overall hours -- strike that.

4           What were your regularly schedule days --

5  not -- what were your regularly scheduled days of the week

6  when you were a watch commander at District 2?

7      A.   Wednesday, Thursdays, Friday, and Saturday.

8      Q.   So if, for example, you only worked eight hours

9  on Wednesday, but then worked 12 hours on Thursday, would

10 you make a modification to both Wednesday and Thursday or

11 would you not change your hours since the total for the

12 two days would still equal 20 hours?

13     A.   It would depend on what the modification was

14 for, but if it was just a standard, you know, regular

15 patrol shift, then, no, as long as it was 40 hours, it was

16 40 hours.

17     Q.   So as long as the time was totalled correctly at

18 the end of the week, you might not always modify the hours

19 up or down; is that correct?

20     A.   Correct.

21     Q.   And would you do that on a week-to-week basis or

22 would you do that on an 80-hour pay period basis?

23     A.   Week to week.

24     Q.   And is not modifying the Wednesday or Thursday

25 so long as the total week equaled 40, is that an example

1    deputies make traffic stops.  There are times I am
2    responding to calls as the primary unit and deputies do
3    that.  Essentially what it boils down to is -- moving up
4    to lieutenant doesn't stop you from being a deputy sheriff
5    is what it boils down to.
6        Q.    But are you contending that you still do the
7    duties of a deputy sheriff with the same level of
8    frequency that a deputy sheriff would do on a daily basis?
9        A.    No, ma'am, I am not contending that.
10       Q.    What percentage of your day or your month or
11   your year would you contend you are doing duties similar
12   to that of a deputy sheriff -- a deputy patrol?
13       A.    You would have to specify what you mean by
14   "similar."
15       Q.    Well, the examples you just provided, I think
16   you said traffic stops, you provided a couple other
17   examples, how -- what percentage of your time do you
18   contend you are performing your duties in a day, in a
19   month, in a year?
20       A.    I couldn't quantify that accurately, not off the
21   top of my head anyway.
22       Q.    Do you have an opinion one way or another as to
23   whether or not you perform more -- strike that.
24             When you were a lieutenant in District 2,
25   did you perform any traffic stops?

DEPOSITION OF ALDEN JAMAAL JACKSON, 04/15/2025

1      *A.*   Yes.

2      *Q.*   Do you have an opinion one way or the other as

3   to whether or not you performed more or less traffic stops

4   than other lieutenants in patrol?

5      *A.*   No.

6                MS. SANTIAGO:  That's all I have.

7                MS. SYVERSON:  Okay.  I have no questions.

8   We will read and sign.

9                MS. SANTIAGO:  All right.

10               VIDEO TECHNICIAN:  This concludes today's

11  deposition.  We are off the record at 4:42.

12               (Proceedings adjourned at 4:42 p.m.)

13

14

15               _____

                        ALDEN JAMAAL JACKSON
16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE

2          I HEREBY CERTIFY that the foregoing deposition
was taken by me pursuant to notice; that I was then and
3  there a Certified Court Reporter for the State of Arizona,
and by virtue thereof authorized to administer an oath;
4  that the witness before testifying was duly sworn by me to
testify to the whole truth and nothing but the truth;
5  pursuant to request, notification was provided that the
deposition is available for review and signature; that the
6  questions propounded by counsel and the answers of the
witness thereto were taken down by me in shorthand and
7  thereafter transcribed through computer-aided
transcription under my direction, and that the foregoing
8  typewritten pages contain a full, true, and accurate
transcript of all proceedings had upon the taking of said
9  deposition, all done to the best of my skill and ability.
          I FURTHER CERTIFY that I am in no way related to
10  nor employed by any of the parties hereto, nor am I in any
way interested in the outcome hereof.
11          I FURTHER CERTIFY that I have complied with the
ethical obligations set forth in ACJA Sections
12  (J)(1)(g)(1) and (2).
          DATED at Phoenix, Arizona, this 23rd day of
13  April, 2025.

14          _____
          CARRIE A. CARIATI
15          Registered Professional Reporter
          Certified Realtime Reporter
16          Certified LiveNote Reporter
          Certificate No. 50355

17

18          I CERTIFY that this Registered Reporting Firm
has complied with the ethical obligations set forth in
19  ACJA Sections (J)(1)(g)(1) and (2).

20
          DATED at Phoenix, Arizona, this 23rd day of
21  April, 2025.

22          _____
          Registered Reporting Firm R1064
23          CARRIE A. CARIATI, Owner

24

25

# EXHIBIT 29

# FILED

# UNDER

# SEAL

# EXHIBIT 30

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on      )
behalf of himself and all     )
those similarly situated,     )
                              )
          Plaintiff,          )
                              )
vs.                           ) Case No.:
                              ) 2:23-cv-00068-DGC
Maricopa County,              )
                              )
          Defendant.          )
                              )


VIDEO-RECORDED DEPOSITION OF JERRY VANCE
(and Videoconference via Zoom)


Phoenix, Arizona
July 14, 2025
1:59 p.m.


REPORTED BY:                CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR   Certified Reporters
AZ CR No. 50200             12725 W. Indian School Rd.
                            Suite F-100
CERTIFIED COPY              Avondale, AZ 85392
                            (480) 429-7573

2

```
 1          VIDEO-RECORDED DEPOSITION OF JERRY VANCE

 2     commenced at 1:59 p.m., on July 14, 2025, at Fisher &

 3     Phillips, LLP, 3200 North Central Avenue, Suite 1550,

 4     Phoenix, Arizona, and videoconference via Zoom before

 5     Kristy A. Ceton, RPR, CRR, Arizona Certified Court

 6     Reporter No. 50200.

 7

 8                           * * *

 9

10     APPEARANCES:

11          For the Plaintiff:

12               FRANKEL SYVERSON, PLLC
                 By:  Patricia N. Syverson, Esq.
13               2375 East Camelback Road
                 Suite 600
14               Phoenix, Arizona 85016
                 patti@frankelsyverson.com
15
            For the Defendants:
16
                 FISHER & PHILLIPS, LLP
17               By:  Shayna Balch Santiago, Esq.
                 3200 North Central Avenue
18               Suite 1550
                 Phoenix, Arizona 85012
19               ssantiago@fisherphilliips.com

20          Also Present:

21               Cedric Tinard, the videographer

22               Donna Matthews (via Zoom)

23

24

25
```

14

1          Q.   All right.  I want to walk through your

2    employment in Patrol Bureaus East and West.

3               So the date of your promotion to

4    lieutenant was January 11th of 2021; is that correct?

5          A.   Yes.

6          Q.   So let's walk through each of the

7    positions that you've held since that date as a

8    lieutenant.  Right.  I guess I should say assignments

9    that you've held since that date.

10              What was your first assignment following

11   your promotion to lieutenant on January 11th, 2021?

12         A.   So I was the nighttime watch commander

13   during that period.  And then I was also assigned to

14   the mobile field force unit.

15         Q.   And was that all in District 1?

16         A.   Yeah.  So the watch commander position

17   was in District 1.  The mobile field force unit is an

18   auxiliary unit.

19         Q.   And what do you mean -- what --

20              Is that auxiliary unit within Patrol

21   Bureaus East or West?

22         A.   It's staffed from those.  It's run by the

23   ACTIC, but it's staffed from various different units

24   in the office.

25         Q.   It's run by who?

Deposition of: Jerry Vance                                    July 14, 2025

16

1          A.    I did, yes.

2          Q.    How long were you the night watch

3    commander in District 1 starting in January of 2021?

4          A.    As my assignment?

5          Q.    Yes.

6          A.    I think until March of that year.

7          Q.    What was your next assignment or schedule

8    following March of 2021?

9          A.    So I was still in District 1, but I was a

10   daytime commander.

11         Q.    And that was -- was it March of 2021

12   through July of 2021?

13         A.    Yes.

14         Q.    Then you transferred to Lake Patrol in

15   July of 2021; is that correct?

16         A.    Yes.

17         Q.    And did you consistently remain in Lake

18   Patrol through September of 2023?

19         A.    Yes.

20         Q.    Where are you currently assigned?

21         A.    I'm assigned to District 7 as the daytime

22   commander.

23         Q.    Okay.  So let's walk through September of

24   2023.

25               What was your next assignment after

17

1    September of 2023?

2            A.    I worked at the enforcement support

3    division.

4            Q.    And that was September 2023 to when?

5            A.    January of '25.

6            Q.    And enforcement support division is not

7    within Patrol Bureaus East or West; is that correct?

8            A.    Yes.

9            Q.    So when you left enforcement support

10   division in January of 2025, is that when you moved

11   to District 7?

12           A.    No.

13           Q.    Where did you move next?

14           A.    I went back to District 1 as the night

15   watch commander.

16           Q.    Okay.  And how long are you in that

17   position for?

18           A.    Until March of 2025.

19           Q.    And then where did you go after March of

20   2025?

21           A.    To District 7.

22           Q.    And that's District 7 dayshift?

23           A.    Yes.

24           Q.    Got it.

25                 All right.  I want to go a little bit

Deposition of: Jerry Vance                                        July 14, 2025

18

1    more into each of those now.

2             All right.  At District 1, January 2021

3    to July of 2022, you held a night watch commander for

4    a few months and then you moved to days starting in

5    March of 2021 through July of 2021, correct?

6        A.   So in --  Yes.  But you said July 2022

7    when you first started that sentence.

8        Q.   I apologize.  Let me start over.

9             District 1, you started as night watch

10   commander from January 2021 to March of 2021,

11   correct?

12       A.   Yes.

13       Q.   What were the hours that you worked?

14       A.   1700 to 0300.

15       Q.   Okay.  And what were your assigned days?

16       A.   Wednesday through Saturday.

17       Q.   And then when you moved to be day

18   commander March of 2021 to July 2021 in District 1,

19   what were your hours and days?

20       A.   0700 to 1700, Wednesday through Saturday.

21       Q.   When you moved to Lake Patrol, what were

22   your days and hours?

23       A.   So I changed positions in Lake Patrol,

24   but I started as the west side commander.  My days

25   were Wednesday through Saturday, 07 to 1700.

19

1          Q.    And when did that change?

2          A.    I would say probably September of that

3    year, I became the administrative lieutenant.

4          Q.    Did you move to --

5                September of what year?

6          A.    '21.

7          Q.    Okay.  All right.

8                So you changed.  And then what were your

9    new days and hours?

10         A.    I -- I think I worked Monday, Tuesday,

11   Thursday, Friday.

12         Q.    Okay.  And hours?

13         A.    07 to 1700.

14         Q.    Okay.  At any point while you worked at

15   Lake Patrol, were you considered an administrative

16   lieutenant?

17         A.    Yes.

18         Q.    During what time period?

19         A.    September of 2021, onwards.

20         Q.    And describe for me what an

21   administrative lieutenant is.

22         A.    So my job, I managed the detective unit

23   at the time, some of the fleet and equipment for the

24   district.  And specific, kind of, to Lake Patrol, I

25   managed the grants that Lake Patrol was assigned.  A

Deposition of: Jerry Vance                                        July 14, 2025

25

1          Q.   Okay.  Describe for me, in your own

2     words, the responsibilities of a patrol lieutenant in

3     Lake Patrol.

4          A.   So it's very similar to the patrol

5     lieutenant in any other district.  You're managing

6     the supervisors, managing the deputies, listening to

7     the radio for incidents that occur, responding to

8     incidents that occur.

9               You know, if there was a drowning in Lake

10    Patrol, there was a lot of resources that needed to

11    respond to that.  So the lieutenant would always

12    respond, no matter.

13              If you were on the east side, if there

14    was a drowning on the west side, you would respond

15    over to that because of the nature of the incident.

16         Q.   How often would there be something as

17    terrible as a -- as a drowning?  I'm hoping it's not

18    as frequently as I'm worried that it might happen.

19              How often would you say drownings would

20    occur?  Was it monthly?  A few times a year?

21         A.   So sometimes it was weeks in the summer.

22    I think the first summer that I worked there in July,

23    we had definitely double-digit drownings for the

24    four-month period.

25         Q.   And with drownings, are they oftentimes a

Deposition of: Jerry Vance                                    July 14, 2025

27

1           A.    Yes.

2           Q.    Correct, right?

3           A.    You're correct, yes.

4           Q.    And then in January of 2025, you moved

5    back to District 1 as a night watch commander,

6    correct?

7           A.    Yes, that's correct.

8           Q.    What were the days and hours that you

9    worked as night watch commander in District 1?

10          A.    I worked Wednesday through Saturday, 1700

11   to 0300.

12          Q.    And what is your current schedule in

13   District 7 starting in March of 2025?

14          A.    Monday through Thursday, 07 to 1700.

15          Q.    Other than your time as an administrative

16   sergeant in Lake Patrol, have you held the position

17   of administrative lieutenant at any other time from

18   January of 2021 through the present?

19          A.    So I was an administrative lieutenant in

20   District 1 -- or sorry -- in Lake Patrol, not

21   sergeant.  But I technically was in an administrative

22   lieutenant role in enforcement support.

23          Q.    Have you ever served as acting commander

24   as a lieutenant since January of 2021 to the present?

25          A.    Yes.  So in I think April of 2024, I was

28

1    the acting captain at enforcement support until

2    January of 2025.

3         Q.   Any other times that you had served as

4    the acting commander as lieutenant?

5         A.   Not that I recall.

6    (Exhibit 3 was marked for identification.)

7         Q.   BY MS. BALCH SANTIAGO:  Jerry, you've

8    been handed what's been marked as Exhibit 3 to your

9    deposition.

10             Do you recognize this document?

11        A.   Yes.

12        Q.   What is this document?

13        A.   The duties as a law enforcement

14   lieutenant as described by Maricopa County.

15        Q.   And the numbers at the bottom says

16   HOUCK175 through 179; is that correct?

17        A.   Yes.

18        Q.   And it's titled "Law Enforcement

19   Lieutenant," and it says "Maricopa County Job

20   Description."

21             Do you see that?

22        A.   Yes.

23        Q.   Have you reviewed this document prior to

24   today's deposition?

25        A.   I don't recall.  Most likely.

29

1       Q.   Well, I want you to take a few minutes to

2   skim through this document.

3            And my question is, is there anything on

4   this job description that you disagree with and you

5   believe law enforcement lieutenants do not do in

6   their role?

7            So I'll give you some time to review

8   through it and let me know if there's anything that

9   you believe is incorrect on here.

10      A.   So I don't see anything that patrol

11  lieutenants may not do, but I wouldn't say they do

12  all of this every day.

13      Q.   Okay.  So if I'm understanding you

14  correctly, you agree that law enforcement lieutenants

15  do do all of the tasks on Exhibit 3; they just might

16  not do them all every day; is that correct?

17      A.   Yes.

18      Q.   Are there any job duties that you believe

19  were left off of this job description at Exhibit 3 to

20  your deposition?

21      A.   I don't see anything about responding to

22  calls for service, conducting traffic enforcement.

23  It's a very general description of the duties.  So

24  it's hard -- it's hard to go -- to talk about every

25  single thing that I would patrol or even a regular

30

1     administrative lieutenant does.

2          Q.   Understood.

3               But if you're saying that there might be

4     some missing job duties on here, I think I heard you

5     say, responding to calls for service and traffic

6     enforcement.  Then, in your opinion, what -- what

7     should be also listed on this job description to

8     cover those -- those duties?

9          A.   I would say include something about

10    responding to incidents rather than just managing and

11    monitoring.

12         Q.   If there were a section added to this job

13    description to include responding to incidents

14    instead of just managing, would you believe that this

15    would be a complete description of the duties of a

16    law enforcement lieutenant?

17         A.   Yeah.  I would think that -- I think

18    something would need to be added to it for a patrol

19    -- is it patrol lieutenant you're asking about?

20         Q.   Yeah.  Let's talk patrol lieutenant

21    first.

22              If we added a section responding to

23    incidents instead of just managing, would that make

24    this a complete job description for a patrol law

25    enforcement lieutenant?

31

1          A.    I guess it would make it more accurate is

2    what I would say.

3          Q.    Is there anything else that you believe

4    is missing off of this job description if it were

5    viewed as a job description for a patrol law

6    enforcement lieutenant?

7          A.    It doesn't mention anything about

8    availability outside of your work hours.

9          Q.    What do you mean by that?

10         A.    Well, sergeants, members of the sheriff's

11    office often contact you outside of your assigned

12    work hours.  And then as -- in the role as mobile

13    field force, I've been called out to respond to, like

14    I said, a lot during the election and during the

15    George Floyd.

16         Q.    Okay.  I'm just trying to understand.

17              If this is not a complete job description

18    for a patrol law enforcement lieutenant, what

19    additions would need to be made to make it a complete

20    job description.  It sounds like you're telling me

21    you need to add something about responding to

22    incidents and then also the availability outside of

23    work hours.  Anything else?

24         A.    Not that I can think of right now.

25         Q.    Okay.  And you made the distinction of a

Deposition of: Jerry Vance                                      July 14, 2025

59

1       Q.   Can you describe the computer-aided
2   dispatch system for me, generally what it is.
3       A.   It's where we put our call signs in and
4   our activity is recorded throughout the day.
5       Q.   Okay.  Actually, let's go backwards a
6   little bit here.
7            Can you walk me through what a typical
8   day would look like for you.  Let's start with you
9   were in District 1.  Starting in -- starting in
10  January of 2021, what did a typical day look like for
11  you in District 1, starting with when you were
12  getting ready to start your shift?
13      A.   So when I worked -- when I first started
14  District 1, I worked as the watch commander.  So I
15  would log on to CAD, look -- the nighttime watch
16  commander, I was responsible for every district on
17  the east side.  So I would generally look through the
18  calls for service to see if there was any major
19  incidents that I needed to respond to.
20           And then, depending on what I saw in CAD,
21  I might go drive to a call or drive to a certain
22  district, or I may drive to the -- to my office, or I
23  may just kind of be at large driving around.
24      Q.   Okay.  As a lieutenant in District 1,
25  were you provided an unmarked vehicle that you could

Deposition of: Jerry Vance                                July 14, 2025

60

1    take to and from your personal residence?

