# EXHIBIT 41

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on       )
behalf of himself and all      )
those similarly situated,      )
                               )
          Plaintiff,           )
                               )
vs.                            ) Case No.:
                               ) 2:23-cv-00068-DGC
Maricopa County,               )
                               )
          Defendant.           )
                               )

VIDEO-RECORDED DEPOSITION OF RUDY VERDUGO ACOSTA, JR.
          (and Videoconference via Zoom)

Phoenix, Arizona
July 15, 2025
1:59 p.m.

REPORTED BY:                    CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR       Certified Reporters
AZ CR No. 50200                 12725 W. Indian School Rd.
                                Suite F-100
CERTIFIED COPY                  Avondale, AZ 85392
                                (480) 429-7573

2

1    VIDEO-RECORDED DEPOSITION OF RUDY VERDUGO ACOSTA, JR.

2    commenced at 9:05 a.m., on July 15, 2025, at Fisher &

3    Phillips, LLP, 3200 North Central Avenue, Suite 1550,

4    Phoenix, Arizona, and videoconference via Zoom before

5    Kristy A. Ceton, RPR, CRR, Arizona Certified Court

6    Reporter No. 50200.

7

8                              *  *  *

9

10   APPEARANCES:

11       For the Plaintiff:

12           FRANKEL SYVERSON, PLLC
             By:  Patricia N. Syverson, Esq.
13           2375 East Camelback Road
             Suite 600
14           Phoenix, Arizona 85016
             patti@frankelsyverson.com
15
         For the Defendants:
16
             FISHER & PHILLIPS, LLP
17           By:  Shayna Balch Santiago, Esq.
             3200 North Central Avenue
18           Suite 1550
             Phoenix, Arizona 85012
19           ssantiago@fisherphilliips.com

20       Also Present:

21           Cedric Tinard, the videographer

22           Donna Matthews (via Zoom)

23

24

25

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

12

1  never given to -- unless --  Let me put it to you

2  this way.

3            It may have been sent to me.  Did I

4  review it verbatim like I'm doing now?  No.

5       Q.   Now that you've had a few moments to

6  review through the documents at Exhibit 1 to your

7  deposition, is there anything incorrect in the

8  responses?

9       A.   No.  I -- I don't have anything in here

10  that I object to.  I just don't remember --

11      Q.   Okay.  So --

12      A.   -- all of it verbatim.

13      Q.   -- is your testimony that the responses

14  in Exhibit 1 to your deposition are true and correct?

15      A.   Yes.

16      Q.   All right.  Take a look at interrogatory

17  No. 1.

18      A.   Okay.

19      Q.   And the response thereto.  What I want to

20  do is go through a chronology of your history at

21  Maricopa County starting upon your --  Strike that.

22            What was the date of your promotion to

23  lieutenant?  Was it on or around October 19th --

24      A.   Yes.

25      Q.   -- 2020?

13

1          A.    Yes, it was.

2          Q.    Okay.  So your promotion to lieutenant at

3    Maricopa County was October 19th, 2020, correct?

4          A.    Yes.

5          Q.    Okay.  And your first assignment

6    following your promotion to lieutenant was in

7    District 3; is that correct?

8          A.    That's correct.

9          Q.    And is it correct that you worked in

10   District 3 as a lieutenant from October 19, 2020,

11   through February 7, 2021?

12         A.    Yes.

13         Q.    During that time period, did you ever

14   serve as a night watch commander?

15         A.    Yes.

16         Q.    When did you serve as a night watch

17   commander in District 3?

18         A.    The whole time I was there.

19         Q.    And, to be clear on the record, you

20   served as a night watch commander in District 3 from

21   October 19, 2020, through February 7, 2021; is that

22   correct?

23         A.    That's correct.

24         Q.    Did you ever serve as acting commander --

25         A.    No.

15

1   yes, I -- there were times that I did oversee other

2   districts, specifically neighboring districts like 2

3   or 4, but it would be, like, one day because there

4   was a day that we all flexed, if you will.  I think

5   it was like a Wednesday.  I can't remember the day.

6             But, essentially, yes, there were times

7   that I was over more than one district.

8        Q.   How did it work in District 3 with the

9   night watch commander?  So for most of your shifts,

10  were you only serving as night watch commander for

11  District 3, then?

12       A.   I would say that, yeah, most of the days,

13  I was in District 3.  That's correct.

14       Q.   I should say most shifts you were just

15  over -- over District 3 as night watch commander,

16  correct?

17       A.   Correct.  There was --  At least once a

18  week, I would -- I would be over other districts.

19       Q.   And were those the districts in -- on the

20  east side or the west side?

21       A.   The west side.

22       Q.   Approximately --  When you -- when you

23  worked District 3 as night watch commander, what days

24  did you work and what were the hours that you worked?

25       A.   Those days were -- I believe it was

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

16

1    Sunday, Monday, Tuesday, and Wednesday.  And they

2    were 5 p.m. until 3:00 in the morning.

3          Q.    Okay.  So you were working four 10-hour

4    shifts?

5          A.    Yes.

6          Q.    So if you're working four 10-hour shifts,

7    how many nights per week on average were you

8    overseeing the whole west side versus just District 3

9    overnight?

10         A.    On average, at least one time a week.

11         Q.    Were there ever any occasions between

12   October 19, 2020, and February 7, 2021, where you

13   were the night watch commander for the whole county?

14         A.    Yes.

15         Q.    How many times did that occur,

16   approximately?

17         A.    My --  It's a guess.  But it's two to

18   three.  Maybe two to three times.  It wasn't very

19   many.  But there was nobody else but me, yes.

20         Q.    When you were serving as the night watch

21   commander overseeing just District 3, were you the

22   highest ranking scheduled person in District 3 at

23   that time?

24         A.    Yes.

25         Q.    When you were serving as night watch

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

17

1    commander over the whole west side, were you the

2    highest ranking scheduled person in Patrol Bureau

3    West?

4            A.   Yes.

5            Q.   When you served as watch commander over

6    the whole county, the approximately two to three

7    times that you did it, were you the highest ranking

8    scheduled person in the County?

9            A.   Yes.

10           Q.   Who did you report to in District 3?

11           A.   Captain Brian Stutsman.

12           Q.   Did you report to Stutsman the entirety

13   of your time in District 3?

14           A.   Yes.

15           Q.   Your next assignment was in District 1;

16   is that correct?

17           A.   That's correct.

18           Q.   And did you work in District 1 from

19   approximately February 8th, 2021, through April of

20   2022?

21           A.   That sounds right, yes.

22           Q.   And did you work the same shift or

23   different shifts during your time in District 1?

24           A.   It started the same shift, and then

25   eventually someone else -- another lieutenant left,

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

18

```
 1   and so there was an opening in the dayshift and so I
 2   moved to a day spot --
 3           Q.   So am --
 4           A.   -- at some point.
 5           Q.   If I'm correct in understanding your
 6   testimony, then, when you started at District 1 in
 7   February of 2021, you started as the night watch
 8   commander?
 9           A.   Yes.
10           Q.   And then after a period of time, you
11   transitioned to days, correct?
12           A.   Correct.
13           Q.   Approximately how long did you serve as
14   night watch commander in District 1?
15           A.   I can't recall exactly what it was, but
16   it was maybe three or four months.  It wasn't very
17   long.
18           Q.   And what days of the week did you serve
19   as night watch commander for District 1?
20           A.   I believe it was the same days.  Sunday,
21   Monday, Tuesday, Wednesday.
22           Q.   And the same hours of 5 p.m. to 3 a.m.?
23           A.   Yes.
24           Q.   So you were, again, working four 10-hour
25   days, correct?
```

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 10 of 189
Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

21

1  scheduled person?

2          A.   Yes.  In patrol.  And I want to elaborate

3  more, if I can.

4          Q.   Absolutely.

5          A.   If there was a special unit that was

6  called out, like SWAT, something like this, because

7  of a situation occurred, they would have a lieutenant

8  on board.  But they would take over that -- whatever

9  the issue was.  But as far as patrol is concerned,

10  yes, I was the highest ranking.

11          Q.   And when you were covering at least two

12  districts during the roughly three to four months

13  that you were night watch commander in District 1,

14  you were the highest ranking scheduled person at that

15  time as well, correct?

16          A.   Yes.

17          Q.   And who did you report to while you were

18  in District 1?

19          A.   It was --  Started out as George Pepe for

20  a few month -- a couple months, and then it went to

21  Cory Morrison.  George Pepe maybe a month.  It wasn't

22  very long.

23          Q.   After you shifted to days in District

24  1 --

25          A.   Yes.

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

23

1          And if at any point during the deposition

2    today, you realize that you need to correct something

3    earlier in your deposition testimony, just let me

4    know.

5          A.    Okay.

6          Q.    We can put that on the record.

7                While you were in District 1 from roughly

8    February 8th, 2021, through April 2022, did you ever

9    serve as acting commander?

10         A.    Yes.

11         Q.    How many times?

12         A.    Not very many.  Maybe two or three times.

13         Q.    And who did you serve as acting commander

14   for?

15         A.    Cory Morrison.  Captain Morrison.

16         Q.    Do you recall the dates that you served

17   as acting commander for Captain Morrison?

18         A.    I do not.

19         Q.    Do you recall the lengths of time that

20   you served as acting commander for Captain Morrison?

21         A.    It may have been a week or two he was on

22   vacation.  Something to that effect.  But it wasn't

23   -- it wasn't longer than two weeks.

24         Q.    Describe for me, in your own words, what

25   an acting commander is.

24

1          A.    The acting commander is basically the

2    highest ranking person at the district that reports

3    all -- well, that will essentially represent the

4    district to -- to executive command.  If they have

5    issues or things that need to be done, it goes

6    through the chain of command.

7              It goes down to the -- to the commander,

8    and the commander will then push it out to everyone

9    below and ensure that the -- the orders are -- orders

10   or details are completed.

11             So it's really that you're the highest

12   ranking person representing -- whether it be a

13   command situation or a citizen that is asking for

14   something or there's an event that's happening in

15   your -- in your district, as the acting commander,

16   you're the -- you're the person that is basically

17   representing that district and has interaction with

18   any of -- anyone that's involved in the organization

19   or organizing whatever is happening.

20        Q.    I understand that it's called "acting

21   commander," but is it essentially a position that you

22   are acting in the place of the captain in the

23   captain's absence?

24        A.    That's correct.

25        Q.    Did you transfer out of District 1 in

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

25

1    approximately April of 2022?

2         A.    Yes.

3         Q.    Where did you transfer to?

4         A.    I went to the general crimes division.

5         Q.    And how long did you remain in general

6    crimes for?

7         A.    It was maybe --

8         Q.    Was it until approximately January of

9    2024?

10        A.    No.  Well, we had two areas.  It was kind

11   of under the same -- I guess it would be under the

12   same bureau, if you will.  Because we had the general

13   crimes division and then we had the major crimes

14   division.

15             So I stayed at general crimes for, I want

16   to say four months, three months, and then I went

17   over to major crimes, but it was still under the same

18   bureau.  So I guess the long answer is, yes, but

19   there were two different sections, if that makes

20   sense.

21        Q.    Understood.

22             And is either --  Let me take them one at

23   a time.

24             Is the general crimes division in Patrol

25   Bureau East or West?

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

26

1          A.    It's the whole county.  There's no -- as

2  -- as the general crimes division is not -- there's

3  no geographical location.  They -- they respond to

4  the whole county.

5          Q.    Do you have an --

6          A.    It's a detective unit.

7          Q.    It's not a patrol unit?

8          A.    It's not a patrol unit.  It's a detective

9  unit.

10          Q.    Do you have an understanding of what

11  Patrol Bureau East is?

12          A.    I have a general understanding, yes.

13          Q.    What is Patrol Bureau East?

14          A.    Patrol Bureau East is essentially the

15  make up of all of -- all of the districts on the east

16  side, and the patrol bureau is all of the patrol

17  functions from captain in that patrol district to

18  lieutenant, sergeants, and then deputies.

19                They actually --  Those are all the

20  different people that are under that -- that -- that

21  East Bureau, but it's all the east -- east side

22  districts.

23          Q.    Do you have an understanding -- and if

24  you don't, you can let me know.  But do you have an

25  understanding as to what divisions or districts are

28

```
 1        A.   Yes.
 2        Q.   So make sure I have a clean record here.
 3             Is it your testimony that from
 4   approximately April 2022 through January of 2024, you
 5   were in either the general crimes division or the
 6   major crimes division?
 7        A.   That's correct.
 8        Q.   And neither of those divisions are in
 9   Patrol Bureaus East or West, correct?
10        A.   That's correct.
11        Q.   In January of 2024, did you transfer to
12   District 2?
13        A.   Yes.
14        Q.   What schedule did you work when you
15   transferred to District 2?
16        A.   I worked the dayshift, which I'm
17   currently on now.  So it never changed.  I work
18   Tuesday through Friday and 7:00 until 5:00 in the
19   morning.
20        Q.   Let me make sure I understood you
21   correctly on this.
22             You have consistently worked the same
23   days and hours in District 2 since your transfer
24   there in January of 2024 to the present, correct?
25        A.   Correct.  There's a couple caveats there,
```

29

1    but, essentially, that was my schedule.

2         Q.   Have you served in a commander capacity?

3         A.   Yes.

4         Q.   Describe for me each of the positions

5    that you have served as a commander in District 2

6    since January 2024.

7         A.   It's just the same situation where it was

8    generally for, like, a week.  Someone's on -- the

9    captain was on vacation and I would cover the

10   district.  Same type of scenario.  But it was very

11   rare.  I think only one time.  I don't think I did it

12   more than once.

13        Q.   So is it your testimony that from January

14   2024 to the present, that you have served as acting

15   commander while the captain was on vacation maybe one

16   time?

17        A.   Yeah.

18        Q.   And that was for about a week, you said?

19        A.   Correct.

20        Q.   Have you served as night watch commander

21   in any capacity in District 2?

22        A.   Well, not night watch, no.  No.

23        Q.   And who have you reported to in District

24   2?

25        A.   I started reporting to Captain Phil

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 17 of 189
Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

30

1    Hilliker was the first captain I reported to.

2            Then the second captain was Captain Aaron

3    Flowers.

4            And, currently, I'm reporting to Captain

5    Mike Trowbridge.

6        Q.   Have you served as acting commander for

7    both Captains Hilliker and Flowers?

8        A.   Yes.

9        Q.   And that's during your time at District

10   2?

11       A.   Correct.

12       Q.   How many times have you served as acting

13   commander for Captain Hilliker?

14       A.   Once, twice maybe.  Not very many.

15       Q.   How many times have you served as acting

16   commander for Captain Flowers?

17       A.   About the same.  Once or twice.

18       Q.   So you've actually served as acting

19   commander in District 2 two to four times; is that

20   correct?

21       A.   Yeah.  What did I say?  One time?

22       Q.   Yes.

23       A.   Oh, I'm sorry.  I was incorrect.  Because

24   I do remember, when I broke it down, it made it

25   easier for me to remember.  But, yeah, there was

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 18 of 189
Deposition of: Rudy Verdugo Acosta, Jr.                                July 15, 2025

31

1    definitely a couple times.  One or time times.  I

2    know for sure one.  I don't want to say -- I think it

3    was two, but my memory's not 100 percent.

4              So at least two.  Yeah.  One for each

5    one, but could have been two.

6         Q.   What's the longest time that you've

7    served as acting commander in District 2?

8         A.   It was maybe a week, 10 days.  Something

9    like that.  It wasn't -- it wasn't very -- it wasn't

10   longer than that.

11        Q.   What's your understanding of the claims

12   you've asserted in this case?

13        A.   Can I -- can I elaborate on another --

14   remember, I said there was a caveat?

15        Q.   Yeah, of course.

16        A.   Can I elaborate on that?

17        Q.   Yes.

18        A.   What happens is in district -- in

19   district -- the west side districts, they have a

20   weekend schedule.  What it is is that we -- District

21   2, 3, and 4 will -- every six weeks, we have a roster

22   where the lieutenants, in order to give everyone a

23   break, we will cover the weekend.

24              So during that week that we're scheduled,

25   we have to change our schedule that week.

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

42

1    frequent.  When I was the night watch commander, it

2    happened more often.

3          Q.   So let me make sure I understand this

4    correctly.

5               Is it your testimony that since you've

6    been in District 2 starting in January of 2024 --

7          A.   Yes.

8          Q.   -- that you're in an administrative

9    lieutenant position?

10         A.    No.  It's not -- I wouldn't --  The title

11   that they give me, it's kind of -- it's got, like,

12   four slashes on it.  Administrative/internal

13   investigations/special -- specialty squad/patrol.  So

14   I -- I still have patrol as one of my functions, but

15   it's not -- it's not the main function.

16              My main function is more -- more the --

17   the daily.  Like, I do a lot of the daily stuff, you

18   know, the building contracts.  You know, POs.  So my

19   stuff is more lean toward the administrative stuff.

20   But I still can do patrol stuff as well.  So it's

21   kind of -- if that helps at all.

22         Q.   Give me a breakdown.  So since -- you

23   said there's four slashes.  There's admin, internal

24   affairs, specialty, and patrol, correct?

25         A.    Correct.

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

66

1        A.    Uh-huh.

2        Q.    -- in October of 2020, when you were in

3    District 3.

4        A.    Uh-huh.

5        Q.    Walk me through what a typical day would

6    look like when you started your shift, including when

7    you would log into CAD.

8        A.    It wasn't typical.  Essentially -- I

9    mean, obviously, the way that it worked with

10   lieutenants was we were on clock from house to house.

11   So when I took off from one house, essentially --

12   didn't always happen, but I would start my time then.

13           And then when I got home, and I was

14   completely done, like, I could still be home for 30

15   minutes and still listening to the radio and still be

16   on but I would be at my house, and then I would

17   essentially log off.  Either I would log off on CAD

18   on the computer or I would call in on the radio and

19   tell them to log me off.

20       Q.    So let me make sure I understand this

21   correctly.

22           So as a lieutenant, you have an unmarked

23   vehicle that you're able to take to and from your

24   personal residence, correct?

25       A.    That's correct.

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 21 of 189
Deposition of: Rudy Verdugo Acosta, Jr.                          July 15, 2025

71

1          A.    Yes.

2          Q.    Was it a personal office or shared

3    office?

4          A.    Personal.

5          Q.    Where was that office located?

6          A.    It was at District 3 inside the

7    substation.

8          Q.    Do you know the address or the

9    crossroads?

10         A.    It was Bell and Dysart, I believe it is.

11   I don't have the exact address.

12         Q.    Approximately how long was your commute

13   from your personal residence to District 3

14   substation?

15         A.    45 minutes.

16         Q.    Was that with or without traffic?

17         A.    It's with moderate traffic, because I

18   would leave -- remember, I start at 5:00 so, you

19   know, I'm running into traffic.  So...

20         Q.    Was it the same amount of time for your

21   return back home?

22         A.    No.  It was shorter.  At 3:00 in the

23   morning, it wasn't as much traffic, so it was a

24   shorter distance.

25         Q.    How long was it on the way home?

72

1          A.    Probably 30, 35, something like that.

2          Q.    How about when you were at District 1?

3     Did you have an office at District 1?

4          A.    Yes.

5          Q.    Where was that office located?

6          A.    It was on --  I know it's on Lewis.

7     That's the street.  I don't know the exact address.

8     But, essentially, it was Mesa Drive -- well, east of

9     -- west of Mesa Drive, and I think it was north of

10    Baseline Road.

11         Q.    Was that a personal office or a shared

12    office?

13         A.    A shared --  No.  It was a personal

14    office.

15         Q.    How long was your commute to and from

16    District 1 from your residence?

17         A.    30 minutes.

18         Q.    Each way?

19         A.    Uh-huh.

20         Q.    With or without traffic?

21         A.    A little bit longer.  Like I said,

22    District 1, when I was -- well, once again, I did

23    night for a little bit, so it was different times.

24    But, essentially, at night, it was probably maybe a

25    little longer.  35.  But in the daytime, it was like

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

73

1    30.

2                 And on the way back, it was long.

3    Daytime, like, when I got off, it was longer.  It

4    took about 40 minutes.

5          Q.   Did you have an office at District 2?

6          A.   Yes.

7          Q.   Where is that office located?

8          A.   It's on --  I should know this address by

9    heart.  I've been there.  It's -- it's on 104th

10   Avenue and is it -- not Olney.  I'm thinking of my

11   house.  South of Van Buren.  No.  North of Van Buren.

12   Trying to think.  Not Roosevelt.  But a little bit

13   further north -- south, I mean.

14                What's that street called?  But it was

15   104th Avenue and --

16         Q.   Approximately Roosevelt?

17         A.   Approximately Roosevelt, I guess.  I'm

18   sorry.  I see that street all the time and I can't

19   remember the name.

20         Q.   Was that a personal office or a shared

21   office?

22         A.   Personal office.

23         Q.   And how long was your commute to and from

24   District 2 from your residence?

25         A.   28 minutes.

74

1          Q.   Is that for both ways or just one way?

2          A.   Yeah.  That's probably both ways.  It's

3    pretty close.  I mean, 28, 30.  It's not crazy, crazy

4    on the way back home.

5          Q.   So let's walk through what a day would

6    look like when you would leave your house to head in

7    to start your shift.  Did it -- did your --  Let's

8    start with District 2.

9               Are you primarily working at District --

10   at the District 2 building in your office or out in

11   the field?

12         A.   In my office.

13         Q.   What percentage of your time would you

14   estimate you spent in your office at District 2

15   versus being out in the field?

16         A.   Probably about 90 percent.

17         Q.   90 percent in your office?

18         A.   Uh-huh.  Yes.

19         Q.   And that's the entirety of your time at

20   District 2, correct?

21         A.   Correct.

22         Q.   Same question with regards to District 3.

23   Would you spend the majority of your time -- what

24   percentage of your time would you spend in your

25   personal office versus out in the field?

75

1          A.    That was probably about 30 percent in my
2    office and 70 percent in the field.
3          Q.    You had a 10-hour shift in District 3,
4    right?
5          A.    Yes.
6          Q.    So if we took your 30-minute drive to and
7    from work?
8          A.    I was 45 minutes in District 3.
9          Q.    45 minutes.  Okay.
10               So we took 45 minutes either way, that's
11   an hour and a half off of your 10-hour shift --
12         A.    Uh-huh.
13         Q.    -- we're left with about eight and a half
14   hours.  So with eight and a half hours remaining, how
15   many hours on average would you say you spent in the
16   office?
17         A.    Like 30 percent of that.  So whatever
18   that -- whatever that is.
19         Q.    Same question with regards to District 1.
20   What percentage of your shift would you spend in
21   office versus out in the field?
22         A.    At night, just had two -- I had two
23   different positions in District 1.  It was night and
24   then I went to days.
25         Q.    Let's take night first and then we'll go

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

76

1    through days.

2             A.    Night would be almost mimicking, because

3    I spent probably about 70 percent in the field and

4    about 30 percent in the office as a night watch

5    commander there.

6             Q.    How about days?

7             A.    Days, it was probably --

8             Q.    Days in District 1.

9             A.    Days in District 1, it was probably about

10   half, 50/50.

11            Q.    So if you worked the 10 -- you worked

12   10-hour shifts in District 1, correct?

13            A.    Yes.

14            Q.    So for those days, it was a 30-minute

15   drive approximately each way, correct?

16            A.    Yes.

17            Q.    That leaves us with about nine hours

18   remaining, correct?

19            A.    Yes.

20            Q.    So would you spend about four and a half

21   hours in the office and about four and a half hours

22   in the field?

23            A.    That's pretty accurate, yeah, for the

24   daytime.

25            Q.    When you were out in the field, what

1   but the issue resolved before you arrived?

2           A.   Yes.

3           Q.   How often would that occur?

4           A.   I -- I couldn't tell you.  I'm not -- I

5   don't have a number.  I mean, it would happen.

6           Q.   Frequently or infrequently?

7           A.   I would say frequently.

8           Q.   Since your promotion to lieutenant in

9   October of 2020, have you consistently earned at

10  least $684 per week?

11          A.   I hope I have.  I don't know.

12          Q.   You don't know one way or the other?

13          A.   Well, I mean, it seems like it.  I would

14  have to break it down.  But that's interesting how

15  you got that number.

16          Q.   This year, are you earning at least

17  $108,000 a year?

18          A.   I'm sorry.  Say again.

19          Q.   This year, 2025, are you earning at least

20  $108,000 a year?

21          A.   Yes.

22          Q.   Last year, 2024, did you earn at least

23  $108,000 a year?

24          A.   I would believe so, yes.  I think I did.

25          Q.   How about in 2023, do you remember if you

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

83

1   earned at least $108,000 per year?

2          A.   That, I would be guessing.  I don't know.

3   I think it was close.  I don't know.

4          Q.   Since your promotion to lieutenant in

5   October of 2020, have you supervised two or more

6   employees consistently?

7          A.   Yes.

8          Q.   I'm going to ask you a series of

9   questions, and the time frame for these questions is

10  in your position as a lieutenant since 2020, but

11  excluding the time that you were in general or major

12  crimes.

13              How many times have you prevented,

14  controlled, or extinguished fires of any type?

15         A.   I think one time.

16         Q.   Since your promotion to lieutenant in

17  2020?

18         A.   Yeah.

19         Q.   Since your promotion to lieutenant

20  October 19, 2020, to the present, how many times have

21  you rescued fire, crime, or accident victims?

22         A.   Fire or --

23         Q.   Fire, crime, or accident victims.

24         A.   I would say at least 10.

25         Q.   But that's the entire time period of

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

84

1    October 19, 2020, to the present, correct?

2         A.   Yeah.  Those are where I'm physically

3    helping and removing them, yes.

4         Q.   Okay.  From October 19, 2020, to the

5    present, how many times have you prevented or

6    detected crimes?

7         A.   Prevented or detected?

8         Q.   Yes.

9         A.   Many times.  I don't know.  A lot.  I

10   know at least a lot.  Busy place in -- both of those

11   Districts 2 and 3 -- 2 and 1 are real busy.  I don't

12   know.  I don't know a number I can give you.  But --

13   And when you say "detected crime," like, you see it

14   happening and you stop it?  Or what do you mean?  I

15   don't know what you mean.

16        Q.   Well, what do you interpret preventing or

17   detecting crimes to be?

18        A.   Well, preventing is, like, you're --

19   you're basically intervening and stopping it.

20             And detecting is, well, you see

21   something, okay, so I see it.  Does that mean that

22   I'm doing anything about it or just that I see it?

23        Q.   All right.  So we take those definitions.

24             Preventing is intervening or stopping,

25   and detecting is seeing it.  How many times have you

1    prevented or detected crimes from October 19th, 2020,

2    to the present?

3           A.   I couldn't -- I know that the preventing

4    of a crime, I've -- Man, I don't know.  A lot.  I

5    couldn't tell you exactly.  I -- I saw a lot more.  I

6    mean, I -- like you said, detecting, probably -- I

7    don't know what number I could put on there.

8           Q.   Can you give me a ballpark?

9           A.   Boy.  I would say --  As far as detecting

10   a crime, I would say 50 to 100.  A lot.  But

11   preventing of the crime is less.  Probably, like,

12   actually -- I mean, it was probably more where I

13   actually took action to stop it.  Probably about 15

14   to 20.

15          Q.   That's from October 19, 2020, to the

16   present?

17          A.   Yeah.  That's -- I mean, that's just a

18   rough guess.

19          Q.   Okay.  How about conducting

20   investigations or inspections for violations of law,

21   how many times since October 19, 2020, to the

22   present, excluding your time in general or major

23   crimes?

24          A.   At least -- at least 50 to 100.

25          Q.   How about performing surveillance, how

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

86

1    many times have you done that from October 19th,

2    2020, to the present?

