# Frankel Syverson pllc

FRANKEL SYVERSON PLLC
2375 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
602-598-4000
Ty D. Frankel (027179)
ty@frankelsyverson.com

9655 Granite Ridge Drive, Suite 200
San Diego, California 92123
602-598-4000
Patricia N. Syverson (020191)
patti@frankelsyverson.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher J. Houck, on behalf of himself and all those similarly situated,<br><br>        Plaintiff,<br><br>      v.<br><br>Maricopa County,<br><br>        Defendant. | Case No. 2:23-cv-00068-DGC<br><br>**PLAINTIFF CHRISTOPHER J. HOUCK'S OPPOSITION TO DEFENDANT'S MOTION TO DECERTIFY PLAINTIFFS' COLLECTIVE ACTION** |

Plaintiff Christopher Houck, through undersigned counsel, submits this Opposition to Defendant's Motion to Decertify Plaintiffs' Collective Action (Doc. 152).

## I.    THE PATROL LIEUTENANTS' CLAIMS SHOULD PROCEED COLLECTIVELY

This case involves a certified FLSA collective consisting of 21 individuals who were all employed as Patrol Lieutenants by Maricopa County ("the County") during the relevant period. Each of the Patrol Lieutenants worked as active law enforcement officers in Patrol Bureaus East or West. Each of the Patrol Lieutenants' typical shifts began by them putting on their uniform (including Body Worn Camera ("BWC"), logging into the computer-aided dispatch system ("CAD"), and immediately starting to monitor the police radio – this routine allowed the Patrol Lieutenants to be ready at a moment's notice to respond to any high-level law enforcement calls for service as they were required to do. Although each of the Patrol Lieutenants did engage in certain administrative functions as part of their Patrol Lieutenant role, their primary role was that of a law enforcement officer. If a call for a "major incident" came in, the Patrol Lieutenants were expected to drop whatever administrative task they may be working on and respond to the law enforcement call. At the incident, the Patrol Lieutenants were responsible for engaging in any and all duties required to preserve life and protect public safety. During the relevant period, all of the Patrol Lieutenants worked more than 40 hours in a workweek engaged in law enforcement duties. However, all of the Patrol Lieutenants were uniformly classified as exempt by the County and, thus, pursuant to that classification did not receive overtime pay. Based on the overwhelming evidence, the Patrol Lieutenants are similarly situated in their primary role as law enforcement officers such that the ultimate merits questions of whether they were entitled to overtime pay can be answered on a collective-wide basis. Decertification is not warranted.

Despite the evidence that the Patrol Lieutenants are similarly situated in their position as law enforcement officers such that collective treatment is appropriate, the County seeks decertification to avoid collective-wide liability. In doing so, the County

misapplies the law regarding what determines the Patrol Lieutenants' "primary duty" and, then based on its improper legal analysis, the County focuses on insignificant and irrelevant differences regarding the Patrol Lieutenants' day-to-day job duties to support its argument that neither the first responder exception nor the three FLSA exemptions – administrative, executive and highly compensated – can be applied to the Patrol Lieutenants in this case on a collective-wide basis.[1]  By focusing on "individualized" variations irrelevant to the material aspects of the Patrol Lieutenants' claims, the County ignores that certification does not require that the Patrol Lieutenants be *identical* in all respects – it requires that the Patrol Lieutenants are *similarly situated* in ways that are *material* to addressing the claims at issue.  *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1114 (9th Cir. 2018).  "If the party plaintiffs' factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Id*. at 1114.  Here, when utilizing the proper legal analysis, the material facts show that the Patrol Lieutenants are similarly situated on issues material to the outcome of the case – *i.e.*, that their primary role is as law enforcement officers – such that any merits analysis can be uniformly applied to the Patrol Lieutenants as a collective and decertification is improper.

Further, decertification would result in judicial inefficiencies for the parties and the Court, necessitating 21 individual trials that would utilize common testimony and documents regarding the County's policies and the Patrol Lieutenants' job duties.  The FLSA collective action procedure is designed to prevent this inefficiency and effectuate the remedial purpose of the FLSA by allowing workers to pursue their claims collectively when they are all subject to the same contested compensation policy, like the one at issue here regarding their exemption classification.  As the Ninth Circuit in *Campbell* explained:

[1] Notably, the County argues in its Motion for Summary Judgment that all the Patrol Lieutenants should be found exempt from overtime, demonstrating that when it benefits the County the Patrol Lieutenants are similarly situated on issues that would lead the County to that conclusion.  *See* Doc. 154 at n. 7.  Ultimately, as will be discussed in this Opposition, the Patrol Lieutenants are similarly situated as to the material issues relevant to the classification determination, such that the collective must remain certified through trial.

2

1    "Party plaintiffs are similarly situated, and may proceed in a collective, to the extent they

2    share a similar issue of law or fact material to the disposition of their FLSA claims.  The

3    district court may be able to decertify where conditions make the collective mechanism

4    truly infeasible, but it cannot reject the party plaintiffs' choice to proceed collectively based

5    on its perception of likely inconvenience."  903 F.3d at 1117.  Here, the County has not

6    demonstrated that this case proceeding as a collective would be "truly infeasible"; to the

7    contrary, this case is well-suited for proceeding as a collective based on the common nature

8    of the material facts surrounding the Patrol Lieutenant's "primary duty."  Thus, the Court

9    should deny the County's motion and allow Plaintiff to continue to proceed as a collective

10    for purposes of litigating the Patrol Lieutenants' overtime claims.

## II.    THE DECERTIFICATION ANALYSIS LOOKS TO WHETHER THE PATROL LIEUTENANTS ARE "SIMILARLY SITUATED" IN MATTERS MATERIAL TO THE FLSA CLAIMS

13    The proper inquiry for decertification is whether the opt in plaintiffs are alike in

14    regard to some *material* aspect of their FLSA claims.  *Campbell,* 903 F.3d at 1114.[2]  This

15    inquiry is distinct from the ad hoc test focusing on individual employment circumstances

16    of the collective members that was explicitly rejected in *Campbell.*  As the Ninth Circuit

17    noted, the ad hoc test fails to account for "what kinds of 'similarity' matter under the

18    FLSA" and improperly leads to "an approach that treats differences as disqualifying, rather

19    than one that treats the requisite kind of similarity as the basis for allowing partially distinct

20    cases to proceed together." *Id*. at 1113-14, 1116-17.  The Ninth Circuit rejected the ad hoc

21    test that allowed defendants like the County to focus on dissimilarities like specific tasks,

22    divisions, management, or hours that district from the issues that matter to liability.  *Id*. at

23    1116.  "If the party plaintiffs' factual and legal similarities *are* material to the resolution of

24    their case, dissimilarities in other aspects should not defeat collective treatment[.]" *Id*. at

---

[2] In *Campbell*, the Ninth Circuit affirmed decertification of a class of over 2000 police officers alleging off-the-clock overtime claims, due to the fact the record evidence did not support the existence of an unwritten department-wide overtime policy.  903 F.3d at 1120. In contrast, here, the collective consists of 21 Patrol Lieutenants who were all uniformly classified as exempt by the County and perform their job duties uniformly pursuant to County policy.

1114 (emphasis in original).[3] "A systemic policy is no less common across the collective

if those subject to it are affected at different times, at different places, in different ways, or

to different degrees." *Id*. at 1116 (citing *Klimchak v. Cardrona, Inc.*, 2011 WL 1120463,

at \*5 (E.D.N.Y. Mar. 24, 2011) ("[I]f defendants had a policy or practice of not paying

overtime compensation to any of its laborers, whether full-time or part-time, union member

or non-union member, all of those employees would be similarly situated for purposes of

this analysis.")).[4] Here, Plaintiff has demonstrated that certification of the collective is still

warranted because the Patrol Lieutenants are similarly situated as to material issue in this

case – that they are all engaged in law enforcement as their primary duty.  In contrast, the

County has failed to demonstrate that the nuanced differences it focuses on in the Patrol

Lieutenants' day-to-day performance of their jobs warrant decertification because the issue

because they are immaterial to the ultimately liability question related to first responder

work.  *Id*. at 1119*; see also Learing,* 722 F.Supp.3d at 937 ("After discovery, plaintiffs

must show that the claimants are similarly situated —though not necessarily identical—to

proceed with an FLSA collective action.")(citations omitted); *Hudgins v. Total Quality*

*Logistics, Inc.*, 2019 WL 354958 at \*4 (N.D. Ill. Jan. 29, 2019) (decertification not

warranted where "members of the subclass shared a common title, job description, and

basic responsibilities" and a "common harm" resulting from classifying all plaintiffs as

"overtime exempt"; "[S]ome variances in individual employees' performance of

---

[3] *See also Learing v. Anthem Cos., Inc.*, 722 F.Supp.3d 929, 936 (D. Minn. 2024)(in deciding whether collective proceedings are warranted it is important to "[a]nalyz[e] the case at the appropriate level of abstraction" because "[i]f one zooms in close enough on anything, differences will abound")(citations omitted).

