# EXHIBIT 22

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on            )
behalf of himself and all          )
those similarly situated,          )
                                   )
        Plaintiff,                 ) No.
                                   ) 2:23-cv-00068-DGC
vs.                                )
                                   )
Maricopa County,                   )
                                   )
        Defendant.                 )
_____)

VIDEOCONFERENCE DEPOSITION OF CHIEF KELLY GRENNAN

Phoenix, Arizona
September 5, 2025
10:03 a.m.

REPORTED BY:
Kellie L. Olney, RPR
AZ Certified Reporter No. 50223

PREPARED FOR:
The Court
(Original)



**Griffin Group International**
**888.529.9990  |  602.264.2230**

**Houck vs**
**Maricopa Country**                                                    **Chief Kelly Grennan**

13

1    informed about those changes so that they could be

2    handled by your department?

3        A.    Typically when changes for employees would come

4    through Central HR, they would usually email us, send us

5    Excel documents, and ask us to make the necessary

6    changes or to fill out -- have the employees fill out

7    the forms and -- and sign for the changes to their

8    records.

9        Q.    Okay.  And do you recall who in Central HR you

10   were dealing with with regard to FLSA issues?

11           MS. BALCH SANTIAGO:  Form.

12           THE WITNESS:  The only person I can remember is

13   Darrien Ellison, but there were other clerks and whatnot

14   that we would deal with as well, but I don't recall any

15   names.

16       Q.    BY MS. SYVERSON:  Okay.  Okay.  So now what is

17   your current position?

18       A.    I am the chief human resource officer.

19       Q.    And have you been in that position since

20   January of 2025?

21       A.    Yes, ma'am.

22       Q.    In that position are you now responsible for

23   overseeing the other -- well, strike that.

24           As chief human resources officer, what

25   divisions do you oversee, if any?

Houck vs                                                              Chief Kelly Grennan
Maricopa Country

20

1   might have reviewed regarding that exemption?

2       A.   No, I do not.

3       Q.   Do you know if they sought legal counsel

4   regarding that exemption?

5            MS. BALCH SANTIAGO:  Form.

6            THE WITNESS:  No, I do not.

7       Q.   BY MS. SYVERSON:  Do you know whether there

8   were ever any investigations done by the County

9   regarding the issues regarding the exemptions for the

10  patrol lieutenants?

11           MS. BALCH SANTIAGO:  Form.  Overbroad.

12           THE WITNESS:  I am not aware of any, no.

13      Q.   BY MS. SYVERSON:  Do you know specifically who

14  was involved in the process of making the exemption

15  determination?

16      A.   Specifically, no.  Just Central HR.

17      Q.   Do you recall whether you personally have been

18  contacted by any patrol lieutenants regarding the

19  classification -- the exempt classification?

20      A.   No, I do not.  I do not recall any.

21           MS. BALCH SANTIAGO:  And form on that.

22      Q.   BY MS. SYVERSON:  Do you recall if you've been

23  contacted by any of the patrol lieutenants regarding

24  overtime issues, generally?

25      A.   No, I do not.

Houck vs
Maricopa Country

Chief Kelly Grennan

21

1   Q.   Are you aware of any patrol lieutenants

2   reaching out to the County regarding overtime issues?

3           MS. BALCH SANTIAGO:   Form.   Overbroad.

4           And just to clarify and give an instruction,

5   her question is as to your personal knowledge, not

6   anything you may have discussed with in- or outside

7   counsel.

8           **THE WITNESS:   Personal knowledge, no, I do not.**

9   Q.   BY MS. SYVERSON:   Are you aware of any

10  discussions that Lieutenant Houck had with Chief Farrow

11  regarding overtime issues?

12          MS. BALCH SANTIAGO:   Same instruction.   She's

13  asking you as to your personal knowledge, not any

14  privileged communications you may have had.

15          **THE WITNESS:   No, I am not aware of any**

16  **personally.**

17  Q.   BY MS. SYVERSON:   I am going to share my

18  screen.   Can you guys see that?

19  **A.   Yes, we can.**

20  Q.   Okay.   I will represent that this is HOUCK 238

21  to 241.   It's email correspondence with Lieutenant Houck

22  and Keely Farrow dated June to July of 2022.   And I'd

23  like to introduce this as Exhibit 1.

24          Do you -- I can kind of scroll through this

25  here, but do you recognize this email exchange between

**Houck vs**
**Maricopa Country**                                              **Chief Kelly Grennan**

22

1    Lieutenant Houck and Keely Farrow?

2    **A.    No, I do not.**

3    Q.    Have you ever been shown this document before?

4    **A.    No, I have not.**

5    Q.    If a lieutenant -- let me scroll to the end

6    here.

7         So this exchange started with Lieutenant Houck

8    reaching out to Commander Farrow regarding wanting some

9    guidance regarding the exempt classification and

10   overtime issues.

11        If this type of email had -- had been sent to

12   you in your current role, what would have been your

13   process in terms of addressing Lieutenant Houck's

14   concern?

