# Frankel
# Syverson pllc

FRANKEL SYVERSON PLLC
2375 E. Camelback Road, Suite 600
Phoenix, Arizona 85016
602-598-4000
Ty D. Frankel (027179)
ty@frankelsyverson.com

9655 Granite Ridge Drive, Suite 200
San Diego, California 92123
602-598-4000
Patricia N. Syverson (020191)
patti@frankelsyverson.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christopher J. Houck, on behalf of himself and all those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Maricopa County,<br><br>Defendant. | Case No. 2:23-cv-00068-DGC<br><br>**PLAINTIFF'S CONTROVERTING STATEMENT OF FACTS IN RESPONSE TO DEFENDANT'S SEPARATE STATEMENT OF FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND MOTION TO DECERTIFY**<br><br>**AND**<br><br>**PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO DECERTIFY** |

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1(b), Plaintiff respectfully submits Plaintiff's Controverting Statement of Facts in Response to Defendant's Separate Statement of Facts in Support of Its Motion for Summary Judgment and Motion to Decertify and Plaintiff's Additional Statement of Facts in Support of Plaintiff's Cross Motion for Summary Judgment and Plaintiff's Response to Defendant's Motion for Summary Judgment and Motion to Decertify. Where Plaintiff does not dispute a given fact or exhibit below, he is doing so only for the purposes of summary judgment or certification of the collective. Plaintiff reserves the right to dispute any such fact or exhibit at trial or if used for any other purpose.

## CONTROVERTING STATEMENT OF FACTS

Plaintiff Christopher J. Houck, through undersigned counsel, submits this Controverting Statement of Facts in support of Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment and Motion to Decertify and in support of his Cross Motion for Summary Judgment.

**I.      General Overview of the Maricopa County Sherriff's Office.**

1.      The Maricopa County Sheriff's Office ("MCSO") oversees law enforcement activities for Maricopa County, primary serving unincorporated areas of the County as well as contracted services in cities and towns. Exh. 1 (Declaration of Kelly Grennan ¶ 5). MCSO is divided into four bureaus: Administration, Compliance, Patrol and Custody. Exh. 1 (Grennan Decl. ¶ 5). The Patrol Bureau (the only Bureau relevant to this case) is further broken down into divisions such as Patrol Bureau East (Districts 1, VII, and Lake Patrol (V)), Patrol Bureau West (Districts II, III, and IV), the Patrol Resources Bureau (Intelligence Information Division, Enforcement Support Division, Judicial Enforcement Division, SWAT, Aviation Services, Extraditions, Court Security Division, and Communications Division), Investigations Bureau (Special Investigations Division, Major Crimes Division, Scientific Analysis Division, General Crimes Division, Property Management Division, and Records & AFIS) and Patrol Bureau. Exh. 1 (Grennan Decl. ¶¶ 8, 9). The Professional Standards Bureau, Patrol Resources Bureau, Investigations Bureau,

1

and Enforcement Support Division are not a part of Patrol Bureaus East or West. Exh. 1 (Grennan Decl. ¶ 10); Exh. 2 (Houck Depo., pp. 64:21-65:1). At no time from February 1, 2020 to the present has SWAT been a part of Patrol Bureau East or West. Exh. 1 (Grennan Decl. ¶ 10).

**Plaintiff's Response to No. 1:** Disputed.  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information and numerous facts in one paragraph.  Plaintiff does not dispute the basic organization of MCSO as set forth by Defendant and that this litigation only involves Patrol Lieutenants in Patrol Bureau East or West.  However, Plaintiff disputes that "At no time from February 1, 2020 to the present has SWAT been a part of Patrol Bureau East or West."  Trowbridge testified that SWAT was part of Patrol Bureau West at least from January of 2020 through March of 2022.  PSOF Ex. 12, Trowbridge 12:25-13:6, 29:20-30:17, 40:3-16.  Trowbridge's testimony based on his personal knowledge about his work performing patrol duties at the County is corroborated by County documents demonstrating periods of time when SWAT was part of Patrol.  PSOF Ex. 12, Trowbridge 15:4-16:1, 24:17-25:9, 26:12-21, 31:24-34:20, 47:2-48:11, 107:14-108:25 and exhibits referenced in deposition (Doc. 155-10 at Exs. 80-83).  *See* SOF ¶¶ 320-322.

2.  Each division within the Patrol Bureau is overseen by a Chief. Exh. 1 (Grennan Decl. ¶ 11). Each district has a Captain/Commander, two to three Lieutenant/Commanders (which, depending on the district and shift, can serve in roles such as "Administrative Lieutenant," "Night Watch Commander," "Weekend Watch Commander," or "Acting Captain"), between two to four sergeants (mid-level supervisors who oversee patrol squads with up to eight patrol deputy and four civilian personnel), patrol deputies, detectives, and administrative/civilian staff. Exh. 1 (Grennan Decl. ¶ 12). Different squads are assigned to work different days and shifts, but each squad consistently reports to the same Lieutenant. Exh. 1 (Grennan Decl. ¶ 12) Patrol Bureaus East and West employ the various Sheriff's deputies that can be seen patrolling Maricopa County's streets on a daily basis, along with their supervisors. Exh. 1 (Grennan Decl. ¶ 11). Patrol deputies

and sergeants are paid on an hourly basis and not considered exempt under the FLSA. Exh. 1 (Grennan Decl. ¶ 13). However, Patrol lieutenants are classified as exempt under the FLSA and are paid a salary basis in excess of $684/week.  Exh. 1 (Grennan Decl. ¶ 13).

**Plaintiff's Response to No. 2:** Disputed.  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information and numerous facts in one paragraph.  Plaintiff disputes that "Patrol lieutenants are classified as exempt under the FLSA"; Plaintiff submits that Patrol lieutenants are classified as exempt under the FLSA *by the County* (Exh. 3 (Ellison Depo., pp. 8:25-10:9)) and whether that is proper is the subject of this litigation.

## II.    Conditional Class Certification

3.    On October 25, 2023, the Court granted conditional class certification under the FLSA for the following group within the MCSO:

> all current and former lieutenants from Patrol Divisions East and West who worked for Defendant at any time from January 11, 2020, to the present (the "potential class members").

(Doc. 38, p. 11).

**Plaintiff's Response to No. 3:**  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information.  Further, this is not a statement of fact but merely a summary of the Court's Order (Doc. 38, at 11:18-22). Plaintiff submits the Order speaks for itself.

4.    Because the FLSA has a two-year lookback period, the relevant time period is from January 11, 2021 to the present. (Doc. 1). If Plaintiff Christopher Houck ("Houck") can establish a willful violation under the FLSA, the lookback period would be extended to January 11, 2020. (Doc. 1).

**Plaintiff's Response to No. 4:**  Disputed.  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information.  Further, this is not so much a statement of fact but a statement of the law.  Plaintiff submits that the relevant time period in the case is January 11, 2020 to the present.  *See* Doc. 38.

5.    Prior to conditional certification, 14 individuals had already opted in. (Docs.

3

5-14, 16-18, 24). These individuals included Keller, Sanchez, Rosenberger, Hunter, Halverson, Brice, Neville, Jackson, Vance, Thomas, Trowbridge, Rankin, Bocardo and Aaosta. (Docs. 5-14, 16-18, 24). Following conditional class certification, another eight individuals opted in, consisting of: Goad, Ranck, Jakowinicz, McCann, Kremer, Cruz, Freeman and Whelan-Gonzales. (Docs. 44, 50, 54, 56-60). The opt-in dates for each of these additional individuals ranges from January 13, 2023 through January 4, 2025.

**Plaintiff's Response to No. 5:** Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information and is merely providing a summary of the Opt in Consent Forms. Plaintiff submits the documents speak for themselves.

6. On December 5, 2023, the Court held a Scheduling Conference in which discovery was discussed. (Doc. 55). The Court ruled that discovery may be taken of 50% of the opt-in Plaintiffs. (Doc. 48).

**Plaintiff's Response to No. 6:** Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information. Further, this is not a statement of fact but merely setting forth a summary of the Court's Orders. Plaintiff submits the Orders speak for themselves.

7. Following Defendant's preparation of and service of discovery on Hunter and Bocardo they unilaterally filed self-titled "Notice of Withdrawal of Consent Form." (Docs. 63, 65).

**Plaintiff's Response to No. 7:** Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information. Further, this is not a statement of fact but merely setting forth information contained in the Notices. Plaintiff submits the Notices speak for themselves.

**III. Maricopa County's Decision to Classify Law Enforcement Lieutenants As Exempt (2007).**

8. In 2007, Maricopa County made the decision to classify lieutenants as exempt from overtime. Exh. 3 (Ellison Depo., pp. 8:25-10:9). This decision was reached after

4

Maricopa County had done a review of lieutenant job duties and reviewed and relied upon guidance from the Department of Labor ("DOL"). Exh. 3 (Ellison Depo., pp. 13:9-15:18) As Darrien Ellison testified at deposition: "So we looked at their central functions. We – we researched and looked at the resources that are on the Department of Labor. There   was   a 2005 Department of Labor opinion letter that we were aware of that another agency or organization reached out to the Department of Labor and asked some questions about lieutenants, patrol lieutenants, and captains" Exh. 3 (Ellison Depo., pp. 13:17 – 14:1).  Mr. Ellison further testified that Maricopa County specifically relied upon an October 2005 DOL letter that specifically addressed the exempt status of patrol lieutenants. Exh. 3 (Ellison Depo., pp. 65:2-68:22). In the opinion letter, the DOL recognized that patrol lieutenants could be exempt from overtime. Exh. 68 (DOL Opinion Letter). Retention of Third-Party Consultant Fields Consulting to Conduct A Job Analysis For Preparation of Accurate Job Descriptions (2017).

**Plaintiff's Response to No. 8:**  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph.  Plaintiff agrees that the County made the decision to classify the Patrol Lieutenants as exempt in 2007.  Plaintiff disputes that the County "reviewed and relied upon guidance from the Department of Labor."  Rather, the County relied entirely on its own employees' lay opinions about the application of the Department of Labor letter when making its decision.  PSOF Ex. 19, Ellison 11:15-24; 13:5-8; 33:3-12.   Human Resources employees who have testified, including the senior official who decided to classify the Patrol Lieutenants as exempt in 2007, admit that the County never consulted with legal counsel about the decision.  PSOF Ex. 19, Ellison 33:3-12; 68:13-70:10; 75:2-76:2.  The 2005 Department of Labor letter recognized that patrol lieutenants *in that case* could be exempt from overtime. Ex. 68 (letter explicitly cautions that the "opinion is based exclusively on the facts and circumstances described in the [the employer's] request" and that the "[e]xistence of any other factual or historical background not contained in [the employer's] request might require a different conclusion[.]")  Senior Human Resources personnel at the County was unaware of the

precise circumstances that were considered by the Department of Labor in reaching its conclusion. PSOF Ex. 19, Ellison 75:7-76:2. *See* SOF 331-332, 334. Finally, the statement "Retention of Third-Party Consultant Fields Consulting to Conduct A Job Analysis For Preparation of Accurate Job Descriptions (2017)" appears to be a misplaced heading and not a supported statement of fact.

9. Fields Consulting Group, Inc. ("Fields") in 2016/2017. Exh. 4 (Fields Report, HOUCK000021). Fields was hired by Maricopa County to analyze the job duties actually performed by deputies, sergeants, lieutenants, and captains within the Patrol Bureau of MCSO. Exh. 4. A report was prepared in 2017. Exh. 4. The purpose of the Job Analysis Report was to assist Maricopa County with preparation of updated and accurate job descriptions for each rank, based on job duties actually performed. Exh. 4.

**Plaintiff's Response to No. 9:** This is not a statement of fact but merely a summary of the Fields Report. Plaintiff submits the document speaks for itself.

10. As stated in the report, Fields sent surveys to numerous individuals, performed interviews, and analyzed the responses before preparation of their findings contained in the report. Fields received and analyzed responses to the "Task Survey" (asking questions about frequency of tasks performed) from *over 90% of the lieutenants in patrol bureau* (37 out of 41 lieutenants). Exh. 4 (Fields report, HOUCK000023; 28). Part of the surveys, Fields specifically asked lieutenant about the "frequency" and "importance" of the various tasks performed. Frequency was ranked as follows: 0: Never, 1: Yearly, 2: Quarterly, 3: Monthly, 4: Weekly, 5: During each shift. Exh. 4 (Fields Report; HOUCK000026). Importance was ranked as follows: 0: Not Important; 1: Somewhat Important; 2: Important; 3: Very Important; 4: Extremely Important. Exh. 4 (Fields Report; HOUCK000026). Lieutenants selected their own rankings in response to the surveys. Exh. 4.

**Plaintiff's Response to No. 10:** This is not a statement of fact but merely a summary of the Fields Report. Plaintiff submits the document speaks for itself.

11.    Upon receipt of the survey results, Fields merged the frequency and importance ratings for an overall "Importance" score. Fields reported the findings to Maricopa County by way of "Task Cluster" tables. The rankings for lieutenants are set forth below:

Table 7c:  Patrol Lieutenant Task Clusters Rank-ordered by Importance

| TASK CLUSTERS (Rank Order by Importance) | Mean Importance |
|---|---|
| Incident Management | 3.33 |
| Career & Professional Development | 3.30 |
| Supervision | 3.28 |
| Community Policing | 3.06 |
| Management | 2.98 |
| Administration | 2.91 |
| Court Security | 2.62 |
| Specialized Assignments (Major Crimes, SI, SWAT Division, And Lake Patrol) | 2.42 |
| Patrol Duties | 2.09 |
| Criminal Investigations | 1.97* |

*rounds to 2.0 and was determined to be critical for this rank

Exh. 4 (Fields Report, HOUCK000034)

**Plaintiff's Response to No. 11:** This is not a statement of fact but merely a summary of the Fields Report.  Plaintiff submits the Fields Report speaks for itself.

12.    After Fields completed its analysis, Fields "updated the class specifications (i.e. position descriptions) for each rank to accurately reflect the competency and duty requirements of each job." Exh. 4 (Fields Report, HOUCK000055). Fields provided draft job descriptions to Maricopa County that "represent the core position at each rank." Exh. 4 (Fields Report, HOUCK 140). The draft job description Fields prepared for lieutenants specifically included "Supervision," "Career & Professional Development," "Incident Management," and "Community Policing, and Administration." Exh. 4 (Fields Report, HOUCK000152-153). Specifically excluded from the draft job description were task clusters for "Patrol Duties" and "Criminal Investigations" due to Fields' assessment that the importance of these duties to the lieutenant role was low. Compare Complete Lieutenant Task List for Survey Questions at HOUCK000087-99 with draft Lieutenant Job Description

at HOUCK000148-151; see, also, HOUCK000034.

**Plaintiff's Response to No. 12:** This is not a statement of fact but merely a summary of the Fields Report. Plaintiff submits the Fields Report speaks for itself.

**IV.    Rollout of Current Law Enforcement Lieutenant Job Description (2019).**

13.    Following completion of the Fields Job Analysis, Maricopa County revised the Law Enforcement Job Description to better align with the actual duties Fields determined the lieutenants were performing on a day-to-day basis. Exh. 3 (Ellison Depo., pp. 78:24-81:22). Maricopa County adopted the job descriptions prepared by Fields, without making any material changes to the "Essential Job Tasks" for the lieutenant positions. Exh. 3 (Ellison Depo., pp. 26:21-27:16).

**Plaintiff's Response to No. 13:** Disputed. The Fields report lists first responder duties that the Patrol Lieutenants perform, including for example interviewing and interrogating suspects, interviewing victims and witnesses at crime scenes, and initiating traffic stops to ensure public safety. PSOF Ex. 22, Grennan 33:25-34:25; Doc. 155-2, 155-3, and 155-11 at Ex. 4 at HOUCK000052. And, to the extent the County contends these patrol duties were simply left out of the job description based on the consultant's assessment of their importance does not mean the patrol duties are not performed by the Patrol Lieutenants. Key County human resources personnel testified that the Fields report delineates numerous first responder tasks that the Patrol Lieutenants perform. PSOF Ex. 21, Farrow 109:6-110:20, 111:14-115:9; PSOF Ex. 22, Grennan 38:23-40:23. *See* SOF ¶¶ 302-303.

14.    In 2019, the current version of the Law Enforcement Lieutenant job description was rolled out. Exh. 5 (Law Enforcement Lieutenant Job Description). Houck and each of the deposed opt-ins (Acosta, Brice, Freeman, Halverson, Jackson, Keller, Neville, Rankin, Rosenberger, Thomas, Trowbridge, Vance) have all conceded the applicability of this job description to Lieutenants within the Patrol Bureau East and West divisions and that they actually perform each of the duties in the job description. Exh. 2 (Houck Depo., p. 173:3-25); Exh. 41 (Acosta Depo. Vol. I, pp. 90:13-91:8); Exh. 22 (Brice

Depo., pp. 103:23-104:16); Exh. 53 (Freeman Depo., pp. 78:24-81:15); Exh. 19 (Halverson Depo., pp. 22:20-23:17); Exh. 28 (Jackson Depo., pp 66:5-67:22); Exh. 10 (Keller Depo., pp. 102:16-104:25); Exh. 25 (Neville Depo., pp. 137:23-140:13); Exh. 38 (Rankin Depo., pp. 25:8-27:3); Exh. 15 (Rosenberger Depo. Vol. I, p. 107:9-23); Exh. 33 (Thomas Depo., p. 68:9-18); Exh. 36 (Trowbridge Depo., p. 49:5-13); Exh. 30 (Vance Depo., pp. 29:3-31:24). Houck

**Plaintiff's Response to No. 14:** Disputed.  Plaintiff agrees that the Law Enforcement Lieutenant Job Description applies to all Law Enforcement Lieutenants, including the Patrol Lieutenants in Patrol Bureaus East and West.  However, the Law Enforcement Lieutenant Job Description itself states that it is not "all-inclusive list" of job duties.  Ex. 5.  Senior Human Resources personnel also agree that the job description does not contain all the duties that the Patrol Lieutenants perform.  PSOF Ex. 22, Grennan 29:17-21.  Further, the Patrol Lieutenants also testified that there are additional patrol duties the Patrol Lieutenants are responsible for that are not included in the job description.  *See, e.g.,* PSOF Ex. 1, Houck 173:3-25, 193:1-12 (Houck testified that he agreed that job description "accurately summarize[s] the essential job tasks of a law enforcement lieutenant" and provides a "general blanket lieutenant" for the County, but he also testified that if there was a job description for the specific duty assignment of "patrol lieutenant" (his position) it should include "going to calls, monitoring the radio, assisting with the apprehension of bad guys, putting together – helping deputies put together criminal investigations" "monitoring the radio, being ready" as that accounts for "75 percent of my time. That's what I'm there for. I'm there to respond to calls. I'm there to respond to things that need a command presence.").  *See also* SOF ¶¶ 355-357.

15.    This Law Enforcement Lieutenant job description sets forth the essential job duties of the Law Enforcement Lieutenant position. Exh. 5 (Law Enforcement Lieutenant Job Description). These duties include administration, incident management, career and professional development, supervision, community policing, and management. Exh. 5 (Law Enforcement Lieutenant Job Description). Absent from the Patrol Lieutenant job

1  description is the expectation that Lieutenants conduct criminal investigations, respond to

2  calls for service, or engage in patrol duties. Exh. 5 (Law Enforcement Lieutenant Job

3  Description). Separate job descriptions exist for sergeants and deputies (officers). Contrary

4  to the Lieutenant position, the sergeant and deputy roles are heavily focused on patrol duties,

5  criminal investigations, and responding to calls for service. The job description for Deputy

6  Sheriff states that the primary duties of the position are criminal investigations, response to

7  calls for service, patrol duties, training, and administration. Exh. 6 (Deputy Sheriff Job

8  Description). The job description for Law Enforcement Sergeant states that the primary

9  duties of the position are training, supervision, administration, patrol duties, and criminal

10 investigations. Exh. 7 (Law Enforcement Sergeant Job Description).

11 **Plaintiff's Response to No. 15:**  Disputed.  Plaintiff objects to the extent that the

12 statement is merely a summary of the job descriptions.  Plaintiff submits the job descriptions

13 speak for themselves.  Plaintiff does dispute that the Law Enforcement Job description sets

14 forth "essential job tasks" and the headings are administration, incident management, career

15 and professional development, supervision, community policing, and management.  Ex. 5.

16 Under the heading "Incident Management," the job description indicates that the Patrol

17 Lieutenants "manage[] and report[] to emergency incident scenes that require an increase

18 in command presence." Ex. 5.  Senior Human Resources personnel also agree that the job

19 description does not contain all the duties that the Patrol Lieutenants perform.  PSOF Ex.

20 22, Grennan 29:17-21.  In addition, the job description indicates that the Patrol Lieutenants

21 must be certified by the State of Arizona as Peace Officers, must have the ability to maintain

22 composure in stressful situations that require emergency action, indicates that they may face

23 dangerous, hostile, and at times life threatening conditions, and must have the ability to

24 perform sprints, jumping and vaulting tasks, and other physical acts commensurate with law

25 enforcement activity in the field.  Ex. 5.  Further, the Law Enforcement Lieutenant Job

26 Description itself states that it is not "all-inclusive list" of job duties.  Ex. 5.  The Patrol

27 Lieutenants also testified that there are additional patrol duties the Patrol Lieutenants are

28 responsible for that are not included in the job description. *See also* SOF ¶¶ 355-357.

**V.    Imposition of Additional Administrative Duties on Sergeants, Lieutenants, and Captains Post *Melendres* Ruling.**

16.    MCSO is subject to various court orders in the case titled Melendres v. Maricopa County, this is a case that was filed asserting racial profiling allegations. Exh. 1 (Grennan Decl. ¶ 15). As a result of certain court orders, MCSO has instituted reforms regarding increased supervision and monitoring by management personnel. Exh. 1 (Grennan Decl. ¶ 15). These reforms have evolved over the years, including following Defendant's revision of its MCSO personnel job descriptions in 2019. Exh. 1 (Grennan Decl. ¶ 15). As a result of these reforms, MCSO supervisors have been tasked with additional administrative and management duties. Exh. 1 (Grennan Decl. ¶ 15).

**Plaintiff's Response to No. 16:**  Disputed**.**  Plaintiff objects to the extent that the statement is merely a summary of the court orders in the *Melendres v. Maricopa County* litigation.  Plaintiff submits the court orders speak for themselves.  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph. Further, although Plaintiff does not dispute that the *Melendres* orders may have resulted in some increase in administrative duties, Plaintiff disputes that has any impact on the priority of law enforcement duties the Patrol Lieutenants engage in.  *See* SOF ¶¶ 293-294.  Further, the Grennan declaration was untimely filed after the after the close of the extended discovery period.  Doc. 127 (noting that fact discovery closed August 8, 2025 other than specific depositions by the end of August 2025).  There is no other evidence in the record to support the position regarding evolving job duties that would have had any impact on the exemption analysis.

**VI.    Plaintiff Christopher Houck and the Opt-Ins' Employment History During the Relevant Time Period.**

**A.    Plaintiff Christopher Houck**

17.    Houck promoted to Lieutenant on April 4, 2022. Exh. 2 (Houck Depo., pp. 61:14-24).

**Plaintiff's Response to No. 17:** Undisputed**.**

18.     Upon Houck's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form.    Exh. 7 (Houck FLSA Employee Acknowledgement Form, MCC 000093). By signing the form Houck acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 7 (Houck FLSA Employee Acknowledgement Form). In signing the form, Houck further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 7 (Houck FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 18:** Undisputed, although Plaintiff submits that the document speaks for itself.

19.     Upon Houck's promotion to Lieutenant on April 4, 2022, he was transferred to District 7 where he worked through April 18, 2022. Exh. 2 (Houck Depo., p. 61:14-24). While at District 7, Houck reported to Lt. Halverson, who was serving as the Acting Captain. Exh. 2 (Houck Depo., pp. 70:22-25).

**Plaintiff's Response to No. 19:** Undisputed.

20.     Houck transferred to District 1 on April 18, 2022, where he worked until January 19, 2025. Exh. 2 (Houck Depo., pp. 61:25-62:3). For the first seven (7) months as a patrol lieutenant in District 1, Houck served as a Watch Commander over the night shift, scheduled Wednesday through Saturday from 5:0pm to 3:0am. Exh. 2 (Houck Depo., p. 62:4-10). Houck switched to days and was scheduled to work Wednesday through Saturday 7:0am to 5:0pm through January 19, 2025. Exh. 2 (Houck Depo., p. 62:11-15).

**Plaintiff's Response to No. 20:** Disputed, although Houck was "scheduled" to work at those times, Houck explained that he would adjust his hours in ADP or Workday to reflect the actual hours he actually worked. *See, e.g.,* PSOF Ex. 1, Houck 55:3-18.

21.     On January 20, 2025, Houck transferred to Court Security, which is not within Patrol Bureaus East or West. Exh. 2 (Houck Depo., pp. 60:21-61:13).

**Plaintiff's Response to No. 21:** Undisputed.

22.     Houck filed his opt-in notice in this case on January 11, 2023. (Doc. 1-2).

**Plaintiff's Response to No. 22:** Undisputed, although Plaintiff submits that the

1  document speaks for itself.

2      23.    The longest potential relevant time period for Houck in this case is April 4,

3  2022 (his promotion to Lieutenant) through January 19, 2025 (the date of his transfer out of

4  Patrol Bureaus East or West) ("Houck Relevant Time Period"). Exh. 2 (Houck Depo., pp.

5  60:21-61:13); (Doc. 1-2).

6      **Plaintiff's Response to No. 23:** Undisputed.

7      24.    Houck earned a salary basis of at least $684 per week during the Houck

8  Relevant Time Period. Exh. 2 (Houck Depo., p. 201:14-17)

9      **Plaintiff's Response to No. 24:** Undisputed**.**

10      25.    Houck supervised at least two employees during the Houck Relevant Time

11  Period. Exh. 2 (Houck Depo., p. 69:7-10)

12      **Plaintiff's Response to No. 25:** Undisputed**.**

13      26.    ███████████████████████████

14  ████████████████████████████████████

15  ████████████████████████████████████

16  ████████████████████████

17      **Plaintiff's Response to No. 26:** Undisputed, although Plaintiff submits that the

18  documents speak for themselves.

19      **B.**    **David Keller**

20      27.    Keller promoted to Lieutenant on October 19, 2020. Exh. 10 (Keller Depo.,

21  p. 17:13-25).

22      **Plaintiff's Response to No. 27:** Undisputed.

23      28.    Upon Keller's promotion to Lieutenant, he signed a Fair Labor Standards Act

24  (FLSA) Employee Acknowledgement form. Exh. 11 (Keller FLSA Employee

25  Acknowledgement Form, MCC 002644). By signing the form Keller acknowledged that

26  Maricopa County had classified him as exempt under the FLSA. Exh. 11 (Keller FLSA

27  Employee Acknowledgement Form). In signing the form, Keller further acknowledged that

28  he had received and read Maricopa County's policy titled Hours Worked for Exempt

Employees. Exh. 11 (Keller FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 28:** Undisputed, although Plaintiff submits that the document speaks for itself.

