# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on behalf )
of himself and all those )
similarly situated, )
                                         )
    Plaintiff, )   NO.
                                           )   2:23-cv-00068-DGC
vs. )
                                           )
Maricopa County, )
                                           )
    Defendant. )
                                           )

VIDEOTAPED DEPOSITION OF CHRISTOPHER JOHN HOUCK

Phoenix, Arizona
March 18, 2025
9:34 a.m.

Glennie Reporting Services, LLC
1555 East Orangewood Avenue     Prepared by:
Phoenix, Arizona 85020
                                     Jill Marnell, RPR
602.266.6535                          Arizona Certified
www.glennie-reporting.com     Reporter No. 50021

1          VIDEOTAPED DEPOSITION OF CHRISTOPHER JOHN HOUCK

2    was taken on March 18, 2025, commencing at 9:34 a.m., at

3    Fisher & Phillips, 3200 North Central Avenue, Suite 1550,

4    Phoenix , Arizona, before Jill Marnell, a Certified

5    Reporter in the State of Arizona.

6                          ---oOo---

7    APPEARANCES

8    For the Defendant:

9              SHAYNA H. BALCH SANTIAGO
               LORI A. GUNER
10             JACOB R. VALDEZ
               Fisher & Phillips
11             3200 North Central Avenue
               Suite 1550
12             Phoenix, Arizona 85012
               ssantiago@fisherphillips.com
13             lguner@fisherphillips.com
               jvaldez@fisherphillips.com

14

15   For the Plaintiff:

16             TY D. FRANKEL
               Frankel Syverson
17             2375 East Camelback Road
               Suite 600
18             Phoenix, Arizona 85016
               ty@frankelsyverson.com

19

20   Also present:  Samantha Elliott, videographer
21                  Megan Morley (via Zoom)

22

23

24

25

183

1  during that one week in District 7?

2       A.   No.

3       Q.   Okay.  How about District 1; have you needed to

4  respond to any major incidences and do incident management

5  in District 1 as a lieutenant?

6       A.   Yes.

7       Q.   How often?

8       A.   In the total what, two and a half years I was

9  there, maybe ten times.

10      Q.   Can you walk me through the incidences that you

11  had to manage those maybe ten times, to the extent that

12  you remember them?

13      A.   They were all kind of like similar.  They all

14  kind of blend together.  But we -- there's -- Say there's

15  like a -- a barricade at a house.  There's a guy in a

16  house and he doesn't want to come out of the house.  So

17  once I find out that it's a barricade and that we have

18  charges, then I head out to the location of the scene and

19  I try to find an area that is out of eyesight from the --

20  from the scene and has some type of positive barriers

21  between us.  So usually I'll go about a block, block and a

22  half away; find like a parking lot or a dirt lot or

23  something to set up the command post.  Then I will put up

24  a pop-up tent; break out a whiteboard; start writing down

25  address, suspect name, who's on scene, where they are at.

Christopher John Houck, Videotaped - 03/18/2025

223

1        A.   I don't think I've ever heard -- I think deputy

2    commander is just a sworn person with the rank of

3    lieutenant or above.  And a watch commander is typically a

4    lieutenant who works at night.

5        Q.   Am I correct in understanding that the watch

6    commander is typically the highest ranking individual in

7    the district at night?

8        A.   Usually.

9        Q.   And that's typically a lieutenant; correct?

10       A.   Correct.

11       Q.   And you served as watch commander over nights for

12   approximately seven months in District 1; correct?

13       A.   Correct.  It's kind of like the new-guy

14   assignment.  That is where they make all the new guys go.

15       Q.   What were the differences between whoever was

16   assigned as watch commander versus -- Strike that.

17               Were there ever two lieutenants -- Strike

18   that.

19               Earlier we established that there's patrol

20   bureaus east and west; correct?

21       A.   Correct.

22       Q.   How is it broken down how watch commanders are

23   assigned in those two bureaus and in the districts?

24               MR. FRANKEL:  Form and foundation.

25               THE WITNESS:  So each bureau is supposed to

Christopher John Houck, Videotaped - 03/18/2025

224

1    have a watch commander on.  So District 2 and 3 would have

2    one watch commander.  And then the other watch commander

3    would cover Districts 7, 5, and -- well, 1, 7, 5, and --

4    Wait a minute.  1, 7, 5 -- yeah, 1, 7, 5.  So that's how

5    they are kind of broken up east and west.