2           A.   Yes.

3           Q.   And so when you would start your day,

4    when would you log into the CAD system?  Was that in

5    your driveway?

6           A.   Yes.

7           Q.   Were you required to be logged into CAD

8    at all times when you were working as a lieutenant in

9    District 1?

10          A.   No.

11          Q.   When were you not required to be logged

12   into CAD?

13          A.   If I was doing some type of

14   administrative work for training.  Potentially, a

15   phone call or -- or dealing with a -- maybe a

16   subordinate outside of my work hours or command staff

17   outside of my work hours.

18          Q.   How often would that occur, like,

19   administrative-type work or training?  Was that less

20   than 5 or 10 hours a month?

21          A.   Yeah.  Probably.

22          Q.   So the majority of the time that you were

23   working, you were logged into the CAD system; is that

24   correct?

25          A.   I think that's fair.  Yeah.

Deposition of: Jerry Vance                                    July 14, 2025

                                                                      61

1          Q.   Okay.  So you would start your shift in

2     your driveway, log into CAD, and then drive either to

3     a call or the district or your office, correct?

4          A.   Yeah.

5          Q.   How --  What was the address of District

6     1?  What's the address of District 1 that you worked

7     at in January of 2021 to July of 2021?  Which

8     crossroads?

9          A.   1840 South Lewis Drive.

10         Q.   And how far was the drive from your house

11    to that building approximately?

12         A.   Time or miles?

13         Q.   Time.

14         A.   I would say without traffic, maybe 20

15    minutes.

16         Q.   How about with traffic?

17         A.   Sometimes 35, 40.

18         Q.   How about the return trip?  Was it about

19    the same?

20         A.   The night shift, no.  3:00 in the

21    morning, it was pretty quick usually.

22         Q.   Closer to 20 minutes?

23         A.   Yeah.

24         Q.   Then you switched, though, to day

25    commander, March 2021 to July of 2021, correct?

Deposition of: Jerry Vance                              July 14, 2025

62

1          A.   Yes.

2          Q.   How about the commutes then to and from

3    work?  Was it between 20 and 40 minutes each way?

4          A.   Yeah.  It was the same.

5          Q.   So let's take these kind of one at a time

6    on these different assignments.

7               So District 1, when you were the night

8    watch commander, January to March of 2021, you would

9    log into CAD in your driveway and then either drive

10   -- if you would drive -- how often would you drive

11   directly to the office?

12         A.   I would say maybe 50 percent of the time.

13         Q.   And the other 50 percent of the time,

14   where would you be driving?

15         A.   I would usually drive somewhere like one

16   of the districts that I was responsible for or to a

17   call.

18         Q.   Can you give me a breakdown of how often

19   you would or what percentage of time you would drive

20   directly to a call at the beginning of your shift?

21         A.   I -- I can't, no.

22         Q.   Was it less than a quarter of the time?

23         A.   I don't recall.

24         Q.   Did you have an office in District 1 on

25   Lewis Drive?

Deposition of: Jerry Vance                                        July 14, 2025

63

1          A.    Yes.

2          Q.    Is it a shared office or a private

3    office?

4          A.    Shared.

5          Q.    Out of your workweek, you worked four

6    10s, correct?

7          A.    Yes.

8          Q.    Out of your four scheduled workdays that

9    were about 10 hours apiece, if we carve out 40

10   minutes, maybe an hour of time for drive time to/from

11   the office, that leaves us about nine hours left in

12   the day.  Did you spend most of those nine hours in

13   your office, out in the field?  Where would you spend

14   the majority of your shift?

15         A.    In the field.

16         Q.    The majority of the nine hours in the

17   field?

18         A.    Yes.

19         Q.    Where in the field?

20         A.    Anywhere I wanted to go.

21         Q.    Would it -- would it be at other district

22   offices or would it be on site for calls?

23         A.    Generally, if I had to do admin work, I

24   would do it on my MDC, not in the office, in any of

25   those offices.

Deposition of: Jerry Vance                                    July 14, 2025

64

1          Q.   And your MDC, is that your issued laptop?

2          A.   Yeah.  That's in the vehicle.

3          Q.   So, to be clear, when you're saying that

4    you're out in the field, is that on site at calls, or

5    is that you driving around and using your unmarked

6    patrol vehicle essentially as a home office?

7          A.   Yes.  So I --  Some of them would be

8    calls, but the majority was, let's say, at large.

9          Q.   And was that by your own choice?

10         A.   My style of leadership, I would say.

11         Q.   You could have gone into the office,

12   though, and worked out of your shared office; is that

13   correct?

14         A.   Yes.

15         Q.   You had the option?

16         A.   Yes.

17         Q.   No one told you that you needed to be at

18   large in your vehicle to do administrative work; is

19   that correct?

20         A.   I would say not -- you don't --  I wasn't

21   specifically told that, no.

22         Q.   Were you generally told that you needed

23   to be at large in your vehicle doing administrative

24   work?

25         A.   It was a decision that I made so that I

1    and responding telephonically to folks on scene?

2            A.    No.   I would consider it responding to

3    the scene.

4            Q.    To the scene?

5            A.    Yeah.

6            Q.    And if I look through your CAD data, the

7    unit history, am I going to see you responding most

8    shifts to five or more scenes while you were serving

9    as watch commander for District 1?

10           A.    I believe so.  I'm not 100 percent.

11           Q.    How about Lake Patrol?

12           A.    Probably not as many calls in Lake

13   Patrol.

14           Q.    During your time in Lake Patrol, when you

15   served as a patrol lieutenant in Lake Patrol, what

16   percentage of your day would you say you were on

17   scene responding to calls?

18           A.    As the patrol -- as the west side patrol

19   lieutenant?

20           Q.    Yes.  As the patrol lieutenant.

21           A.    I wouldn't --  Not very many.

22           Q.    What does "not very many" mean?  Less

23   than 25 percent of the time?

24           A.    Yes.

25           Q.    Where would the other 75 percent of your

Deposition of: Jerry Vance                                    July 14, 2025

70

1    time be spent?  Would that be at the office?

2          A.    When I was the west side lieutenant, I

3    had about an hour and 45-minute drive time to get to

4    my area of responsibility.

5          Q.    Each way?

6          A.    Yes.

7          Q.    Would you also use your MCSO vehicle as

8    essentially a home office during your time as Lake

9    Patrol west side patrol?

10          A.    Yes.

11          Q.    So then if you told me that you would be

12   on scene about 20 -- less than 25 percent of the time

13   as patrol over the west side, I understand that your

14   -- your drive was lengthy each way.  Describe for me

15   what that remaining 75 percent of your day would

16   consist of, other than your drive time.

17          A.    Some administrative work in the -- like,

18   in the shared office.  And I remember during that

19   period of time, there was a large area that I needed

20   to -- geographic area that I needed to learn.  So I

21   would spend quite a bit of time trying to understand

22   some of the areas that we needed to get to and areas

23   of the lake that were called different names and

24   stuff so I could respond if needed.

25          Q.    How did you educate yourself?  Were you

Deposition of: Jerry Vance                                      July 14, 2025

71

1  driving around?  Looking at maps?

2        A.    Yeah.  There was a map, and then, you

3  know, some of it, a deputy would have to take me by

4  boat.  But, yeah, I would say the majority of it was

5  me driving around.

6        Q.    When you served as a patrol lieutenant in

7  Lake Patrol, you had an office, correct?  You said

8  you had a shared office?

9        A.    Yes.

10       Q.    Where was the office located at?

11       A.    In --  Lake Pleasant in the Maricopa

12  County building that they had up there.

13       Q.    When you were in the administrative

14  capacity with Lake Patrol, did you have an office in

15  the same location or a different location?

16       A.    Different location.

17       Q.    Where was the administrative position?

18  Where was your office for the administrative

19  position?

20       A.    So that was in the Salt River rec area.

21  Bush Highway and Usery Road.

22       Q.    And how long was your drive to/from that

23  office in the Salt River recreation area from your

24  home?

25       A.    11 minutes.

Deposition of: Jerry Vance                                   July 14, 2025

72

1          Q.   Very close.

2          A.   Yeah.

3          Q.   And when you were in that administrative

4    position, walk me through what a typical day would

5    look like.  Would you just drive into the office and

6    start your day?

7          A.   Yeah.

8          Q.   So you would log into CAD in your

9    driveway and then drive to the administrative office

10   or the office at Salt River recreation area?

11         A.   Generally speaking, yes.

12         Q.   And what percentage of your day would you

13   say you spent in the office versus on scene in the

14   field in this administrative position?

15         A.   I would say maybe 90, 95 percent.

16         Q.   90 to 95 percent in your office as

17   opposed to in the field?

18         A.   If I was just the administrative

19   lieutenant for that day, yes.

20         Q.   When you went back to District 1 after

21   your time in Lake Patrol, can you describe for me if

22   your position and time in the office versus time in

23   the field changed at all?

24         A.   When I went back to watch commander

25   earlier this year?

Deposition of: Jerry Vance                                    July 14, 2025

75

 1    some more administrative meetings that typically

 2    don't go on at night.

 3         Q.   Is there more opportunity and time for

 4    administrative duties as a day commander versus a

 5    night commander?

 6         A.   What do you mean by more -- what do you

 7    mean by that question?

 8         Q.   Well, let's go through some things here.

 9    Actually, let me --

10         In your role as a lieutenant since

11    January of 2021, have you earned at least $684 a

12    week?

13         A.   Yeah.  I believe so.

14         Q.   Have you earned at least $108,000 a year

15    since your promotion to lieutenant in 2021?

16         A.   I'm not 100 percent what my first pay --

17    pay was as a lieutenant.

18         Q.   How about currently?

19         A.   Currently, yes.

20         Q.   How about last year, in 2024?

21         A.   Last year, yes.

22         Q.   Have you consistently since you were

23    promoted to lieutenant in 2021 supervised two or more

24    employees?

25         A.   Yes.

Deposition of: Jerry Vance                                July 14, 2025

76

1        Q.    Have you performed evaluations for

2   sergeants assigned to you as lieutenant since 2021?

3        A.    Yes.

4        Q.    How often have you performed those

5   evaluations?

6        A.    Yearly.

7        Q.    For how many sergeants?

8        A.    In total?

9        Q.    How many --  Give me how many each year

10   and how many in total, approximately.

11        A.    I don't think I've ever really been

12   assigned more than, I would say, six employees at a

13   time for the purposes of eval.

14        Q.    Okay.  In your time at District 1, either

15   as a watch commander or day commander, have you been

16   assigned -- were you assigned any -- and this is in

17   2021.  Were you assigned any special projects?

18        A.    Yes.

19        Q.    What special projects were you assigned

20   during that time period?

21        A.    I remember having to author the

22   operations plan or review the operations plan for the

23   district.

24        Q.    Any other special projects?

25        A.    Not that I recall.

Deposition of: Jerry Vance                                    July 14, 2025

77

1          Q.    How about in Lake Patrol as either a

2     patrol lieutenant or as administrative lieutenant,

3     were you given any special projects?

4          A.    I was the --  We had a mounted unit with

5     horses.  I was the commander of the mounted unit, and

6     I helped to grow and develop that unit.

7          Q.    What do you mean by that?

8          A.    There was four horses at the time and we

9     grew it to eight horses.  There was multiple parts of

10    equipment and there was deputies that we needed to

11    train to increase the unit.

12         Q.    Have you done any special projects in

13    your time at District 7?

14         A.    I -- I changed the shift schedule, and

15    then I have a community -- I have a squad 5 that is a

16    proactive squad.  They do patrol and then they do

17    extra duties for the -- the district.

18         Q.    Jerry, are you familiar with the concept

19    of Blue Team supervisor notes?

20         A.    Yes, ma'am.

21         Q.    Can you describe what they are for me?

22         A.    So sworn employees of every rank are

23    required to get two supervisor notes a month

24    documenting certain compliance reviews and checks and

25    then a performance-based note.

84

1          Q.    Have you been involved in any budgeting

2     processes during your time in Lake Patrol?

3          A.    Other than managing the grant money for

4     the events, I guess that's the budgeting that I've

5     done.

6          Q.    Have you been involved in any budgeting

7     or funding with game and fish?

8          A.    Again, we would get grant money from

9     them, too.

10         Q.    Is that a separate grant?

11         A.    Yes.

12         Q.    And would you manage and oversee that

13    funding as well?

14         A.    Yes.

15         Q.    Would you oversee any funding with the

16    mounted unit?

17         A.    More, I would -- we did request funds to

18    make purchases, but not really a -- an ongoing

19    budget.

20         Q.    Would you do purchase order requests and

21    submissions for the mounted unit?

22         A.    Yes.

23         Q.    Did you have anyone assist you with that

24    or was -- were you taking the lead on that?

25         A.    The deputy has done it and the sergeant

Deposition of: Jerry Vance                                    July 14, 2025

91

1          A.    No.

2          Q.    Have you provided any employees with

3    sustained findings for internal affairs

4    investigations?

5          A.    Maybe if it was my sergeant, my direct

6    subordinate.

7          Q.    Can you recall any specific instances?

8          A.    I believe when I was at Lake Patrol, my

9    administrative sergeant received discipline.

10         Q.    Have you ever provided coaching or

11   feedback to any of your subordinate sergeants or

12   deputies?

13         A.    I have, yes.

14         Q.    Would that be in all of your positions

15   from District 1, District 7, and Lake Patrol?

16         A.    Can I -- I just want to confirm.

17               So there's a coaching that gets handed

18   down from the Professional Standards Bureau that I --

19   I've delivered to somebody.  But in terms of me doing

20   a coaching with somebody, no, I have not done that.

21         Q.    Have you put any sergeants or deputies in

22   your chain of command on an action plan?

23         A.    Not that I recall, no.

24         Q.    Is it possible?

25         A.    It is possible, yeah.

92

1          Q.    Have you given any deputies or sergeants

2    that you supervise constructive feedback?

3          A.    Yes.

4          Q.    How often?  Daily?  Weekly?  Monthly?

5          A.    Yeah.  Probably weekly, I would say,

6    depending on their performance.

7          Q.    And is that across all of your positions

8    at District 1, District 7, and Lake Patrol?

9          A.    Yeah.

10         Q.    Since your promotion to lieutenant in

11   January of 2021, how many times have you prevented,

12   controlled, or extinguished fires of any type?

13         A.    Maybe once or twice that I can think of.

14         Q.    And that's for roughly a four-year time

15   period, right?

16         A.    Yeah.

17         Q.    Okay.  How many times since your

18   promotion to lieutenant in January of 2021 have you

19   rescued fire, crime, or accident victims?

20         A.    Could you repeat the question?

21         Q.    Absolutely.

22               Since your promotion to lieutenant in

23   January of 2021, how many times have you rescued

24   fire, crime, or accident victims?

25         A.    I guess, what -- could you define, like,

Deposition of: Jerry Vance                                July 14, 2025

105

1    similarities or differences in duties between days at

2    District 7 and days at District 1?

3                MS. SYVERSON:  Form.

4                THE WITNESS:  The duties are very

5    similar.  The volume would be the major difference.

6         Q.    BY MS. BALCH SANTIAGO:  Which district is

7    the busier district?

8         A.    District 1.

9         Q.    If I understood your earlier testimony

10   correctly, you were able to spend a significant

11   amount of time in the office in District 7, but it

12   was the opposite in District 1?

13        A.    I -- I thought, when you asked me that,

14   you asked me about Lake Patrol, but I might be wrong.

15        Q.    Well, I thought that it was at least 50

16   percent split with District 7, is that correct, or

17   not correct?

18        A.    There's -- there is an ability to spend

19   significant more time in the office in District 7.

20        Q.    Than District 1?

21        A.    Yeah.

22        Q.    So if I were to rank these in amount of

23   time that you were able to spend in the office versus

24   in the field, you could spend the most amount of time

25   in the office in Lake Patrol, correct?

Deposition of: Jerry Vance                                    July 14, 2025

106

1          A.    As -- in my role?

2          Q.    In your role, yes.

3          A.    Yes.

4          Q.    Then you were able to spend the least

5    amount of time in the office in District 1, correct?

6          A.    Yes.

7          Q.    And in the middle was District 7?

8          A.    Yes.

9                MS. BALCH SANTIAGO:  All right.  I'm at

10   time.  So unless your counsel has any follow-up

11   questions.

12

13                        EXAMINATION

14   BY MS. SYVERSON:

15         Q.    I just want to clarify one area that you

16   had talked about.

17                So in your role as an administrative

18   lieutenant, you had said that if you were just an

19   administrative lieutenant for a day, that you would

20   spend between 90 and 95 percent of your time in the

21   office.

22                But earlier I think you had also

23   testified that you were in a position where you could

24   kind of fill in if a patrol lieutenant wasn't there

25   or was on leave or if additional patrol lieutenants

Deposition of: Jerry Vance                                    July 14, 2025

109

1          Q.   Okay.  And would the calls and responses

2    that you took as administrative assistant -- as an

3    administrative lieutenant be reflected in the CAD

4    data?

5          A.   Generally speaking, yes.

6               MS. BALCH SANTIAGO:  Okay.

7               MS. SYVERSON:  Okay.  We'll read and

8    sign.

9               THE VIDEOGRAPHER:  This concludes today's

10   deposition.  We are off the record at 5:24.

11        (The proceedings concluded at 5:24 p.m.)