3            A.    Not very much surveillance.  Probably

4    three or four times.  Not -- not a lot of

5    surveillance.

6            Q.    How about pursuing, restraining, and

7    apprehending suspects, how many times have you done

8    that from October 19th, 2020, to the present?

9            A.    Probably 10 to 15.

10           Q.    How many times have you detained or

11   supervised suspected and convicted criminals,

12   including those on probation or patrol, from

13   October 19th, 2020, to the present?

14           A.    That I detained them?  What did you say?

15           Q.    That you detained or supervised suspected

16   and convicted criminals?

17           A.    A lot.  I mean, if I -- if I'm

18   supervising, I'm watching -- you know, as things are

19   unfolding, I'm watching it.  So many times.  If

20   they're arresting people or there's some type of a

21   situation, if I'm detecting.  Detecting is probably

22   less because I didn't see it.

23                 But if they're -- if I'm supervising what

24   they're doing as a lieutenant, you're kind of

25   watching over everything that's going on.  So I don't

1    know.  There's a lot.

2         Q.   When you would be on scene, would you be

3    the individual directly responsible for supervising

4    suspected or convicted criminals?

5         A.   No.

6         Q.   Who would be responsible for directly

7    supervising?

8         A.   Sergeant.  If there was not a sergeant

9    involved, then I would probably be more -- I would,

10   but that was very rare.  Sergeants are usually

11   involved.

12        Q.   How many times have you been directly

13   responsible for detaining or supervising suspected

14   and convicted criminals since October 19th, 2020, to

15   the present?

16        A.   I personally did?  At least 15 to 20.

17        Q.   How many times have you interviewed

18   witnesses from October 19th, 2020, to the present,

19   excluding time in general major crimes?

20        A.   Very little.  Probably five.

21        Q.   How many times have you interrogated and

22   fingerprinted suspects from October 19, 2020, to the

23   present?

24        A.   Zero.  None.

25        Q.   How many times have you prepared

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 33 of 189
Deposition of: Rudy Verdugo Acosta, Jr.                         July 15, 2025

88

1    investigative reports from October 19, 2020, to the

2    present, excluding your time in major and general

3    crimes?

4         A.    Maybe two.

5         Q.    Now, I want to go back to where you gave

6    me numbers for preventing or detecting crimes and I

7    want to clarify.

8              Is that when you were personally

9    preventing or detecting crimes or is that when you

10   were assisting your team with preventing or detecting

11   crimes?

12        A.    No, it would be personally.  I was

13   personally.  If I was involved, like, if I was the

14   watch commander and I seen something or I was

15   supervising.

16      (Exhibit 3 was marked for identification.)

17        Q.    BY MS. BALCH SANTIAGO:  Rudy, you've been

18   handed what's been marked as Exhibit 3 to your

19   deposition.

20             Do you recognize this document?

21        A.    Yes.

22        Q.    What is this document?

23        A.    It's just an identification of the job

24   classification and all the details as to what the job

25   tasks are of a lieutenant.

1          A.    Uh-huh.

2          Q.    I want to give you a few moments to

3    review through this job description.  And let me know

4    if there is -- if there are any job tasks on this job

5    description that you think law enforcement

6    lieutenants do not perform?

7          A.    Okay.

8          Q.    So my question was, in reviewing through

9    the job description at Exhibit 3 to your deposition,

10   are there any listed job tasks that you contend law

11   enforcement lieutenants do not perform?

12         A.    No.

13         Q.    Would you agree that this law enforcement

14   lieutenant job description correctly summarizes the

15   job responsibilities of a law enforcement lieutenant?

16         A.    Generally, yes.  But if you're asking me

17   if I agree that there's things on here that should be

18   on here that -- things that we do sometimes that are

19   not listed, I would say that it's probably about 99

20   percent accurate.  But there's other things that --

21   and you can't capture it.  You can't capture

22   everything in a job description that's going to

23   encompass everything that that job does.  So I'm

24   satisfied with what it says.

25              But being -- doing this job for some

1          A.    Shininger.  He's a lieutenant.  Retired

2    lieutenant now, but...  He just -- he knows we're not

3    getting paid.  But he says if you're working

4    overtime, you should record it.  I should have

5    listened to him.  I did a little bit a couple times

6    but didn't keep up with it.

7          Q.    Did anyone tell you not to record --

8          A.    No.

9          Q.    -- your hours worked in Workday or ADP?

10         A.    No.

11         Q.    So it was your personal choice to not

12   record all of your hours worked in ADP or Workday; is

13   that correct?

14         A.    That's correct.

15             MS. BALCH SANTIAGO:  Based on time, we're

16   not going to have a lot of time to go over these.

17   But start.

18        (Exhibit 6 was marked for identification.)

19             MS. BALCH SANTIAGO:  What exhibits are

20   these?

21             THE COURT REPORTER:  6 and 7.

22        (Exhibit 7 was marked for identification.)

23             THE WITNESS:  Two different systems.

24         Q.    BY MS. BALCH SANTIAGO:  Rudy, you've been

25   handed what has been marked as Exhibits 6 and 7 to

91

1    time -- and I wouldn't know how to tell you, what to

2    tell you what's different.  But I just -- I'm built

3    that way where I think that there's probably some

4    things it doesn't capture.  But I'm happy with it.

5         Q.   Can you list for me anything that was

6    left off, in your opinion, of the law enforcement

7    lieutenant job description?

8         A.   No, I can't.

9         Q.   Are you familiar with Blue Team

10   supervisor notes?

11        A.   Yes.

12        Q.   Do you have access to review Blue Team

13   supervisor notes authored about you?

14        A.   Usually, I'm copied on them, yes.  If

15   it's involving me, usually.

16        Q.   Did you read through your Blue Team

17   supervisor prior to today's deposition at any point?

18        A.   Not -- not -- no, not something recently,

19   no.

20        Q.   At any point?

21        A.   I do -- I do occasionally, yes.

22        (Exhibit 4 was marked for identification.)

23        Q.   BY MS. BALCH SANTIAGO:  You've been

24   handed what's been marked as Exhibit 4 to your

25   deposition.

Deposition of: Rudy Verdugo Acosta, Jr.                    July 15, 2025

105

1              MS. SYVERSON:  Object.  Foundation.

2              THE WITNESS:  It's kind of the same

3    question you asked me on the first one.

4              Once again, I -- I would say by looking

5    at it, it looks like I shouldn't be.  But I sure want

6    to know why, because, I mean, in a 40-hour workweek

7    --  Hold on.  This one is different.  It's not more

8    than -- 20 and -- yeah, this doesn't even show me

9    working a full 40 hours.  So I took a lot of vacation

10   time and time off.  So I don't know.  I don't know

11   why.

12             So the answer is, am I -- do I feel like

13   I'm entitled to it?  No.  But I feel like I'm

14   entitled to some -- someone to explain it to me.

15             MS. BALCH SANTIAGO:  I think we're at

16   time.  So we'll agree to reconvene.  I'll get an

17   assessment of how much time we have left.

18             THE VIDEOGRAPHER:  This concludes today's

19   deposition.  We are off the record at 11:30.

20        (The proceedings adjourned at 11:30 a.m.)

21

22

23        _____

24             RUDY VERDUGO ACOSTA, JR.

25

106

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3

 4            BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
 5   Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
 6   testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
 7   and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
 8   typewriting under my direction; that the witness
     requested reading and signing said deposition; that
 9   the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
              I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12            I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14
     Kristy A. Ceton                    50200_____
15   Certified Reporter                 CR Number

16                                      7.28.25
     _____
17   Certified Reporter Signature       Date

18
              I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).

20
21   Carrie Reporting, LLC             R1064
     Registered Reporting Firm         RRF No.
22
                                       7.28.25
23   Registered Reporting Firm         Date
     Signature
24

25
```

Carrie Reporting, LLC - Certified Reporters
480.429.7573

# EXHIBIT 42

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on          )
behalf of himself and all         )
those similarly situated,         )
                                  )
          Plaintiff,              )
                                  )
vs.                               ) Case No.:
                                  ) 2:23-cv-00068-DGC
Maricopa County,                  )
                                  )
          Defendant.              )
                                  )

VIDEO-RECORDED DEPOSITION OF RUDY VERDUGO ACOSTA, JR.
                    VOLUME II

Phoenix, Arizona
August 7, 2025
2:03 p.m.

REPORTED BY:                   CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR      Certified Reporters
AZ CR No. 50200                12725 W. Indian School Rd.
                               Suite F-100
CERTIFIED COPY                 Avondale, AZ 85392
                               (480) 429-7573

108

1  VIDEO-RECORDED DEPOSITION OF RUDY VERDUGO ACOSTA, JR.

2  commenced at 2:03 p.m., on August 7, 2025, at Fisher

3  & Phillips, LLP, 3200 North Central Avenue, Suite

4  1550, Phoenix, Arizona, before Kristy A. Ceton, RPR,

5  CRR, Arizona Certified Court Reporter No. 50200.

6

7                              * * *

8

9  APPEARANCES:

10      For the Plaintiff:

11          FRANKEL SYVERSON, PLLC
            By:  Patricia N. Syverson, Esq.
12          2375 East Camelback Road
            Suite 600
13          Phoenix, Arizona 85016
            patti@frankelsyverson.com

14

        For the Defendants:

15

            FISHER & PHILLIPS, LLP
16          By:  Shayna Balch Santiago, Esq.
            3200 North Central Avenue
17          Suite 1550
            Phoenix, Arizona 85012
18          ssantiago@fisherphilliips.com

19      Also Present:

20          Cedric Tinard, the videographer

21

22

23

24

25

Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                          August 7, 2025

115

1          If we had eight deputies -- or, I think,

2   possibly more were included at that time.  It's not

3   now, but -- that there was a span of control that we

4   had to have.  So I needed to ensure that we had the

5   right amount of supervisors.

6          Q.   So if a sergeant would call out sick,

7   then what would you need to do to ensure proper

8   coverage?

9          A.   I would either -- myself, I would either

10  have some -- a sergeant call around and have a

11  sergeant come in or have -- I, myself, would -- I

12  would now move into a patrol function and -- and

13  watch over and help the -- the sergeant if he needed

14  assistance.

15         Q.   Okay.  And let's kind of take this

16  district by district.

17              So in your time in District 3 --

18         A.   Yes, ma'am.

19         Q.   -- as a lieutenant, did you ever issue

20  any action plans to your subordinates?

21         A.   No.

22         Q.   Did you ever address employee misconduct

23  with any of your subordinates in District 3 as a

24  lieutenant?

25         A.   No.  I think it was direct -- I provided

1    direction for issues that I felt needed to be

2    explained, but I don't think I had any formal where I

3    actually had put them on an action plan.

4         Q.   Did you initiate any complaints or

5    reports with PSB or internal affairs regarding any of

6    your subordinates while you were District 3's

7    lieutenant?

8         A.   The -- that's -- that's a good question.

9    I -- I know of one situation that occurred where I

10   was involved, but I was involved not directly.  I had

11   some -- I think I was more involved as a -- I guess

12   it was after the fact.  So because that person was my

13   first report, I knew about it.

14             But I don't remember having a direct

15   influence on the whole outcome of that particular

16   investigation.

17        Q.   But you were involved in it?

18        A.   I believe I was.  I know that at some

19   point -- you know, I don't -- maybe I wasn't.  I just

20   -- maybe it was just told to me and I -- and I

21   remember it.  I -- I can still remember some of the

22   details about it.  But I have -- I think I believe --

23   it's coming clear.  That was already set in motion.

24             So when I came back to work, it was

25   already started.  So it wasn't me involved.  But

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 44 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

117

1    something occurred at some point in time, either I

2    was on my shift or I was -- heard about it.

3              Q.   Have you been in -- have you issued any

4    employee action plans in Districts 1 or 2 as

5    lieutenant?

6              A.   No, I don't believe so.  No.

7              Q.   Have you initiated any internal affairs

8    investigations or complaints filings with PSB

9    regarding any of your subordinates in Districts 1 or

10   2?

11             A.   I could have.  I don't recall any, but I

12   could have.  I don't --  Because, essentially, if I'm

13   -- if I'm the supervisor at the time that this comes

14   in, whether it's a complaint of some sort, then I am

15   -- I have to put it -- I have it put it in.  I have

16   to put the complaint in.

17             And I don't recall anything that was very

18   egregious that would -- I mean, I probably -- because

19   my memory's not as good as it used to be.  But I

20   don't remember anything that -- specifically that

21   was -- maybe if you had something that you can -- you

22   can ask me about it and say, is this something you

23   did?  I just don't remember.

24             Q.   Let me ask you differently.

25             Did you have the authority to issue an

```
 1    action plan to your subordinates?
 2         A.   Yes, I have the authority, yes.
 3         Q.   Did you have the authority to file a
 4    complaint with PSB internal affairs regarding your
 5    subordinate employees?
 6         A.   Yes.
 7         Q.   If a complaint was filed with PSB or
 8    internal affairs, could the outcome of an
 9    investigation be disciplinary action against the
10    employee?
11         A.   Could be.
12         Q.   Is the first step in the process for
13    disciplinary action always going to be an
14    investigation by PSB?
15         A.   No.  The first step -- the first step
16    will be, you know, usually in a district setting.  If
17    something's occurred that that supervisor -- and I
18    guess it could be by policy.  I'm trying to remember
19    if it says that anyone can do that.
20              But, essentially, if I see a policy
21    violation or something that's occurred and I choose
22    to move in that direction, I can start it, or anyone.
23    A sergeant or a lieutenant can start it, a captain.
24         Q.   So it's your testimony that with regards
25    to discipline, the first step in the disciplinary
```

Deposition of: Rudy Verdugo Acosta, Jr., Vol. II       August 7, 2025

119

```
 1    process could be you observing misconduct and

 2    reporting it to PSB?

 3            A.   Could be, yeah.

 4            Q.   And you had the authority to do that,

 5    correct?

 6            A.   Yes.  I mean, I have the -- as a

 7    supervisor, I have the right to, if I see something

 8    that I feel is -- needs to be -- I guess, I'm the one

 9    that says, I'll bring it to them, and then they make

10    the decision as to whether they think it needs to go

11    any further.  Yeah.  So I can start it.

12            Q.   Have you ever sat on any promotions

13    boards?

14            A.   I don't think I have.

15            Q.   Have you been involved in the hiring or

16    interviewing process for any sworn or unsworn

17    personnel?

18            A.   Yes.

19            Q.   And has that been as a lieutenant?

20            A.   Yes.

21            Q.   Describe that for me.

22            A.   We had a -- a couple of DSAs, that --

23    they're deputy service aides that were -- we were --

24    had a series of maybe eight interviews, and I was one

25    of the participants on that that made the choice to,
```

Case 2:23-cv-00068-DGC   Document 157-6   Filed 09/27/25   Page 47 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

120

1    you know, move -- move certain applicants forward.

2          Q.   How did you decide to move certain

3    applicants forward?

4          A.   Based off of --  We -- we gave everyone

5    the same question.  So it was -- we were directed to

6    -- to do that.  And based on the -- the overall, you

7    know, responses, we -- we felt, I felt -- and because

8    there's three of us, so we all had our own decisions,

9    and we were making a decision based off these

10   decisions, the way that they answered, I felt they

11   were -- they were more seasoned, if you will, or

12   maybe they answered it more in the favor -- more in

13   the -- in a way that I would say fits the job

14   description.

15            And so that's -- that's how I did that.

16   But my -- my -- my vote was only a third of it, so it

17   wasn't like -- I didn't make the final say.  I just

18   said -- and so majority ruled.

19          Q.   So with regards to the -- these

20   interviews, it was a series of eight interviews,

21   correct?

22          A.   Yes.

23          Q.   And it was a panel of three individuals,

24   correct?

25          A.   Correct.

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 48 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

121

1        Q.   That were reviewing these applicants.

2    And according to certain preset questions, you

3    individually scored --

4        A.   Correct.

5        Q.   -- these applicants, and then also came

6    up with an overall score based on the group; is that

7    correct?

8        A.   That's correct.

9        Q.   And then certain individuals with higher

10   scores proceeded to the next round of interviews?

11       A.   Correct.  And we put them on a list

12   that -- you know, from one to whatever.  And then we

13   would give that to human resources and they would

14   offer them the job or the next step if they wanted to

15   take it.

16       Q.   And was it up to you, was it your

17   discretion on how to rank these individuals depending

18   on how they answered the responses?

19       A.   No.  It was -- it was collective.  The

20   three of us basically.

21       Q.   For your scores?

22       A.   Oh, for my scores?  Yeah.  My scores

23   were, yeah.

24       Q.   Have you been involved in hiring or

25   interviewing in any other capacities as a lieutenant?

Case 2:23-cv-00068-DGC   Document 157-6   Filed 09/27/25   Page 49 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

122

1          A.   We -- just -- just in those kind of oral

2    boards, like, with -- if there was somebody that

3    wanted to come down for a position, like, let's say

4    in the detectives and/or something to that effect, a

5    couple of them, it was -- it was -- they were

6    employees already, but they just wanted to come to

7    our division.

8               Then we would just -- it wasn't really --

9    it wasn't an employment thing.  It was more

10   transferring them into a different section.  So we

11   would -- we would just ask them all the same

12   questions and find out who would be more -- who would

13   fit more into our -- the way we do things.  So I've

14   done that a couple times.

15        Q.   Okay.  So it's your testimony that since

16   your promotion to lieutenant in October 2020, a few

17   times you've been involved in lateral transfers from

18   one department or division to another?

19        A.   Yeah.  Or they're -- they're actually --

20   we're soliciting them to -- to do an interview for

21   the -- for that position.

22        Q.   And what does that process look like?

23   Describe it for me.

24        A.   Essentially, we'll put out a -- a

25   briefing board that goes out to all the county, all

123

1    the sheriff's office employees saying we have a -- we

2    have a position of interest in whatever section we're

3    in, detective unit.

4              And then we'll get whatever series of

5    applicants, the people that are interested in it.

6    And then we'll set up interviews and conduct the

7    interviews.  And then at this point, we would make

8    recommendations and then submit up the chain to our

9    captain and chief, and they would -- I didn't really

10   have the say to say, we're going to take this person.

11             But, collectively, would say, these

12   people seem to rank better.  So we kind of ranked

13   them.  And then that's it.  I didn't really have --

14   we had no say as far as who they would take.  There's

15   just kind of a -- a process that we had.

16        Q.   Well, you had input as to who might be

17   considered for the transfer, correct?

18        A.   Oh, yeah.  Yeah.  We all had input.  We

19   did.  It was...

20        Q.   Have you ever been involved in --  Strike

21   that.

22             Have you handled any internal affairs

23   investigations?

24        A.   Yes.  Yes, I have.

25        Q.   How many?

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 51 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

128

1    doing it every day.  But I've -- I've tried to.  It's

2    pretty often.  I don't know.  If I say daily, I'm --

3    I'm sure there's a day I didn't, but it's pretty

4    often.

5          Q.   Multiple times a week?

6          A.   Yeah.  That's pretty accurate.

7          Q.   Do you conduct performance evaluations of

8    your assigned subordinates?

9          A.   I do, yes.

10          Q.   For how many subordinates and how often?

11          A.   Right now, I have three subordinates.

12    And once a year.

13          Q.   Has that been consistent with each of the

14    districts that you've been in?

15          A.   Pretty much, yes.

16          Q.   So on average, three evaluations -- on

17    average, three subordinates, and once a year for all

18    districts?

19          A.   Yes.

20          Q.   Have you conducted any training, formal

21    training or pieces for the academy?

22          A.   As a lieutenant?

23          Q.   Yes.

24          A.   I don't believe I have as a lieutenant.

25          Q.   There's a reference in your supervisor

Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                              August 7, 2025

129

```
 1   notes.  And if you want to follow me, you can go to
 2   page MCC20102.  Near the bottom of the page.
 3           A.    Okay.  I think I'm there.
 4           Q.    Second paragraph up from the bottom, it
 5   says "Traffic Stop Review."
 6                 Do you see that?
 7           A.    I do, yes.
 8           Q.    And that second line down mid --
 9   midsentence, it says, "I was unable to locate any
10   traffic stops.  This is not unusual for a lieutenant,
11   as traffic stop activity is not his primary
12   responsibility."
13                 Do you see that?
14           A.    Yes.
15           Q.    Do you agree with that statement?
16           A.    Yes, I do.
17           Q.    In your own words, what is your primary
18   responsibility?
19           A.    Well, my current assignment today, I'm
20   more of an administrative lieutenant.  However, a
21   perfect example, this weekend, we all rotate -- and
22   when I say "we," lieutenants rotate on the west side
23   and we'll be watch commanders for the daytime.
24                 So, like, this weekend, it's my time to
25   -- to be a watch commander.  Essentially, I'll be out
```

Deposition of: Rudy Verdugo Acosta, Jr., Vol. II          August 7, 2025

130

1    on patrol and be in uniform and listening up for

2    anything that requires my intervention.

3          Q.   How about when you were in District 3,

4    what was your primary responsibility?

5          A.   My primary responsibility was I was the

6    night watch commander for District 3.  So I was all

7    the time assigned as a watch commander in patrol.

8    And that was for District 2 and 3.

9          Q.   What was your primary duty or

10   responsibility as a watch commander?

11         A.   Overseeing the patrol functions, ensuring

12   that, you know, obviously policies are followed,

13   everybody's safe.  There's not anything being done

14   that is going to get anybody hurt.  Making sure that

15   I had good communication with my sergeants out there,

16   that if they had questions, if there was anything

17   that they needed direction on, they would contact me.

18              Just being -- just being available to

19   them to try to give them guidance if they needed it.

20         Q.   Okay.  What was your primary

21   responsibility or duty in District 1 as lieutenant?

22         A.   District 1, I -- I know that I -- I

23   believe I might have went over it.  I'm having a hard

24   time remembering, but I -- I think I may have went

25   over as a night watch commander, but it was really

Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

131

1    short-lived.  I think I -- eventually I went to a

2    dayshift spot.

3              I don't even know the exact dates, but it

4    wasn't very long.  And once --  As a dayshift

5    supervisor, I basically was a patrol -- patrol

6    lieutenant, which I absolutely could -- I responded

7    many times -- many times I responded to incidents

8    that occurred on -- and I can -- I have one in

9    particular that I never forget.

10             But it was -- yeah, it was basically

11   giving guidance and -- and ensuring that the deputies

12   were safe and that they were following policies and

13   procedures and -- and that they were documenting

14   whatever they needed to document to ensure it was

15   done appropriately.

16        Q.   And in District 2, from January 2024 to

17   the present, it's my understanding that that is more

18   of an administrative lieutenant role that you are

19   currently in, correct?

20        A.   That's correct.  However, there are times

21   that if the captain's off or someone's off, then I

22   can cover, I'll cover it.  And as a dayshift admin

23   lieutenant, I also -- you know, I can -- I wear a

24   uniform and -- and -- like I am now.  And so I can

25   respond to situations that require a lieutenant to be

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 55 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II    August 7, 2025

132

1  involved.

2            So even though I have that -- those --

3  the title and the job to do those things, I could

4  very well, you know, have to go and deal with the

5  patrol situation.

6        Q.   But how would you characterize your

7  primary responsibilities or role in District 2 as the

8  administrative lieutenant?

9        A.   I have -- I'm basically over the IA --

10  internal affairs investigations.  So I have one

11  sergeant that is the one for the district that does

12  all the reports, at least at the district level.  And

13  I ensure that -- review them and ensure that

14  everything is -- is done properly.

15            And then I also involved with what they

16  call the specials, which is the field training

17  program.  Also, the traffic car.  And -- and -- and

18  then, obviously, the building maintenance and

19  anything that has to do with supplies for the -- for

20  -- for the district itself.

21        Q.   Have you ever as a lieutenant, since your

22  promotion to lieutenant in October of 2020,

23  supervised district detective personnel?

24        A.   Yes.

25        Q.   When was that and for how long?

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 56 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II          August 7, 2025

141

 1    overseeing those district detectives would you say

 2    encompassed supervision, management, guidance of

 3    those detectives?

 4         A.   I'd say quite a bit.

 5         Q.   What percentage?

 6         A.   Probably, like, 60 percent.  Probably 70.

 7    That was kind of -- I don't know.  I was kind of OCD

 8    about things because I wanted to make sure the cases

 9    were done accurately.

10         Q.   Okay.  Have you ever been -- have you

11    ever been involved with the FTO program?

12         A.   I believe -- I was -- I had -- that was

13    under my tutelage as well.  That was another one of

14    my duties that I had.  The FTO program was under my,

15    I guess -- so I was involved, but not directly.  I

16    was more of a manager.

17         Q.   What was your involvement in managing the

18    FTO program?

19         A.   Ensuring that the -- the process is

20    actually going correctly.  If there were any issues,

21    if there's things that needed to be done on my part

22    as administrator to -- to -- to ensure that if

23    there's something that needs -- that they need,

24    equipment, or if they were having problems with --

25    issues with something, that I would be that

Deposition of: Rudy Verdugo Acosta, Jr., Vol. II          August 7, 2025

142

 1    communicator to -- to the training program, training

 2    supervisors and/or lieutenants that these are things

 3    that we need to be aware of.  So I was -- mainly

 4    communication.

 5         Q.   And FTO stands for field training

 6    officer, correct?

 7         A.   That's correct.

 8         Q.   And you worked, was it four 10-hour

 9    shifts?

10         A.   Correct.

11         Q.   So of your four 10-hour shifts per week,

12    how many hours per shift would you say you spent on

13    the FTO program or hours per year?

14         A.   I -- I would probably say that I

15    definitely -- at least two hours a day I would put

16    approximately.  I would do that.  Spend my time

17    either documenting, sharing.

18              And I also had to prepare, you know,

19    reports to send up to the captain to ensure that he

20    knew what was going on with the -- with the program

21    itself, where it was heading.

22         Q.   So this was your supervision, oversight

23    of individuals in the field training officer program

24    regarding their performance?

25         A.   Correct.  And if they needed -- if there

1    was things that they needed, also administratively,

2    if they had -- if there's something that they didn't

3    have and they needed it, then I would be that voice.

4         Q.   Am I correct in understanding this is for

5    newly hired or newly sworn officers?

6         A.   That's correct.

7         Q.   And it's your testimony that you spent

8    about two hours per day working on this FTO program,

9    correct?

10        A.   Yeah, that's approximate.  That's about

11   right.

12        Q.   And what time period were you in charge

13   or involved in this FTO program?

14        A.   I got to -- I think I was -- the whole

15   time I was there, I believe that was my -- I don't

16   think that my duties ever went to someone else.

17        Q.   The whole time at District 1 or the whole

18   time as --

19        A.   At District 1.

20             THE COURT REPORTER:  You have to let her

21   finish, please.

22        Q.   BY MS. BALCH SANTIAGO:  So it's your

23   testimony that the whole time that you were at

24   District 1 from approximately February 8, 2021, to

25   April 2022, you were involved in this FTO program --

Case 2:23-cv-00068-DGC   Document 157-6   Filed 09/27/25   Page 59 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II    August 7, 2025

144

 1   supervision of deputies in the FTO program and you

 2   would spend about two hours per day on that?

 3        A.   I can -- It wasn't immediate.  I

 4   remember, I said, when I first came over, I wasn't --

 5   I wasn't given those duties right away, but when I

 6   went to the dayshift and became a commander there,

 7   that was just one of my -- I think I even maintained

 8   a -- I think it might have been at least four or five

 9   months that I actually transitioned to the detective

10   portion of it.

11             And I don't know if it's hard to -- it's

12   hard to explain.  But when I came over as a

13   lieutenant in patrol, it started at nights, went to

14   days.  And as a dayshift lieutenant, you know, I -- I

15   became kind of that quasi-multiple function dayshift,

16   and then a -- administrative function, detective, and

17   then FTO program.  So I kind of had multiple things.

18        Q.   But isn't it true that you switched over

19   to supervising district detective personnel in

20   District 1 in March of 2021?

21        A.   It could have been, because, like I said,

22   it was a short time.  When I went in February, it was

23   only a short time that I went from night to days.

24   And then as a dayshift watch commander -- a dayshift

25   lieutenant, I had a patrol unit.  I had a patrol

Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

145