[4] And, if collective treatment is premised on a genuine dispute of material fact as to the merits of the opt in plaintiffs' FLSA claims, the collective cannot be decertified unless the factual dispute is resolved against the plaintiffs' assertions.  *Id*. at 1119.  As the Ninth Circuit in *Campbell* explained: "The collective mechanism is meant to ensure that party plaintiffs have the option of benefitting from the efficiencies of collective litigation—including, in cases presenting genuine disputes of material fact, collective access to trial. That principle is not consistent with allowing district courts to break apart the collective based on their own resolution of merits questions otherwise reserved to the trier of fact. If there is a merits dispute that would survive summary judgment on which the disposition of decertification also depends, the merits dispute should be tried. Whether the question will be answered favorably or unfavorably is for the trier of fact." *Id.*

responsibilities common to their positions are inevitable and insufficient to call for decertification.")(citations omitted); *Butler v. DirectSAT USA, LLC*, 47 F.Supp.3d 300, 311 (D.Md. 2014)(in denying decertification court found that "A collective action does not necessitate that there be no differences among class members, nor does it prohibit individualized inquiry in connection with fashioning the specific relief or damages to be awarded to each class member.")(internal citations omitted); *Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528 (S.D. Tex. 2008)(decertification was improper despite company's claim of disparate factual and employment settings among the plaintiffs).

### III.    THERE IS SUBSTANTIAL EVIDENCE THAT THE PATROL LIEUTENANTS ARE SIMILARLY SITUATED FOR PURPOSES OF CERTIFICATION THROUGH TRIAL

At conditional certification, the Court found that "Plaintiffs sufficiently allege that they are alike with regard to a material aspect of this litigation – namely, that they all have the primary duty of law enforcement," and "[f]rom this evidence the Court can reasonably infer that the putative class members are victims of a 'singular decision, policy, or plan' which comprises an essential element of their FLSA claim." *See* Doc. 38, at 7:21-8:10. The evidence obtained since that time bolsters that the Patrol Lieutenants are similarly situated regarding the material issues in this case, which is supported by declarations and deposition testimony from Houck, testimony from twelve opt-in Patrol Lieutenants and five Captains who have supervised the Patrol Lieutenants personally and have knowledge of their job responsibilities in each of the Districts, and the County's own documents and policies.

The evidence is clear that the Patrol Lieutenants perform their jobs in the same manner across all the Districts in Patrol Bureaus East and West, and in fact, they are required to. The Patrol Lieutenants and their Captains testified that because the Patrol Lieutenants are active law enforcement officers, each of the Patrol Lieutenants' typical shifts began by them putting on their uniform, including body cameras, so that they would be ready to respond at a moment's notice to any call for law enforcement service. *See, e.g.,* SOF ¶ 292 (Ex. 15, Cpt. Bailey 54:9-13 ("the lieutenants that all worked under me wore their uniform. They wore their body armor. They wore their body worn cameras. And

they were expected to carry the same equipment that a deputy would carry when he was on duty."); Ex. 18, Cpt. Stutsman 34:16-18, 62:6-10 (required to wear BWC "just like a deputy is"); Ex. 6, Jackson 30:8-23, 33:15–34:14, 35:2-20, 40:2-8, 43:3-8 ("uniformed, armed, prepared to be a first responder or respond as backup"); Ex. 11, Thomas 47:2-51:5 (required to be in uniform, including BWC).[5]

Once in uniform, the Patrol Lieutenants log into the CAD system at the start of the day – most from their driveways at home – so that dispatch was aware they were available for law enforcement calls and was able to track their activity throughout the shift and then they immediately start to monitor the radio to ensure they were aware of what was going on in the District and when there was a law enforcement call they needed to respond to. *See, e.g.,* SOF ¶ 292 (Ex. 18, Cpt. Stutsman 34:6-35:3 (logged in and monitoring); Ex. 14, Cpt. Aldorasi 23:7-24:9 (patrol lieutenants' job is not simply an office job – have to be involved in patrol duties, logged into CAD, monitor radio for activity); Ex. 1, Houck 21:9-22:23, 30:5-23, 31:15-32:14, 96:3-11 (logged in, monitoring radio so "can respond to first responder law enforcement calls as required by the County"); Ex. 4, Freeman 50:16-53:12 (required to be logged on during normal shift when doing law enforcement); Halverson 35:20-36:19, 46:3-10 (logged into CAD and monitoring calls for service before driving to work)).[6]

---

[5] *See also* SOF ¶ 292 (Ex. 14, Cpt. Aldorasi 27:9-14 (wear BWC); Ex. 16, Cpt. Kratzer 27:12-28:6, 52:2-4 (wears a uniform and BWC so they can respond); Halverson 35:20-36:19 (started shift by putting on uniform); Ex. 17, Cpt. Lee 38:15-39:1, 66:19-23 (in uniform, with BWC, in case need to respond); Ex. 4, Freeman 50:16-53:12 (required to be in uniform); Ex. 9, Rankin 104:2-6 (in uniform); Doc. 27-1, Houck Decl. at 11, ¶16); Doc. 27-2, Halverson Decl. at 3, ¶7 and Sanchez Decl. at 127, ¶12.

[6] *See also* SOF ¶ 292 (Ex. 16, Cpt. Kratzer 25:2-25 (logged into CAD and monitoring radio); Ex. 10, Rosenberger 44:10-21, 46:16-25 (logged into CAD); Ex. 17, Cpt. Lee 35:20-36:2, 54:6-17 (logged into CAD and monitoring radio as those as patrol duties); Ex. 11, Thomas 47:2-51:5 (required to be logged in and monitoring radio); Ex. 8, Neville 71:1-72:3 (logged into CAD); Ex. 6, Jackson 32:15–34:14, 35:2-20, 40:2-8 (logged into CAD and monitoring the radio); Ex. 9, Rankin 19:17-25, 21:22-22:12, 90:22-91:3 (expected to log onto CAD); Ex. 13, Vance 59:1-61:4, 62:7-17 (logged into CAD); Ex. 7, Keller 64:18-65:8, 99:7-10, 100:9-101:6 (logged into CAD and monitor radio); Ex. 3, Brice 35:1–37:4, 37:21-39:12 (required to be logged into CAD, monitor radio and be available for calls)); Doc. 27-1, Houck Decl. at 10, ¶11; Doc. 27-2, Halverson Decl. at 3, ¶7 and 4, ¶12 and Sanchez Decl. at 126, ¶7 and 127, ¶12.

The testimony from the Patrol Lieutenants and their Captains further demonstrates that all the Patrol Lieutenants across all districts in Patrol Bureaus East and West are expected to provide law enforcement as their primary duty, including being required to respond to all high-level patrol calls and report as first responders in the field for all such calls – including "major incidents" such as armed robberies, homicides, shooting victim incidents, drownings, and school threats.  *See, e.g.,* SOF ¶ 293 (Ex. 13, Vance  66:11-67:9 (required to respond to "major incidents" "like, a deputy-involved shooting, deputy-involved accident, if an employee got injured, if a suspect or a member of the public got injured at the hands of the sheriff's office'" and "major incidents like, you know, shooting in a community"); Ex. 15, Cpt. Bailey 43:10-19, 62:6-63:21 ("you would expect a watch commander or a lieutenant to show up on" all newsworthy, unusual or major emergency incidents – such as armed robberies, homicides, shooting victim incidents); Ex. 4, Freeman 27:1-22, 28:4-20, 30:4-24 (function was to respond to significant events, such as major crimes, anything with media, homicide, suicide, serious vehicular accidents, shooting, assaults, "deputy-involved shooting"); Ex. 8, Neville 124:6-125:14 (expected to go to major incidents, any time a "gun gets fired in a district that I'm a commander of.  I'm going to [respond].")).[7]

And, importantly, the testimony from the Patrol Lieutenants and their Captains demonstrates that such emergency law enforcement duties take priority over any administrative tasks Patrol Lieutenants have.  As Captain Stutsman explained: "[A]ll the administrative duties come to a screeching halt when preservation of life is foremost.  They

---

[7] *See also* SOF ¶ 293 (Ex. 18, Cpt. Stutsman 57:3-16, 59:12-60:15, 66:17-22 (should go out on all Officer Involved Shooting (OIS) calls, "absolutely" should respond to school threat calls); Ex. 17, Cpt. Lee 42:9-13, 56:4-57:5 (expected to respond to major incidents, which includes drownings); Ex. 16, Cpt. Kratzer 26:12-19, 45:7-16 (expected to respond to major incidents, as outlined in the MCSO policy); Ex. 2, Acosta 78:8-79:4 (required to go on "serious calls" or "critical incidents", such as shootings, aggravated assault search where people were injured, major accidents, kidnapping, murder, hostage situation, bus accident with lots of kids); Ex. 9, Rankin 17:2-14 (go to priority class to service that would need incident command, such as shootings, stabbings, anything where an officer got hurt, questionable deaths) and Rankin 97:11-25 (go to more serious calls, like homicide)); Doc. 27-1, Houck Decl. at 10, ¶10; Doc. 27-2, Halverson Decl. at 3, ¶8 and Sanchez Decl. at 126, ¶8).

1   will respond, and they will stop what they're doing." SOF ¶ 294, Ex. 18, Cpt. Stutsman

2   65:22-66:1; *see also* SOF ¶ 294 (Ex. 18, Cpt. Stutsman 66:20-22 ("that's the preservation

3   of life I mentioned.  That is foremost, and then property and then administrative"); Ex. 3,

4   Brice 49:20-50:3, 54:9-16, 57:13-16 ("you're still listening to radio and something kicks

5   out, then you got to unfortunately drop all of that and then go and take that call. And then

6   you -- and that was part of the – the difficulty of patrol, is you have these assignments and

7   you are constantly being pulled away from those assignments and you have to come back";

8   "if you spend all your time doing admin, you are not doing your job, right. Admin stuff is

9   important, but you got to -- we are here for policing"); Ex. 6, Jackson 93:25-94:5, 96:7-17,

10  96:24-97:5 (as a patrol lieutenant "you are uniformed, armed, listened to the radio,

11  monitoring CAD, so you are ready to respond at all times and expected to respond. So

12  doing an EPA [employee performance evaluation] would take a back burner to first

13  responder duties as -- as they came up.")).[8]  Significantly, Patrol Lieutenants are subject to

14  reprimand or discipline for failure to respond to such incidents.  *See, e.g.,* SOF ¶ 296 (Ex.