15        MS. BALCH SANTIAGO:  Form.  Foundation.

16   Speculation.

17        **THE WITNESS:  It would be hard to say.  I would**

18   **have to be in the role and, you know, be able to**

19   **properly assess what was going on at the time, so it**

20   **would be hard to say how I would handle that.**

21   Q.    BY MS. SYVERSON:  Okay.  So you -- there isn't

22   a specific protocol as to how these types of concerns

23   would be addressed?

24        MS. BALCH SANTIAGO:  Form.

25        **THE WITNESS:  No specific protocol, no.**



**Houck vs**
**Maricopa Country**                                              Chief Kelly Grennan

29

1   is a more recent version of this job description?

2       A.   No, I don't know offhand.

3       Q.   Would that be something in your position that

4   you would be aware of?

5       A.   I would have -- I would be able to see it, but

6   we have hundreds of job descriptions, so whether or not

7   if there is a current one for specifically two

8   lieutenants, I would have to look.  I don't know off the

9   top of my head, no.

10      Q.   Okay.  And would you agree with me that it's

11  what the patrol lieutenants actually do in their jobs

12  that matter versus what is outlined in a job description

13  for purposes of FLSA classification?

14          MS. BALCH SANTIAGO:  Form.

15          But go ahead and answer.

16          THE WITNESS:  It would be their overall duties.

17      Q.   BY MS. SYVERSON:  And so those would be the

18  actual duties that they're performing; is that correct?

19      A.   It would be the duties described in the job

20  description, as well as the other duties that are

21  assigned at each division or district or assignment.

22      Q.   This job description is dated 2019.  Were you

23  involved at all in the creation of this job description?

24      A.   No, I was not.

25      Q.   Is that something that your division at that



31

1   doing -- taking over some of the roles of the sergeants

2   and deputies in the districts?

3           MS. BALCH SANTIAGO:  Form.  Foundation.

4   Speculation.

5           **THE WITNESS:  Not that I'm aware of, no.**

6      Q.   BY MS. SYVERSON:  Are you aware of a job

7   analysis report that was done in 2016?

8      **A.   The Fields study?**

9      Q.   Yes.

10     **A.   Is that the one you're referring to?  Yes, I**

11  **am.**

12     Q.   Okay.  I'm going to introduce this as

13  Exhibit 3, and this is labeled HOUCK 21 to 155.

14          Do you recognize this document?

15     **A.   I do recognize it, yes.**

16     Q.   Okay.  And I can scroll through or give you

17  access to scroll through it all.  I'm not going to be

18  super specific, but if you recognize this document,

19  we'll go forward with that.

20          So were you involved in this particular study?

21          MS. BALCH SANTIAGO:  Form.  Overbroad.

22          **THE WITNESS:  Personnel Services did have**

23  **responsibilities to coordinate the paperwork for it,**

24  **yes.**

25     Q.   BY MS. SYVERSON:  Okay.  And so on page -- it's

32

1   HOUCK 22, where you're listed here as -- as part of the

2   committee that was assisting with the Fields Consulting

3   Group, that's what you're referring to there,

4   coordinating the paperwork and providing information to

5   the Fields Consulting Group?

6       **A.    Correct.**

7       Q.    Did they specify what paperwork they were

8   looking for?

9           MS. BALCH SANTIAGO:   Form.

10          **THE WITNESS:   I -- I don't recall that far**

11  **back.**

12      Q.   BY MS. SYVERSON:   Okay.   Were these -- do you

13  recall whether you were gathering information that was

14  already in files or that had already been completed or

15  whether you were assisting in having the -- having new

16  information created specifically for this report?

17          MS. BALCH SANTIAGO:   Form.

18          **THE WITNESS:   I would say it would probably be**

19  **all of the above.   I mean, they -- I would say all of**

20  **the items you have indicated were probably paperwork**

21  **gathering as part of the overall project.**

22      Q.   BY MS. SYVERSON:   Okay.   And as part of this

23  project, did you -- did you personally speak to any of

24  the patrol lieutenants regarding the report that was

25  being done?



Chief Kelly Grennan

33

1    A.    I do not recall speaking to anybody specific to

2    the report, no.

3    Q.    Do you know what the purpose of this report

4    was?

5    A.    I believe at the time it was to update the job

6    description for the -- not only the lieutenants, it was

7    all of the job descriptions for the sworn series.

8    Q.    And do you know what led to the County engaging

9    in this analysis?

10   A.    Specifically, no, but I do recall that the job

11   description prior to the update based upon the Fields

12   study had been well over 20 years old and in some

13   instances talked about manual jobs rather than computer

14   jobs.  So it was definitely in need of updating

15   throughout the ranks.

16   Q.    Okay.  So to your knowledge, it wasn't specific

17   to -- to looking at this exemption analysis, per se.  It

18   was more just a general updating of job descriptions?

19        MS. BALCH SANTIAGO:  Form.  Foundation.

20   Speculation.

21        THE WITNESS:  That was my understanding, yes.

22   Q.    BY MS. SYVERSON:  Okay.  I'm going to scroll

23   down here a bit to HOUCK 52.  Do you see this?