29.    From October 2020 through January 2021, Keller was assigned to District 2. Exh. 10 (Keller Depo., p. 18:1-13). He reported to Captain Shawn Braaten while assigned to  District 2. Exh. 10 (Keller Depo., p. 19:4-10).

**Plaintiff's Response to No. 29:** Undisputed.

30.    From January 2021 through January 2022, Keller was assigned to District 7. Exh. 10 (Keller Depo., p. 18:14-22). He reported to Captain Larry Kratzer while in District 7. Exh. 10 (Keller Depo., p. 14:11-13). He worked 7:30am to 5:30pm when he was assigned day shifts. If he was assigned night shift as watch commander, the hours were 5:0pm to 3:0am. Exh. 10 (Keller Depo., p. 73:7-15). In District 7 Keller served as Acting Commander "probably two to three times" for Captain Kratzer. Exh. 10 (Keller Depo., p 39:3-12).

**Plaintiff's Response to No. 30:** Disputed, as to the term "worked" as Keller was testifying to his "scheduled workdays" and explained that he would adjust his hours in ADP or Workday to reflect the actual hours he "worked". *See, e.g.,* PSOF Ex. 7, Keller 24:21-27:12.

31.    In January 2022, Keller transferred to District 3 where he is currently assigned.  Exh. 10 (Keller Depo., pp. 18:20-19:3). He currently reports to Captain Brian Stutsman in District 3. Exh. 10 (Keller Depo., p. 13:1-4). He currently works Tuesday through Friday, from 7:30am to 5:30pm. Exh. 10 (Keller Depo., p. 26:8-14). Keller served as Acting Captain for Stutsman "probably…five or six times." Exh. 10 (Keller Depo., p. 39:3-12).

**Plaintiff's Response to No. 31:** Disputed, as to the term "works" as Keller was testifying to his scheduled workdays and explained that he would adjust his hours in ADP or Workday to reflect the actual hours he "worked". *See, e.g.,* PSOF Ex. 7, Keller 24:21-27:12.

32.    Keller filed his opt-in notice in this case on January 13, 2023. (Doc. 5).

14

**Plaintiff's Response to No. 32:** Undisputed, although Plaintiff submits that the document speaks for itself.

33.    Keller's potentially relevant time period in this case is October 19, 2020, (his promotion date to Lieutenant) through the present date ("Keller Relevant Time Period). Exh. 10 (Keller Depo., p. 17:13-25).

**Plaintiff's Response to No. 33:** Undisputed.

34.    Keller earned a salary basis of at least $684 per week during the Keller Relevant Time Period. Exh. 10 (Keller Depo., p. 20:8-1)

**Plaintiff's Response to No. 34:** Undisputed.

35.    Keller supervised at least two employees during the Keller Relevant Time Period. Exh. 10 (Keller Depo., pp. 37:14-38:2)

**Plaintiff's Response to No. 35:** Undisputed.

36.    ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**Plaintiff's Response to No. 36:** Undisputed, although Plaintiff submits that the documents speak for themselves.

### C.    Emmanuel Sanchez

37.    Sanchez was promoted to Lieutenant on June 27, 2022, and was assigned to District 3 under Captain Brian Ellis Stutsman. Exh. 65 (Sanchez Personnel Action Form, MCC 019987).

**Plaintiff's Response to No. 37:** Undisputed.

38.    Upon Sanchez's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 13 (Sanchez FLSA Employee Acknowledgement Form, MCC 019991). By signing the form Sanchez acknowledged that

Maricopa County had classified him as exempt under the FLSA. Exh. 13 (Sanchez FLSA Employee Acknowledgement Form). In signing the form, Sanchez further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 13 (Sanchez FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 38:** Undisputed, although Plaintiff submits that the document speaks for itself.

39.    From April 17, 2023, through February 5, 2024, Sanchez was assigned to District 2 and reported to Captain Philip Duane Hilliker. Exh. 66 (Sanchez Blue Team Supervisor Notes Excerpt, MCC 020075-020076).

**Plaintiff's Response to No. 39:** Undisputed.

40.    On February 5, 2024, Sanchez transferred out of District 2 into the SWAT division. Exh. 67 (Sanchez Blue Team Supervisor Notes Excerpt, MCC 020091).

**Plaintiff's Response to No. 40:** Undisputed.

41.    Sanchez filed his opt-in notice in this case on January 17, 2023. (Doc. 6).

**Plaintiff's Response to No. 41:** Undisputed, although Plaintiff submits that the document speaks for itself.

42.    Sanchez's potentially relevant time period in this case is June 27, 2022 (his promotion date to Lieutenant) through February 5, 2024 (the date of his transfer out of Patrol Bureaus East or West divisions) ("Sanchez Relevant Time Period").

**Plaintiff's Response to No. 42:** Undisputed.

43.    [Intentionally left blank].

44.    [Intentionally left blank].

45.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

**Plaintiff's Response to No. 45:** Undisputed, although Plaintiff submits that the documents speak for themselves.

1    **D.    Donald Rosenberger**

2    46.    Rosenberger was promoted to to Lieutenant on February 26, 2007. Exh. 15

3    (Rosenberger Depo. Vol. I, p. 56:8-16).

4    **Plaintiff's Response to No. 46:** Undisputed.

5    47.    Upon Rosenberger's promotion to Lieutenant, he signed a Fair Labor

6    Standards Act (FLSA) Employee Acknowledgement form. Exh. 17 (Rosenberger FLSA

7    Acknowledgement Form, MCC 003497). By signing the form Rosenberger acknowledged

8    that Maricopa County had classified him as exempt under the FLSA. Exh. 17 (Rosenberger

9    FLSA Acknowledgement Form). In signing the form, Rosenberger further acknowledged

10   that he had received and read Maricopa County's policy titled Hours Worked for Exempt

11   Employees. Exh. 17 (Rosenberger FLSA Acknowledgement Form).

12   **Plaintiff's Response to No. 47:** Undisputed, although Plaintiff submits that the

13   document speaks for itself.

14   48.    From at least January 2020 through January 2021, Rosenberger was assigned

15   to District 1. Exh. 15 (Rosenberger Depo. Vol I., pp. 42:18-43:2).

16   **Plaintiff's Response to No. 48:** Undisputed.

17   49.    From January 2021 through January 2022, Rosenberger was assigned to

18   District 6. Exh. 15 (Rosenberger Depo. Vol. I, p. 42:1-06). In District 6, Rosenberger first

19   reported to Captain Lugo and then to Captain Aldorasi. Exh. 15 (Rosenberger Depo. Vol. I,

20   p. 41:21-25). He worked 10-hour shifts from Sunday through Wednesday while in District

21   6.  Exh. 15 (Rosenberger Depo. Vol. I, p. 38:11-20).

22   **Plaintiff's Response to No. 49:** Undisputed.

23   50.    From January 2022 and to the present, Rosenberger is assigned to the Lake

24   Patrol division. Exh. 15 (Rosenberger Depo. Vol. I, pp. 17:19-18:1). He currently works 10

25   -hour shifts, Sunday through Wednesday. Exh. 15 (Rosenberger Depo. Vol. I, p. 18:2-16).

26   He initially reported to Captain Dave Lee and then Captain Aaron Flowers. At the time of

27   his deposition on July 18, 2025, Rosenberger was reporting to Lieutenant Matt Hunter. Exh.

28   15 (Rosenberger Depo. Vol. I, pp. 21:23-22:10). Matt Hunter served as the Acting

Commander while Captain Aaron Flowers was transferred out. Exh. 15 (Rosenberger Depo. Vol. I, pp. 21:23-22:10).

**Plaintiff's Response to No. 50:** Disputed, as to the term "works" as Rosenberger was testifying to his scheduled workdays and explained that he would adjust his hours in Workday to reflect the actual hours he worked. *See, e.g.,* PSOF Ex. 10, Rosenberger 133:6-134:25.

51.    Rosenberger filed his opt-in notice in this case on January 18, 2023. (Doc. 7).

**Plaintiff's Response to No. 51:** Undisputed, although Plaintiff submits that the document speaks for itself.

52.    Rosenberger's potentially relevant time period in this case is January 11, 2020 (three years preceding the filing of this lawsuit) through the present date. (Rosenberger Relevant Time Period").

**Plaintiff's Response to No. 52:** Undisputed.

53.    Rosenberger assumes he earned a salary basis of at least $684 per week during the Rosenberger Relevant Time Period. Exh. 15 (Rosenberger Depo. Vol. I, p. 63:21-25)

**Plaintiff's Response to No. 53:** Undisputed.

54.    Rosenberger supervised at least two employees during the Rosenberger Relevant Time Period. Exh. 15 (Rosenberger Depo. Vol. I, p. 64:16-18)

**Plaintiff's Response to No. 54:** Undisputed.

55.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

**Plaintiff's Response to No. 55:** █████████████████████

████████████████████████████████████████████████

█████████████████████████████████

### E.    Matthew Hunter

56.    Hunter filed his opt-in notice in this case on January 18, 2023. (Doc. 8).

**Plaintiff's Response to No. 56:** Undisputed, although Plaintiff submits that the document speaks for itself.

57.    Hunter does not have a relevant time period associated with his opt-in because he filed a Notice of Withdrawal of Consent on April 5, 2024, notifying the Court that he was withdrawing his consent to opt-in to the lawsuit. (Doc. 63).

**Plaintiff's Response to No. 57:** Undisputed, although Plaintiff submits that the document speaks for itself.

### F.    Jonathan Halverson

58.    [Intentionally left blank].

59.    Upon Halverson's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 20 (Halverson FLSA Employee Acknowledgement Form, MCC 002083). By signing the form Halverson acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 20 (Halverson FLSA Employee Acknowledgement Form). In signing the form, Halverson further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 20 (Halverson FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 59:** Undisputed, although Plaintiff submits that the document speaks for itself.

60.    [Intentionally left blank].

61.    From March 11, 2019, through January 2021, Halverson was assigned District 7  as a lieutenant and reported to Larry Kratzer. Exh. 19 (Halverson Depo., pp. 16:23-17:3). He worked Monday through Wednesday from 7am to 5pm. Exh. 19 (Halverson Depo., pp. 60:25-61:4).

**Plaintiff's Response to No. 61:** Disputed, as to the term "worked" as Halverson was testifying to his "scheduled hours" and explained that he would adjust his hours in ADP or

Workday to reflect the actual hours he "worked". PSOF Ex. 5, Halverson 61:5-16.

62.    From January 2021 through January 2022, Halverson was assigned to the Bureau of Internal Oversight and reported to Captain James McFarland. Exh. 19 (Halverson Depo., p. 16:3-19) The Bureau of Internal Oversight is not part of the Patrol Bureaus East or West divisions. Exh. 19 (Halverson Depo., p. 16:3-19). He worked Monday through Wednesday from 7am to 5pm. Exh. 19 (Halverson Depo., pp. 60:25-61:4).

**Plaintiff's Response to No. 62:** Disputed, as to the term "worked" as Halverson was testifying to his "scheduled hours" and explained that he would adjust his hours in ADP or Workday to reflect the actual hours he "worked". PSOF Ex. 5, Halverson 61:5-16.

63.    From January 2022 through January 2024, Halverson was assigned to District 7, Patrol Bureau East Division and reported to Captain Larry Kratzer. Exh. 19 (Halverson Depo., p. 15:4-14). He worked Monday through Wednesday from 7am to 5pm. Exh. 19 (Halverson Depo., pp. 60:25-61:4). Halverson has served as "Acting Captain" multiple times, including one period that spanned 19 weeks. Exh. 19 (Halverson Depo., pp. 33:1-3; 64:6-16; 65:9-17; 67:11-20)

**Plaintiff's Response to No. 63:** Disputed, as to the term "worked" as Halverson was testifying to his "scheduled hours" and explained that he would adjust his hours in ADP or Workday to reflect the actual hours he "worked". PSOF Ex. 5, Halverson 61:5-16.

64.    From January 2024 through March 2025, Halverson transferred to the traffic stop analysis unit. Exh. 19 (Halverson Depo., 14:7-17) The traffic stop analysis unit is not within the Patrol Bureaus East or West divisions. Exh. 19 (Halverson Depo., p. 14:7-20). He worked Monday through Wednesday from 7am to 5pm. Exh. 19 (Halverson Depo., pp. 60:25--61:4).

**Plaintiff's Response to No. 64:** Disputed, as to the term "worked" as Halverson was testifying to his "scheduled hours" and explained that he would adjust his hours in ADP or Workday to reflect the actual hours he "worked". PSOF Ex. 5, Halverson 61:5-16.

65.    On March 3, 2025, Halverson was promoted to Captain for the Enforcement Support Division. Exh. 19 (Halverson Depo., pp. 11:22-12:11). The Enforcement Support

Division is not in Patrol Bureaus East or West divisions. Exh. 19 (Halverson Depo., pp. 11:22-12:11).

**Plaintiff's Response to No. 65:** Undisputed.

66.    Halverson filed his opt-in notice in this case on January 18, 2023. (Doc. 9).

**Plaintiff's Response to No. 66:** Undisputed, although Plaintiff submits that the document speaks for itself.

67.    Halverson's potentially relevant time period in this case is January 11, 2020 (three years preceding the filing of this lawsuit) through January 2021 (the date of his transfer our of Patrol Bureaus East or West) and from January 2022 (the date of transfer back into District 7) through January 2024 (the date of his transfer out of Patrol Bureaus East or West)("Halverson Relevant Time Period").

**Plaintiff's Response to No. 67:** Undisputed.

68.    Halverson earned a salary basis of at least $684 per week during the Halverson Relevant Time Period. Exh. 19 (Halverson Depo, pp. 67:24-68:2).

**Plaintiff's Response to No. 68:** Undisputed.

69.    Halverson supervised at least two employees during the Halverson Relevant Time Period. Exh. 19 (Halverson Depo., p. 68:9-11).

**Plaintiff's Response to No. 69:** Undisputed.

70.

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████

**Plaintiff's Response to No. 70:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**G.    Todd Brice**

71.    [Intentionally left blank].

72.    Upon Brice's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form.    Exh. 23 (Brice FLSA Employee Acknowledgement Form, MCC 001764). By signing the form Brice acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 23 (Brice FLSA Employee Acknowledgement Form). In signing the form, Brice further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 23 (Brice FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 72:** Undisputed, although Plaintiff submits that the document speaks for itself.

73.    [Intentionally left blank].

74.    From December 4, 2017, through February 24, 2020, Brice was assigned to District 3 and reported to Captain Paul Chagolla. Exh. 22 (Brice Depo., pp. 14:25-15:5). In District 3, Brice worked night shifts serving as Watch Commander, Sunday through Wednesday from 5:0pm to 3:0am. Exh. 22 (Brice Depo., p. 15:14-21).

**Plaintiff's Response to No. 74:** Disputed, as to the term "worked" as Brice was testifying to his scheduled workdays and explained that he would adjust his hours in the system to reflect the actual hours he "worked". *See, e.g.,* PSOF Ex. 3, Brice 19:3-23.

75.    From February 24, 2020, to the present, Brice has been assigned to the Compliance Bureau. Exh. 22 (Brice Depo., pp. 13:20-14:17). The Compliance Bureau is not part of the Patrol East or West divisions. Exh. 22 (Brice Depo., p. 14:15-24). Brice's schedule is currently Monday through Thursday, 10 hours per day. Exh. 22 (Brice Depo., pp. 15:22--16:10).

**Plaintiff's Response to No. 75:** Disputed, as to the term "worked" as Brice was testifying to his scheduled workdays and explained that he would adjust his hours in the system to reflect the actual hours he "worked". *See, e.g.,* PSOF Ex. 3, Brice 19:3-23.

76.    Brice filed his opt-in notice in this case on January 19, 2023. (Doc. 10).

**Plaintiff's Response to No. 76:** Undisputed, although Plaintiff submits that the

document speaks for itself.

77.    Brice's potentially relevant time period in this case is January 11, 2020 (three years preceding the filing of this lawsuit) through February 2020 (the date of his transfer out of Patrol Bureaus East or West) ("Brice Relevant Time Period").

**Plaintiff's Response to No. 77:** Undisputed.

78.    Brice earned a salary basis of at least $684 per week during the Brice Relevant Time Period. Exh. 22 (Brice Depo, pp. 104:25-105:3)

**Plaintiff's Response to No. 78:** Undisputed.

79.    Brice supervised at least two employees during the Brice Relevant Time Period Exh. 22 (Brice Depo., pp. 105:25-106:3)

**Plaintiff's Response to No. 79:** Undisputed.

80.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

**Plaintiff's Response to No. 80:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**H.    Ryan Neville**

81.    Neville was promoted to Lieutenant on July 26, 2021. Exh. 25 (Neville Depo., pp. 11:25-12:12).

**Plaintiff's Response to No. 81:** Undisputed.

82.    Upon Neville's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form.Exh.    26    (Neville    FLSA    Employee Acknowledgement Form). By signing the form Neville acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 26 (Neville FLSA Employee Acknowledgement Form). In signing the form, Neville further acknowledged that he had

23

received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 26 (Neville FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 82:** Undisputed, although Plaintiff submits that the document speaks for itself.

83.    From July 26, 2021, through April 2023, Neville was assigned to District 2 and reported initially to Captain Joe Dietrich and then to Captain Phil Hilliker. Exh. 25 (Neville Depo., pp. 89:19-90:6). While in District 2, Neville worked the day shift, Tuesday through Friday. Exh. 25 (Neville Depo., p. 65:1-09).

**Plaintiff's Response to No. 83:** Undisputed.

84.    From April 2023 to the present, Neville was assigned to the Special Investigations division as a Narcotics Division Commander. Exh. 25 (Neville Depo., p. 76:9-14). The Special Investigations division is not part of the Patrol Bureaus East or West. Exh. 25 (Neville Depo., pp. 12:20-14:18).

**Plaintiff's Response to No. 84:** Undisputed.

85.    Neville filed his opt-in notice in this case on January 20, 2023. (Doc. 11).

**Plaintiff's Response to No. 85:** Undisputed, although Plaintiff submits that the document speaks for itself.

86.    Neville's potentially relevant time period in this case is July 26, 2021 (the date of his promotion to Lieutenant) through April 2023 (the date of his transfer out of Patrol Bureaus East or West) ("Neville Relevant Time Period").

**Plaintiff's Response to No. 86:** Undisputed.

87.    Neville believes he earned a salary basis of at least $684 per week during the Neville Relevant Time Period. Exh. 25 (Neville Depo, p. 39:16-22).

**Plaintiff's Response to No. 87:** Undisputed.

88.    Neville supervised at least two employees during the Neville Relevant Time Period. Exh. 25 (Neville Depo., pp. 40:21-25).

**Plaintiff's Response to No. 88:** Undisputed.

89.

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████

5    **Plaintiff's Response to No. 89:** Undisputed, although Plaintiff submits that the

6 documents speak for themselves.

7    **I.    A.J. Jackson**

8    90.    Jackson was promoted to Lieutenant on November 28, 2022. Exh. 28 (Jackson

9 Depo, p. 24:8-22).

10    **Plaintiff's Response to No. 90:** Undisputed**.**

11    91.    [Intentionally left blank].

12    92.    From November 28, 2022, through January 2024, Jackson was assigned to

13 District 2 and reported to Captain Philip Hilliker. Exh. 28 (Jackson Depo., pp. 24:19-24).

14 Jackson worked Wednesday through Saturday. Exh. 28 (Jackson Depo., pp. 92:2-7).

15    **Plaintiff's Response to No. 92:** Undisputed**.**

16    93.    From January 2024 through May 2024, Jackson was assigned to the Major

17 Crimes division and reported to Captain Frederick Aldorasi. Exh. 28 (Jackson Depo., pp.

18 25:5-26:11) The Major Crimes division is not part of the Patrol Bureaus East or West

19 divisions. Exh. 28 (Jackson Depo., pp. 25:5-26:11).

20    **Plaintiff's Response to No. 93:** Undisputed.

21    94.    From May 2024 through December 2024, Jackson transferred to the General

22 Crimes division and reported to Captain John Bailey. Exh. 28 (Jackson Depo., pp. 25:17-

23 26:11). The General Crimes division is not part of the Patrol Bureaus East or West divisions.

24 Exh. 28 (Jackson Depo., pp. 25:17-26:11).

25    **Plaintiff's Response to No. 94:** Undisputed.

26    95.    From December 2024 to January 2025, Jackson was assigned to the Lake

27 Patrol Division (approximately two months) and reported to Captain Dave Lee. Exh. 28

28 (Jackson Depo., p. 26:16-25). During Lake Patrol, Jackson worked Wednesday through

Saturday from 10am to 8pm. Exh. 28 (Jackson Depo., p. 40:16-21). On March 3, 2025, Jackson was transferred to Homicide Unit Commander. Exh. 28 (Jackson Depo., p. 27:1-3).

**Plaintiff's Response to No. 95:** Disputed, as to the term "worked" as Jackson was testifying to his "regularly assigned shift hours" and explained that he would adjust his hours in Workday to reflect the actual hours he "worked". PSOF Ex. 6, Jackson 90:25-92:1.

96.    Jackson filed his opt-in notice in this case on January 23, 2023. (Doc. 12).

**Plaintiff's Response to No. 96:** Undisputed, although Plaintiff submits that the document speaks for itself.

97.    Jackson's potentially relevant time period in this case is November 28, 2022 (the date of his promotion to Lieutenant) through January 2024 (the date of his transfer out of Patrol Bureaus East or West) and December 2024 (the date he transferred into Lake Patrol) through January 2025 (the date of his transfer out of Patrol Bureaus East or West) ("Jackson Relevant Time Period").

**Plaintiff's Response to No. 97:** Undisputed.

98.    Jackson earned a salary basis of at least $684 per week during the Jackson Relevant Time Period. Exh. 28 (Jackson Depo, p. 44:18-23)

**Plaintiff's Response to No. 98:** Undisputed.

99.    Jackson supervised at least two employees during the Jackson Relevant Time Period. Exh. 28 (Jackson Depo., p. 45:6-13)

**Plaintiff's Response to No. 99:** Undisputed.

100.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

**Plaintiff's Response to No. 100:** Undisputed, although Plaintiff submits that the documents speak for themselves.

1  **J.    Jerry Vance**

2  101.    Vance was promoted to Lieutenant on January 11, 2021. Exh. 30 (Vance

3  Depo., p. 14:3-05).

4  **Plaintiff's Response to No. 101:** Undisputed**.**

5  102.    Upon Vance' promotion to Lieutenant, he signed a Fair Labor Standards Act

6  (FLSA) Employee Acknowledgement form.    Exh. 31 (Vance FLSA Employee

7  Acknowledgement Form; MCC 003761). By signing the form Vance acknowledged that

8  Maricopa County had classified him as exempt under the FLSA. Exh. 31 (Vance FLSA

9  Employee Acknowledgement Form). In signing the form, Vance further acknowledged that

10  he had received and read Maricopa County's policy titled Hours Worked for Exempt

11  Employees. Exh. 31 (Vance FLSA Employee Acknowledgement Form).

12  **Plaintiff's Response to No. 102:** Undisputed, although Plaintiff submits that the

13  document speaks for itself.

14  103.    From January 11, 2021, through March 2021, Vance was assigned to District

15  1 as the nighttime watch commander. Exh. 30 (Vance Depo., pp. 14:10-16:13). Vance

16  worked from 5pm to 3am, Wednesday through Saturday, during his assignment as the

17  nighttime watch commander. Exh. 30 (Vance Depo., p. 18:8-20).

18  **Plaintiff's Response to No. 103:** Disputed, as to the term "worked" as Vance was

19  testifying to his scheduled hours and explained that he would adjust his hours in ADP and

20  Workday to reflect the actual hours he "worked".  PSOF Ex. 13, Vance 43:9-44:3.

21  104.    From March 2021 through July 2021, Vance was assigned to District 1 as the

22  daytime watch commander. Exh. 30 (Vance Depo., pp. 14:10-16:13). Vance worked from

23  7am to 5pm, Wednesday through Saturday, during his assignment as the daytime watch

24  commander. Exh. 30 (Vance Depo., p. 18:8-20).

25  **Plaintiff's Response to No. 104:** Disputed, as to the term "worked" as Vance was

26  testifying to his scheduled hours and explained that he would adjust his hours in ADP and

27  Workday to reflect the actual hours he "worked".  PSOF Ex. 13, Vance 43:9-44:3.

28  105.    From July 2021 through September 2023, Vance was assigned to the Lake

27

Patrol division. Exh. 30 (Vance Depo., p. 16:14-19). From July 2021 through September 2021, he worked Wednesday through Saturday, 7am to 5pm. Exh. 30 (Vance Depo., pp. 18:21-19:6). From September 2021 through September 2023, he worked Monday, Tuesday, Thursday and Friday from 7am to 5pm. Exh. 30 (Vance Depo., p. 19:7-13).

**Plaintiff's Response to No. 105:** Disputed, as to the term "worked" as Vance was testifying to his scheduled hours and explained that he would adjust his hours in ADP and Workday to reflect the actual hours he "worked". PSOF Ex. 13, Vance 43:9-44:3.

106.    From September 2023 through January 2025, Vance was assigned to the Enforcement Support division. Exh. 30 (Vance Depo., pp. 16:23-17:5). The Enforcement Support division is not part of Patrol Bureaus East or West divisions. Exh. 30 (Vance Depo., pp. 16:23-17:8).

**Plaintiff's Response to No. 106:** Undisputed.

107.    From January 2025 through March 2025, Vance returned to District 1 as the nighttime watch commander. Exh. 30 (Vance Depo., p. 17:19-23). Vance worked Wednesday through Saturday from 5pm to 3am. Exh. 30 (Vance Depo., p. 27:4-11).

**Plaintiff's Response to No. 107:** Disputed, as to the term "worked" as Vance was testifying to his scheduled hours and explained that he would adjust his hours in ADP and Workday to reflect the actual hours he "worked". PSOF Ex. 13, Vance 43:9-44:3.

108.    From March 2025 to the present, Vance has been assigned to District 7. Exh. 30 (Vance Depo., p. 17:19-23). Vance's current schedule in District 7 is Monday through Thursday, 7am to 5pm. Exh. 30 (Vance Depo., p. 27:12-14).

**Plaintiff's Response to No. 108:** Disputed, as to the term "worked" as Vance was testifying to his scheduled hours and explained that he would adjust his hours in ADP and Workday to reflect the actual hours he "worked". PSOF Ex. 13, Vance 43:9-44:3.