6                There was typically two watch commanders on

7    per night, but there was many nights when there was only

8    one because the other one was off.

9        Q.   BY MS. BALCH SANTIAGO:  Can you walk me through

10   what the chain of command would be on a night where there

11   were either two or one watch commanders?

12                MR. FRANKEL:  Form.

13                THE WITNESS:  If something of significance

14   happened the watch commander would have to respond to the

15   scene.  And then the watch commander would make

16   notifications to the captain of the district.  And then

17   the captain would then in turn notify the chief of the --

18   the bureau chief.  And then the bureau chief -- I don't --

19   I don't know what he would do with the information.

20   That's typically how it went.

21       Q.   BY MS. BALCH SANTIAGO:  What do you mean by

22   something of significance?

23       A.   Well, like if there was a barricade or say

24   somebody got murdered, I would -- I would have to let my

25   captain know because that's what they expect, is for you

250

```
 1   STATE OF ARIZONA        )
                             )  ss.
 2   COUNTY OF YAVAPAI       )

 3          BE IT KNOWN that I took the foregoing
     proceedings; that the witness was duly sworn by me; that
 4   said transcript is a full, true, and accurate record of
     the proceedings; that the proceedings were taken down by
 5   me in shorthand and thereafter reduced to print under my
     direction; that I have acted in compliance with
 6   ACJA 7-206.

 7          I CERTIFY that I am in no way related to any of
     the parties hereto, nor am I in any way interested in the
 8   outcome thereof.

 9          Pursuant to request, notification was provided
     that the deposition is available for review and signature.
10
            Dated this 1st day of April, 2025.
11

12

13

14   _____
                    JILL MARNELL
15          Certified Reporter #50021
            Registered Professional Reporter

16          *     *     *     *     *     *

17          I CERTIFY that GLENNIE REPORTING SERVICES, LLC,
     has complied with                            : forth in
18   ACJA 7-206.

19

20

21

22   _____
            GLENNIE REPORTING SERVICES, LLC
23               Registered Reporting Firm
                  Arizona RRF No. R1035

24

25
```

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on       )
behalf of himself and all      )
those similarly situated,      )
                               )
          Plaintiff,           )
                               )
vs.                            ) Case No.:
                               ) 2:23-cv-00068-DGC
Maricopa County,               )
                               )
          Defendant.           )
                               )


VIDEO-RECORDED DEPOSITION OF BENJAMIN FREEMAN




Phoenix, Arizona
August 7, 2025
10:06 a.m.




REPORTED BY:                   CARRIE REPORTING, LLC
Kristy A. Ceton, RPR, CRR      Certified Reporters
AZ CR No. 50200                12725 W. Indian School Rd.
                               Suite F-100
                               Avondale, AZ 85392
CERTIFIED COPY                 (480) 429-7573

2

1       VIDEO-RECORDED DEPOSITION OF BENJAMIN FREEMAN

2    commenced at 10:06 a.m., on August 7, 2025, at Fisher

3    & Phillips, LLP, 3200 North Central Avenue, Suite

4    1550, Phoenix, Arizona, before Kristy A. Ceton, RPR,

5    CRR, Arizona Certified Court Reporter No. 50200.

6

7                          *  *  *

8

9    APPEARANCES:

10        For the Plaintiff:

11            FRANKEL SYVERSON, PLLC
              By:  Patricia N. Syverson, Esq.
12            2375 East Camelback Road
              Suite 600
13            Phoenix, Arizona 85016
              patti@frankelsyverson.com
14
          For the Defendants:
15
              FISHER & PHILLIPS, LLP
16            By:  Shayna Balch Santiago, Esq.
              3200 North Central Avenue
17            Suite 1550
              Phoenix, Arizona 85012
18            ssantiago@fisherphilliips.com

19        Also Present:

20            Cedric Tinard, the videographer

21

22

23

24

25

Deposition of: Benjamin Freeman                    August 7, 2025

92

1    a day, on the average.

2            Q.   And is that time that you're spending in

3    the office or is that out in the field?