12

13

14

15               _____

16               JERRY VANCE

17

18

19

20

21

22

23

24

25

110

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3

 4           BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
 5   Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
 6   testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
 7   and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
 8   typewriting under my direction; that the witness
     requested reading and signing said deposition; that
 9   the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
             I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12           I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14
     Kristy A. Ceton                     50200_____
15   Certified Reporter                  CR Number

16
     _____        7.25.25
17   Certified Reporter Signature        Date

18
             I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).
20
21   Carrie Reporting, LLC               R1064
     Registered Reporting Firm           RRF No.
22
23   _____        7.25.25
     Registered Reporting Firm           Date
24   Signature
25
```

Carrie Reporting, LLC - Certified Reporters
480.429.7573

# EXHIBIT 31



# FAIR LABOR STANDARDS ACT (FLSA)
# EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 01/11/2021 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

**Employee ID:** 811080630    **Position #:** 76991    **Name** (Last, First): Vance, Jerry

**Market Range Title:** Law Enforcement Lieutenant    **Working Title:** Law Enforcement Lieutenant

**FLSA Status:**
☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)
☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

Employee Signature _____    Date _____

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

Employee Signature _____#1783_____    Date __1/5/21__

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

Supervisor Name (print) Gertrude T. Jackson    Supervisor Signature _____ By MCSO HR    Date 1/5/2021

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

Revised: 08/07/2017
CONFIDENTIAL

MCC 003761

# EXHIBIT 32

# FILED

# UNDER

# SEAL

# EXHIBIT 33

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on    )
behalf of himself and all   )
those similarly situated,   )
                            )
          Plaintiff,        )
                            )
vs.                         ) Case No.:
                            ) 2:23-cv-00068-DGC
Maricopa County,            )
                            )
          Defendant.        )
                            )


VIDEO-RECORDED DEPOSITION OF JASON THOMAS
       (and Videoconference via Zoom)



Phoenix, Arizona
July 14, 2025
9:15 a.m.

REPORTED BY:                CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR   Certified Reporters
AZ CR No. 50200             12725 W. Indian School Rd.
                            Suite F-100
CERTIFIED COPY              Avondale, AZ 85392
                            (480) 429-7573

2

1          VIDEO-RECORDED DEPOSITION OF JASON THOMAS

2     commenced at 9:15 a.m., on July 14, 2025, at Fisher &

3     Phillips, LLP, 3200 North Central Avenue, Suite 1550,

4     Phoenix, Arizona, and videoconference via Zoom before

5     Kristy A. Ceton, RPR, CRR, Arizona Certified Court

6     Reporter No. 50200.

7

8                         * * *

9

10    APPEARANCES:

11        For the Plaintiff:

12            FRANKEL SYVERSON, PLLC
              By:  Patricia N. Syverson, Esq.
13            2375 East Camelback Road
              Suite 600
14            Phoenix, Arizona 85016
              patti@frankelsyverson.com
15
          For the Defendants:
16
              FISHER & PHILLIPS, LLP
17            By:  Shayna Balch Santiago, Esq.
              3200 North Central Avenue
18            Suite 1550
              Phoenix, Arizona 85012
19            ssantiago@fisherphilliips.com

20        Also Present:

21            Cedric Tinard, the videographer

22            Donna Matthews (via Zoom)

23

24

25

Deposition of: Jason Thomas                                    July 14, 2025

12

1   sent an e-mail which was information relayed from our

2   HR department that indicated the amount of hours I

3   worked unpaid as our timekeeper system tracks unpaid

4   hours for the salaried employees.

5        Q.   And I'm going to show you some exhibits

6   here shortly.  But when you're talking about the

7   hours unpaid in the system, are you talking about a

8   designation on pay stubs that say reg no pay hours?

9        A.   I believe that's correct.  I haven't

10  reviewed that in a while, but I think that's how --

11  regular hours unpaid is what they designate them as,

12  I believe.  That's what the r-e-g would be.

13       Q.   So, actually, let's -- let's walk through

14  this a little bit here.

15            What was the date of your promotion to

16  lieutenant?

17       A.   April 4th, 2022.

18       Q.   And when you were promoted, do you know

19  what timekeeping system was in place?

20       A.   I'm pretty sure we were in Workday at

21  that time.

22       Q.   And do you remember what the timekeeping

23  system was before Workday?

24       A.   ADP.

25       Q.   So it would have been either ADP or

Deposition of: Jason Thomas                                    July 14, 2025

13

1    Workday, correct?

2         A.    Yes.  I'm pretty sure it was Workday.  I

3    think we've been on that for six years now.

4         Q.    Okay.  So how does it work with Workday,

5    to the extent that you know --  Actually, strike

6    that.

7              Have you had the same scheduled days and

8    hours since your promotion in April of 2022?

9         A.    I believe at the end of March, I was

10   given a temporary assignment in our communications

11   division.  And that ended about a month ago.

12        Q.    End of March 2025?

13        A.    Yes.

14        Q.    And that was a temporary assignment?

15        A.    To our communications division.

16        Q.    Was that in Patrol Bureaus East or West?

17        A.    No.  Communications division is separate

18   from both those.

19        Q.    Okay.  Prior to this assignment that's --

20              And are you back in your prior assignment

21   now?

22        A.    Yes, with some modifications on the

23   hours.

24        Q.    All right.  So let's walk through your

25   history of employment since your promotion to

14

1    lieutenant in April of 2022.

2              What division or what district were you

3    assigned to at the time of your promotion?

4         A.   District 1 patrol.

5         Q.   And was your position with District 1

6    patrol Sunday through Wednesday 7 a.m. to 5 p.m., all

7    the way from April 2022 through March of 2025?

8         A.   No.  So starting April of 2022, I was a

9    nighttime watch commander, Wednesday night through

10   Saturday night, 5 p.m. to 3 a.m.  And that was for

11   about a two-week period.

12        Q.   So that was from April 20- -- because

13   we're only talking about since the time of your

14   promotion.  So April 24, 2022, for about two weeks?

15        A.   I can't recall exactly, but I believe it

16   was about two weeks.  And then I want to say by March

17   of 2022 -- I'm sorry.  Not March.  May of 2022, I

18   moved to Wednesday through Saturday day shifts,

19   7 a.m. to 5 p.m.

20        Q.   And did you remain in District 1 dayshift

21   Wednesday through Saturday 7 a.m. to 5 p.m. through

22   March of 2025?

23        A.   I forget when I moved to -- it's about

24   that time.  No.  Of 2023 is when I moved to Sunday

25   through Wednesday instead of Wednesday through

Deposition of: Jason Thomas                                    July 14, 2025

15

1   Saturday.  And I might have been December of 2023,

2   January 2024.  Around there.

3          Q.   So, again, I want to make sure I

4   understand this.

5               So April 24, 2022, your first position in

6   District 1 following your promotion to lieutenant was

7   Wednesday to Saturday night 5 p.m. to 3 a.m. for

8   roughly two weeks?

9          A.   Yes.

10         Q.   Correct?

11         A.   Approximately, yes.

12         Q.   The next assignment started around May of

13  2022, and that was dayshift Wednesday to Saturday,

14  7 a.m. to 5 p.m., and you remained in that position

15  until about 2023?

16         A.   Yes.  About.

17         Q.   And then in -- do you remember what point

18  in 2023?

19         A.   I don't remember if it was December '22,

20  if it was January of '23.  It was about that time

21  frame.

22         Q.   Okay.  So either late -- December 2022 or

23  January 2023, you then moved Sunday through

24  Wednesday, also dayshift, 7 a.m. to 5 p.m.?

25         A.   Correct.

Deposition of: Jason Thomas                                    July 14, 2025

                                                                      16

1        Q.   And how long were in that position for?

2        A.   Until March of '25.

3        Q.   And then in March of 2025, until -- when

4    did that communications division position end?

5        A.   I want to say it's around June 7th.

6        Q.   2025.

7             What were the hours that you worked and

8    days that you worked in the communications division?

9        A.   7 a.m. to 5 p.m., Monday through

10   Thursday.

11       Q.   And when you left the communications

12   division in June of 2025, did you go back to District

13   1?

14       A.   I did.

15       Q.   And did you go back to your old schedule

16   of Sunday through Wednesday?

17       A.   The schedule changed to Monday through

18   Thursday.

19       Q.   Monday through Thursday?

20       A.   Correct.

21       Q.   And 7 a.m. to 5 p.m.?

22       A.   Correct.

23       Q.   Okay.  I'm going to run through this so I

24   make sure I have this clear.

25            Starting in April 24, 2022, you were

Deposition of: Jason Thomas                                    July 14, 2025

17

1    doing, in District 1, Wednesday to Saturday night

2    from 5 p.m. to 3 a.m. for about two weeks.

3             A.   Okay.  Can you say the day again in that?

4             Q.   Yeah.  April 24 of 2022.

5             A.   So I'm sorry.  It's not 24.  It's 4.

6             Q.   April 4.  Sorry.

7                  April 4 of 2022?

8             A.   Correct.

9             Q.   So April 4, 2022, you were in District 1

10   Wednesday to Saturday night from 5 p.m. to 3 a.m. for

11   about two weeks, correct?

12            A.   Correct.

13            Q.   And the next position or the next

14   assignment was roughly May of 2022.  You moved to

15   dayshift, Wednesday through Saturday, 7 a.m. to

16   5 p.m., also in District 1, correct?

17            A.   Correct.

18            Q.   You remained in that position until

19   roughly December 2022, January 2023.  And that's when

20   you moved to Sunday through Wednesday, 7 a.m. to

21   5 p.m., also in District 1, correct?

22            A.   Correct.

23            Q.   You were in that position until about

24   March of 2025, correct?

25            A.   Yes.

18

1          Q.   Then you moved and did a temporary

2    assignment in the communications division, which is

3    not in Patrol Bureaus East or West, correct?

4          A.   Correct.

5          Q.   And that was March 2025 through June 7th

6    of 2025, correct?

7          A.   Approximately June 7th.

8          Q.   Okay.  And then after your temporary

9    assignment in communications division came to an end,

10   you returned to District 1, but your new days and

11   hours are Monday through Thursday, 7 a.m. to 5 p.m.

12   dayshift, correct?

13         A.   Correct.

14         Q.   And all of those positions were held as a

15   lieutenant, correct?

16         A.   Correct.

17         Q.   Okay.  During this time, as lieutenant,

18   have you ever -- have you ever served as acting

19   commander?

20         A.   Yes.

21         Q.   How many times?

22         A.   There was probably four times that were

23   just for, like, a week or a weekend.  And then there

24   was one time that was for about two and a half

25   months.

Deposition of: Jason Thomas                                    July 14, 2025

19

1      Q.   Have you served as acting commander for
2   --  Strike that.
3           As lieutenant, you reported to a captain,
4   correct?
5      A.   Correct.
6      Q.   And the captain reported to a chief,
7   correct?
8      A.   Correct.
9      Q.   When you served as an acting commander,
10  were you serving in the place of your captain while
11  they were out?
12     A.   Yes.
13     Q.   Have you served as acting commander for
14  multiple captains or just for a single captain?
15     A.   I believe just one.
16     Q.   What captain have you served as acting
17  commander for?
18     A.   John Bailey.
19     Q.   Let's walk through each of the times that
20  you can remember serving as acting commander for him.
21          What was the first time that you recall
22  serving as acting commander for Captain John Bailey,
23  roughly?
24     A.   No idea on the dates, but it was
25  basically if he was on vacation for maybe a week or

20

1    something.

2         Q.    How much contact would you have with

3    Captain Bailey while he was on vacation?

4         A.    Zero.

5         Q.    So he was out of pocket completely on his

6    vacations?

7         A.    I'm not sure what you mean by "out of

8    pocket."

9         Q.    If an issue came up, you were handling

10   the issues that came up, correct, in his absence?

11        A.    Depending on the issue, yeah.  I would

12   handle minor issues, and anything else, I would

13   report to the chief with.

14        Q.    Did you ever have occasion to need to

15   call or get in contact with Captain Bailey while he

16   was out on vacation or on a leave and you were

17   serving as acting commander for him?

18        A.    When he was out on medical leave, I had

19   contact with him at least once.

20        Q.    For what issue?

21        A.    I do not recall at all.

22        Q.    Was it a call to check in and see how he

23   was doing or was it work-related?

24        A.    The main reason would be to check in on

25   him.  However, during those conversations, work

Deposition of: Jason Thomas                                    July 14, 2025

21

1    matters always seemed to appear.  I cannot recall

2    what specific work matter at all.

3         Q.   Do you recall what caused you to initiate

4    the call?  Was it a work issue that you needed his

5    assistance with, or did you initiate the call to

6    check on him?

7         A.   It was to check on him.

8         Q.   And then work issues just may have come

9    up in casual conversation?

10        A.   Yes.

11        Q.   How long was his medical leave that

12   you're referring to?

13        A.   I don't recall specifically, but it was

14   over four months, because an acting captain came in

15   after that two-and-a-half-month period.

16        Q.   So if I understand your testimony

17   correctly, when Captain Bailey went out on a medical

18   leave, you serve as acting captain for about two and

19   a half months, and then another captain came in to

20   serve as acting captain after that?

21        A.   Correct.

22        Q.   Who was the acting captain that came in

23   after two and a half months?

24        A.   Captain Dave Lee.  He was assigned to

25   lake patrol, and he was given both divisions to be

22

1    captain of during that time.

2          Q.   And is there a single captain that

3    oversees District 1?

4          A.   By our organizational chart, yes.

5          Q.   Is -- is there some other --

6               What do you mean by the "organizational

7    chart, yes"?

8          A.   So, for instance --  Okay.  I'm sorry.  I

9    may have misunderstood your question.

10              So during that temporary period, a

11   captain had two divisions.  So --

12         Q.   Let me rephrase with dates.

13         A.   Okay.

14         Q.   I apologize for the ambiguity.

15              From April 4 of 2022 through the present,

16   at the times that you have been in District 1, have

17   there ever been two captains that oversaw District 1?

18         A.   No.

19         Q.   So when you were serving as acting

20   commander and told me there were about four occasions

21   of a week or so, plus a longer stint of about two and

22   a half months, were you the highest ranking

23   individual in District 1?

24         A.   I would say yes.  Well --  Yeah.  Never

25   mind.  Lieutenant Houck and I are even with our time

Deposition of: Jason Thomas                                    July 14, 2025

23

1    as lieutenants.  We promoted the same day.  So we're

2    equals in that respect.

3          Q.   But my question is, when you were serving

4    as acting commander, were you the highest ranking

5    individual in District 1?

6          A.   Yes.

7          Q.   So let's take the example that you

8    provided with Lieutenant Houck.

9               Did you and Lieutenant Houck overlap in

10   District 1?

11         A.   On Wednesdays, we both worked.

12         Q.   During what time period?  Do you recall?

13         A.   Because he was a watch commander, so from

14   the time his watch commander time ended, which I

15   believe is the January '23 time frame.  Lieutenant

16   Rank took over as the watch commander.  So at that

17   time, is when Lieutenant Houck went to daytime,

18   Wednesday through Saturday, and I went to daytime

19   Sunday through Wednesday.

20               So I'm not exactly sure what that date

21   is.

22         Q.   So in roughly January of 2023, if Captain

23   Bailey had taken a leave and appointed you as acting

24   commander during that time, and your schedule

25   overlapped with Lieutenant Houck on Wednesdays, would

Deposition of: Jason Thomas                                    July 14, 2025

24

1    you outrank Lieutenant Houck as acting commander?

2         A.   My hesitation on answering the question

3    is, the only thing that made me acting was an e-mail

4    that the captain would say that he's out of office,

5    any issues go to Lieutenant Thomas.

6              So rankwise, we still held the same rank.

7    That didn't change.  The -- I would just handle or

8    address any issues that would go to -- above a

9    lieutenant that would normally go to the captain.  I

10   would handle those issues.

11             So it wasn't that I'm told during that

12   period that I am outranking Lieutenant Houck, because

13   we both were still lieutenants.  It's just the next

14   level of review on a Blue Team entry would come to

15   me, that sort of thing.

16        Q.   You had different approval authority

17   during that time period as acting commander, correct?

18        A.   Correct.

19        Q.   And it was a greater approval authority,

20   correct?

21        A.   For administrative stuff, yes.

22        Q.   All right.  So let's talk about Workday a

23   little bit here.

24             Do you have an understanding as to how

25   your scheduled hours are entered into Workday?

Deposition of: Jason Thomas                    July 14, 2025

25

1        A.    I believe so.

2        Q.    Describe for me your understanding.

3        A.    Hours are preset by a Workday

4   administrator.  And then I mainly change the hours as

5   needed.

6        Q.    How do you change the hours as needed?

7        A.    I go into Workday and I will change,

8   whether it be the start time or end time that was

9   off.  I removed start time or end time as needed, as

10  applicable, and replace it with the actual start and

11  end time.

12       Q.    Did you receive any instructions or

13  directives from Maricopa County on how to modify the

14  start and stop times in Workday or ADP prior to that?

15       A.    Nothing formal.

16       Q.    How about informal?

17       A.    Other lieutenants and captains explained

18  to me how they handled their worksheet or their --

19  sorry -- timesheet, and I took their practice and did

20  it.

21       Q.    Were you told to add hours to your

22  timesheet if you worked additional hours past your

23  scheduled hours?

24       A.    It was recommended from other lieutenants

25  to do so.

Deposition of: Jason Thomas                                July 14, 2025

29

1          A.   Correct.

2          Q.   Other than the current being incorrect,

3     has your schedule at any other time from April of

4     2022 through the present been loaded incorrectly into

5     ADP or Workday, to your knowledge?

6          A.   To my knowledge, it has been correct

7     since then.

8          Q.   So since the schedule is preloaded into

9     Workday, walk me through if you worked 50 hours in

10    workweek 1 and you wanted to take some time off, take

11    some vacation in a week 2, would you need to make any

12    adjustments to your schedule in Workday at the end of

13    the two-week pay period?

14         A.   Yes.

15         Q.   What would that look like?

16         A.   Any -- any hours showing as regular hours

17    worked, I would change to correct the time off,

18    whether it be sick or vacation, to where for the

19    two-week period it would equal up to 80 total.

20         Q.   But if you worked 50 hours, working hours

21    in week 1, could you --  Strike that.

22              If you worked 50 hours in week 1, then

23    you could take week 2 completely off, but only need

24    to record 30 hours of vacation; is that correct?

25         A.   That is correct.

1          A.   Yes.  Computer-aided dispatch.

2          Q.   Can you describe for me the

3    computer-aided dispatch system?

4          A.   It's a system where users log in and can

5    monitor calls for service for the sheriff's office.

6          Q.   Were you required to be logged into the

7    CAD system --

8          A.   Yes.

9          Q.   -- during your scheduled hours?

10         A.   Sorry.

11              During my work hours, yes.

12         Q.   And when would you log in to the CAD

13   system?

14         A.   Immediately when I would get into my

15   vehicle, my assigned county take-home vehicle, I

16   would log in.

17         Q.   And so I understand this correctly, you

18   had an assigned unmarked county vehicle that you were

19   able to take home with you each day, correct?

20         A.   Correct.

21         Q.   And so when would you -- walk me through

22   the start of your day.

23              You would, you know, get ready and your

24   shift would start -- for the majority of the time

25   period relevant to this case, your shift was 7 a.m.

Deposition of: Jason Thomas                                July 14, 2025

48

1    to 5 p.m., correct?

2         A.    Correct.

3         Q.    So walk me through what a typical day

4    would look like, including when you would log in to

5    the CAD system and when you would also -- yeah, when

6    you would log in to the CAD system.

7         A.    I put my full uniform on, body worn

8    camera, radio, and my computer.  I grab it.  I go out

9    to my vehicle.  I dock the computer, and I

10   immediately log in to the CAD system.  And I start my

11   commute to work.