```
 1   squad.  I was over patrol squads.
 2            And then they added the detectives.  And
 3   I think -- I've always had the FTO program.  So
 4   probably from, like you said, March, I've always had
 5   that FTO program.
 6        Q.  March of 2021 through the end of your
 7   time in District 1?
 8        A.  Correct.
 9            MS. SYVERSON:  I think your time's about
10   up.
11            MS. BALCH SANTIAGO:  Give me, like, 30
12   seconds to --
13            THE WITNESS:  Is this water --  Can I
14   have this water?
15            MS. BALCH SANTIAGO:  Absolutely.
16            THE WITNESS:  Thank you.
17        Q.  BY MS. BALCH SANTIAGO:  Last question.
18   Turn to page MCC20117.
19        A.  Okay.
20        Q.  Let me know when you're there.
21        A.  I'm here.
22        Q.  Okay.  The second to last paragraph at
23   the bottom there, it says, "During the month of
24   August 2021."
25            Do you see that?
```

Case 2:23-cv-00068-DGC    Document 157-6    Filed 09/27/25    Page 61 of 189
Deposition of: Rudy Verdugo Acosta, Jr., Vol. II                    August 7, 2025

147

1           THE WITNESS:  Absolutely.

2      Q.   BY MS. SYVERSON:  You can still answer.

3           MS. BALCH SANTIAGO:  I can make an

4  objection for the record, but then you go ahead and

5  respond --

6           THE WITNESS:  Oh, I'm sorry.

7           MS. BALCH SANTIAGO:  -- unless she

8  instructs you not to.

9           So overbroad.

10           THE WITNESS:  Okay.

11           Yes.  I would be -- I could.  If they

12  needed my help, essentially, they would --

13           Yes.  The answer is yes.

14      Q.   BY MS. SYVERSON:  And were you in uniform

15  during that time period?

16      A.   I was.

17           MS. SYVERSON:  Okay.  That's all I have.

18           MS. BALCH SANTIAGO:  Okay.  You guys will

19  read and sign?

20           THE VIDEOGRAPHER:  This concludes today's

21  deposition.  We are off the record at 2:53.

22      (The proceedings concluded at 2:53 p.m.)

23

24                    _____

25                    RUDY VERDUGO ACOSTA, JR.

148

1    STATE OF ARIZONA        )
                             ) ss.
2    COUNTY OF MARICOPA      )

3

4            BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
5    Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
6    testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
7    and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
8    typewriting under my direction; that the witness
     requested reading and signing said deposition; that
9    the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
             I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12           I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14
     Kristy A. Ceton                    50200_____
15   Certified Reporter                 CR Number

16   _Kristy A Ceton_____     8.12.25
17   Certified Reporter Signature       Date

18
             I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).

20

21   Carrie Reporting, LLC              R1064
     Registered Reporting Firm          RRF No.

22
     _Michele Durrer_____              8.12.25
23   Registered Reporting Firm          Date
24   Signature

25

# EXHIBIT 43



## FAIR LABOR STANDARDS ACT (FLSA)
## EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 10/19/2020 | 500 | Maricopa County Sheriff's Office |

### I. EMPLOYEE INFORMATION

| **Employee ID:** | **Position #:** 70262 | **Name** (Last, First): Acosta Jr., Rudy |
|---|---|---|

| **Market Range Title:** Law Enforcement Lieutenant | **Working Title:** Law Enforcement Lieutenant |
|---|---|

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

### II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____        _____
Employee Signature                                              Date

### III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____        10/14/2020
Employee Signature                                              Date

### IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

Gertrude T. Jackson                    _____    10/14/2020
Supervisor Name (print)              Supervisor Signature              Date
                                                      for MCSO HR

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

CONFIDENTIAL
ATTORNEY EYES ONLY
Revised: 08/07/2017

MCC 019992

# EXHIBIT 44

# FILED

# UNDER

# SEAL

# EXHIBIT 45



# FAIR LABOR STANDARDS ACT (FLSA) EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| September 14, 2011 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| Employee ID: | Position #: 00002923 | Name (Last, First): Jakowinicz, Brian J |
|---|---|---|
| Market Range Title: Law Enforcement Lieutenant | | Working Title: Law Enforcement Lieutenant |

| FLSA Status: Exempt | Non-Exempt = Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.  Exempt = Not eligible for overtime pay. |
|---|---|

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy (B7006) is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy (B7006) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7006.pdf

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy (B7006).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| _____ | _____ |
|---|---|
| Employee Signature | Date |

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy (B7011) is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy (B7011) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7011.pdf

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy (B7011).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| _____ | 11-08-11 |
|---|---|
| Employee Signature | Date |

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy (B7006) or the Hours Worked for Exempt Employees Policy (B7011), whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

| Rollie Seebert | Rollie Seebert | 11-10-11 |
|---|---|---|
| Supervisor Name (print) | Supervisor Signature | Date |

**NOTE:** The original signed acknowledgement form is maintained by the department while a copy of the form must be sent to Employee Records.

Revised: 8/4/11

CONFIDENTIAL ATTORNEY EYES ONLY

MCC 019994

# EXHIBIT 46

# FILED

# UNDER

# SEAL

# EXHIBIT 47



# FAIR LABOR STANDARDS ACT (FLSA) EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| September 14, 2011 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| | | |
|---|---|---|
| **Employee ID** | **Position #:** 00001463 | **Name** (Last, First): McCann,Frederick K |
| **Market Range Title:** Law Enforcement Lieutenant | | **Working Title:** Law Enforcement Lieutenant |

| | |
|---|---|
| **FLSA Status:** Exempt | Non-Exempt = Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week. |
| | Exempt = Not eligible for overtime pay. |

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy (B7006) is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked and Overtime Policy (B7006) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7006.pdf

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy (B7006).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

Employee Signature                                                    Date

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy (B7011) is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgement form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy (B7011) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7011.pdf

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy (B7011).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

Employee Signature                                                    Date    11/1/11

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy (B7006) or the Hours Worked for Exempt Employees Policy (B7011) , whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

CAPTAIN BILL VANAUSDAL                   Van Ausdal 167          11/1/11
Supervisor Name (print)                  Supervisor Signature        Date

**NOTE:** The original signed acknowledgement form is maintained by the department while a copy of the form must be sent to Employee Records.

Revised: 8/4/11

CONFIDENTIAL
ATTORNEY EYES ONLY

MCC 019995

# EXHIBIT 48

# FILED

# UNDER

# SEAL

# EXHIBIT 49



# FAIR LABOR STANDARDS ACT (FLSA) EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 09/26/2016 | 50 0 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| Employee I | Position #: 18865 | Name (Last, First): Kremer, James |
|---|---|---|
| **Market Range Title:** Law Enforcement Lieutenant | | **Working Title:** Law Enforcement Lieutenant |

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy (B7006) is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy (B7006) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7006.pdf

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy (B7006).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| | |
|---|---|
| Employee Signature | Date |

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy (B7011) is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy (B7011) from their department HR liaison or by going to Employee Compensation's website: http://ebc.maricopa.gov/pp/budget/pdf/B7011.pdf

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy (B7011).
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| *James J. Kremer* | 09/30/16 |
|---|---|
| Employee Signature | Date |

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy (B7006) or the Hours Worked for Exempt Employees Policy (B7011) , whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

| CAPT. Henry BRANDIMARTE 833 | *Capt. H. Brandimarte 833* | 10/11/16 |
|---|---|---|
| Supervisor Name (print) | Supervisor Signature | Date |

**NOTE:** The original signed acknowledgement form is maintained by the department while a copy of the form must be sent to Employee Records.

Revised: 03/11/2015

CONFIDENTIAL
ATTORNEY EYES ONLY

MCC 019996

# EXHIBIT 50

# FILED

# UNDER

# SEAL

# EXHIBIT 51

## FAIR LABOR STANDARDS ACT (FLSA)
## EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 07/26/2021 | 500 | Maricopa County Sheriff's Office |

### I. EMPLOYEE INFORMATION

| Employee ID ▉ | Position #: 76993 | Name (Last, First): Cruz, Jennifer |
|---|---|---|
| Market Range Title: Law Enforcement Lieutenant | | Working Title: Law Enforcement Lieutenant |

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

### II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____     _____
Employee Signature                                          Date

### III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

_____     7-13-21
Employee Signature                                          Date

### IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

_____     _____     7/13/2021
Supervisor Name (print)                Supervisor Signature                Date

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

CONFIDENTIAL
ATTORNEY EYES ONLY
Revised: 08/07/2017                                          MCC 024935

# EXHIBIT 52

# FILED

# UNDER

# SEAL

# EXHIBIT 53

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on      )
behalf of himself and all     )
those similarly situated,     )
                              )
            Plaintiff,        )
                              )
vs.                           ) Case No.:
                              ) 2:23-cv-00068-DGC
Maricopa County,              )
                              )
            Defendant.        )
                              )

VIDEO-RECORDED DEPOSITION OF BENJAMIN FREEMAN

Phoenix, Arizona
August 7, 2025
10:06 a.m.

REPORTED BY:                  CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR     Certified Reporters
AZ CR No. 50200               12725 W. Indian School Rd.
                              Suite F-100
                              Avondale, AZ 85392
CERTIFIED COPY                (480) 429-7573

2

1        VIDEO-RECORDED DEPOSITION OF BENJAMIN FREEMAN

2    commenced at 10:06 a.m., on August 7, 2025, at Fisher

3    & Phillips, LLP, 3200 North Central Avenue, Suite

4    1550, Phoenix, Arizona, before Kristy A. Ceton, RPR,

5    CRR, Arizona Certified Court Reporter No. 50200.

6

7                            * * *

8

9    APPEARANCES:

10       For the Plaintiff:

11              FRANKEL SYVERSON, PLLC
                By:  Patricia N. Syverson, Esq.
12              2375 East Camelback Road
                Suite 600
13              Phoenix, Arizona 85016
                patti@frankelsyverson.com
14
         For the Defendants:
15
                FISHER & PHILLIPS, LLP
16              By:  Shayna Balch Santiago, Esq.
                3200 North Central Avenue
17              Suite 1550
                Phoenix, Arizona 85012
18              ssantiago@fisherphilliips.com

19       Also Present:

20              Cedric Tinard, the videographer

21

22

23

24

25

18

1    responses to Maricopa County's First Set of

2    Nonuniform Interrogatories.

3          A.    Uh-huh.

4          Q.    And my question to you is going to be,

5    did you review these responses and verify the

6    accuracy prior to them being submitted to my office?

7          A.    When we talk specifically about right in

8    here where it talks about the dates that states,

9    yeah, November of '22 is when I was promoted and sent

10   to District 7.  And then April of '23 is when I went

11   to District 3.

12         Q.    Well, my question is, now that you had an

13   opportunity to review through Exhibit 2 to your

14   deposition, which are Benjamin Freeman's Responses to

15   Defendant's Set of Nonuniform Interrogatories, did

16   you review the responses herein for correctness prior

17   to them being submitted to my office?

18         A.    Yes.

19         Q.    And are the responses, in fact, correct,

20   at least as of the date they were submitted to my

21   office?

22         A.    Yes.

23         Q.    Okay.  So now, let's flip to page 3.  The

24   response to interrogatory No. 1.  My question to you

25   earlier was, when were you promoted to lieutenant?

Deposition of: Benjamin Freeman                                    August 7, 2025

19

1    Is it your testimony that you were promoted to

2    lieutenant in November of 2022?

3            A.    That would be correct, yes.

4            Q.    And you also testified that you were

5    currently in District 3, correct?

6            A.    Yes.

7            Q.    Is it your testimony that you have been

8    in District 3 as a lieutenant since April of 2023?

9            A.    That is correct.

10           Q.    And prior to serving in District 3, you

11   were in District 7; is that correct?

12           A.    That is correct.

13           Q.    And is it correct that you were in

14   District 7 upon your promotion to lieutenant through

15   your transfer to District 3 in April of 2023?

16           A.    Can you reword that?

17           Q.    Absolutely.

18                 I'm trying to understand the timeline and

19   what districts you've been in since your promotion to

20   lieutenant.  So my understanding is that you're

21   promoted to lieutenant in November of 2022, correct?

22           A.    Yes.

23           Q.    At that time, you were working in

24   District 7; is that correct?

25           A.    After my promotion to lieutenant, I was

Deposition of: Benjamin Freeman                          August 7, 2025

20

1    sent to District 7.

2           Q.    Where were you at prior to District 7?

3           A.    I was a sergeant in Lake Patrol when I

4    got promoted.

5           Q.    Were you a lieutenant in Lake Patrol for

6    a period of time before your transfer to District 7?

7           A.    No.

8           Q.    Okay.  So the entire time that you have

9    been a lieutenant from your promotion in November of

10   2022, you have been in either District 7 or District

11   3; is that correct?

12          A.    That is correct.

13          Q.    Okay.  When you were in District 7, what

14   was your schedule or shift from November 2022 through

15   April 2023?  And if it changed, let me know.

16          A.    It did.  It changed.

17                There were --  When I first got promoted,

18   I went to dayshift for a very short period of time to

19   get acclimated and access to Fountain Hills, which is

20   District 7, and kind of the ins and outs.

21                As my counterpart lieutenant that was on

22   dayshift at that time was going to be going on

23   vacation, and my captain was going to be going on

24   vacation, so I was needed to basically cover.  As a

25   brand-new lieutenant, I was covering the district as

21

1    the acting captain for I believe a week.

2              Upon his return, it was about a month or

3    two, and then I went to the watch commander position

4    and began working the Sunday through Wednesday, 5P to

5    3A or 7P to 5A, somewhere in there.

6         Q.   So let me make sure I understand this

7    correctly.

8              So when you first started at District 7

9    in November 2022 as a lieutenant, you first worked

10   the dayshift, correct?

11        A.   Yes.  For about --  In total time,

12   probably about three weeks to a month.

13        Q.   And what were those hours and days?

14        A.   Dayshift usually 6:00 to 4:00, 7:00 to

15   5:00.

16        Q.   Is there discretion on start and stop

17   times for dayshift?

18        A.   Based upon your boss's response, yeah.

19   If your captain allows you to come in later, he'll

20   allow you to come in later.  Some guys prefer to

21   start earlier.

22        Q.   Did you have discretion on your start and

23   stop time?

24        A.   Yes.

25        Q.   When did -- did you consistently start

22

1   BY MS. SANTIAGO:

2        Q.   What else would need to be included?

3        A.   Sergeants also act at the direction of the

4   lieutenant to complete special projects, presentations,

5   and any other duties that's required.

6        Q.   Anything else?

7        A.   That I can think of off the top of my head, no.

8        Q.   Let's next go to Exhibit 5 to your deposition,

9   which has Bates label at the bottom HOUCK 175 through 179.

10                 Do you see that?

11       A.   I see it, yes.

12       Q.   Did I read that correctly?

13       A.   Yes.

14       Q.   Do you recognize this document?

15       A.   Yes, it's the law enforcement lieutenant job

16  description.

17       Q.   And have you reviewed this document prior to

18  today's deposition?

19       A.   Yes.

20       Q.   Does this Exhibit 5 to your deposition appear to

21  be a true and correct copy of the law enforcement

22  lieutenant job description?

23       A.   A lieutenant does all of these functions, but

24  this list is not all-inclusive.

25       Q.   What is not on this list that you think should

23

1   be added to the job description?

2       A.   Conducting and processing internal and external

3   investigations, reviewing EIS, that's the Employee

4   Identification System -- well, the employee -- it's part

5   of the Early Alert System from employees to determine

6   actions, projects assigned by a captain.

7                 And this -- this job description does not

8   include the requirement of actually taking the calls for

9   service and being the first responder on scene.  And some

10  of the items mentioned simply don't exist.  For example,

11  review squad productivity report, there is no such thing

12  as a squad productivity report.

13      Q.   Anything else on the law enforcement lieutenant

14  job description, Exhibit 5 to your deposition, that you

15  disagree with that are not job duties of a lieutenant?

16      A.   A lieutenant does do all of these functions,

17  plus additional.

18      Q.   Where is the reference to the squad patrol

19  report that you said does not exist?

20      A.   Under "Administration," it is in the lower third

21  on the right side.

22      Q.   And I am going to read from the job description,

23  "Reviews Squad Productivity Report to provide feedback on

24  performance and set goals for improved productivity."

25                 Did I read that correctly?

24

1      A.   Yes.

2      Q.   As a lieutenant, did you review productivity in

3  general of your subordinates?

4      A.   Yes, we did.

5      Q.   So there's not that specific report but you did

6  review productivity in general?

7      A.   Correct.

8      Q.   Are there any other errors, discrepancies,

9  misstatements that you are aware of in this law

10 enforcement lieutenant job description?

11     A.   It's just missing duties, but what is here is in

12 our functions of a lieutenant.

13     Q.   So with regards to the Essential Job Tasks that

14 are listed under law enforcement lieutenant, the first one

15 referenced is Administration.

16          Do you see that?

17     A.   I do.

18     Q.   Approximately how much of your time do you think

19 you spent doing the administration tasks set forth under

20 that heading when you were a law enforcement lieutenant in

21 District 7?

22          MS. SYVERSON:  Is there a specific time

23 frame since he was there twice?

24 BY MS. SANTIAGO:

25     Q.   Say during either of your time periods in

25

1    Patrol Bureau.

2         Q.   And what you're referring to, is that the

3    agreement between lieutenants in Districts 2, 3, and

4    4 to essentially rotate the scheduling of weekends to

5    share the burden of weekends?

6         A.   Correct.

7         Q.   And that's something unique to the west

8    side, correct?

9              MS. SYVERSON:  Object.

10             To the extent you know.

11             THE WITNESS:  Yeah.

12        Q.   BY MS. BALCH SANTIAGO:  Do you have any

13   --  Are you aware of whether the east side has a

14   similar arrangement?

15        A.   It's gone back and forth based upon their

16   districts.

17        Q.   Do you have an awareness as to whether or

18   not the east side currently has the similar practice

19   as the west side regarding weekends?

20        A.   I know that they're working on it, but I

21   don't know if it has been implemented yet.

22        Q.   All right.  So back to your time at

23   District 7.

24             You started there upon your promotion

25   November of 2022.  You were in the dayshift for about

1    three weeks to a month.

2          A.    Uh-huh.

3          Q.    Correct?

4          A.    Yeah, that sounds right.

5          Q.    Then you transferred to nightshift,

6    correct?

7          A.    Yes.

8          Q.    And when you transferred to nightshift,

9    were you the watch commander?

10         A.    Yes, I was.

11         Q.    Describe for me, in your own words, what

12   a watch commander is.

13         A.    The watch commander for watch commander

14   7, which was my position when I was in Fountain

15   Hills, was the east side watch commander.  Sunday

16   through Wednesday from about 5 o'clock in the evening

17   until about 3 o'clock in the morning.  My

18   responsibility was to be the commander of the east

19   side districts.

20              That would be District 7, Fountain Hills;

21   District 1 in Mesa; a fairly significant portion of

22   Lake Patrol, as well as District 4, Cave Creek and

23   Carefree, even though they fall on the West Side

24   Patrol Bureau.  Don't ask me how they figured that

25   out.  That was a decision above me.

21

1    the acting captain for I believe a week.

2              Upon his return, it was about a month or

3    two, and then I went to the watch commander position

4    and began working the Sunday through Wednesday, 5P to

5    3A or 7P to 5A, somewhere in there.

6         Q.   So let me make sure I understand this

7    correctly.

8              So when you first started at District 7

9    in November 2022 as a lieutenant, you first worked

10   the dayshift, correct?

11        A.   Yes.  For about --  In total time,

12   probably about three weeks to a month.

13        Q.   And what were those hours and days?

14        A.   Dayshift usually 6:00 to 4:00, 7:00 to

15   5:00.

16        Q.   Is there discretion on start and stop

17   times for dayshift?

18        A.   Based upon your boss's response, yeah.

19   If your captain allows you to come in later, he'll

20   allow you to come in later.  Some guys prefer to

21   start earlier.

22        Q.   Did you have discretion on your start and

23   stop time?

24        A.   Yes.

25        Q.   When did -- did you consistently start

34