15  14, Cpt. Aldorasi 24:10-19; Ex. 17, Cpt. Lee 37:1-38:5; Ex. 18, Cpt. Stutsman 35:10-19;

16  Ex. 16, Cpt. Kratzer 26:21-27:10).

17          Despite the non-exempt nature of the Patrol Lieutenants' primary job duties – *i.e.*,

18  law enforcement – all of the Patrol Lieutenants are uniformly classified by the County as

19  exempt from overtime.  SOF ¶ 353 (Doc. 155-4 at Ex. 5 (job description noting "exempt"

20  status); FLSA Employee Acknowledgments, Doc. 155-4 at Ex. 7; Doc. 155-5 at Exs. 11,

21  13; Doc. 155-6 at Exs. 17, 20, 23; Doc. 155-7 at Exs. 26, 31, 34, 39; Doc. 155-8 at Exs. 43,

22  45, 47, 49, 51, 54, 56; Doc. 155-9 at Exs. 61, 69; *see also* SOF ¶ 353 (Ex. 15, Cpt. Bailey

---

[8] *See also* SOF ¶ 294 (Ex. 15, Cpt. Bailey  66:11-67:7 (for "big events" or serious calls, the call would take priority over admin tasks);  Ex. 17, Cpt. Lee 44:24-45:9 ("managing a major incident definitely is more important than those administrative tasks"); Ex. 16, Cpt. Kratzer 26:21-27:10, 28:20-29:12 (when first responder incident presents itself, it is the priority over administrative tasks); Ex. 14, Aldorasi  27:2-8 (law enforcement is more important than administrative duties); Ex. 9, Rankin 94:21-95:15, 95:20-96:20 ("primary function was to patrol and the needs of patrol and to assist and lead patrol, and then everything was secondary to that")); Doc. 27-1, Houck Decl. at 10, ¶12; Doc. 27-2, Halverson Decl. at 3, ¶6 and Sanchez Decl. at 126, ¶6.

8:7-9:1; Ex. 14, Cpt. Aldorasi 6:23-7:5; Ex. 17, Cpt. Lee 9:12-25; Ex. 1, Houck 12:17-21; Trowbridge 95:12-19; Doc. 27-1, Houck Decl. at 10, ¶17); Doc. 27-2, Halverson Decl. at 4, ¶14 and Sanchez Decl. at 127, ¶13.  And, all of the Patrol Lieutenants are subject to the same uniform compensation policies and practices, including regularly and repeatedly working in excess of forty hours per week without overtime pay.  *See* SOF ¶ 354 (Doc. 155-8, at Ex. 59; Doc. 27-1, Houck Decl. at 10-11 at ¶¶ 18, 20, 25-27 and 13-32 (Exhibit A (paystubs)); Doc. 27-2, Halverson Decl. at 4-5, ¶¶15-17, 20-21 and 6-117 (Exhibit A (paystubs)) and Sanchez Decl. at 127-128, ¶¶14-15, 19; Doc. 27-2, Halverson Decl. at 4, ¶¶15-17-5, ¶¶20-21 and Sanchez Decl. at 127, ¶¶14-15, 18-128, ¶19).[9]

Thus, the evidence in this case clearly demonstrates the Patrol Lieutenants are similarly situated: each of the Patrol Lieutenants in Patrol Bureau East and West have the same primary job duty of law enforcement.  All the Patrol Lieutenants are subject to the same job duties and compensation policies that will be analyzed when determining the merits of this case. Just as the Court found that certification was warranted at the initial stages of this case, it is similarly warranted now based on the record evidence.  *See Campbell*, 903 F.3d at 1114; *see also Pruess v. Presbyterian Health Plan, Inc.*, 745 F.Supp.3d 1218, 1248 (D.N.M. 2024)(decertification not warranted where plaintiffs "have similar job duties" as well as subject to the same "contract, use the same standardized tools and software, are subject to the same supervision and auditing, receive the same training, and allegedly were subjected to the same uniform practice affecting the entire class similarly, making collective treatment appropriate notwithstanding the differences Defendants identify"); *Hudgins,* 2019 WL 354958 at *4 (same).

---

[9] *See, e.g.,* SOF ¶ 354 (Ex. 2, Acosta 53:16-55:17, 98:2-17; Ex. 7, Keller 19:17-25, 23:15-18; Ex. 8, Neville 61:25-63:5; Houck 12:17-13:25, 19:18-20:5; Ex. 3, Brice 18:24-19:23; Ex. 4, Freeman 68:18-69:3, 73:15-74:11; Ex. 6, Jackson 29:22-31:8; Ex. 5, Halverson 57:21-58:13, 60:3-24, 62:5-10; Ex. 9, Rankin 32:23-33:13; Ex. 10, Rosenberger 13:23-14:15; Ex. 11, Thomas 32:25-33:6, 43:1-46:23; Ex. 12, Trowbridge 95:9-96:5, 98:2-25; Vance 7:17-20, 38:9-12).

**IV.    THE COUNTY MISAPPLIES THE "PRIMARY DUTY" TEST TO ATTEMPT TO MANUFACTURE DIFFERENCES SUPPORTING DECERTIFICATION**

Although Plaintiff has met his burden of demonstrating that the Patrol Lieutenants are similarly situated such that this case can proceed on a collective basis, the County seeks to decertify the collective. In doing so, an underlying premise of the County's Motion is focused on a misapplication of the law – specifically misapplication of the primary duty test when it involves first responders.  As discussed at length in Plaintiff's Cross Motion for Summary Judgment and Response in Opposition to Defendant's Motion for Summary Judgment ("Cross Motion for Summary Judgment"), courts consider an employee's first responder duties when analyzing each of the elements of the primary duty test related to the exemptions that the County attempts to rely on.  *See Morrison v. County of Fairfax, VA*, 826 F.3d 758, 769-70 (4th Cir. 2016).[10]   In conducting that primary duty analysis, courts are clear that the practical nature of being a first responder must be taken into account as much of a first responder's time and day may be devoted to work that is not necessarily frontline law enforcement, but that does not negate the fact that their "primary duty" is still first responder in nature.  *See Cunningham v. Mission Support Alliance, LLC*, 2019 WL 13201913, at *5-*7 (E.D. Wash. July 22, 2019)("the principal, main, major, or most important duty that the Captains perform is emergency response" because the captains "must be prepared to leave the station in response to an emergency call" and such calls "take preference over any other activity.").[11]  And, given the nature of first responder work,

---

[10] Plaintiff incorporates by reference his Cross Motion for Summary Judgment for a full discussion of the County's misapplication of the first responder exception and exemption analysis.  *See* Plaintiff's Cross Motion and Response in Opposition to Motion for Summary Judgment at Sections IV-V.

[11] *See also Carson v. City of Los Angeles*, 2016 WL 7647681, at *7-*8 (C.D. Cal. Sept. 22, 2016) (fire department captains' "primary duty consists of nonexempt emergency response work because their emergency response duties outweigh any exempt work in terms of relative importance," noting that "responding to emergencies is the single most important part of [their] job", and emphasized that first responder work does not necessarily require the work to be performed on the scene as office tasks can also relate to first responder duties); *Barrows v. City of Chattanooga*, 944 F.Supp.2d 596, 604-05 (E.D. Tenn. 2013)(holding that although captain's firefighting duties were not the largest percentage of his time, they were the most important duties performed because he was tasked with interrupting whatever other tasks to respond to calls).

10

1  "management-like tasks undertaken in conjunction with, or directly related to, primary first

2  responder duties do not turn a first responder into an exempt executive or administrator;"

3  the focus is on determining what is "the more important part of the job" to decide if the

4  first responder exception applies. *Morrison,* 826 F.3d at 762 (4th Cir. 2016).[12]   Further,

5  the first responder exception explicitly provides that the white collar and highly

6  compensated exemptions (raised by the County here), "do not apply to police officers" and

7  "similar employees, regardless of rank or pay level," who perform certain first responder

8  tasks because their primary duties are not managerial, administrative, or professional in

9  nature, even if they perform exempt tasks (29 C.F.R. § 541.3(b)(1)), and first responders

10  also do not qualify as exempt under the highly compensated test because their primary duty

11  does not include performance of office or non-manual labor work. *Cunningham,* 2019 WL

12  13201913, at *4.

13       Despite this law, the County misapplies the legal analysis required to determine

14  whether the Patrol Lieutenants are subject to the first responder exception, which in turn

15  causes the County to focus on purported dissimilarities irrelevant to the material first

16  responder issue.  In particular, the County: (1) improperly focuses its analysis of the white-

17  collar exemptions solely on the Department of Labor regulations (*see* Doc. 152 at 9-10

18  (citing 29 C.F.R. § 541.100(a)(2) and § 541.200(a)(2)-(3) for definition of "management"

19  and 29 C.F.R. § 541.700(a) for definition of "primary duty")), and fails to address the first

20  responder exception in its analysis;[13] (2) misleads the Court with its statement that the

21  "federal regulations set forth a list of emergency response tasks that are decidedly

22

23  [12] The County cites to *Watkins v. City of Montgomery*, 919 F.Supp. 2d 1254, 1264-1265
24  (M.D. Ala. 2013) in support of the proposition that the first responder exception must be
   considered in conjunction with the exemptions.  Doc. 152, at 23:6-8.  In *Watkins*, after an
   analysis of the job duties and elements of the exemptions, the court denied summary
25  judgment finding there was an issue of disputed fact as to "whether the primary duty of a
   Fire Suppression Lieutenant is one of a first responder or one of an exempt executive or
26  administrative employee."  *Id.* at 919 F.Supp.2d at 1264-1265.
   [13] The County's citation to *Burke v. Mgmt. and Training Corp.*, 2018 WL 4038115 (N.D.
27  Miss. Aug. 22, 2018) regarding the management requirement of the white-collar
   exemptions is distinguishable from the facts here.  Unlike here, *Burke* involved lieutenants
28  working at a correctional facility (versus the law enforcement Patrol Lieutenants at issue
   here) and the court did not even address the first responder exception.