24   A.    Yes, I do.

25   Q.    Okay.  And here in this first section it -- it



34

1  says, "The following tasks were rated as

2  important/borderline important but showed

3  inconsistencies across districts and assignments."

4          Can you just, to yourself, read that set of

5  bullet points that appears after that?

6          MS. BALCH SANTIAGO:  Patti, just so I can

7  follow along, what's the Bates on that page?

8          MS. SYVERSON:  52.

9          **THE WITNESS:  Okay.**

10  Q.   BY MS. SYVERSON:  And these tasks that were

11  outlined here that had been identified as being

12  important or borderline important, would you agree with

13  me that most of these tasks are first -- first

14  responder-type tasks?

15          MS. BALCH SANTIAGO:  Form.  Foundation.

16  Speculation.

17          **THE WITNESS:  They are first -- first**

18  **responders would do these types of tasks, yes, if their**

19  **jobs dictated that, yes.**

20  Q.   BY MS. SYVERSON:  Okay.  And -- and none of

21  these bullet points are really managerial in nature; is

22  that correct?

23          MS. BALCH SANTIAGO:  Form.

24          **THE WITNESS:  Those that are listed, I would**

25  **say no.**



38

1    correct?

2            MS. BALCH SANTIAGO:  Misstates report.

3            Go ahead and answer.

4            **THE WITNESS:  Without seeing the entire report**

5    **in context, I don't know if this was the final version**

6    **of what was produced for law enforcement lieutenants,**

7    **but this was items for the lieutenants to review.**

8        Q.   BY MS. SYVERSON:  Okay.  Was this -- did -- as

9    part of the Fields report, did -- were the patrol

10   lieutenants talked to regarding the tasks that they felt

11   were important in their -- important to their job

12   duties?

13           MS. BALCH SANTIAGO:  Form.

14           **THE WITNESS:  I -- I was not involved in any**

15   **discussions.  I do know they filled out, like, surveys**

16   **as to what their specific jobs were, which was part of**

17   **my responsibility in personnel services was to**

18   **coordinate the paperwork flow.**

19       Q.   BY MS. SYVERSON:  Okay.  But you didn't

20   personally talk to the patrol lieutenants about that?

21   You just were collecting the paperwork; is that correct?

22       **A.   Yes, ma'am.**

23       Q.   So on HOUCK 91, there is a -- Cluster 4 is

24   entitled "Incident Management."  Do you see that

25   section?

Houck vs
Maricopa Country

Chief Kelly Grennan

39

1    A.    Yes, I do.

2    Q.    And if you could look over those bullet points,

3    and it goes into the next page.

4         And basically the question is, are these the

5    types of tasks that you would expect a first responder

6    to be involved in?

7         MS. BALCH SANTIAGO:    Form.

8         **THE WITNESS:    Again, these were items that they**

9    **were asked to review.    Whether or not they rated them**

10   **for review and for actual use in regards to MCSO patrol**

11   **lieutenants, I -- I do not know how they rated them and**

12   **where they ended up.**

13   Q.    BY MS. SYVERSON:    Okay.    But these -- these

14   items that appear in this list, would you agree with me

15   that they are the types of -- types of activities that a

16   first responder would engage in?

17        MS. BALCH SANTIAGO:    Form.    Foundation.    And

18   legal conclusion.

19        **THE WITNESS:    Yes, they could be, yes.**

20   Q.    BY MS. SYVERSON:    Okay.    And then moving down

21   to Cluster 5, this is titled "Patrol Duties."    This is

22   on HOUCK 92.    If you could take a look at this section

23   of bullet points as well, and then I'll have the same

24   question for you.

25   A.    I've finished.



**Houck vs**
**Maricopa Country**                                                    Chief Kelly Grennan

40

1    Q.    Okay.  There is a few more.

2    **A.    There's more?  Just a few.**

3          **Okay.**

4    Q.    Okay.  And again, are these patrol duties ones

5    that a first responder would engage in?

6          MS. BALCH SANTIAGO:  Form.

7          **THE WITNESS:  Yes, they would be first**

8    **responder duties, yes.**

9    Q.    BY MS. SYVERSON:  Okay.  And then one more

10   section, Cluster 6, which is Community Policing, this is

11   on HOUCK 94 to 95.  If you could take a look at this

12   section as well.

13   **A.    I'm done with that page, if there's more.**

14   Q.    Just a couple.

15   **A.    Okay.**

16   Q.    And are these community policing tasks the type

17   of tasks that first responders would engage in?

18         MS. BALCH SANTIAGO:  Form.  Overbroad.

19   Compound.

20         **THE WITNESS:  On this particular list, I would**

21   **say the first responders could perform some of these,**

22   **but there would be other units within the office that**

23   **could as well.**

24   Q.    BY MS. SYVERSON:  Okay.  Do you have any basis

25   to dispute that the tasks that you were just reviewing