109.    Vance filed his opt-in notice in this case on January 23, 2023. (Doc. 13).

**Plaintiff's Response to No. 109:** Undisputed, although Plaintiff submits that the document speaks for itself.

110.    Vance's potentially relevant time period in this case is January 11, 2021 (the

date of his promotion to Lieutenant) through September 2023 (the date of his transfer out of Patrol Bureaus East or West) and January 2025 (the date he transferred back into District 1) through the present. ("Vance Relevant Time Period).

**Plaintiff's Response to No. 110:** Undisputed.

111.    Vance earned a salary basis of at least $684 per week during the Vance Relevant Time Period. Exh. 30 (Vance Depo., p. 75:8-13).

**Plaintiff's Response to No. 111:** Undisputed.

112.    Vance supervised at least two employees during the Vance Relevant Time Period. Exh. 30 (Vance Depo., pp. 75:22-25).

**Plaintiff's Response to No. 112:** Undisputed.

113.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

**Plaintiff's Response to No. 113:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**K.    Jason Thomas**

114.    Thomas was promoted to Lieutenant on April 4, 2022. Exh. 33 (Thomas Depo., p. 12:15-17).

**Plaintiff's Response to No. 114:** Undisputed.

115.    Upon Thomas' promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 34 (Thomas FLSA Employee Acknowledgement Form; MCC 004007). By signing the form Thomas acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 34 (Thomas FLSA Employee Acknowledgement Form). In signing the form, Thomas further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 34 (Thomas FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 115:** Undisputed, although Plaintiff submits that the document speaks for itself.

116.    From April 4, 2022, through March 2025, Thomas was assigned to District 1. Exh. 33 (Thomas Depo., pp. 13:24-17:25). From April 2022 and for approximately two weeks, Thomas worked Wednesday through Saturday from 5pm to 3am. Exh. 33 (Thomas Depo., pp. 15:3-11; 17:9-17). Thereafter he worked the day shift in District 1, Wednesday through Saturday from 7am to 5pm, until about December 2022/January 2023. Exh. 33 (Thomas Depo., pp. 15:12-16; 17:13-22). Afterwards, Thomas moved his schedule to Sunday through Wednesday from 7am to 5pm until about March 2025. Exh. 33 (Thomas Depo., pp. 15:12-16; 17:13-25).

**Plaintiff's Response to No. 116:** Disputed, as to the term "worked" as Thomas was testifying to his scheduled hours and explained that he would adjust his hours in ADP and Workday to reflect the actual hours he "worked".  PSOF Ex. 11, Thomas 43:11-44:5.

117.    From March 2025 through June 7, 2025, Thomas was assigned to the communications division, which is not part of the Patrol Bureau East or West divisions. Exh. 33 (Thomas Depo., p. 18:1-04). From June 7, 2025, to the present, Thomas returned to District 1. He works Monday through Thursday from 7am to 5pm. Exh. 33 (Thomas Depo., p. 18:8-13).

**Plaintiff's Response to No. 117:** Disputed, as to the term "worked" as Thomas was testifying to his scheduled hours and explained that he would adjust his hours in ADP and Workday to reflect the actual hours he "worked".  PSOF Ex. 11, Thomas 43:11-44:5.

118.    Thomas filed his opt-in notice in this case on January 30, 2023. (Doc. 14).

**Plaintiff's Response to No. 118:** Undisputed, although Plaintiff submits that the document speaks for itself.

119.    Thomas' potentially relevant time period in this case is April 4, 2022 (the date of his promotion to Lieutenant) through March 2025 (the date of his transfer out of Patrol Bureau East or West) and June 7, 2025 (the date he transferred back into District 1) through the present ("Thomas Relevant Time Period").

**Plaintiff's Response to No. 119:** Undisputed**.**

120. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

**Plaintiff's Response to No. 120:** Undisputed, although Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph. Plaintiff also submits that the documents speak for themselves.

**L.    Michael Trowbridge**

121. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██

**Plaintiff's Response to No. 121:** Undisputed, although Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph. Plaintiff also submits that the documents speak for themselves.

122.    Upon Trowbridge's promotion to Lieutenant, Maricopa County treated him as an exempt employee. Exh. 36 (Trowbridge Depo., p. 95:4-19).

**Plaintiff's Response to No. 122:** Undisputed**.**

123.    On March 3, 2025, Trowbridge was promoted to Captain. Exh. 36 (Trowbridge Depo., pp. 11:5-12:7).

**Plaintiff's Response to No. 123:** Undisputed**.**

124.    Trowbridge filed his opt-in notice in this case on February 1, 2023. (Doc. 16).

**Plaintiff's Response to No. 124:** Undisputed, although Plaintiff submits that the document speaks for itself.

125.    Trowbridge does not have a relevant time period in this case. Trowbridge was not assigned to any patrol bureau during the relevant period for this lawsuit (January 11, 2020, through the present). The SWAT division is not part of any Patrol Bureau East or West division. Trowbridge was transferred from District 2 Patrol (5042) to the SWAT Division (5055) effective November 5, 2018. Exh. 37 (Michael Trowbridge Transfer Email, MCC 020216).

**Plaintiff's Response to No. 125:** Disputed.  Trowbridge testified that SWAT was part of Patrol Bureau West at least from January of 2020 through March of 2022.  PSOF Ex. 12, Trowbridge 12:25-13:6, 29:20-30:17, 40:3-16.  Trowbridge's testimony based on his personal knowledge about his work performing patrol duties at the County is corroborated by County documents demonstrating periods of time when SWAT was part of Patrol.  PSOF Ex. 12, Trowbridge 15:4-16:1, 24:17-25:9, 26:12-21, 31:24-34:20, 47:2-48:11, 107:14-108:25 and exhibits referenced in deposition (Doc. 155-10 at Exs. 80-83). *See* SOF ¶¶ 320-322.

**M.    Andrew Rankin**

126.    Rankin was promoted to Lieutenant on April 4, 2022. Exh. 38 (Rankin Depo.,p. 11:17-19).

**Plaintiff's Response to No. 126:** Undisputed.

127.    Upon Rankin' promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 39 (Rankin FLSA Employee Acknowledgement Form; MCC 004221). By signing the form Rankin acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 39 (Rankin FLSA Employee Acknowledgement Form). In signing the form, Jacksoon further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 39 (Rankin FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 127:** Undisputed, although Plaintiff submits that the

document speaks for itself.

128.    From April 4, 2022, through September 30, 2024, Rankin was assigned to District 3 and reported to Captain Brian Stutsman. Exh.38 (Rankin Depo., pp. 11:20-12:10). Rankin started as a watch commander from 5pm to 3am, Sunday through Wednesday before switching to a day shift lieutenant from 8am to 6pm, Monday through Thursday. Exh. 38 (Rankin Depo., pp. 12:13-13:2).

**Plaintiff's Response to No. 128:** Disputed, as to the hours worked as Rankin was testifying to his "scheduled workdays" and explained that he would adjust his hours in ADP or Workday to reflect the actual hours he "worked". *See, e.g.,* PSOF Ex. 9, Rankin 31:11-32:2.

129.    Beginning September 30, 2024, and to the present, Rankin is currently assigned to the bureau of internal oversight. Exh. 30(Rankin Depo., pp. 10:19-11:2). The bureau of internal oversight is not part of the Patrol Bureaus East or West divisions. Exh. 38 (Rankin Depo., pp. 10:19-11:11). Rankin currently reports to Captain Dominic Reaulo. Exh. 38 (Rankin Depo., p. 12:11-12).

**Plaintiff's Response to No. 129:** Undisputed.

130.    Rankin filed his opt-in notice in this case on February 10, 2023. (Doc. 17).

**Plaintiff's Response to No. 130:** Undisputed, although Plaintiff submits that the document speaks for itself.

131.    Rankin's potentially relevant time period is April 4, 2022 (the date of his promotion to Lieutenant) through September 30, 2024 (the date of his transfer out of Patrol Bureau East or West divisions) ("Rankin Relevant Time Period").

**Plaintiff's Response to No. 131:** Undisputed.

132.    Rankin earned a salary basis of at least $684 per week during the Rankin Relevant Time Period. Exh. 38 (Rankin Depo., p. 16:9-11)

**Plaintiff's Response to No. 132:** Undisputed.

133.    Rankin supervised at least two employees during the Rankin Relevant Time Period. Exh. 38 (Rankin Depo., p. 16:12-13)

**Plaintiff's Response to No. 133:** Undisputed.

134. ████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

**Plaintiff's Response to No. 134:** Undisputed, although Plaintiff submits that the documents speak for themselves.

### N.    Kelly Bocardo

135.    Bocardo filed her opt-in notice in this case on February 13, 2023. (Doc. 18).

**Plaintiff's Response to No. 135:** Undisputed, although Plaintiff submits that the document speaks for itself.

136.    Bocardo does not have a relevant time period associated with her opt-in because she filed a Notice of Withdrawal of Consent on June 6, 2024, notifying the Court that she was withdrawing her consent to opt-in to the lawsuit. (Doc. 65).

**Plaintiff's Response to No. 136:** Undisputed, although Plaintiff submits that the document speaks for itself.

### O.    Rudy Acosta

137.    Acosta was promoted to Lieutenant on October 19, 2020. Exh. 41 (Acosta Depo. Vol. I, p. 13:2-4). He was assigned to District 3 until February 7, 2021, and served as a night watch commander. Exh. 41 (Acosta Depo. Vol. I, pp. 12:22-13:23). He worked Sunday through Wednesday from 5pm until 3am. Exh. 41 (Acosta Depo. Vol. I, pp. 15:22-16:2). He reported to Captain Brian Stutsman. Exh. 41 (Acosta Depo. Vol. I, p. 17:10-14).

**Plaintiff's Response to No. 137:** Disputed, as to the term "worked" as Acosta was testifying to his scheduled hours and explained that he would adjust his hours in ADP and Workday to reflect the actual hours he "worked". PSOF Ex. 2, Acosta 36:6-11, 48:14-50:7.

138.    Upon Acosta's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 43 (Acosta FLSA Employee Acknowledgement Form; MCC 019992). By signing the form Acosta acknowledged that

Maricopa County had classified him as exempt under the FLSA. Exh. 43 (Acosta FLSA Employee Acknowledgement Form). In signing the form, Acosta further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 43 (Acosta FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 138:** Undisputed, although Plaintiff submits that the document speaks for itself.

139.    From February 8, 2021, through April 2022, Acosta was assigned to District 1. Exh. 41 (Acosta Depo. Vol. I, p. 17:15-20) He initially worked the same shift as District 3 (night watch commander) until he transferred to a day shift position. Exh. 41 (Acosta Depo. Vol. I, pp. 17:18-18:12). He reported to Captain George Pepe. Exh. 41 (Acosta Depo. Vol I., p. 21:17-22).

**Plaintiff's Response to No. 139:** Undisputed**.**

140.    From April 2022 to January 2024, Acosta was assigned to the general crimes division. Exh. 41 (Acosta Depo. Vol. I, p. 28:2-7) The general crimes division is not part of the Patrol Bureaus East and West divisions. Exh. 41 (Acosta Depo. Vol I., pp. 24:25-26:9; 28:2-10).

**Plaintiff's Response to No. 140:** Undisputed.

141.    Beginning January 2024 through the present, Acosta has been assigned to District 2. Exh. 41 (Acosta Depo. Vol I., p. 28:11-13). Acosta worked the day shift Tuesday through Friday from 7am to 5pm. Exh. 41 (Acosta Depo. Vol. I, p. 28:11-19). He initially reported to Captain Phil Hilliker, then Captain Aaron Flowers and now reports to Captain Michael Trowbridge. Exh. 41 (Acosta Depo. Vol. I, pp. 29:23-30:5).

**Plaintiff's Response to No. 141:** Disputed, as to the term "worked" as Acosta was testifying to his scheduled hours and explained that he would adjust his hours in ADP and Workday to reflect the actual hours he "worked". PSOF Ex. 2, Acosta 36:6-11, 48:14-50:7.

142.    Acosta filed his opt-in notice in this case on March 6, 2023. (Doc. 24).

**Plaintiff's Response to No. 142:** Undisputed, although Plaintiff submits that the document speaks for itself.

143.    Acosta's potentially relevant time period is October 19, 2020 (the date of his promotion to Lieutenant) through April 2022 (the date of his transfer out of Patrol Bureau East or West divisions) and January 2024 (the date he transferred back in the patrol districts) through the present ("Acosta Relevant Time Period").

**Plaintiff's Response to No. 143:** Undisputed.

144.    Acosta earned a salary basis of at least $684 per week during the Acosta Relevant Time Period. At deposition Acosta testified that he did not know if he earned at least $684 a week since his promotion to Lieutenant but "hoped" he had. Exh. 41 (Acosta Depo. Vol. I, p. 82:8-15).

**Plaintiff's Response to No. 144:** Undisputed.

145.    Acosta supervised at least two employees during the Acosta Relevant Time Period. Exh. 41 (Acosta Depo. Vol I , p. 83:4-7).

**Plaintiff's Response to No. 145:** Undisputed.

146.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**Plaintiff's Response to No. 146:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**P.    Brian Jakowiniz**

147.    [Intentionally left blank].

148.    Upon Jakowinicz's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 45 (Jakowinicz FLSA Employee Acknowledgement Form; MCC 019994). By signing the form Jakowinicz acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 45 (Jakowinicz FLSA Employee Acknowledgement Form). In signing the form, Jakowinicz further

acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 45 (Jakowinicz FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 148:** Undisputed, although Plaintiff submits that the document speaks for itself.

149.    For the entire 2020 performance year and through June 9, 2021, Jakowinicz was assigned to District 1. He retired from his Lieutenant position on June 9, 2021. Exh. 76 (Jakowinicz Blue Team Supervisor Note, MCC 020200).

**Plaintiff's Response to No. 149:** Undisputed.

150.    Jackowinicz filed his opt-in notice in this case on December 20, 2023. (Doc. 54).

**Plaintiff's Response to No. 150:** Undisputed, although Plaintiff submits that the document speaks for itself.

151.    Jakowinicz's potentially relevant time period is January 11, 2020 (three years preceding the filing of this lawsuit) through June 4, 2021 (the date he retired from his Lieutenant position) ("Jackowinciz Relevant Time Period").

**Plaintiff's Response to No. 151:** Undisputed.

152.    [Intentionally left blank].

153.    [Intentionally left blank].

154.    ███████████████████████████████

████████████████████████████████████

███████████████████████████

**Plaintiff's Response to No. 154:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**Q.    Frederick McCann**

155.    For the entire 2020 performance year, McCann was assigned to District 4 as an East Side Watch Commander and reported to Captain Larry Kretzer. Exh. 75 (McCann Evaluation, MCC 020046-020059)

**Plaintiff's Response to No. 155:** Undisputed.

156.    McCann signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 47 (McCann FLSA Employee Acknowledgement Form; MCC 019995). By signing the form McCann acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 47 (McCann FLSA Employee Acknowledgement Form). In signing the form, Mcann further acknowledged that he had received and read   Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 47 (McCann FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 156:** Undisputed, although Plaintiff submits that the document speaks for itself.

157.    In 2021, McCann transferred to District 1 and reported to Captain Cory Morrison. McCann retired from his position as a Lieutenant on September 30, 2021.

**Plaintiff's Response to No. 157:** Undisputed**.**

158.    McCann filed his opt-in notice in this case on December 27, 2023. (Doc. 56).

**Plaintiff's Response to No. 158:** Undisputed, although Plaintiff submits that the document speaks for itself.

159.    McCann's potentially relevant time period is January 11, 2020 (three years preceding the filing of this lawsuit) through September 30, 2021 (the date he retired from his Lieutenant position) ("McCann Relevant Time Period").

**Plaintiff's Response to No. 159:** Undisputed.

160.    [Intentionally left blank].E

161.    [Intentionally left blank].

162.    ████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████

**Plaintiff's Response to No. 162:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**R.    James Kremer**

163.    For the entire 2020 performance year, Kremer was assigned to the Lake Patrol

38

Division as a West Side Patrol Commander and reported to Captain Fred Aldorasi. Exh. 71 (Kremer Evaluation, MCC 020053-020059).

**Plaintiff's Response to No. 163:** Undisputed.

164.    Upon Kremer's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 49 (Kremer FLSA Employee Acknowledgement Form; MCC 019996). By signing the form Kremer acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 49 (Kremer FLSA Employee Acknowledgement Form). In signing the form, Kremer further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 49 (Kremer FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 164:** Undisputed, although Plaintiff submits that the document speaks for itself.

165.    Kremer remained in the Lake Patrol Division in 2021 until he resigned from his Lieutenant position effective April 30, 2021. He reported to Captain Dave Lee from February 2021 through his last day of employment. Exh. 72 (Kremer Supervisor Notes, MCC 020201-020206).

**Plaintiff's Response to No. 165:** Undisputed.

166.    Kremer filed his opt-in notice in this case on December 27, 2023. (Doc. 57).

**Plaintiff's Response to No. 166:** Undisputed, although Plaintiff submits that the document speaks for itself.

167.    Kremer's potentially relevant time period is January 11, 2020 (three years preceding the filing of this lawsuit) through April 30, 2021 (the date he retired from his Lieutenant position) ("Kremer Relevant Time Period").

**Plaintiff's Response to No. 167:** Undisputed.

168.    [Intentionally left blank].

169.    [Intentionally left blank].

170.    ███████████████████████████████████████████████

████████████████████████████████████████████████████████████.

█████████████████████

**Plaintiff's Response to No. 170:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**S.    Jennifer Cruz**

171.    Cruz was promoted to Lieutenant on July 26, 2021.

**Plaintiff's Response to No. 171:** Undisputed.

172.    Upon Cruz's promotion to Lieutenant, she signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 51 (Cruz FLSA Employee Acknowledgement Form; MCC 024935). By signing the form Cruz acknowledged that Maricopa County had classified her as exempt under the FLSA. Exh. 51 (Cruz FLSA Employee Acknowledgement Form). In signing the form, Cruz further acknowledged that she had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 51 (Cruz FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 172:** Undisputed, although Plaintiff submits that the document speaks for itself.

173.    From July 26, 2021, through January 9, 2022, Cruz was assigned to District 7 and reported to Larry Kratzer.

**Plaintiff's Response to No. 173:** Undisputed.

174.    She transferred to the Training Division on January 10, 2022. The Training Division is not part of the Patrol Bureaus East or West divisions.

**Plaintiff's Response to No. 174:** Undisputed.

175.    Cruz filed her opt-in notice in this case on December 27, 2023. (Doc. 58).

**Plaintiff's Response to No. 175:** Undisputed, although Plaintiff submits that the document speaks for itself.

176.    Cruz's potentially relevant time period is July 26, 2021 (the date of her promotion to Lieutenant through January 10, 2022 (the date she transferred out of Patrol Bureaus East or West) ("Cruz Relevant Time Period").

**Plaintiff's Response to No. 176:** Undisputed.

177.    [Intentionally left blank].

178.    [Intentionally left blank].

179.    ████████████████████████████████

████████████████████████████████████████

███████████████████

**Plaintiff's Response to No. 179:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**T.    Benjamin Freeman**

180.    Freeman was promoted to Lieutenant on November 28, 2022 Exh. 53 (Freeman Depo., pp. 18:23-19:3). Since his promotion to Lieutenant, Freeman has "flexed" his hours, but does not know one way or the other how many times. Exh. 53 (Freeman Depo., pp. 22:11-23:7).

**Plaintiff's Response to No. 180:** Undisputed.

181.    Upon Freeman's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 54 (Freeman FLSA Employee Acknowledgement Form; MCC 017500). By signing the form Freeman acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 54 (Freeman FLSA Employee Acknowledgement Form). In signing the form, Freeman further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 54 (Freeman FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 181:** Undisputed, although Plaintiff submits that the document speaks for itself.

182.    From November 28, 2022, through April 2023, Freeman was assigned to District 7. Exh. 53 (Freeman Depo., pp. 18:23-21:5) Freeman worked day shift hours, which were from 6am to 4pm or 7am to 5pm. Exh. 53 (Freeman Depo., p. 21:8-15). After approximately one month in District 7, Freeman transferred to the night shift and worked as a Watch Commander Sunday through Wednesday, from 5pm to 3am. Exh. 53 (Freeman Depo., pp. 25:24-26:19). In this role, Freeman had discretion regarding his start and stop

41

times. Exh. 53 (Freeman Depo., pp. 21:13-22:3).

**Plaintiff's Response to No. 182:** Disputed, as to the term "worked" as Freeman was testifying to his "scheduled workdays" and explained that he would adjust his hours in the system to reflect the actual hours he "worked". PSOF Ex. 4, Freeman 60:5-61:15. Further, Freeman testified that any "discretion" he had regarding his start times was "[b]ased upon your boss's response…If your captain allows you to come in later, he'll allow you to come in later." PSOF Ex. 4, Freeman 21:16-20. *See also* PSOF Ex. 23, MCSO Policy GC-8, *Compensation and Teleworking Procedures* (deviations from the normal scheduled hours require approval from division commander or their designee).

183.    Beginning April 2023 and through the present, Freeman has been assigned to District 3. Exh. 53 (Freeman Depo., p. 19:7-12). Freeman works in District 3 as a night shift watch commander, Sunday through Wednesday from 6pm to 3am. Exh. 53 (Freeman Depo., p. 38:2-12).

**Plaintiff's Response to No. 183:** Disputed, as to the term "worked" as Freeman was testifying to his "scheduled workdays" and explained that he would adjust his hours in the system to reflect the actual hours he "worked". PSOF Ex. 4, Freeman 60:5-61:15.

184.    Freeman filed his opt-in notice in this case on December 27, 2023. (Doc. 59).

**Plaintiff's Response to No. 184:** Undisputed, although Plaintiff submits that the document speaks for itself.

185.    Freeman's potentially relevant time period is November 28, 2022 (the date of his promotion to Lieutenant) through the present ("Freeman Relevant Time Period").

**Plaintiff's Response to No. 185:** Undisputed.

186.    Freeman earned a salary basis of at least $684 per week during the Freeman Relevant Time Period. Exh. 53 (Freeman Depo., p. 94:8-20).

**Plaintiff's Response to No. 186:** Undisputed.

187.    Freeman supervised at least two employees during the Freeman Relevant Time Period. Exh. 53 (Freeman Depo., p. 95:6-9).

**Plaintiff's Response to No. 187:** Undisputed.

188. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

**Plaintiff's Response to No. 188:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**U.    Dmitrius Whelan-Gonzales**

189.    Whelan-Gonzales signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 56 (Whelan-Gonzales FLSA Employee Acknowledgement Form; MCC 019997). By signing the form Whelan-Gonzales acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 56 (Whelan-Gonzales FLSA Employee Acknowledgement Form). In signing the form, Whelan-Gonzales further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 56 (Whelan-Gonzales FLSA Employee Acknowledgement Form).

**Plaintiff's Response to No. 189:** Undisputed, although Plaintiff submits that the document speaks for itself.

190.    Whelan-Gonzales was a Lieutenant in the Major Crimes Division under Captain Frederick Aldorasi until his transfer to the Lake Patrol Division on September 25, 2023. Exh. 63 (Whelan-Gonzales Blue Team Supervisor Notes Excerpt, MCC 020208)

**Plaintiff's Response to No. 190:** Undisputed.

191.    From September 25, 2024, through March 2025, Whelan-Gonzales was assigned to the Lake Patrol Division. Exh. 63 (Whelan-Gonzales Blue Team Supervisor Notes Excerpt, MCC 020208). In March of 2025, he transferred to the Enforcement Support Division. Exh. 79 ((Whelan-Gonzales Blue Team Supervisor Notes, MCC 025083).

**Plaintiff's Response to No. 191:** Undisputed.

192.    Whelan-Gonzales filed his opt-in notice in this case on January 4, 2024. (Doc. 60).

**Plaintiff's Response to No. 192:** Undisputed, although Plaintiff submits that the document speaks for itself.

193.    Whelan-Gonzales' potentially relevant period frame is September 25, 2023 (the date of his promotion to Lieutenant) through March 2025 (the date he transferred out of Patrol Bureaus East or West) ("Whelan-Gonzales Relevant Time Period").

**Plaintiff's Response to No. 193:** Undisputed.

194.    [Intentionally left blank].

195.    [Intentionally left blank].

196.    ███████████████████████████████████████████

**Plaintiff's Response to No. 196:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**VII.    MCSO Issued Vehicles**

197.    Deputies and sergeants are issued patrol vehicles that are conspicuously marked with the MCSO logo and text. Exh. 1 (Grennan Decl. ¶ 23). However, lieutenants are typically issued unmarked inconspicuous SUVs, trucks, or sedans (comparable to the type of vehicle issued to a detective). Exh. 1 (Grennan Decl. ¶ 23). Each of the deposed lieutenants testified that MCSO has issued them unmarked vehicles that they are able to take home. Exh. 41 (Acosta Depo. Vol. I, p. 66:22-25); Exh. 22 (Brice Depo., p. 39:5-12); Exh. 53 (Freeman Depo.,   52:10-16); Exh. 19 (Halverson Depo., p. 47:15-21); Exh. 2 (Houck Depo., pp. 228:10-229:1); Exh. 28 (Jackson Depo., p. 34:12-14); Exh. 10 (Keller Depo., p. 42:19-25); Exh. 25 (Neville Depo., p. 71:4-9); Exh. 38 (Rankin Depo., p. 22:3-9);

1   Exh. 15 (Rosenberger Depo. Vol. I, p. 29:8-11); Exh. 33 (Thomas Depo., p. 47:17-20); Exh.
2   36 (Trowbridge Depo., pp. 70:25-71:5); Exh. 30 (Vance Depo., pp. 59:24-60:2). MCSO has
3   longstanding written policies and procedures regarding the "Use, Assignment, and
4   Operation of Vehicles." Exh. 60 (MCSO Use, Assignment, and Operation of Vehicles
5   Policy (GE-4), MCC 000040-000053). These policies and procedures expressly state that
6   "[u]nmarked vehicles shall not normally be used for traffic law enforcement functions." Id.,
7   p. 8 (Office Vehicles and Equipment (C)). Instead, use of unmarked vehicles may only be
8   used with permission of a division commander and, only then, under certain limited
9   circumstances such as an extraordinary emergency. Exh. 1 (Grennan Decl. ¶ 24) The policy
10  considerations behind disallowing unmarked vehicles to perform routine traffic law
11  enforcement functions are simple – traffic stops by law enforcement personnel in an
12  unmarked patrol vehicle can potentially be hazardous both to the general public and the law
13  enforcement officer involved. Exh. 1 (Grennan Decl. ¶ 24)

14  **Plaintiff's Response to No. 197:** Disputed. Plaintiff objects to this SOF as improper
15  pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph. Plaintiff does
16  not dispute that Patrol Lieutenants are issued unmarked vehicles. Plaintiff also does not
17  dispute the policies set forth in MCSO Use, Assignment, and Operation of Vehicles Policy
18  (GE-4) and states that the document speaks for itself. However, in addition to
19  "extraordinary emergency" circumstances, the Patrol Lieutenants testified about engaging
20  in other more routine situations in their unmarked vehicles, such as traffic stops. *See, e.g.,*
21  PSOF Ex. 9, Rankin 64:8-22; *see also* SOF 234.