4            A.   It depends.  If it's something --  Like,

5    we had a deputy recently get injured while making an

6    arrest.  So I responded out to that.  The deputy --

7    deputy was okay.  He got transported to the hospital.

8            But I went out and I took a supervisory

9    role and I watched how my sergeants addressed the

10   entire scene, how we dealt with the suspect who is in

11   custody, how they delineated the paperwork and the

12   responsibilities to their deputies.

13           And it was exactly how I would have

14   expected them to handle it.  So there was no need to

15   go over that.  Then, it was just the reminders of the

16   necessary administrative tasks, workers' comp

17   paperwork, risk management stuff.

18           So --  And that's just because things

19   like that hopefully don't happen very often, so guys

20   can forget some of the small minutiae things that

21   need to be done.

22           Q.   How often when you're on scene do you

23   take what you just described as a supervisory role

24   and assess how your guys have responded?

25           A.   That's the majority of what I do when I

Deposition of: Benjamin Freeman                                    August 7, 2025

93

1    respond out.  If it requires me taking over an

2    incident, that's going to be some of your more severe

3    stuff where you may be calling in additional

4    resources, and I -- I would use, like, a barricaded

5    subject as an example.

6            At that point, I'm going to be taking an

7    incident commander role, where my sergeant is going

8    to be dealing with his guys and keeping the subject

9    basically barricaded where he's at and working that

10   -- working that process while I'm getting the

11   additional resources out.

12       Q.   How many times would you say that you

13   have responded to a serious incident, like a

14   barricade, over the course of a year?

15       A.   As a watch commander, much more

16   frequently than now on dayshift.  As a watch

17   commander, I would say probably, let's call it an

18   average twice a month.

19            When -- As a dayshift lieutenant, it

20   just ebbs and flows.  I want to say last month, we

21   had three homicides in a week or in a seven-day -- in

22   a seven-day period.  That's unheard of for us.  So,

23   obviously, a little bit busier.

24            But, like I said, it kind of ebbs and

25   flows.  So averages are kind of hard to skew because

94

1    things ebb and flow.  But I would say probably on the

2    average, once a month is probably a pretty fair

3    assessment of where I have to come in as an incident

4    commander and take something over from my sergeants.

5              And that's more to just take the

6    liability off of them so that way they can take care

7    of their people and move forward.

8         Q.   Okay.  Since your promotion to a

9    lieutenant, have you earned at least $684 a week?

10        A.   I have no idea.  I would probably assume

11   so, but I have no idea.  I know what -- I know what

12   hits my account every two weeks.

13        Q.   What hits your account every two weeks?

14   And that can be subject to protective order.

15        A.   Yeah, it's -- I would say -- I don't

16   know.  Probably -- what gets direct-deposited and

17   then I have stuff routed, probably right around 2,600

18   every two weeks.  Minus that seven weeks where I was

19   on workers' comp.  That was a little different

20   because of workers' comp rules and stuff.

21        Q.   Have you -- Did you earn at least

22   $108,000 in 2024?

23        A.   I believe so.  I would have to look at my

24   W-2, but I believe so.

25        Q.   Did you earn at least $108,000 in 2023?

142

1    STATE OF ARIZONA        )
                            ) ss.
2    COUNTY OF MARICOPA      )

3

4              BE IT KNOWN that the foregoing
     proceedings were taken by me, KRISTY A. CETON, a
5    Certified Reporter, in and for the County of
     Maricopa, State of Arizona; that the witness before
6    testifying was duly sworn to testify to the whole
     truth; that the questions propounded to the witness
7    and the answers of the witness thereto were taken
     down by me in shorthand and thereafter reduced to
8    typewriting under my direction; that the witness
     requested reading and signing said deposition; that
9    the foregoing pages are a true and correct transcript
     of all proceedings had, all done to the best of my
10   skill and ability.
               I FURTHER CERTIFY that I am in no way
11   related to any of the parties hereto, nor am I in any
     way interested in the outcome hereof.
12             I FURTHER CERTIFY that I have complied
     with the ethical obligations set forth in ACJA
13   7-206(J)(1)(g)(1) and (2).

14

     Kristy A. Ceton                     50200_____
15   Certified Reporter                  CR Number

16   _Kristy A. Ceton_                   8.12.25
17   Certified Reporter Signature        Date

18

               I CERTIFY that this Registered Reporting
19   Firm has complied with the ethical obligations set
     forth in ACJA 7-206(J)(1)(g)(1) and (2).