12            At the end of my day, I commute home,

13   still in uniform.  And as soon as I pull into my

14   neighborhood, I start the logoff process.  By the

15   time I'm parked, my computer's logged off and shut

16   off.

17        Q.    In District 1, did you have a physical

18   office?

19        A.    Yes.

20        Q.    Where was your physical office located?

21        A.    Right as you enter the door for

22   employees, there is an office off to the side that I

23   share with the other lieutenants.

24        Q.    So you shared an office with lieutenants?

25        A.    Yes.

1          Q.   At all times from April of 2022 through

2     the present, while you were in District 1 patrol,

3     were you required to be logged into the CAD system

4     during your shift?

5          A.   Yeah.

6          Q.   Your scheduled shift was four days a

7     week, 10 hours a day, correct?

8          A.   Correct.

9          Q.   And if I carved out your commute to/from

10    work, which is about 40 minutes a day, that would be

11    about nine hours, 20 minutes left in the day,

12    correct?

13         A.   Yes.

14         Q.   What --  Can you give me a breakdown of

15    how much time you would spend in your office versus

16    out in the field?

17         A.   I would be in the office unless my

18    presence was required out in the field.  And that's a

19    huge variable, depending on what the type of call was

20    that I would be needed at.

21         Q.   Can you give me your best estimate?

22         A.   On how often I went on scene for a call

23    for service?

24         Q.   Let me ask it a little bit differently.

25              Were there ever times where you would be

Deposition of: Jason Thomas                                    July 14, 2025

52

1    in your office the whole day?

2           A.    There were days like that, yes.

3           Q.    How many?

4           A.    I would say around three out of the four

5    days.  That was most often.

6           Q.    So on a weekly basis, around three out of

7    the four days, you would be in your office for the

8    entire day, correct?

9           A.    Correct.

10          Q.    So on the fourth day, how much of your

11   time would be split between your office and out in

12   the field?

13          A.    It would be depending on the call.  If it

14   was, I want to say, a homicide, I would be 10 hours

15   on scene.  If it was a -- you know, three hours on

16   scene would be for most of the scenes I'm called out

17   to, and 10 hours on the more serious ones.

18          Q.    Have there ever been any occasions where

19   you were going to head out to a scene but the scene

20   was resolved or under control before you arrived?

21          A.    Sure.  There was times.

22          Q.    How often would that occur?

23          A.    Maybe four times a year.

24          Q.    How often would you say in a year -- how

25   many traffic stops would you say you conduct in a

53

1    given year?

2         A.    I've only done two or three since I made

3    lieutenant in April of 2022.

4         Q.    And why is that?

5         A.    My primary responsibility is not civil

6    traffic violations.  And -- and doing those takes you

7    away from being able to do what my primary

8    responsibilities are as incident commander.

9         Q.    And what is your primary responsibility

10   as a commander?

11        A.    Incident command.  So if there's an

12   incident, taking command of it.  A significant

13   incident.

14        Q.    Can you describe for me what you mean by

15   that, taking command of an incident?

16        A.    So the significant incident, I set up a

17   command post.  I request additional resources.  I

18   assign duties to people on scene.  I ensure

19   notifications are given to the chain of command.

20   Ensure the sergeants are properly doing their duties.

21        Q.    When you are going out to take command of

22   an incident, to use your phrase, are you usually the

23   highest ranking individual on scene?

24        A.    Yes.  There's only one incident that I

25   have had that --  I should rephrase.

54

1              There's an on-call chief that comes out,
2     but they do not take command of the scene.  Their
3     primary duties is reporting to the sheriff.  But on
4     every scene I've had, they didn't take command from
5     me.  I continued command.  And there was one where a
6     captain showed up and he did take command.
7              Q.   What was the situation where the captain
8     took command?
9              A.   It was an active shooter in Town of
10    Guadalupe.  This was in 2022.  And Captain Dave Lee
11    from my patrol was on duty and came over.
12             Q.   Was that when you were recently promoted
13    to lieutenant?
14             A.   It was fairly recent.
15             Q.   Well, you were promoted to lieutenant in
16    April of 2022, correct?
17             A.   Correct.
18             Q.   So this happened in 2022.  You would have
19    been serving in the capacity as a lieutenant for
20    eight months or less, correct?
21             A.   Yeah.
22             Q.   When you set up a command post, would you
23    agree that your responsibility is to supervise and
24    manage your subordinates?
25             A.   Yeah.  That's the same with sergeants.

68

1    description that you disagree with, anything that you

2    contend is not a job task or responsibility of a law

3    enforcement lieutenant.

4          A.    So do you want me to review all of it or

5    just the job task?

6          Q.    As much as you need to review to feel

7    comfortable answering my questions.

8          A.    All right.  I reviewed it.

9          Q.    Now that you've had the opportunity to

10   review Exhibit 8 to your deposition, is there

11   anything in Exhibit 8 that you disagree with that a

12   law enforcement lieutenant does not do?

13         A.    I do not disagree.

14         Q.    So you agree that all of the job

15   responsibilities or essential job tasks in Exhibit 8

16   are, in fact, job tasks performed by law enforcement

17   lieutenants, correct?

18         A.    Correct.

19         Q.    Next question.  Is there anything that is

20   left off of the law enforcement lieutenant job

21   description that you contend law enforcement

22   lieutenants do that's not listed in this job

23   description?

24         A.    I would say to be all-encompassing, it

25   should also include the same descriptions as what a

74

1          Q.   Let's -- let's take this more broad

2     definition.

3               So if we take the broad definition of

4     detaining or handcuffing someone in addition to

5     arrests, how many times have you arrested, detained,

6     or handcuffed someone since April of 2022 to the

7     present?

8          A.   So I would say three.  But that one isn't

9     added.

10         Q.   So if I understand you correctly then,

11    since April 4 of 2022, which is your date of your

12    promotion to lieutenant, through the present, the

13    only times that you have arrested, detained, or

14    handcuffed someone are the three instances you just

15    described?

16         A.   That is all I recall at this time.

17         Q.   Is it possible that those are the only

18    times since --

19         A.   It is possible.

20         Q.   -- since April of 2022?

21         A.   Yes, it's possible.

22         Q.   Since April 4 of 2022, have you

23    supervised at least two or more employees

24    consistently?

25         A.   Yes.

79

1    provide your own individualized rankings each time

2    you sat on promotional panel for sergeants?

3          A.   Yes.  We did an individual member and

4    then a group.

5          Q.   And same question with regards to

6    lieutenant promotional panel.  You provided your own

7    individualized rankings in addition to an overall

8    group ranking, correct?

9          A.   Yes.  That's an outside company from

10   California.  They give us their procedure.  And it's

11   -- that was their procedure was to do that.

12         Q.   Have you ever been involved in an

13   internal affairs investigation?

14         A.   Yes.

15         Q.   How many times?

16         A.   What kind of involvement?  Principal?

17   Witness?  Investigator?  All of the above?

18         Q.   In any way.  How about you walk me

19   through the various ways that you can be involved in

20   an internal affairs investigation.

21         A.   Sergeants and above -- the rank of

22   sergeant and above can be the investigator.  So I've

23   been the investigator as a sergeant and as a

24   lieutenant.  And you can also be involved as a lead,

25   as a principal, as a witness, and as a complainant.

80

1    I think that's all of them.

2          Q.    Okay.  So let's take what I think will be

3    the easier ones first.

4                Have you ever been a complainant in an

5    internal affairs investigation?

6          A.    Yes.

7          Q.    How many times?

8          A.    I believe three.

9          Q.    Okay.

10         A.    Maybe four.

11         Q.    We'll walk through each of those in a

12   second.  Have you ever been a witness in an internal

13   affairs investigation?

14         A.    Yes.

15         Q.    Approximately how many times?

16         A.    Five.

17         Q.    Have you ever been the principal in an

18   internal affairs investigation?

19         A.    Yes.

20         Q.    How many times?

21         A.    At least four.  That true number, I don't

22   know.  They don't tell us.

23         Q.    Have you ever been the lead in an

24   internal affairs investigation?

25         A.    Not 100 percent sure, because the lead

81

1    and witness kind of carry over, and I'm not quite

2    sure if I was considered a lead or witness in one of

3    those.  But they're -- it would have been one of

4    those five if I was a lead.

5         Q.   Okay.  And have you ever been the

6    investigator in an internal affairs investigation?

7         A.   Yes.

8         Q.   How many times approximately?

9         A.   10.  I could be off on that one.

10         Q.   Now, the numbers that you gave me, are

11    these numbers since your time as a lieutenant or does

12    it include your time as a sergeant as well?

13         A.   Included time as a sergeant.

14         Q.   So if I were to only focus on your time

15    as a lieutenant, how many times have you been the

16    complainant in an internal affairs investigation

17    since April of 2022?

18         A.   So only one of those would have been as

19    sergeant, and the rest of them would be as

20    lieutenant.

21         Q.   So two to three?

22         A.   Yeah.

23         Q.   How about as a witness?

24         A.   I believe as a witness, they've all been

25    as lieutenant.

87

1    system.  It's any supervisor can be given one to

2    issue to an employee.  It's to an employee in our

3    chain of command, though.

4              So I would issue a coaching to a sergeant

5    who was found sustained on a policy violation during

6    someone's investigation, internal affairs

7    investigation, not necessarily mine.

8              And it's just that I'm the current

9    supervisor of that employee, so then I would issue

10   that coaching.  That's a formal one.

11             As far as informal coachings and just

12   discussions and stuff, yeah, I've done that.  But

13   that's just a normal during the week thing.

14        Q.   How many times during a given workweek

15   would you guess that you've done informal coaching or

16   feedback with sergeants or deputies in your district?

17        A.   I would say at least once a week.

18        Q.   How many times would you say in a year

19   you've done formal coachings with deputies or

20   sergeants in your district?

21        A.   Once, maybe twice in a year.

22        Q.   Have you placed anyone on an action plan?

23        A.   No.

24        Q.   Do you have the authority to place

25   someone on an action plan?

88

1          A.   Yes.

2          Q.   Do you perform evaluations of your

3    assigned staff?

4          A.   Yes.

5          Q.   How often?

6          A.   We have a yearly employee performance

7    appraisal you do to your assigned.

8          Q.   And how often do you -- how many

9    individuals do you perform evaluations for on a

10   yearly basis?

11         A.   I think it's approximately three.  Kind

12   of depends.  If you had both of the ones assigned to

13   you during the year, that number can go up.

14         Q.   Do you have any input or authority if a

15   deputy or sergeant wants to adjust their schedule to

16   assist with that modification?

17         A.   Yeah.

18         Q.   What authority do you have?

19         A.   Authorizing an adjustment to their

20   schedule, I guess.

21         Q.   On a one-off basis, or do you have the

22   authority to adjust or modify someone's schedule if

23   they wanted to switch regularly scheduled workdays?

24         A.   No.  Because the division commander would

25   have to approve that.  The captain.  I'm sorry.

Deposition of: Jason Thomas                                    July 14, 2025

114

1    since April of 2022.

2                  How many times since your promotion to

3    lieutenant in 2022 have you prevented control or

4    extinguished fires of any type?

5          A.   I guess zero.

6          Q.   How many times since your promotion to

7    lieutenant in April of 2022 have you rescued fire,

8    crime, or accident victims?

9          A.   You said fire, accident, or?

10         Q.   Crime victims.

11         A.   Not necessarily -- I mean, I've responded

12   to crashes, but I wasn't necessarily rescuing the

13   victim.  It was kind of a noninjury crash or -- yeah.

14   So I didn't necessarily rescue them, but I was part

15   of the first response to crashes and crime victim.

16         Q.   So how many times have you rescued fire,

17   crime, or accident victims?

18         A.   I wouldn't take credit for rescuing them,

19   I guess.

20         Q.   Is that none since your promotion in

21   April of 2022?

22         A.   I'm not recalling any, so I'll say no.

23   None.

24         Q.   If I make it broader and you are

25   responding to crashes, how many scenes have you

Deposition of: Jason Thomas                                    July 14, 2025

115

1    responded to crashes since your promotion in April of

2    2022?

3         A.   I would say about -- it feels like about

4    10.

5         Q.   Ten over the course of about three years?

6         A.   Yeah.  Sorry.  Yes.

7         Q.   How many times since April of 2022 have

8    you prevented or detected crimes?

9         A.   I guess it's kind of hard to say.

10   Prevention, is that direct or indirect?  Sometimes

11   your presence is enough for prevention.  It's kind of

12   hard to gauge that one.

13             And detected crimes?

14        Q.   Yes.

15        A.   When I go to a scene, I often point out

16   the crime.  So I -- I would say about 20.  Maybe

17   more.  But about 20.

18        Q.   About 20 over the course of three years?

19        A.   Correct.

20        Q.   How about conducting investigations or

21   inspections for violations of law?  How many times

22   have you done that since your promotion in April of

23   2022?

24        A.   What's that phrase again?

25        Q.   Conducting investigations or inspections

Deposition of: Jason Thomas                                    July 14, 2025

116

1    for violations of law?

2         A.    I had conducted at least two

3    investigations.  It's been more than that.  Probably

4    about 10 to 12.  Because I also handle walk-up

5    traffic at the district.  When citizens come to the

6    district, I'll take their information, if necessary,

7    write a report.

8         Q.    Okay.  So over the last three years since

9    your promotion in April of 2022, your best estimate

10   is 10 to 12 investigations or inspections that you've

11   conducted?

12        A.    Yes.

13        Q.    Okay.  How many times have you performed

14   surveillance since your promotion to lieutenant in

15   April of 2022?

16        A.    About six.

17        Q.    That's over three years?

18        A.    Yes.

19        Q.    I think we've already discussed this one.

20              Pursuing, restraining, and apprehending

21   suspects.  Is that the three that you gave me

22   earlier?

23        A.    Yes.

24        Q.    Since April of 2022?

25        A.    Correct.

Deposition of: Jason Thomas                                July 14, 2025

117

1          Q.   Okay.  The next one is, detaining or

2     supervising suspected and convicted criminals,

3     including those on probation or parole.  How many

4     times have you done that since April of 2022?

5          A.   We don't do probation or parole at all,

6     sheriff's office.

7          Q.   Including those on probation or parole.

8     So let me read it to you again.

9               Detaining or supervising suspected and

10    convicted criminals, including those on probation or

11    parole?

12         A.   I'm sorry.  That first part again.

13    Detaining or?

14         Q.   Detaining or supervising suspected and

15    convicted criminals?

16         A.   Suspected and convicted.  Oh, so I've

17    been on scene and watched the suspect while the

18    investigator had to go about and do their own stuff,

19    I would say a dozen times.

20         Q.   Over three years?

21         A.   Yes.  12.  Over three years.

22         Q.   How about interviewing witnesses, how

23    many times have you interviewed witnesses since April

24    of 2022?

25         A.   It feels like about 20 times.

1      Q.   Over three years?

2      A.   Yes.

3      Q.   How about interrogating and

4   fingerprinting suspects, how many times have you done

5   that since April of 2022?

6      A.   I would say maybe assisted with

7   interrogation four or five times.  We don't do any

8   fingerprinting in the patrol districts.

9      Q.   So you assisted with interrogation four

10  to five times over three years?

11     A.   Yeah.

12     Q.   And no -- none on the fingerprinting?

13     A.   Yeah.  We don't do any fingerprinting on

14  patrol.

15     Q.   Okay.  And last one is preparing

16  investigative reports.  How many times have you

17  prepared investigative reports since April of 2022?

18     A.   I would say about 10.  Preparation being

19  as in I authored something as a part of that

20  investigation is about 10.  I prep them to submit to

21  the county attorney quite often.

22     Q.   Of the topics that we just discussed --

23  I'll briefly go through them again.  Things like

24  rescuing fire, crime, or accident victims, preventing

25  or detecting crimes, conducting investigations,

Deposition of: Jason Thomas                                July 14, 2025

123

1    as if -- you know, as a lieutenant or any other

2    lieutenant would have been?

3              MS. BALCH SANTIAGO:  Form.

4              THE WITNESS:  Yes.  I did all -- all my

5    lieutenant duties remain the same.  It was additional

6    duties I had to do during the acting times.

7              MS. SYVERSON:  Okay.  Those are the only

8    questions I had.

9              MS. BALCH SANTIAGO:  All right.  You guys

10   going to read and sign?

11             MS. SYVERSON:  Yes.

12             THE VIDEOGRAPHER:  We are off the record

13   at 12:39.

14        (The proceedings concluded at 12:39 p.m.)

15

16

17

18              _____

                JASON THOMAS

19

20

21

22

23

24

25

Deposition of: Jason Thomas                                          July 14, 2025

124

1    STATE OF ARIZONA        )
                             ) ss.
2    COUNTY OF MARICOPA      )

3

4            BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
5    Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
6    testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
7    and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
8    typewriting under my direction; that the witness
     requested reading and signing said deposition; that
9    the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
             I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12           I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14
     Kristy A. Ceton                    50200_____
15   Certified Reporter                 CR Number

16   _Kristy A Ceton_                     7.25.25
17   Certified Reporter Signature        Date

18
             I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).

20
21   Carrie Reporting, LLC               R1064
     Registered Reporting Firm           RRF No.

22
     _Michele Durrer_                     7.25.25
23   Registered Reporting Firm           Date
24   Signature

25

# EXHIBIT 34



# FAIR LABOR STANDARDS ACT (FLSA)
# EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 04/04/2022 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| Employee ID: 811070461    Position #: 2915 | Name (Last, First): Thomas, Jason |
|---|---|
| Market Range Title: Law Enforcement Lieutenant | Working Title: Law Enforcement Lieutenant |

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____     _____
Employee Signature                                                  Date

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____ # 51629     _____ 3/30/22
Employee Signature                                      Date

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

Gertrude T. Jackson     Gerty T. Jack     3/30/2022
Supervisor Name (print)     Supervisor Signature     Date
                                  for MCSO HR

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

Revised: 08/07/2017
CONFIDENTIAL

MCC 004007

# EXHIBIT 35

# FILED

# UNDER

# SEAL

# EXHIBIT 36

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CHRISTOPHER J. HOUCK, on          )
behalf of himself and all         )
those similarly situated,         )
                                  )
          Plaintiff,              )
                                  )   No.
                                  )   2:23-cv-00068-DGC
          vs.                     )
                                  )
                                  )
MARICOPA COUNTY,                  )
                                  )
          Defendant.              )
_____   )

VIDEORECORDED DEPOSITION OF MICHAEL TROWBRIDGE

Phoenix, Arizona
August 27, 2025
10:38 a.m.

Reported by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS               Certified Reporters
AZ CR No. 50574                 12725 W. Indian School Road
NM CCR No. 614                  Suite F-100
Certified Realtime Reporter     Avondale, Arizona 85392
Certified Realtime Captioner
Registered Professional Reporter        (480) 429-7573


(COPY)

```
 1              VIDEORECORDED DEPOSITION OF MICHAEL

 2   TROWBRIDGE commenced at 10:38 a.m. on August 27, 2025, at

 3   the law offices of FISHER & PHILLIPS LLP, 3200 NORTH

 4   CENTRAL AVENUE, SUITE 1550, PHOENIX, ARIZONA, before

 5   MICHAELA HERMAN DAVIS, a Certified Reporter, in and for

 6   the County of Maricopa, State of Arizona.