```
 1            A.    Basically, to field any of the issues
 2      from any of the citizens, or trying and address
 3      administrative paperwork from the commander level
 4      that still includes things that I -- while doing
 5      that, I'm still doing my regular job.  Those are just
 6      taken on as added tasks.
 7            Q.    When you -- when you are serving as
 8      acting comman- -- as acting captain, is it correct
 9      that you are serving essentially in the captain's
10      place in their absence?
11            A.    Correct.
12            Q.    How many times have you served as acting
13      captain?
14            A.    In Fountain Hills, once.  In District 3,
15      since I've been there, I think probably twice.
16            Q.    And --
17            A.    Maybe three times.
18            Q.    And for approximately how long at a time?
19            A.    About a week, usually.  Two weeks at
20      most.
21            Q.    Let's take Fountain Hills, District 7,
22      first.  When you served as acting captain in Fountain
23      Hills, District 7, did you -- were you in contact
24      with your captain while you were serving as acting
25      captain?
```

Deposition of: Benjamin Freeman                    August 7, 2025

37

1          A.    It's probably 7:00 to 5:00, I think.

2    Whatever the 10 hours is.

3          Q.    Do you have discretion as to your start

4    and stop times?

5          A.    Yes.

6          Q.    Doing days in District 3?

7          A.    Yes.

8          Q.    How much discretion do you have in

9    setting your hours at District 3 days?

10         A.    Reasonable, based upon what we have.  I

11   communicate with my counterpart, Lieutenant Keller,

12   if I have meetings or if I have events or if I have

13   an appointment or anything like that, if I have a

14   reason why I'm going to be starting -- starting

15   later, starting earlier, going home early or staying

16   later, whatever the case may be.

17         Q.    So, for example, if you had a doctor's

18   appointment that you had scheduled for 8:00 in the

19   morning on a Tuesday, you would have the flexibility

20   to start at 9:00?

21         A.    Yes.

22         Q.    Would you then stay later that day or in

23   some way flex your hours?

24         A.    Usually, I would stay later to obtain my

25   10 hours, or I would adjust it and add an hour or so

38

1    another day.

2         Q.   In District 3, when you first arrived at

3    District 3 as a watch commander, you were working

4    Sunday through Wednesday nights, correct?

5         A.   Correct.

6         Q.   And what were those hours?

7         A.   I usually worked 6:00 to 4:00.

8         Q.   Did you have any degree of discretion or

9    flexibility on those hours?

10        A.   Very minimal.  The standard was 5:00 to

11   3:00.  My captain approved me to work 6:00 to 4:00

12   based upon my kid's schedule.

13        Q.   And when you were a -- when you were the

14   watch commander for District 3, that was in the west

15   side, correct?

16        A.   Correct.

17        Q.   When you served as watch commander for

18   District 3, were you serving as the highest ranking

19   individual for the west side during your shift at

20   night?

21        A.   Yes.

22        Q.   Did you ever serve as the watch commander

23   for the entire county while you were watch commander

24   in District 3?

25        A.   Oh, yes.

46

1   for?

2          A.    Six or seven years now.

3          Q.    So definitely since your promotion to

4   lieutenant?

5          A.    Oh, yeah.

6          Q.    How long of commute was it from your

7   current address to the old District 3 office at

8   Dysart and Bell?

9          A.    They're about the same commute.  It's

10  about -- traffic depending, it's anywhere between 30

11  to 45.

12         Q.    And is that for days, nights, or both?

13         A.    I would say days for sure.  Nights, if I

14  got held over for something, going back towards the

15  17 was a nightmare, because everybody trying to go

16  from the West Valley to the 17.  And that could go --

17  that would definitely extend it.

18         Q.    To how long?

19         A.    Kick on another probably 10 to 15

20  minutes.  So up to about an hour.  And now that

21  there's some additional roads opened up off of the

22  303, such as 43rd and 51st Avenue, that can help.  I

23  can dive off of that and jig-jog over.

24         Q.    When you were at District 7, did you have

25  a private office?

47

 1          A.   Yes.

 2          Q.   What was the location or crossroads of

 3   that private office?

 4          A.   It was at the Fountain Hills.  It was at

 5   the -- what the heck do they call it?  It's their --

 6   Give me a second.  I'm just going to look it up and

 7   I'll tell you the exact address.

 8          Q.   That's fine.

 9          A.   It's in their -- it's in, like, the city

10   council building.  Of course, the Internet's going

11   slow today.

12          Q.   Just give me the crossroads.  General

13   crossroads.

14          A.   Saguaro and -- God, like I said, I can't

15   even remember.  I don't remember spending -- there

16   wasn't just a whole lot of time there.  I just know

17   how to get there.  16705 East Avenue of the

18   Fountains.

19          Q.   And when you were commuting from your

20   personal residence to that building at District 7,

21   how long was the commute?

22          A.   About an hour.

23          Q.   Each way?

24          A.   Yeah.

25          Q.   Is that the same for days and nights?

Deposition of: Benjamin Freeman                    August 7, 2025

48

1          A.   Yeah.  Yeah.  I would take different

2     routes, depending upon the time of the day.

3          Q.   Okay.  So let's start with District 7

4     nights.

5          A.   Uh-huh.

6          Q.   Because that was your first assignment,

7     correct?

8          A.   No.  I was on dayshift when I first went

9     there.

10         Q.   I apologize.

11              District 7 dayshift when you first

12    started?

13         A.   Yes.

14         Q.   Walk me through what a typical day would

15    look like starting from when you left your house.

16         A.    I would make the commute towards Fountain

17    Hills.  Upon arrival, I would check in with the

18    dayshift sergeants -- sergeant -- excuse me -- to see

19    what -- how the day was going.  I would obviously be

20    logged onto my computer so I could see what calls for

21    service were being worked.

22              Upon arrival at the district, it would be

23    talking with sergeant, seeing if they needed

24    anything, and then I would meet with my counterpart

25    who is Lieutenant Halverson at the time.  He and I

52

1    partial day and I was just coming into the office to

2    deal with administrative stuff, then I may not have

3    logged in.

4              But most of the time on my workdays, I'm

5    logged in and in uniform.

6         Q.   And when would you log into the CAD

7    system?  At what point in your day?

8         A.   In my driveway when I'm getting ready to

9    leave.

10        Q.   And is that because you were issued a

11   Maricopa County or MCSO unmarked vehicle as part of

12   your employment as lieutenant?

13        A.   Yes.

14        Q.   And so you can take that vehicle to and

15   from work, correct?

16        A.   Correct.

17        Q.   And you have your County-issued laptop,

18   correct?

19        A.   Yep.

20        Q.   That's in the vehicle?

21        A.   Yep.

22        Q.   And you use that to log into the CAD

23   system in your driveway, correct?

24        A.   Correct.

25        Q.   When do you log out of the CAD system?

Deposition of: Benjamin Freeman                    August 7, 2025

53

1        A.    Driveway.

2        Q.    So if I understand this correctly, you,

3   each morning prior to the start of your shift, walk

4   up to your vehicle, you then log into the CAD system?

5        A.    Uh-huh.

6        Q.    Start driving to the Fountain Hills

7   district?

8        A.    Uh-huh.

9        Q.    Complete your shift, and then drive back

10  home to your personal residence and log out of the

11  CAD system in your driveway, correct?

12       A.    Yes.

13       Q.    So with regards to --  When you first

14  started in District 7 days, you told me that a lot of

15  that time was training time; is that correct?

16       A.    The first few days, yeah, it was

17  training.  The first couple weeks -- I'm sorry --

18  yes, was training.

19       Q.    Did you have much time in the field

20  during those first few weeks -- days at District --

21       A.    7.

22       Q.    -- 7?

23       A.    Yeah.  I did spend some time driving

24  around getting acclimated with the areas, the

25  roadways, where points of interest were such as the

54

1    schools, different areas of concern where we had had

2    speed complaints and things like that, so I could try

3    and get an idea of how to assist the sergeants in

4    allocating personnel to address the concerns.

5         Q.    If we're only talking about those first

6    three to four weeks when you were days District 7 --

7         A.    Uh-huh.

8         Q.    -- how much time would you say you spent

9    in the office in headquarters versus in the field?

10        A.    I would say probably 75 percent of that

11   time was in the office and about 25 percent was out

12   on the road.

13        Q.    Next position is watch commander District

14   7.  Same question.

15             How much of your time would you spend in

16   the headquarters -- in headquarters building versus

17   out in the field?

18        A.    Average week, I'm probably a little bit

19   closer to 50/50.  There would be some weeks where it

20   would be more heavily administrative.  And then on

21   weeks where I would have lighter administrative

22   weeks, I would be out on the road driving around, not

23   just in Fountain Hills, but as well as District 4 and

24   District 1.

25        Q.    Okay.  And when you are out in the field,

Deposition of: Benjamin Freeman                    August 7, 2025

55

1    not in the headquarters building, what is your

2    purpose of being out in the field?

3         A.   I respond to calls, assist the sergeants.

4    Even if the sergeants are doing their administrative

5    responsibilities, I would respond to calls with the

6    deputies to help mentor and train.  As well as

7    working nights, I was a big DUI guy.  So I would be

8    looking for impaired drivers while I'm out driving

9    around.

10            And then, obviously, just going to calls,

11   helping the guys out if they were busy.  I would take

12   some of the lower priority calls to get them off of

13   their plate so they're not having to go from call to

14   call to call.

15        Q.   Did you ever use your County-issued

16   vehicle as a home office?

17        A.   Can you be more specific?

18        Q.   Absolutely.

19            Did you ever do administrative work out

20   of your company-issued vehicle?

21        A.   Yes.

22        Q.   How often was that?

23        A.   Almost nightly.  Whether it was reviewing

24   Praxis, could be typing up a shift summary.  We had

25   to do a nightly report that went up to the executive

Deposition of: Benjamin Freeman                    August 7, 2025

56

 1    command staff and all of the captains so they would

 2    know what events took place overnight so that way

 3    they were prepared for anything that they had to deal

 4    with in the morning during the day.

 5           Q.   So if I further divide up your time

 6    outside of the headquarters building, how much of

 7    your time was actually -- how much of the time out in

 8    the field was actually on scene versus in your

 9    vehicle doing things like responding to questions

10    from your subordinates or doing administrative

11    paperwork?

12           A.   It would depend on the day.  I mean, it

13    -- it -- it's so fluid, where there could be nights

14    where there's not a lot going on.  I spent quite a

15    bit of time training a couple of the deputies in

16    District 7 who had interest in DUI enforcement.

17              So I spent time riding with them and

18    showing them things to look for, assisting them with

19    traffic stops, and field sobriety tests and things

20    like that.  So it -- I mean, that would be one week.

21              And then the next week, they would be out

22    making traffic stops and I would go out and back them

23    up.  They --  It would truly depend upon what --

24    excuse me -- it would depend upon what administrative

25    tasks I had that particular day and that particular

1    week would dictate how much more time I could spend

2    on the road.

3              My goal was to always be out on the road,

4    especially as a watch commander.

5         Q.   Let's shift to your time over at District

6    3.

7              At District 3, when you transferred over

8    as a watch commander nights --

9         A.   Uh-huh.

10        Q.   -- how much time were you at the district

11   headquarters versus out in the field?

12        A.   It was about the same.  I was probably 50

13   percent on the field, 50 percent in the office.  And,

14   again, that would still fluctuate depending upon what

15   I had.  One of my squads was a rotation ground for

16   sergeants just due to promotions, transfers, and

17   things like that.

18              So there was a lot of helping train new

19   sergeants on their administrative tasks and the

20   things that they need to do.  Fielding a lot of

21   questions, showing them the proper processes through

22   Blue Team and Praxis and helping them stay caught up

23   and learning their routine that they needed to

24   devise.

25              And they could kind of figure it out, but

Deposition of: Benjamin Freeman                    August 7, 2025

58

1    it was making sure that they knew what the ins and

2    outs were.  So...

3         Q.    Okay.  So when you switched to District 3

4    days --

5         A.    Uh-huh.

6         Q.    -- how much of your time is spent at

7    headquarters versus out in the field?

8         A.    That one --  Now it's changed a little

9    bit.  I'm probably more 75 percent in the office, 25

10   percent on the road.

11        Q.    Can you describe for me --

12              Actually, are you familiar with ADP?

13        A.    ADP?

14        Q.    Yes.

15        A.    Yes.

16        Q.    Is that the former timekeeping system

17   that Maricopa County used?

18        A.    Yes.

19        Q.    Is the current timekeeping system

20   Workday?

21        A.    Yes.

22        Q.    What is your understanding of how hours

23   are loaded into Workday or how they were loaded into

24   ADP?

25              A.    ADP, I couldn't tell you how they were

Deposition of: Benjamin Freeman                          August 7, 2025

59

1    loaded.  I --  When we transitioned over, I had a

2    phone number saved in my phone, and when I got to

3    work, I called it and clocked in.  And when I was

4    done, I clocked out.

5            With Workday, when we transitioned to

6    that, it was an application on my County phone.  And

7    at that time, I was a Lake -- I was a Lake Patrol

8    sergeant.  So same kind of thing.  It was available

9    from my house and securing ending my day at my house.

10   It was clocking in on my phone when I was in my car

11   ready to go, and clocking out when I was, again, in

12   my driveway.

13           With ADP -- or, I'm sorry, with Workday,

14   after being promoted to lieutenant, the shifts were

15   basically just plugged in as 10 hours a day based

16   upon your schedule.

17      Q.   So it's your testimony that after your

18   promotion in November of 2022, your understanding is

19   that your four 10-hour days were loaded into the

20   Workday system for you; is that correct?

21      A.   Correct.

22      Q.   How were they loaded?  Was it hours?  Was

23   it total amounts per day?

24      A.   10 hours a day.  There was no time --

25   there was no from 7 o'clock in the morning until 5

Deposition of: Benjamin Freeman                                    August 7, 2025

60

1     o'clock at night.  It's just loaded 10 hours because

2     of the exempt status.  It's how many -- it's not

3     broken down by the hour that you work.  It's just how

4     many hours did you work.

5          Q.    Okay.  And what was your understanding of

6     what you were required to do if you deviated from

7     working 10 hours in a day?

8          A.    It didn't really matter because I was in

9     an exempt status.  So if I worked 12 hours one day,

10    it was, obviously, try and adjust it as you can to

11    eight hours the next, or try and flex those two hours

12    off, or, basically, you would just eat it.

13              When there were -- when there were things

14    that stuck out to me as I'm being held over an

15    exorbitant amount of time, I would make sure to go in

16    and try and adjust those and say, instead of working

17    a 10-hour day, I worked a 15-hour day or a 16-hour

18    day.

19              I would go in and definitely adjust that

20    to try and account for it to show.

21              But, unfortunately, due to the fact that

22    we were basically told when you got promoted, Yep,

23    you're -- you're no longer hourly, you're salaried.

24    You work 40 hours in a week or you work 50 hours in a

25    week, you're getting paid for 40.

Deposition of: Benjamin Freeman                    August 7, 2025

61

1              So I tried to make a very concerted

2      effort to adjust my time.  But it's -- there's no

3      guarantee for every week.  And then on my days off,

4      this little guy right here never goes away.

5              So whether I was fielding calls on my day

6      off, checking e-mails on my day off, just so that way

7      I don't walk into a complete mess on my Monday, I

8      would try and stay up to date with everything.

9          Q.   Okay.  Were you instructed to record any

10     additional hours worked into Workday above and beyond

11     your 10-hour shift?

12         A.   I don't recall if I was ever instructed

13     to or not.  It was just one of those things where if

14     it was something that was pretty obvious that I got

15     held over for something, I would go in and enter it.

16         Q.   Were you ever told not to record your

17     hours into Workday?

18         A.   I don't believe so.

19              And if I could, can I clarify that

20     answer?

21         Q.   Absolutely.

22         A.   So every two weeks, we have to do -- we

23     have to do our time sheets.  So at that point, I

24     would go in and adjust and make sure that the days

25     that I worked, I had put my hours in for those days.

78

```
 1              A.    I have provided my pay stubs.
 2                   MS. BALCH SANTIAGO:  All right.  We've
 3       been going for a while.  Why don't we take a short
 4       break and we will resume.
 5                   THE VIDEOGRAPHER:  We are off the record
 6       at 11:48.
 7                   (A break was taken at 11:48 a.m.)
 8                   THE VIDEOGRAPHER:  We are back on the
 9       record at 11:59.
10              Q.    BY MS. BALCH SANTIAGO:  All right.  We've
11       taken a brief break.  You've had an opportunity to
12       confer with your counsel.
13                   Do you need to change any of your
14       responses to my earlier questions?
15              A.    No.
16                   MS. BALCH SANTIAGO:  Okay.
17           (Exhibit 3 was marked for identification.)
18              Q.    BY MS. BALCH SANTIAGO:  You've been
19       handed what's been marked as Exhibit 3 to your
20       deposition, Lieutenant.
21                   Do you recognize this document?
22              A.    Yes.
23              Q.    What is this document?
24              A.    The job description for a law enforcement
25       lieutenant.
```

79

1          Q.   Have you reviewed this document prior to

2     today's deposition?

3          A.   Yes, I have.

4          Q.   So I'm going to ask you some questions

5     about this document since you've reviewed it prior to

6     today's deposition.

7          A.   Uh-huh.

8          Q.   Are there any job tasks included in this

9     law enforcement lieutenant job description that you

10    contend a law enforcement lieutenant does not do?

11    Take as much time as you need to review through it

12    again.

13         A.   Okay.  Can you restate your question?

14         Q.   Absolutely.

15         So in looking at Exhibit 3 to your

16    deposition, it's the law enforcement lieutenant job

17    description, are there any job tasks listed in this

18    job description that you contend law enforcement

19    lieutenants do not do?

20         A.   No, I don't believe so.

21         Q.   Is it your testimony that the law

22    enforcement lieutenant job description is a correct

23    summary of the job duties of a law enforcement

24    lieutenant?

25         A.   I do.  But I will expand on that where it

1    says, "Essential job tasks, this is not an

2    all-inclusive list of all job duties that may be

3    required.  Employees may be required to perform other

4    related duties as assigned."

5               So, first and foremost, I am a deputy

6    sheriff.

7          Q.   You're a deputy sheriff or you're a

8    lieutenant?

9          A.   I am a deputy sheriff with the rank of

10   lieutenant.

11         Q.   Are there job duties that are not on this

12   job description that you contend should be on here?

13         A.   Part of your job as a deputy sheriff is

14   to take action when you -- when it's deemed

15   necessary.  I swore an oath to uphold the

16   Constitution, both Arizona and the United States.

17   Uphold the laws within the State -- within Arizona.

18   That's part of my job.

19               So if while on duty and I'm at work and I

20   observe something, especially while I'm in uniform, I

21   take it as I have a responsibility to act and take

22   action.

23               So prime example.  Tuesday -- I believe

24   it was Tuesday.  Yesterday.  I had a guy go blowing

25   my doors off at 100 miles an hour on the Loop 303 on

81

1    my way to my office.  I was in full uniform.  I was

2    in my County take-home unmarked vehicle.  I made a

3    traffic stop, and issued -- and issued him a

4    citation.

5                 I am aware that there are lieutenants

6    that would not do that, whether they're not patrol

7    lieutenants, whether they're not in uniform.  Because

8    of the job responsibilities that I have as a patrol

9    lieutenant, I also take leadership as an example that

10   my guys, deputies, sergeants, and my counterparts

11   should not be afraid to do their job and take law

12   enforcement action, as they're deputy sheriffs.

13                 They're sworn police officers in the

14   state of Arizona.  Our job role changes a little bit

15   as you go up in rank.

16        Q.   Is this same oath taken by captains?

17        A.   Yeah.  Every deputy sheriff, when they

18   get sworn in as a peace officer, has an oath of

19   office that they took when they became a deputy

20   sheriff.

21        Q.   Are captains also deputy sheriffs?

22        A.   Yes.

23        Q.   Are chiefs also deputy sheriffs?

24        A.   Sworn chiefs are, yes.

25        Q.   Is the undersheriff a deputy sheriff?

82

1      Q.   And were you temporarily reassigned during the

2   completion of that staffing study?

3      A.   Temporarily reassigned, but not reassigned out

4   of the division.  There's a difference.  My chain in

5   command wasn't changed, but I was reassigned for that

6   project.  TDY is what we call it.

7                I was still a District 7 lieutenant, but I

8   was taken from there and put into enforcement support to

9   work with Cory Morrison on that project, but my -- my

10  assignment is still District 7.

11     Q.   Were you doing any patrol-related duties during

12  that approximately three-month period?

13     A.   No.

14     Q.   Have you been involved in any budgeting as a

15  lieutenant within District 7?

16     A.   Yes.

17     Q.   Have you been involved in making recommendations

18  regarding new equipment or tools?

19     A.   No.

20     Q.   While you were in District 7 as a lieutenant

21  between January of 2020 through 2024, understanding that

22  there was a time period that you were not actually in

23  District 7 during that time period, how many times did you

24  personally rescue fire, crime, or accident victims?

25     A.   Was I on scene with them, or did I actually

92

1    a day, on the average.

2        Q.    And is that time that you're spending in

3    the office or is that out in the field?

4        A.    It depends.  If it's something --  Like,

5    we had a deputy recently get injured while making an

6    arrest.  So I responded out to that.  The deputy --

7    deputy was okay.  He got transported to the hospital.

8            But I went out and I took a supervisory

9    role and I watched how my sergeants addressed the

10   entire scene, how we dealt with the suspect who is in

11   custody, how they delineated the paperwork and the

12   responsibilities to their deputies.

13           And it was exactly how I would have

14   expected them to handle it.  So there was no need to

15   go over that.  Then, it was just the reminders of the

16   necessary administrative tasks, workers' comp

17   paperwork, risk management stuff.

18           So --  And that's just because things

19   like that hopefully don't happen very often, so guys

20   can forget some of the small minutiae things that

21   need to be done.

22       Q.    How often when you're on scene do you

23   take what you just described as a supervisory role

24   and assess how your guys have responded?

25       A.    That's the majority of what I do when I

93

1    respond out.  If it requires me taking over an

2    incident, that's going to be some of your more severe

3    stuff where you may be calling in additional

4    resources, and I -- I would use, like, a barricaded

5    subject as an example.

6              At that point, I'm going to be taking an

7    incident commander role, where my sergeant is going

8    to be dealing with his guys and keeping the subject

9    basically barricaded where he's at and working that

10   -- working that process while I'm getting the

11   additional resources out.

12        Q.   How many times would you say that you

13   have responded to a serious incident, like a

14   barricade, over the course of a year?

15        A.   As a watch commander, much more

16   frequently than now on dayshift.  As a watch

17   commander, I would say probably, let's call it an

18   average twice a month.

19             When --  As a dayshift lieutenant, it

20   just ebbs and flows.  I want to say last month, we

21   had three homicides in a week or in a seven-day -- in

22   a seven-day period.  That's unheard of for us.  So,

23   obviously, a little bit busier.

24             But, like I said, it kind of ebbs and

25   flows.  So averages are kind of hard to skew because

94

1    things ebb and flow.  But I would say probably on the

2    average, once a month is probably a pretty fair

3    assessment of where I have to come in as an incident

4    commander and take something over from my sergeants.

5              And that's more to just take the

6    liability off of them so that way they can take care

7    of their people and move forward.

8         Q.   Okay.  Since your promotion to a

9    lieutenant, have you earned at least $684 a week?

10        A.   I have no idea.  I would probably assume

11   so, but I have no idea.  I know what -- I know what

12   hits my account every two weeks.

13        Q.   What hits your account every two weeks?

14   And that can be subject to protective order.

15        A.   Yeah, it's -- I would say -- I don't

16   know.  Probably -- what gets direct-deposited and

17   then I have stuff routed, probably right around 2,600

18   every two weeks.  Minus that seven weeks where I was

19   on workers' comp.  That was a little different

20   because of workers' comp rules and stuff.

21        Q.   Have you --  Did you earn at least

22   $108,000 in 2024?

23        A.   I believe so.  I would have to look at my

24   W-2, but I believe so.

25        Q.   Did you earn at least $108,000 in 2023?

95

1          A.    Again --  Yeah, probably.

2          Q.    And you're promoted in 2022, correct?

3          A.    Yeah.  So having been a sergeant in Lake

4    Patrol prior to my promotion, yeah, that year, I'm

5    pretty sure I made more than 108,000.

6          Q.    Okay.  At all times since you have been a

7    lieutenant in November of 2022, have you supervised

8    two or more employees?

9          A.    Yes.

10         Q.    Have you -- since you were -- since you

11   have been a lieutenant, November 2022 to the present,

12   have you approved or denied any requests for days off

13   or overtime by sergeants or deputies?

14         A.    Approved time off, yes.  Denied any time

15   off, I don't believe so.  Overtime, yeah.  A lot of

16   overtime.

17         Q.    Have you set or coordinated or made

18   recommendations regarding work schedules for your

19   sergeants or deputies?

20         A.    Not that would affect them directly.  We

21   had -- myself and my counterpart had discussed

22   possibly changing workdays.  Several of the districts

23   worked different schedules.  Fountain Hills deputies

24   worked vastly different schedule than Districts 2, 3,

25   and 4.  And 1, I don't even know what District 1 is

Deposition of: Benjamin Freeman                        August 7, 2025

95

1        A.    Again --  Yeah, probably.

2        Q.    And you're promoted in 2022, correct?

3        A.    Yeah.  So having been a sergeant in Lake

4   Patrol prior to my promotion, yeah, that year, I'm

5   pretty sure I made more than 108,000.

6        Q.    Okay.  At all times since you have been a

7   lieutenant in November of 2022, have you supervised

8   two or more employees?

9        A.    Yes.

10        Q.    Have you -- since you were -- since you

11   have been a lieutenant, November 2022 to the present,

12   have you approved or denied any requests for days off

13   or overtime by sergeants or deputies?

14        A.    Approved time off, yes.  Denied any time

15   off, I don't believe so.  Overtime, yeah.  A lot of

16   overtime.

17        Q.    Have you set or coordinated or made

18   recommendations regarding work schedules for your

19   sergeants or deputies?

20        A.    Not that would affect them directly.  We

21   had -- myself and my counterpart had discussed

22   possibly changing workdays.  Several of the districts

23   worked different schedules.  Fountain Hills deputies

24   worked vastly different schedule than Districts 2, 3,

25   and 4.  And 1, I don't even know what District 1 is

97

1          Q.   What is that procedure?

2          A.   It follows policy where they -- each of

3    our squads have two sergeants.  So primarily the

4    first thing they're going to do is let their

5    counterpart know.  If for some reason their -- their

6    counterpart is off, they would notify the lieutenant,

7    whether that would be me, my counterpart, or a watch

8    commander.

9          Q.   Have you been involved in the

10   interviewing or screening process of any civilian or

11   noncivilian hires?

12         A.   Yes.  I sat on the last sergeant

13   interview panel for their testing process, and I sat

14   on the last hiring panel or interview panel -- excuse

15   me -- for DSAs, for our deputy service aides.

16         Q.   When did you sit on the hiring panel for

17   DSAs?

18         A.   That was earlier this year.

19         Q.   As a lieutenant, correct?

20         A.   Yes.

21         Q.   When did you sit on the sergeant panel?

22         A.   I want to say it was earlier this year.

23   No.  It was last year.  It was last year.

24         Q.   2024, but as a lieutenant, correct?

25         A.   As a lieutenant, yeah.

1          Q.   What was your role in that sergeant

2     promotional panel?

3          A.   We --  It was myself, a sworn sergeant

4     from our agency, and then it was a lieutenant from

5     another agency.  And it was a scenario-based question

6     where it was read to each candidate, the exact same

7     way, and then we took notes of their answers and how

8     they responded, and they were scored by the company

9     that scored them.

10               We, as a group, collectively totaled out

11    their scores based upon what we evaluated and how we

12    perceived how they answered, came up with a total,

13    and then those all went to our third party for

14    tabulation.

15         Q.   So is it safe to assume that you ranked

16    the individuals that were sitting on the sergeant

17    promotional panel according to a matrix or certain

18    information to score them against?

19         A.   There's a -- there's a significant

20    matrix.  It was not just us.  There were -- I believe

21    it was a total of three or four scenarios in addition

22    to their written tests that they had to complete.

23               We did not -- we did not dictate where

24    that person landed on that list.  We just calculated

25    how they responded to our scenario.

99

1         Q.   So with regards to the scenario that you

2    read to the individuals sitting on the sergeant

3    promotional panel, you scored them based on your

4    scenario, correct?

5         A.   Correct.

6         Q.   Did you provide your own individualized

7    score or was it a group score or was it both?

8         A.   It was both.

9         Q.   And were these deputies promoting to

10   sergeant, or sergeants wanting to promote to

11   lieutenant?

12        A.   Deputies to sergeant.

13        Q.   And how long did this process take?

14        A.   Two days.

15        Q.   Two full days?

16        A.   Yeah.  I believe so.  There were, I

17   believe, about 20 candidates, so we had to see every

18   one of them.

19        Q.   Have you sat on a promotional panel for

20   sworn officers on any other occasions?

21        A.   Yes.  As a sergeant, when I was in Lake

22   Patrol, we sat on the interview panel interviewing

23   candidates that wanted to come to Lake Patrol that

24   would have been deputies.

25        Q.   Okay.  Other than those two examples you

Deposition of: Benjamin Freeman                                    August 7, 2025

101

1      Q.   Does it typically result in disciplinary

2  action?

3      A.   Depends on the severity of the

4  misconduct.

5      Q.   Have any reports of misconduct that you

6  raised resulted in disciplinary action, to your

7  knowledge?

8      A.   I'm trying to think of my most recent

9  ones.  One left, and left in -- she resigned on her

10  own.  I'm sure that there's been one that I've

11  entered that received minor discipline, so it was

12  either a coaching or a written reprimand.  But as far

13  as major discipline, I don't believe so.

14      Q.   You mentioned written reprimand.  Do you

15  have the authority to issue verbal reprimands?

16      A.   We don't do verbal reprimands.  We view

17  them as coachings.  And, yes.  But there's a specific

18  guideline that has to be followed in order to give a

19  coaching.

20      Q.   But you do have authority to issue a

21  verbal coaching?

22      A.   Yes.

23      Q.   Have you done a verbal coaching?

24      A.   Yes.

25      Q.   How many times have you done a verbal

Deposition of: Benjamin Freeman                          August 7, 2025

102

1    coaching since your promotion to lieutenant?

2          A.    None.  I've --  Let me rephrase that.

3                I've been directed by our -- I can't

4    remember his -- what the official title is -- by our

5    disciplinarian to issue a coaching based upon a

6    finding that PSB found misconduct, and their form of

7    discipline was a coaching, and we had to issue that

8    to them -- to the employee.

9          Q.    And you issued that yourself?

10         A.    I have done one -- one or two.  And I've

11   had sergeants issue them to their deputies.

12         Q.    Okay.  Have you done any performance

13   evaluations for your subordinates?

14         A.    Yes.

15         Q.    How many and how often?

16         A.    Annually, and depending upon -- depending

17   upon how many guys I'm supervising at that particular

18   time, how many people I'm supervising.

19         Q.    Okay.  I'm going to ask you a series of

20   questions, and the relevant time period is going to

21   be since your promotion to lieutenant.

22         A.    Okay.

23         Q.    Since your promotion to lieutenant in

24   November 2022, how many times have you prevented,

25   controlled, or extinguished fires of any type?

Deposition of: Benjamin Freeman                                    August 7, 2025

103

1           A.    I can't think of any offhand.  I'm,

2      like -- I'm sure I've been to a couple car fires

3      where I've used an extinguisher, but that may have

4      been as a sergeant when I was in lakes.

5           Q.    Since your promotion to lieutenant in

6      November of 2022, how many times have you rescued

7      fire, crime, or accident victims?

8           A.    Several.

9           Q.    Three?

10          A.    Let's go less than five.  I have been

11     first on scene at accidents on several occasions.

12          Q.    And that's since November of 2022 to the

13     present?

14          A.    Yes.

15          Q.    How many times have you prevented or

16     detected crimes since your promotion to lieutenant in

17     November of 2022?

18          A.    Can you ask that one more time?

19          Q.    Absolutely.

20                How many times have you prevented or

21     detected crimes since your promotion to lieutenant in

22     November of 2022?

23          A.    Less than 50.

24          Q.    How many times have you conducted

25     investigations or inspections for violations of law

1    since November 2022, your promotion to lieutenant?

2         A.   Less than 100.

3         Q.   How many times have you performed

4    surveillance since your promotion to lieutenant in

5    November of 2022?

6         A.   Less than five.

7         Q.   How many times have you pursued,

8    restrained, or apprehended suspects since your

9    promotion to lieutenant in November of 2022?

10        A.   Less than 50.

11        Q.   How many times have you detained or

12   supervised suspected and convicted criminals,

13   including those on probation or parole, since your

14   promotion to lieutenant in November of 2022?

15        A.   Ask the first part of that again, please.

16        Q.   Detaining or supervising suspected and

17   convicted criminals, including those on probation or

18   parole?

19        A.   Detaining suspect --  One more time.

20   Sorry.

21        Q.   Detaining or supervising suspected and

22   convicted criminals, including those on probation or

23   parole?

24        A.   I'm going to say less than five.

25        Q.   How many times have you interviewed

1    witnesses since your promotion to lieutenant in

2    November of 2022?

3         A.    Let's go less than 20.

4         Q.    How many times have you interrogated and

5    fingerprinted suspects since your promotion to

6    lieutenant in November of 2022?

7         A.    Fingerprinted, that's going to be no.

8              Interrogated, I would say interviewed

9    suspects, I would say probably less than 50.

10        Q.    How many investigative reports have you

11   prepared since your promotion to lieutenant in

12   November of 2022?

13        A.    That one, I'm going to have to say I

14   don't know.  I would have to pull my reports from

15   TraCS, to give you an answer.

16        Q.    Can you give me an approximate?

17        A.    I -- to be honest, I don't want to -- I

18   don't want to perjure myself and say way too many or

19   way too less.  So I'm going to have to say I don't

20   know.  I would have to pull up my TraCS account and

21   run it up to see how many I made.

22        Q.    What are you referring to by your TraCS

23   account?

24        A.    That would be our report writing system

25   that we utilize.  Deals with citations, reports.

110

1          Q.    Okay.

2          A.    From November of '22 to current, I have

3     authored 17 reports, and he says, 14 citations, as

4     well.

5          Q.    Thank you for that.

6          A.    Uh-huh.  Like I said, I didn't a hundred

7     percent trust this.  It feels a little light.

8          Q.    So would the 17 reports encompass the 17

9     citations?

10          A.    It -- it could, because I'm sure a couple

11     of those were DUIs.  So it would not surprise me if

12     the citation was also accompanying the report.

13          Q.    Okay.  Anything else you need to correct?

14          A.    No, ma'am.  I'm good.

15          Q.    Are you familiar with Blue Team

16     supervisor notes?

17          A.    Yes.

18          Q.    What are those?

19          A.    Bimonthly notes written on my

20     subordinates.  When I was a sergeant, it was my

21     deputies.  As a lieutenant now, it's the sergeants

22     that are assigned to me.  But any -- basically any

23     supervisor can write a supervisor note on any deputy,

24     sergeant, lieutenant, whatever the case may be.

25          Q.    Are there parameters or requirements on

111

1   how many Blue Team notes you must make regarding your

2   subordinates?

3           A.   Correct.  I have to make one performance

4   note a month, and I have to review -- I have to

5   document two, we call them EIS notes.  It's the

6   employee intervention system.  It's our protocols

7   that show patterns and things like that, that -- we

8   review those for no changes, or if there are changes,

9   that kind of thing, and then we review those twice a

10  month, document it in a Blue Team note.

11          But also encompassing the performance

12  note is usually the performance note, body-worn

13  camera review, traffic stops.  It's the things that

14  are pertinent to evaluate their performance through

15  the month.

16          Q.   And that's one performance note and two

17  EIS notes for each subordinate, correct?

18          A.   Correct.

19          Q.   Do you do those notes only for sergeants

20  or sergeants and deputies?

21          A.   Only sergeants.

22          Q.   And how many sergeants on average have

23  you had under your supervision since your promotion

24  to lieutenant?

25          A.   I'm going to say three, as an average.

114

1     person in his rank and assignment."

2                 Do you see that?

3          A.    Yes.

4          Q.    Do you agree with that statement?

5          A.    Yeah.

6          Q.    How often do you conduct traffic stops as

7     lieutenant?

8          A.    Differences in job roles.  Watch

9     commander was a little more frequent than I do on

10    dayshift.  As I stated earlier, I'm kind of a DUI

11    guy.  I ran our DUI program for quite a while.

12    Especially working nights as a watch commander in my

13    travels either around my district, to or from, it

14    would not be uncommon for me to make a traffic stop

15    for potentially impaired drivers.

16                It would not be uncommon for me to stop

17    somebody for criminal speed.  It's still not uncommon

18    for me to do it.  It's uncommon in the fact that as a

19    lieutenant, I still do make traffic stops.  That --

20    that's a rarity in our agency that lieutenants are

21    active with patrol and that lieutenants go out and

22    actually make traffic stops.  That is a rarity.

23         Q.    So let's take it assignment by assignment

24    then.

25                So when you started in District 7 days --

Deposition of: Benjamin Freeman                          August 7, 2025

115

1    A.    Uh-huh.

2    Q.    -- for about three weeks to a month, how

3  many traffic stops do you think you conducted during

4  that time period?

5    A.    This one was obviously -- this supervisor

6  note was for December.  So from the time that he

7  entered this --  Let's check.  So this was -- this

8  note was written on 12/12 of '22.  So for the first

9  note, that would encompass from my time from being

10 promoted on November 28th through December 12th that

11 I had not made any traffic stops, which is not

12 uncommon.

13    Q.    The next note is dated 12/21/2022.

14 That's on page MCC8598.

15          Do you see that?

16    A.    12/21.  Yes.

17    Q.    And there's a notation that says,

18 "Lieutenant Freeman has made two traffic stops during

19 this rating period."

20          Do you see that?

21    A.    Yes.

22    Q.    So is it safe to assume that you made a

23 total of two traffic stops during your time in

24 dayshift at District 7 following your promotion to

25 lieutenant?

1          A.   I don't believe at this point it was

2     dayshift, because -- in that, recently assisted with

3     the night watch commander duties.  I worked last

4     night as the watch commander to assist with staffing

5     vacancies.  So that would probably be when I made

6     those traffic stops was when I was working on

7     nightshift.

8          Q.   Okay.  Can you give me your best estimate

9     of how many traffic stops you conducted doing watch

10    commander nightshift duties in District 7?  You can

11    give me an average per week.

12         A.   Maybe one.

13         Q.   Can you compare and contrast that for me

14    and let me know how many traffic stops you would

15    expect a deputy in your district to conduct on a

16    weekly basis?

17         A.   Depending on their assignment.  If

18    they're assigned as a traffic car, I would expect

19    them to make quite a few.  There is no requirement

20    for deputies to make traffic stops.  They are not

21    held to a quota or to any standard like that.

22              Some people are more traffic-oriented

23    than others.  When I have my FTOs with trainees, I

24    expect them to make traffic stops throughout their

25    shift to adequately train the new deputy.  But I have

141

1    questions.  We'll read and sign.

2              MS. BALCH SANTIAGO:  Okay.

3              THE VIDEOGRAPHER:  This concludes today's

4    deposition.  We are off the record at 1:35.

5         (The proceedings concluded at 1:35 p.m.)

6

7

8

9

10         _____

11                BENJAMIN FREEMAN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

142