11

1    managerial" (Doc. 152 at 12-13 (citing 69 Fed. Reg. at 22130)), while failing to

2    acknowledge that simply performing managerial tasks is not enough – the Court must also

3    complete its primary duty analysis to determine whether they are in fact managers versus

4    first responders; (3) fails to consider that management-like tasks undertaken in conjunction

5    with or directly related to first responder duties do not turn a first responder into an exempt

6    executive or administrator (*see Morrison*, 826 F.3d at 769-70; *Barrows*, 944 F.Supp.2d at

7    603);[14] and (4) narrows the first responder exception to focus exclusively on whether the

8    Patrol Lieutenants are performing only the handful of examples of law enforcement duties

9    specifically enumerated in 29 C.F.R. § 541.3(b) (Doc. 152, at 23:13-14), again ignoring

10   that exempt tasks, such as managerial tasks, and first responder tasks are typically

11   intertwined.[15]

12        The County's failure to apply the proper "primary duty" test taking into account the

13   first responder exception ultimately leads to the County focusing on the wrong issues at

---

14

15   [14] The County cites to *Benavides v. City of Austin*, 2012 WL 12882001 (W.D. Tex. Sept.
16   21, 2012), which is distinguishable as it does not address decertification issues. Rather,
     after an analysis which acknowledges the interplay between the white-collar exemptions
17   and the first responder exception, the court denied summary judgment of a collective of
     EMS Field Commanders because "the Plaintiffs' evidence that their primary duty is first
18   response" creates a disputed issue of material fact, and, in contrast, granted summary
     judgment against two non-Field Commanders who were involved in planning major events
19   doing administrative work and not primarily first responder duties. Significantly, however,
     despite the fact that the analysis of the white-collar exemptions and the first responder
20   exception is completely on point and applicable to the issues in the County's motion for
     summary judgment and that the County is clearly aware of this decision, the County fails
21   to cite *Benavides* anywhere in its analysis of the exemptions in its motion for summary
     judgment (Doc. 154).
     [15] Even *Maestas v. Day & Zimmerman, LLC*, 664 F.3d 822, 827, 828 (10th Cir. Jan. 4,
22   2012), which the County relies on for its narrow interpretation of the applicable first
     responder duties (Doc. 152, at 23:2-3), acknowledges that exempt tasks, such as managerial
23   tasks, and first responder tasks are typically intertwined. *See Maestas*, 664 F.3d at 827, 828
     ("Although the first responder regulation reaffirms the primary duty test, it changes the
24   analysis in a subtle but significant way: It states that first responders are not exempt
     executives even if they "also direct [ ] the work of other employees in the conduct of an
25   investigation or fire"; "high-level employees who perform some first responder duties, like
     police lieutenants or fire chiefs, can nonetheless be exempt executives if their primary duty
26   is managerial[.]'")). Further, although the *Maestas* court cites to a 2005 Department of
     Labor Opinion letter – which the County notes in its motion (Doc. 152 at 23:2-6) – that
27   opinion letter from 2005 specifically relies on case law that has since been called
     "misplaced" by far more recent federal court analysis of the first responder exception. *See,*
28   *e.g., Morrison*, 826 F.3d at 768.

1   decertification (as discussed further in Section V below).  For example, the County focuses

2   on purported differences between the Patrol Lieutenants' supervisory duties – for instance

3   that one may have served on a promotional board, or been involved in training, or been

4   assigned a specific project relating to a building design – while ignoring that in considering

5   the first responder exception, the focus is on the nature of the work and the "job as a whole"

6   and that these types of differences do not matter to the underlying issue of whether the

7   Patrol Lieutenants' primary duty (*i.e.*, their most important duty) is law enforcement and

8   that of a first responder.  Then, after going down the road of the improper "primary duty"

9   analysis, the County emphasizes these irrelevant differences to argue that decertification is

10  warranted – in essence applying the ad hoc test that the Ninth Circuit in *Campbell* rejected

11  because it improperly leads to "an approach that treats differences as disqualifying, rather

12  than one that treats the requisite kind of similarity as the basis for allowing partially distinct

13  cases to proceed together." *Campbell*, 903 F.3d at 1113-14, 1116-1117.[16]  The County's

14  misapplication of the law should not distract this Court from the actual issue for this motion

15  – whether the Patrol Lieutenants are "similarly situated" in their primary duty of law

16  enforcement – which Plaintiff has demonstrated they are.  *See* Section III, above.

17  ## V.  NONE OF THE COUNTY'S ARGUMENTS WARRANT DECERTIFICATION

18

19      The County offers a series of misguided arguments about decertification, which

20  ignore Houck's common evidence demonstrating the Patrol Lieutenants are "similarly

21  situated" as to the material issue in this case (Section III), misapply the proper law on the

22  "primary duty" test (Section IV), and engage in an improper ad hoc decertification analysis

---

[16] *See also Landis v. Elevance Health Cos., Inc.*, 2025 WL 2557193, *6 (E.D.N.C. Aug. 22, 2025)("Defendants emphasize that Plaintiffs work on different teams, have different duties, and conduct different types of utilization review using different guidelines. [] However, these differences are not significant to the question of Plaintiffs' exempt status, and any differences are outweighed by the similarities between Plaintiffs.")(citations omitted); *Learing,* 722 F.Supp.3d at 936 (in finding plaintiffs "similarly situated" that court stated: "The core issue in this overtime pay dispute is whether utilization review work performed by NMMs at Anthem falls under exempt categories, meaning not qualifying for overtime pay….Despite some differences in NMMs' assignments, all operate under a common employment framework that outlines their main duties, individual authority levels, and job performance standards." (citations omitted).

13

focusing primarily on immaterial differences rather than material similarities. However, as explained below, none of the County's arguments warrant decertification of the Patrol Lieutenants.

A.    **Plaintiff Is Not Relying On "Generalized Evidence" To Show The Patrol Lieutenants Are "Similarly Situated"**

The County argues that Plaintiff cannot rely on "generalized evidence" (such as the job description, compensation and overtime policies and uniform exempt classification) to demonstrate the Patrol Lieutenants are "similarly situated," by citing to Plaintiff's Motion for Conditional Certification. Doc. 152 at 5:25-6:2. Even at the initial conditional certification stage, however, Plaintiff relied on more than "generalized evidence," including declarations from Plaintiff Houck and three other opt in plaintiffs. Now having the benefit of full discovery, Plaintiff is relying on testimony, declarations and discovery from five Captains, testimony from twelve Patrol Lieutenants in addition to Plaintiff regarding their job duties, as well as the County's documents and Senior Human Resources employees' testimony.

Although Plaintiff does not rely on the uniform job description *exclusively* (versus evidence of the Patrol Lieutenants day-to-day job duties), it would not be appropriate to simply ignore the County's job description either. In fact, the County relies on the job description heavily it its own summary judgment analysis to argue that the Patrol Lieutenants are properly classified as exempt from overtime. Doc. 154, at 6-7. Further, the job description supports that the Patrol Lieutenants are similar for purposes of certification through trial. All of the Patrol Lieutenants are subject to the same, uniform job description which specifically refers to them as "Law Enforcement Lieutenants" and classified as exempt. SOF ¶ 355 (Doc. 155-4, at Ex. 5 (job description); (Ex. 14, Cpt. Aldorasi 14:22-15:7; Ex. 17, Cpt. Lee 20:1-16, 22:7-10; Ex. 16, Cpt. Kratzer 18:20-19:12). And, when looking at the actual job description, it is clear that the Patrol Lieutenants are required to engage in law enforcement as their "primary duty." For example, under the heading "Incident Management," the job description indicates that the Patrol Lieutenants

1   "manage[] and report[] to emergency incident scenes that require an increase in command

2   presence." Doc. 155-4, at Ex. 5.  The job description also indicates that the Patrol

3   Lieutenants must be certified by the State of Arizona as Peace Officers, must have the

4   ability to maintain composure in stressful situations that require emergency action,

5   indicates that they may face dangerous, hostile, and at times life threatening conditions,

6   and must have the ability to perform sprints, jumping and vaulting tasks, and other physical

7   acts commensurate with law enforcement activity in the field.  Doc. 155-4, at Ex. 5.