22  **VIII.  MCSO'S Computer Aided Dispatch ("CAD") System.**

23  198.    MCSO's CAD system is a software program that members of the MCSO have
24  on their laptops. Exh. 2 (Houck Depo., p. 20:17-23). It is where dispatchers keep track of
25  calls for service and dispatch deputies to take calls for service from that system. Exh. 2
26  (Houck Depo., p. 20:17-23).

27  **Plaintiff's Response to No. 198:** Undisputed.

28  199.    Lieutenants in Patrol Bureaus East and West log in to the CAD system at the

start of their shift in their driveway and log out at the end of their shift, also in their driveway. Exh. 41 (Acosta Depo. Vol. I, p. 66:5-19); Exh. 22 (Brice Depo., pp. 61:8-62:5); Exh. 53 (Freeman Depo., pp. 52:6-53:12); Exh. 19 (Halverson Depo., pp. 47:22-48:3); Exh. 2 (Houck Depo., pp. 21:14-22:1); Exh. 28 (Jackson Depo., p. 35:2-11); Exh. 25 (Neville Depo., pp. 71:21-72:3); Exh. 38 (Rankin Depo., pp. 90:22-91:3); Exh. 15 (Rosenberger Depo. Vol. I, pp. 54:15-55:18); Exh. 33 (Thomas Depo., p. 48:3-16); Exh. 36 (Trowbridge Depo., p. 69:17-24); Exh. 30 (Vance Depo., pp. 60:3-6; 72:8-11).

**Plaintiff's Response to No. 199:** Undisputed.

## IX.    Patrol Lieutenants' Time Spent Commuting, In Office, and In the Field

200.    While working in District 1, Houck testified it took him between 90 minutes and three hours each day, depending on traffic, to commute round trip from between his home and his office. Exh. 2 (Houck Depo., p. 102:2-12). For the remaining seven to 8.5 hours of his shift, Houck testified he spent approximately four to five hours in his office at District 1. Exh. 2 (Houck Depo., p. 198:9-20). Houck testified he spent approximately 20 to 25 percent of his time each week out in the field responding to calls for service. Exh. 2 (Houck Depo., p. 19:13-21).

**Plaintiff's Response to No. 200:** Disputed. Plaintiff does not dispute that Houck offered the testimony set forth above. However, the citation to Houck Depo. 19:13-21 is incorrect; that cite is not related to this statement of fact. Plaintiff Houck also testified more fully in stating that assisting with apprehension and patrol and monitoring the radio is "75 percent of my time. That's what I'm there for. I'm there to respond to calls. I'm there to respond to things that need a command presence." PSOF Ex. 1, Houck 193:4-12. And if "carve out and put aside the portion of that in monitoring the radio", it would be "probably looking at about 20, 25 percent" responding to calls. PSOF Ex. 1, Houck 193:13-21. Further, Houck testified that only about 25% of his time is spent doing administrative duties. PSOF Ex. 1, Houck 181:7-15.

201.    While working in District 3, Acosta testified it took him approximately 75 to 80 minutes each day to commute round trip between his home and his office. Exh. 41

(Acosta Depo. Vol. I, pp. 71:12-72:1). For the remainder of his 10-hour shift, Acosta estimates he spent 30% of his time in his office and 70% of his time in the field. Exh. 41 (Acosta Depo. Vol. I, pp. 74:22-75:18). While working in District 1, Acosta testified it took him approximately one hour each day to commute round trip between his home and his office. Exh. 41 (Acosta Depo. Vol. I, pp. 72:2-73:4). For the remainder of his 10-hour shift, Acosta estimates he spent 30% of his time in his office and 70% of his time in the field when he worked night shifts, and estimates he split his time 50/50 in his office and in the field when he worked day shifts. Exh. 41 (Acosta Depo. Vol. I, pp. 75:19-76:24). Acosta testified it currently takes him approximately 30 minutes each day to commute roundtrip from his home to the District 2 office. Exh. 41 (Acosta Depo. Vol. I, pp. 73:5-74:4). Acosta testified he spends approximately 90% of his time in his office versus out in the field. Exh. 41 (Acosta Depo. Vol. I, p. 74:9-21).

**Plaintiff's Response to No. 201:** Plaintiff does not dispute that Acosta offered the testimony set forth above. However, Acosta testified that while currently he is more in an administrative role in District 2 and spends more time in the office, he still has the radio on, is logged into CAD and still involved in patrol such that if there was a critical incident, he "absolutely" would still be expected to respond. PSOF Ex. 2, Acosta 41:9-18, 146:19-147:16.

202.    While working in District 3, Brice testified it took him an hour to an hour and a half to commute to work and about 50 minutes to an hour to commute back home. Exh. 22 (Brice Depo., pp. 40:20-41:20). Brice testified it was "common" for him to head to his office multiple times per week during his ten-hour shift, when he served as a watch commander for the west side. Exh. 22 (Brice Depo., p. 44:1-17). The amount of time Brice spent in his office varied depending on administrative workload. He testified he could spend five hours a night in his office if he had administrative tasks. Exh. 22 (Brice Depo., pp. 53:17-54:24). He also testified there were times he spent an entire day at his office. Exh. 22 (Brice Depo., p. 55:15-24). It would be rare for him to spend an entire shift in his office as a nighttime watch commander. Exh. 22 (Brice Depo., pp. 54:25-55:14). Spending half a

shift or more in the office was less likely than not, as the expectation was to be out in the field unless administrative duties required otherwise. Exh. 22 (Brice Depo., pp. 56:10-57:17).

**Plaintiff's Response to No. 202:** Undisputed.

203.    While working in District 7, Freeman testified it took one hour each way, regardless of night or day shift to commute to work. Exh. 53 (Freeman Depo., pp 47:19-48:02). Freeman testified that while in District 7 – for the first 3-4 weeks - he spent 75% of his time in the office and about 25% of his time in the field. Exh. 53 (Freeman Depo., pp. 54:5-12). While as a watch commander in District 7, his time was closer to 50% in the office and 50% in this field. Some weeks were more administrative, while other weeks allowed for more time on the road. Exh. 53 (Freeman Depo., p. 54:13-24). While working in District 3, Freeman testified it took him between 30 to 45 minutes to commute to work for day shifts. For the remaining 9 to 9.5 hours of his shift, Freeman spent about 75% of his time in the office and 25% of his time in the field. Exh. 53 (Freeman Depo., p. 58:3-10). After transferring to night shifts in District 3, Feeman testified it takes about one hour to commute to work. Exh. 53 (Freeman Depo., p., 46:6-17). Freeman testified as a nighttime watch commander in District 3, he spends 50% of time in the office and 50% of his time in the field. Exh. 53 (Freeman Depo., p. 57:7-24).

**Plaintiff's Response to No. 203:** Undisputed.

204.    While working in District 7, Halverson testified it took approximately 30 minutes to 45 minutes each way to commute to work. Exh. 19 (Halverson Depo., p. 96:11-14). Halverson testified that he spent two-thirds of his workday in the office. The rest of the day was spent meeting with supervisors or going by a scene. Exh. 19 (Halverson Depo., p. 96:15-22). Halverson testified being on scene in the field was about 10-20% of his time as a lieutenant. Exh. 19 (Halverson Depo., p. 95:12-17).

**Plaintiff's Response to No. 204:** Undisputed.

205.    While in District 2, Jackson testified his commute to work took approximately 15 minutes. Exh. 28 (Jackson Depo., p. 34:19-25). Jackson was not able to quantity the

48

percentage of time while in District 2 that he spent in the office versus the field, but stated he never spent an entire shift in the office. There were times where Jackson spent no time in the office during a shift in District 2. Exh. 28 (Jackson Depo., pp. 36:23-37:24). While in Lake Patrol, Jackson testified his commute to work took approximately one hour. Exh. 28 (Jackson Depo., p. 39:21-23). Jackson spent about 50% of his time in office and 50% of time in the field while in Lake Patrol. Exh. 28 (Jackson Depo., p. 40:9-12).

**Plaintiff's Response to No. 205:** Undisputed.

206.    While in District 2, Keller testified it took him 35 minutes each way to commute to and from work. Exh. 10 (Keller Depo., pp. 74:2-7). For the remaining 9.5 hours of his shift, Keller spent 50% of his time in the office and 50% of the time in the field. Exh. 10 (Keller Depo., pp. 74:12-75:7). While in District 7, Keller testified it took him about 1.5 hours y to commute to work and two hours to commute back home. Exh. 10 (Keller Depo., p. 71:14-25). Keller spent about 2 hours per day in the office and the remaining time (about 4.5 to 5 hours) were spent in the field. Exh. 10 (Keller Depo., pp. 69:24-70:16). While in District 3, Keller testified it takes about 15 minutes to commute each way to and from work. Exh. 10 (Keller Depo., p. 76:3-17). Keller testified he spends 50% of his workday in the office and 50% in the field. Exh. 10 (Keller Depo., pp.76:18-77:2). During a 10-hour shift, Keller would be in the office 4.5 to 5 hours each day and in the field 4.5 to 5 hours each day. Exh. 10 (Keller Depo., p. 78:2-06).

**Plaintiff's Response to No. 206:** Undisputed.

207.    While in District 2, Neville testified his commute took about 25 minutes to and from work. Exh. 25 (Neville Depo., pp. 116:1-117:12). Neville testified he would try to spend the first "couple three hours in the office" to take care of administrative concerns. He estimated he needed about 2-3 hours per day in the office and the remainder of the day in the field. Exh. 25 (Nevile Depo., pp. 123:15-124:3). Neville further testified that the amount of time spent in the office versus the field varied greatly depending on the needs of the district, the day of the week and whether there were major incidents. Exh. 25 (Neville Depo., pp. 121:23-122:15).

1    **Plaintiff's Response to No. 207:** Disputed.  Plaintiff does not dispute that Neville

2    offered the testimony set forth above.  However, Neville also testified that "the majority of

3    the time I tried to be out in the field."  PSOF Ex. 8, Neville 141:19-20.

4    208.    While in District 3, Rankin testified his commute to and from work took

5    approximately 30 minutes. Exh. 38 (Rankin Depo., p. 21:09-11). Rankin testified the

6    majority of the remaining 9.5 hours of his shift was spent in the office. Half of the day he

7    would be in his personal office and the other half he would be in the captain's or other

8    sergeants' offices. Exh. 38 (Rankin Depo., p. 24:2-9).

9    **Plaintiff's Response to No. 208:** Disputed.  Plaintiff does not dispute Rankin's

10   testimony but he further provided testimony that it was not all in the office as "our primary

11   function was to patrol and the needs of patrol and regarding the Patrol Lieutenant position

12   overall."  PSOF Ex. 9, Rankin 94:21-95:2; *see also* PSOF Ex. 9, Rankin 17:2-14 ("Your job

13   was to go to priority calls to service that might need incident command, such as shootings,

14   stabbings, anything where an officer got hurt, anything that is -- has like a questionable

15   death that may not be a natural death, you would try to assist on….If there was a need for

16   incident command, ICS, you were expected to attempt to get there in a timely manner, if

17   you could, and take incident command.").

18   209.    While in District 1, Rosenberger testified it took about 30 minutes to commute

19   each way to and from work. Exh. 15 (Rosenberger Depo. Vol. I, pp. 43:3-9). For the

20   remaining 9.5 hours of his 10-hour shift, Rosenberger spent one hour in the office and about

21   9 hours in the field. Exh. 15 (Rosenberger Depo. Vol. I, pp. 43:23-44:1). While in District

22   6, Rosenberger's commute to work was about five minutes each way. Exh. 15 (Rosenberger

23   Depo. Vol. I, p. 39:8-11). Rosenberger spent about one hour in the office and the rest of the

24   shift (9 hours) in the field. Exh. 15 (Rosenberger Depo. Vol. I, p. 40:4-8). While in Lake

25   Patrol, Rosenberger testified it takes about 25-30 minutes each way to commute to work.

26   Exh. 15 (Rosenberger Depo. Vol. I, p. 22:19-24). Rosenberger spends approximately one

27   hour every workday in the office and the remaining 8.5 hours of his shift in the field. Exh.

28   15 (Rosenberger Depo. Vol. I, p. 26:6-20).

1      **Plaintiff's Response to No. 209:** Undisputed.

2      210.    While in District 1, Thomas testified it takes about 20 minutes each way to

3   commute to and from work. Exh. 33 (Thomas Depo., p. 51:9-13). Thomas testified he

4   spends about 3 out his 4 workweek days entirely in the office. Exh. 33 (Thomas Depo., pp.

5   51:24-52:9). On the remaining workday, Thomas spends his time out in the field, but the

6   time spent on the field varied by how long he is needed at the scene. Exh. 33 (Thomas

7   Depo., p. 52:10-17).

8      **Plaintiff's Response to No. 210:** Undisputed.

9      211.    Trowbridge testified that he spent 1.5 hours roundtrip commuting to and from

10  his office. Exh. 36 (Trowbridge Depo., pp. 74:24-75:4). Trowbridge testified that after

11  subtracting commute time, he estimated about 60-70% of his remaining work hours were

12  spent in the field and the other 30-40% of the time were spent in the office performing

13  administrative tasks. Exh. 36 (Trowbridge Depo., pp. 72:15-73:15).

14     **Plaintiff's Response to No. 211:** Undisputed.

15     212.    While in District 1 as a nighttime watch commander, Vance testified it took

16  up to 40 minutes to drive into work and approximately 20 minutes to drive home. Exh. 30

17  (Vance Depo., p. 61:5-23). While in District 1 in a dayshift position, Vance testified it took

18  the same amount of time to travel to and from work as working as the nighttime watch

19  commander. Exh. 30 (Vance Depo., pp. 61:24-62:4). The majority of Vance's remaining 9

20  hours into his 10-hour shift was spent in the field, not in the office. Exh. 30 (Vance Depo.,

21  p. 63:8-20). While in Lake Patrol as the West Side Lieutenant, Vance would drive about an

22  hour and 45 minutes each way to work. Exh. 30 (Vance Depo., pp. 69:25-70:06). Vance

23  spent 25% of his time as the Lake Patrol West Side Lieutenant in the field responding to

24  calls. Exh. 30 (Vance Depo., p. 69:14-24). The remaining 75% would be spent performing

25  administrative tasks. Exh. 30 (Vance Depo., pp. 69:25-70:24). While in Lake Patrol in an

26  administrative capacity, Vance testified it took about 11 minutes to drive to work. Exh. 30

27  (Vance Depo., p. 71:22-25). Vance spent about 90-95% of his day in the office. Exh. 30

28  (Vance Depo., p. 72:12-19). While in District 7, Vance testified that there is an ability to

spend significantly more time in the office in District 7 compared to District 1, but not as much as in Lake Patrol. District 1 was the district where he spent the least amount of time in the office. Exh. 30 (Vance Depo., pp. 105:9-106:8).

**Plaintiff's Response to No. 212:** Undisputed.

**X.    Primary Patrol Lieutenant Job Duties**

213.   The MCSO has numerous policies and procedures in place ranging from "General Policies and Procedures" that govern day-to-day operations to more specific "Enforcement Policies and Procedures" on discrete topics. MCSO sworn personnel are also subject to Maricopa County personnel policies and procedures. One such policy is MCSO's "Command Responsibility" policy.

**Plaintiff's Response to No. 213:**  Undisputed, however Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it provides no evidentiary citation.

214.   The MCSO Command Responsibility Policy was put into place to "ensure supervisors, at all levels, provide proper direction, coordination and control of subordinates." Exh. 58 (MCSO Command Responsibility Policy GB-2, MCC 000015-000039). The policy defines a "Commander" as "[a]n employee with the rank of lieutenant or above" and defines a "First-Line Supervisor" as "[a]n employee with the rank of sergeant." Exh. 58 (Policy GB-2) The policy specifically states that in order "to ensure accountability, a supervisor shall" perform tasks including, but not limited to, the following:

- Actively direct and supervise employees of a lower rank to ensure they perform assigned duties efficiently;
- Monitor situations in which subordinates are involved and ensure that proper actions are taken;
- Assume command of any situation coming to their attention that requires their involvement;
- Respond to emergencies as necessary and assume command until they are relieved by another supervisor assuming such command;
- Ensure that subordinates promptly and accurately complete all required reports

1    on proper forms;

2    • Investigate reports of unlawful, improper, or immoral conduct of subordinates;

3    • Maintain a written record of the performance of each of their subordinate

4    employees; and

5    • Document all tarries and early departures of employees. The Command

6    Responsibility policy further states that First-line supervisors (sergeants) are

7    required to, among other things, respond to the scene of certain arrests such as

8    assault or injury to a member of the public by a MCSO employee, use of force,

9    felony pursuits, and critical incidents (i.e. use of force, death, discharge of a

10    firearm by a MCSO employee). Exh. 58 (Policy GB-2).

11    **Plaintiff's Response to No. 214:** This is not a statement of fact but merely a

12    summary of the Fields Report.  Plaintiff submits the document speaks for itself.

13    215.    As the above supervisory job duties demonstrate (as also corroborated by the

14    Lieutenant job description), lieutenants are not required or expected to engage in deputy

15    level tasks such as rescuing crime victims, detecting crimes, conducting criminal

16    investigations, apprehending suspects, or interviewing/interrogating individuals. Instead,

17    lieutenants are required to supervise their direct reports who carry out these law enforcement

18    duties.  Accordingly, to the extent Plaintiff is alleging lieutenants use perform deputy level

19    tasks "alongside the officers" on their teams, such an argument focuses on the degree and

20    extent that individual lieutenants intentionally deviate from written job descriptions,

21    policies and procedures.

22    **Plaintiff's Response to No. 215:** Disputed.  Plaintiff objects to this SOF as improper

23    pursuant to LRCiv 56.1(a) as it provides no evidentiary citation.  Plaintiff further objects to

24    the extent this is simply argument and not a statement of fact.  Further, Plaintiff disputes

25    that the supervisory job duties set forth in Exh. 58 (Policy GB-2) are specific to Patrol

26    Lieutenants, nor does the policy specifically state that Patrol Lieutenants are not to engage

27    in those activities or are "intentionally deviat[ing]" from written policy if they do engage in

28    those activities.  Further, the Law Enforcement Lieutenant Job Description itself states that

it is not "all-inclusive list" of job duties.  Doc. 155-4 at Ex. 5.  Senior Human Resources personnel also agree that the job description does not contain all the duties that the Patrol Lieutenants perform.  PSOF Ex. 22, Grennan 29:17-21.  Further, the Patrol Lieutenants also testified that there are additional patrol duties the Patrol Lieutenants are responsible for that are not included in the job description. *See also* Response to SOF 14, above.

**XI.    Patrol Lieutenants Hold Significant Command Responsibility**

216.    When a patrol district's Captain/Commander is unavailable, a Patrol Lieutenant will fill the role as the patrol district's "acting commander" or "acting captain, who becomes the highest-ranking individual in the patrol district. Exh. 2 (Houck Depo., p. 62:20- 22); Exh. 38 (Rankin Depo., p. 33:21-25); Exh. 41 (Acosta Depo. Vol. I, pp. 23:24-24:19). The following Patrol Lieutenants have served as acting commander/captain within their assigned patrol districts for periods ranging from an occasional weekend to several consecutive months at a time. Exh. 41 (Acosta Depo. Vol. I, pp. 23:6-23; 30:18-31:10); Exh. 53 (Freeman Depo., p. 34:12-20); Exh. 2 (Houck Depo., pp. 62:23-63:10); Exh. 19 (Halverson Depo., pp. 64:17-67:22); Exh. 30 (Vance Depo., pp. 27-23-28:2); Exh. 10 (Keller Depo., pp. 38:20-41:20); Exh. 38 (Rankin Depo., pp.: 33:21-34:9); Exh. 33 (Thomas Depo., p. 18:17-25). Similarly, Patrol Lieutenants who work the night shift are referred to as the "watch commander" and are the highest-ranking individual during that shift for Patrol Bureau East or West, and at times for the entire County. Exh. 2 (Houck Depo., pp. 63:11-16; 223:5-224:8; 226:23-227:7); Exh. 41 (Acosta Depo. Vol. I, p. 14:8-19).

**Plaintiff's Response to No. 216:** Disputed.  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph.  While Plaintiff does not dispute that the Patrol Lieutenants may have served in roles where they were the "highest-ranking individual in the district," the Patrol Lieutenants still maintain their role and duties as a Patrol Lieutenant in these roles.  PSOF Ex. 14, Cpt. Aldorasi 64:21-65:8; PSOF Ex. 11, Thomas 122:17-123:6; PSOF Ex. 7, Keller 38:3-9.  Similarly, that a Watch Commander may be the "highest-ranking individual" on shift, that does not change the Patrol Lieutenant's primary duties.  *See* PSOF Ex. 18, Cpt. Stutsman 65:2-11 (overall the

1    day and night shifts are "pretty similar").  *See* SOF ¶¶ 360, 364.

2    **XII.    Patrol Lieutenants' Primary Duty Involves Management and Managerial Tasks**

3        **A.    Make Recommendations as to Hiring and Promotions**

4        217.    Many of the opt-ins testified that they were involved with and make

5    recommendations as to hiring and promotion decisions. Exh. 53 (Freeman Depo., pp. 97:9-

6    99:18); Exh. 15 (Rosenberger Depo. Vol. I, pp. 66:4-7; 86:11-91:2); Exh. 30 (Vance Depo.,

7    pp. 87:15-89:5). For example, Patrol Lieutenants serve on hiring panels of deputy services

8    aides, interview lateral transfer candidates and administrative assistants, and make

9    recommendations regarding their hiring. Exh. 42 (Acosta Depo. Vol II, pp. 119:15-123:19);

10   Exh. 25 (Neville Depo., pp. 98:10-99:10); Exh. 38 (Rankin Depo., pp. 65:7-69:16). Patrol

11   Lieutenants also serve on deputy-to-sergeant and sergeant-to-lieutenant promotion boards.

12   Exh. 22 (Brice Depo., pp. 111:12-112:23); Exh. 28 (Jackson Depo., pp. 54:25-56:20).

13       **Plaintiff's Response to No. 217:** Disputed. Plaintiff does not dispute the testimony

14   provided, however there is also testimony in the record that Patrol Lieutenants did not have

15   authority to make final hiring or promotional decisions. *See, e.g.,* PSOF Ex. 15, Cpt. Bailey

16   25:7-16 (lieutenants "had no say in hiring or firing or even assignments"); PSOF Ex. 18,

17   Cpt. Stutsman 28:19-29:9 (even as a Captain, can be involved in the process but does not

18   have discretion to hire or fire – all goes through HR); PSOF Ex. 14, Cpt. Aldorasi 20:12-

19   21:1, 22:6-12 (lieutenants and even captains do not have authority – all goes through HR;

20   lieutenants may have "advisory' role on staffing issues but they "do not have the last say");

21   PSOF Ex. 2, Acosta 119:15-123:10 (involved in making recommendations but "didn't make

22   the final say" as that would go up to captain and chief).  *See also* SOF ¶ 314.

23       **B.    Participate in Discipline and Internal Affairs Investigations**

24       218.    Patrol Lieutenants have the authority to report misconduct; file complaints;

25   initiate, serve as the principal, and assume responsibility over internal affairs investigations,

26   including making recommendations of sustained findings; issue action plans to

27   subordinates; and issue verbal and formal coachings. Exh. 42 (Acosta Depo. Vol. II, pp.

28   115:19-119:11); Exh. 22 (Brice Depo., pp. 113:15-114:8); Exh. 53 (Freeman Depo., pp.

101:14-102:10); Exh. 25 (Neville Depo., pp. 93:14-97:21); Exh. 38 (Rankin Depo., p. 60:1-15); Exh. 33 (Thomas Depo., pp. 79:18-81:9; 87:14-21); Exh. 2 (Houck Depo., pp. 212:16-15; 221:11-22); Exh. 10 (Keller Depo., pp. 57:11-61:3); Exh. 30 (Vance Depo., pp. 89:6-91:25).

**Plaintiff's Response to No. 218:** Disputed.  Plaintiff does not dispute the testimony provided, however there is also testimony in the record that Patrol Lieutenants did not have authority to make final disciplinary decisions.  *See, e.g.,* PSOF Ex. 1, Houck 15:6-12, 209:21-210:10, 211:20-212:7 (no authority to issue discipline); PSOF Ex. 8, Neville 26:2-5 (decision to place on admin leave would have to go through executive chief level); PSOF Ex. 3, Brice 107:9-16 (not permitted to make recommendations regarding discipline); PSOF Ex. 7, Keller 54:6-20 (not permitted to discipline subordinates)). *See also* SOF ¶ 313.

## C.    Supervise, Monitor, and Direct the Work of Subordinate Employees

219.    Houck and the deposed opt-ins all testified that they supervise two or more employees. Exh. 2 (Houck Depo., p. 69:7-10); Exh. 10 (Keller Depo., p. 37:4-19); Exh. 15 (Rosenberger Depo. Vol. I, p. 64:16-18); Exh. 53 (Freeman Depo., p. 95:6-09); Exh. 19 (Halverson Depo., p. 68:9-11); Exh. 22 (Brice Depo., pp. 105:25-106:3); Exh. 25 (Neville Depo., p. 40:23-25); Exh. 28 (Jackson Depo., p. 45:6-13); Exh. 30 (Vance Depo., p. 75:22-25); Exh. 33 (Thomas Depo., p. 74:22-25); Exh. 38 (Rankin Depo., p. 16:12-13); Exh. 41 (Acosta Depo. Vol. I, p. 83:4-07). Patrol Lieutenants acknowledged the importance of their responsibility for supervising, monitoring, and directing the work of their subordinates. For example, Houck testified he "actively" supervises a couple hours each week and "passively" supervises "all day." Exh. 2 (Houck Depo., pp. 189:9-190:16). As stated by Brice when asked what the primary duty of a law enforcement lieutenant is: "You are the – the supervisor, you are there to help the deputies and sergeants grow so they can one day also be supervisors, so a combination of management, leadership, policing, and unfortunately a lot of admin duties that have to be done." Exh. 22 (Brice Depo., pp. 118:6-119:13). As stated by Vance, a Patrol Lieutenant's responsibility of managing deputies is similar across all districts. Exh. 30 (Vance Depo., p. 25:1-15).

**Plaintiff's Response to No. 219:** Disputed. Plaintiff does not dispute the testimony provided, however there is also testimony in the record that Patrol Lieutenants' primary duty was that of law enforcement regardless of their supervisory duties and that Patrol Lieutenants "supervise by policy" – *i.e.*, enforce the County's policies – and have no discretion to deviate from the County's policies that they have no role in setting. PSOF Ex. 7, Keller 91:10-19. *See also* SOF ¶ 309.