20

21   Carrie Reporting, LLC               R1064
     Registered Reporting Firm           RRF No.

22

23   _Michele Durrer_                    8.12.25
     Registered Reporting Firm           Date
24   Signature

25

# EXHIBIT 3

1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Christopher J. Houck, on          )
behalf of himself and all         )
those similarly situated,         )
                                  )
        Plaintiff,                ) No. 2:23-cv-00068-DGC
                                  )
vs.                               )
                                  )
Maricopa County,                  )
                                  )
        Defendant.                )
                                  )
                                  )

VIDEOTAPED DEPOSITION OF JONATHAN HALVERSON

Phoenix, Arizona
April 8, 2025
9:33 a.m.

CERTIFIED COPY

Reported by:                      CARRIE REPORTING, LLC
CARRIE A. CARIATI                 Certified Reporters
Certified Professional Reporter   17505 North 79th Avenue
Certified Realtime Reporter       Suite 301-C
Arizona CR No. 50355              Glendale, Arizona 85308
carrie@carriereporting.com        (480)429-7573

3

1              VIDEOTAPED DEPOSITION OF JONATHAN HALVERSON

2    was taken on April 8, 2025, commencing at 9:33 a.m.

3    at the law offices of Fisher & Phillips, LLP, 3200 North

4    Central Avenue, Suite 1550, Phoenix, Arizona, before

5    CARRIE A. CARIATI, RPR, CRR, a Certified Reporter in the

6    State of Arizona.

7

8    COUNSEL APPEARING:

9    For the Plaintiff:

10          Frankel Syverson, PLLC
            By:  PATRICIA N. SYVERSON
11          9655 Granite Ridge Drive
            Suite 200
12          San Diego, California   92123
            patti@frankelsyverson.com
13
     For the Defendant:
14
            Fisher & Phillips, LLP
15          By:  SHAYNA BALCH SANTIAGO
            3200 North Central Avenue
16          Suite 1550
            Phoenix, Arizona  85012
17          ssantiago@fisherphillips.com

18

19

20   Also present:  Samantha Elliott, videographer
                    Megan Morley
21

22

23

24

25

87

1  Q. When you say that you have been the one to
2 respond to a call for service, how many calls were you
3 responding to the call for service as the primary unit
4 from January 2020 through 2024?
5  A. I would have to look at CAD, or if you have it,
6 look for disposition codes.
7    (Deposition Exhibit No. 11 was marked for
8 identification by the reporter.)
9 BY MS. SANTIAGO:
10  Q. You have been handed what has been marked as
11 Exhibit 11 to your deposition.
12    Do you recognize what this document is?
13  A. Yes.
14  Q. Is this a summary of those disposition codes
15 that you are referring to?
16  A. No, this is not disposition codes.  These are
17 calls for service and numbers by year.
18  Q. Does this show the number of calls for service
19 that you responded to in a given year?
20  A. I don't know, because it doesn't have the
21 disposition codes.
22  Q. For example -- and this is Exhibit 11 to your
23 deposition, MCC 575.  On the upper left, it says,
24 "Employee Stats, Halverson, Jonathan."
25    Do you see that?

88

1       A.   I do.

2       Q.   Underneath that, there is a portion of a chart,

3   and it says, "Call," and underneath that it says, "Deputy

4   Initiated Activities (On View/OV)" and "Calls for

5   Service."

6            Do you see that?

7       A.   I do.

8       Q.   And then there's some years.

9            Do you see that?

10      A.   Yes.

11      Q.   Does that refer to how many calls you took,

12  whether it was initiated on your own or responding to a

13  call for service from members of the general public for

14  that given year?

15      A.   No.  No, this is not complete, though.  This

16  would only be CAD.

17      Q.   Okay.

18      A.   And this would not show the disposition codes,

19  so this does not show -- your question was about me being

20  primary.  This does not address primary or support or

21  anything else.