 7

 8

 9                            *  *  *

10                    A P P E A R A N C E S

11   FOR THE PLAINTIFFS:

12              FRANKEL SYVERSON, PLLC
                BY: MS. PATRICIA N. SYVERSON
13                  9655 GRANITE RIDGE DRIVE
                    SUITE 200
14                  SAN DIEGO, CALIFORNIA 92123
                    patti@frankelsyverson.com
15

16   FOR THE DEFENDANT:

17              FISHER & PHILLIPS LLP
                BY:  MS. SHAYNA BALCH SANTIAGO
18                  3200 NORTH CENTRAL AVENUE
                    SUITE 1550
19                  PHOENIX, ARIZONA 85012-2487
                    ssantiago@fisherphillips.com
20

21   ALSO PRESENT:

22
                SAMANTHA ELLIOTT, VIDEOGRAPHER
23
                MEGAN MORLEY (via Zoom)
24

25
```

1  argue that the responses you provided today were the true

2  and correct responses.

3              Is that understood?

4      *A.*    Yes.

5      *Q.*    Where are you currently employed?

6      *A.*    With the Maricopa County Sheriff's Office.

7      *Q.*    And what is your current position?

8      *A.*    Current position is the rank of captain.

9  District 2 commander, which is the southwest valley.

10     *Q.*    How long have you been in that position for?

11     *A.*    Since March 3rd of 2025.

12     *Q.*    And was March 3, 2025, the date of your transfer

13 into District 2 or the date of your promotion to captain?

14     *A.*    Both.

15     *Q.*    Congratulations.

16     *A.*    Thanks.

17     *Q.*    Prior to your promotion to captain, what was the

18 position you held immediately before that?

19     *A.*    I was a SWAT lieutenant within the SWAT division

20 since my promotion to lieutenant in November of 2018.

21 Until March of '25.

22     *Q.*    So let me make sure I have those dates right.

23              So your promotion to lieutenant was November

24 when?

25     *A.*    '18.  2018.

1    *Q.*    And in November of 2018, you were promoted to

2    lieutenant and then immediately moved into the SWAT

3    division?

4    *A.*    Correct.

5    *Q.*    And you remained in that role until your

6    promotion to captain March 3, 2025; correct?

7    *A.*    Correct.

8    *Q.*    So at all -- strike that.

9          What bureau is SWAT in?

10   *A.*    Currently it's in the support services bureau.

11   *Q.*    Can you walk me through the history since you

12   were in SWAT since November of 2018 through March 3rd of

13   2015?  What bureau was SWAT in in November of 2018?

14   *A.*    I have no idea.  The -- the -- the bureau or the

15   way it works is -- it's almost like a shell game with the

16   sheriff's -- they don't -- it doesn't really matter what

17   bureau you're in.  It's -- the SWAT division, it was under

18   a certain chief, Frank McWilliams, that liked the

19   division, so he always kept us under his umbrella.

20          That's why we went from patrol bureau west

21   to investigations, but we don't investigate anything.  It

22   didn't make sense, but that's just how they move things

23   around.  So I'd have to go back and look at records to see

24   what bureau it was in.

25   *Q.*    Is it your testimony that SWAT was under patrol

1      A.    No.

2      Q.    All right.  So let's take a look at Exhibit 1 to

3  your deposition.

4            Why did you produce this document?  Why did

5  you feel it was important to produce in this case?

6      A.    So I was contacted by my chief at the time, Hank

7  Brandimarte who was the chief of Patrol Bureau West, and

8  asked to basically come up with a memo or create a memo

9  for him to show him what it would look like if there was

10 two, essentially, squads under the SWAT division under the

11 tactical operations unit, which is the SWAT team.

12     Q.    And this was dated January 8th of 2020; correct?

13     A.    Correct.

14     Q.    Do you have any reason to dispute the accuracy

15 of the date that this was prepared on January 8, 2020?

16     A.    No.

17     Q.    Take a look at Exhibit 2 to your deposition.

18 This is TROW 4 through 34.  And it's titled Maricopa

19 County Sheriff's Office Patrol Resource Bureau SWAT

20 Division Operations Manual.

21           Do you see that?

22     A.    Yes.

23     Q.    Did I read that correctly?

24     A.    Yes.

25     Q.    Why was this document produced?  What's its

1   relevance or importance?

2       A.    It was just showing that we were in the patrol

3   resource bureau -- or that we were part of the patrol

4   divisions basically, even though we were considered the

5   SWAT division.

6       Q.    What is a -- what is a patrol resource bureau?

7       A.    I -- that's one of the only times I've seen that

8   where it says patrol resource bureau.  Usually it was

9   patrol bureau west or east.

10      Q.    Where does it state patrol resource bureau?

11      A.    At the top of the operations manual.

12      Q.    And do you have an understanding as to whether

13  patrol resource bureau is its own independent bureau apart

14  from patrol bureaus east or west?

15      A.    I don't.

16      Q.    You don't know one way or the other?

17      A.    I don't.  And, again, it doesn't -- it didn't

18  specifically matter for the job that we were doing.

19      Q.    Did you assist with the preparation of this

20  operations manual at TROW 4 through 34?

21      A.    I'll have to look through it.  So I -- so I

22  would be one of the ones that would review it.  I did,

23  because I added the organizational chart.  This is one of

24  the first times we had two tactical commanders.  So there

25  was two lieutenants in the building.  So I helped put that

1    together.
2              And then I don't know if there's a grappler
3    section, but when we started bringing grapplers, if that
4    was new at all, then that would have been something that I
5    would have helped put in there.
6       Q.    So the organizational chart that you're
7    referring to is on page TROW 9; correct?
8       A.    Correct.
9       Q.    And does it reference what bureau SWAT is in on
10   this page?
11      A.    It does not.
12      Q.    Next, take a look at Exhibit 3 to your
13   deposition.
14             Can you tell me why you produced this
15   document?
16      A.    I produced it because on TROW 36, the second
17   page under Sergeant John Davison, who is one of my direct
18   reports, who is a K-9 sergeant, but it shows his title is
19   sergeant enforcement command/patrol and enforcement
20   support, so just another thing to show that we were tied
21   to patrol, even though we were the SWAT division.
22      Q.    Where's the reference to patrol support?
23      A.    Where it says patrol and enforcement support
24   under Sergeant John Davison.
25      Q.    Oh, midway down the page where it says "involved

1   employee"; correct?

2       *A.*   Correct.

3       *Q.*   Do you have any understanding, one way or the

4   other, as to whether or not enforcement command/patrol and

5   enforcement was separate and apart from patrol bureaus

6   east or west?

7       *A.*   I don't.  And, again, over that six-and-a-half

8   years, my job description, my roles, responsibilities, the

9   calls we were responding to didn't change; it remained the

10  same for six-and-a-half years, no matter what bureau it

11  was under.

12      *Q.*   Next, take a look at Exhibit 4 to your

13  deposition.  This is TROW 38 through 40.

14          Why was this document produced?

15      *A.*   So this was produced -- this is a memo from

16  myself to Chief McWilliams, and it just was showing that

17  in November of '21, I guess this is around the time frame

18  that we would have switched from patrol bureau west over

19  to investigations bureau.

20      *Q.*   So I see where it says "investigations bureau"

21  at the top of the page to Deputy Chief Frank McWilliams,

22  investigations bureau.  But where is there a reference to

23  patrol bureau west on here?

24      *A.*   There's not.  Investigations bureau is a

25  separate -- separate from patrol bureau west.

1    three years, patrol lieutenants."

2                Do you see that?

3    *A.*    Yes.

4    *Q.*    Did I read that correctly?

5    *A.*    Yes.

6    *Q.*    Do you consider yourself to be a patrol

7    lieutenant?

8    *A.*    At the time, yes.  We were attached to patrol.

9    I consider the entire time; unfortunately, I'm only

10   covered during a certain time frame.  But, like I said, my

11   job didn't change during those six and a half years.

12   *Q.*    But from the time period of -- sorry.

13               From the time period of February 1, 2020,

14   through the present, are there any time periods that you

15   contend you were in the patrol division?

16   *A.*    During the time frame we were in patrol bureau

17   west until we switched over to investigations.

18   *Q.*    And other than Exhibits 1 through 4, you don't

19   have any records -- other than Exhibits 1 through 4, do

20   you have any other records or facts in support of that?

21   *A.*    No.  Not that I produced.

22   *Q.*    Do you have any other records or facts?

23   *A.*    No.  Again, I'd have to go back and look through

24   old e-mails and memos.

25               (Deposition Exhibit No. 7 was marked for

1    lieutenant in 2018.  So I've seen something similar, but I
2    can't say that it was this exact one.  There may have been
3    changes from when I had the announcement and tested for
4    lieutenant.

5        Q.    Okay.  So what I want you to do is take as much
6    time as you need to review through this document.  My
7    questions to you are going to be as follows:  Is there
8    anything on -- my question is:  Do you -- do you agree
9    that this is a correct job description for the position of
10   law enforcement lieutenant; that it correctly summarizes
11   the position?

12       A.    It appears to be a pretty good summary of what
13   the job of a lieutenant is.

14       Q.    Okay.  Is there anything that is not on this law
15   enforcement lieutenant job description that, in your
16   opinion, should be on here?

17       A.    No.  Doesn't look like it.

18             I don't see it in here.  I mean, it talks
19   about a lot of supervision, but at the lieutenant level,
20   there's an expectation that you're still active.  You're
21   still going to calls for service, stuff like that.

22             It's different than my role now as a
23   captain.  Captain is more of an administrative paperwork
24   type stuff.  As a lieutenant, you're like in the
25   day-to-day operations making decisions on the ground type

1      Q.    What was the date of your promotion to captain
2  again?
3      A.    March 3, 2025.
4      Q.    So I'm going to ask you some questions, and the
5  relevant time period is February 1, 2020 to March 3, 2025.
6            During that time period, have you always
7  earned at least -- strike that.
8            During that time period, have you always
9  supervised at least two or more employees?
10     A.    Yes.
11     Q.    During that time period, was your primary duty
12  managing the enterprise or a customarily recognized
13  department of MCSO?
14     A.    Can you repeat that?
15     Q.    Yeah.
16            Was your primary duty managing a MCSO or a
17  recognized department or subdivision within MCSO?
18            MS. SYVERSON:  Object.
19            THE WITNESS:  Like I spoke about earlier
20  that at the lieutenant level, they are like a mid-level
21  manager, but I wouldn't say you're managing the entire
22  division like at a captain level.
23  BY MS. SANTIAGO:
24     Q.    Was your primary duty to manage and oversee the
25  units or squads that were assigned to you?

1      *A.*    Probably two or three times.

2      *Q.*    Over five years?

3      *A.*    Yes.

4      *Q.*    As a lieutenant in SWAT, did you have your own

5   personal office?

6      *A.*    Yes.

7      *Q.*    Where was that office at?

8      *A.*    It's on the Durango Complex.  The address is

9   3335 West Durango in Phoenix.  So 35th Avenue and Durango.

10     *Q.*    And it was your own personal office as opposed

11  to a shared office; correct?

12     *A.*    Correct.

13     *Q.*    Did you have the same personal office at the

14  Durango facility from February 1, 2020 through your

15  promotion in March of 2025?

16     *A.*    Yes.

17     *Q.*    How would you -- walk me through what a typical

18  day would look like and how you would start your day?

19     *A.*    So being -- it could vary a lot depending on

20  what was going on, if there was a search warrant in the

21  morning, but a typical day would be -- I'd log on either

22  in my driveway or closely after leaving my neighborhood

23  because the reception isn't very good out by the White

24  Tank Mountains.

25             So I log on the computer, so CAD, as you

1   referred to earlier.  Showing myself available.  And then
2   I'm a West Valley person, so District 2, which is
3   Southwest Valley, and District 3, Northwest Valley, are
4   the districts that I had up on my CAD screen to see what
5   was going on.
6               But, again, being in the SWAT division, we
7   were responsible for the entire county, so we would have
8   to go anywhere.  And then just depending on what the
9   day had -- K-9 was out working doing the patrol stuff,
10  back them up.  The TOU guys and the SWAT guys sometimes
11  would be doing workups for search warrants that were
12  coming up and stuff.
13              And then patrol would call a lot of times
14  for assistance either in Guadalupe or stuff going on just
15  throughout the county.  And as a SWAT division, we got
16  tasked with additional details.  So pretty much anything
17  that the sheriff's office wanted us to do.
18              We had a group of guys that took their job
19  seriously, did good job of it, looked nice in uniform, so
20  we got tasked with all types of stuff.  So election
21  details, stuff that you wouldn't think has anything to do
22  with SWAT, we would be doing.
23      Q.    So when you would start your day, sounds like --
24  let me back up.
25              Did you have an unmarked Maricopa County

1    Sheriff's Office vehicle that was issued to you?

2        *A.*    Yes.

3        *Q.*    And you were able to take that to and from your

4    home; right?

5        *A.*    Yes.

6        *Q.*    How far of a drive was it from the personal

7    residence that -- that you -- that you had at the time to

8    the Durango location where your office was?

9        *A.*    Probably about 25 miles.

10       *Q.*    How long would that take you to get to/from

11   work, depending on traffic?

12       *A.*    Yeah.  On the way home it would take -- it could

13   take almost an hour.  On the way to work, that's -- a lot

14   of times, I would start my day a little bit earlier to

15   avoid traffic on I-10 eastbound.

16       *Q.*    Did you have any level of discretion in what

17   time you could start and stop your shift?

18       *A.*    To a certain extent.  But it was -- a lot of it

19   was dependent on what was going on, like I referred to

20   earlier.  A lot of times there would be early morning

21   search warrants where our stage location would be at

22   4 o'clock in the morning or 4:30 in the morning.  So the

23   hours varied quite a bit.

24       *Q.*    So how -- how often would you start your day

25   with an early morning search warrant?  Like how often,

1   weekly or monthly, would that be, on average?

2       A.    I would say maybe -- almost once a week,

3   typically.  And a lot of times, it happened to be on

4   Thursdays was the main day that we would seem to have the

5   search warrants early in the morning.

6       Q.    And so when you would have an early morning

7   search warrant, would you first head into the office or

8   first head to the staging area?

9       A.    Go straight to the stage location.  Depending on

10  the time.  I mean, if it was -- sometimes drug dealers

11  don't like to wake up early.  So if it was an afternoon

12  one, then go to the office first and then go to the

13  staging location in the afternoon.  Depends how punctual

14  they were, I guess.

15      Q.    On days that you didn't have an early morning

16  search warrant, would you typically go straight to the

17  office to start your day, or would you typically go and

18  start your day in the field?

19      A.    It could vary.  So it depended on what I had

20  going on.  Sometimes in the field.  Sometimes in the

21  office if there was paperwork or administrative stuff to

22  do.

23      Q.    Can you give me a split of kind of how -- with

24  the ebbs and flows, kind of how it averaged?

25      A.    Like I said, the patrol districts stay pretty

1   busy.  So it would just -- a lot of it would be dependent

2   on calls for service, like what was going on.  If there

3   was something priority or a high likelihood of violence,

4   stuff like that, that is the stuff that our division, a

5   lot of times, would be involved in and help out with.

6               Or if it looked like it was going to lead to

7   potential use of force, we had different tools that we

8   could use to mitigate issues or de-escalate situations,

9   where patrol, it was a little limited on what they could

10  do.

11      Q.   But, like, was it 50/50, something different, on

12  going straight to the office versus going out in the

13  field?

14      A.   I'd say probably 70/30.  70 going out to the

15  field; 30 going into the office.

16      Q.   Okay.  And then since you did have your own

17  personal office, would you at some point make it back to

18  your personal office most days that you were on shift?

19      A.   Yes.  Typically.  It may not be for long,

20  though.  I might get there and then have to leave again.

21      Q.   How much time, if we were to carve out -- strike

22  that.

23               Did your shift hours change at all from

24  February of 2020 through March of 2025?

25      A.   Change in what way?  I mean, they always

1  changed.

2      Q.    Did -- did you typically work 10-hour days,

3  12-hour days, something else?

4      A.    So typically, or at least what the hours that

5  were put into Workday, was Monday through Thursday from

6  0600 to 1600.  To 4 o'clock.

7      Q.    One more time.  Monday through Thursday?

8      A.    Yeah.  06, 0600.

9      Q.    Uh-huh.

10     A.    To 1600.  To 4:00 p.m.

11     Q.    So typically you would be scheduled to work four

12  10-hour shifts?

13     A.    Correct.  But it -- that rarely happened.

14     Q.    And I understand you're saying that it rarely

15  happened.  But you were scheduled to work --

16     A.    That was the schedule, correct.  Yeah.

17     Q.    -- the four 10-hour shifts?

18     A.    Yes.

19     Q.    So if you were scheduled to work a 10-hour

20  shift, and if we were to carve out your drive time --

21  which it sounds like it's between 30 minutes and an hour

22  each way, depending on traffic; is that fair?

23     A.    Correct.

24     Q.    So if we were to average that and say an hour

25  and a half of drive time each day if you were going

1  to/from the office.  Does that sound fair?

2      A.    Yeah.  It could depend -- you know, on -- on

3  some days, it would be more; some days, less.  But yeah,

4  around that.

5      Q.    Okay.  So if that leaves us at 8.5 hours left in

6  the shift, how would you say those hours are split with

7  you being in the office versus being out in the field when

8  you were a lieutenant in SWAT from February 1, 2020

9  through March 3rd of 2025?

10     A.    So probably 60 to 70 in the field, and then that

11  30 percent in the office doing the administrative tasks.

12     Q.    When you were out in the field, did you -- were

13  you typically onsite with subordinates that you

14  supervised?

15     A.    Yes.

16     Q.    How many, typically?

17     A.    Like on an average search warrant?

18     Q.    Yeah.  Did you typically only have one or two

19  people with you?  Was it typically --

20     A.    It would be --

21     Q.    -- like five people?

22     A.    -- like 30.

23     Q.    And were they all people that reported to you?

24     A.    Well, the half of that would be -- depends how

25  it was split up or who was all there.  But so all the TOU