```
 1   STATE OF ARIZONA        )
                             ) ss.
 2   COUNTY OF MARICOPA      )

 3

 4           BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
 5   Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
 6   testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
 7   and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
 8   typewriting under my direction; that the witness
     requested reading and signing said deposition; that
 9   the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
             I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12           I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14

     Kristy A. Ceton                50200_____
15   Certified Reporter             CR Number

16   Kristy A Ceton                 8.12.25
     _____
17   Certified Reporter Signature   Date

18

             I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).

20

21   Carrie Reporting, LLC          R1064
     Registered Reporting Firm      RRF No.

22

23   Michele Durrer                 8.12.25
     Registered Reporting Firm      Date
24   Signature

25
```

# EXHIBIT 54



# FAIR LABOR STANDARDS ACT (FLSA)
# EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 11/28/2022 | 500 | Maricopa County Sheriff Office |

## I. EMPLOYEE INFORMATION

| Employee ID: | Position #: 2933 | Name (Last, First): Freeman, Benjamin |
|---|---|---|

| Market Range Title: Law Enforcement Lieutenant | Working Title: Law Enforcement Lieutenant |
|---|---|

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| Employee Signature | Date |
|---|---|

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| Employee Signature | *11-17-22* Date |
|---|---|

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

| Gertrude T. Jackson | Gertrude T. Jackson MCSO HR | 1/7/2023 |
|---|---|---|
| Supervisor Name (print) | Supervisor Signature | Date |

**NOTE:** Signed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee Records.

CONFIDENTIAL
ATTORNEY EYES ONLY
Revised: 08/07/2017

MCC 017500

# EXHIBIT 55

# FILED UNDER SEAL

# EXHIBIT 56



# FAIR LABOR STANDARDS ACT (FLSA)
## EMPLOYEE ACKNOWLEDGEMENT FORM

| Effective Date | Dept. No. | Department Name |
|---|---|---|
| 01/29/2018 | 500 | Maricopa County Sheriff's Office |

## I. EMPLOYEE INFORMATION

| | | |
|---|---|---|
| **Employee ID** ▮▮▮▮▮ | **Position #:** 61449 | **Name** (Last, First): Whelan-Gonzales, Dmitrius |
| **Market Range Title:** Law Enforcement Lieutenant | | **Working Title:** Law Enforcement Lieutenant |

**FLSA Status:**

☐ Non-Exempt (Hourly employee paid for all hours worked and overtime pay for hours worked over 40 in a work week.)

☒ Exempt (Not eligible for overtime pay.)

## II. NON-EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked and Overtime Policy is to outline the County's compliance with federal and state laws pertaining to hours worked and overtime. Non-exempt employees are required to read this policy, direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked and Overtime Policy from their department HR liaison or by going to:
http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is non-exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked and Overtime Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| Employee Signature | Date |
|---|---|

## III. EXEMPT SUMMARY AND ACKNOWLEDGEMENT

The purpose of the Hours Worked for Exempt Employees Policy is to outline the County's tracking of work hours for employees who are exempt from the overtime provisions of the FLSA in accordance with the principles of public accountability. Exempt employees are required to read this policy, to direct any questions they have to their department HR liaison, and to sign this acknowledgment form. Employees can obtain a copy of the Hours Worked for Exempt Employees Policy from their department HR liaison or by going to: http://az-maricopacountyintranet.maricopa.gov/190/Policy-Library.

I acknowledge that my FLSA status is exempt as stated above and that:
- I was provided access to, read, understand, and will comply with the Hours Worked for Exempt Employees Policy.
- I sought clarification for any questions that I had regarding this policy from my department HR liaison and will seek further clarification if I have additional questions in the future.
- I understand that violation of this policy may result in disciplinary action up to and including termination.
- I understand that a copy of this signed acknowledgment form will be placed in my personnel file.

| Employee Signature *[signature]* 51789 | Date 1/25/18 |
|---|---|

## IV. SUPERVISOR ACKNOWLEDGEMENT

I certify that I received, read, and understand the Hours Worked and Overtime Policy or the Hours Worked for Exempt Employees Policy, whichever is applicable; will comply with the provisions of this policy as it relates to the employee mentioned above; will seek clarification from my department HR liaison if I have questions regarding this policy and the treatment of the employee mentioned above; and I understand that violation of this policy as a supervisor may result in disciplinary action up to and including termination.

| ~visor Name (print) *[signature] F. Morris* | Supervisor Signature *[signature]* | Date 2-5-18 |
|---|---|---|

~ed acknowledgement forms are maintained by departments while a copy of the form must be sent to Employee

CONFIDENTIAL
ATTORNEY EYES ONLY

/07/2017

MCC 019997

# EXHIBIT 57

# FILED

# UNDER

# SEAL

# EXHIBIT 58



# *The Briefing Board*

### Number 20-60
### October 15, 2020

## IMMEDIATE POLICY CHANGE
## GB-2, COMMAND RESPONSIBILITY

Employees are **required** to read the Office Policy below to ensure they are familiar with the changes that have been made. All Employees are **required** to log into TheHUB, to review and acknowledge an understanding of the Office Policy within **30 days**.

Employees are reminded that *The Briefing Board* has the same force and effect of Office Policy. Division commanders shall ensure that employees have access to a copy of this *Briefing Board* announcement. Policy changes should be discussed during shift briefings, as specified in Office Policy GB-2, *Command Responsibility.*

## GB-2, COMMAND RESPONSIBILITY

**Effective immediately**, Office Policy GB-2, *Command responsibility,* is revised as follows (Changes indicated in ~~strikethrough~~ text):

**PROCEDURES**

13.    **Sworn Supervisors Responsibilities**

2    Review each *Vehicle Stop Contact Form* (VSCF) and *Non-Traffic Contact Form* (NTCF);

a.    Supervisors shall review all VSCF and NTCFs made by each deputy under their supervision within TraCS. Absent exceptional circumstances, supervisors shall review all VSCF and NTCFs involving a detention/Terry stop within 72 hours of receiving such documentation.

b.    If the ~~VSCF or~~ NTCF did not include a detention, the supervisor shall review the form within seven calendar days. When the supervisor completes their review, and approves the form, the supervisor is indicating their agreement that the ~~VSCF or~~ NTCF contains all of the necessary elements of the legal basis for the action.

 



# *The Briefing Board*

### Number 22-08
### February 01, 2022

## IMMEDIATE POLICY CHANGE
## GB-2, COMMAND RESPONSIBILITY

Employees are **required** to read the Office Policy below to ensure they are familiar with the changes that have been made. All Employees are **required** to log into TheHUB, to review and acknowledge an understanding of this Office Policy within **30 days**.

Employees are reminded that *The Briefing Board* has the same force and effect of Office Policy. Division commanders shall ensure that employees have access to a copy of this *Briefing Board* announcement. Policy changes should be discussed during shift briefings, as specified in *Office Policy GB-2, Command Responsibility.*

## GB-2, COMMAND RESPONSIBILITY

**Effective immediately,** Office Policy GB-2, *Command Responsibility,* is revised as follows (Changes indicated in ~~strikethrough~~ and **UPPER-CASE BOLD UNDERLINED** text):

13.     **Sworn Supervisor Responsibilities:** In addition to other matters addressed in this Office Policy, sworn supervisors shall provide the effective supervision necessary to ensure that deputies are following Office policies or procedures, federal, state, or local criminal or applicable civil laws, administrative rules and regulations.

   I.     Body-Worn Camera Recording Reviews: ~~On a monthly basis, supervisors shall conduct~~ two ~~random reviews of traffic stop video footage for each of their subordinates'~~ body-worn camera recordings. **THE MONTHLY REVIEW OF TRAFFIC STOP VIDEO FOOTAGE SHALL BE COMPLETED, AS SPECIFIED IN OFFICE POLICY GJ-35,** *BODY-WORN CAMERAS.* Additionally, supervisors must review a subordinate's body-worn camera recordings in relation to a complaint, an investigation, a pursuit, or critical incident. A review of videos in relation to a complaint, an investigation, a pursuit, or critical incident, shall not be considered as the monthly review of a randomized video. The monthly reviews shall be documented in Blue Team Supervisor Notes. The supervisor shall assess the following:

   1.     The deputy's performance and training needs;

   2.     Policy compliance;

   3.     Consistency between written reports and body-worn camera recordings; and

   4.     Whether the camera was functioning properly, and its use was consistent with Office Policy GJ-35, *Body-Worn Cameras.*

   5.     The methodology and supervisory checklist for consistently reviewing Body-Worn Camera recordings can be found at the following shared drive location; ~~UM~~\BIO\Forms.





# MARICOPA COUNTY SHERIFF'S OFFICE
# POLICY AND PROCEDURES

| Subject | Policy Number |
| --- | --- |
| **COMMAND RESPONSIBILITY** | **GB-2** |
| | **Effective Date** |
| | **06-28-19** |

| Related Information | Supersedes |
| --- | --- |
| Arizona Constitution, Article 12, Section 3 | GB-2 (05-10-18) |
| ARS § 11-441 through 459 | |
| CP-2, *Code of Conduct* | |
| CP-8, *Preventing Racial and Other Bias-Based Profiling* | |
| CP-9, *Occupational Safety Program* | |
| EA-2, *Patrol Vehicles* | |
| EB-2, *Traffic Stop Data Collection* | |
| GA-1, *Development of Written Orders* | |
| GC-1, *Leaves and Absences* | |
| GC-4, *Employee Performance Appraisals* | |
| GC-17, *Employee Disciplinary Procedures* | |
| GC-19, *Dress and Appearance* | |
| GC-20, *Uniform Specifications* | |
| GG-1, *Peace Officer Training Administration* | |
| GG-2, *Detention/ Civilian Training Administration* | |
| GH-2, *Internal Investigations* | |
| GH-4, *Bureau of Internal Oversight Audits and Inspections* | |
| GH-5, *Early Identification System* | |
| GI-1, *Radio and Enforcement Communications Procedures* | |
| GJ-2, *Critical Incident Investigations.* | |
| GJ-35, *Body-Worn Cameras* | |

## PURPOSE

The purpose of this Office Policy is to establish the order of command authority in the absence of the Sheriff, clear lines of authority through unity of command, guidelines for effective span of control, and other elements of command responsibility.

Although this Office Policy refers to "employees" throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and posse members.

## POLICY

It is the policy of the Office to ensure supervisors, at all levels, provide proper direction, coordination, and control of subordinates. Supervisors shall direct their efforts toward the intelligent and efficient performance of the functions of the Office and shall require their subordinates to do the same.

## DEFINITIONS

➢ **Bureau of Internal Oversight (BIO) Action Form:** A form that captures command's response when the Audits and Inspections Unit (AIU) has identified perceived deficiencies during the performance of non-audit services, regardless of whether the deficiency is within the scope of the inspection, or outside the scope. The *BIO Action Form* (see attachment A) shall be sent out by the AIU as an attachment to a *BIO Action Form* entry initiated through Blue Team to a commander when their employee has been identified as having a perceived deficiency in a non-audit service report. The commander shall assign the form to be completed by the identified employee's immediate

**Policy GB-2,** *Command Responsibility*                    **Effective Date: 06-28-19**

supervisor. The completed *BIO Action Form* shall include the immediate supervisor and the employee's signature affirming the action taken to remedy the identified perceived deficiency. When deficiencies are identified, they shall be handled, as specified in Office Policy GH-5, *Early Identification System*, and this Office Policy. An Early Identification System (EIS) alert notification will be automatically initiated after the threshold of three deficiencies in a rolling 12-month period, identified from AIU inspections. The supervisor shall complete one of the following action options when completing a *BIO Action Form:*

     A.     Training provided by MCSO, as specified in Office Policies GG-1, *Peace Officer Training Administration* and GG-2, *Detention/Civilian Training Administration;*

     B.     Squad briefings,;

     C.     Coaching;

     D.     Referred to the Professional Standards Bureau (PSB) for investigation;

     E.     Meeting with Supervisor;

     F.     Meeting with the Commander;

     G.     Supervisor Evaluation Period;

     H     Supervisor Ride Along/Work Along;

     I.     Re-assignment;

     J.     Employee Services;

     K.     Action Plan; or

     L.     No Further Action – To be used only in situations where the division identified and addressed the deficiency prior to being notified by the BIO. The Blue Team event number that was used to memorialize corrective actions previously taken by the division, shall be included to demonstrate that no additional action is warranted.

*Blue Team:* The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IAPro Early Identification case management system.

*Boilerplate:* Language that is stock, unoriginal, appears repeatedly in different reports, and fails to attest to the unique facts of an incident.

*Chain of Command:* Lines of communication going downward or upward through each successive level of command and supervision within the Office.

*Conclusory:* Language that is an inference, which has no proof.

*Court Order Required Training* **(CORT):** The section of the Training Division that covers CORT Technical Support, CORT Curriculum Development, CORT Implementation, CORT Administration, and a supervisor to oversee all positions.

*Deputy:* Any sworn law enforcement officer employed by or working for the Office, to include a reserve deputy.

2

**Policy GB-2,** *Command Responsibility*                                    **Effective Date: 06-28-19**

*Early Identification System* **(EIS):** A system of electronic databases that capture and store threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified. Blue Team, the EIS Dashboard, IAPro, and EIPro are applications of EIS.

*Early Intervention Unit* **(EIU):** The EIU is part of the Bureau of Internal Oversight. The EIU is responsible for the implementation, maintenance, and operation of the EIS and for providing training and assistance to the EIS users. The unit conducts data analysis, data input, and review of activities exceeding thresholds to address potentially problematic conduct or operating procedures. The Office shall ensure there is sufficient staff to facilitate EIS input and training.

*Employee:* A person currently employed by the Office in a classified, unclassified, full-time, part-time, contract, temporary, or probationary status

*Incident Report* **(IR)** *Memorialization:* An entry generated in Blue Team by a supervisor detailing report writing deficiencies of a serious nature, or any investigatory stop, detention, or search unsupported by reasonable suspicion or are otherwise in violation of Office Policy. The *IR Memorialization* shall be generated if an employee's report, investigatory stop, detention, or search, contains any of the following: conclusory or boilerplate language; inconsistent information; lacks support for the action; has other indicia that the information in the report or form is not authentic or correct; lacks articulation of the legal basis for action; has other indicia that the information in the report or form is not authentic or correct; lacks probable cause for arrest; lacks reasonable suspicion; lacks elements of the crime; or appears to show evidence of bias-based profiling.

*Internal Affairs Investigator:* Any employee who conducts an administrative investigation of misconduct, including investigators assigned to the PSB or supervisors in an Office division or bureau who are assigned to investigate misconduct.

➢  *Intervention:* An approved action taken by a supervisor to improve a situation or prevent a potential negative work performance deficiency situation from developing into misconduct.

*Line-Level Inspections:* Conducted by supervisors to ensure personnel are complying with Office policies, standard operating procedures, and requirements governing appearance, use and maintenance of uniforms, equipment, and facilities.

*Misconduct:* Includes any violation of Office Policy or procedure, federal, state, or local criminal or civil law, constitutional violations, whether criminal or civil, administrative rules including, but not limited to, the Maricopa County Merit System Rules, or Office regulations.

> *Criminal Misconduct:* Misconduct by an employee that a reasonable and trained supervisor or internal affairs investigator would conclude could result in criminal charges due to the apparent circumstances of the misconduct.

> *Minor Misconduct:* Conduct that, if sustained, would result in discipline or corrective action less severe than a suspension.

➢  Minor misconduct, while a violation of Office Policy, can often be addressed with supervisor initiated intervention intended to improve a situation, or prevent a potential negative work performance situation from progressing into a misconduct investigation. To address these employee behaviors, supervisors may initiate an intervention method, as specified in Office Policy GH-5, *Early Identification System,* to include;

3

**Policy GB-2,** *Command Responsibility*                                    **Effective Date: 06-28-19**

squad briefing; meeting with supervisor; employee services; supervisor ride-along/work along; training, supervisor evaluation period; action plan; meeting with the commander; re-assignment, and coaching. The use of intervention shall only be used to address employee minor misconduct or behavior that does not exceed a Category 1, First or Second Offense or a Category 2, First Offense, and which has not been received by the Office as an External Complaint or has not already been assigned to the PSB.

*Serious Misconduct:* Conduct that, if sustained, would result in discipline of a suspension, demotion, or dismissal.

*Patrol Activity Log* **(PAL):** A report generated by Praxis indicating the activities of a patrol deputy or patrol supervisor which are captured through Office Code entries entered into the CAD System by Communications Division personnel, patrol deputies, and patrol supervisors. These activities include all dispatched calls and self-initiated activity conducted throughout their shift.

*Shift Briefings:* Informal sessions of short duration to keep employees' knowledge levels high, to keep employees up-to-date on new trends and developments, to keep employees notified of changes in schedule and assignments, and to provide training updates as determined by the Training Division.

*Supervisor:* An employee to whom subordinates report.

    A.   Commander: An employee with the rank of lieutenant or above, or its civilian equivalent and above.

    B.   First-Line Supervisor: An employee with the rank of sergeant, or its civilian equivalent.

*TheHUB:* The learning management system by which employees, reserve deputies, and posse members are provided access to all Office Policies; and where the acknowledgment of all Office Policy updates and revisions, indicating that they have been reviewed and understood by the viewer, are recorded. TheHUB shall also be used by employees, reserve deputies, and posse members to complete training requirements, and to register for in-person courses.

*Threshold:* The point at which a sufficient number of incidents have occurred to alert the EIU of conduct or performance that could become problematic for an employee or require a review of an Office operating procedure.

*Volunteer:* A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

**PROCEDURES**

1    **Command Authority of the Office:** The order of command authority for the Office shall be:

    A.   Sheriff: The elected position of Sheriff is derived from the Arizona Constitution, Article 12, Section 3, which permits the legislature to establish the range and scope of the Sheriff's authority, mandated duties, and responsibilities as set forth in Arizona Revised Statutes (ARS) § 11-441 through 459. The Maricopa County Sheriff's Office is the agency established to assist the Sheriff in executing their statutory duties and in providing public safety services to the members of the public of Maricopa County. The mandated responsibilities of the Office include, but are not limited to:

        1.   Providing law enforcement and preservation of the peace throughout all of Maricopa County, while recognizing that primary responsibility in incorporated cities is that of local police;

        2.   Providing for the care, custody, and control of individuals incarcerated in the Maricopa County jails;

4

**Policy GB-2, *Command Responsibility***                         **Effective Date: 06-28-19**

    3.    Supporting the Maricopa County Superior Court System by providing prisoner detention and transportation services, courtroom security, and the service of court process;

    4.    Conducting or coordinating, within Maricopa County, search or rescue operations involving the life or health of any person; and

    5.    Providing the training, logistical, and administrative support necessary to comply with mandated functions.

B.    In the absence of the Sheriff, the Chief Deputy shall assume the Sheriff's duties and responsibilities. The Chief Deputy is appointed by the Sheriff. The Chief Deputy performs duties that include, but are not limited to enforcing policies, rules, and regulations; preparing recommendations necessary to improve public relations; making public appearances as required; and applying management principles in administering to the needs of the Office.

C.    Prior to an absence of both the Sheriff and the Chief Deputy, either shall designate a sworn deputy chief to assume the duties and responsibilities of the Office. If no successor has been designated, the most senior, highest ranking sworn deputy chief shall assume responsibility.

2.    **Chain of Command:** Generally, the chain of command shall be followed at all times.

    A.    There are occasions when the chain of command may be circumvented, but employees shall use discretion when operating outside the chain of command and may be held accountable for indiscretions. Generally, chain of command shall be informed following any deviation from the normal reporting structure.

    B.    Nothing in this Office Policy shall preclude any supervisor from exercising direct contact or authority over any subordinate in their chain of command in the efficient and timely conduct of duty. When possible, intervening levels of supervision should be informed.

    C.    Employees who observe or become aware of any act of misconduct by another employee shall, as soon as practicable, report the incident to a supervisor or directly to the PSB, or any outside entity authorized to take corrective action, without fear of retaliation. When the misconduct involves a supervisor, the employee shall contact the next level in the chain of command. Employees may also contact the PSB, at any time, regarding misconduct involving an Office employee or make a Blue Team entry.

3.    **Command Unity:** In order to achieve command unity, supervisors shall adhere to the following:

    A.    Only one employee shall command or supervise a particular component, activity, incident, operation, or situation;

    B.    No subordinate shall report to more than one single, consistent, and clearly identified direct supervisor at any given time;

    C.    In emergencies, a supervisor is not relieved of the responsibility to act, even though a subordinate or incident is not under their direct command;

    D.    First-line patrol supervisors shall be responsible for closely and consistently supervising all deputies under their primary command; and

    E.    First-line patrol supervisors shall ensure that all deputies under their direct command comply with Office Policy, court orders, federal, state, and local law.

5

**Policy GB-2,** *Command Responsibility*                              **Effective Date: 06-28-19**

4    **Direct Control:**

➢        A.    First-line patrol supervisors shall be assigned as the primary supervisor to no more persons than it is possible to effectively supervise. First-line patrol supervisors shall be assigned to supervise no more than a total of eight deputies, reserve deputies, and posse members , but in no event, should a patrol supervisor be responsible for more than a total of ten deputies, reserve deputies, and posse members.

1.    A Field Training Officer (FTO) and an Officer in Training (OIT) riding in the same patrol vehicle shall count as one deputy toward the ratio.

2.    An OIT driving solo in a patrol vehicle, on their limited solo phase, shall count as one deputy toward the ratio.

3.    Two patrol deputies riding in the same patrol vehicle shall count as two deputies toward the ratio.

4.    Civilian observers, academy recruit ride-alongs, and employee ride-alongs shall not count toward the ratio.

B.    If circumstances warrant an increase or decrease in the level of supervision for any unit, squad, or shift, the reason shall be documented in a memorandum. The memorandum documenting the request for an increase or decrease shall be forwarded through the chain of command. Upon review completion, a copy of the memorandum with command responses shall be forwarded to CID for distribution, and to the BIO for notification for any potential inspections that may be related. Supervisors establishing a span of control shall consider the following factors:

1.    The complexity and nature of the supervisor's duties, and the complexity of the subordinate's duties;

2.    The capabilities and experience of the supervisor and their subordinates;

3.    The geographic size of the district; and

4.    The volume of calls for service.

5.    **Delegated Authority:** No responsibility shall be assigned to an employee unless the supervisor has the authority necessary to fulfill that responsibility. Inherent with delegated authority is the latitude to make decisions and take the necessary actions to satisfy the requirements of each assigned task. Commensurate with authority, employees accept responsibility for the use, misuse, or failure to use that authority.

A.    A subordinate shall be held accountable for the exercise of delegated authority.

B.    Nothing in this Office Policy absolves a supervisor from responsibility and accountability for supervising subordinates and their use of delegated authority.

C.    A first-line supervisor shall appoint a designee to act in their place when they are absent from duty, unless such appointment is made by a higher authority. A designee acting as a first-line supervisor shall have the same authority and responsibility as the first-line supervisor they replace. Subordinates shall not be designated as acting first-line supervisors.

6.    **Orders:** Orders are commands or directives issued by a person with authority. When orders are given in the form of oral commands, they should be simple and direct and may be followed by a written order.

6

MCC 000022

**Policy GB-2,** *Command Responsibility*                    **Effective Date: 06-28-19**

    A.    Written orders should be used when: a situation is complex enough that misunderstanding is reasonably possible; when several persons or units are involved and all must have the same understanding; and when coordination, control, and follow-up are necessary.

        1.    Such orders permit the recipient to refer to them for details and serve as evidence of precise instructions.

        2.    Written orders are considered received when a subordinate receives a copy or becomes aware of the order after it is posted on an *MCSO Administrative Broadcast*, *The Briefing Board*, *MCSO Training Bulletin*, *MCSO Memorandum*, or in another accessible place.

    B.    Oral orders shall be binding for compliance on an individual or groups of individuals when they receive or are made aware of them.

    C.    Employees shall conscientiously obey all lawful orders given to them by persons having authority. Orders being relayed have the same authority as orders coming directly from the supervisor. Should a supervisor exercise authority over another supervisor's subordinates they shall inform that supervisor as soon as practical.

    D.    When a conflict of orders occurs, employees shall respectfully call the conflicting order to the attention of the supervisor giving the new order. Should this information not change the supervisor's position, that supervisor's lawful order shall be followed. The employee shall not be held responsible for disobedience of the previous order.

7.    **Accountability:** To hold responsible, or to make one answer for something within one's own power or control.

    A.    To ensure accountability, a supervisor shall:

        1.    Actively direct and supervise employees of lesser rank to ensure they perform assigned duties efficiently;

        2.    Monitor situations in which subordinates are involved and ensure that proper actions are taken;

        3.    Assume command of any situation coming to their attention that requires their involvement;

        4.    Respond to emergencies as necessary and assume command until relieved by another supervisor assuming such command;

        5.    Promptly obey orders of superiors and ensure subordinates do the same;

        6.    Submit a written, factual report when an employee risks their life in the performance of duty or for any other act that would tend to bring credit to the employee or the Office;

        7.    Ensure that subordinates promptly and accurately complete all required reports on proper forms;

        8.    Ensure that proper maintenance and care is given to Office property;

        9.    Inform an employee's immediate supervisor, as well as their own supervisor, of any neglect of duty, incompetence, insubordination, or misconduct by an employee not under their supervision as specified in Office Policy CP-2, *Code of Conduct*; and

7

10.  Investigate reports of unlawful, improper, or immoral conduct of subordinates, as specified in Office Policy GH-2, *Internal Investigations.*

B.  Supervisors shall maintain a written record of the performance of each of their employees in Blue Team Supervisor Notes. The record shall reflect the employee's positive traits and accomplishments and any observed shortcomings.

1.  Supervisor notes shall be of sufficient quality and frequency to facilitate the preparation of an accurate and detailed performance review, but at a minimum an entry shall be completed every month. Supervisors shall complete two supervisor notes per month on sworn employees at a minimum.

2.  Supervisors who have employees that are on an extended leave of absence shall complete a supervisor note to document the beginning date and end date of the absence.

3.  If supervisors had discussions with subordinates regarding discriminatory policing or any Office Policy, this should be documented in Blue Team Supervisor or Briefing Notes. The supervisor shall ensure that they select the proper note in the allegation tab when documenting the discussion.

4.  Supervisors and commanders shall conduct two reviews per month of each sworn, and one per month of each non-sworn subordinates' EIS information for the purpose of identifying and responding to any conduct patterns or concerns including, but not limited to racial profiling, improper immigration enforcement, investigatory stop violations, detentions unsupported by reasonable suspicion or otherwise in violation of Office Policy. This review shall be documented within the Blue Team Supervisor Notes.

5.  Supervisors and commanders shall review EIS records within 14 business days, including disciplinary history, of all employees upon transfer to their supervision or command. This review shall be documented within the Blue Team Supervisor Notes.

6.  Supervisors and commanders shall be responsible for handling potential deficiencies of their employees noted in non-audit inspection reports by the Bureau of Internal Oversight Audits and Inspections Unit (AIU).