8        Further, the Patrol Lieutenants testified that while the job description accurately

9   provided an overview of their job duties, there are other aspects of their job that were not

10  necessarily included in the job description itself.[17]  In particular, the Patrol Lieutenants'

11  testimony emphasized that they are all routinely required to engage in law enforcement

12  duties.  For example, Houck testified that the job description provides a description for a

13  "general blanket lieutenant" for the County (Ex. 1, Houck 193:1-3), but a job description

14  for the specific duty assignment of "patrol lieutenant" would include "going to calls,

15  monitoring the radio, assisting with the apprehension of bad guys, putting together –

16  helping deputies put together criminal investigations" "monitoring the radio, being ready"

17  as that accounts for "75 percent of my time. That's what I'm there for. I'm there to respond

18  to calls. I'm there to respond to things that need a command presence."  SOF ¶ 357 (Ex. 1,

19  Houck 192:4-193:12)[18]; *see also* Doc. 152 at n.2.  Thus, the job description and the

20

21  _____

    [17] Such testimony is not surprising as the job description itself provides it "is not an all-
22  inclusive list of all job duties that may be required," and Senior Human Resources
    personnel also agree that the job description does not contain all the duties that the Patrol
23  Lieutenants perform.  Doc. 155-4, at Ex. 5; SOF ¶ 356, Ex. 22, Grennan 29:17-21.
    [18] *See, e.g.,* SOF ¶ 357 (Ex. 5, Halverson 22:20-23:17, 26:3-27:15 (confirms patrol
24  lieutenants do all those activities listed but also should include the "requirement of actually
    taking the calls for service and being the first responder on scene"); Ex. 4, Freeman 79:15-
25  85:12 (general job description but would add that "So if while on duty and I'm at work and
    I observe something, especially while I'm in uniform, I take it as I have a responsibility to
26  act and take action"; talks about work environment that implies not just an office job); Ex.
    11, Thomas  68:19-69:5 (job description should also include deputy descriptions because
27  "you respond to calls for services, make arrests, ensure public safety "you're still a law
    enforcement officer"); Ex. 8, Neville 138:22-140:23 (more than what is involved in job
28  description – doesn't really address that "actively supervising"); Ex. 9, Rankin 26:1-15

1    testimony from the Patrol Lieutenants describing their day-to-day job duties demonstrates

2    that the Patrol Lieutenants are all "similarly situated" as law enforcement officers.

3        Plaintiff also does not rely exclusively on the County's uniform classification of

4    Patrol Lieutenant's as exempt, but it would be improper to simply ignore the County's

5    uniform classification because it is indicative of the fact that the County itself believes the

6    Patrol Lieutenants' job duties are similar.  *See, e.g., Hudgins*, 2019 WL 354958 at *6 ("The

7    Court is also persuaded that [defendant's] decision to categorically exempt all [logistics

8    executives] is probative. Despite [defendant's] efforts to cast this point as immaterial, such

9    a "uniform exemption policy is certainly relevant" in determining whether an exemption

10   defense would be individualized") (citation omitted); *Morgan v. Fam. Dollar Stores, Inc.,*

11   551 F.3d 1233, 1264 (11th Cir. 2008) ("the bulk of evidence demonstrated that the store

12   managers were similarly situated and even Family Dollar perceived no such distinction.

13   Indeed, it exempted all store managers from overtime pay requirements without regard to

14   store size, sales volume, region, district, or hiring and firing authority.").

15       **B.    Discovery Confirms The Patrol Lieutenants Are "Similarly Situated"
            as to Whether Their Primary Duty is Exempt or Non-Exempt**

16       The County argues generally that the "discovery confirms" the Patrol Lieutenants

17   are not similarly situated for purposes of determining whether their primary duty is exempt

18   or non-exempt work.  That is simply not supported by the evidence in this case.  For

19   example, the County argues that "the Plaintiffs' testimony confirms that each Plaintiff was

20   not actually performing similar duties."  (Doc. 152 at 7:23-24). However, as set forth

21   above, in fact the testimony in this case from the Patrol Lieutenants and their Captains is

22   that all the Patrol Lieutenants are uniformed law enforcement officers who are logged into

23   CAD and monitoring the radio to be ready to respond at a moment's notice to respond to

24

25

26   (believes accurate but "similarly to the sergeant position, we also are enforcing laws and
     maintaining order while protecting life and property as our first responsibility as a police
27   officer in any position"); Ex. 13, Vance 29:18-31:2 (should also include "responding to
     incidents rather than just managing and monitoring'"); Ex. 7, Keller 102:16-104:25
28   (beyond "management role" should include more duties regarding "serve and protect the
     community" and "law enforcement officer")).

1    any high-level calls for service as they were required to do.  All the Patrol Lieutenants

2    engage in law enforcement duties, including responding to "major incidents" such as armed

3    robberies, homicides, shooting victim incidents, drownings, and school threats.  And, the

4    Patrol Lieutenants and their Captains testified that these law enforcement duties take

5    priority over all administrative tasks they may be working on.  *See* Section III above.

6    Significantly, the County points to no evidence demonstrating that the Patrol Lieutenants

7    do ***not*** engage in active law enforcement duties. Thus, given the similarities in the Patrol

8    Lieutenants' job duties, the question of whether their primary duty is exempt or non-

9    exempt work is a question that can be answered for the collective as a whole.

10        The County next argues that "resolution" of each Patrol Lieutenant's claim will

11   require "the factfinder to engage in multiple fact-intensive and highly individualized

12   inquiries," especially in light of the "number of exemptions involved in this case." Doc.

13   152 at 8:26-93.  First, as the County acknowledges, "the FLSA exemptions for executive,

14   administrative, and highly compensated employees do not apply to 'first responders,'

15   which includes individuals whose "primary duty is related to emergency response or law

16   enforcement."  Doc. 152 as 10:21-24 (citing 29 C.F.R. § 541.3).  Thus, contrary to the

17   County's claim that there are "multiple permutations of the exemptions and duty analysis"

18   – there is really just one main question to be resolved on the merits:  whether the Patrol

19   Lieutenants' primary duty of law enforcement qualifies them as non-exempt first

20   responders subject to overtime pay.  This question can be answered on a collective-wide

21   basis given the similarities in the Patrol Lieutenants' primary duty as law enforcement

22   officers.  Further, "[j]ust because the [exemption defense] inquiry is fact-intensive does not

23   preclude a collective action where plaintiffs share common job traits." *Pruess,* 745

24   F.Supp.3d at 1250 ("Individual questions concerning the administrative exemption do not

25   require decertification" because "at the decertification stage, the overarching issue is

26   'whether common questions of law and fact exist that justify representational litigation.'");

27

28

1  *see also Morgan,* 551 F.3d at 1263; *Landis,* 2025 WL 2557193, at *7.[19]

2          The County argues that the Patrol Lieutenants are not "similarly situated" due to

3  "wide variation amongst [the Patrol Lieutenants] with regards to their duty assignments"

4  Doc. 152, at 9:4-5. However, none of the County's arguments actually support that the

5  Patrol Lieutenants are not similarly situated.  First, the County's assertion that it is

6  "commonplace" for Patrol Lieutenants to routinely transfer between Patrol Districts (Doc.

7  152 at 9:8-10) actually *supports* that the Patrol Lieutenants are interchangeable within the

8  Patrol Districts and the Districts are similar in nature. There is no evidence that District-

9  specific training was required or that different policies exist in the different Patrol Bureau

10  districts.  And, there is no evidence to suggest that different supervising Captains would be

11  implementing different compensation or employment policies in the different districts.  To

12  the contrary, the compensation policy – *i.e.*, the exempt classification – is a MCSO policy

13  that is uniformly applied county-wide.  *See, e.g.,* Doc. 155-4, at Ex. 5 (Law Enforcement

14  Lieutenant job description noting "exempt" classification); Doc. 155-8, at Ex. 59.  And,

15  the Captains and Patrol Lieutenants testified that regardless of what district or shift (day or

16  night) they are assigned to, the duties and policies amongst the assignments were "very

17  similar."  *See, e.g.,* SOF ¶ 358 (Ex. 13, Cpt. Vance 19:14-21:9, 24:18-25:15, 32:25-34:10,

18  104:25-105:8, 107:2-25 (the Patrol Lieutenants' assignments are "very similar" in that they

19  are responsible for "managing the supervisors, managing the deputies, listening to the radio

20  for incidents that occur and responding to the incidents that occur"; "The volume would be

21

22

23  ───────────────────

24  [19] Both *Guanzon* and *Weeks* – cited by the County – are distinguishable. Doc. 152, at 8:12-
     14. Both cases focus heavily on the dissimilar facts of the third element of the
25  administrative exemption, *but*, significantly, neither case analyzes the exemption in
     conjunction with the first responder exception – as must be done here.  Further, in *Guanzon*,
26  the court's decision to decertify was supported by the fact plaintiff attempted to rely on
     generalized evidence, failed to "dispute Vixxo's legal arguments concerning whether [four
27  of the seven] identified functions can trigger the administrative exemption," and that such
     "omissions, standing alone, suggest Vixxo's motion should be granted", as well as "some
28  of the factual assertions contained in Plaintiff's brief are belied by the record" – factors
     which do not exist here.

1   the major difference").[20]  To the extent a Patrol Lieutenant transferred out of Patrol Bureau

2   East or West for a period of time, that will not require an "individualized assessment" – in

3   fact, the County has already identified precisely when each Patrol Lieutenant was acting in

4   the position of Patrol Lieutenant in Patrol Bureau East or West during the relevant time

5   period and that is the only time at issue in this case.  Doc. 155-10 at Ex. 77.  And, that some

6   of the Patrol Lieutenants may have also worked in other areas outside of Patrol Bureaus

7   East and West does not negate that they are similarly situated in how they performed their

8   jobs as Patrol Lieutenants while working in Patrol Bureaus East and West during the

9   relevant period, which is the only aspect of their work at the County at issue in this case.

10          Finally, "whether each Plaintiff worked more than 40 hours in any one workweek"

11  is not a "separate" issue that would require a "mini trial for each Plaintiff" (Doc. 152 at

12  8:8-11).  The Patrol Lieutenants have uniformly testified that they were required to work

13  more than forty hours a week without receiving overtime.[21]  Further, the payroll records

14  similarly support that the Patrol Lieutenants worked more than forty hours in a workweek.