### D.    Assume Command and Direct Operations at Major Incidents

220.    Patrol Lieutenants are responsible for responding to significant incidents. Houck and the deposed opt-ins testified to their supervisory and managerial role when responding to significant incidents. This includes taking command of the incident until it is resolved, setting up a command post, calling in and coordinating resources, assigning duties to people on scene, ensuring notifications are given to the chain of command, and ensuring sergeants are properly doing their duties. Exh. 53 (Freeman Depo., pp. 92:22-93:11); Exh. 2 (Houck Depo., pp. 181:19-182:4); Exh. 25 (Neville Depo., p. 18:8-20); Exh. 38 (Rankin Depo., pp. 98:5-100:19); Exh. 33 (Thomas Depo., pp. 53:9-54:6).

**Plaintiff's Response to No. 220:** Disputed. Plaintiff does not dispute the testimony provided, however there is also testimony in the record that the Patrol Lieutenants are still actively engaging in law enforcement duties on the scene of major incidents and that taking command of significant incidents until they are resolved does not involve simply "managerial tasks," but law enforcement tasks as well. *See, e.g.,* PSOF Ex. 18, Cpt. Stutsman 22:5-23:18; PSOF Ex. 16, Cpt. Kratzer 20:13-21:3, 21:15-22:13; PSOF Ex. 14, Cpt. Aldorasi 16:14-18:4; PSOF Ex. 17, Cpt. Lee 26:3-27:1, 39:19-23, 41:4-17; PSOF Ex. 8, Neville 126:2-128:8; PSOF Ex. 3, Brice 118:6-119:13, 122:6-21. *See also* SOF ¶ 305.

### E.    Evaluate Personnel Performance and Monitor and Enforce Legal Compliance Measures

221.    Patrol Lieutenants perform annual performance evaluations for each of their sergeants. Exh. 2 (Houck Depo., pp. 218:4-219:6); Exh. 10 (Keller Depo., pp. 61:18-62:10); Exh. 15 (Rosenberger Depo. Vol. I, pp. 64:19-65:18); Exh. 53 (Freeman Depo., p. 102:12-

18); Exh. 19 (Halverson Depo., p. 80:6-08); Exh. 22 (Brice Depo., pp. 108:13-109:4); Exh. 25 (Neville Depo., pp. 97:22-98:2); Exh. 28 (Jackson Depo., p. 52:2-17); Exh. 30 (Vance Depo., p. 76:1-13); Exh. 33 (Thomas Depo., p. 88:2-13); Exh. 38 (Rankin Depo., p. 42:16-22); Exh. 42 (Acosta Depo. Vol. II, p. 128:7-19). On a bi-weekly basis, Patrol Lieutenants also prepare performance notes for each of their sergeants to ensure legal compliance with policies, procedures, protocols, and court orders, which is based on a review of the sergeants' internal affairs investigations and reports, BlueTeam supervisor notes, productivity, patrol activity logs, traffic stops, arrests, accidents, and body camera video. Exh. 22 (Brice Depo., pp. 37:15-39:4); Exh. 53 (Freeman Depo., pp. 110:25-111:21); Exh. 19 (Halverson Depo., pp. 22:20-24:4); Exh. 2 (Houck Depo., pp. 174:6-179:22); Exh. 10 (Keller Depo., pp. 41:22-42:18); Exh. 38 (Rankin Depo., pp. 62:23-63:17); Exh. 15 (Rosenberger Depo. Vol. I, pp. 26:21-27:23); Exh. 36 (Trowbridge Depo., pp. 101:19-102:5); Exh. 30 (Vance Depo., p. 77:18-25).

**Plaintiff's Response to No. 221:** Undisputed.

**F.    Participate in Training Programs, Budgeting, and Special Projects**

222.    Patrol Lieutenants are responsible for several other key managerial and administrative tasks to maintain departmental functions and operational readiness. For example, Patrol Lieutenants are involved in budgeting. Exh. 19 (Halverson Depo., p. 82:14-15); Exh. 30 (Vance Depo., p. 84:1-19). Patrol Lieutenants conduct formal training to sergeants and deputies, serve as firearms instructors for the MCSO firearms training unit, teach substantive courses at the policy academy, and manage and oversee Field Training Officer programs. Exh. 19 (Halverson Depo., p. 81:5-15); Exh. 28 (Jackson Depo., pp. 50:5-51:18); Exh. 25 (Neville Depo., pp. 105:23-111:20); Exh. 42 (Acosta Depo. Vol. II, pp. 141:10-145:5); Exh. 15 (Rosenberger Depo. Vol. I, pp. 66:11-67:2). Patrol Lieutenants are also tasked with special projects where they make important recommendations, including scheduling projects to address staffing issues, design and buildouts of facilities, procuring new equipment and devices like fingerprint scanners for office-wide implementation, and revising district operations manuals. Exh. 19 (Halverson Depo., pp. 69:10--70:9); Exh. 25

(Neville Depo., pp. 111:21-115:25); Exh. 38 (Rankin Depo., pp. 48:17-49:13; 52:11-54:16); Exh. 10 (Keller Depo., pp. 91:20-92:18); Exh. 30 (Vance Depo., p. 76:19-23).

**Plaintiff's Response to No. 222:** Disputed. Plaintiff does not dispute the testimony provided, however there is also testimony in the record that the Patrol Lieutenants are still actively engaging in law enforcement duties despite these other projects (such as training or budgeting), and these projects do not negate that the Patrol Lieutenants' are similarly situated in their primary duty being law enforcement. *See also* SOF ¶ 315.

**XIII.   The Opt-Ins Do Not Have a Primary Duty to Serve as A First Responder.**

223.   29 C.F.R. § 541.3(b) sets forth the so-called "First Responder" rule and identifies the types of duties that would qualify as non-exempt first responder duties, if a lieutenant were to personally perform them as part of his/her primary duties. These duties include: preventing, controlling or extinguishing fires of any type; rescuing fire, crime or accident victims; preventing or detecting crimes; conducting investigations or inspections for violations of law; performing surveillance; pursuing, restraining and apprehending suspects; detaining or supervising suspected and convicted criminals, including those on probation or parole; interviewing witnesses; interrogating and fingerprinting suspects; preparing investigative reports; or other similar work. 29 C.F.R. § 541.3(b).

**Plaintiff's Response to No. 223:** This is not a statement of fact but merely sets out a portion of the "First Responder" regulation. Plaintiff submits the regulation (29 C.F.R. § 541.3(b)) speaks for itself. Plaintiff further objects to the extent this provides argument and not a statement of fact.

**A.    Preventing, Controlling or Extinguishing Fires Of Any Type**

224.   When asked at deposition regarding whether they have personally prevented, controlled or extinguished fires as a patrol lieutenant during the relevant time period, Keller, Freeman, Jackson, Thomas, and Rankin each testified they had done so "0" times. Exh. 10 (Keller Depo., p. 83:13-20); Exh. 53 (Freeman Depo., p. 102:23-25); Exh. 28 (Jackson Depo., p. 70:8-13); Exh. 33 (Thomas Depo., p. 114:2-05); Exh. 38 (Rankin Depo., p. 75:12-15). Rosenberger, Brice, Neville, Vance, and Acosta testified they had each done so once

or twice during their entire time as a patrol lieutenant. Exh. 15 (Rosenberger Depo. Vol. I, p. 97:15-23); Exh. 22 (Brice Depo., p. 120:4-24); Exh. 25 (Neville Depo., pp. 134:14-135:1); Exh. 30 (Vance Depo., p. 92:10-16); Exh. 41 (Acosta Depo. Vol. I, p. 83:13-18).

**Plaintiff's Response to No. 224:** Undisputed.

### B.    Rescuing Fire, Crime or Accident Victims

225.    When asked at deposition regarding whether they had personally rescued fire, crime or accident victims as a patrol lieutenant during the relevant time period, Keller, Halverson, Brice, Jackson each testified they had done so "0" times. Exh. 10 (Keller Depo., pp. 83:21--84:8); Exh. 19 (Halverson Depo., p. 83:2-5); Exh. 22 (Brice Depo., p. 122:1-5); Exh. 28 (Jackson Depo., p. 70:14-17). Rankin testified that he "once" provided a "bandage" to a person as a patrol lieutenant. Exh. 38 (Rankin Depo., p. 75:16-25). Freeman testified he had done so less than five times as a patrol lieutenant. [Clip quotes from SOF] Exh. 53 (Freeman Depo., p. 103:5-11). [Houck insert from MSJ] Neville testified he had done so about "half a dozen" times as a patrol lieutenant. Exh. 25 (Neville Depo., p. 135:2-19). Acosta testified he had done so "at least 10" times in nearly 5 years (since October 2020). Exh. 41 (Acosta Depo. Vol. I, pp. 83:19--84:3). Rosenberger testified he had done so approximately "15-20" times since his transfer to Lake Patrol 3.5 years ago (since January 2022). Exh. 15 (Rosenberger Depo. Vol. I, pp. 98:24-99:15). Vance testified he had done so approximately 20-30 times in approximately 2.5 years. Exh. 30 (Vance Depo., pp. 92:17-94:3). Thomas testified he has responded to 10 vehicle accidents as a patrol lieutenant. Exh. 33 (Thomas Depo., pp.114:6-115:6).

**Plaintiff's Response to No. 225:** Undisputed.

### C.    Preventing Or Detecting Crimes

226.    When asked at deposition regarding whether they had prevented or detected crimes as a patrol lieutenant during the relevant time period: Rankin testified that he cannot recall any time over the 2 years of being a patrol lieutenant where he prevented or detected crimes other than one instance where he apprehended a suspect. Exh. 38 (Rankin Depo., pp. 76:4-77:1). Brice testified he prevented or detected crimes twice in his six months as a watch

commander. Exh. 22 (Brice Depo., pp. 122::6-21). Neville testified that he prevented or detected crimes "half a dozen times" in two years. Exh. 25 (Neville Depo., pp. 135:20-136:24). Rosenberger testified he prevented or detected crimes "probably ten times" since his transfer to Lake Patrol 3.5 years ago (since January 2022). Exh. 15 (Rosenberger Depo. Vol I., pp. 100:20-23). Houck testified he had "detected crimes, very infrequently," meaning "probably no more than 15" could not provide an estimate for how many times her personally prevented crimes, and instead contended that his mere presence at a location could prevent crime. Exh. 2 (Houck Depo., pp. 244:2-22;). Thomas testified he had done so approximately 20 times since April 2022. Exh. 33 (Thomas Depo., p. 115::7-19). Freeman testified he had done so "less than 50" times in since November 2022. Exh. 53 (Freeman Depo., p. 103:15-23). Acosta testified he had done so 50-100 times in nearly 5 years (since October 2020). Exh. 41 (Acosta Depo. Vol. I, p 84:4-85:18). Keller testified he had done so approximately 100 times in nearly 5 years (since October 2020). Exh. 10 (Keller Depo., p. 84:9-21). Jackson testified that he had done so but that "there is no way to approximate" the number of times. Exh. 28 (Jackson Depo., pp. 70:18-71:2). Vance testified he had done so on a weekly basis as a patrol lieutenant. Exh. 30 (Vance Depo., pp. 94:4-07).

**Plaintiff's Response to No. 226:** Undisputed.

**D.    Conducting Investigations Or Inspections For Violations Of Law**

227.    When asked at deposition regarding whether they had conducted investigations or inspections for violations of law as a patrol lieutenant during the relevant time period, Halverson testified he could only "think of one incident" in the 4 years he was a Lieutenant. Exh. 19 (Halverson Depo., pp. 83:13-84:4). Keller testified he had done so 6-12 times in nearly 5 years (since October 2020). Exh. 10 (Keller Depo., p. 85:3-14). Thomas testified he had done so between ten to twelve times Since April 2022. Exh. 33 (Thomas Depo., pp. 115:20--116:12). Houck testified he had done so "several times" but no more than 20 times since April 2022. Exh. 2 (Houck Depo., pp. 245:19-247:6). Vance testified he had done so between 50-75 times in approximately 2.5 years. Exh. 30 (Vance Depo., p. 84:9-15).  Acosta testified he had done so at least 50 to 100 times since October 2020. Exh.

41 (Acosta Depo. Vol. I, p. 85:19-24). Rosenberger testified he had done so "upwards of 75" times since his transfer to Lake Patrol 3.5 years ago (since January 2022). Exh. 15 (Rosenberger Depo. Vol. I, p. 101:10-15). Freeman testified he had done so less than 100 times since November 2022. Exh. 53 (Freeman Depo., pp. 103:24-104:2). Brice and Rankin testified that they assisted with the investigations. Specifically, Brice testified that he would assist his subordinates with the investigation but that he was not assigned as a case agent. Exh. 22 (Brice Depo., pp. 122:22-123:21). Rankin testified that he was not the primary lieutenant but that he assisted with approximately 75 investigations over two years. Exh. 38 (Rankin Depo., pp. 73:25-74:13). Neville and Jakson each testified that they would need to review their unit history reports to approximate a response. Exh. 25 (Neville Depo., pp. 135:25-136:21); Exh. 28 (Jackson Depo., p. 71:3-20).

**Plaintiff's Response to No. 227:** Undisputed.

### E.    Performing Surveillance

228.    When asked at deposition regarding whether they had performed surveillance as a patrol lieutenant during the relevant time period: Halverson, Brice, and Jackson each testified that they did not perform any surveillance during their entire time as a patrol lieutenant. Exh. 19 (Halverson Depo., p. 84:5-8); Exh. 22 (Brice Depo., p. 114:9-17); Exh. 28 (Jackson Depo., p. 71:21-23). Keller, Freeman, Neville, Thomas, Rankin and Acosta each testified they had done so up to ten times during their entire time as a patrol lieutenant. Exh. 10 (Keller Depo., p. 85:17-22); Exh. 53 (Freeman Depo., p. 104:3-6); Exh. 25 (Neville Depo., pp. 130:23-131:10); Exh. 33 (Thomas Depo., pp. 116:13-18); Exh. 38 (Rankin Depo. p. 72:10-19); Exh. 41 (Acosta Depo. Vol. I, pp. 85:25-86:5). Vance testified he performed surveillance between 10-20 times in approximately 2.5 years. Exh. 30 (Vance Depo., p. 94:16-19). Houck testified he had done so "a few times [m]aybe 30 times or so" since April 2022.  Exh. 2 (Houck Depo., p. 247:11-15). Rosenberger testified he performed surveillance "upwards of at least 30 times" since his transfer to Lake Patrol in January 2022. Exh. 15 (Rosenberger Depo. Vol. I, pp. 101:25-102:11).

**Plaintiff's Response to No. 228:** Undisputed.

1

**F.    Pursuing, Restraining and Apprehending Suspects**

2    229.    When asked at deposition regarding whether they had pursued, restrained or

3    apprehended suspects as a patrol lieutenant during the relevant time period: Brice testified

4    that he would pursue someone "maybe once a year" but does not remember apprehending

5    anyone during the time he was a patrol lieutenant. Exh. 22 (Brice Depo., pp. 114:18-

6    115:21). Rosenberger and Halverson each testified they had done so once. Exh. 15

7    (Rosenberger Depo. Vol I., p. 102:21-25); Exh. 19 (Halverson Depo., pp. 84:9-12). Thomas

8    testified he had done so 3 times since April 2022. Exh. 33 (Thomas Depo., p. 116:19-25).

9    Rankin testified he had done so approximately 5 times in 2 years. Exh. 38 (Rankin Depo.,

10    pp. 72:20-73:7). Acosta testified he had done so "probably 10 to 15" times in nearly 5 years

11    (since October 2020). Exh. 41 (Acosta Depo. Vol. I, p. 86:6-9). Keller testified he had done

12    so about 15 times in nearly 5 years (since October 2020). Exh. 10 (Keller Depo., p. 86:17-

13    25). Houck testified he had done so "around 20 times" since April 2022. Exh. 2 (Houck

14    Depo., pp. 247:22-248:3). Vance testified he had done so between 20-30 times in 2.5 years.

15    Exh. 30 (Vance Depo., pp. 94:20-95:1). Freeman testified he had done so less than 50 times

16    since November 2022. Exh. 53 (Freeman Depo., p. 104:7-10). Neville testified he had done

17    so less than ten times in approximately 2 years. Exh. 25 (Neville Depo., p. 131:11-21).

18    Jackson testified he did pursue, restrain and apprehend suspects but was unable to provide

19    an estimate of the number of times. Exh. 28 (Jackson Depo., pp. 71:24-72:14).

20    **Plaintiff's Response to No. 229:** Undisputed.

21    **G.    Detaining Or Supervising Suspected And Convicted Criminals, Including Those On Probation Or Parole**

22    230.    When asked at deposition regarding whether they had detained or supervised

23    suspected and convicted criminals, including those on probation or parole, as a patrol

24    lieutenant during the relevant time period: Keller testified he had not detained anyone on

25    his own in approximately 4.5 years (Since October 2020). Exh. 10 (Keller Depo., p. 88:3-

26    15). Freeman testified he had done so less than 5 times since November 2022. Exh. 53

27    (Freeman Depo., p. 104:11-24). Thomas testified he had done so 12 times since April 2022.

28

Exh. 33 (Thomas Depo., p. 117:1-21). Rosenberger testified he had done so "around 15" times since January 2022. Exh. 15 (Rosenberger Depo. Vol. I, p. 103:18-21). Vance testified he had done so more than 25 times but less than 40 in approximately 2.5 years. Exh. 30 (Vance Depo., p. 95:2-12). Rankin testified he had done so "maybe 30 times" in approximately 2 years. Exh. 38 (Rankin Depo., p. 77:2-23). Houck testified he had done "probably about 50 times" in a supporting capacity and less than ten times in a primary capacity since April 2022. Exh. 2 (Houck Depo., p. 248:4-14). Acosta testified he had done so "at least 15 to 20" times since October 2020. Exh. 41 (Acosta Depo. Vol. I, p. 87:12-16).

**Plaintiff's Response to No. 230:** Undisputed.

### H.    Interviewing Witnesses

231.    When asked at deposition regarding whether they had interviewed witnesses as a patrol lieutenant during the relevant time period: Rankin testified he does not remember interviewing any witnesses, but it is possible that he had done so during his two years as a patrol lieutenant. Exh. 38 (Rankin Depo., pp. 73:11-18). Brice testified he cannot recall but that it was not "super often". Exh. 22 (Brice Depo., pp. 115:22-116:19). Keller, Halverson and Acosta each testified they had done so approximately 5 times. Exh. 10 (Keller Depo., p. 88:16-20); Exh. 19 (Halverson Depo., pp. 84:20-25); Exh. 41 (Acosta Depo. Vol. I, p. 87:17-20). Rosenberger testified he had done so approximately 10 times since January 2022. Exh. 15 (Rosenberger Depo. Vol. I, p. 104:7-10). Neville testified he had done so "anywhere from 10 to 50" times in approximately 2 years. Exh. 25 (Neville Depo., p. 132:1-18). Freeman and Thomas each testified he had done so approximately 20 times as a patrol lieutenant. Exh. 53 (Freeman Depo., pp. 104:25-105:3); Exh. 33 (Thomas Depo., pp. 117:22-118:2). Vance testified he had done so less than 50 times in approximately 2.5 years. Exh. 30 (Vance Depo., p. 95:13-20). Houck testified he had done about 50 times in a supporting capacity and less than ten times in a primary capacity since April 2022. Exh. 2 (Houck Depo., p. 248:4-14). Jackson testified he had done so but would provide an approximation of how many times. Exh. 28 (Jackson Depo., p. 73:5-14).

**Plaintiff's Response to No. 231:** Undisputed.

**I.    Interrogating And Fingerprinting Suspects**

232.    When asked at deposition regarding whether they had interrogated and fingerprinted suspects as a patrol lieutenant during the relevant time period: Keller, Rosenberger, Halverson, Jackson, Rankin and Acosta each testified that they had done so zero times. Exh. 10 (Keller Depo., pp. 88:24-89:6); Exh. 15 (Rosenberger Depo. Vol. I, p. 104:11-22); Exh. 19 (Halverson Depo., p. 85:1-4); Exh. 28 (Jackson Depo., p. 73:15-17); Exh. 38 (Rankin Depo., p. 73:19-24); Exh. 41 (Acosta Depo. Vol. I, pp. 87:21-24). Brice testified he interrogated a suspect at least once but cannot recall if it was during his time as a Watch Commander. Brice did not fingerprint any suspects. Exh. 22 (Brice Depo., pp. 123:22-124:8). Thomas testified he interrogated approximately 4-5 times in approximately since April 2022 and does not fingerprint suspects. Exh. 33 (Thomas Depo., p. 118:3-14). Vance testified he interrogated and fingerprinted suspects less than 20 times in approximately 2.5 years. Exh.30 (Vance Depo., p. 95:21-25). Neville testified he interrogated less than 30 times in approximately 2 years and did not fingerprint any suspects. Exh. 25 (Neville Depo., pp.132:19-133:9). Freeman testified he interrogated suspects less than 50 times and fingerprinted suspects zero times since November 2022. Exh. 53 (Freeman Depo., 105:4-9).

**Plaintiff's Response to No. 232:** Undisputed.

**J.    Preparing Investigative Reports**

233.    When asked at deposition regarding whether they had prepared investigative reports as a patrol lieutenant during the relevant time period: Rankin testified that he does not recall "taking a primary on any investigative reports". Exh. 38 (Rankin Depo., pp. 77:24-78:3). Keller testified he prepared one in nearly 5 years (since October 2020). Exh. 10 (Keller Depo., p. 89:7-12). Acosta testified he prepared "maybe two" investigate reports in nearly 5 years (since October 2020). Exh. 41 (Acosta Depo. Vol. I, pp. 87:25-88:4). Brice testified he wrote a supplement to an investigative report "maybe a handful, couple of times" in the six months as a Watch Commander. Exh. 22 (Brice Depo., p. 124:9-16).  Halverson testified he prepared investigative reports two or three times in approximately 4 years. Exh.

19 (Halverson Depo., p. 85:5-8). Rosenberger testified he prepared investigative reports 3 times since January 2022. Exh. 15 (Rosenberger Depo. Vol. I, p. 105:8-11. Neville and Vance each testified they prepared less than 10 investigative reports. Exh. 25 (Neville Depo., pp. 133:10-134:13); Exh. 30 (Vance Depo., p. 96:1-4). Thomas testified he prepared an investigative report approximately 10 times since April 2022. Exh. 33 (Thomas Depo., p. 118:15-21). Freeman and Jackson each testified that they had prepared investigative reports but are unable to provide an approximation. Exh. 53 (Freeman Depo., p. 105:10-25); Exh. 28 (Jackson Depo., p. 74:10-21).

**Plaintiff's Response to No. 233:** Undisputed.

**K.    Traffic Stops**

234.    When asked at deposition regarding whether they had performed any traffic stops as a patrol lieutenant during the relevant time period: Houck testified that his understanding is the MCSO does not want lieutenants performing routine traffic stops unless it's a significant safety issue. Houck further testified that lieutenants have unmarked vehicles because they do not want bystanders flagging down lieutenants to handle calls for service. Houck testified that this was a verbal order to him by his Captain. Exh. 2 (Houck Depo., pp. 229:2-230:10). Acosta testified that he agreed with his supervisor's statement in his traffic stop review which stated "I was unable to locate any traffic stops. This is not unusual for a lieutenant, as traffic stop activity is not his primary responsibility." Exh. 41 (Acosta Depo. Vol. I, pp. 128:25-129:16). Rankin testified that he has not made a traffic stop since 2015-2016. Rankin stated that he operated under personal preference whether to make stops, unless there was an emergency where he needed to intervene. Exh. 38 (Rankin Depo., pp. 63:18-64:22). Keller testified that it is "normal" for lieutenants to perform traffic stops but that he does not do as many as other lieutenants because he specifically chooses to only perform a traffic stop when its for reckless driving or a DUI. Exh. 10 (Keller Depo., pp. 42:19-44:15).  Freeman testified that he performed "maybe one" traffic stop per week as a Watch Commander. Exh. 53 (Freeman Depo., pp. 114:6-116:12). Thomas has performed 1-2 traffic stops since April 2022. Thomas stated that his primary responsibility

is not civil traffic violations. Exh. 33 (Thomas Depo., pp. 52:24-53:8). Halverson testified he performed 2-3 traffic stops over a four year period. Exh. 19 (Halverson Depo., pp. 85:14-85:21). Vance testified he performed approximately 13 traffic stops between 2021 and 2023. Exh. 30 (Vance Depo., p. 103:8-24). Rosenberger testified he has completed approximately 40 traffic stops in about 6 months (from January 2025 to July 2025). Exh. 15 (Rosenberger Depo. Vol. I, p. 34:3-20). Rosenberger further testified that he averaged 20-25 traffic stops per year for 2022 and 2023 during Lake Patrol. Exh. 15 (Rosenberger Depo. Vol. I, p. 35:12-23). Jackson testified that he performed traffic stops as a lieutenant but did not provide a number. Exh. 28 (Jackson Depo., pp. 97:24-98:5).

**Plaintiff's Response to No. 234:** Undisputed.

235.    [Intentionally left blank].

**XIV.    ADP And WorkDay**

236.    During the relevant time period, Defendant has utilized two timekeeping and payroll providers ADP and Workday. While Defendant has no obligation under the FLSA to keep accurate records of hours worked for exempt employees, Defendant nevertheless requires all employees (exempt and non-exempt) to track their hours worked in its timekeeping system. Exh. 1 (Grennan Decl. ¶ 20). For exempt employees, work schedules are preloaded into the timekeeping system. Exh. 2 (Houck Depo., pp. 53:1-55:13); Exh. 53 (Freeman Depo., pp. 59:17-61:20). The hours appear as a total number of hours per day for each scheduled day of the week. For example, Houck testified that in District 1 he worked Wednesday, Thursday, Friday and Saturday. So Workday would automatically populate 10 hours on Wednesday, 10 hours on Thursday, 10 hours on Friday and 10 hours on Saturday. Exh. 2 (Houck Depo., pp. 52:25-53:12). At the end of each pay period, lieutenants are instructed to make adjustments (up or down) to their pre-loaded hours to accurately reflect the actual hours they have worked, and to certify the same. Exh. 35 (Thomas Depo., pp. 29:8-30:6) Houck and the opt-ins concede that their adjustments to the ADP and/or Workday systems were self-reported and done on the "honor code." Exh. 25 (Neville Depo., pp. 63:6-64:7).