22      Q.   Well, take a look below that where it says,

23  "Dispositions by Year," and there is some other

24  categories:  "Assist to Other Agency," "Assisting Unit,"

25  "Non traffic Contact," "Primary Unit" --

89

1          A.    I'm sorry.  This is disposition codes.

2                    MS. SYVERSON:  Do you have a question?

3    Sorry.

4                    THE WITNESS:  Sorry, am I missing --

5    BY MS. SANTIAGO:

6          Q.    Yeah, let me rephrase that.

7                    So does this document, Exhibit 11 to your

8    deposition, show how many calls you responded to as a

9    primary unit, for example, in 2020?

10         A.    Yes.

11         Q.    And what is that number for 2020 as a primary

12   unit?

13         A.    46.

14         Q.    What is that number for 2021 that you responded

15   to as a primary unit?

16         A.    Six.

17         Q.    What is the number that you responded to as a

18   primary unit in 2022?

19         A.    Ten.

20         Q.    What is the number that you responded to as a

21   primary in 2023?

22         A.    Seven.

23         Q.    How about as an assisting unit that you

24   responded to in 2020?

25         A.    14.

90

1    Q.    That you responded to as an assisting unit in

2    2021?

3    A.    Two.

4    Q.    That you responded to as an assisting unit in

5    2022?

6    A.    Six.

7    Q.    And that you responded to as an assisting unit

8    in 2023?

9    A.    It shows zero.

10            MS. SYVERSON:  And just to clarify, I want

11   to note that this document only goes through June of 2023.

12            MS. SANTIAGO:  Noted.

13            THE WITNESS:  And this is only for -- it

14   was captured in CAD.

15   BY MS. SANTIAGO:

16   Q.    Understood.

17            What numbers would you expect to see for a

18   primary unit responding for a given year for a deputy?

19   A.    I don't know.  Depends on the district, and I

20   don't know what those numbers would be.

21   Q.    Do you have any idea?

22   A.    I don't.

23   Q.    Would it typically be more than 46 for the year?

24   A.    Yes.

25   Q.    Would it typically be more than a hundred for

91

1   the year?

2       A.   I would think so.

3       Q.   Would it typically be more than 200 for the

4   year?

5       A.   I don't know.

6       Q.   Do you have any reason to doubt the accuracy of

7   the numbers in this report as they existed as of

8   June 27th, 2023?

9               MS. SYVERSON:  Object.  Already testified

10  to that issue.

11              THE WITNESS:  I -- I don't know.  This is

12  only what is on CAD.

13  BY MS. SANTIAGO:

14      Q.   Okay.

15      A.   So this is going to be the minority of your --

16  of your calls.

17      Q.   What would the majority of your calls be?

18      A.   The majority would be what every sergeant and

19  lieutenant and captain -- well, not captains usually, but

20  that is where you are not on CAD attached to the call.

21  You are on status, and you do the exact same function,

22  whether you are advising or making that decision as well.

23              This is only the CAD.  You are missing the

24  whole status function, and the only way to get those

25  numbers would be to cross-reference your call sign

1    attached to the CAD.

2        Q.   Let me make sure I understand this correctly.

3    If you are the primary responding unit, then that's going

4    to be reflected in CAD, correct?

5        A.   If you are the primary, yes.

6        Q.   So what you are referring to is more of the

7    oversight supervisor commanding officer responsibilities

8    overseeing these calls.

9                 Is that -- am I understanding that

10   correctly?

11                 MS. SYVERSON:  Object.

12                 THE WITNESS:  Or running the sergeant role,

13   in which case, what you are going to have is a call sign

14   attached to the call in CAD notes, but not necessarily

15   attached to the call as a unit.

16                 This is also not going to cover anything

17   that was done after your log in/log off times.

18   BY MS. SANTIAGO:

19       Q.   Understood.

20                 What I am trying to determine, though, is

21   if your testimony is that a majority of responding to

22   calls is not included within CAD data, what exactly your

23   role is with regards to those calls, so --

24       A.   Sure.

25                 MS. SYVERSON:  Object to the form.

93

1          MS. SANTIAGO:  I am not done with my

2   question yet.

3          Q.   BY MS. SANTIAGO:  My understanding is that if

4   you are the primary responding unit, then that's going to

5   be reflected in CAD.  So if there are other calls that you

6   are responding to that are not included in CAD, you are

7   referring to calls that you are not the primary responding

8   unit; is that correct?

9          A.   Yes.

10          Q.   Okay.  So with that understanding, and knowing

11   that every day and every call is likely different, what is

12   your role as nonprimary in overseeing or responding to

13   calls?