```
 1        Q.    How much did you earn in 2024?
 2        A.    Earn for the County?
 3        Q.    Yes.
 4        A.    I'm not sure.  I'd have to look at my pay stubs.
 5   But approximately -- 2024.  So probably 130, 128,
 6   somewhere in there.
 7        Q.    How about 2023?  Do you recall?
 8        A.    It probably would have been 124, I think.  125,
 9   somewhere in there.  These are just estimates.  I could
10   find out for sure but somewhere in that range.
11        Q.    How about 2022?
12        A.    Probably 118, 119, somewhere in there.
13        Q.    2021?
14        A.    Probably around the same, 117, 118, somewhere in
15   there.
16        Q.    And how about 2020?
17        A.    Probably more like 112, 113.
18        Q.    Throughout the day when you're on a scheduled
19   shift, did you have the discretion or ability to go grab
20   lunch with a colleague?
21        A.    Yeah.  I could.  I would -- I frequently would
22   bring my lunch, but I could if I wanted to.
23        Q.    Were there limitations on how long of a lunch or
24   break that you could take?
25        A.    No.
```

DEPOSITION OF MICHAEL TROWBRIDGE, 08/27/2025

1    Q.    Could you go meet a friend across town and --
2    and grab lunch with them for an hour if you wanted to?
3    A.    I could have, yes.
4    Q.    Did you ever do that?
5    A.    Very rarely.
6    Q.    How often?
7    A.    I can't even remember doing that.  Maybe once or
8    twice.
9    Q.    Did you ever grab lunch with your subordinates?
10   A.    Yes.
11   Q.    How often?
12   A.    During most days.  We had a little kitchenette
13   within the SWAT building, and then there's a little
14   restaurant called the Durango Grill that's right there
15   within walking distance from the SWAT building.  So
16   occasionally guys would grab food there and everybody
17   would be in that little kitchenette area.
18   Q.    How long of a break would you typically take for
19   lunch?
20   A.    Maybe 20 minutes, 30 minutes.  A lot of times, I
21   would eat lunch at my desk, just getting stuff done.
22   Q.    Did you ever perform -- strike that.
23         Earlier you testified that you had a
24   work-issued vehicle; correct?  Unmarked vehicle?
25   A.    Correct.

1      Q.    And did you have a laptop that you could plug in
2   in your vehicle?
3      A.    Yes.  Not -- it's mounted, but yes.
4      Q.    Did you ever do administrative work in that
5   County-issued vehicle?
6      A.    Yes.
7      Q.    Would you ever use that County-issued vehicle as
8   a home office?
9      A.    I mean, we were so busy that, yes, sometimes it
10  would be -- that's where I did most of my online training.
11  My Blue Team supervisor notes were typically done in that
12  vehicle on that computer.
13     Q.    How -- how much time would you spend per day
14  going doing things like online training, Blue Team
15  supervisor notes, or other administrative work from your
16  vehicle?
17     A.    I -- I don't know if I would quantify it as
18  daily, but maybe a couple hours a week.
19     Q.    What are blue team supervisor notes?
20     A.    Basically, the -- the sheriff's office is still
21  under federal court monitor, so we have to do two
22  supervisor notes on each sworn employee, one on a civilian
23  employee per month.
24           And that includes any traffic stop reviews.
25  So if they made any traffic stops, you have to review the

1    body-camera video and document how the traffic stop went

2    and any -- any issues that came up.

3         Q.    Do you need to do Blue Team supervisor notes for

4    members of your team?

5         A.    Previously, yes.  And currently, yes.

6         Q.    When you were in SWAT, who would you need to do

7    Blue Team supervisor notes for between January of 2020 and

8    March of 2025?

9         A.    So primarily during that time frame, it was

10   Sergeant Jimmie Clapper, who was a SWAT sergeant, the TOU

11   sergeant; and then Sergeant John Davison, who was the K-9

12   sergeant, were the two sworn, so I'd have to do two

13   supervisor notes, one of those being a performance note.

14             And then my other one would be for Emily

15   Armijo, the administrative assistant.  And I would be

16   required to do one.  Obviously, she's not making traffic

17   stops, but do one supervisor note, which would contain a

18   performance note also.

19        Q.    And the first sergeant you referenced was Jimmie

20   Clapper.  Who was the other sergeant?

21        A.    John Davison.

22        Q.    And that was the K-9?

23        A.    Correct.

24        Q.    Does the term "flex time" mean anything to you?

25        A.    Not really.  The sheriff's office doesn't do it.

1  enforcement support building and division, but I don't
2  remember ever, like, a specific bureau.
3  BY MS. SANTIAGO:
4      Q.   Is it possible that this reference to
5  enforcement patrol bureau west is a typo?
6      A.   It could be.  It could have meant patrol bureau
7  west.
8      Q.   Or it could be a typo that it was supposed to
9  refer to enforcement bureau; correct?
10     A.   Correct.  Like your previous question, I don't
11 know of an enforcement bureau.
12             MS. SANTIAGO:  That's all that I have.
13             MS. SYVERSON:  We'll read and sign.
14             THE VIDEOGRAPHER:  This concludes today's
15 deposition.  Off the record at 2:05.
16
17             (WHEREUPON, this deposition concluded at
18 2:05 p.m.)
19
20
21
22             _____
23             MICHAEL TROWBRIDGE
24
25

STATE OF ARIZONA    )
                    ) ss.
COUNTY OF MARICOPA  )


        BE IT KNOWN that the foregoing proceedings were
taken by me, MICHAELA HERMAN DAVIS, a Certified Reporter,
in and for the County of Maricopa, State of Arizona; that
the witness before testifying was duly sworn to testify to
the whole truth; that the questions propounded to the
witness and the answers of the witness thereto were taken
down by me in shorthand and thereafter reduced to
typewriting under my direction; that the foregoing pages
are a true and correct transcript of all proceedings had,
all done to the best of my skill and ability.

        I CERTIFY that I am in no way related to any of
the parties hereto, nor am I in any way interested in the
outcome hereof.

                [X] Review and signature was requested.
                [ ] Review and signature was not requested.
                [ ] Review and signature was waived.


        I FURTHER CERTIFY that I have complied with the
ethical obligations set forth in ACJA 7-206(F)(3) and
ACJA 7-206(J)(1)(g)(1) and (2). Dated at Phoenix, Arizona,
this 1st day of September, 2025.




_____
     Michaela H. Davis, RPR, CRR, CRC
           Arizona CR No. 50574
           New Mexico CCR No. 614


        I CERTIFY that Carrie Reporting, LLC, has
complied with the ethical obligations set forth in
ACJA 7-206.  Dated at Phoenix, Arizona, this 2nd day of
September, 2025.

_____
          Carrie Reporting, LLC
          Arizona RRF No. R1064

# EXHIBIT 37

**MaLinda Johanning (MCSO)**

| | |
|---|---|
| **From:** | MaLinda Johanning (MCSO) |
| **Sent:** | Friday, November 02, 2018 1:22 PM |
| **To:** | Michael Trowbridge |
| **Cc:** | |



**Subject:**    Official Transfer Notice

Lieutenant Michael Trowbridge #S1703,

**Congratulations on your promotion!**

Effective Monday, November 5, 2018 you are officially transfer from District 2 Patrol (5042) to SWAT Division (5055).

Please report to Captain Tim Palmer for further information on this assignment.

==Commanders and supervisors shall conduct a review of EIS records within 14 days, including disciplinary history, of all employees upon transfer to their supervision or command. This review shall be documented within the Blue Team Supervisor Notes, as specified in Office Policy GH-5, Early Identification System (EIS)==

MaLinda Johanning #A9657
Administrative Assistant to
CFO Jim Prindiville, Administration Command
Deputy Chief Aldorasi, Investigations & Intelligence Bureau
(602) 876-1822 / Fax (602) 876-0076



1

CONFIDENTIAL
ATTORNEY EYES ONLY

MCC 020216

# EXHIBIT 38

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CHRISTOPHER J. HOUCK, on          )
behalf of himself and all          )
those similarly situated,          )
                                   )
            Plaintiff,             )
                                   )        No.
                                   )        2:23-cv-00068-DGC
            vs.                    )
                                   )
                                   )
MARICOPA COUNTY,                   )
                                   )
            Defendant.             )
_____   )


VIDEORECORDED DEPOSITION OF ANDREW RANKIN

Phoenix, Arizona
April 11, 2025
1:35 p.m.


Prepared by:                    CARRIE REPORTING, LLC
MICHAELA H. DAVIS                Certified Reporters
Registered Professional Reporter 17505 N. 79th Avenue
Certified Realtime Reporter      Suite 301-C
Certified Realtime Captioner     Glendale, AZ 85308
AZ CR No. 50574                   (480) 429-7573
NM CCR No. 614

(COPY)

```
 1             VIDEORECORDED DEPOSITION OF ANDREW RANKIN
 2   commenced at 1:35 p.m. on April 11, 2025, at the law
 3   offices of FISHER & PHILLIPS LLP, 3200 NORTH CENTRAL
 4   AVENUE, SUITE 1550, PHOENIX, ARIZONA, before MICHAELA
 5   HERMAN DAVIS, a Certified Reporter, in and for the County
 6   of Maricopa, State of Arizona.
 7
 8
 9                           * * *
10                    A P P E A R A N C E S
11   FOR THE PLAINTIFF:
12            FRANKEL SYVERSON, PLLC
             BY: MS. PATRICIA N. SYVERSON
13               9655 GRANITE RIDGE DRIVE
                 SUITE 200
14               SAN DIEGO, CALIFORNIA 92123
                 patti@frankelsyverson.com
15
16   FOR THE DEFENDANT:
17            FISHER & PHILLIPS LLP
             BY:  MS. SHAYNA BALCH SANTIAGO
18               MS. LORI A. GUNER
                 3200 NORTH CENTRAL AVENUE
19               SUITE 1550
                 PHOENIX, ARIZONA 85012-2487
20               ssantiago@fisherphillips.com
21
     ALSO PRESENT:
22
                 SAMANTHA ELLIOTT, VIDEOGRAPHER
23
                 MEGAN MORLEY, via Zoom
24
25
```

1        A.    I don't specifically recall any documents.

2   There might have been -- she might have put up some

3   documents, but I don't recall what they were or what we

4   were -- specific.

5        Q.    Independent from meeting with your counsel, did

6   you review any documents or do anything else to prepare

7   for today's deposition?

8        A.    No.

9        Q.    Do you have any diaries or logs regarding hours

10  worked?

11       A.    No.

12             I assume you mean outside of our official

13  timekeeping system.

14       Q.    Do you possess any logs or diaries?

15       A.    No.

16       Q.    What is your -- you're currently employed by

17  Maricopa County; correct?

18       A.    Yes.

19       Q.    What's your current position?

20       A.    I'm a lieutenant in the bureau of internal

21  oversight.

22       Q.    And when did you first start in that role?

23       A.    This is where the memory issues come into play.

24  I think it was around August of '24.  Could have been

25  September.

1        Q.    But sometime in fall of 2024?

2        A.    Yes.

3        Q.    Prior to starting -- strike that.

4              Is your current position in BIO -- is BIO

5    within patrol bureau east or west?

6        A.    No.

7        Q.    Just to make sure we have a clean record on

8    that.

9              So BIO is not in patrol bureau east or west;

10   is that correct?

11       A.    Correct.

12       Q.    Prior to being in BIO, what was your prior role?

13       A.    I was a lieutenant in District III patrol.

14       Q.    And District III is in patrol bureau east or

15   west; correct?

16       A.    West, correct.

17       Q.    Were you -- and when were you promoted to be a

18   lieutenant?

19       A.    April 4th of 2022.

20       Q.    And were you immediately placed into

21   District III, or were you in a couple of different

22   districts?

23       A.    I was immediately placed into District III.

24       Q.    So is it correct that you served as lieutenant

25   in District III from approximately April 4, 2022 through

1    around August of 2024?

2        A.    Correct.

3        Q.    And there are no other periods of time that you

4    were a lieutenant in patrol bureaus east or west?

5        A.    No.

6        Q.    When you were a lieutenant in District III, did

7    you have multiple supervisors or just a single supervisor?

8        A.    Single supervisor.

9        Q.    Who was that?

10        A.    Captain Brian Stutsman.

11        Q.    And who is your current supervisor?

12        A.    Captain Dominic Reaulo.

13        Q.    When you were in District III patrol, what

14    shifts did you work?

15        A.    I started at as a watch commander which was

16    5 p.m. to 3 a.m. Sunday to Wednesday.  And then from

17    there, I became a day shift lieutenant, and I typically

18    worked 8 to 6 Monday to Thursday.

19        Q.    Make sure I have it correctly.  You started as a

20    watch commander in District III as lieutenant, 5 p.m. to

21    3 a.m. Sunday through Wednesday; correct?

22        A.    Correct.

23        Q.    And then the next shift you had was day shift

24    lieutenant in District III and that was 8 a.m. to 6 p.m.?

25        A.    Correct.

1    Q.    And that was Monday through Thursday?

2    A.    Yes.

3          I would preface it that as the watch

4    commander, my duties extended far outside of District III,

5    but my commander was assigned to District III, as was I.

6    But I was the watch commander for the entire county.

7    Q.    Fair point, and thank you for that

8    clarification.  So let's talk about your position as watch

9    commander.

10         As watch commander, did you frequently serve

11   as watch commander for the entire -- for all patrol bureau

12   west?

13   A.    I typically served all of patrol bureau west and

14   east.

15   Q.    Did you say that you typically did all of patrol

16   bureau west and east?

17   A.    Yes.

18   Q.    What do you mean by that?

19   A.    We were short-handed, so I was covering both

20   sides of the county, 9200 square miles.

21   Q.    And approximately what percentage of your shifts

22   were you covering all of patrol bureaus west and east?

23   A.    The whole shift.

24   Q.    You worked -- were you working four 10s?

25   A.    Yeah.  Sunday to Wednesday four 10s.  5 p.m. to

1          I would argue that your administrative

2    duties were secondary and minimal to patrol duties in most

3    cases, most circumstances.

4          And I would argue that there are some

5    federal rules that indicate when a lieutenant is supposed

6    to be salary versus hourly, when they are considered

7    administrative versus not, and I do not think that we meet

8    the burden of being administrative.

9          Q.   While you served as lieutenant in Patrol

10   District III, did you earn at least $684 a week?

11         A.   Yes.

12         Q.   Did you supervise two or more individuals?

13         A.   Yes.

14         Q.   In -- strike that.

15              2023 was the first full year that you were a

16   lieutenant in Patrol District III; correct?

17         A.   Correct.

18         Q.   In that year did you earn at least $108,000 for

19   the year?

20         A.   I don't remember.

21         Q.   Can you walk me through -- you indicated that

22   you were a watch commander for at least a portion of your

23   time at District III; correct?

24         A.   Yes.

25         Q.   What was entailed with being a watch commander

 1  worked in the first location versus the temporary

 2  location?

 3       A.   Well, the first location would have been when I

 4  promoted, and then we moved into the temporary location

 5  last summer, maybe July.  Maybe earlier.  I don't

 6  remember.  I'm sorry.

 7       Q.   So summer of 2024?

 8       A.   I think so.

 9       Q.   How far of a drive is it from your house to

10  either the old or the new temporary District III location?

11       A.   Thirty minutes.

12       Q.   So I understand that the direction from your

13  captain was that will you need to be logged into CAD

14  during the busy hours, and I think you testified about

15  9 a.m.?

16       A.   Uh-huh.  Yes.  Sorry.

17       Q.   Was that consistent with the start time of your

18  shift, or were you expected to start earlier than that?

19       A.   I typically started around 8.

20       Q.   Was that a set schedule, or was there some

21  flexibility to your start time?

22       A.   There was flexibility, but I tried to be

23  consistent, and I tried to log on as early as I could.  It

24  was dependent on how the morning was going.  Sometimes I

25  was already handling things before I was logged on because

1   sometimes you already have sergeants calling you before
2   your shift starts.
3       Q.   When you would log into CAD for the first time,
4   where would you do that?  Would you do that in your
5   vehicle?  Would you do that in your office?  Somewhere
6   else?
7       A.   Typically, in my vehicle at my house.
8       Q.   Were you issued an unmarked vehicle?
9       A.   Yes.
10      Q.   So would you go down to your unmarked vehicle,
11  log into CAD, and then start your drive into the office?
12      A.   Correct.
13      Q.   Did you have a physical office space in the old
14  District III?
15      A.   Initially, I had a shared office space.  But
16  then they moved our detective bureau, and it opened up
17  some additional office space, so I had my own office space
18  after that.
19      Q.   In the old building; correct?
20      A.   Yes.
21      Q.   When did you first get your own office in the
22  old space?
23      A.   The watch commander had always had a shared
24  office, but since they had moved detectives maybe two
25  months after I became a watch commander, something like

1    Q.    Understood.

2          When you would get to the office, how much

3    of your day would be spent at District III?

4    A.    The majority of it.

5    Q.    And would the majority of your day be spent in

6    your office, in sergeant offices, in the captain's office?

7    A.    You're kind of all over the place.  I would say

8    half the time in my office; the other half the time either

9    in the captain's or sergeants' offices.

10   Q.    And what type of work would you be doing from

11   your office -- or what type of work would you be doing

12   from the District III building?

13   A.    Well, you'd have to go through reports that need

14   to be reviewed, making sure everything is getting downtown

15   appropriately, charging documents, mail runs.  You would

16   be conferring with your patrol sergeants about calls,

17   about issues, employee concerns.

18          If they were short-handed, can you help us

19   find additional help for a specific day or week.  Any

20   priorities or tasks that the captain has for you related

21   to community needs, town council needs.  Just -- it's a

22   wide variety of things.

23          (Deposition Exhibit Nos. 1, 2 and 3 were

24          marked for identification by the reporter.)

25          ///

1                    On the spreadsheet, the total amount that
2   you are claiming, total unpaid, multiplied by regular
3   hourly rate, overtime rate, as stated on this chart is
4   owed appears to correlate to the regular no pay on stub.
5                    Am I correct in that understanding?
6        *A.*   Correct.
7        *Q.*   So is the only time that you are alleging
8   entitlement to in this case based on the reg no pay
9   category on your stubs?
10       *A.*   I am not alleging any additional time as I don't
11  have records for additional time worked.  I am just
12  highlighting that there were definitely times where I
13  worked additional time.
14       *Q.*   But sitting here today, other than hours that
15  were input in the reg no pay category on your stub, you
16  don't have any facts or information regarding additional
17  hours worked beyond that; correct?
18       *A.*   Not with me, no.
19       *Q.*   Do you have facts?
20       *A.*   No.  I don't think so.
21       *Q.*   Does the phrase "acting captain" mean anything
22  to you?
23       *A.*   Yes.  It's when you're a lieutenant and you're
24  performing your own duties and the duties of the captain
25  because he is out of office.

1    Q.   Have you ever served as an acting captain?

2    A.   Yes.

3    Q.   How many times?

4    A.   I can specifically remember two, but there was

5  probably more.  One of those times was for a lengthy

6  period of time; maybe two, two and a half months.

7    Q.   Were both of these times while you were in

8  District III as a lieutenant?

9    A.   Yes.

10   Q.   So walk me through the one that was

11 approximately two to two and a half months in District III

12 as a lieutenant.

13   A.   My captain had a surgery and was on extended

14 FMLA.  And he discussed with me that even though he was

15 going out for a long period of time, he believed I had the

16 skill set to run the district so he didn't have to ask

17 another captain to perform double duty.

18        And that decision was run up the chain of

19 command.  I don't know how high, but above him, and they

20 agreed.  So it was left to -- the district was left to me

21 to command.

22   Q.   Do you remember the dates?

23   A.   I could find them.  I don't remember offhand.  I

24 think he had his surgery March of last year, but I'm not

25 sure.

1     A.    There was periods of time where it was three and
2     periods of time where it was four.
3     Q.    And beneath sergeants were deputies; correct?
4     A.    Correct.
5     Q.    So if there were three to four sergeants that
6     reported to you at any given time in Patrol District III,
7     how many deputies were under that?
8     A.    Underneath the sergeants?
9     Q.    Yes.
10    A.    Typically four to five.
11    Q.    Under each sergeant; correct?
12    A.    Correct.
13    Q.    So would that be roughly 12 to 20 deputies total
14    that you would have oversight for?
15    A.    Correct -- approximately, yes.
16    Q.    Did you perform any evaluations on your
17    subordinate sergeants?
18    A.    Yes.
19    Q.    How many?
20    A.    Well, they had to get annual evaluations done
21    and then -- so at least four a year.  Three to four a
22    year.  Yeah, I would say three to four a year.
23    Q.    Have you ever served on a promotional board?
24    A.    I didn't serve on a promotional board; I helped
25    advise the company that was creating the last lieutenants'