    a.  The BIO will initiate a BIO Action Form entry and include as attachments, the *BIO Action Form* and the non-audit inspection report, through Blue Team to the affected commander.

    b.  The commander shall assign the task of completing the *BIO Action Form* to the identified employee's immediate supervisor.

    c.  Prior to determining any corrective action taken, supervisors should review the employee's EIS Dashboard. When repeat deficiencies occur, appropriate action should be taken to remedy the situation.

    d.  The supervisor shall address what action was taken to remedy the deficiency of the employee. The *BIO Action Form* shall include both the immediate supervisor and the employee's signatures affirming the action taken.

    e.  The completed *BIO Action Form* shall be completed, as specified in Office Policy GH-4, *Bureau of Internal Oversight Audits and Inspections* by the affected division within 30 calendar days of the assigned date in Blue Team, and then routed

8

**Policy GB-2,** *Command Responsibility*                    **Effective Date: 06-28-19**

back through the chain of command to the BIO Action Forms review group, utilizing the Blue Team application.

C.  Supervisors shall document employee information into the EIS and use the EIS to monitor subordinates' conduct as specified in Office Policy GH-5, *Early Identification System*. Supervisors shall attempt to identify and address performance or conduct issues before they reach a threshold alert within the EIS.

D.  Supervisors shall conduct inspections by way of personal observations, review of reports and records, and conversations with employees. These inspections shall be recorded in Blue Team, as specified in Office Policy GH-5, *Early Identification System*, as Line-Level Inspections and include the specifics regarding when the inspection was done, what was inspected, who did the inspection, and the findings of the inspection. Areas of inspection may include, but are not limited to, the following:

  1.  Appearance and grooming, in accordance with Office Policies GC-19, *Dress and Appearance* and GC-20, *Uniform Specifications*;

  2.  Vehicle condition;

  3.  Employee compliance with written and oral instructions;

  4.  Facility or work area cleanliness and condition;

  5.  Condition of assigned equipment, such as weapons, radios, first aid kits, and fire suppression equipment; and

  6.  Other.

E.  Supervisors shall document all tardies and early departures of their employees into Blue Team, as specified in Office Policy GC-1, *Leaves and Absences*, and GH-5, *Early Identification System*. Unscheduled absences will be captured in the ADP System. No Blue Team entry will be required by the supervisor.

  1.  Supervisors shall forward any FMLA documentation from an employee related to an attendance event to the Leave Management Section (LMS), as specified in GC-1, *Leaves and Absences*.

  2.  Supervisors who have identified a possible attendance issue with an employee shall contact the LMS for guidance <u>prior</u> to initiating early intervention, disciplinary action, or addressing attendance issues in an employee's performance appraisal.

  3.  If an employee exceeds the allowable Unscheduled Absence alert threshold, the EIU will send an alert to the employee's supervisor for further action, as specified in Office Policy GH-5, *Early Identification System*.

  4.  Supervisors shall respond to an EIS alert generated regarding absences, as specified in Office Policy GH-5, *Early Identification System*.

  5.  No employee shall be subject to retaliation or discrimination as a result of using leave protected by the FMLA, state law, or federal law or for filing any complaint relating to their use of leave protected by state or federal law.

9

MCC 000025

**Policy GB-2,** *Command Responsibility*                          **Effective Date: 06-28-19**

➢          F      **Supervisor Initiated Intervention:** Supervisors shall initiate approved interventions, as specified in GH-5, *Early Identification System*, to improve a situation or prevent a potential negative work performance situation before it develops into a misconduct investigation. Supervisors may also initiate this action when an employee's conduct has minimal negative impact on the overall operations of the Office. Supervisors shall refer to Office Policy GH-2, *Internal Investigations*, for further guidance on supervisor initiated interventions.

8.    **Multiple Division Cooperation:** When an operation requires employees from different commands to function as a single unit, the on-scene ranking supervisor of the division with overall responsibility for the outcome of the operation or incident response shall be the commander.

   A.    The senior sworn supervisor shall assume command in an initial response except in a jail facility. Command may later be transferred to a specialty unit supervisor or a higher ranking supervisor, for example the transfer of a secure crime scene from patrol to detective personnel.

   B.    When an incident occurs in a jail facility that requires the response or presence of sworn personnel, such as a riot or a criminal investigation, command of the jail facility shall remain with the jail supervisor, or designee.

         1.    Command of the specific operation or incident response shall be assumed by the appropriate sworn supervisor.

         2     The sworn supervisor in charge of the operation, incident response, or investigation shall work jointly with detention supervisors to assign or deploy sworn and detention personnel as needed.

   C.    In all cases, the on-scene ranking supervisor with overall responsibility for the outcome of the operation or incident response shall be held accountable for the use of any delegated authority.

9.    **TheHUB Training:** Upon publication of a new or revised Office Policy, or a mandatory training course, supervisors shall ensure assigned employees log into TheHUB, review the relevant policy and acknowledge an understanding of that policy, or complete the mandatory training course requirement.

   A.    All Critical Policy and those Office Policies identified by the Chief Deputy or Chief of Staff may require further review and shall require employees to correctly answer questions regarding the revised or new Office Policy.

   B     TheHUB may be accessed at https://maricopa.csod.com/client/maricopa/default.aspx.

   C     Within 50 days of the Office policy being distributed, all relevant employees shall complete TheHUB requirement.

10.   **Compliance Reviews:** All commanders or their designees, shall complete monthly compliance reviews of mandatory training, to include CORT and classroom training, and required Office Policy acknowledgments, through TheHUB, for all employees under their command. To review completion compliance, commanders are provided purview access through the TheHUB Dashboard for assessing each of their assigned employee's compliance progress. Commanders shall access the Reports menu dropdown to conduct these reviews. In the event an employee has not completed mandatory training or required Office Policy acknowledgments as specified, the commander shall take appropriate action.

11.   **Shift Briefings:** Shift briefings shall be conducted as necessary or as determined by the division commander. Blue Team Briefing Notes shall be utilized to memorialize shift briefings so the events and information can be referenced if necessary.

10

MCC 000026

**Policy GB-2,** *Command Responsibility* **Effective Date: 06-28-19**

A. The commanding employee of each division shall be responsible for ensuring that the information provided during shift briefings is accurate and effectively conveyed to all employees. The first line supervisor is normally responsible for conducting shift briefings.

    1. Supervisors shall ensure that information is made available to all employees under their command.

    2. Subordinate employees may suggest or request training updates or topics to be covered during briefings.

B. Shift briefings may include, but are not limited to, the following:

    1. Review of current, new, or revised Office policies;

    2. New court decisions;

    3. Updates on law enforcement and corrections methods and techniques;

    4. Review of current laws;

    5. Current issues which affect the community, such as major investigations, stolen vehicles, and wanted persons;

    6. Training bulletins;

    7. New procedures; and

    8. Reinforcement to subordinates that biased-based policing and profiling is unacceptable.

C. The Training Division may be requested to provide personnel and instructors with expertise in specialized areas to provide training updates during shift briefings. Other divisions of the Office may also be called upon for assistance within their areas of expertise, such as bombs, arson, and narcotics.

12. **Supervisory Alert Notification and Intervention:** An alert for supervisory review shall be generated by the EIS when an employee meets, or exceeds, an established threshold

A. There are five categories of alerts generated by the EIS.

    1. Allegation Alert: An alert is generated when the frequency of an allegation reaches the set threshold.

    2. Incident Type Alert: An alert is generated when the frequency of an incident type reaches the set threshold

    3. Monitored Status Alert: An alert is generated when a tracked behavior is entered while an employee is in monitored status. Monitored status is used to track employees on administrative leave or probation.

    4. Overall Alert: An alert is generated when the overall frequency of multiple incidents types reaches the set threshold.

    5. Supervisory Alert: An alert is generated when the frequency of the tracked actions of the

11

**Policy GB-2,** *Command Responsibility*                    **Effective Date: 06-28-19**

employees supervised by the same person reach the set threshold.

B.   Supervisors may also initiate the EIS alert process on subordinate personnel prior to the employee meeting or exceeding an established threshold to address employee performance and/or conduct.

   1.   To initiate the process, the supervisor shall utilize the Incident Type of Discretionary Alert in Blue Team.

   2.   The entry shall include a written justification for the alert and be submitted through the supervisor's chain of command to the EIU.

   3.   If approved by the chain of command, the EIS will generate an alert and the alert process will commence.

   4.   If not approved by the chain of command, the reason for the non-approval will be documented within the entry by the non-approving entity, and it will be forwarded to the EIU with a carbon copy sent in Blue Team to the initiating supervisor.

   5.   Non-approved Discretionary Alerts will be stored within the EIS Supervisor Notes of the employee.

C.   Established thresholds are viewable within EIS by accessing the EI Dashboard.

   1.   Thresholds are calculated within the EIS on a specified rolling time period.

   2.   While specified thresholds are established to assist supervisors with identifying patterns of conduct, thresholds do not substitute for continual proactive supervision.

   3.   Supervisors shall not wait for an alert to be received prior to taking corrective action for observed patterns, practices, or activities in violation of Office Policy.

   4.   When supervisors receive EIS alerts on employees, they shall complete the alert process, as specified in Office Policy GH-5, *Early Identification System*.

13.   **Sworn Supervisor Responsibilities:** In addition to other matters addressed in this Office Policy, sworn supervisors shall provide the effective supervision necessary to ensure that deputies are following Office policies or procedures, federal, state, or local criminal or applicable civil laws, administrative rules and regulations.

➢     A.   Clearly Identified Supervisor: All deputies, shall be assigned to a single, consistent, and clearly identified supervisor. Patrol supervisors shall be assigned to supervise no more than a total of eight deputies, reserve deputies, and posse members, but in no event should a supervisor be responsible for more than a total of ten deputies, reserve deputies and posse members

   1.   The following considerations shall apply:

      a.   A Field Training Officer (FTO) and an Officer in Training (OIT) riding in the same patrol vehicle shall count as one deputy toward the ratio and documented on the shift roster.

      b.   An OIT driving solo in a patrol vehicle, on their limited solo phase, shall count as one deputy toward the ratio and documented on the shift roster.

12

    c.    Two patrol deputies riding in the same patrol vehicle shall count as two deputies toward the ratio and documented on the shift roster.

    d    Civilian observers, academy recruit ride alongs and employee ride alongs shall not count toward the ratio and shall be noted on the shift roster.

2.    First-line patrol supervisors shall ensure that a Daily Shift Roster is completed for each shift in order to reflect the subordinates that are working under that supervisor for each day worked. The Daily Shift Roster shall be completed by the end of shift and include, but need not be limited to, the following:

    a.    The date, listed as DD/MM YY;

    b.    The shift times;

    c.    The supervisor's name and serial number;

    d    All employees supervised to include their serial numbers and letter designator:

        (1)    "S" signifies deputy sheriff;

        (2)    "A" and "B" signifies either a detention officer or civilian employee;

        (3)    "R" signifies reserve deputy;

        (4)    "V" signifies a former compensated deputy who retires and is approved for reserve deputy status;

        (5)    "P" signifies posse member;

    e.    The assigned vehicle number;

    f    The employee's call sign, and

    g.    The names of any public observers, deputy in training, posse member, reserve deputy, or any other pertinent information.

3.    Only a patrol bureau chief can modify the format of the Daily Shift Roster. It shall be retained digitally in an area accessible to all patrol supervisors.

4    If at any time a patrol supervisor supervises more than a total of eight deputies, reserve deputies and posse members, and no more than a total of ten deputies, reserve deputies, and posse members, the supervisor shall write a memorandum documenting the situation and why the preferred 8:1 ratio could not be met. The memorandum documenting the situation shall be forwarded through the chain of command. Upon review completion, a copy of the memorandum with command responses shall be forwarded to CID for distribution, and to the BIO for notification for any potential inspections that may be related. The patrol supervisor shall also document this occurrence on the Daily Shift Roster. The Office shall then take action to remedy the situation. The consideration identified in Section 13.A.1 shall also apply when completing the Daily Shift Roster.

13

MCC 000029

**Policy GB-2,** *Command Responsibility*                **Effective Date: 06-28-19**

     5.    Patrol supervisors shall be available throughout the shift to provide adequate on-scene field supervision to deputies under their direct command and, as needed, to provide supervisory assistance to other units.

     6.    Patrol supervisors shall be assigned to and shall work the same days and hours as the deputies under their direct command, absent exceptional circumstances.

B.    Policing Activities: First-line supervisors shall ensure deputies are policing actively and effectively, are provided with instruction necessary to correct mistakes, and are held accountable for misconduct. Effective supervision requires supervisors to:

     1.    Respond to the scene of certain arrests; including but not limited to:

        a.    Immigration related arrests;

        b.    Assault on or injury to an employee;

        c.    Allegation of assault or injury to a member of the public by an employee;

        d.    Any arrest that involves use of force requiring documentation in a *Use of Force Report;*

        e.    Felony pursuits;

        f.    All critical incidents, as specified in Office Policy GJ-2, *Critical Incident Investigations* including, but not limited to:

           (1)    Any incident that involves the use of force by an employee resulting in death or serious physical injury;

           (2)    The intentional or unintentional discharge of a firearm by an employee in the performance of their lawful duties; or

           (3)    The death of a prisoner or inmate, by any means, while in the custody of the Office;

     2.    Review each *Vehicle Stop Contact Form* (VSCF) and *Non-Traffic Contact Form* (NTCF);

        a.    Supervisors shall review all VSCF and NTCFs made by each deputy under their supervision within TraCS. Absent exceptional circumstances, supervisors shall review all VSCF and NTCFs involving a detention/Terry stop within 72 hours of receiving such documentation.

        b.    If the VSCF or NTCF did not include a detention, the supervisor shall review the form within seven calendar days. When the supervisor completes their review, and approves the form, the supervisor is indicating their agreement that the VSCF or NTCF contains all of the necessary elements of the legal basis for the action.

           (1)    Supervisors shall review all VSCF and NTCF for accuracy, brevity, completeness, boilerplate or conclusory language, inconsistent information, lack of articulation of the legal basis for the action, or other indicia that the information in the VSCF or NTCF is not authentic or

14

**Policy GB-2,** *Command Responsibility*                    **Effective Date: 06-28-19**

correct. Supervisors shall address concerns with the VSCF or NTCF author through non-disciplinary or disciplinary action as appropriate.

(2)    Supervisors shall document on an IR Memorialization Blue Team entry any investigatory stops/ detentions, or searches that appear unsupported by reasonable suspicion or are otherwise in violation of Office Policy; or investigatory stops/detentions, or searches that indicate the need for corrective action or review of Office policy or training.

(3)    Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops/detentions or searches, which may include non-disciplinary correction action or referring the incident for administrative or criminal investigation.

(4)    The information for the IR Memorialization entry shall be documented through Blue Team by selecting the proper reason that the NTCF is memorialized in the allegations tab, as specified in Office Policy GH-5, *Early Identification System*. The IR Memorialization form shall be sent to the EIU through the chain of command, using Blue Team.

3.    Review and confirm the accuracy and completeness of each IR;

4.    Respond to each complaint of misconduct;

5.    Ensure deputies are working actively to engage the community and increase public trust and safety;

6.    Provide counseling, redirection, and support to deputies as needed; and

7.    Hold deputies accountable for performing each of their duties.

C.    Immigration-Related Investigation or Immigration-Related Crime: Deputies are required to notify and check with a supervisor before any questioning as to alienage or immigration status is initiated to ensure that the circumstances justify such an action under Office policy, and receive approval to proceed with questioning and/or an arrest following an immigration-related inquiry, as specified in Office Policy EB-1, *Traffic Enforcement, Violator Contacts, and Citation Issuance*.

1.    The supervisor shall approve or disapprove the deputy's investigation or arrest recommendation based on the available information and conformance with Office policy.

2.    The supervisor shall take appropriate action to address any deficiencies in the deputy's investigation or arrest recommendations, including releasing the subject, recommending non-disciplinary corrective action for the deputy, and/or referring the incident for administrative investigation.

D.    Review of Stops, Investigative Detentions, and Arrests Documentation: Employees shall submit documentation of all stops, investigatory detentions, and arrests. Supervisors shall review all documentation submitted, as specified in Office Policies GF-5, *Incident Report Guidelines* and GC-4, *Employee Performance Appraisals*.

1.    Supervisors shall use Blue Team Supervisor Notes in the EIS to track each subordinate's violations or deficiencies in stops, investigatory detentions and arrests, and the corrective actions taken, in order to identify deputies needing repeated corrective action. The quality

15

and completeness of the supervisory review shall be taken into account in the supervisor's own performance evaluations. Supervisors shall:

a.   Notify the PSB when a violation of Office policy has occurred;

b.   Ensure that each violation or deficiency is noted in the deputy's performance evaluations; and

c.   Take appropriate corrective or disciplinary action against supervisors who fail to conduct complete, thorough and accurate reviews of deputies' stops, investigatory detentions, and arrests.

➢   2.   Supervisors shall unequivocally and consistently reinforce to subordinates that discriminatory policing is unacceptable. This ongoing reinforcement shall be conveyed, as specified in Office Policy CP-8, *Preventing Racial and Other Bias-Based Profiling,* and shall be documented through TheHUB or in Blue Team as a Supervisor Note or Briefing Note. The supervisor shall ensure that the proper note in the allegation tab in Blue Team is selected when documenting the reinforcement with staff.

3.   When a subordinate's report writing reveals deficiencies of a serious nature, the supervisor signing off on the report shall document an *IR Memorialization* entry in Blue Team. The *IR Memorialization* entry shall be documented through Blue Team by selecting the proper reason that the IR is memorialized in the allegations tab. The *IR Memorialization* entry shall be sent to the EIU through the chain of command, using Blue Team.

Supervisors shall document an *IR Memorialization* entry if an employee's report contains conclusory or boilerplate language, contains inconsistent information, lacks support for the action, has other indicia that the information in the report or form is not authentic or correct, contains no probable cause for arrest, contains no reasonable suspicion, is missing elements of the crime, or is bias-based profiling.

a.   Supervisors shall document an *IR Memorialization* entry if an employee's report contains conclusory or boilerplate language. These deficiencies are related, because the use of conclusory language can lead to boilerplate language. For example, an employee may write "I noticed the subject was drunk." This language is conclusory, because it is not supported by fact, and when repeated across reports, the language is also boilerplate.

(1)   Based on the unique facts of the incident, the report could have avoided conclusory language by stating descriptive, explanatory language such as: "I noticed the subject had a strong odor of an alcoholic beverage emitting from the subjects person, the subject's eyes were bloodshot and watery, the subject staggered as they walked toward me and the subject's speech was slurred as they spoke. It appeared the subject was under the influence of alcohol."

(2)   Although this new language is not conclusory, it can become boilerplate through repeated use in reports. This problem often arises through use of a template. Supervisors should, therefore, look for repeated language even if it is not conclusory.

16

**Policy GB-2, *Command Responsibility***                    **Effective Date: 06-28-19**

b.    Supervisors shall document an *IR Memorialization* entry if any investigatory stop or detention appears unsupported by reasonable suspicion or is otherwise in violation of Office Policy, or if any stop or detention indicates a need for corrective action or review of Office policy or training. Supervisors shall take appropriate action to address all violations or deficiencies in investigatory stops or detentions, which may include non-disciplinary corrective action, as specified in Office Policy GH-5, *Early Identification System* or when referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations*. If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

c.    Supervisors shall document an *IR Memorialization* entry if any arrests appear unsupported by probable cause, are otherwise in violation of Office policy, or indicate a need for corrective action or review of Office policy, strategy, tactics, or training. Supervisors shall take appropriate action to address violations or deficiencies in making arrests, which may include notification to prosecuting authorities, non-disciplinary corrective action, as specified in Office Policy GH-5, *Early Identification System* or when referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations*. If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

E.    Review of Data Collection and Traffic Stops:

1.    As specified in Office Policy EB-2, *Traffic Stop Data Collection,* supervisors shall conduct monthly reviews and have monthly discussions with the deputies under their command regarding each traffic stop and collected data generated during the review period. The monthly review shall be documented in Blue Team as specified in Office Policy GH-5, *Early Identification System.*

a.    Supervisors shall utilize the TraCS database and the information from the Supervisor Responsibilities Effective Law Enforcement (SRELE) training, and the EIS training each supervisor is provided to review traffic stop and collected data, to determine whether there are warning signs or indicia of possible racial profiling, unlawful detentions and arrests, or improper enforcement of immigration-related laws. Supervisors shall take appropriate action to address all violations or deficiencies, which may include non-disciplinary corrective action, as specified in Office GH-5, *Early Identification System,* or may require referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations.* If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures*

b.    Supervisors shall acknowledge the interactions through the use of the "Discussed with Deputy" indicator function within the TraCS Form Manager for each individual stop and associated forms discussed with their deputy.

c    This process shall be completed for each individual stop and collected data reviewed. Supervisors are prohibited from selecting multiple traffic stops and applying the "Discussed with Deputy" indicator function at one time. The reviews will then be input into Blue Team from TraCS.

17

**Policy GB-2,** *Command Responsibility*                                          **Effective Date: 06-28-19**

2.  If reviews of the traffic stop data indicate that a deputy or unit may be engaging in racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, or that there may be systemic problems regarding any of the foregoing, supervisors shall take reasonable steps to investigate and monitor the situation. Interventions shall be documented in the EIS, as specified in Office Policy GH-5, *Early Identification System* or when referring the incident for administrative or criminal investigation, as specified in Office Policy GH-2, *Internal Investigations.* If a sustained policy violation is determined following the administrative investigation, the matter shall be managed as specified in Office Policy GC-17, *Employee Disciplinary Procedures.*

3.  If there is a systemic problem of racial profiling, unlawful searches or seizures, or unlawful immigration enforcement, the Office shall take appropriate steps at the agency level, in addition to initiating corrective and/or disciplinary measures against the supervisor or command staff. All actions taken shall be documented in writing.

F.  EIS Data Review: Supervisors shall utilize the EIS for data analysis, pattern identification, intervention, and documentation. Additional required usage includes, but is not limited to:

1.  Comparative data analysis, including peer group analysis, to identify patterns of activity by individual deputies or groups of deputies, including consideration of the nature of the deputy's assignment, and not solely on the number or percentages of the incidents in any category of information recorded in the EIS.

2.  Identification of warning signs or other indicia of possible misconduct. Supervisors who identify warning signs or other indicia shall, unless exigent circumstances exist, immediately notify their chain of command, or in no circumstances more than 72 hours, to determine how to properly address the concern.

    (a)  Supervisors may also initiate the EIS alert process on subordinate personnel prior to the employee meeting or exceeding an established threshold to address employee performance and/or conduct.

        (1)  To initiate the process, the supervisor shall utilize the Incident Type of Discretionary Alert in Blue Team.

        (2)  The entry shall include a written justification for the alert and be submitted through the supervisor's chain of command to the EIU.

        (3)  If approved by the chain of command, the EIS will generate an alert and the alert process will commence.

    (b)  Warning signs or other indicia include but are not limited to:

        (1)  Failure to follow any of the documentation requirements mandated by Office policy;

        (2)  Racial and ethnic disparities in the deputy's traffic stop patterns, including disparities or increases in stops for minor traffic violations, arrests following a traffic stop, and immigration status inquiries that cannot be explained by statistical modeling of race neutral factors or characteristics of the deputy's specific duties, or racial or ethnic disparities in traffic stop patterns when compared with data of a deputy's peers;

18

MCC 000034

**Policy GB-2,** *Command Responsibility*                                           **Effective Date: 06-28-19**

        (3)    Evidence of extended traffic stops or increased inquires and/or investigations involving driver or passengers belonging to a protected category, as specified in Office Policy CP-3, *Workplace Professionalism Discrimination and Harassment*;

        (4)    A citation rate for traffic stops that is an outlier when compared to data of a deputy's peers, or a low rate of seizure of contraband or arrests following searches and investigations;

        (5)    Complaints by members of the public or other employees; and/or

        (6)    Other indications of racial or ethnic bias in the exercise of official duties.

    3.    Supervisors and commanders shall conduct two reviews per month of each sworn, and one per month of each non-sworn subordinates' EIS information for the purpose of identifying and responding to any conduct patterns or concerns including, but not limited to racial profiling, improper immigration enforcement, investigatory stop violations, detentions unsupported by reasonable suspicion or otherwise in violation of policy. This review shall be documented within the Blue Team Supervisor Notes.

    4.    Supervisors and commanders shall initiate, implement, and assess the effectiveness of interventions for deputies, supervisors, and units, based on assessments of the information contained in the EIS.

    5.    Supervisors and commanders shall review EIS records within 14 business days, including disciplinary history, of all employees upon transfer to their supervision or command. This review shall be documented within the Blue Team Supervisor Notes.

G.    Supervisors shall review the Patrol Activity Log (PAL) through Praxis for all patrol shifts worked by their assigned subordinates. Supervisors shall check PAL for accuracy and completeness. This review shall ensure subordinates are accurately accounting for their activities during the shift by properly utilizing Out Codes while not assigned to an event. Supervisors should also examine the PAL to confirm correct Disposition Codes are entered when closing events.

    1.    This review shall occur no later than seven calendar days after the completion of the shift under review.

    2.    At the completion of the review, the reviewing supervisor must select "Approved, No Issues Found" or "Issues Found."

        a.    If the supervisor selects "Issues Found," the supervisor shall add a comment in the provided text box. Supervisors should be aware that any information captured in this box will be visible to all Office personnel. Information of a confidential nature, including possible issues which may result in an administrative investigation, should not be entered in this box.

        b.    If the supervisor needs to document issues regarding a confidential matter, or issues which may result in an administrative investigation, the supervisor shall make the appropriate entry into Blue Team.

    3.    Once the initial supervisor review is completed, Praxis will not allow further entry directly into the PAL. Any further comments regarding the PAL shall be entered into Blue Team. The completed record of the review and/or comment for each subordinate is uploaded automatically through the Praxis into the EIS for tracking purposes.