15  *See, e.g.,* SOF ¶¶ 326-327 (Doc. 27-1, Houck Decl. at 10-11 at ¶¶ 18, 20, 25-27 and 13-32

16  (Exhibit A (paystubs)); Doc. 27-2, Halverson Decl. at 4-5, ¶¶15-17, 20-21 and 6-117

17  (Exhibit A (paystubs)) and Sanchez Decl. at 127-128, ¶¶14-15, 19; Ex. 19, Ellison 102:12-

18  105:6).  And, importantly, the law is clear that at decertification, the focus should be on the

19  similarities between the Patrol Lieutenants and the common overtime policy and not on

20

----

21  [20] *See also* Ex. 17, Cpt. Lee 58:10-16; 59:9-62:21 (Lake Patrol may not have as much crime

22  but has "more safety issues" – still patrol related and still exchangeable with other districts); Ex. 14, Cpt. Aldorasi 43:21-44:2 (same patrol type duties in Lake Patrol even

23  though different transportation may be used to perform); Ex. 10, Rosenberger 60:25-61:2, 62:16-25 (scheduling and day/night shift lieutenants are essentially the same in all three

24  districts he worked in); Ex. 18, Cpt. Stutsman 65:2-11 (although nighttime watch commanders have some differences, "overall, I think, yes, they're probably pretty

25  similar."); Ex. 1, Houck 28:9-16, 63:11-24 (districts/day & night shifts – similar duties but may be busier)).

26  [21] *See, e.g.,* SOF ¶ 326 (Ex. 2, Acosta 53:16-55:17, 98:2-17; Ex. 7, Keller 19:17-25, 23:15-18; Ex. 8, Neville 61:25-63:5; Ex. 1, Houck 12:17-13:25, 19:18-20:5; Ex. 3, Brice 18:24-

27  19:23; Ex. 4, Freeman 68:18-69:3, 73:15-74:11; Ex. 6, Jackson 29:22-31:8; Ex. 5, Halverson 57:21-58:13, 60:3-24, 62:5-10; Ex. 9, Rankin 32:23-33:13; Ex. 10, Rosenberger

28  13:23-14:15; Ex. 11, Thomas 32:25-33:6, 43:1-46:23; Ex. 12, Trowbridge 95:9-96:5, 98:2-25; Ex. 13, Vance 7:17-20, 38:9-12).

differences in number of hours worked or different amounts of overtime due. *Campbell*, 903 F.3d at 1114, 1116-1117 ("A systemic policy is no less common across the collective if those subject to it are affected at different times, … or to different degrees."; "Nor are individualized damages calculations inherently inconsistent with a collective action. In the wage-and-hour context, if a common question regarding the employer's liability is answered in the plaintiffs' favor, individualized calculations of work hours may readily be addressed with any of the practices developed to deal with Rule 23 classes facing similar issues.").

### C.    The Patrol Lieutenants Are Similarly Situated Such That Whether The First Responder Exception Applies To Them Is A Question That Can Be Answered Uniformly

The County argues decertification is warranted because the Patrol Lieutenants' performance of first responder duties is "incredibly varied and individualized." However, the County's narrow interpretation of the first responder exception which focuses exclusively on whether the Patrol Lieutenants are performing the handful of law enforcement tasks specifically enumerated in 29 C.F.R. § 541.3(b) (*see* Doc. 152, at 23:13-14), completely ignores that courts are to consider the practical nature of the Patrol Lieutenants' job duties *as a whole*. *Cunningham*, 2019 WL 13201913, at *6 (internal citation omitted; emphasis added). *See also* Section IV, above; *see generally* Plaintiff's Cross Motion of Summary Judgment.

Further, by focusing on purported variations between how the Patrol Lieutenants perform their job duties on a day-to-day basis, the County is improperly engaging in an ad hoc analysis rejected by the Ninth Circuit. *Campbell,* 903 F.3d at 1113-14, 1116-1117. Regardless, when properly considered, none of the "individualized" issues the County raises regarding application of the first responder exception warrants decertification. In fact, in attempting to demonstrate the existence of "individualized" and "varied" duties, the County has actually demonstrated that ***all*** the Patrol Lieutenants have in their role as a Patrol Lieutenant actually engaged in the specific activities set forth in the 29 C.F.R. § 541.3(b) (such as rescuing fire, crime or accident victims, preventing or detecting crimes;

conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports).  For example, the County states that one Patrol Lieutenant testified he may have apprehended a suspect once in a two-year period, while another did less than 50 times in a three-year period and yet another did 100 times in four and a half years.  Doc. 152 at 24:23-27.  What is clear from this testimony is that all three Patrol Lieutenants are "similarly situated" in that they engaged in these first responder duties.[22]  The County's focus on the specific number of times the Patrol Lieutenants spend out in the field engaged in a specific task or the percentage of time spent on non-exempt tasks misses the point – when law enforcement employees like the Patrol Lieutenants engage in first responder work, the material question then becomes whether it is their primary duty when considering the overall importance.[23]

In fact, the County's analysis is so ultra-focused on simply looking to the duties set forth in 29 C.F.R. § 541.3(b) that it borders on the absurd.  For example, as 29 C.F.R. § 541.3(b) is a general regulation for all first responders – which would include police, fire fighters, paramedics, and other emergency responders – such that the first duty enumerated (*i.e.*, "preventing, controlling or extinguishing fires of any type") is presumably intended as an example of a duty related to fire fighters.  Rather than simply acknowledge that, the County devotes an entire section in its motion to the Patrol Lieutenants' involvement with fires in its effort to demonstrate variations between the Patrol Lieutenants who serve as

---

[22] *See also* CAD "Employee Stats" (CAD reports showing all Patrol Lieutenants engaged in first responder duties), at Doc. 159-2, at 39-68.

[23] *See, e.g., Morrison*, 826 F.3d at 769, 770 (the nature of this type of first responder emergency work is generally to wait, so it would be "illogical" to give much consideration to the amount of time a first responder devotes to work in the field related to emergency calls and the "time presumably would vary from year to year, based on how many emergencies arise, without changing the character of the employee's job as a whole.")(internal citation omitted); *Barrows,* 944 F.Supp.2d at 604-5 (holding that although the captain's firefighting duties were not the largest percentage of his time, they were the most important duties performed because he was tasked with interrupting whatever other tasks to respond to calls).

1   police officers, not firemen.  Doc. 152, at 23:26-24:6.  But, as set forth above, the County's

2   efforts to show such irrelevant differences does not negate the similarities in the material

3   issue of the Patrol Lieutenants' primary duty of law enforcement.

4        Further, the County's attempts to minimize the Patrol Lieutenants' first responder

5   work by noting the number of times a Patrol Lieutenant was the "primary responding unit"

6   (Doc. 152 at 22-29), or comparing the frequency at which the Patrol *Lieutenants* perform

7   first responder duties to that of the Patrol *Deputies* (Doc. 152 at 23:15-22), are misplaced.

8   These variations are irrelevant under a proper analysis of their "primary duty," which

9   requires a holistic examination of their job duties, and ignores that the first responder

10  regulation itself states that it applies to "police officers…regardless of rank or pay level."

11       **D.**    **The Patrol Lieutenants Are Similarly Situated Such That Whether The**
             **Executive, Administrative, And Highly Compensated Exemptions**
12           **Apply To Them Is A Question That Can Be Answered Uniformly**

13       Despite acknowledging the first responder exception takes precedence over the

14  other white collar and highly compensated exemptions (Doc. 152, at 10:21-24), the County

15  spends 14 pages of its 29-page brief pointing out purported differences in the Patrol

16  Lieutenant's day-to-day job duties arguing that each Patrol Lieutenant's "primary duty"

17  would require an "individualized analysis" by the Court, and as a result, whether the

18  executive, administrative, and highly compensated employee exemptions apply cannot be

19  determined on a collective-wide basis.  Doc. 152, at 9-22.  When properly analyzed, none

20  of the purported "individualized" issues the County raises warrant decertification because

21  the evidence demonstrates that the Patrol Lieutenants are "similarly situated" such that the

22  question of whether their "primary duty" involves exempt or non-exempt job duties will

23  be answered on a collective-wide basis.

24       Further, in reviewing the County's exemption arguments, it should not be lost on

25  the Court that while the County is arguing the collective should be decertified because the

26  executive, administrative, and highly compensated exemptions cannot be applied to the

27  Patrol Lieutenants on a collective basis due to supposed "individualized" issues, it is

28  arguing the opposite in its simultaneously filed motion for summary judgment where it

seeks summary judgment on the grounds that "Houck and the other Plaintiffs are properly classified as exempt from overtime pursuant to the executive, administrative, and/or highly compensated exemptions." *See* Doc. 154, at 1:27-2:3.  As the Court in *Learing* explained:

> "An inherent tension exists between Anthem's summary judgment argument—that all NMMs fit within either the administrative or learned professional overtime exemption—and its opposition to collective proceedings, citing differences in NMM subject areas and work settings. This contradiction highlights the need to evaluate at the appropriate level of abstraction. ***The key question is whether the plaintiffs' differences are substantial enough to outweigh their common experiences under the alleged FLSA-violating practices*** ….Although individual NMMs may experience variations in their day-to-day duties, these do not subvert the central question of whether their primary job duty of conducting utilization review constitutes nonexempt work under the FLSA. Thus, despite some individual variability, NMMs are similarly situated in Anthem's utilization management program and all face the same alleged FLSA violation: their work was misclassified as exempt from overtime pay."