**Plaintiff's Response to No. 236:** Disputed. Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph. Plaintiff further objects to the extent this provides legal argument regarding its "obligation under the FLSA." Plaintiff does not dispute that the County utilized two timekeeping systems and that for the most part any adjustments to the ADP and/or Workday systems were self-reported. Plaintiff disputes that the County "requires all employees (exempt and non-exempt) to track their hours worked in its timekeeping system," especially as to hours above 40 in a workweek. While the County had a policy of requiring Patrol Lieutenants to track their hours, the County only required Patrol Lieutenants to account for 40 hours per week or 80 hours per two week pay period, which is not necessarily their actual hours worked. PSOF Ex. 19, Ellison 100:9-25, 101:6-12, 101:18-102:1. *See also* SOF ¶ 325.

237.    Maricopa County is a public agency that maintains a public accountability policy regarding payment of wages to exempt employees. Exh. 59 (MCSO Hours Worked for Exempt Employees Policy (HR2472), MCC000620-622). That policy provides, in pertinent part: "Maricopa County is a public employer who provides paid leave and has compensation system based on principles of public accountability. Exempt employees and those not covered by the FLSA who are eligible for paid leave will not be paid for hours they do not work or use paid leave. All exempt and not covered employees must account for timekeeping system at least the hours for which they are paid by either working or using leave." Exh. 59 (Policy HR2472)

**Plaintiff's Response to No. 237:** This is not a statement of fact but merely a summary of the MCSO policy. Plaintiff submits the document speaks for itself.

238.    Maricopa County's payroll system requires all employees' pay to be entered as an hourly rate, even for employees who are salaried. Thus, in order for payroll to be processed correctly, exempt employees' pay must be manually converted to an hourly rate before it is submitted for payroll. Therefore, lieutenants' pay stubs show an "hourly" rate but they are actually salaried employees.

**Plaintiff's Response to No. 238:** Plaintiff objects to this SOF as improper pursuant

68

1  to LRCiv 56.1(a) as it provides no evidentiary citation.

2  **XV.    Unlogged Hours**

3      239.    Some of the opt ins have alleged they worked hours outside of their regularly

4  scheduled work hours and failed to log those hours into Defendant's timekeeping system,

5  Workday. However, none of the opt-ins have claimed they were ever told not to log hours.

6  To the contrary, Acosta admitted he was never told not to log hours and was actually

7  instructed and encouraged to log all hours. Exh. 41 (Acosta Depo. Vol I, p. 96:7-13).

8      **Plaintiff's Response to No. 239:** Disputed.  Plaintiff objects to this SOF as improper

9  pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph.  While the County

10  had a policy of requiring Patrol Lieutenants to track their hours, the County only required

11  Patrol Lieutenants to account for 40 hours per week or 80 hours per two week pay period.

12  PSOF Ex. 19, Ellison 100:9-25, 101:6-12, 101:18-102:1.

13  **XVI.    [Additional Facts Relevant to Defendant's Motion to Decertify]**

14      240.    Some Patrol Lieutenants have not served on promotion boards, some Patrol

15  Lieutenants have not been involved with interviewing or hiring decisions, and some Patrol

16  Lieutenants have not been involved with promotions or hiring whatsoever. Exh. 42 (Acosta

17  Depo. Vol. II, p. 119:12-14); Exh. 38 (Rankin Depo., p. 42:23-24); Exh. 25 (Neville Depo.,

18  p. 98:3-4); Exh. 22 (Brice Depo., p. 107:9-16); Exh. 28 (Jackson Depotr., p. 57:6-10); Exh.

19  2 (Houck Depo., pp. 210:11-13; 211:6-11); Exh. 10 (Keller Depo., pp. 53:24-54:5; 62:11-

20  13).

21      **Plaintiff's Response to No. 240:** Undisputed.

22      241.    Jackson and Vance each testified they have never provided verbal and/or

23  formal coaching. Exh. 28 (Jackson Depo., pp. 57:11-59:15); Exh. 30 (Vance Depo., p.

24  91:10-20).

25      **Plaintiff's Response to No. 241:** Undisputed.

26      242.    Houck, Jackson, and Keller testified they have never been involved in

27  budgeting. Exh. 2 (Houck Depo., p. 222:10-12); Exh. 28 (Jackson Depo., p. 59: 22-25);

28  Exh. 10 (Keller Depo., p. 93:11-12).

**Plaintiff's Response to No. 242:** Undisputed.

243.    Houck and Rankin each testified they have not conducted any formal training as a Patrol Lieutenant. Exh. 2 (Houck Depo., p. 220:10-13); Exh. 38 (Rankin Depo., p. 59:9-16).

**Plaintiff's Response to No. 243:** Undisputed.

244.    Houck and Jackson each testified they have not been involved with any special projects relating to materials, supplies, machinery, equipment, and the like. Exh. 2 (Houck Depo., p. 222:5-9); Exh. 28 (Jackson Depo., p. 59:16-25).

**Plaintiff's Response to No. 244:** Undisputed.

245.    Patrol Lieutenants conceded that the regular duties and responsibilities vary significantly between day shifts and nights, as well from district to district. Exh. 28 (Jackson Depo., pp. 67:15-68:9); Exh. 42 (Acosta Depo. Vol. II, p.130:20-15; 131:16-132:20). Moreover, Patrol Lieutenants characterized their primary duties in significantly different ways. Exh. 2 (Houck Depo., pp. 19:18-11; 234:22-25); Exh. 10 (Keller Depo., pp. 105:24-106:13); Exh. 33 (Thomas Depo., p. 53:5-20); Exh. 25 (Neville Depo., pp. 16:6-17:9; 142:17-144:22). Patrol Lieutenants further testified to significant differences in the amount of time they spend performing their job duties, with some conceding they cannot accurately quantify the time they spend on certain tasks because of the overlap of managerial, administrative, office, and field responsibilities. Exh. 2 (Houck Depo., pp. 181:7-15; 186:19-22; 189:9-190:2; 191:3-15; 192:4-192:12; 193:13-21; 198:6-15; 198:17-199:17); Exh. 41 (Acosta Depo. Vol. I, p. 42:5-14); Exh. 19 (Halverson Depo., pp. 24:13-25:13); Exh. 28 (Jackson Depo., pp. 36:23-38:6).

**Plaintiff's Response to No. 245:** Disputed.  Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes numerous facts in one paragraph.  Further, while Plaintiff does not dispute the testimony cited, the Captains and Patrol Lieutenants testified that regardless of what district or shift (day or night) they are assigned to, the duties and policies amongst the assignments were "very similar."  *See, e.g.,* PSOF Ex. 13, Vance 19:14-21:9, 24:18-25:15, 32:25-34:10, 104:25-105:8, 107:2-25 (the Patrol Lieutenants'

assignments are "very similar" in that they are responsible for "managing the supervisors, managing the deputies, listening to the radio for incidents that occur and responding to the incidents that occur"; "The volume would be the major difference"); PSOF Ex. 17, Cpt. Lee 58:10-16; 59:9-62:21 (Lake Patrol may not have as much crime but has "more safety issues" – still patrol related and still exchangeable with other districts); PSOF Ex. 14, Cpt. Aldorasi 43:21-44:2 (same patrol type duties in Lake Patrol even though different transportation may be used to perform); PSOF Ex. 10, Rosenberger 60:25-61:2, 62:16-25 (scheduling and day/night shift lieutenants are essentially the same in all three districts he worked in); PSOF Ex. 18, Cpt. Stutsman 65:2-11 (although nighttime watch commanders have some differences, "overall, I think, yes, they're probably pretty similar."); PSOF Ex. 1, Houck 28:9-16, 63:11-24 (districts/day & night shifts – similar duties but may be busier). *See also* SOF ¶ 358.

**XVII. Additional Employment Facts for Opt-In Plaintiffs Jeremy Goad and Richard Ranck**

  **A.    Jeremy Goad**

  246.    Goad worked as a lieutenant in District 4. Exh. 1 (Grennan Decl. ¶ 50). His last day of employment with MCSO was March 2, 2021. Exh. 1 (Grennan Decl. 50); (MCC 020163).

  **Plaintiff's Response to No. 246:** Undisputed.

  247.    Upon Goad's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form.    Exh. 69 (Goad FLSA Employee Acknowledgement Form; MCC 020237). By signing the form Goad acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 69 (Goad FLSA Employee Acknowledgement Form ). In signing the form, Goad further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 69 (Goad FLSA Employee Acknowledgement Form).

  **Plaintiff's Response to No. 247:** Undisputed, although Plaintiff submits that the document speaks for itself.

248.    As of November 28, 2020, Goad was assigned to District 4. Exh. 78 (Goad Blue Team Supervisor Notes Excerpts, MCC020160). In District 4 he served as the Division Commander for several weeks in his Captain's absence.   Exh. 78 (Goad Blue Team Supervisor Notes Excerpts, MCC020160).   was assigned to District 1 as a Watch Commander. Exh. 78 (Goad Blue Team Supervisor Notes Excerpts, MCC 020163).

**Plaintiff's Response to No. 248:** Undisputed.

249.    Goad filed his opt-in notice in this case on November 28, 2023. (Doc. 44).

**Plaintiff's Response to No. 249:** Undisputed, although Plaintiff submits that the document speaks for itself.

250.    Goad's potentially relevant time period is November 28, 2020 (three years prior to his opt in date) through his last day worked, January 5, 2021 ("Goad Relevant Time Period").

**Plaintiff's Response to No. 250:** Undisputed.

251.    ███████████████████████████████████████████
███████████████████

**Plaintiff's Response to No. 251:** Undisputed, although Plaintiff submits that the documents speaks for itself.

**B.    Richard Ranck**

252.    Ranck was promoted to Lieutenant on November 28, 2022. Exh. 64 (Ranck Blue Team Supervisor Notes Excerpt, MCC 020163)

**Plaintiff's Response to No. 252:** Undisputed.

253.    Upon Ranck's promotion to Lieutenant, he signed a Fair Labor Standards Act (FLSA) Employee Acknowledgement form. Exh. 61 (Ranck FLSA Employee Acknowledgement Form; MCC 019993). By signing the form Ranck acknowledged that Maricopa County had classified him as exempt under the FLSA. Exh. 61 (Ranck FLSA Employee Acknowledgement Form). In signing the form, Ranck further acknowledged that he had received and read Maricopa County's policy titled Hours Worked for Exempt Employees. Exh. 61 (Ranck FLSA Employee Acknowledgement Form

**Plaintiff's Response to No. 253:** Undisputed, although Plaintiff submits that the document speaks for itself.

254.   On November 28, 2022, Ranck was assigned to District 1 as a Watch Commander. Exh. 64 (Ranck Blue Team Supervisor Notes Excerpt, MCC 020163).

**Plaintiff's Response to No. 254:** Undisputed.

255.   Ranck filed his opt-in notice in this case on December 7, 2023. (Doc. 50).

**Plaintiff's Response to No. 255:** Undisputed, although Plaintiff submits that the document speaks for itself.

256.   Rank's potentially relevant time period is November 28, 2022 (the date of his promotion) to the present, unless he has transferred out of District 1 ("Ranck Relevant Time Period").

**Plaintiff's Response to No. 256:** Undisputed.

257.   ███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████

**Plaintiff's Response to No. 257:** Undisputed, although Plaintiff submits that the documents speak for themselves.

**XVIII.    Additional Facts Regarding First Responder Duties**

258.   Plaintiff Halverson testified he responded to calls for service as the primary unit 46 times in 2020, six times in 2021, ten times in 2022, and seven times through June 2023, yet he would typically expect a patrol deputy to respond to calls for service as the primary unit more than 100 times per year. Exh. 19 (Halverson: 89:7–91:5). Plaintiff Jackson responded to calls for service as the primary unit ten times during a seven-month period in 2023, yet he would expect that number to be higher for a patrol deputy. Exh. 28 (Jackson: 79:18–24).

**Plaintiff's Response to No. 258:** Undisputed.

259.   Plaintiff Keller testified to approximately 15 instances since October 2020,

yet his patrol deputies pursue, restrain, or apprehend suspects an average of "three times a day." Exh. 10 (Keller Depo., p.86:17–87:17). Plaintiff Rosenberger testified that his patrol deputies during that same time period, the "majority of them could get an arrest every day." Exh. 15 (Rosenberger Depo. Vol. I, pp. 102:12-25; 110:2-20).

**Plaintiff's Response to No. 259:** Undisputed.

260.    Plaintiff Rosenberger testified to approximately 15 instances since January 2022, yet "a good amount" of his patrol deputies detain or supervise a suspected or convicted criminal at least once per shift, especially because "if they're making traffic stops, they're detaining somebody." Exh. 15 (Rosenberger Depo., pp. 103:1-21; 110:21-111:4).

**Plaintiff's Response to No. 260:** Undisputed.

261.    Plaintiff Acosta conducted approximately 10 to 50 interviews in District 2 between July 2021 and April 2023 but testified that is "[c]ertainly not to the level that a deputy would be expected to do . . . ." Exh. 42 (Acosta Depo. Vol. II:, p. 132:1–18). Similarly, Plaintiff Keller has conducted approximately five interviews since October 2020, while his patrol deputies interview witnesses "daily" and "365 at minimum a year." Exh. 10 (Keller Depo., p.88:16–23).

**Plaintiff's Response to No. 261:** Undisputed.

262.    Keller, he was asked whether the number of primary investigative reports he has prepared is "lower than sheriff deputy officers that are doing patrol," and his response was, "Oh, significantly, yes." Exh. 10 (Keller Depo., p.133:10–134:13).

**Plaintiff's Response to No. 262:** Undisputed.

263.    Plaintiff Freeman testified he conducted approximately one traffic stop per week when serving as Watch Commander of District 7 and expects a patrol deputy in District 7 "to make quite a few" on a weekly basis. Exh. 53 (Freeman: 116:8–21).

**Plaintiff's Response to No. 263:** Undisputed.

**XIX.   Additional Facts Relating to Michael Trowbridge's Duty Assignment in SWAT**

264.    Trowbridge may offer the following four documents for the position that SWAT was in Patrol Bureau West: (1) a Maricopa County Sheriff's Office Patrol Resource

1    Bureau SWAT Division Operations Manual ("SWAT Operations Manual") (Exh. 80, cover

2    page produced at TROW000004), (2) a "Supervisor Note" that Trowbridge entered for a

3    sergeant (Exh. 81, TROW000035-36); (3) a 11/29/21 Memorandum from Trowbridge in

4    "SWAT Division" to Deputy Chief McWilliams in "Investigations Bureau" (Exh. 82,

5    TROW000038-40; and (4) A 1/8/20 Memorandum from Trowbridge in "SWAT Division"

6    to Deputy Chief Brandimarte in Patrol Bureau West (Exh. 83, TROW000001-2).

7        **Plaintiff's Response to No. 264:** Disputed.   In addition to these documents,

8    Trowbridge also testified that he has knowledge regarding SWAT being in Patrol Bureau

9    West based on communicating with his "two previous chiefs."  PSOF Ex. 12, Trowbridge

10   14:19-16:1.

11       265.   As for the SWAT Operations Manual, Trowbridge testified that the manual

12   was produced because it "was just showing that were in the patrol resource bureau" as of

13   the date of the manual." Exh. 36 (Trowbridge Depo., pp. 24:25-25:5). Trowbridge further

14   testified that he did not have an understanding as to whether Patrol Resource Bureau was

15   its own independent bureau apart from Patrol Bureaus East or West. Exh. 36 (Trowbridge

16   Depo., pp. 25:12-18).

17       **Plaintiff's Response to No. 265:** Disputed.   Trowbridge testified in full that the

18   document "was just showing that we were in the patrol resource bureau -- or that we were

19   part of the patrol divisions basically, even though we were considered the SWAT division."

20   When asked what a "patrol resource bureau" referred to, Trowbridge testified "that's one of

21   the only times I've seen that where it says patrol resource bureau. Usually it was patrol

22   bureau west or east."  PSOF Ex. 12, Trowbridge 25:2-9.

23       266.   As for the Supervisor Note, Trowbridge testified he produced it because

24   "TROW 36, the second page" "shows his title is sergeant enforcement command/patrol and

25   enforcement support." Exh. 36 (Trowbridge Depo., pp. 26:12-24). However, Trowbridge

26   quickly conceded that he didn't have any understanding one wat or the other whether

27   "command/patrol and enforcement" was "separate and apart from patrol bureau east or west.

28   Exh. 36 (Trowbridge Depo., p. 27:3-11).

**Plaintiff's Response to No. 266:** Disputed.   Trowbridge testified in full that "I produced it because on TROW 36, the second page under Sergeant John Davison, who is one of my direct reports, who is a K-9 sergeant, but it shows his title is sergeant enforcement command/patrol and enforcement support, so just another thing to show that we were tied to patrol, even though we were the SWAT division." PSOF Ex. 12, Trowbridge 26:16-21.

267.    As for the 11/29/21 Memorandum, Trowbridge testified he produced it because it "was showing that in November of '21 … we would have switched from patrol bureau west over to investigations bureau." Exh. 36 (Trowbridge Depo., p. 27:12-19). But when asked if there was a reference to patrol bureau west on the Memorandum, Trowbridge conceded "[t]here's not. Investigations bureau is a separate – separata from patrol bureau west." Exh. 36 (Trowbridge Depo., p. 27:20-25).

**Plaintiff's Response to No. 267:** Undisputed.

268.    As for the 1/9/20 Memorandum, a memo from one individual to another is not indicative of what department SWAT fell under. Even putting that aside, it is dated before the relevant time period in this case. Trowbridge opted in on February 1, 2023. Doc. 16. Thus, even if a 3-year lookback period were to apply, his relevant period would be February 1, 2020, through March 3, 2025. [SOF, ¶¶ 123-24]. A memo dated January 9, 2020, does not establish whether SWAT was part of patrol bureau west nearly two weeks later. At deposition, Trowbridge testified that he did not have any other facts or records (other than the above referenced documents) to support his position that SWAT was in Patrol Bureaus East or West. Exh. 36 (Trowbridge Depo., p. 30:12-24).

**Plaintiff's Response to No. 268:** Disputed.  Plaintiff objects to this SOF as improper to the extent this provides argument and not statements of fact.  Trowbridge testified about why he produced the January 9, 2020 memo: "So I was contacted by my chief at the time, Hank Brandimarte who was the chief of Patrol Bureau West, and asked to basically come up with a memo or create a memo for him to show him what it would look like if there was two, essentially, squads under the SWAT division under the tactical operations unit, which is the SWAT team."  The memo itself notes that it is from Trowbridge (SWAT Division) to

Deputy Chief Brandimarte (Patrol Bureau West).  Exh. 83.

269.    Houck testified that the SWAT division is not within the patrol bureaus east or west. Exh. 2 (Houck Depo., pp. 66:08-20).

**Plaintiff's Response to No. 269:** Undisputed, although Plaintiff objects to this on the grounds of lack of foundation as Houck was not assigned to SWAT and Houck did not testify as to what time period he was referring or the basis for his belief.

270.    When asked if SWAT was within patrol bureaus east or west, Halverson testified "they are not assigned to those bureaus." Exh. 19 (Halverson Depo., pp. 13:12-16).

**Plaintiff's Response to No. 270:** Undisputed, although Plaintiff objects to this on the grounds of lack of foundation as Halverson was not assigned to SWAT and Halverson did not testify as to what time period he was referring or the basis for his belief.

271.    When asked if SWAT was within patrol bureaus east or west, Neville testified "neither". Exh. 25 (Neville Depo., pp. 24:02-03).

**Plaintiff's Response to No. 271:** Undisputed, although Plaintiff objects to this on the grounds of lack of foundation as Neville was not assigned to SWAT and Neville did not testify as to what time period he was referring or the basis for his belief.

**XX.    Additional Facts Regarding Plaintiffs' Discretion to Set Their Own Start/Stop Times, Days Worked, or Lunches**

272.    Freeman testified that he had discretion regarding his start and stop times for his schedule. Exh. 53 (Freeman Depo., pp. 21:16-24). Freeman further testified he had reasonable discretion on setting his hours worked. Exh. 53 (Freeman Depo., pp. 21:16-24). He would communicate with his counterpart his reason for starting later, earlier, or going home early or staying late. Exh. 53 (Freeman Depo., pp. 37:07-16).

**Plaintiff's Response to No. 272:** Disputed.  Freeman testified that any "discretion" he had regarding his start times was "[b]ased upon your boss's response…If your captain allows you to come in later, he'll allow you to come in later."  PSOF Ex. 4, Freeman 21:16-20.  *See also* PSOF Ex. 23, MCSO Policy GC-8, *Compensation and Teleworking Procedures* (deviations from the normal scheduled hours require approval from division

commander or their designee).

273.    Rosenberger testified that he can start his schedule "pretty much whenever I want." Exh. 15 (Rosenberger Depo. 18:11-16). Further, when asked whether he was aware of any other lieutenants in Lake Patrol that similarly get to start and end their shift based on their discretion, Rosenberger testified "all three lieutenants in Lake Patrol have that discretion". Exh. 15 (Rosenberger Depo., pp. 18:17-21).

**Plaintiff's Response to No. 273:** Disputed.  Plaintiff does not dispute that he offered the testimony, but Rosenberger further testified that with regard to start time, it can "vary" between 7am or 8am and then "whenever I start, I usually try to end, obviously, 10 hours later."  PSOF Ex. 10, Rosenberger 18:9-16, 20:2-7.  *See also* PSOF Ex. 23, MCSO Policy GC-8, *Compensation and Teleworking Procedures* (deviations from the normal scheduled hours require approval from division commander or their designee).

274.    Rankin testified that there was flexibility to his work schedule. He would try to log on as early as possible. Exh. (Rankin Depo., pp. 21:12 – 22:02). Further, Rankin testified that every rank took a lunch break "when you have the time to take your lunch". Exh. (Rankin Depo., pp. 102:10-21).

**Plaintiff's Response to No. 274:** Undisputed.

275.    Trowbridge testified that he had the discretion to take a lunch for as long as he preferred. Exh. 36 (Trowbridge Depo., pp. 99:18 – 100:03). Further, Trowbridge testified he had discretion to "a certain extent" on when he could start and stop his shift and that it was based on what was occurring in the field. Exh. 36 (Trowbridge Depo., pp. 71:16-23). *See also* PSOF Ex. 23, MCSO Policy GC-8, *Compensation and Teleworking Procedures* (deviations from the normal scheduled hours require approval from division commander or their designee).

**Plaintiff's Response to No. 275:** Undisputed.

**XXI.  Additional Facts Regarding Plaintiffs' Use of Their County Vehicle as a "Home Office" or Doing Administrative Work in Their County Vehicle**

276.    Freeman testified that he performed administrative work from his company-

1    issued vehicle "almost nightly". Exh. 53 (Freeman Depo., pp. 55:15 – 56:04).

2        **Plaintiff's Response to No. 276:** Undisputed.

3    277.    Rosenberger testified that he used his county-issued vehicle to perform

4    administrative work while assigned to District 6, Lake Patrol and District 1, specifically

5    stating that he reviewed paperwork. Exh. 15 (Rosenberger Depo., pp.41:01-20).

6        **Plaintiff's Response to No. 277:** Undisputed.

7    278.    Vance testified that he would perform administrative work from his vehicle's

8    laptop and would prefer to perform administrative work from his vehicle rath than going

9    into the office. Exh. 30 (Vance Depo., pp. 63:08 – 64:08).

10       **Plaintiff's Response to No. 278:** Undisputed.

11   279.    Trowbridge testified that when he was busy, he would do his online training

12   and Blue Team Supervisor notes from his vehicle. Exh. 36 (Trowbridge Depo., p.101:07-

13   12).

14       **Plaintiff's Response to No. 279:** Undisputed.

15   **XXII. Additional Facts Regarding Plaintiffs' Duty of Incident Management**

16   280.    When asked to describe the essential job task of "incident management" in

17   his own words, Houck testified that lieutenants "respond to major scenes and set up … a

18   command post. Where you basically set up a pop-up tent and you coordinate the resources

19   that coming out, like the --- the SWAT team, the hostage negotiation team, and you basically

20   take charge or command of the incident until the incident is resolved." Exh. 2 (Houck Depo.,

21   pp. 181:19-182:4).

22       **Plaintiff's Response to No. 280:** Undisputed.

23   281.    Houck testified that whenever "something of significance" occurred such as

24   a barricade situation or murder, he was expected to take command of the scene, make

25   judgment calls in real time and then provide a briefing up the chain of command "after [he]

26   made the world safe." Exh. 2 (Houck 224:9-225:14)..

27       **Plaintiff's Response to No. 281:** Undisputed.

28   282.    Defendant sent two letters to Plaintiff's counsel requesting the identities of

any opt-ins that were anticipated to offer declarations in this case. Exh. 73 (March 13, 2024 Letter to Frankel Syverson); Exh. 74 (July 15, 2024 Letter to Frankel Syverson).

**Plaintiff's Response to No. 282:** Plaintiff objects to this SOF as improper pursuant to LRCiv 56.1(a) as it includes unnecessary background information.  Further, this is not a statement of fact but merely a summary of Defendants' letters.  Plaintiff submits the documents speak for themselves.

**XXIII.**     **Additional Facts Regarding the Primary Duty Analysis**

    **A.**     **Relative Importance of Exempt Duties**

283.     Acosta testified that when he worked in District 1, his primary duty was "basically giving guidance and – and ensuring that the deputies were safe and that they were following policies and procedures and – and that they were documenting whatever they needed to document to ensure it was done appropriately." Exh. 42 (Acosta depo., 129:17-132:20). Plaintiff Acosta now works day shifts in District 2, where he serves more of an administrative lieutenant role and characterizes his primary responsibilities as overseeing "internal affairs investigations," working with the "field training program," and "building maintenance and anything that has to do with supplies for . . . the district itself." Exh. 42 (Acosta Depo. Vol. II., 129:17-132:20).

**Plaintiff's Response to No. 283:** Disputed.  Plaintiff objects on the grounds that the term "primary duty" calls for a legal conclusion.  Acosta further explained that that in District 1, during the day he was "mostly going to patrols, going to actual calls for service," and the night shift was "absolutely more focused on the patrol calls" and probably out 70% of the time; he was required to go on "serious calls" – such as shootings, aggravated assault search where people were injured, major accidents, kidnapping, murder, hostage situation, and "critical incidents" such as bus accident with lots of kids (PSOF Ex. 2, Acosta 77:7-79:12, 131:3-9).  And, even in the role of an "administrative lieutenant", the lieutenants still have law enforcement/first responder duties.  *See* PSOF Ex. 2, Acosta 41:9-18, 146:19-147:16 (although he is currently in more of an administrative role in District 2, he still has the radio on, is logged into CAD and still involved in patrol such that if there was a critical

incident, he "absolutely" would still be expected to respond).

284.    Houck testified his "primary duty as patrol lieutenant remains law enforcement, being available to respond to calls," yet he agreed that it is not the primary duty of a Patrol Lieutenant to actually "respond to calls for service." Exh. 1 (Houck Depo., 19:18-24, 234:22-25).