14          A.   Directing that call, analyzing the evidence,

15   making the decisions on probable cause, ensuring that the

16   deputy processes it the correct way.

17          Q.   How often are you, to use your words, directing

18   the call remotely, not on scene, what percentage of the

19   time?

20          A.   Out of all of them?

21          Q.   Yes.

22          A.   That would be the majority of them.  I don't

23   know what percentage to assign to it.

24          Q.   And to be clear, that means you are available

25   via phone, text message, e-mail --

94

1        A.    I have been on call for 21 years.

2        Q.    But when you are directing the call remotely,

3    those are the forms --

4        A.    Yes.

5        Q.    -- correct?  It is --

6        A.    Not e-mail or text.  It is going to be a text

7    with -- I am -- this is just an example.  Barricade

8    hostage, that's a phone call or you go to the scene.  A

9    lot of those you will end up taking care of by telephone,

10   so not by text or e-mail.  Phone call.

11       Q.    What percentage of calls where you are directing

12   the call or responding to are you on scene?

13       A.    I don't know.  Those would be a much smaller

14   percentage.

15       Q.    Less than 25 percent?

16       A.    Yes, except for -- oh, I'm sorry.  That was just

17   as a watch commander.

18       Q.    And earlier you testified that when you would,

19   you know, get into your vehicle, drive into the office,

20   after you have logged in to CAD, you would oftentimes go

21   directly to your office, sometimes you would go on scene,

22   it could vary by the day, and then you would drive back

23   home.

24            What I want to determine is, what

25   percentage of your time would you spend driving to/from

95

1    the office or in the office versus being on scene in the

2    field?

3        A.    The majority of it would -- you would go on

4    scene, but that might only happen a couple of times a

5    week.  But when you go on scene, depending upon if you are

6    in the scene or not, you are not going to be doing it on

7    CAD.  You are going to be doing it under a status, and

8    then you are going to have to look at the call sign in CAD

9    notes.

10        Q.    Got it.  So I understand what you are saying

11    with the status.

12            My question to, though, is:  What

13    percentage of your time as a lieutenant would you spend

14    either in the office or driving to/from the office versus

15    being on scene?

16        A.    On scene would be, I would think, 10 to

17    20 percent.

18        Q.    And how much of your day would you spend --

19    strike that.

20            You have a physical office that you have

21    been assigned by MCSO, correct?

22        A.    Yes.

23        Q.    And you had one office as a lieutenant, correct?

24        A.    Yes.

25        Q.    Do you have a new office as a captain?

106

CERTIFICATE

1

2          I HEREBY CERTIFY that the foregoing deposition
was taken by me pursuant to notice; that I was then and
3    there a Certified Court Reporter for the State of Arizona,
and by virtue thereof authorized to administer an oath;
4    that the witness before testifying was duly sworn by me to
testify to the whole truth and nothing but the truth;
5    pursuant to request, notification was provided that the
deposition is available for review and signature; that the
6    questions propounded by counsel and the answers of the
witness thereto were taken down by me in shorthand and
7    thereafter transcribed through computer-aided
transcription under my direction, and that the foregoing
8    typewritten pages contain a full, true, and accurate
transcript of all proceedings had upon the taking of said
9    deposition, all done to the best of my skill and ability.
          I FURTHER CERTIFY that I am in no way related to
10   nor employed by any of the parties hereto, nor am I in any
way interested in the outcome hereof.
11        I FURTHER CERTIFY that I have complied with the
ethical obligations set forth in ACJA Sections
12   (J)(1)(g)(1) and (2).
          DATED at Phoenix, Arizona, this 21st day of
13   April, 2025.

14
                         CARRIE A. CARIATI
15                       Registered Professional Reporter
                         Certified Realtime Reporter
16                       Certified LiveNote Reporter
                         Certificate No. 50355
17

18        I CERTIFY that this Registered Reporting Firm
has complied with the ethical obligations set forth in
19   ACJA Sections (J)(1)(g)(1) and (2).

20
          DATED at Phoenix, Arizona, this 21st day of
21   April, 2025.

22

23                       _____
                         Registered Reporting Firm R1064
                         CARRIE A. CARIATI, Owner
24

25