```
 1  prepared and understood how to appropriately grade the
 2  scenarios.
 3      Q.   And in selecting the multiple choice questions
 4  for this promotional exam, did you have the ability to use
 5  independent discretion to pick which ones you felt were
 6  appropriate?
 7      A.   Yes.
 8      Q.   Did you have the ability to use independent
 9  discretion to formulate a realistic scenario for
10  incorporation into the evaluation?
11      A.   Yes.  And they specifically use people of same
12  rank because those are the people who are going to know
13  the best how to craft those scenarios, just as we would
14  use sergeants to create -- help create sergeant tests.
15      Q.   Have you sat on an awards board?
16      A.   No.  Not to my recollection.
17      Q.   Have you ever been tasked with reviewing or
18  revising an operations manual?
19      A.   Yes.
20      Q.   When?
21      A.   2023, probably into 2024, I helped revamp
22  District III's operational manual that needed some pretty
23  significant overhaul.
24      Q.   What needed to be overhauled in the operations
25  manual?
```

1     *A.*   Just a lot of it was out of date.  It had old

2   policies that needed to be updated.  It didn't have

3   sections that applied to, like, new equipment that we were

4   using.  Deputy service aides were something that was

5   created, and we needed to add large pieces to it.

6             I'm trying to think of what else.

7             The document itself was very troublesome.

8   It had been -- somebody had been copy and pasting Excel,

9   .pdf, and Word.  And it was so difficult for me to use the

10  draft that I -- with the assistance of some administrative

11  staff, we basically had to redo it.  And that was

12  difficult for me because I don't have -- I'm not great

13  with the computer software in that way.

14    *Q.*   Was anyone else tasked alongside you with

15  revising the operations manual?

16    *A.*   I don't remember anyone being tasked alongside

17  me.

18    *Q.*   So were you spearheading the project of revising

19  the operations manual?

20    *A.*   Yes.

21    *Q.*   How many hours did it take you to revise the

22  operations manual?

23    *A.*   I don't recall.  I probably put -- I probably

24  put 20 hours into it total.

25    *Q.*   Did you exercise any independent discretion or

1  kind of who the points of contact are, how many students
2  there are at the school.  It's a -- it was a long form;
3  there was a lot of information on it.  But my captain was
4  instrumental in all that.
5      Q.   Were there any portions of the operations manual
6  that you needed to create on your own?
7      A.   I don't recall specifically ever creating any of
8  these sections on my own.
9      Q.   But you could have?
10     A.   I don't believe I did.
11     Q.   Were you ever involved in a District III remodel
12 design and building?
13     A.   Yes.
14     Q.   In what way?
15     A.   I went to some meetings to help make some
16 decisions related to desired equipment, layout, and
17 various functions of the redesign/remodel.
18     Q.   What decisions were you involved in regarding
19 equipment, layout, and design?
20     A.   I had -- so the project was already far along
21 when I became a lieutenant.  And my captain had been
22 spearheading it from the beginning of its inception, so he
23 had way more knowledge on it than I did.  But he just had
24 me assist him in some of those meetings in, hey, what do
25 you think about -- does this door need to be locked?  Does

1  there need to be a camera at this angle?  Should these

2  cells in the holding area be for men?  Should these be for

3  women?  How should -- so, like, me and my captain would

4  regularly discuss layouts within the structure.

5          I tried to incorporate a few things that the

6  County wasn't interested in incorporating due to cost.

7  But -- and then I would assist in -- I assisted in a few

8  tours for the County staff and the hired company when they

9  needed to see the old building because they needed to

10  understand what their -- what the teardown was going to

11  encompass.  They needed to come in and kind of view the

12  whole building and see in all the rooms and stuff.  So I

13  helped with that a few times.

14     Q.    Did you make any recommendations regarding

15  design and layout of the new facility?

16     A.    I did.

17     Q.    And I think you gave me the example of, like,

18  locking doors, camera location, cell location.  Anything

19  else?

20     A.    I requested that we build an indoor range and a

21  helicopter pad, and neither one of those got approved.

22     Q.    Indoor gun range; right?

23     A.    Correct.

24     Q.    But an outdoor helicopter pad?

25     A.    Yeah.  I guess I should be more specific.  Not

1    an indoor helicopter pad.

2       Q.   That sounded really cool, but I could see how

3    that could get pricey.

4               Any other recommendations that you made

5    regarding the redesign and layout?

6       A.   Not that I can recall offhand.  I'm sorry.  It's

7    possible, but I just don't remember.

8       Q.   Were any of the recommendations that you made

9    accepted?

10      A.   I don't specifically remember what

11   recommendations I made that were accepted.  Most of the

12   design of the building -- the design of the building was

13   already done when I went to the district.  I was helping

14   with smaller things than general design, like I said, like

15   camera placement and stuff like that.  I'm sure some of my

16   recommendations were accepted; I just can't recall what.

17      Q.   Were you involved in a project relating to body

18   cams?  Or just Axon fleet cameras in general?

19      A.   Oh, yes.  I was asked to -- I was asked

20   specifically by the chiefs directly to conduct a purchase

21   of some Fleet 3 -- it's an in-car camera license plate

22   reader system through Axon.

23      Q.   Got it.

24               So this was the license plate reader camera

25   software?

```
 1    break.  You've had an opportunity to confer with your
 2    counsel.
 3              Do you need to change any of your responses
 4    to my earlier questions?
 5         A.   No.
 6         Q.   Before the break, we were talking about some of
 7    your job duties and whether or not you had engaged in
 8    certain types of duties.
 9              Have you ever conducted training?
10         A.   Formal training?
11         Q.   Let's start with formal, yes.
12         A.   I've -- as a sergeant, I would teach at the
13    academy.
14         Q.   Have you ever taught at the academy as a
15    lieutenant?
16         A.   No.
17         Q.   Have you ever taught any training sessions to
18    your sergeants or deputies on policies or procedures?
19         A.   I would say that I have helped teach them
20    informally things about policy or procedure that they
21    should know, yes.
22         Q.   How often do you teach informally your sergeants
23    and/or deputies when you were in District III?
24         A.   It's hard to put a number on, but maybe once a
25    week.
```

DEPOSITION OF ANDREW RANKIN, 04/11/2025

60

1        Q.    Have you ever handled an internal affairs
2    investigation?
3        A.    Yeah.  I worked in internal affairs for
4    three years.
5        Q.    While you were in District III patrol as a
6    lieutenant, did you handle any internal affairs
7    investigations?
8        A.    I assumed authority over one because it was done
9    inadequately by the sergeant, so I had to fix it and
10   submit it.  So I took responsibility for that one, so I'd
11   say yes.
12             And then I was in the chain of command for
13   review of internal affairs investigations that were
14   assigned to the district at certain points in my time in
15   District III.
16       Q.    And when you were in the chain of command to
17   review these internal affairs investigations, were you
18   reviewing reports or documents authored by your sergeants?
19       A.    Yes.
20       Q.    And how often would that occur while you were a
21   lieutenant in District III?
22       A.    Fairly regularly.  Weekly.
23       Q.    One a week or multiple a week?
24       A.    I would say I reviewed parts of documents, like,
25   once a week, but I would say we had one or two assigned to

1  sergeants could also have to complete them from time to

2  time; correct?

3      A.    Correct.

4      Q.    Do you know if it worked the same way in other

5  districts, or if the internal affairs investigations were

6  just evenly distributed amongst the different sergeants?

7      A.    In my time there -- because it's changed, but in

8  my time there, the districts all had an assigned sergeant.

9      Q.    Have you handled responding to any employee

10  complaints or grievances?

11      A.    I'm sure that I've helped with, informally, when

12  employees are having a dispute over something or a

13  disagreement or there's -- just like any job personality

14  clash, and we have to find methods to come to resolutions.

15            Anything formal, like if somebody submitted

16  a formal complaint or a formal grievance, it would go up

17  the chain of command beyond me.

18      Q.    Did you perform any audits?

19      A.    I do now.

20      Q.    Did you perform any audits in District III as a

21  lieutenant?

22      A.    No.

23      Q.    But you did monitor or implement the compliance

24  measures that were in place by the court order; correct?

25      A.    Yes.

1    Q.    And that would include reviewing the body cam
2  video of at least two stops for your sergeants and doing
3  the -- at least two Blue Team Supervisor Notes per week;
4  correct?
5    A.    Correct.  If the sergeant made two traffic
6  stops.
7    Q.    And thank you for that clarification.
8         Was it common for your sergeants to make two
9  traffic stops per month?
10   A.    No.
11   Q.    Was it common for your sergeants to not make any
12 traffic stops for the month?
13   A.    Yes.  I had one sergeant who was more proactive
14 than probably most in the agency, so there was a period of
15 time where he was making two a month that I would review.
16 But I would say the other sergeants, rare, if ever, that
17 they made traffic stops.
18   Q.    Was it common for you to make traffic stops
19 while you were a lieutenant in Patrol District III?
20   A.    No.
21   Q.    Approximately how many traffic stops do you
22 think you made as a lieutenant in Patrol District III
23 between 2022 and 2024?
24   A.    Definitely zero.  The last time I made a traffic
25 stop -- I made one traffic stop as a sergeant in 2015 or

1    '16 or something like that.  That's the only traffic stop
2    I've made in the last ten years.
3                    And that was only because they asked me to
4    take make a traffic stop because the federal monitors
5    wanted to witness one.  So I took them on -- I was
6    instructed to take them on a ride-along and conduct a
7    traffic stop, so I did.
8         Q.    And you drive an unmarked vehicle; right?
9         A.    I do as a lieutenant now, yes.
10        Q.    And is the understanding that lieutenants are
11   discouraged from making traffic stops in unmarked vehicles
12   unless it's exigent circumstances that would require
13   immediate intervention?
14        A.    That was the principle that I operated under,
15   but my captain wholeheartedly would have appreciated us
16   making traffic stops.  He liked the idea of leading by
17   example.
18                    So it was a personal preference for me not
19   to make traffic stops unless it was an emergency, which
20   there wasn't one where I needed to intervene.  It's not
21   required for supervisors of any rank to make traffic
22   stops.
23        Q.    And are some lieutenants -- strike that.
24                    You've worked with a variety of other
25   lieutenants during your time with MCSO; correct?

```
1          A.    Yes.

2          Q.    Based on what you've seen, based on what you've

3    personally witnessed, do different lieutenants have

4    different levels of how hands-on they are with regards to

5    traffic stops and being on scene?

6          A.    Yes.

7          Q.    Have you been involved in any hiring processes?

8          A.    Yes.  I was involved in hiring an administrative

9    assistant and -- I should say making recommendations for

10   hiring of administrative assistants and deputy service

11   aides.

12         Q.    And was that while you were at District III in

13   patrol as a lieutenant?

14         A.    Yes.

15         Q.    And that was an administrative assistant and who

16   else?

17         A.    I helped conduct hiring for a round of nine

18   deputy service aides.

19         Q.    And can you describe for me what deputy service

20   aides do?

21         A.    They supplement patrol in handling calls of

22   service that are nondangerous in nature so that deputies

23   have more time to answer higher priority calls.