19

**Policy GB-2, *Command Responsibility***                    **Effective Date: 06-28-19**

    4    When a deputy works a shift outside of their regularly assigned squad or district, or works a special assignment such as a DUI Task Force, special event, or an off-duty job that would require a PAL; it will be the responsibility of the shift supervisor who is managing the deputy on an irregular shift or special assignment to review the deputy's PAL for accuracy and completeness.

        a.    The shift Supervisor who is supervising the employee for this specialized detail shall also review any associated daily paperwork generated while working a specialized detail or shift to incorporate all TraCS documents and IR's completed during that shift.

        b.    The responsibility for reviewing the Monthly Body Worn Camera Video and the Monthly Discussion of Traffic Data will fall under the responsibility of the regularly assigned supervisor for the deputy.

        c.    Since the shift supervisor in these circumstances will not be completing the deputy's Employee Performance Appraisal, the shift supervisor should document deficient performance or performance worthy of commendation in Blue Team, so that the information is available to the deputy's regularly assigned supervisor.

        d.    Failure by a shift supervisor to review the PAL of a subordinate deputy, or a deputy they are managing on an irregular shift or special assignment for accuracy and completeness, shall result in a Blue Team entry; and may result in discipline, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

H.    Blue Team Supervisor Notes: Supervisors shall document a minimum of two monthly Blue Team Supervisor Notes regarding performance for each deputy under their command. Blue Team shall be used to report the monthly review to Court Implementation Division (CID), as outlined in Office Policy EB-2, *Traffic Stop Data Collection*.

I.    Body-Worn Camera Recording Reviews: On a monthly basis, supervisors shall conduct two random reviews of traffic stop video footage for each of their subordinates' body-worn camera recordings. Additionally, supervisors must review a subordinate's body-worn camera recordings in relation to a complaint, an investigation, a pursuit, or critical incident. A review of videos in relation to a complaint, an investigation, a pursuit, or critical incident, shall not be considered as the monthly review of a randomized video. The monthly reviews shall be documented in Blue Team Supervisor Notes. The supervisor shall assess the following:

    1.    The deputy's performance and training needs;

    2.    Policy compliance;

    3.    Consistency between written reports and body-worn camera recordings; and

    4.    Whether the camera was functioning properly, and its use was consistent with Office Policy GJ-35, *Body-Worn Cameras*.

    5.    The methodology and supervisory checklist for consistently reviewing Body-Worn Camera recordings can be found at the following shared drive location; U:\BIO\Forms.

J.    Specialized Units Enforcing Immigration-Related Laws: In the event there is a specialized unit enforcing immigration-related laws, first-line supervisors in such a specialized unit shall directly supervise the law enforcement activities of new members of the unit for one week by accompanying

20

**Policy GB-2,** *Command Responsibility*                    **Effective Date: 06-28-19**

them in the field and shall directly supervise the in-the-field activities of all members of the unit for at least two weeks every year.

14.  **Sworn Commander Responsibility:** Sworn commanders shall hold all supervisors directly accountable for the quality and effectiveness of the supervision they provide, including the performance evaluations prepared as specified in Office Policy GC-4, *Employee Performance Appraisals*, and whether they identified and responded to employee misconduct, as specified in Office Policies GC-17, *Employee Disciplinary Procedures,* GH-5, *Early Identification System,* and GH-2, *Internal Investigations*. Sworn commanders shall document the findings of the following actions in Blue Team.

    A.  Commanders shall review, in writing, all supervisory reviews related to arrests that are unsupported by probable cause, are otherwise in violation of Office policy, or that indicate a need for corrective action or review of agency policy, strategy, tactics, or training. The commander's review shall be completed within 14 business days of receiving the document reporting the event.

    B.  Commanders shall evaluate the corrective action and recommendations in the supervisor's written report and ensure that all appropriate corrective action is taken.

    C.  Commanders shall take appropriate corrective or disciplinary action against first-line supervisors who fail to conduct adequate and consistent quality reviews of subordinates, as specified in Office Policies GH-5, *Early Identification System* and GC-4, *Employee Performance Appraisals*.

    D.  Commanders shall periodically review the EIS reports and information, and initiate, implement or assess the effectiveness of interventions for individual deputies, supervisors and units based on the review.

    E.  Commanders shall conduct a review of EIS records within 14 business days, including disciplinary history, of all employees upon their transfer to their supervision or command. This review shall be documented within the Blue Team Supervisor Notes.

    F.  Commanders, or their designees, shall complete monthly compliance reviews of mandatory training, to include CORT and classroom training, and required Office Policy acknowledgments, through TheHUB, for all employees under their command. To review completion compliance, commanders are provided purview access through the TheHUB Dashboard for assessing each of their assigned employee's compliance progress. Commanders shall access the Reports menu dropdown to conduct these reviews. In the event an employee has not completed mandatory training or required Office Policy acknowledgments as specified, the commander shall take appropriate action.

➢ 15.  **Supervisor Employee Performance Appraisal (EPA) Responsibilities:** As specified in Office Policy GC-4, *Employee Performance Appraisals*, immediate supervisors are responsible for evaluating the competence of each assigned employee. Supervisors should be fair, impartial, and accurate in evaluating the performance of their employees. Supervisors who fail to conduct reviews of adequate and consistent quality are subject to appropriate corrective or disciplinary action.

16.  **Office Responsibility:** The Office shall hold all commanders and supervisors directly accountable for the quality and effectiveness of the supervision they provide including the performance evaluations prepared, as specified in Office Policy GC-4, *Employee Performance Appraisals*, and whether they identified and responded to employee misconduct, as specified in Office Policies GC-17, *Employee Disciplinary Procedures,* and GH-2, *Internal Investigations*.

17.  **Command Responsibility Regarding Public Access to the Complaint Process:** The Office shall ensure all commanders and supervisors over patrol areas, and areas of public access, adequately provide members of the public with information and forms regarding the complaint filing process.

21

MCC 000037

**Policy GB-2,** *Command Responsibility*                    **Effective Date: 06-28-19**

A.   *Comment and Complaint Forms*: The *Comment and Complaint Forms*, in both English and Spanish, shall be made widely available and maintained at locations around Maricopa County including, but not limited to, the websites of the Maricopa County Sheriff's Office and Maricopa County government. Permanent placards in English and Spanish shall be posted and maintained in locations clearly visible, at all hours, to members of the public at the reception desk at MCSO headquarters and at all District Stations. The placards shall clearly and simply describe the public complaint process and shall include relevant contact information, including telephone numbers, email addresses, mailing addresses, and internet sites. The Community Outreach Division shall be responsible for ensuring that *Comment and Complaint Forms* are available at all times, as specified in Office Policy GJ-24, *Community Relations and Youth Programs*.

   1.   *Comment and Complaint Forms* shall not contain any language that could reasonably be construed as discouraging the filing of a complaint, such as warnings about the potential criminal consequences for filing false complaints.

   2.   The Office shall make reasonable efforts to ensure that complainants who speak other languages (including sign language) and have limited English proficiency can file complaints in their preferred language. The fact that a complainant does not speak, read, or writes in English, or is deaf or hard of hearing, will not be grounds to decline to accept a complaint.

   3.   All Office vehicles shall have a supply of *Comment and Complaint Forms* for distribution to any members of the public that request them. Deputies shall provide information about how to file a complaint, their name and badge number, and the contact information, including telephone number and e-mail address, of the supervisor.

      a    When notified by an employee, a member of the public, or through a *Comment and Complaint Form*, the supervisor shall immediately document the notification and ensure that PSB has been advised through Blue Team in accordance with Office Policy GH-2, *Internal Investigations*.

      b.   Employees receiving complaints shall ensure the maintenance of confidentiality. Employees shall not divulge the name of any person filing a complaint or provide complaint information to anyone other than the supervisor and/or PSB employees authorized by Office command personnel to properly process and investigate allegations of misconduct.

B.   Placards: The office shall post and maintain in locations clearly visible to members of the public, at all hours, permanent placards clearly and simply describing the civilian complaint process. Locations of the placards shall include the reception desk at the Office Headquarters, Districts, and other public locations. The placards shall include relevant contact information, telephone numbers, email addresses, mailing addresses, and Internet sites. The placards shall be in both English and Spanish. The Community Outreach Division shall be responsible for ensuring that *Comment and Complaint Forms* are available at all times.

18.   **Misconduct Investigative Action Responsibilities:** The Office shall ensure all allegations of employee misconduct, whether internally discovered or based on a complaint from a member of the public, are fully, fairly, and efficiently investigated. All investigative findings must be supported by the appropriate standard of proof and documented in writing. All employees who commit misconduct shall be held accountable, as specified in Office Policy GC-17, *Employee Disciplinary Procedures*.

   A.   The on-duty supervisor or commander shall immediately document in Blue Team the reported act of misconduct. This information shall be automatically routed to the PSB.

22

**Policy GB-2, *Command Responsibility***                    **Effective Date: 06-28-19**

B.    All complaints and allegations of misconduct, including third-party and anonymous complaints and allegations, shall be investigated. All employees and members of the public shall be permitted to report allegations of misconduct anonymously.

C.    If at any point during a misconduct investigation an investigating supervisor outside of the PSB has information indicating that the principal may have committed misconduct of a serious or criminal nature, the investigator shall immediately notify the PSB, which shall take over the investigation.

D.    If, after an investigation conducted outside of the PSB, an employee's actions are found to violate policy, the investigating supervisor's division commander shall direct and ensure the appropriate discipline and/or corrective action is administered.

E.    Enforcement Division Commanders of supervisors assigned administrative investigation conducted outside of the PSB, shall conduct reviews of those misconduct investigations, as specified in Office Policy GB-2, *Internal Investigations*.

F.    If, after an investigation conducted by the PSB, an employee's actions are found to violate policy, the PSB Commander shall direct and ensure appropriate discipline and/or corrective action. Where the incident indicates policy, training, tactical, or equipment concerns, the PSB supervisor shall ensure that necessary training is delivered and that policy, tactical, or equipment concerns are resolved. A memorandum of concern detailing the policy, training, tactical or equipment concerns, and any proposed recommendations, shall be authored and forwarded to the appropriate bureau chief and division commander for review and action.

G.    If the PSB Commander or the division commander in which the internal affairs investigation was conducted determines that the findings of the investigation report are not supported by the appropriate standard of proof, the commander shall return the investigation to the investigator for correction or additional investigative effort, shall document the inadequacies, and shall include this documentation as an addendum to the original investigation. The investigator's supervisor shall take appropriate action to address the inadequately supported determination and any investigative deficiencies that led to it. The commander shall be responsible for the accuracy and completeness of investigation reports prepared by internal affairs investigators under their command.

H.    Where an internal affairs investigator conducts a deficient misconduct investigation, the investigator shall receive the appropriate corrective and/or disciplinary action. An internal affairs investigator's failure to improve the quality of their investigations after corrective and/or disciplinary action is taken shall be grounds for demotion and/or removal from a supervisory position or the PSB.

I.    The quality of investigators' internal affairs investigations and supervisor reviews of investigations shall be taken into account in their EPA.

23

MCC 000039

# EXHIBIT 59



# MARICOPA COUNTY INTERNAL POLICY

| Policy Title: | Policy Number: | HR2472 |
|---|---|---|
| **HOURS WORKED FOR EXEMPT EMPLOYEES** | Current Adoption Date: | 08-21-2019 |
| | Current Implementation Date: | 08-21-2019 |
| Approved by: **BOARD OF SUPERVISORS** | Board Agenda Number: | C-49-11-054-6-01 |
| | Original Adoption Date: | 04/27/2011 |

## I.  PURPOSE

To outline the requirements for employees who are exempt from or not covered by the overtime provisions of the Fair Labor Standards Act (FLSA) to account for and record the hours for which they are paid.

## II.  AUTHORITY

This Policy is authorized by the Board of Supervisors pursuant to A.R.S. § 11-251.

## III.  APPLICATION

This Policy applies to all employees who are exempt from or not covered by the provisions of the FLSA in Maricopa County appointed departments as well as the Flood Control District of Maricopa County and the Maricopa County Library District (Special Districts). The Board of Supervisors is authorized to jointly adopt policies applying to the Special Districts under the Intergovernmental Agreement, C-06-18-393-6-00, approved on April 11, 2018. This Policy does not apply to exempt employees who do not earn paid leave or who are involved in a furlough.

This Policy also applies to County elected offices unless the elected official has implemented a similar policy specific to his or her office.

## IV.  DEFINITIONS

**A.  Exempt Employee:** An employee who is exempt from overtime pay based on duties performed and compensation as established by the FLSA.

**B.  Fair Labor Standards Act (FLSA):** The federal law that establishes minimum wage, overtime pay eligibility, recordkeeping, and child labor standards.

**C.  Hours Worked:** All time during which employees are permitted to work that does not include paid or unpaid leave (e.g., vacation time, sick leave, bereavement leave, civic duty leave, witness leave, crime victim leave, military leave, administrative leave, holiday, floating personal day, and leaves without pay).

**D.  Leave:** Paid or unpaid leave as defined in HR2415 *Employee Leave* (e.g., vacation, sick leave, bereavement, civic duty leave, witness leave, crime victim leave, military leave, administrative leave, holiday, floating personal day, and leaves without pay**).**

**E.  Not Covered Employee:** An employee who is not covered by the FLSA (e.g., elected officials' personal staff, policy making appointees, and legal advisors). For purposes of this Policy, this has no tie to those not covered by a merit system.

MCC 000620

| Policy Title:<br>**HOURS WORKED FOR EXEMPT EMPLOYEES** | Policy Number: | HR2472 |
| | Current Adoption Date: | 08-21-2019 |

## V. <u>POLICY</u>

### A. No Overtime Compensation for Exempt and Not Covered Employees

Exempt and not covered employees may frequently work beyond their normal work hours or 40 hours per week and shall not receive additional pay for those hours.

### B. Accountability Requirements for Exempt and Not Covered Employees

Maricopa County is a public employer who provides paid leave and has a compensation system based on principles of public accountability. Exempt employees and those not covered by the FLSA who are eligible for paid leave will not be paid for hours they do not work or use paid leave. All exempt and not covered employees must account for and record in the County's timekeeping system at least the hours for which they are paid by either working or using leave.

In general, full-time exempt and not covered employees are expected to work or account for at least 40 hours per week, or for those on an alternative work schedule, their normal scheduled hours for that week. An exception may be granted by an Appointing Authority when an employee works an excessive amount of time over his or her normal work hours in which the employee's accountable hours may be managed over the duration of the pay period. This is neither a right nor a guarantee for the employee.

Exempt, not covered employees, or their supervisors who misrepresent or fail to account for and record the hours for which the employees are paid may be subject to disciplinary action, up to and including termination.

### C. Reduction in Pay

If exempt or not covered employees who are eligible for paid leave do not account for and record at least the hours for which they are paid by either working or using leave in accordance with HR2415 *Employee Leave*, their pay may be reduced by the number of hours they failed to work or use leave when the failure to use leave to cover absences is because the employees:

1. Exhaust all paid leave

2. Fail to seek approval to use leave according to departmental policy

3. Seek approval for leave and are denied

### D. Managing Hours Worked

Appointing Authorities and supervisors are responsible for establishing and communicating work schedules, and approving any changes to them in advance.

### E. Recordable Work Time

Generally, activities that are compensable work time when performed by non-exempt employees also constitute as work time for exempt and not covered employees, and should be recorded as hours worked. Conversely, activities that are non-compensable work time when performed by non-exempt employees generally also constitute as non-compensable work for exempt and not covered employees, and should not be recorded as hours worked. See HR2471 *Hours Worked and Overtime*.

MCC 000621

| Policy Title:<br>**HOURS WORKED FOR EXEMPT EMPLOYEES** | Policy Number: | HR2472 |
|---|---|---|
| | Current Adoption Date: | 08-21-2019 |

### F.  Eligibility for FLSA Exemption

Eligibility for FLSA exempt status is primarily based on the compensation method, duties, and type of responsibilities for each individual position/employee. Human Resources determines the exempt status for each position/employee, according to the provisions outlined in the FLSA. Departments are responsible for monitoring the duties of each employee and must notify Human Resources when an employee's duties, responsibilities or compensation change. Human Resources will reevaluate the exemption from overtime status of any employee/position after a change, and, as warranted, will revise or maintain such status. Departments or employees who have questions, or feel the overtime eligibility of an employee/position is incorrect, should contact Human Resources immediately.

### G.  Record Keeping

In addition to the records required for payroll purposes, departments must maintain for three (3) years a record of each exempt or not covered employee's regular work schedule in the Human Resources Information System of record.

### H.  Concerns about Reductions in Pay

Employees who believe an improper deduction or error to their salary occurred must immediately report it to their human resources liaison or Human Resources. Reports of improper deductions will be promptly investigated and resolved if an error occurred. If an administrative error occurs and an employee is overcompensated, the employee shall work with Central Payroll on a plan to reimburse the overpayment.

Revision History

| Version | Revision Date | Description of Revision |
|---|---|---|
| 1 | 04-27-2011 | Initial version *(C-49-11-054-6-00)* |
| 2 | 08-21-2019 | Renumbered the policy and updated definitions, policy format, and language to remove outdated wording *(C-49-11-054-6-01)* |

MCC 000622

# EXHIBIT 60



| MARICOPA COUNTY SHERIFF'S OFFICE POLICY AND PROCEDURES | | |
|---|---|---|
| **Subject** **USE, ASSIGNMENT, AND OPERATION OF VEHICLES** | **Policy Number** **GE-4** | |
| | **Effective Date** **02-22-23** | |

| **Related Information** | **Supersedes** |
|---|---|
| ARS 28-624; 28-914, 33-1809, 36-601.01 Maricopa County Policy A2310 CP-4, *Emergency and Pursuit Driving* EA-2, *Patrol Vehicles* EA-18, *Law Enforcement Extra-Duty and Off-Duty Employment* EB-1, *Traffic Enforcement, Violator Contacts, and Citation Issuance* EB-7, *Traffic Control and Services* GC-17, *Employees Disciplinary Procedures* GD-19, *Injury or Death of an Employee or Volunteer* GD-21, *Business Travel and Training Expenses* GD-4, *Use of Tobacco Products* GE-2, *County Purchase Cards* GH-5, *Early Identification System* GJ-9, *Restraint and Transportation of Prisoners and Inmates* | GE-4 (04-06-22) |

**PURPOSE**

The purpose of this Office Policy is to establish guidelines and procedures regarding the use, assignment, operation, maintenance, and inspection of Office vehicles, and the review of Office vehicle accidents.

**POLICY**

It is the policy of the Office to ensure that all vehicles are managed in an efficient, safe, and cost-effective manner. All accidents involving Office vehicles are reviewed by the bureau chief in charge of the respective division under their command, in order to determine cause and to institute corrective and preventive actions where possible.

Although this Office Policy refers to employees throughout, this Office Policy also applies with equal force to all volunteers. Volunteers include, but are not limited to, reserve deputies and posse members.

**DEFINITIONS**

*Accident:* Any collision involving an Office vehicle with another vehicle, object, or person resulting in property damage or personal injury.

*Blue Team:* The Early Identification System (EIS) application that allows employees and supervisors to record information in a database regarding incidents, performance, and conduct. The information from Blue Team is transferred to the IA Pro Early Identification case management system.

*Early Identification System* **(EIS)**: A system of electronic databases that captures and stores threshold events to help support and improve employee performance through early intervention and/or to identify problematic operating procedures, improving employee performance, identifying detrimental behavior, recognizing outstanding accomplishments, and to improve the Office's supervisory response. The computerized relational database shall collect, maintain, integrate, and retrieve information gathered in order to highlight tendencies in performance, complaints, and other activities. The database allows the Office to document appropriate identifying information for

involved employees, (and members of the public when applicable), and the actions taken to address the tendencies identified.  Blue Team, IAPro, and EIPro are applications of the EIS.

*EI Dashboard:* A Blue Team database tool that provides a visual overview of an employee's status in the EIS and is used to monitor alerts within the system. The EI Dashboard indicates the number of identified incidents for tracked threshold events. The color yellow indicates the employee is one incident away from reaching a threshold. The color red indicates the employee has reached or surpassed a threshold.

*Emergency Driving:* A deputy responding to life-threatening circumstances, a violent or potentially violent crime or other felony in progress, or engaging in pursuit driving, while operating an authorized emergency vehicle with activated emergency equipment. While responding to emergencies, deputies are granted statutory exemptions from the observance of speed limits and other direction, control, and parking regulations, so long as they do not unduly endanger life or property. **A deputy is never relieved from the duty to drive with due regard for the safety of all persons.**

*Non-Preventable Accident:* Accidents that occur while proceeding in the lane of traffic at a safe and legal speed, while waiting to make a turn from a proper lane, while stopped in traffic due to existing conditions or in compliance with a traffic sign, signal, or officer, or struck while legally and properly parked.

*Office Vehicle:* Any vehicle owned, leased, or purchased by Maricopa County for Office use, to include vehicles recovered under the Racketeering Influenced and Corrupt Organizations (RICO) Act.

*Out of Service Vehicle:* Any Office vehicle, which by reason of its mechanical condition can no longer be returned to service.

*Preventable Accident:* An accident in which the driver failed to exercise every reasonable precaution to prevent the accident. This is irrespective of whether or not there is property damage or personal injury, the extent of the loss of injury, to whom it occurred, and the location of the accident.

*Pursuit Driving:* An active attempt by a deputy operating an authorized emergency vehicle, with activated emergency equipment, to apprehend a fleeing vehicle and its occupants who are aware of the attempt, resist apprehension through failure to stop, and employ evasive driving tactics.

*Special-Purpose Vehicles:* Nonstandard vehicles assigned to contend with weather, terrain, sound restrictions, or special operational needs. This includes vehicles such as mobile command posts, tactical operations vans, bomb disposal vehicles, all-terrain vehicles (ATVs), motorcycles, boats, aircraft, and prisoner transport vehicles.

*Volunteer:* A person who performs hours of service for civic, charitable, or humanitarian reasons, without promise, expectation, or receipt of compensation for services rendered. An employee may not volunteer to perform the same, similar, or related duties for the Office that the employee is normally paid to perform.

## PROCEDURES

1.  **Responsibilities of Managing the Fleet:** To ensure the efficient operation and management of Office vehicles, the Maricopa County Sheriff's Office (MCSO) Fleet Management Division, subject to consultation with executive command staff, shall have the responsibility and authority to initiate the purchase of all Office vehicles. The MCSO Fleet Management Division shall also be responsible for vehicle assignment, reassignment, repair, and replacement.

    A.    All vehicles shall be managed with the primary goal of maintaining public safety and performing law enforcement functions.

2

B.    All division commanders having a reasonable expectation of being called out during their normal off-duty hours shall be assigned a vehicle. Commanders shall not use assigned vehicles during a prescheduled absence, unless the commander is to return to an on-call status, prior to returning to their normal on-duty scheduled hours. Approval for use of an assigned vehicle shall be at the discretion of the respective bureau chief, with final approval by the Sheriff or designee.

C.    All vehicles shall normally remain within the bureau to which they were assigned until reassigned by the MCSO Fleet Management Division. When the assigned operator is transferred to another bureau, they may not take the vehicle with them, unless approved by the Sheriff or designee.

D.    Bureau chiefs are responsible for ensuring that their fleet is used efficiently. The MCSO Fleet Management Division shall provide each bureau with quarterly reports, documented on the Fleet Management Data Report located in the Office's shared drive, concerning the fleet usage to assist in making efficient use of the assigned vehicles.

E.    At the end of the vehicle's second year of service life, those which have exceptionally high or low mileage shall be reassigned to equalize the mileage among all vehicles. When it becomes advisable to transfer vehicles between bureaus for the good of the Office, the respective bureau chiefs shall be consulted before any transfers take place.

2.    **Commander and Division Responsibilities for Vehicle and Equipment Inspection:**

A.    The division commander or designee shall ensure that all vehicles assigned to their division are being inspected quarterly, and that the inspections are documented in Blue Team, as a Line Level Inspection. A quarterly inspection should be completed during January, April, July, and October of each calendar year. The division commander or designee shall be responsible for ensuring that vehicle fluids are maintained at proper levels, and that scheduled preventive maintenance and service is completed in a timely manner, as specified in Office Policy EA-2, *Patrol Vehicles*.

B.    Each division shall maintain completed quarterly inspection reports for a period of two years, unless the vehicle has been taken out of service or reassigned. Out-of-service vehicle records may be destroyed; reassigned vehicle records shall be forwarded to the division where the vehicle is currently assigned.

C.    Inspections of patrol vehicles shall be performed and documented, as specified in Office Policy EA-2, *Patrol Vehicles*.

D.    All Office vehicles shall have a supply of the current version of the *Comment and Complaint Forms*, in both English and Spanish, for distribution to any member of the public, upon request.

3.    **Special-Purpose Vehicles:** Each division to which special-purpose vehicles are assigned shall include a section in their Operations Manual governing the deployment, use, and maintenance of each vehicle type. The following areas will be covered in the section on special-purpose vehicles:

A.    A statement of the objectives of their operation or usage;

B.    Instructions, conditions, and limitations of usage;

C.    Authorization for use in various situations;

D.    Qualifications and training for employees assigned to operate the vehicle;

MCC 000042

**Policy GE-4,** *Use, Assignment, and Operation of Vehicles*                    **Effective Date: 02-22-23**

E.   Designation of assignments where employees are responsible for the condition and maintenance of vehicles to include, but not be limited to, ensuring that the vehicle's fluids are maintained at proper levels and that scheduled preventive maintenance or service is completed in a timely manner;

F.   A listing of the equipment, if any, to be kept in, on, or with, the vehicle; and

G.   A listing of assignments where employees are authorized to operate the vehicle or use the associated equipment.

4.   **Assigned Vehicles:** Assigned vehicles shall be restricted to compensated, full-time employees of the Office, except when otherwise authorized by the Sheriff or designee.

A.   The assignment of assigned vehicles shall not be applied on a convenience basis but restricted to those individuals having a reasonable expectation of being called out during their normal off-duty hours, or have a reasonable expectation of reporting to different duty locations. The request for an assigned vehicle shall be submitted through the chain of command, and if approved by the bureau chief, shall be forwarded to the Sheriff or designee for final approval.

B.   Employees who are assigned a vehicle will fall into one of three tiers:

1.   Assigned Vehicle Tier 1: Overnight vehicle privileges for residence parking will be authorized for employees who have a reasonable expectation of being called out during their normal off-duty hours where a timely response is critical.