722 F.Supp.3d at 937-938 (citations omitted, emphasis added).

   **1.**  **Whether the Patrol Lieutenants qualify as exempt executives or administrators can be answered on a collective-wide basis[24]**

     **a.**  **Primary Duty of Management**

   As explained above, when analyzing whether the Patrol Lieutenants' primary duty was management or administration, the County fails to apprehend the interplay between the first responder exception to overtime and the white-collar overtime exemption analysis necessary to account for the nature of work when an employee is a first responder.  The case law is clear that their first responder duties must be considered when analyzing the exemptions and management-like tasks "undertaken in conjunction with, or directly related to, primary first responder duties do not turn a first responder into an exempt executive or administrator."  *Morrison*, 826 F.3d at 769-70; *see also Barrows*, 944 F.Supp.2d at 603.  Here, the evidence demonstrates that the Patrol Lieutenants are "similarly situated" such that whether their "primary duty" of law enforcement is to be considered that of a non-exempt first responder can be determined on a collective-wide basis.  *See* Sections III and

---

[24] As to the executive and administrative exemptions, the County does not argue that there are any variations between the Patrol Lieutenants as to the salary requirements or that the Patrol Lieutenants direct the work of two or more other employees.  *See* Doc. 152, at II(B)(3)(a)(1), II(B)(3)(a)(3) and II(B)(3)(b).

1  IV(A), above.  Further, the County once again applies the improper decertification standard

2  by engaging in an ad hoc analysis of the Patrol Lieutenant's job duties thereby "zooming

3  in" so close to focus on purported variations between how the Patrol Lieutenants perform

4  their job duties that it completely ignores all similarities between the Patrol Lieutenants.

5  *See* Sections II and IV(B), above.  When properly considered, none of the "individualized"

6  issues the County raises regarding the element of "management" duties under the executive

7  and administrative exemptions warrants decertification.

8           i.      **The County mischaracterizes the "differences"**
                    **between the Acting Captain, Watch Commander**
9                   **and Day Commander Roles**

10          The County cites examples of what it claims are "significant differences in

11  command responsibilities and job duties" based on duty assignment (*i.e.*, Acting Captain,

12  Watch Commander and Day Commander) and variations between districts.  Doc. 152 at

13  12:21-22; Doc. 152 at 12-15.  In doing so, the County ignores the testimony that supports

14  that regardless of duty assignment the Patrol Lieutenant's primary duty is still law

15  enforcement.  *See* Section IV, above.

16          When Patrol Lieutenants are in the role of *Acting* Captain – *i.e.*, filling in for a

17  Captain when he is on leave or vacation – the Patrol Lieutenant still maintains his role and

18  duties as a Patrol Lieutenant in addition to taking on Captain duties.  *See* SOF ¶ 360 (Ex.

19  14, Cpt. Aldorasi 64:21-65:8; Ex. 11, Thomas  122:17-123:6; Ex. 7, Keller 38:3-9).  And,

20  the duty assignment of Watch Commander is simply the name given to the night-shift

21  Patrol Lieutenant.  Although there may be differences in volume of calls between the day

22  and night shifts, and even certain districts, that also does not change the nature of the Patrol

23  Lieutenant's primary duty.  *See, e.g.,* SOF ¶ 361 (Ex. 14, Cpt. Aldorasi 43:21-44:2 (same

24  patrol type duties in Lake Patrol even though difference transportation may be used to

25  perform); Ex. 10, Rosenberger 60:25-61:2 and 62:16-25 (day and night shifts and

26  scheduling in different districts is essentially the same); Ex. 17, Cpt. Lee 58:10-16; 59:9-

27  62:21 (Lake Patrol may not have as much crime but has "more safety issues" – still patrol

28  related and still exchangeable with other districts); Ex. 1, Houck 28:9-16, 63:11-24

1  (districts/day & night shifts have similar duties but some may be busier); Ex. 13, Vance

2  104:25-105:8 ("the duties are very similar. The volume would be the major difference.")).[25]

3  And, even in the role of an "administrative lieutenant", the Patrol Lieutenants still have

4  law enforcement/first responder duties.  *See* SOF ¶ 362 (Acosta 41:9-18, 146:19-147:16

5  (although he is currently in more of an administrative role in District 2, he still has the radio

6  on, is logged into CAD and still involved in patrol such that if there was a critical incident,

7  he "absolutely" would still be expected to respond)).

8      The County refers to the roles of Acting Captain and Watch Commander as being

9  the "highest-ranking individuals" in the District in an effort to create a "difference" in the

10  factual circumstances of the Patrol Lieutenants during those limited periods of time.  Doc.

11  152 at 12-14.   Although for that particular shift, the Watch Commander may be the

12  "highest-ranking individual" on shift, that does not change the Patrol Lieutenant's primary

13  duties.  *See* SOF ¶ 364 ( Ex. 18, Cpt. Stutsman 65:2-11 (overall the day and night shifts are

14  "pretty similar")); *see also Mullins v. City of New York*, 653 F.3d 104, 119 (2nd Cir. 2011)

15  ("The district court's conclusion that plaintiffs are often the only supervisors in the field

16  and thus exercise discretion in the performance of their duties...overlooks the fact that such

17  discretion forms part of their performance of law enforcement work in the field.").  The

18  Watch Commander assignment "still requires you to be uniformed, armed, prepared to be

19  a first responder or respond as backup."  SOF ¶ 365 (Ex. 6, Jackson 43:3-8).

20      To the extent the County is implying that Patrol Lieutenants are free from

21  supervision in these roles, that is not supported by the evidence.  Rather, the evidence

22  supports that even in these instances, the Patrol Lieutenants have little freedom in deciding

23  how to perform their jobs, which weighs in favor of them being non-exempt from overtime.

24  For example, Captains – not Patrol Lieutenants – had final decision-making power in terms

25

26  [25] Although Jackson did testify that the districts may have differences, the "main"
27  difference he noted was simply the "hours" and also the type of patrol (*e.g.*, residential
   versus unincorporated areas such as national parks or county parks) – he did not offer any
28  testimony raising doubt that the Patrol Lieutenants engage in law enforcement duties.  *See*
   SOF ¶ 363.

of district decisions.  *See, e.g.,* SOF ¶ 307 (Ex. 15, Cpt. Bailey 24:16-25:1 ("I would let the lieutenants make their decisions.  But if it was a decision that I thought maybe was not the best interest of the office or the individual, I would overrule them.") and 33:3-34:4, 59:12-60:12 (captains reviewed lieutenants on all tasks they performed to ensure they followed all the County policies and tracked the lieutenants consistently throughout day when logged onto CAD); Ex. 8, Neville 25:20-26:1 (as lieutenant he doesn't have "the kind of command latitude to be able to make day-to-day decisions that shape the landscape of this agency by personnel or policy", decisions go through "his bosses"); Ex. 1, Houck 15:6-12 (no authority to make important decisions)); Doc. 27-1, Houck Decl. at 10, ¶14; Doc. 27-2, Halverson Decl. at 4, ¶10 and Sanchez Decl. at 126, ¶10.  And, even when they are the highest-ranking official on duty, the Patrol Lieutenants ultimately must run decision-making by their Captains and/or Chief.  SOF ¶ 304 (Ex. 1, Houck 115:13-116:7 (after night shift, had to update captains and chief about status of all calls); Ex. 11, Thomas  20:2-21:2, 24:16-21 (when acting captain, may still have contact with captain if any major issues came up); Ex. 8, Neville 126:2-128:8 (as a watch commander, he was "scene commander" but was still "getting my orders from my captain who, at the time, is asleep in his bed")).

### ii.    The County mischaracterizes the "differences" between "primary duties" Patrol Lieutenants perform

The County also seeks to demonstrate variations in the Patrol Lieutenants "primary duty" based on testimony from when they were asked at their depositions to draw a legal conclusion regarding what their "primary responsibilities" were as a Patrol Lieutenant. Doc. 152 at 14-15.  However, as set forth above, all the Patrol Lieutenants confirmed that their job duties involved law enforcement based on the job description as well as additional duties they all performed.  *See* Section V(A), above.  And, despite the County's effort to cherry-pick certain lines of questioning to misrepresent the character of the Patrol Lieutenants' job *as a whole*, the Patrol Lieutenants all testified that their primary duty was law enforcement.  For example, in addition to describing his position as providing guidance and ensuring deputies followed policy, Acosta also testified that in District 1, during the

day he was "mostly going to patrols, going to actual calls for service," and the night shift was "absolutely more focused on the patrol calls" and he was required to go on "serious calls" and "critical incidents." Plt's CSOF ¶ 283 (Acosta 77:7-79:12, 131:3-9). In comparison to the excerpt the County provided (in bold below), Houck testified *in full* that: "My **primary duty as a patrol lieutenant remains law enforcement, being available to respond to calls**, being -- having to show up in uniform, be on the radio, be logged in to the CAD system to be dispatched to calls. I'm not a -- in a management-type role. I'm still in a first responder role….[M]y primary duty remains law enforcement. That's what – that's what I'm there for." Plt's CSOF ¶ 284 (Ex. 1, Houck 19:22-20:11).[26] The County ignores specific testimony by Keller and Thomas confirming what patrol duties should be included on the job description. *See, e.g.,* Plt's CSOF ¶¶ 285-286 (Ex. 7, Keller 103:12-15, 104:13-25 ("My duties at first and foremost is being a law enforcement officer," and job description should include those duties); Ex. 11, Thomas 68:19-69:5, 70:5-13 ("still a law enforcement officer" so job description should include "respond to calls for service, make arrests upon probable cause" and "ensure public safety")). And, Neville testified that in addition to "command and control" duties, that "primarily night shift patrol commander but also day shift, I was responding to calls for service. I was taking calls as a primary. I was writing reports. I was doing a lot of the same jobs that I did as a patrol sergeant….Certainly there is an administrative role to being a lieutenant to a captain, but there is also a first responder aspect to it where you are going out on those scenes;" "first responder duties" included "responding to major incidents, traffic accidents, emergency calls for service." Plt's CSOF ¶ 287 (Ex. 8, Neville 26:11-27:20).[27]

---

[26] *See also* Plt's CSOF ¶ 284 (Houck 192:4-193:12 (as a Patrol Lieutenant his job involved "going to calls, monitoring the radio, assisting with the apprehension of bad guys, putting together – helping deputies put together criminal investigations" "being ready" as that accounts for "75 percent of my time. That's what I'm there for. I'm there to respond to calls. I'm there to respond to things that need a command presence.")).