**Plaintiff's Response to No. 284:** Disputed.  Plaintiff objects on the grounds that the term "primary duty" calls for a legal conclusion.  Houck testified *in full* that: "My primary duty as a patrol lieutenant remains law enforcement, being available to respond to calls, being -- having to show up in uniform, be on the radio, be logged in to the CAD system to be dispatched to calls. I'm not a -- in a management-type role. I'm still in a first responder role….[M]y primary duty remains law enforcement.  That's what – that's what I'm there for." (PSOF Ex. 1, Houck 19:22-20:11); *see also* PSOF Ex. 1, Houck 192:4-193:12 (as a Patrol Lieutenant his job involved "going to calls, monitoring the radio, assisting with the apprehension of bad guys, putting together – helping deputies put together criminal investigations" "being ready" as that accounts for "75 percent of my time. That's what I'm there for. I'm there to respond to calls. I'm there to respond to things that need a command presence.").  And, the County's claim that "[Houck] agreed that it is not the primary duty of a Patrol Lieutenant to *actually* 'respond to calls for service'" ignores that the context of the testimony was in comparison to deputies who are required to "take all the calls that come in from dispatch," including calls that do not require a supervisor because they are low level crimes.  (PSOF Ex. 1, Houck 234:1-25).

285.    Keller testified his "primary duty is to uphold the laws, lead by example, while managing [his] sergeant and deputies," and testified that there are "some personnel . . . that are in management positions, all ranks [including lieutenant], that their primary job is just to sit in their office." Exh. 10 (Keller depo., 105:24-106:13).

**Plaintiff's Response to No. 285:** Disputed.  Plaintiff objects on the grounds that the term "primary duty" calls for a legal conclusion.  Plaintiff does not dispute Keller's testimony but he further testified that: "My duties at first and foremost is being a law

1    enforcement officer," and job description should include those duties.  PSOF Ex. 7, Keller

2    103:12-15, 104:13-25.

3        286.    Thomas, his primary responsibility is "incident command" of "significant

4    incidents," where he "set[s] up a command post," "request[s] additional resources,"

5    "assign[s] duties to people on scene," "ensure[s] notifications are given to the chain of

6    command," and "[e]nsure[s] the sergeants are properly doing their duties." Exh. 33 (Thomas

7    Depo., 53:5-20).

8        **Plaintiff's Response to No. 286:** Disputed. Plaintiff objects on the grounds that the

9    term "primary duty" calls for a legal conclusion.  Plaintiff does not dispute Thomas'

10   testimony but he further testified that he was "still a law enforcement officer" so job

11   description should include "respond to calls for service, make arrests upon probable cause"

12   and "ensure public safety."  PSOF Ex. 11, Thomas 68:19-69:5, 70:5-13.

13       287.    Neville testified that his responsibilities as watch commander are "primarily

14   command and control trying to keep everything balanced and make sure that resources are

15   gotten to the patrol deputies on the ground." Exh. 25 (Neville depo., 16:6-17:9). Neville

16   further testified about his responsibilities as follows: "So I'm being held to the standard of

17   you are not an engaged leader, you're not out there with your troops, you're not responding

18   to these emergency calls because you're spending your entire time in the office, that's a bad

19   mark on my reputation. I would be held accountable for that, up to and including discipline.

20   But then when I go out and do it, I'm also told you still have your administrative stuff you

21   have to get taken care of     " Exh. 25 (Neville depo., 142:17-144:22).

22       **Plaintiff's Response to No. 287:**  Disputed.  Plaintiff objects on the grounds that the

23   term "primary duty" calls for a legal conclusion.  Plaintiff does not dispute Neville's

24   testimony but he further provided testimony regarding the Patrol Lieutenant position

25   overall.  For example, in addition to "command and control" duties, Neville testified that

26   "primarily night shift patrol commander but also day shift, I was responding to calls for

27   service. I was taking calls as a primary. I was writing reports. I was doing a lot of the same

28   jobs that I did as a patrol sergeant….Certainly there is an administrative role to being a

lieutenant to a captain, but there is also a first responder aspect to it where you are going out on those scenes;" "first responder duties" included "responding to major incidents, traffic accidents, emergency calls for service." PSOF Ex. 8, Neville 26:11-27:20. *See also* PSOF Ex. 8, Neville 141:16-23 (he would try and "get my admin stuff knocked out in the first two to three hours of my shift and then spend the rest of the time out there, the majority of the time I tried to be out in the field. If there was a major incident, if there was a shooting, I was going. If there was an armed robbery, I was going; I was responding in person.").

### B.    Amount of Time Spent Performing Exempt Work

288.    Houck estimates that he spends 25% percent of his time performing administrative duties; less than 5% of his time performing incident management; very little time each week actively supervising his sergeants; passively supervising his sergeants "all the time;" 5 to 10% of his time performing management duties; 75% of his time monitoring the radio, which he describes is a function of his primary duty of patrol; 20 to 25% percent of his time each week actually responding to calls for service; between 45 minutes to three hours of every 10-hour shift commuting to and from the District 1 facility depending on traffic; and between four and five hours of every 10-hour shift in his office performing administrative duties and conversing with sergeants. Exh.2 (Houck depo., 181:7-15, 186:19-22, 189:9-190:2, 191:3-15, 192:4-192:12, 193:13-21, 198:6-199:17).

**Plaintiff's Response to No. 288:** Disputed.    Plaintiff does not dispute Houck's testimony but, regardless of the attached percentages, Houck further testified that: "My primary duty as a patrol lieutenant remains law enforcement, being available to respond to calls, being -- having to show up in uniform, be on the radio, be logged in to the CAD system to be dispatched to calls. I'm not a -- in a management-type role. I'm still in a first responder role….That my primary duty remains law enforcement." PSOF Ex. 1, Houck 19:22-20:11.

289.    Acosta estimates that he currently spends approximately 65% of his time performing administrative work, another 15% performing duties related to internal affairs, and five percent 5% for patrol functions. Exh. 41 (Acosta depo., 42:5-14).

**Plaintiff's Response to No. 289:**  Disputed.  Plaintiff does not dispute Acosta's testimony but he further testified that even in his current role of an "administrative lieutenant", he still has law enforcement/first responder duties.  *See* PSOF Ex. 2, Acosta 41:9-18, 146:19-147:16 (although he is currently in more of an administrative role in District 2, he still has the radio on, is logged into CAD and still involved in patrol such that if there was a critical incident, he "absolutely" would still be expected to respond).

290.    Halverson was asked to estimate how much time he spent each day (over more than a two-year period in District 7) performing the administrative tasks set forth in the Patrol Lieutenant job description, and he testified he could not provide an accurate percentage because all the essential duties set forth in the job description "are intermixed" and "every task [he] did involve[d] administration, supervisory oversight, management, mentoring, professional development." Exh. 19 (Halverson depo., 24:13-25:13).

**Plaintiff's Response to No. 290:**  Disputed.  Plaintiff does not dispute Halverson's testimony but he further testified that the percentage of time he would spend "[o]n scene would be, I would think, 10 to 20 percent."  PSOF Ex. 5, Halverson 95:12-17.

291.    Jackson testified that when he worked in District 2 from November 2022 through January 2024, the tasks he performed while working in his office were "[j]ust regular administrative stuff like checking e-mails, supervisor notes, report reviews, just the standards," yet he could not quantify what percentage of time he actually spent in his office versus out in the field because "[i]t would be a guess." Exh. 28 (Jackson depo., 36:23-38:6).

**Plaintiff's Response to No. 291:** Disputed.  Plaintiff does not dispute Jackson's testimony but he further testified that he never spent an entire shift in the office as a Patrol Lieutenant and that there were some instances when he would have spent an entire shift outside of the office.  PSOF Ex. 6, Jackson 37:8-21.

/ / /

/ / /

/ / /

/ / /

1    **Plaintiff's Additional Statement of Facts**

2    292.    During their shifts, each of the Patrol Lieutenants are required to be in uniform

3    (including wearing their Body Worn Camera ("BWC")), logged into the computer-aided

4    dispatch ("CAD") system and monitoring the police radio, as the Patrol Lieutenants are not

5    simply working in the office but are required to be ready at a moment's notice to respond

6    to any high-level patrol calls.  PSOF Ex. 6, Jackson 30:8-23, 32:15–34:14, 35:2-20, 40:2-8,

7    43:3-8 ("uniformed, armed, prepared to be a first responder or respond as backup", logged

8    into CAD and monitoring the radio); PSOF Ex. 1, Houck 21:9-22:23, 30:5-23, 31:15-32:14,

9    96:3-11 (logged in, monitoring radio so "can respond to first responder law enforcement

10   calls as required by the County"); PSOF Ex. 15, Cpt. Bailey 54:9-13 ("the lieutenants that

11   all worked under me wore their uniform.  They wore their body armor.  They wore their

12   body worn cameras.  And they were expected to carry the same equipment that a deputy

13   would carry when he was on duty"); PSOF Ex. 14, Cpt. Aldorasi 23:7-24:9 (lieutenants' job

14   is not simply an office job – they have to be involved in patrol duties, logged into CAD,

15   monitor radio for activity); PSOF Ex. 18, Cpt. Stutsman 34:6-35:3 62:6-10 (required to wear

16   BWC "just like a deputy is", logged in and monitoring the radio); PSOF Ex. 14, Cpt.

17   Aldorasi 27:9-14 (wear BWC); PSOF Ex. 16, Cpt. Kratzer 25:2-25, 27:12-28:6, 52:2-4

18   (wears a uniform and BWC so they can respond, logged into CAD and monitoring radio);

19   PSOF Ex. 5, Halverson 35:20-36:19 (in uniform); PSOF Ex. 17, Cpt. Lee 35:20-36:2, 38:15-

20   39:1, 54:6-17, 66:19-23 (in uniform, with BWC, logged into CAD and monitoring radio in

21   case need to respond); PSOF Ex. 4, Freeman 50:16-53:12 (in uniform and required to be

22   logged on during normal shift when doing law enforcement); PSOF Ex. 11, Thomas 47:2-

23   51:5 (in uniform, including BWC, logged in and monitoring radio); Rankin 19:17-25, 21:22-

24   22:12, 90:22-91:3, 104:2-6 (in uniform and expected to be logged in); PSOF Ex. 7, Keller

25   64:18-65:8, 99:7-10, 100:9-101:6 (in uniform, logged into CAD and monitor radio); PSOF

26   Ex. 10, Rosenberger 44:10-21, 46:16-25 (logged into CAD); PSOF Ex. 5, Halverson 35:20-

27   36:19, 46:3-10 (logged into CAD and monitoring calls for service before driving to work);

28   PSOF Ex. 8, Neville 71:1-72:3 (logged into CAD); PSOF Ex. 13, Vance 59:1-61:4, 62:7-

17 (logged into CAD); PSOF Ex. 3, Brice 35:1–37:4, 37:21-39:12 (required to be logged into CAD, monitor radio and be available for calls); Doc. 27-1, Houck Decl. at 10, ¶11-11, ¶16; Doc. 27-2, Halverson Decl. at 3, ¶7 and 4, ¶12 and Sanchez Decl. at 127, ¶12.

293.    Each of the Patrol Lieutenants are expected to provide law enforcement as their primary duty, including being required to respond to all high-level patrol calls and report as first responders in the field for all such calls – including "major incidents" such as armed robberies, homicides, shooting victim incidents, drownings, and school threats. PSOF Ex. 13, Vance 66:11-67:9 (required to respond to "major incidents" "like, a deputy-involved shooting, deputy-involved accident, if an employee got injured, if a suspect or a member of the public got injured at the hands of the sheriff's office'" and "major incidents like, you know, shooting in a community, an accident where somebody died or has the potential to die due to their injuries"); PSOF Ex. 15, Cpt. Bailey 43:10-19, 62:6-63:21 ("you would expect a watch commander or a lieutenant to show up on" all newsworthy, unusual or major emergency incidents – such as armed robberies, homicides, shooting victim incidents); PSOF Ex. 17, Cpt. Lee 42:9-13, 56:4-57:5 (expected to respond to major incidents, which includes drownings); PSOF Ex. 16, Cpt. Kratzer 26:12-19, 45:7-16 (expected to respond to major incidents, as outlined in the MCSO policy); PSOF Ex. 18, Cpt. Stutsman 57:3-16, 59:12-60:15, 66:17-19 (should go out on all Officer Involved Shooting (OIS) calls, "absolutely" should respond to school threat calls); PSOF Ex. 2, Acosta 78:8-79:4 (required to go on "serious calls" or "critical incidents", such as shootings, aggravated assault search where people were injured, major accidents, kidnapping, murder, hostage situation, bus accident with lots of kids); PSOF Ex. 4, Freeman 27:1-22, 28:4-20, 30:4-24 (function was to respond to significant events, such as major crimes, anything with media, homicide, suicide, serious vehicular accidents, shooting, assaults, "deputy-involved shooting"); PSOF Ex. 8, Neville 124:6-125:14 (expected to go to major incidents, any time a "gun gets fired in a district that I'm a commander of.  I'm going to [respond]."); PSOF Ex. 9, Rankin 17:2-14 (go to priority calls to service that would need incident command, such as shootings, stabbings, anything where an officer got hurt, questionable deaths), PSOF

Ex. 9, Rankin 97:11-25 (go to more serious calls, like homicide); Doc. 27-1, Houck Decl. at 10, ¶10; Doc. 27-2, Halverson Decl. at 3, ¶8 and Sanchez Decl. at 126, ¶8.

294. Such first responder duties take priority over any administrative tasks Patrol Lieutenants had. Captain Stutsman testified: "[A]ll the administrative duties come to a screeching halt when preservation of life is foremost. They will respond, and they will stop what they're doing." PSOF Ex. 18, Cpt. Stutsman 65:22-66:1; *see also* PSOF Ex. 18, Cpt. Stutsman 66:20-22 ("that's the preservation of life I mentioned. That is foremost, and then property and then administrative"); PSOF Ex. 3, Brice 49:20-50:3, 54:9-16, 57:13-16 ("you're still listening to radio and something kicks out, then you got to unfortunately drop all of that and then go and take that call…the difficulty of patrol, is you have these [administrative] assignments and you are constantly being pulled away from those assignments and you have to come back"; "if you spend all your time doing admin, you are not doing your job, right. Admin stuff is important, but you got to -- we are here for policing"); PSOF Ex. 6, Jackson 93:25-94:5, 96:7-17, 96:24-97:5 (as a patrol lieutenant "you are uniformed, armed, listened to the radio, monitoring CAD, so you are ready to respond at all times and expected to respond. So doing an EPA [employee performance evaluation] would take a back burner to first responder duties as -- as they came up"); PSOF Ex. 15, Cpt. Bailey 66:11-67:7 (for "big events" or serious calls, the call would take priority over administrative tasks); PSOF Ex. 14, Cpt. Aldorasi 27:2-8 (law enforcement is more important than administrative duties); PSOF Ex. 17, Cpt. Lee 44:24-45:9 ("managing a major incident definitely is more important than those administrative tasks"); PSOF Ex. 16, Cpt. Kratzer 26:21-27:10, 28:20-29:12 (when first responder incident presents itself, it is the priority over administrative tasks); PSOF Ex. 9, Rankin 94:21-95:15, 95:20-96:20 ("primary function was to patrol and the needs of patrol and to assist and lead patrol, and then everything was secondary to that"; includes "directing work" as well as "going to the important calls yourself to manage things when they are of high priority"); Ex. 15, Cpt. Bailey 45:1-5, 54:19-55:7, 56:20-57:3 ("primary function" is to "protect the public", "prevent crime" and "oversee and manage the assets" that are involved in first responder

duties and, in doing so, they are also engaged as a first responder when necessary)); Doc. 27-1, Houck Decl. at 10, ¶12; Doc. 27-2, Halverson Decl. at 3, ¶6 and Sanchez Decl. at 126, ¶6.

295.   As Houck explained, as a Patrol Lieutenant his job involved "going to calls, monitoring the radio, assisting with the apprehension of bad guys, putting together – helping deputies put together criminal investigations" "being ready" as that accounts for "75 percent of my time. That's what I'm there for. I'm there to respond to calls. I'm there to respond to things that need a command presence."  PSOF Ex. 1, Houck 192:4-193:12.

296.   Significantly, Patrol Lieutenants are subject to reprimand or discipline for failure to respond to such incidents.  *See, e.g.,* PSOF Ex. 14, Cpt. Aldorasi 24:10-19; PSOF Ex. 17, Cpt. Lee 37:1-38:5; PSOF Ex. 18, Cpt. Stutsman 35:10-19; PSOF Ex. 16, Cpt. Kratzer 26:21-27:10.

297.   Simply stated, the Patrol Lieutenants' primary role is as a law enforcement officer.  As Houck explained:

> "The duties that I have as a patrol lieutenant are exactly the same as I had as a patrol sergeant….My primary duty as a patrol lieutenant remains law enforcement, being available to respond to calls, being -- having to show up in uniform, be on the radio, be logged in to the CAD system to be dispatched to calls. I'm not a -- in a management-type role. I'm still in a first responder role….That my primary duty remains law enforcement. That's what – that's what I'm there for."

PSOF Ex. 1, Houck 19:22-20:11. *See also* PSOF Ex. 8, Neville 26:11-27:20 (still law enforcement role: "I was responding to calls for service. I was taking calls as a primary. I was writing reports. I was doing a lot of the same jobs that I did as a patrol sergeant when I worked as a sergeant in District II.").

298.   This understanding of the Patrol Lieutenant's role was shared by the Patrol Lieutenants' Captains as well.  For example, Captain Stutsman explained that he expected his Patrol Lieutenants were actively involved in law enforcement as "we're cops first, always":

> "[M]y lieutenants are uniformed.  They respond.  They are constantly monitoring.  They go out when necessary and they are engaged….So my lieutenants are engaged in the field. Yes, they have administrative duties.  Yes, they spend time in the office, but they are available to respond to all calls for

service."

PSOF Ex. 18, Cpt. Stutsman 58:22-59:4, 33:3-10; *see also* PSOF Ex. 18, Cpt. Stutsman 36:14-22 ("But the lieutenants, that's their job. They are to get out there. They're to make sure that everything is d[one, so, yes, they will be responding…. [T]hey are uniformed, and I do want them out there hands-on at the scene."), PSOF Ex. 18, Cpt. Stutsman 16:13-20 (lieutenants are "first responders").

299.    Captains are a higher rank than the Patrol Lieutenants who are supervised by captains. *See, e.g.,* PSOF Ex. 14, Cpt. Aldorasi 12:19-13:7 (captains' duties included supervising Patrol Lieutenants); PSOF Ex. 15, Cpt. Bailey 32:20-34:4 (captains were responsible for evaluating the Patrol Lieutenants and ensuring they were complying with all County policies and procedures); Doc. 155-4 at Ex. 5 HOUCK000179 (noting Law Enforcement Lieutenants report to Law Enforcement Captains).

300.    Senior Human Resources employees from the County agree that how the Patrol Lieutenants *actually* perform their jobs is what matters, not the job descriptions. PSOF Ex. 19, Ellison 50:19-51:13; PSOF Ex. 20, Erskine 36:4-24.

301.    Senior Human Resources personnel also agree that the job description does not contain all the duties that the Patrol Lieutenants perform. PSOF Ex. 22, Grennan 29:17-21.

302.    The Fields report lists first responder duties that the Patrol Lieutenants perform, including for example interviewing and interrogating suspects, interviewing victims and witnesses at crime scenes, and initiating traffic stops to ensure public safety. PSOF Ex. 22, Grennan 31:12-34:25, 39:14-40:24; Doc. 155-2, 155-3, and 155-11 at Ex. 4 at HOUCK000052.

303.    Key County human resources personnel testified that the Fields report delineates numerous first responder tasks that the Patrol Lieutenants perform. PSOF Ex. 21, Farrow 109:6-110:20, 111:14-115:9; PSOF Ex. 22, Grennan 38:23-40:23.

304.    Even when they may be the highest-ranking official on duty such as when they are serving a period as night commander or an acting captain, the Patrol Lieutenants

ultimately must run decision-making by their Captains and/or Chief.  PSOF Ex. 1, Houck
115:13-116:7 (after night shift, had to update captains and chief about status of all calls);
PSOF Ex. 11, Thomas 20:2-21:2, 24:16-21 (when acting captain, may still have contact
with captain if any major issues came up); PSOF Ex. 8, Neville 126:2-128:8 (as a watch
commander, he was "scene commander" but was still "getting my orders from my captain
who, at the time, is asleep in his bed").

305.    Patrol Lieutenants are responsible for "incident management" of high-level
calls which is not simply supervision and management but involves being actively engaged
in law enforcement duties.  *See* PSOF Ex. 15, Cpt. Bailey 26:23-27:17 (when "running an
incident" – such as a barricade, a warrant service, an aggravated assault – "the lieutenants
are the ones that pretty much go in and they become the incident manager for that event…So
are they putting hands on a suspect and putting handcuffs on a suspect?  It happens
occasionally.  But for the most part, they're directing the law enforcement operation at the
time of the incident."); PSOF Ex. 18, Cpt. Stutsman 22:5-23:18 and PSOF Ex. 16, Cpt.
Kratzer 20:13-21:3, 21:15-22:13 (incident management occurs in the field and "absolutely"
involves law enforcement duties); PSOF Ex. 14, Cpt. Aldorasi 16:14-18:4 (incident
management routinely includes "any sort of major incident that might occur in the field:
maybe a death, a fatal car accident, a homicide that occurs in the streets, you know, in our
community, hit-and-run" and the lieutenants involved are engaged in first responder duties);
PSOF Ex. 17, Cpt. Lee 26:3-27:1, 39:19-23, 41:4-17 ("Lieutenants manage bigger incidents
where there needs to be additional resources requested, interagency communication,
command posts"; management of these types of large incidents are "a first responder
activity"); PSOF Ex. 8, Neville 126:2-128:8 (duties on scene include "coordinating" the
command and control center, as well as in one example, "responding with the [deputies and
sergeants]" to rescue and recover flood victims and control looting); PSOF Ex. 3, Brice
118:6-119:13, 122:6-21 (primary duty is controlling the scene and do what needs to be done,
engage in active patrolling to prevent crime); Ex. 6, Jackson 93:25-94:5, 96:7-17, 96:24-
97:5 (lieutenants were "absolutely" first responders as they were "expected in their role to

respond to an emergency incident and [ ] administer lifesaving efforts in whatever capacity that may be in, so you risk life and limb to save that of another"); Ex. 9, Rankin 94:21-95:15, 95:20-96:20 ("primary function was to patrol and the needs of patrol and to assist and lead patrol, and then everything was secondary to that"; includes "directing work" as well as "going to the important calls yourself to manage things when they are of high priority"); Ex. 15, Cpt. Bailey 45:1-5, 54:19-55:7, 56:20-57:3 ("primary function" is to "protect the public", "prevent crime" and "oversee and manage the assets" that are involved in first responder duties and, in doing so, they are also engaged as a first responder when necessary)).

306.    All such duties involve the Patrol Lieutenants engaging in non-exempt, first responder duties.  As Lieutenant Halverson explained:

> Q. Earlier you indicated that you are a first responder. Do you remember that testimony?
> A. Yes.
> Q. What exactly do you mean by that? Do you mean that you are the one actually making arrests and doing investigations, or is that a reference to your supervising, overseeing, giving feedback to your sergeants and your deputies who are preforming those duties?
> A. **They are all first responder responsibilities.** I have actually been the one to go out and take the calls for service and clear them or write a report. I have been the one to actually go and make the arrest. I have also been the one that does the very same job as the sergeant or a senior deputy in helping them make the decisions and process the scene, whether it is being there or do it telephonically.

PSOF Ex. 5, Halverson 86:10-25; *see also* PSOF Ex. 5, Halverson 93:10-23, 94:11-15 (even if the non-primary responder, he would be "directing that call, analyzing evidence, making the decisions on probable cause, ensuring that the deputy processes it the correct way").

307.    The Captains – not the Patrol Lieutenants – had final decision-making power in terms of district decisions.  *See, e.g.,* PSOF Ex. 15, Cpt. Bailey 24:16-25:1 ("I would let the lieutenants make their decisions.  But if it was a decision that I thought maybe was not the best interest of the office or the individual, I would overrule them.") and 33:3-34:4, 59:12-60:12 (Captains reviewed lieutenants on all tasks they performed to ensure they followed all the County policies and tracked the lieutenants consistently throughout day when logged onto CAD); PSOF Ex. 8, Neville 25:20-26:1 (as lieutenant he doesn't have "the kind of command latitude to be able to make day-to-day decisions that shape the

landscape of this agency by personnel or policy", decisions go through "his bosses"); PSOF Ex. 1, Houck 15:6-12 (no authority to make important decisions); Doc. 27-1, Houck Decl. at 10, ¶14; Doc. 27-2, Halverson Decl. at 4, ¶10 and Sanchez Decl. at 126, ¶10.

308.    As Lieutenant Jackson explained, the job description says "The Law Enforcement Lieutenant administers, plans, organizes and directs the operations of a district," [but] that's not true. That would be the captain's job. The law enforcement lieutenant supports the captain in that -- in that mission." PSOF Ex. 6, Jackson 66:23-67:9.

309.    The Patrol Lieutenants "supervise by policy" – *i.e.*, enforce the County's policies – and have no discretion to deviate from the County's policies that they have no role in setting.  PSOF Ex. 7, Keller 91:10-19 ("There is no discretion from a captain to lieutenant. The way we're told how we supervise is by policy. So it's all the same.").

310.    For example, Patrol Lieutenants do not create paid sick time policies for their subordinates but simply convey and follow the County's established paid sick time policy. *See, e.g.,* PSOF Ex. 11, Thomas 75:21-76:4, PSOF Ex. 8, Neville 93:7-18, PSOF Ex. 9, Rankin 36:24-37:6, PSOF Ex. 4, Freeman 96:23-97:8.

311.    The Patrol Lieutenants also do not have final or full authority to **create department policies.**  PSOF Ex. 8, Neville 26:6-10 (would have to go through policy review process if didn't agree with policy); PSOF Ex. 9, Rankin 48:17-52:10 (updated operations manual but really no discretion; specifically told what to do by captain).

312.    The Patrol Lieutenants also do not have final or full authority to **make final scheduling decisions.** PSOF Ex. 1, Houck 72:12-14, 75:8-76:3 (need captain's permission for scheduling); PSOF Ex. 4, Freeman 95:17-25 (did not make scheduling decisions); PSOF Ex. 11, Thomas 88:14-89:15 (no authority to permanently adjust someone's schedule or change squad, requires "captain's approval"); PSOF Ex. 6, Jackson 45:21-46:10 (made recommendations but not accepted); PSOF Ex. 13, Vance 104:12-20 (could only temporarily change schedules).