24         Q.    And is this the person that's typically going to

25   do callbacks if somebody had called in and it's a
```

1    nonurgent matter?

2        *A.*    Correct.

3        *Q.*    And are these individuals that can take

4    information to be included in a police report over the

5    phone?

6        *A.*    Yes.

7        *Q.*    And you personally interviewed the

8    administrative assistant; correct?

9        *A.*    I did.

10       *Q.*    And did you make a recommendation as to whether

11    or not to hire that person?

12       *A.*    I did.

13       *Q.*    What was your recommendation?

14       *A.*    Well, we made a list of -- if -- if they weren't

15    recommended, then it was a no.  If they were recommended,

16    it was, yes, and then they were ranked on a list.  And we

17    submitted that list to human resources.

18       *Q.*    What was your recommendation as to this specific

19    administrative assistant?

20       *A.*    She was ranked number 2 on the list, and she

21    was -- she was recommended and ranked second.

22       *Q.*    So you personally made either a yes-or-no

23    recommendation and gave a numerical ranking as well;

24    correct?

25       *A.*    Correct.

1      Q.   What was your recommendation as to yes or no?

2      A.   Yes.

3      Q.   And your numerical ranking was 2 or her overall

4   was 2?

5      A.   The overall was 2.  They are kind of the same

6   thing.  I'm confused.

7      Q.   Well, it sounds to me, but maybe I'm just

8   mistaken in this, that you both gave a verbal or

9   written -- you gave a yes to hiring her, but it sounds

10  like she was also ranked.

11            In my experience when there's a ranking

12  system, a lot of times, for example, if there were three

13  people making a decision, everyone would rank 1 to 5, and

14  then those lists would be compared to come up with an

15  overall almost average --

16     A.   Yeah.

17     Q.   -- for each person.

18            So my question to you is:  How did this

19  process that you are describing work?  Did you provide

20  your own yes or no and numerical rank which was later

21  averaged, or was it something else?

22     A.   I provided my own yes or no, but there were only

23  two of us involved in the hiring process, me and I brought

24  the other administrative assistant in because I figured if

25  anyone knows how to do the job, it's her, so I'll have her

1   help me in the process.  And we discussed where they

2   should be ranked together, and we ranked them.

3       Q.    So you both were yeses on this administrative

4   assistant, and then you in a combined fashion ranked them

5   number 1 and number 2?

6       A.    Yeah.  I think we had a list of like -- I don't

7   remember the size.  It was five or more that we had on the

8   list.

9       Q.    And you recommended she be hired, and she was,

10  in fact, hired; correct?

11      A.    Correct.

12      Q.    How about these nine deputy service aides?  What

13  was the process for interviewing and hiring them?

14      A.    We had to review their applications, and then we

15  did a similar process.  Me and another lieutenant would do

16  an oral interview with them.  The questions are the same

17  for every candidate.  You write their responses, and you

18  ultimately discuss the ranking for -- at the end of the

19  day for that candidate.

20      Q.    How many individuals were interviewed in total

21  for these nine aide positions?

22      A.    Somewhere around 50 or 60.

23      Q.    Oh, wow.

24            Did you personally interview all 50 or 60?

25      A.    No.  There was one day where I couldn't do it,

```
 1   and I don't remember why.  But I was there for most of it.
 2        Q.    Were you there for two-thirds of it?
 3        A.    Yeah.
 4        Q.    So you likely reviewed at least 30 to 40 -- or
 5   you interviewed at least 30 to 40?
 6        A.    Yeah.  We had -- we had some no shows, so I
 7   don't know exactly the amount, but sure.  Let's say 30.
 8        Q.    And then you made recommendations regarding
 9   hiring as to the 30 that you -- of the 30 that you
10   interviewed which ones you liked?
11        A.    Yes.
12        Q.    And were those recommendations accepted?
13        A.    I believe so, yes.
14        Q.    Were the individuals that you recommended to be
15   hired, in fact, hired?
16        A.    Some.
17        Q.    Anyone else that you were involved in the hiring
18   process with?
19        A.    Not that I recall, no.
20        Q.    Have you ever been involved in the decision
21   to -- the decision or process to exit someone out of the
22   organization?
23        A.    We had a deputy who failed his field training.
24   And I'm not -- I wasn't directly involved in the field
25   training process; that is a process that goes through the
```

1          Q.    Do you recall if you were the only member of

2    MCSO from District III in this evacuation planning

3    meeting?

4          A.    I think I was.

5          Q.    Did you provide any input during the meeting?

6          A.    I'm sure I did.

7          Q.    Do you know if your input was accepted?

8          A.    I don't remember.  I don't have a recollection

9    of it.

10         Q.    In your time while you were a lieutenant in

11   Patrol District III, did you personally perform any

12   surveillance?

13         A.    Yes.

14         Q.    How many times?

15         A.    I can remember one specifically, but -- I'd say

16   one.  I'm just going to go with one.  That's all I can

17   remember right now.

18         Q.    One time one day?

19         A.    That's all I remember, yeah.

20         Q.    When you were a lieutenant in Patrol

21   District III, did you pursue, restrain, or apprehend any

22   suspects as lieutenant in Patrol District III?

23         A.    Pursue suspects, yes.  I can't remember if I

24   handcuffed some people or not while I was a lieutenant in

25   District III.  I don't think I did.  I can't remember if I

 1  did.

 2      *Q.*    If you pursued individuals in District III as a

 3  lieutenant, how many times did you do that?

 4      *A.*    Maybe like five times.  We'd be looking for

 5  somebody.  We'd have a grid set up.  Somebody would see

 6  them.  We'd be running around trying to catch bad guys

 7  running around our town.

 8      *Q.*    And that was from approximately April 2022 to

 9  August of 2024; correct?

10      *A.*    Yes.

11      *Q.*    When you were a lieutenant in Patrol

12  District III for roughly two years from April 2022 to

13  August of 2024, did you interview any witnesses?

14      *A.*    I don't specifically remember interviewing any

15  witnesses.

16      *Q.*    Is it possible that you didn't interview any

17  witnesses during that two-year time frame?

18      *A.*    It's possible.

19      *Q.*    During the roughly two-year time period

20  April 2022 to August 2024 as a lieutenant in Patrol

21  District III, did you interrogate or fingerprint any

22  suspects?

23      *A.*    No.  And it would be very rare that any of us

24  fingerprinted anyone, including deputies.

25      *Q.*    From April 2022 to August 2024 as a lieutenant

1   in patrol -- lieutenant in District III, did you conduct

2   investigations or inspections for violations of law?

3       A.    One more time.

4       Q.    Between April 2022 and August of 2024 as a

5   lieutenant in District III, did you conduct investigations

6   or inspections for violations of law?

7       A.    I assisted on investigations.  I wasn't primary

8   as a lieutenant usually would not be.

9       Q.    How many investigations do you believe that you

10  assisted with from April 2022 to August 2024?

11      A.    Oh, my gosh.  75.

12      Q.    Maybe 75 over the course of two years?

13      A.    Yeah.

14      Q.    And what would you consider to be assisting?

15      A.    Well, you're typically going to take charge of

16  the situation and figure out what's been done, what still

17  needs to be done, help coordinate people to get things

18  done appropriately, call resources, help set up a

19  perimeter.

20          You know, I've definitely spoke to witnesses

21  on scenes just to get an idea of what we're dealing with.

22  I wouldn't say that I've ever specifically interviewed a

23  witness but helped them figure out how many victims they

24  have, how many suspects they have, what laws are

25  applicable, what violations of law we're looking at, do we

1  have enough to author a search warrant, do we need to call

2  detectives, do we need to set up a perimeter; coordinating

3  and making decisions as the lieutenant would and should.

4      Q.    So when you were saying you were assisting with

5  conducting investigations, was your role primarily

6  logistics and coordination of resources?

7      A.    Yes.  And also establishing that there is a

8  violation of the law and what violations of the law have

9  occurred, determining that there is probable cause, and

10  gathering all that information to make sure that we're

11  moving forward in the appropriate direction with the call.

12      Q.    When you were a lieutenant in Patrol

13  District III, did you ever prevent, control, or extinguish

14  a fire?

15      A.    I don't think so.  Not as a lieutenant.

16      Q.    As a lieutenant in Patrol District III, did you

17  ever rescue fire, crime, or accident victims?

18      A.    I applied a bandage to a man's bloody arm in an

19  accident scene once.  I specifically remember that.  Tried

20  to comfort him until fire could get on scene to help him.

21  So I would say yes.

22      Q.    Any other instances of that?

23      A.    Not that I can recall specifically, but

24  there's -- no, I can't -- I'm sorry.  My memory is not

25  what it used to be.

1      Q.     And that was while you were a lieutenant in

2  Patrol District III; correct?

3      A.     Yes.

4      Q.     Okay.  As a lieutenant in Patrol District III

5  between April 2022 and August of 2024, did you prevent or

6  detect any crimes?

7      A.     Not that I can specifically recall.

8             I did just recall, me and another lieutenant

9  and my captain apprehended a suspect on a -- that had

10  committed a violent crime, and we conducted a high-risk

11  stop on the suspect, and the suspect was taken into

12  custody.  I do remember that.

13      Q.     And that was who?  It was you?

14      A.     Me, the other lieutenant, and the captain did

15  the high-risk stop.

16      Q.     Are you saying high-risk stop?

17      A.     Yes.

18      Q.     And that was while you were a lieutenant in

19  Patrol District III; correct?

20      A.     Yes.

21      Q.     Do you remember about when that was?

22      A.     Maybe early 2024.

23      Q.     Any other instances that you can think of where

24  you apprehended a suspect as a lieutenant in Patrol

25  District III?

1      A.    Not that I can think of specifically.

2      Q.    How about detaining or supervising suspected and

3  convicted criminals as a lieutenant in Patrol District III

4  between April 2022 and August of 2024?

5      A.    I'd baby-sit them sometimes when they came to

6  the station so that the deputy could get things done.

7  Because you've got to have eyes on them.

8      Q.    How often would you do that?

9      A.    I probably did it 20 times.

10     Q.    Over the course of two years?

11     A.    Maybe more.  Maybe 30 times.  I don't know.

12     Q.    And what would that consist of?

13     A.    Just moving over to wherever they are being

14  held, whatever tank they are in, so that I have eyes on

15  them and just kind of being in that area to keep eyes on

16  them --

17     Q.    Could you be getting --

18     A.    -- period.

19     Q.    Oh, sorry.

20     A.    That's it.

21     Q.    Could you get other work done while you were

22  watching them?

23     A.    If I brought my computer with me, yeah.

24     Q.    And how many times would you say that you

25  prepared investigative reports as a lieutenant in Patrol

```
 1   District III between April 2022 and August 2024?
 2        A.   I don't recall being -- taking a primary on any
 3   investigative reports as a lieutenant in District III.
 4                  (Deposition Exhibit No. 6 was marked for
 5             identification by the reporter.)
 6   BY MS. SANTIAGO:
 7        Q.   Andrew, you've been handed what has been marked
 8   as Exhibit 6 to your deposition.
 9                  Does this type of report look familiar to
10   you?
11        A.   Yeah.  It appears to be a stat form.
12        Q.   And this is a stat form for you; correct?
13        A.   Yes.
14        Q.   And it's from April 5, 2022 through June 26,
15   2023.
16                  Do you see that?
17        A.   Yes.
18        Q.   And what does this report summarize?
19        A.   Calls that I actively noted responding to in
20   patrol.
21        Q.   And if you look on the left-hand side,
22   underneath where it says Employee Stats and your name, it
23   says "Events as of 6/28/2023."
24                  Do you see that?
25        A.   Yes.
```

1    A.    Yes.

2    Q.    Is that consistent with when you would have

3  likely logged off of the CAD system at the conclusion of

4  your shift?

5    A.    It's -- I would say it's when I logged off CAD,

6  yes.

7    Q.    And is the fact that the logoff date is a day --

8  is the next date after the login time consistent with the

9  fact that you were working the overnight shift?

10    A.    Yes.

11    Q.    Then if you follow down onto the next page,

12  there's another unit initial log for service on 5/2/2022

13  at 7 -- 17:04:07.

14              Do you see that on page 5106?

15    A.    Yeah, I do.

16    Q.    Is that consistent with your next evening shift

17  and logging in?

18    A.    It would appear so, yes.

19    Q.    Do you have any reason to dispute the accuracy

20  of the data contained in this CAD unit history report?

21    A.    No.

22    Q.    Do you agree that you would typically log into

23  the CAD system at the beginning of your shift from home?

24    A.    Yeah.  As much as possible.

25    Q.    Would you agree you generally log off of the CAD

1    system once you arrived back home at the conclusion of

2    your shift?

3       A.    Yes.  Normally.

4       Q.    Next I want you to take a look at Exhibit 8 to

5    your deposition.  It has Bates numbers Rankin 1 through

6    65.

7             Do you see that?

8       A.    Yes.

9       Q.    I'll make the representation that these are pay

10   stubs that were produced by your counsel's office.

11            Do you have any reason to doubt the accuracy

12   or authenticity of these earnings statements?

13      A.    No.

14      Q.    Another set of time records.

15            Not time records.  Earnings statements.

16            Exhibit 9 to your deposition, MCC 1063

17   through 1076.  These are earnings statements from ADP that

18   were provided to your counsel's office.

19            Have you reviewed these prior to today's

20   deposition?

21      A.    No, I've not looked at them since I provided

22   them to counsel.

23      Q.    Do you have any reason to doubt the authenticity

24   or accuracy of these earnings statements at Exhibit 9 to

25   your deposition?

1          A lot of these deputies and even sergeants

2    never had detective experience, whereas I have.  So it's

3    helpful for me to prevent things that you can't correct

4    once they are done wrong, so ...

5          Q.   So when you would go on scene for these serious

6    calls a few times a month, was it in an incident command

7    role?

8          A.   Not always.  Incident command was usually only

9    needed to be instituted when something was still

10   happening, like you had a hostage situation that was

11   openly occurring or you had a suspect on the loose from a

12   homicide, you would want -- and you're going to conduct

13   some type of grid search.  Maybe you have a perimeter up

14   that would need incident command.

15         Q.   So to phrase it a little bit differently, with

16   the serious calls when you go out a few times a month to

17   them, was it to either be an incident command role if the

18   situation was still ongoing or to otherwise direct and

19   oversee your sergeants and deputies?

20         A.   Yeah.  And assist because we're almost always

21   going to be short-handed.  There's -- the most deputies

22   that we're ever going to get on a scene is a few.  If

23   you're lucky, you have four deputies on a scene.

24              And there's a lot of things happening, so

25   you might be helping watch a witness or something like

1   that just because there's not enough hands to run the

2   event.

3             So sometimes you do have to be more

4   hands-on, but I always tried to take the lead, especially

5   in a major incident, because there's going to be questions

6   from command, and I want to be able to answer them.

7      *Q.*   What do you mean you always try to take the

8   lead?

9      *A.*   Try and be in charge of the incident, take

10   responsibility for it.

11      *Q.*   Take responsibility in the context of directing

12   others?  Or you actually taking the lead of doing the

13   interviewing interrogation?

14      *A.*   Well, usually if I'm heading out to one of those

15   scenes, interviews and interrogations are going to be done

16   by detectives anyways.  So we're not typically

17   interviewing anyone other than probably the victim as an

18   initial interview to try and get additional information on

19   whatever is happening.

20             But I need to know all the working parts of

21   the incident so that I can best coordinate resources,

22   including what resources we have and calling out

23   additional resources.

24             But being present and being there and being

25   hands on in the incident allows you the ability to take

1  responsibility for it so in the event that something does

2  go wrong, it doesn't just fall onto my sergeants; it would

3  ultimately be my responsibility.

4      Q.    I guess what I'm asking is:  What are you

5  meaning by being hands-on?

6      A.    Well, if it's a search, I'm going to take

7  control of directing the search and where our units are

8  going and what avenues they should be checking.

9              If it's a barricade situation, I'm going to

10  make -- or a hostage situation and I'm on scene, I'm going

11  to make decisions about whether or not we're going in for

12  a potential rescue situation or whether we're waiting for

13  SWAT to arrive to take over control of the scene,

14  gathering all the information to relay that information up

15  the chain of command.

16              And, again, this is all relative to how

17  quickly I can get to the scene.  Because a lot of -- there

18  are times where a lot of this has to be done without me

19  there because I'm on my way, unfortunately.

20      Q.    How often does a lot of this have to be

21  conducted while you're own your way en route to a scene?

22      A.    Almost always.  Vast majority of the time.

23      Q.    A lot of times is the situation already resolved

24  or under control by the time you're on scene?

25      A.    A lot of times it is, depending on how far your

1      *A.*    Probably 30 to 45 minutes normally, I would

2 think.  Hour at the most.

3      *Q.*    And other times that you grab lunch during the

4 day, how do you typically grab lunch?

5      *A.*    I almost always get lunch at the same place

6 every single day and eat it in my office every single day

7 while I'm working.  I go to Salad And Go almost every day,

8 either that or Chipotle, and I take it back to my office,

9 and I eat it there.

10     *Q.*    And how long of a lunch do you usually take?

11     *A.*    You know, I don't particularly time it, I guess,

12 but not very long.  Long enough to go pick up my lunch and

13 come back and eat it.  But I always would get it from a

14 place in my district right up the road.  I probably took a

15 20-minute lunch typically.

16           And I should note that police -- there's

17 some police agencies that have dedicated breaks for their

18 employees.  We do not.  You take your lunch when you have

19 the time to take your lunch.  That's every rank.  Your

20 lunch is as long as you have the time to take it

21 essentially.

22     *Q.*    Last question.  You've worked for several

23 different captains as you've been a lieutenant; correct?

24     *A.*    Two.

25     *Q.*    Was it just the one in District III and the one

```
 1   questions I had.
 2                MS. SANTIAGO:  All right.  Free to go.
 3                MS. SYVERSON:  You're done.
 4                THE VIDEOGRAPHER:  This concludes today's
 5   deposition.  Off the record at 4:59.
 6                MS. SYVERSON:  Read and sign.
 7
 8                (WHEREUPON, this deposition concluded at
 9   4:59 p.m.)
10
11
12                           _____
13                           ANDREW RANKIN
14
15
16
17
18
19
20
21
22
23
24
25
```

1   STATE OF ARIZONA     )
                         )  ss.
2   COUNTY OF MARICOPA   )

3

4          BE IT KNOWN that the foregoing proceedings were
    taken by me, MICHAELA HERMAN DAVIS, a Certified Reporter,
5   in and for the County of Maricopa, State of Arizona; that
    the witness before testifying was duly sworn to testify to
6   the whole truth; that the questions propounded to the
    witness and the answers of the witness thereto were taken
7   down by me in shorthand and thereafter reduced to
    typewriting under my direction; that the foregoing pages
8   are a true and correct transcript of all proceedings had,
    all done to the best of my skill and ability.

9

          I CERTIFY that I am in no way related to any of
10  the parties hereto, nor am I in any way interested in the
    outcome hereof.

11

                 [X] Review and signature was requested.
12               [ ] Review and signature was not requested.
                 [ ] Review and signature was waived.

13

14         I FURTHER CERTIFY that I have complied with the
    ethical obligations set forth in ACJA 7-206(F)(3) and
15  ACJA 7-206(J)(1)(g)(1) and (2). Dated at Phoenix, Arizona,
    this 28th day of April, 2025.

16

17                         _____
18                         Michaela H. Davis, RPR, CRR, CRC
                                 Arizona CR No. 50574
19                               New Mexico CCR No. 614

20

21         I CERTIFY that Carrie Reporting, LLC, has
    complied with the ethical obligations set forth in
22  ACJA 7-206.  Dated at Phoenix, Arizona, this 30th day of
    April, 2025.

23

24                         _____
                                 Carrie Reporting, LLC
25                               Arizona RRF No. R1064

# EXHIBIT 39



# FAIR LABOR STANDARDS ACT (FLSA)
# EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 04/04/2022 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| | |
|---|---|
| **Employee ID:** 811074913     **Position #:** 18784 | **Name** (Last, First): Rankin, Andrew |
| **Market Range Title:** Law Enforcement Lieutenant | **Working Title:** Law Enforcement Lieutenant |

**FLSA Status:**
☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)
☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| | |
|---|---|
| Employee Signature | Date |

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| | |
|---|---|
| Employee Signature | Date 3/30/22 |

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

| | | |
|---|---|---|
| Gertrude T. Jackson | _(signature)_ for MCSO HR | 3/30/2022 |
| Supervisor Name (print) | Supervisor Signature | Date |

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

Revised: 08/07/2017

COFNIDENTIAL

# EXHIBIT 40

# FILED UNDER SEAL