2.   Assigned Vehicle Tier 2: Overnight vehicle privileges for off-site parking will be authorized for employees who are assigned a vehicle as part of their duties who don't have a reasonable expectation of being called out during normal off-duty hours but have a reasonable expectation of reporting to different duty locations. Off-site parking locations shall be approved by the bureau chief.

3.   Assigned Vehicle Tier 3: Employees who are assigned vehicles but do not meet the criteria of Tier 1 or Tier 2 shall park their assigned vehicles at their assigned duty location.

4.   Any deviation from the assigned vehicle tiers shall be reviewed by all three executive chiefs. Once reviewed, the executive chiefs will make a recommendation to the Sheriff or designee for final approval.

C.   Employees who are assigned a vehicle shall be responsible for the upkeep of the vehicle, for ensuring that vehicle fluids are maintained at proper levels, and that scheduled preventive maintenance or service is completed in a timely manner.

D.   Vehicles authorized for residence parking shall be parked off the street whenever possible and secured in a manner which minimizes the possibility of damage, vandalism, or theft. Office vehicles shall not be parked in a manner which creates a hazard. ARS 33-1809 allows law enforcement vehicles to be parked on a street or driveway if the vehicle is required to be available for emergency deployment. Employees operating Office vehicles are responsible for notifying any responsible party such as, a Homeowners Association (HOA), regarding the status of their Office vehicle.

E.   Assigned vehicles shall be used for official business only, except when reasonable expectations of being called out, and/or on-call status exist.

4

**Policy GE-4,** *Use, Assignment, and Operation of Vehicles*                    **Effective Date: 02-22-23**

F.   Office vehicles used by employees in off-duty law-enforcement employment, including transportation to and from the off-duty law-enforcement employment, shall follow procedures as specified in Office Policy EA-18, *Law Enforcement Extra-Duty and Off-duty Employment*.

G.   Employees, with prior approval from a bureau chief, may use Office vehicles for vehicle escort services, as specified in Office Policy EB-7, *Traffic Control and Services*. These services include the following:

   1   Special events;

   2.   Members of the public requests;

   3.   Emergency vehicles;

   4.   Oversized vehicles; or

   5.   Funeral escort services.

5.   **Operator's Responsibilities:**

A.   All employees shall operate Office vehicles in a careful and prudent manner, obey all applicable State and Federal traffic laws, and comply with all Office rules pertaining to such operation. Employees operating emergency vehicles shall comply with the requirements of ARS 28-624. The safety of the public and all vehicle occupants shall be of paramount concern to include, but not be limited to, subjects detained for incarceration, as specified in Office Policy GJ-9, *Restraint and Transportation of Prisoners and Inmates*.

B.   Employees are prohibited from using cellular phones, unless a hands-free device is used to operate the cellular phone or other mobile electronic device (e.g., smartphone, tablet, or laptop) while driving an Office vehicle/equipment or while driving a private vehicle on official business. This prohibition includes, but is not limited to, texting, emailing, reviewing documents, and placing phone calls. Employees operating an authorized emergency vehicle or law enforcement vehicle who use a portable wireless communication device while acting in an official capacity, are exempt from this prohibition, as specified in ARS 28-914; however, employees shall still use due regard, and only when safe to do so.

C.   All assigned Office Mobile Data Computers (MDCs) have Global Positioning System (GPS) tracking capabilities. GPS tracking capabilities provide real time and historical information to Communication Division personnel to ensure employees safety, decrease Office liability, and provide for the efficient deployment of Office resources.

   1.   The GPS tracking feature on the MDC shall **not** be disabled by an employee unless prior approval has been obtained from their bureau chief for reasons to include, but not limited to, a specific task or investigative action.

   2.   Upon completion of the approved specific task or investigative action for the deactivation, the employee shall immediately reactivate the GPS feature.

D.   Smoking, smokeless tobacco, and vapors/e-cigarettes are prohibited in all Office vehicles and equipment, and in any private vehicle used on official business if more than one person is in the vehicle, as specified in Office Policy GD-4, *Use of Tobacco Products*.

MCC 000044

**Policy GE-4,** *Use, Assignment, and Operation of Vehicles*                    **Effective Date: 02-22-23**

E.  Employees shall not allow their assigned vehicles to be operated by non-Office personnel, unless the vehicle is being serviced. Office vehicles shall be used for official business only.

F.  All employees who operate an Office vehicle shall have in their possession a valid Arizona Driver's License for the type of vehicle operated. Operators of specialty vehicles, including, but not limited to helicopters, shall possess, and maintain the specialty certification needed to operate that type of vehicle.

G.  When employees drive any vehicle, on or off-duty, requiring additional provisions to a regular driver's license, they shall possess the required class endorsement.

H.  All employees who have their driving privileges either suspended or revoked by the State of Arizona shall promptly inform their supervisor and generate an entry through Blue Team of such suspension or revocation.

I.  Employees authorized to operate an Office vehicle shall maintain a Maricopa County Vehicle Use Permit (VUP) by completing the VUP training course in TheHUB. Employees shall not operate an Office vehicle without first completing this course.

   1.  The VUP is valid until the employees AZ driver's license expires.

   2.  If an employee's driver license expires, they will need to complete the VUP training in TheHUB again once they obtain a new driver's license.

J.  All employees and authorized passengers shall fasten their seat belts when operating or riding in Office vehicles. Seat belts shall be fastened before vehicles are set in motion. Supervisors may grant exceptions to this Office Policy for specific situations to include, but not be limited to, tactical operations where employees are required to exit vehicles swiftly, and/or covertly to execute their objective.

K.  Employees should set the parking brake when leaving the vehicle unattended while the motor is idling.

L.  Volunteers may operate an Office vehicle under any of the following conditions:

   1.  When authorized by the on-duty supervisor;

   2.  When accompanied by a compensated employee;

   3.  When certified by the Office as a Reserve Deputy; or

   4.  When accompanied by a Reserve Deputy.

M.  An employee operating an Office vehicle shall ensure that only authorized persons ride in the vehicle. Authorized persons include employees of the Office or the County, persons authorized by the supervisor, those participating in the Public Observer Program, and those persons transported in the performance of duty. Employee's family members or other acquaintances, excluding the Public Observer Program or in extreme emergencies, are not authorized to ride in an Office vehicle without the approval of a bureau chief.

N.  Employees shall ensure that their assigned vehicles are kept clean and free of litter. Trash and debris shall be removed from Office vehicles and disposed of properly.

6

MCC 000045

O.     An unattended Office vehicle shall be locked, especially when the vehicle contains a long gun or any other weapon, unless it would be unwise to lock the vehicle.

    1.     When a vehicle is not used during a shift, the long gun or any other weapon shall be removed and secured in the Office facility at which the vehicle is parked, unless the vehicle is equipped with an extra locking mechanism, including, but not limited to, a safe.

    2.     When a vehicle is parked during off-duty hours at an approved designated off-site parking location, assigned duty location, or the residence of the employee who has Assigned Vehicle Tier privileges, the employee shall remove and secure all long guns and/or any other weapons unless the vehicle is equipped with an extra locking mechanism authorized by the Office, including, but not limited to, a safe. A vehicle manufacturer's installed concealed storage area, locking glove box, or the placement of a weapon into a locked vehicle trunk that is not equipped with an Office authorized locking mechanism is not sufficient to meet the requirement of this section.

    3.     When a vehicle is being serviced at any repair facility or service center, weapons, law enforcement equipment, and computers shall be removed from the vehicle entirely and remain under the immediate control of the employee. If a vehicle is expected to be in for repair for one shift or longer or is transported by anyone other than sworn personnel or an armed detention officer, all weapons, law enforcement equipment, and computers shall be removed and secured in the Office facility to which the vehicle is assigned prior to transporting it to the service facility. Anyone leaving a vehicle for service shall also remove any portable radio or portable telephone equipment at the time the vehicle is left.

    4.     Unless authorized by their division commander, civilian personnel shall not transport Office weapons for any reason, including for service or repair.

6.     **Office Vehicles and Equipment:**

A.     All vehicles purchased shall be of the same class and include a factory-equipped, heavy-duty police package to allow flexibility in reassignment, unless there is a compelling reason for a special-purpose vehicle and the exception is in the best interests of the Office.

B.     Employees operating an Office vehicle to conduct Office business may travel up to 75 miles outside the border of Maricopa County without authorization. Office vehicles shall not be operated beyond 75 miles outside the limits of Maricopa County except:

    1.     In pursuit situations, as specified in Office Policy CP-4, *Emergency and Pursuit Driving*;

    2.     When authorized by a supervisor;

    3.     When authorized by the Sheriff or designee for conducting official law enforcement activities, extradition trips, or investigations. The Sheriff or designee may authorize the use of an Office vehicle anywhere within the continental United States. Family members or other acquaintances are not authorized to ride in an Office vehicle on any out of Maricopa County travel, without the approval of a bureau chief. If family or other acquaintances are going to attend such travel, a personally owned vehicle would be required, and all the personal vehicle requirements would apply, as specified in this Office Policy;

    4.     When authorized by the chain of command, and in coordination with the Financial Services Division for attendance at a seminar or training event. The initial *Training/Travel Request Form* must indicate the intent to use an Office vehicle. Transportation charges deemed

7

appropriate by the Financial Services Division shall be recommended to the division commander who approved the training; or

5. In the course of Office duties when exigent circumstances arise.

C. Unmarked vehicles shall not normally be used for traffic law enforcement functions. Procedures as to when such use is appropriate are specified in Office Policy EB-1, *Traffic Enforcement, Violator Contacts, and Citation Issuance.*

D. Equipment installed by the Maricopa County Equipment Services Department, upon approval of the Sheriff or designee, is the only equipment authorized for Office vehicles.

1. Personnel who believe additional equipment is essential in the performance of their duties shall submit a written request, through the chain of command to the Sheriff or designee explaining the need for the equipment. If the request is approved, the Office shall make arrangements for the installation of the equipment.

2. Employees shall not remove lights or equipment from an Office vehicle unless authorized by the Fleet Management Division.

E. Loose equipment carried to facilitate Office functions, such as first aid kits, flares, blankets, and pylons, shall be specified by the respective division commander.

F. All law enforcement vehicles shall be equipped with emergency equipment.

G. The Office shall make every effort to replace routinely used Office vehicles no later than the end of their fifth year of service.

7. **Leased Vehicles:** No Maricopa County leased vehicles shall be contracted and/or utilized for personal use.

8. **Personal Vehicles:** An employee shall not use their personal vehicle for Office-related work without prior written authorization. The employee shall submit a memorandum through their chain of command to the Sheriff or designee for final approval.

A. The use of a personal vehicle in travel to and from an Office-sanctioned, out-of-county training event requires that the preapproved written authorization be attached to the *Training/Travel Request Form*. Once the *Training/Travel Request Form* contains the appropriate approvals, the memorandum and form shall be sent to the Travel Unit. The Travel Unit shall coordinate vehicle needs by ensuring that multiple employees attending the same event use the fewest reasonable number of private vehicles at Maricopa County expense or are assigned an Office vehicle. Any transportation changes deemed appropriate by the Travel Unit shall be recommended to the division commander who approved the training request for implementation. When personal vehicle use is not submitted for coordination by the Travel Unit, mileage reimbursement shall not be approved.

B. Employees using their personal vehicles to drive between Office facilities for non-Travel/Training related travel such as, but not limited to, conducting official business, picking up office supplies, or award plaques shall use mileage reimbursement forms which shall be submitted through their chain of command to the Payroll Section of the Human Resource Services Division. Forms are located on the Office's shared drive.

C. Out-of-state travel in personal vehicles may be approved. However, maximum reimbursement shall not exceed the lowest available airfare rate which was available at the time of the trip's authorization.

8

D.     If it becomes necessary to use a personal vehicle for Office business, the vehicle shall be in a condition which shall not bring discredit upon the Office.

E.     Employees shall furnish and maintain proof of insurance (financial responsibility) as required by Arizona Revised Statutes (ARS). Only vehicles licensed and registered in the State of Arizona shall be approved and operated by the employee.

F.     If an employee who has been authorized to use their personal vehicle on Maricopa County business is involved in an accident causing a liability loss, the employee's liability insurance policy shall carry primary loss liability up to the limits of the policy. Any remaining liability shall be the responsibility of Maricopa County's self-insurance program in accordance with ARS.

G.     An employee authorized to use their personal vehicle shall receive the current reimbursement mileage rate authorized by Maricopa County.

H.     Request for reimbursement should be submitted no later than the pay period following the date the expense was incurred. Mileage reimbursement shall be entered into the County payroll system by means of the employee's timecard.

9.     **Accident:** In the event of an accident or any damage to an Office vehicle or a posse owned vehicle performing an authorized function of the Office, employees or posse members shall immediately render aid, request assistance as necessary, secure the scene, and promptly notify the supervisor in charge or designee. They shall inform the supervisor of the incident, location, damage, and injuries, if any, if they are able.

A.     The employee or posse member in charge of the vehicle shall remain at the scene and act as the incident dictates, including ensuring notification of the proper law enforcement agency for investigative purposes, if they are able.

B.     When an accident occurs within Office jurisdiction, it shall be investigated by the Office.

C.     An employee shall not investigate an accident in which they were involved.

D.     An employee involved in an accident shall not make any statement to others involved, or to bystanders, regarding fault or liability in the accident. The employee shall further refrain from making any statements to private attorneys or accident adjusters, unless specifically authorized to do so by Maricopa County Risk Management. Any such requests should be referred to Maricopa County Risk Management.

   1.     Each Office vehicle should have a Vehicle Operator's Handbook and is required to have the ADOT Certificate of Automobile Self-Insurance card which states Maricopa County is self-insured and includes Maricopa County Risk Management's contact information.

   2.     Employees may contact Maricopa County Risk Management or the MCSO Fleet Management Division for a replacement copy of either a vehicle handbook or insurance card.

   3.     A copy of the of the ADOT Certificate of Automobile Self-Insurance card is available for print in the Office's shared drive.

E.     When an Office vehicle or posse owned vehicle performing an authorized function of the Office is involved in a traffic accident, regardless of jurisdiction, the Vehicular Crimes Unit Supervisor shall be notified if any of the following occurred:

   1.     Any person is injured;

9

**Policy GE-4,** *Use, Assignment, and Operation of Vehicles*                    **Effective Date: 02-22-23**

      2.      There is considerable property damage;

      3.      The operator is, or might be, in violation;

      4.      The vehicle was being operated under emergency conditions;

      5.      Prisoners or inmates were being transported;

      6.      The vehicle was occupied by persons not employed by the Office; or

      7.      A supervisor feels the circumstances warrant notification.

F.      Upon notification, the Vehicular Crimes Unit Supervisor shall decide whether the Vehicular Crimes Unit shall respond.

G.      The Office may take over or assist in investigations when accidents involving Office vehicles or posse owned vehicles performing an authorized function of the Office occur in other jurisdictions, if requested or permitted by the law enforcement agency responsible for investigating the accident. The Office may conduct independent investigations when another agency investigates an Office involved accident, if deemed appropriate by the Vehicular Crimes Unit Supervisor. The Office shall assist as much as possible with traffic and crowd control, as needed.

10.    **Forms Required for Vehicle Accidents:** If able, within 24 hours of the accident or damage to an Office vehicle, employees shall accurately complete and forward through the chain of command all necessary forms. If the accident or damage to a posse owned vehicle occurred while performing an authorized function of the Office, the posse member and the supervisor in charge shall complete the documentation procedures specified in this Office Policy.

A.      Required Forms:

      1.      Risk Management Forms: The operator's supervisor shall prepare the Maricopa County Risk Management Online Claim Form. These forms can be completed electronically through the https://mymc.maricopa.gov/ website. The website can be accessed directly or from the SharePoint Portal, by selecting the Risk Management Forms link. Once on the Risk Management page, supervisors will be able to select the "Online Claim Form" link to file a claim. Supervisors shall select the "Damaged County Vehicle" and/or "Damaged County Property" form from the incident type menu. When necessary, the "Injured County Employee or Volunteer" form shall be completed.

      2.      Office Forms: To ensure that there is an objective review of the incident, the employee, or employee's supervisor, if the employee is physically incapable, shall prepare a memorandum detailing the circumstances of the accident.

B.      Routing of Forms:

      1.      Risk Management:

            a.      When completing these forms electronically, the Damaged County Vehicle and/or Damaged County Property form will be sent to Maricopa County Risk Management once the Submit button is selected. A copy shall be printed to include in Blue Team prior to submitting the forms to Maricopa County Risk Management. These forms

10

**Policy GE-4,** *Use, Assignment, and Operation of Vehicles*                    **Effective Date: 02-22-23**

        shall be prepared for every incident in order to facilitate the reimbursement of insurance proceeds.

        b.    If an accident exposes Maricopa County to any serious liability, the employee's division commander should verbally advise Maricopa County Risk Management at the earliest opportunity.

  2.    Blue Team: All information and forms shall be entered into Blue Team. The supervisor shall make an entry into Blue Team with an incident type of Vehicle Accident. All necessary documentation, including but not limited to, the Maricopa County Risk Management Damaged County Vehicle and the Damaged County Property forms, any photographs of damage to the vehicle or of the scene of the accident, and the memorandum explaining the circumstances of the accident, shall be uploaded into Blue Team and attached to the incident. The supervisor shall forward the Vehicle Accident Blue Team entry through the chain of command for review.

  3.    Fleet Management: An electronic copy of the Damaged County Vehicle form shall be forwarded immediately upon completion, to the MCSO Fleet Management Division within 24 hours.

  4.    The employer's Report of Industrial Injury shall be processed, as specified in Office Policy GD-19, *Injury or Death of an Employee or Volunteer*.

11.    **Office Vehicle Accidents:**

  A.    Investigation of Office Policy violations shall be conducted, as specified in Office Policy GH-2, *Internal Investigations*. Regardless of fault or injury, all Office vehicle accidents shall be documented in Blue Team, as specified in this Office Policy. Supervisors shall review employee activity in the Early Identification System (EIS), as required.

    1.    **Not At-Fault Vehicle Accidents:** Employees operating an Office vehicle involved in an accident in which it is determined during an accident investigation, review of the collision report, or during a command vehicle accident review, the employee is **not** at fault.

        a.    The accident shall be entered into Blue Team by the supervisor under the Incident Type: Vehicle Accident.

        b.    The Blue Team entry shall include as attachments all related paperwork and reports, such as memorandums, the Damaged County Vehicle form, photographs, Employers Report of Industrial Injury, and any initial Maricopa County Risk Management documents. This action includes those accidents investigated by the Office or another law enforcement agency.

        c.    A **not** at fault vehicle accident requires no further action and is not required to be reported to PSB for review.

        d.    If the vehicle accident is caused by a suspect intentionally colliding with an Office vehicle in an attempt to evade apprehension, and it is determined the employee in the vehicle is a victim of a crime, a Vehicle Accident entry in Blue Team shall be completed in addition to the required Risk Management Forms, as specified in this Office Policy.

    2.    **At-Fault Vehicle Accidents:** Employees operating an Office vehicle involved in an accident

in which it is determined during an accident investigation, review of the collision report, or during a command vehicle accident review, the employee is at fault.

    a.   The accident shall be entered into Blue Team by the supervisor under the Incident Type: Vehicle Accident.

    b.   The Blue Team entry shall include as attachments all related paperwork and reports, such as memorandums, the Damaged County Vehicle form, photographs, Employers Report of Industrial Injury, and any initial Maricopa County Risk Management documents. This action includes those accidents investigated by the Office or another law enforcement agency.

    c.   When an employee exceeds the EIS established threshold for these vehicle accidents, the employee and the employee's supervisor shall be notified through Blue Team. The supervisor shall complete the EIS Alert Response form, as specified in Office Policy GH-5, *Early Identification System.*

3.   **Minor Vehicle Damage Accidents**: Employees operating an Office vehicle involved in a minor vehicle damage accident, such as coming into contact with a concrete pillar or curb, a tree, a sign, another office vehicle, or other object where damage occurs; the employee operating the vehicle causes damage to the undercarriage of the vehicle; or when the employee operating the vehicle causes damage to the vehicle due to driving on a non-paved road.

    a.   The minor vehicle damage accident shall be entered into Blue Team by the supervisor under the Incident Type: Vehicle Accident.

    b.   Blue Team entries shall include as attachments all related paperwork and reports, such as memorandums, the Damaged County Vehicle form, photographs, Employers Report of Industrial Injury, and any initial Maricopa County Risk Management documents.

    c.   When an employee exceeds the EIS established threshold for these vehicle accidents, the employee and the employee's supervisor shall be notified through Blue Team. The supervisor shall complete the EIS Alert Response form, as specified in Office Policy GH-5, *Early Identification System.*

4.   **Emergency and Pursuit Driving Accidents:** Employees operating an Office vehicle involved in an accident during an emergency or pursuit driving, regardless of fault.

    a.   Emergency or pursuit driving accident shall be entered into Blue Team by the supervisor under the Incident Type: Vehicle Accident.

    b.   A separate entry shall be entered by the supervisor into Blue Team under the Incident Type: Internal Complaint.

    c.   The entry shall include as attachments all related paperwork and reports, such as memorandums, the Damaged County Vehicle form, photographs, Employers Report of Industrial Injury, and any initial Maricopa County Risk Management documents. This action includes those accidents investigated by the Office or another law enforcement agency.

B.   **Vehicle Accident Coaching**: Coachings regarding Office vehicle accidents shall be considered

12

**Policy GE-4,** *Use, Assignment, and Operation of Vehicles*                    **Effective Date: 02-22-23**

separately when determining placement in the disciplines matrixes for those matters covered by Office Policy GC-17, *Employee Disciplinary Procedures*, and shall not be counted with any other Coachings unrelated to an Office vehicle accident.

12. **Preventable, Non-Preventable and Safety Measure Vehicle Accident Review:**

   A.  Vehicle Accidents: Whenever a preventable or non-preventable accident occurs with an Office vehicle, the commander of the division in which the involved employee is assigned shall forward the Blue Team entry, completed by the supervisor, to the bureau chief in charge of the division, for review. The Blue Team entry should include all related paperwork and reports, such as memorandums, the Damaged County Vehicle form, and citations, if applicable. The *Industrial Injury/Significant Exposure Memorandum* shall be reviewed, as specified in Office Policy GD-19, *Injury or Death of An Employee or Volunteer.*

   B.  Administrative Review: The bureau chief in charge of the division shall be responsible for conducting administrative reviews regarding vehicle accidents that involve employees using Office vehicles. Each accident shall be carefully analyzed to determine if it was preventable or non-preventable under the circumstances. The circumstances and conditions as they existed at the time of the accident shall be taken into consideration when making this determination.

   C.  Recommendations: After the bureau chief in charge of the division makes a determination as to whether the accident was preventable or non-preventable, the bureau chief may recommend that specific safety measures be taken to prevent a reoccurrence. The bureau chief in charge of the division shall send a copy of the findings along with their recommendations to the commander of the division in which the involved employee works, and carbon copy their executive chief. The bureau chief or executive chief may request further review of a vehicle accident presumptively deemed non-preventable. Recommendations in response to an accident may include, but are not limited to, the following:

      1.  Revisions of work practices;

      2.  The addition or elimination of equipment; or

      3.  The additional training of personnel.

   D.  Response: Once the employee's division commander receives a reply from the bureau chief in charge of the division, the division commander shall prepare a response in the Vehicle Accident Blue Team entry which shall include actions regarding the bureau chief findings. The response shall be sent to the bureau chief in charge of the division, in Blue Team, for review. After review, the bureau chief shall forward the Blue Team entry to the Early Intervention Unit for retention in the EIS. The bureau chief shall carbon copy the executive chief in charge of the division when the entry is forwarded.

13. **Vehicle Breakdown and Repairs:**

   A.  When an Office vehicle breaks down, the employee operating or in charge of the vehicle shall contact the Communications Division. The employee shall provide their name, the Office-issued vehicle number, the location of the vehicle, and advise if they will be remaining at the scene. The Communications Division shall contact the appropriate towing company.

   B.  Personnel shall make no attempt to repair vehicles or equipment unless specifically authorized to do so by a supervisor. The Equipment Services Department may authorize minor repairs, such as headlight or emergency light flasher replacements, to be done by Office personnel.

MCC 000052

**Policy GE-4,** *Use, Assignment, and Operation of Vehicles* **Effective Date: 02-22-23**

14. **Fuel:** Depending on the Office vehicle, fuel may be obtained from a Maricopa County fuel pump using a fuel key, AIMS2, or a Fuel Card. Employees may also utilize Purchase Cards (P-Cards) for the purchase of fuel for Office vehicles when it is not practical to use Maricopa County pumps, as specified in Office Policy GE-2, *County Purchase Cards*.

    A.    Fuel Key: A fuel key containing an electronic chip may be issued for each older model Office vehicle, and because the key is unmarked, it should be kept attached to the vehicle key ring. When used, the fuel key will electronically record the fuel dispensed to the vehicle for which the key was issued. The fuel key is to be used only for the vehicle for which it was issued. If a key is lost, a memorandum shall be sent to the MCSO Fleet Management Division as soon as possible requesting a replacement key. If a fuel key is found without identifying marks or other keys attached, it shall be taken to the service writers at the Equipment Services Department for decoding. In unusual circumstances, a division commander can request, by memorandum to the Equipment Services Department, the temporary assignment of a fuel key charged to their Low Org.

    B.    AIMS2: All new vehicles are equipped with AIMS2 which eliminates the need for a fuel key. AIMS2 is an electronic ring attached to the vehicle gas tank which allows refueling at Maricopa County pumps. All Maricopa County pumps are capable of refueling Office vehicles installed with AIMS2. Office personnel should contact Equipment Services regarding any problems that occur while refueling.

    C.    Fuel Card: Fuel Cards may be temporarily assigned to specific Office vehicles for fuel purchases **only** at designated locations. This would occur when repairs and/or updates to Maricopa County fuel pumps are being conducted. The Fuel Card shall remain with the designated Office vehicle and shall only be used during the timeframe of the repairs and/or updates to Maricopa County fuel pumps. Affected division commanders shall provide a list of vehicles in need of Fuel Cards to MCSO Fleet Management Division. When using the Fuel Card, the employee shall enter a PIN # and the vehicle's mileage in order to obtain fuel at the designated location. Once repairs and/or updates are completed to the Maricopa County fuel pumps, the Fuel Cards will be deactivated. All deactivated Fuel Cards shall be returned to MCSO Fleet Management Division.

MCC 000053