[27] *See also* Plt's CSOF ¶ 287 (Ex. 8, Neville 141:16-23 (tried to "get my admin stuff knocked out in the first two to three hours of my shift and then spend the rest of the time out there, the majority of the time I tried to be out in the field. If there was a major incident, if there was a shooting, I was going. If there was an armed robbery, I was going; I was responding in person.")).

### iii. The County improperly focuses on time allocation between tasks

The County improperly focuses its analysis on percentage estimates about the amount of time Patrol Lieutenants spend performing exempt duties versus non-exempt duties in an attempt to manufacture variations. Doc. 152 at 16 and 20. However, the County's narrow focus on the amount of time spent performing such duties misapplies the "primary duty" analysis. The law is clear that "[p]rimary duty does not mean the most time-consuming duty; it instead connotes the 'principal' or 'chief' – meaning the most important duty performed by the employee." *Barrows*, 944 F.Supp.2d at 601 (internal citations omitted); *see also Cunningham*, 2019 WL 13201913, at *5 (holding that captains were exempt from overtime even though they only spent 3% of their time on duty responding to emergency calls).[28]

Even if the Court were to accept the percentages that the County relies on, they actually support that the Patrol Lieutenants are "similarly situated" in their primary duty. The Patrol Lieutenants testified that they have spent approximately between 5% and 70% of their time in the field (Doc. 152 at 16, 22), demonstrating that all the Patrol Lieutenants are "similarly situated" in that they do law enforcement work in the field. And, although the County argues that Halverson and Jackson could not estimate an amount of time specifically spent only on certain tasks (Doc. 152, at 16-17), that has no bearing on whether the Patrol Lieutenants are "similarly situated" – especially here where both Patrol Lieutenants confirmed that they did perform law enforcement duties.[29]

---

[28] *See also Hudgins,* 2019 WL 354958 at *6 (at decertification, the court addressed "not the strength of [defendant's] defenses but rather their uniformity across the collective group" and found that "It is enough to observe that the primary duty of the LAEs in the plaintiff class is unlikely to depend only or even primarily on factual questions of how much time each individual LAE spent on particular tasks. Without determining at this point *what* the LAEs' primary duty was or is, it appears that a class-wide resolution is possible under the second element of the administrative-exemption regulation.")(citations omitted).
[29] Although the County notes that Halverson "could not provide an accurate percentage" of time he spent on administrative tasks (Doc. 152, at 16:20-26), he did testify that the percentage of time he would spend "[o]n scene would be, I would think, 10 to 20 percent." Ex. 5, Halverson 95:12-17. Similarly, although Jackson did testify he could not quantify a percentage of time he was in the office versus in the field (Doc. 152, at 16:26-17:3), he

iv.     **The County's focus on "other managerial tasks" does not negate application of the first responder exception**

The County provides a list of "other managerial tasks" that it claims demonstrates that the Patrol Lieutenants' job duties "vary widely." Doc. 152, at 17:4-6. In making this argument, the County ignores once again that given the nature of first responder work, "management-like tasks undertaken in conjunction with, or directly related to, primary first responder duties do not turn a first responder into an exempt executive or administrator." *Morrison,* 826 F.3d at 767; *see also Barrows*, 944 Supp.2d at 604. Further, the County continues to improperly focus on supposed differences in the day-to-day performance of their jobs versus the similarities regarding the material issue. The fact that some of the Patrol Lieutenants were involved in training or "special projects" does not negate that the Patrol Lieutenants' are similarly situated in their primary duty being law enforcement such that this case can proceed on a collective-wide basis.

b.     **Authority to Hire, Fire or Discipline Patrol Lieutenants**

The County's arguments regarding the Patrol Lieutenants' authority to hire or fire individuals are misplaced. While some of the Patrol Lieutenants have been involved in providing recommendations regarding hiring/firing, none of the Patrol Lieutenants testified they had direct and full authority to hire or fire any individuals. And, in fact, the Captains confirmed that even the Captains do not have such authority as all such decisions go through Human Resources. *See, e.g.,* SOF ¶ 314 (Ex. 15, Cpt. Bailey 25:7-16 (lieutenants "had no say in hiring or firing or even assignments"); Ex. 18, Cpt. Stutsman 28:29:9 (even as a Captain, can be involved in the process but does not have discretion to hire or fire – all goes through HR); Ex. 14, Cpt. Aldorasi 20:12-21:1, 22:6-12 (lieutenants and even captains do not have authority – all goes through HR; lieutenants may have "advisory' role on staffing issues but they "do not have the last say"); Ex. 2, Acosta 119:15-123:10 (involved in making hiring or promotional recommendations but "didn't make the final

---

also testified that he never spent an entire shift in the office as a Patrol Lieutenant and that there were some instances when he would have spent an entire shift outside of the office. Ex. 6, Jackson 37:8-21. *See* Plt's CSOF ¶¶ 290-291.

1   say" as that would go up to captain and chief); Ex. 17, Cpt. Lee 32:4-19, 33:4-19, Ex. 16,

2   Cpt. Kratzer 23:10-24:25, Ex. 1, Houck 15:6-12, 209:16-210:10, 211:20-212:2, and Ex. 9,

3   Rankin 70-8-14 (lieutenants and even captains involved in process but HR makes

4   decisions); Ex. 4, Freeman 98:10-99:8 and Ex. 8, Neville 98:10-23 (involved in

5   promotional panel and interviewing but didn't make final determination)); Doc. 27-1,

6   Houck Decl. at 10, ¶15; Doc. 27-2, Halverson Decl. at 4, ¶11 and Sanchez Decl. at 127,

7   ¶11).

8        And, although the County attempts to manufacture differences by pointing to

9   occurrences of tasks such as making disciplinary reports, action plans, and coaching, the

10  evidence demonstrates that the Patrol Lieutents do not have the authority to actually

11  discipline sergeants or deputies. *See, e.g.,* SOF ¶ 313 (Ex. 1, Houck 15:6-12, 209:21-

12  210:10, 211:20-212:7 (no authority to issue discipline); Ex. 8, Neville 26:2-5 (decision to

13  place on admin leave would have to go through executive chief level); Ex. 3, Brice 107:9-

14  16 (not permitted to make recommendations regarding discipline); Ex. 7, Keller 54:6-20

15  (not permitted to discipline subordinates)). Regardless, these variations do not address the

16  relevant point at this stage – whether the Patrol Lieutenants are similarly situated as to their

17  law enforcement duties.

18        **2.     The Patrol Lieutenants are not exempt highly compensated employees**

19        The County recognizes, "to be exempt under the highly compensated employee

20  exemption, an employee's primary duty must include 'performing office or non-manual

21  work" (Doc. 152 at 10:4-6 (citing sec 541.601(d)), but then ignores the law that provides

22  police officers cannot qualify as exempt under the highly compensated exemption, because

23  it "applies only to employees whose primary duty includes office or non-manual work."

24  Department of Labor Preamble to First Responder Regulation, 69 FR 22122-01, 2004 WL

25  865626, at *22129-130. Here, because the evidence demonstrates that Patrol Lieutenants

26  are "similarly situated" in their "primary duty" of law enforcement, the question of whether

27  they are exempt as highly compensated employees will be a question capable of being

28

1    answered on behalf of the collective.  *See, e.g., Morrison*, 826 F.3d at n.11; *Carson*, 2016

2    WL 7647681, at *8.

3         Although the County goes on to address the other two elements of the highly

4    compensated exemption, neither warrant decertification here based on the Patrol

5    Lieutenants being similarly situated as to their primary duty.  As set forth above, the

6    amount of time Patrol Lieutenants may or may not spend performing tasks in "their office

7    versus in the field" (Doc. 152, at 22:7-9) is not the appropriate consideration for whether

8    the exemption applies.  *See, e.g., Cunningham,* 2019 WL 13201913, at *5-*7 ("[t]ime alone

9    [] is not the sole test", because although the captains "spent less than 3% of their time on

10   duty responding to emergency calls," such a small percentage of first responder work out

11   in the field did not mean that the captains were not first responders as a matter of law

12   because "the very nature of emergency response work involves waiting for the next call.").

13   And, that there may be differences in the Patrol Lieutenants' salaries during the relevant

14   period is not a difference as to a material issue that would make collective treatment

15   "infeasible" – it is an issue that goes to the ultimate merits determination which is not at

16   issue at decertification.

17   **VI.    CONCLUSION**

18        Defendant's Motion should be denied in its entirety and this action should proceed

19   collectively.

20        DATED:  November 21, 2025.

21
                                              **FRANKEL SYVERSON PLLC**
22                                            By    *s/ Ty D. Frankel*
                                              Ty D. Frankel
23                                            2375 E. Camelback Road, Suite 600
                                              Phoenix, Arizona 85016
24
                                              **FRANKEL SYVERSON PLLC**
25                                            Patricia N. Syverson
                                              9655 Granite Ridge Drive, Suite 200
26                                            San Diego, California 92123
27                                            *Attorneys for Plaintiff*
28