313.    The Patrol Lieutenants also do not have final or full authority to **discipline sergeants or deputies.** PSOF Ex. 1, Houck 15:6-12, 209:21-210:10, 211:20-212:7 (no

authority to issue discipline); PSOF Ex. 8, Neville 26:2-5 (decision to place on admin leave would have to go through executive chief level); PSOF Ex. 3, Brice 107:9-16 (not permitted to make recommendations regarding discipline); PSOF Ex. 7, Keller 54:6-20 (not permitted to discipline subordinates).

314. The Patrol Lieutenants also do not have final or full authority to **hire or fire employees.** PSOF Ex. 15, Cpt. Bailey 25:7-16 (lieutenants "had no say in hiring or firing or even assignments"); PSOF Ex. 18, Cpt. Stutsman 28:19-29:9 (even as a Captain, can be involved in the process but does not have discretion to hire or fire – all goes through HR); PSOF Ex. 14, Cpt. Aldorasi 20:12-21:1, 22:6-12 (lieutenants and even captains do not have authority – all goes through HR; lieutenants may have "advisory' role on staffing issues but they "do not have the last say"); PSOF Ex. 2, Acosta 119:15-123:10 (involved in making recommendations but "didn't make the final say" as that would go up to captain and chief); PSOF Ex. 17, Cpt. Lee 32:4-19, 33:4-19, PSOF Ex. 16, Cpt. Kratzer 23:10-24:25, PSOF Ex. 1, Houck 15:6-12, 209:16-210:10, 211:20-212:2 and PSOF Ex. 9, Rankin 70:8-14 (lieutenants and even captains involved in process but HR makes decisions); PSOF Ex. 4, Freeman 98:10-99:8 and PSOF Ex. 8, Neville 98:10-23 (involved in promotional panel or interviewing but didn't make final determination); PSOF Ex. 6, Jackson 57:6-10, PSOF Ex. 3, Brice 107:9-16 and PSOF Ex. 7, Keller 53:24-54:5 (not involved in hiring/firing); Doc. 27-1, Houck Decl. at 10, ¶15; Doc. 27-2, Halverson Decl. at 4, ¶11 and Sanchez Decl. at 127, ¶11).

315. The Patrol Lieutenants also do not have final or full authority to **make purchase/budgeting decisions.** PSOF Ex. 1, Houck 222:10-18 (never heard of lieutenants doing budgeting); PSOF Ex. 8, Neville 142:20-143:4 (filled out a purchase order but numerous higher command signatures required to finalize).

316. Many of the tasks – such as "taking command of significant incidents until they are resolved" – do not involve simply "managerial tasks," but law enforcement tasks as well. *See, e.g.,* PSOF Ex. 18, Cpt. Stutsman 22:5-23:18; PSOF Ex. 16, Cpt. Kratzer 20:13-21:3, 21:15-22:13; PSOF Ex. 14, Cpt. Aldorasi 16:14-18:4; PSOF Ex. 17, Cpt. Lee

26:3-27:1, 39:19-23, 41:4-17; PSOF Ex. 8, Neville 126:2-128:8; PSOF Ex. 3, Brice 118:6-119:13, 122:6-21.

317.   The County stated Houck testified that:

- he "put procedures in place regarding call outs", **BUT** Houck also testified that really what that entailed was simply having the sergeants and deputies follow the County's sick leave and vacation policies (PSOF Ex. 1, Houck 208:10-209:8)

- "had authority to file complaints about employees with internal affairs", **BUT** Houck also testified that "[a]nybody in the sheriff's office or outside the sheriff's office can file complaints," including third parties and anonymously, and that he was "forbidden by policy to issue discipline" and could only "enter a complaint in BlueTeam and sen[d] it to PSB to investigate and discipline" (PSOF Ex. 1, Houck 212:3-11, 214:4-215:1)

- "conducted informalized training", **BUT** Houck also testified that it simply consisted of "briefing my squad" on how to handle certain calls or fill out certain forms or going over how a call went and only happened maybe "six, seven times a year" (PSOF Ex. 1, Houck 220:10-221:10)

318.   Houck testified that he only "5 to 10 percent" of his time was spent on management duties (PSOF Ex. 1, Houck 191:12-15).

319.   The sergeants make more than the Patrol Lieutenants when factoring in their overtime, which even results in Patrol Lieutenants not wanting to be promoted above sergeant. *See, e.g.,* PSOF Ex. 4, Freeman 131:19-132:1 (had to work a lot of off duty work to make up for decrease in pay following promotion to Patrol Lieutenant).

320.   Trowbridge testified that SWAT was part of Patrol Bureau West at least from January of 2020 through March of 2022.  PSOF Ex. 12, Trowbridge 12:25-13:6, 29:20-30:17, 40:3-16.

321.   In fact, when specifically asked at his deposition whether he fell within the collective definition comprised of "all current and former lieutenants from patrol divisions

94

east and west who worked for [the County] at any time from January 11, 2020 and the present," Trowbridge unequivocally answered, "Yes.    Definitely."    PSOF Ex. 12, Trowbridge 31:24-32:15.

322.    Trowbridge's testimony based on his personal knowledge about his work performing patrol duties at the County is corroborated by County documents demonstrating periods of time when SWAT was part of Patrol.    PSOF Ex. 12, Trowbridge 15:4-16:1, 24:17-25:9, 26:12-21, 31:24-34:20, 47:2-48:11, 107:14-108:25 and exhibits referenced in deposition (Doc. 155-10 at Exs. 80-83).

323.    Some Patrol Lieutenants tracked all their hours in the timekeeping system and the records show how many hours they worked, including overtime.    PSOF Ex. 2, Acosta 36:6-11, 48:14-50:7; PSOF Ex. 7, Keller 24:11-25:10, 26:15-20, 4:18-35:15, 125:10-12 ("But if I have to [work over 40 hours], and it's something that needs to get done, I will give you that extra time, but I reflect that appropriately."); PSOF Ex. 8, Neville 57:17-58:12, 61:25-63:5; PSOF Ex. 1, Houck 48:1-13, 85:6-18; PSOF Ex. 3, Brice 18:24-19:23, 22:10-23:2; PSOF Ex. 4, Freeman 60:5-61:15; PSOF Ex. 6, Jackson 91:12-15; PSOF Ex. 5, Halverson 61:5-16; PSOF Ex. 9, Rankin 31:8-32:22; PSOF Ex. 10, Rosenberger 13:23-14:15; PSOF Ex. 11, Thomas 25:3-26:4, 43:1-46:23; PSOF Ex. 12, Trowbridge 103:22-104:24, 106:19-107:1; PSOF Ex. 24, Opt in Plaintiffs' Responses to NUI No. 6; PSOF Ex. 19, Ellison 102:12-105:6.

324.    Others tracked only up to 40 hours per week or 80 hours per two week pay period, but they worked additional hours off the clock.    *See, e.g.,* PSOF Ex. 6, Jackson 92:17-20 (so long as 40 hours, may not always modify); PSOF Ex. 9, Rankin 31:8-32:22 (may not have always recorded); PSOF Ex. 12, Trowbridge 103:22-104:10 (not "very religious" about adjusting time because "it was almost depressing because you weren't getting paid more than 80 hours"); PSOF Ex. 19, Ellison 102:12-105:6; PSOF Ex. 25, Opt in Plaintiffs' Responses to NUI No. 6.

325.    While the County had a policy of requiring Patrol Lieutenants to track their hours, the County only required Patrol Lieutenants to account for 40 hours per week or 80

hours per two week pay period, which is not necessarily their actual hours worked. PSOF Ex. 19, Ellison 100:9-25, 101:6-12, 101:18-102:1.

326.    There is testimony, written discovery, and payroll records supporting that the Patrol Lieutenants were required to work more than forty hours a week without receiving overtime. *See, e.g.,* PSOF Ex. 2, Acosta 53:16-55:17, 98:2-17; PSOF Ex. 7, Keller 19:17-25, 23:15-18; PSOF Ex. 8, Neville 61:25-63:5; PSOF Ex. 1, Houck 12:17-13:25, 19:18-20:5; PSOF Ex. 3, Brice 18:24-19:23; PSOF Ex. 4, Freeman 68:18-69:3, 73:15-74:11; PSOF Ex. 6, Jackson 29:22-31:8; PSOF Ex. 5, Halverson 57:21-58:13, 60:3-24, 62:5-10; PSOF Ex. 9, Rankin 32:23-33:13; PSOF Ex. 10, Rosenberger 13:23-14:15; PSOF Ex. 11, Thomas 32:25-33:6, 43:1-46:23; PSOF Ex. 12, Trowbridge 95:9-96:5, 98:2-25; PSOF Ex. 13, Vance 7:17-20, 38:9-12; Doc. 27-1, Houck Decl. at 10-11 at ¶¶ 18, 20, 25-27 and 13-32 (Exhibit A (paystubs)); Doc. 27-2, Halverson Decl. at 4-5, ¶¶15-17, 20-21 and 6-117 (Exhibit A (paystubs)) and Sanchez Decl. at 127-128, ¶¶14-15, 19; PSOF Ex. 23, 24 Opt in Plaintiffs' Responses to NUI No. 6.

327.    The County knows that the Patrol Lieutenants work overtime, which is made evident by the Captains' testimony indicating that Patrol Lieutenants work overtime and the fact that the County's CAD records (and many payroll records) show that to be the case as well. *See, e.g.*, Doc. 159-1 at 17-75 (Houck's CAD Patrol Activity Log from CAD); Doc. 27-1, at 13-32, Doc. 27-2 at 6-117 (paystubs); PSOF Ex. 19, Ellison 102:12-105:6.

328.    Darrien Ellison, the senior Human Resources employee who made the decision to classify the Patrol Lieutenants as exempt from overtime in 2007, testified that he does not recall evaluating the first responder exception when the decision was made. PSOF Ex. 19, Ellison 8:25-10:9, 16:8-14.

329.    Despite being tasked with determining the classification, Mr. Ellison also fundamentally misunderstands the law, believing that an employee cannot be a first responder under the exception if they have any managerial duties. PSOF Ex. 19, Ellison 26:12-16.

330.    Had the County not failed to consult with legal counsel at any point regarding

the Patrol Lieutenants' classification, perhaps this misconception about the law could have been corrected. PSOF Ex. 19, Ellison 26:12-20, 33:3-12.

331. The County relied entirely on its own employees' lay opinions about the application of the Department of Labor letter when making the decision to classify the Patrol Lieutenants as exempt. PSOF Ex. 19, Ellison 11:15-24, 13:5-8, 33:3-12.

332. The senior Human Resources official who decided to classify the Patrol Lieutenants as exempt in 2007 admits that the County never consulted with legal counsel about the decision. PSOF Ex. 19, Ellison 33:3-12, 68:13-70:10, 75:2-76:2.

333. The County appears to identify one of its lay employees involved with the original classification as an FLSA "expert," but the County admits that she has no legal background, no formal recognition as an expert, and in fact the County did not even consider this employee important enough in the classification decision to disclose her as a witness in this case. PSOF Ex. 19, Ellison 12:2-13:18, 14:5-13, 62:20-23 (when asked if she was an FLSA expert, Ellison responded, "that was just what we called her.").

334. The County did not know about the factual circumstances that led to the Department of Labor determination it claims to have relied on, with senior Human Resources personnel at the County testifying that the County was unaware of the precise circumstances that were considered by the Department of Labor in reaching its conclusion. PSOF Ex. 19, Ellison 68:13-70:7, 73:6-74:1, 75:7-76:2.

335. The County never submitted its own request to the Department of Labor about the exempt status of the Patrol Lieutenants, nor does the person who was tasked with the classification determination recall having ever researched any case law regarding the classification. PSOF Ex. 19, Ellison 76:11-19.

336. The County received correspondence indicating that Patrol Lieutenants believed their job duties had changed such that they were non-exempt, and human resources employees testified about potential changes in their job duties resulting from staffing shortages during the COVID-19 pandemic in 2020. PSOF Ex. 26, HOUCK000238-241; PSOF Ex. 19, Ellison 41:24-42:10; PSOF Ex. 21, Farrow 86:1-88:14, 117:10-118:6.

337. Yet, the County did not re-evaluate the legality of their classification. PSOF Ex. 19, Ellison 51:10-13; PSOF Ex. 21, Farrow 86:1-88:14, 117:10-118:6.

338. Houck sent senior human resources personnel, Keely Farrow, correspondence raising concerns that he performed the same duties as a non-exempt sergeant when he was a Patrol Lieutenant, emphasizing that Patrol Lieutenants agreed with his belief that they should be paid overtime based on the job duties they are required to perform. PSOF Ex. 26, HOUCK000238-241; PSOF Ex. 21, Farrow 40:12-41:16.

339. He also raised the fact that lieutenants in other departments are non-exempt and entitled to overtime. PSOF Ex. 21, Farrow 45:1-7; PSOF Ex. 26, HOUCK000238-241.

340. Keely Farrow, who was a senior Human Resources employee tasked with answering questions from Patrol Lieutenants like Houck about their exemption classification, testified that she did not speak with legal counsel or consult with anyone else at the County about Houck's inquiry raising concerns about the Patrol Lieutenants' improper classification. PSOF Ex. 21, Farrow 36:13-39:16, 40:4-6, 41:22-42:5, 45:1-18.

341. Ms. Farrow had access to lawyers at the County to ask questions related to Human Resources issues that arise, but she still never talked with them about the exemption classification even though she did not have training on the FLSA. PSOF Ex. 21, Farrow 41:22-42:5, 44:16-25, 45:8-18, 57:8-20, 59:12-22, 60:19-61:5, 67:8-68:3.

342. Ms. Farrow also neglected to do any investigation into whether the Patrol Lieutenants were properly classified after Houck raised his concerns about the exemption; she never talked to any other Patrol Lieutenants or their Captains about it or looked into whether their duties impacted the legality of the classification. PSOF Ex. 21, Farrow 47:25-48:19, 71:21-24.

343. After Houck stated that the Patrol Lieutenants do not perform exempt job duties and specifically raised the first responder exception, Ms. Farrow could not recall any affirmative steps taken to ensure the County had them properly classified. PSOF Ex. 21, Farrow 75:14-77:21, 78:16-24.

344. Ms. Farrow does not even recall having considered the first responder

1    exception to the overtime exemption when considering the concerns raised about the Patrol

2    Lieutenants' classification.  PSOF Ex. 21, Farrow 73:24-74:19.

3        345.    Ms. Farrow also acknowledged that Houck contacted her specifically stating

4    that his Captain informed him that the Patrol Lieutenants' job duties had changed since they

5    were classified as exempt from overtime and specifically asking for an investigation into

6    the classification of Patrol Lieutenants versus other types of lieutenants, yet Ms. Farrow did

7    nothing to investigate that either.  PSOF Ex. 21, Farrow 90:8-91:11.

8        346.    Ms. Farrow also testified that COVID-19 caused significant staffing decreases

9    that impacted how the Patrol Lieutenants performed their jobs, yet the County never

10   conducted any investigation into whether they remained properly classified as exempt.

11   PSOF Ex. 21, Farrow 86:1-88:14, 117:10-118:6.

12       347.    The County relies on the department run by Ms. Farrow to report changes in

13   the Patrol Lieutenants' role to central human resources when they occur, so Human

14   Resources can consider any potential issues regarding their classification as exempt.  PSOF

15   Ex. 19, Ellison 56:15-57:5, 60:6-18, 66:5-67:7, 68:5-22; PSOF Ex. 20, Erskine 30:17-25,

16   45:2-46:10; Doc. 155-8, at Ex. 59 (MCC000620-622 at § F).

17       348.    Farrow's job duties include identifying issues within the Sheriff's Department

18   where the Patrol Lieutenants work that may need to be addressed by central human

19   resources for the County.  PSOF Ex. 21, Farrow 51:19-52:1.

20       349.    Mr. Ellison, a chief human resources employee within the central Human

21   Resources department, admitted that the department where Houck worked should have

22   taken steps to evaluate the issues that he raised about the exemption classification.  PSOF

23   Ex. 19, Ellison 43:18-44:3, 45:15-25.

24       350.    However, the issues raised by Houck were never investigated further by

25   anyone at the County, in violation of its own internal policy about monitoring their job

26   duties.  PSOF Ex. 20, Erskine 30:17-31:19, 46:11-21: PSOF Ex. 19, Ellison 51:10-13; PSOF

27   Ex. 21, Farrow 71:21-72:3, 75:14-25, 76:13-80:4, 90:8-91:11.

28       351.    Chief Human Resources Officer Grennan has never even seen the

correspondence from Houck regarding his belief that the Patrol Lieutenants are misclassified.  PSOF Ex. 22, Grennan 13:16-18, 21:20-22:2.

352.    She also testified that she is not aware of any investigation that was ever done by the County regarding issues related to the exemption classification for the Patrol Lieutenants.  PSOF Ex. 22, Grennan 13:16-18, 20:7-12.

**Decertification Specific Facts**

353.    All of the Patrol Lieutenants are uniformly classified by the County as exempt from overtime.  Doc. 155-4 at Ex. 5 (job description noting "exempt" status); FLSA Employee Acknowledgments, Doc. 155-4 at Ex. 7; Doc. 155-5 at Exs. 11, 13; Doc. 155-6 at Exs. 17, 20, 23; Doc. 155-7 at Exs. 26, 31, 34, 39; Doc. 155-8 at Exs. 43, 45, 47, 49, 51, 54, 56; Doc. 155-9 at Exs. 61, 69; PSOF Ex. 15, Cpt. Bailey 8:7-9:1; PSOF Ex. 14, Cpt. Aldorasi 6:23-7:5; PSOF Ex. 17, Cpt. Lee 9:12-25; PSOF Ex. 1, Houck 12:17-21; PSOF Ex. 12, Trowbridge 95:12-19; Doc. 27-1, Houck Decl. at 10, ¶17; Doc. 27-2, Halverson Decl. at 4, ¶14 and Sanchez Decl. at 127, ¶13.

354.    All of the Patrol Lieutenants are subject to the same uniform compensation policies and practices, including regularly and repeatedly working in excess of forty hours per week without overtime pay.  *See, e.g.,* Doc. 155-8 at Ex. 59; Doc. 27-1, Houck Decl. at 10-11 at ¶¶ 18, 20, 25-27 and 13-32 (Exhibit A (paystubs)); Doc. 27-2, Halverson Decl. at 4-5, ¶¶15-17, 20-21 and 6-117 (Exhibit A (paystubs)) and Sanchez Decl. at 127-128, ¶¶14-15, 19; Doc. 27-1, Houck Decl. at 10-11 at ¶¶ 18, 20, 25-27; Doc. 27-2, Halverson Decl. at 4, ¶¶15-17-5, ¶¶20-21 and Sanchez Decl. at 127, ¶¶14-15, 18-128, ¶19; PSOF Ex. 2, Acosta 53:16-55:17, 98:2-17; PSOF Ex. 7, Keller 19:17-25, 23:15-18; PSOF Ex. 8, Neville 61:25-63:5; PSOF Ex. 1, Houck 12:17-13:25, 19:18-20:5; PSOF Ex. 3, Brice 18:24-19:23; PSOF Ex. 4, Freeman 68:18-69:3, 73:15-74:11; PSOF Ex. 6, Jackson 29:22-31:8; PSOF Ex. 5, Halverson 57:21-58:13, 60:3-24, 62:5-10; PSOF Ex. 9, Rankin 32:23-33:13; PSOF Ex. 10, Rosenberger 13:23-14:15; PSOF Ex. 11, Thomas 32:25-33:6, 43:1-46:23; PSOF Ex. 12, Trowbridge 95:9-96:5, 98:2-25; PSOF Ex. 13, Vance 7:17-20, 38:9-12.

355.    All of the Patrol Lieutenants are subject to the same, uniform job description

which specifically refers to them as "Law Enforcement Lieutenants" and classified as exempt. Doc. 155-4 at Ex. 5 (Law Enforcement Lieutenant job description); PSOF Ex. 14, Cpt. Aldorasi 14:22-15:7; PSOF Ex. 17, Cpt. Lee 20:1-16, 22:7-10; PSOF Ex. 16, Cpt. Kratzer 18:20-19:12.

356. The job description itself provides it "is not an all-inclusive list of all job duties that may be required," and Senior Human Resources personnel also agree that the job description does not contain all the duties that the Patrol Lieutenants perform. Doc. 155-4 at Ex. 5 (Law Enforcement Lieutenant job description); PSOF Ex. 22, Grennan 29:17-21.

357. In particular, the Patrol Lieutenants' testimony emphasized that they are all routinely required to engage in law enforcement duties. For example, Houck testified that the job description provides a description for a "general blanket lieutenant" for the County (PSOF Ex. 1, Houck 193:1-3), but a job description for the specific duty assignment of "patrol lieutenant" would include "going to calls, monitoring the radio, assisting with the apprehension of bad guys, putting together – helping deputies put together criminal investigations" "monitoring the radio, being ready" as that accounts for "75 percent of my time. That's what I'm there for. I'm there to respond to calls. I'm there to respond to things that need a command presence." PSOF Ex. 1, Houck 192:4-193:12; *see also* Doc. 152 at n.2; PSOF Ex. 5, Halverson 22:20-23:17, 26:3-27:15 (confirms patrol lieutenants do all those activities listed but also should include the "requirement of actually taking the calls for service and being the first responder on scene"); PSOF Ex. 4, Freeman 79:15-85:12 (general job description but would add that "So if while on duty and I'm at work and I observe something, especially while I'm in uniform, I take it as I have a responsibility to act and take action"; talks about work environment that implies not just an office job); PSOF Ex. 11, Thomas 68:19-69:5 (job description should also include deputy descriptions because "you respond to calls for services, make arrests, ensure public safety "you're still a law enforcement officer"); PSOF Ex. 8, Neville 138:22-140:23 (more than what is involved in job description – doesn't really address that "actively supervising"); PSOF Ex. 9, Rankin 26:1-15 (believes accurate but "similarly to the sergeant position, we also are enforcing laws

and maintaining order while protecting life and property as our first responsibility as a police officer in any position"); PSOF Ex. 13, Vance 29:18-31:2 (should also include "responding to incidents rather than just managing and monitoring"'); PSOF Ex. 7, Keller 102:16-104:25 (beyond "management role" should include more duties regarding "serve and protect the community" and "law enforcement officer").

358.    And, the Captains and Patrol Lieutenants testified that regardless of what district or shift (day or night) they are assigned to, the duties and policies amongst the assignments were "very similar." *See, e.g.,* PSOF Ex. 13, Vance 19:14-21:9, 24:18-25:15, 32:25-34:10, 104:25-105:8, 107:2-25 (the Patrol Lieutenants' assignments are "very similar" in that they are responsible for "managing the supervisors, managing the deputies, listening to the radio for incidents that occur and responding to the incidents that occur"; "The volume would be the major difference"); PSOF Ex. 17, Cpt. Lee 58:10-16; 59:9-62:21 (Lake Patrol may not have as much crime but has "more safety issues" – still patrol related and still exchangeable with other districts); PSOF Ex. 14, Cpt. Aldorasi 43:21-44:2 (same patrol type duties in Lake Patrol even though different transportation may be used to perform); PSOF Ex. 10, Rosenberger 60:25-61:2, 62:16-25 (scheduling and day/night shift lieutenants are essentially the same in all three districts he worked in); PSOF Ex. 18, Cpt. Stutsman 65:2-11 (although nighttime watch commanders have some differences, "overall, I think, yes, they're probably pretty similar."); PSOF Ex. 1, Houck 28:9-16, 63:11-24 (districts/day & night shifts – similar duties but may be busier).

359.    Further, the payroll records similarly support that the Patrol Lieutenants worked more than forty hours in a workweek. *See, e.g.,* Doc. 27-1, Houck Decl. at 10-11 at ¶¶ 18, 20, 25-27 and 13-32 (Exhibit A (paystubs)); Doc. 27-2, Halverson Decl. at 4-5, ¶¶15-17, 20-21 and 6-117 (Exhibit A (paystubs)) and Sanchez Decl. at 127-128, ¶¶14-15, 19; PSOF Ex. 19, Ellison 102:12-105:6.

360.    Further, when Patrol Lieutenants are in the role of *Acting* Captain – *i.e.*, filling in for a Captain when he is on leave or vacation – the Patrol Lieutenant still maintains his role and duties as a Patrol Lieutenant in addition to taking on Captain duties. *See* PSOF Ex.

14, Cpt. Aldorasi 64:21-65:8; PSOF Ex. 11, Thomas 122:17-123:6; PSOF Ex. 7, Keller 38:3-9.

361.    Although there may be differences in volume of calls between the day and night shifts, and even certain districts, that also does not change the nature of the Patrol Lieutenant's primary duty.  *See, e.g.,* PSOF Ex. 14, Cpt. Aldorasi 43:21-44:2 (same patrol type duties in Lake Patrol even though difference transportation may be used to perform); PSOF Ex. 10, Rosenberger 60:25-61:2 and 62:16-25 (day and night shifts and scheduling in different districts is essentially the same); PSOF Ex. 17, Cpt. Lee 58:10-16; 59:9-62:21 (Lake Patrol may not have as much crime but has "more safety issues" – still patrol related and still exchangeable with other districts); PSOF Ex. 1, Houck 28:9-16, 63:11-24 (districts/day & night shifts have similar duties but some may be busier); PSOF Ex. 13, Vance 104:25-105:8 ("the duties are very similar. The volume would be the major difference.").

362.    And, even in the role of an "administrative lieutenant", the Patrol Lieutenants still have law enforcement/first responder duties.  *See* PSOF Ex. 2, Acosta 41:9-18, 146:19-147:16 (although he is currently in more of an administrative role in District 2, he still has the radio on, is logged into CAD and still involved in patrol such that if there was a critical incident, he "absolutely" would still be expected to respond).

363.    Although Jackson did testify that the districts may have differences, the "main" difference he noted was simply the "hours" and also the type of patrol (*e.g.,* residential versus unincorporated areas such as national parks or county parks) – he did not offer any testimony raising doubt that the Patrol Lieutenants engage in law enforcement duties.

364.    Although for that particular shift, the Watch Commander may be the "highest-ranking individual" on shift, that does not change the Patrol Lieutenant's primary duties.  *See* PSOF Ex. 18, Cpt. Stutsman 65:2-11 (overall the day and night shifts are "pretty similar").

365.    The Watch Commander assignment "still requires you to be uniformed, armed,

prepared to be a first responder or respond as backup." PSOF Ex. 6, Jackson 43:3-8.

DATED: November 21, 2025.

**FRANKEL SYVERSON PLLC**

By ___*s/ Ty D. Frankel*___
Ty D. Frankel
2375 E. Camelback Road, Suite 600
Phoenix, Arizona 85016

**FRANKEL SYVERSON PLLC**
Patricia N. Syverson
9655 Granite Ridge Drive, Suite 200
San Diego, California 92123

*Attorneys for Plaintiff*